NOT YET SCHEDULED FOR ORAL ARGUMENT

———————————

No. 16-7077

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

JENNIFER B. CAMPBELL,
APPELLEE,

v.

DISTRICT OF COLUMBIA,
APPELLANT.

———————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

**BRIEF FOR THE DISTRICT OF COLUMBIA AS APPELLANT**

———————————

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—The plaintiff below and appellee here is Jennifer B. Campbell. The defendants below were the District of Columbia and Wayne M. Turnage, in his official capacity as Director, District of Columbia Department of Health Care Finance. The District of Columbia is the appellant. There are no amici.

B. *Ruling under review*.—The District of Columbia appeals from the May 25, 2016 order (Contreras, J.) denying the District's motion for judgment as a matter of law, as well as all orders merged therein, including but not limited to the January 20, 2016 judgment on the verdict. (ECF Nos. 75, 98).

C. *Related cases*.—There are no related cases.

i

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF THE CASE................................................................2

     1.    Campbell Is Hired To Manage Implementation Of The
         District's Healthcare Exchange. ........................................2

     2.    A Contractor Accuses Campbell Of Refusing To Consider His
         "Phase 1" Bid Unless He Hired Her Friend. ..........................3

     3.    Another Contractor Accuses Campbell Of Pressuring Her
         Company To Partner With A Particular Company In Its "Phase
         2" Bid....................................................................5

     4.    Both Contractors Tell The Department Director That Campbell
         Has Engaged In Unethical Conduct. ....................................7

     5.    Turnage Places Campbell On Administrative Leave And
         Investigates The Contractors' Allegations, Then Recommends
         Her Termination. ........................................................9

     6.    In Response To Press Inquiry, The Mayor's Office Releases
         Turnage's E-Mails Explaining The Reason For Campbell's
         Termination. ............................................................13

     7.    After Two Years Of Sporadic Consulting Work, Campbell
         Returns To Her Career In The Healthcare Industry. ...............16

     8.    The District Court Denies The District's Motion For Judgment
         As A Matter Of Law On Campbell's "Stigma Or Foreclosure"
         Claim. ...................................................................16

STANDARD OF REVIEW ................................................................19

SUMMARY OF ARGUMENT ............................................................19

ARGUMENT ................................................................................21

I.  The District Is Entitled To Judgment As A Matter Of Law On
    Campbell's "Stigma Or Foreclosure" Claim Because A Liberty
    Interest Claim Based On Government Speech Should Only Be
    Recognized Under A "Reputation-Plus" Theory. ............................21

    A.  This Court recognizes two liberty-interest theories, each
        applicable to a particular type of governmental action............22

    B.  A claim based on governmental speech should be
        cognizable only under a "reputation-plus" theory,
        because only that theory incorporates the essential
        elements of common-law defamation......................................27

        1.  The Court has appropriately applied the
            "reputation-plus" theory to due process claims
            based on government speech. ........................................28

        2.  Recognition of a speech-based claim under the
            "stigma or foreclosure" framework would
            eliminate the "truth" defense, which would stifle
            open governance and free speech. .................................31

        3.  Recognition of a speech-based claim under the
            "stigma or foreclosure" framework would
            eliminate the "publication" requirement, which
            could expose the government to liability for
            internal communications.................................................36

        4.  Campbell did not base her "stigma or foreclosure"
            claim on a non-speech action, as the district court
            suggested.......................................................................37

    C.  Even if Campbell had preserved a "stigma or
        foreclosure" claim arising out of her termination itself,
        the claim should be rejected as inconsistent with settled
        law underlying at-will employment. .........................................39

II.    Alternatively, The District Is Entitled To Judgment As A
       Matter Of Law On Campbell's "Stigma or Foreclosure" Claim
       Because Her Employment Opportunities Were Not Foreclosed. .......42

CONCLUSION ....................................................................................................46

# TABLE OF AUTHORITIES*

*Cases*

*Amobi v. District of Columbia*, 755 F.3d 980 (D.C. Cir. 2014) .................24, 30, 34

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................................19

*Aponte v. Calderon*, 284 F.3d 184 (1st Cir. 2002) ..................................................29

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) .........................................................31

*Armstrong v. Thompson*, 80 A.3d 177 (D.C. 2013)..................................................31

*Atwell v. Lisle Park Dist.*, 286 F.3d 987 (7th Cir. 2002).........................................29

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) .....................................................21, 41

*Bhd. of R. Trainmen v. Chi., M. & St. P. R. Co.*,
380 F.2d 605 (D.C. Cir. 1967)..................................................................................39

*\*Bishop v. Wood*, 426 U.S. 341 (1976) ..........................................22, 35, 36, 37, 40

*Cafeteria Workers v. McElroy*, 367 U.S. 886 (1961) ..............................................43

*Codd v. Velger*, 429 U.S. 624 (1977)......................................................24, 26, 33, 34

*Competitive Enter. Inst. v. Mann*, Nos. 14-CV-101 & 14-CV-126,
2016 D.C. App. LEXIS 435 (D.C. Dec. 22, 2016)...................................................31

*\*Crooks v. Mabus*, No. 15-5212, 2016 U.S. App. LEXIS 23180
(D.C. Cir. Dec. 23, 2016)............................................... 24, 25, 26, 28, 30, 36, 37, 40

*Crowe v. Cty. of San Diego*, 608 F.3d 406 (9th Cir. 2010) ....................................29

*Daniels v. Williams*, 474 U.S. 327 (1986) ...............................................................39

*\*Doe v. U.S. Dep't of Justice*,
753 F.2d 1092 (D.C. Cir. 1985)............................................... 23, 25, 30, 35, 38, 40

---

\*          Authorities upon which we chiefly rely are marked with asterisks.

v

*Ersek v. Twp. of Springfield*, 102 F.3d 79 (3d Cir. 1996)...................................34, 35

*Evangelou v. Dist. of Columbia*, 639 F. App'x 1 (D.C. Cir. 2016) ........................43

*GE v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010).........................................................23

*Graham v. City of Phila.*, 402 F.3d 139 (3d Cir. 2005)............................................32

*Greene v. McElroy*, 360 U.S. 474 (1959).................................................................42

*Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994) ................25, 26, 38, 40

*Ky. v. Graham*, 473 U.S. 159, 165-66 (1985)...........................................................16

*McCormick v. District of Columbia*,
752 F.3d 980 (D.C. Cir. 2014) ..................................... 21, 23, 25, 28, 35, 38, 39, 40

*Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983) ............................23, 24, 44

*O'Donnell v. Barry*,
148 F.3d 1126 (D.C. Cir. 1998)................. 22, 23, 25, 28, 30, 32, 35, 38, 41, 43, 44

*Old Dominion Dairy v. Sec'y of Def.*, 631 F.2d 953 (D.C. Cir. 1980) ...................24

*Orange v. District of Columbia*, 59 F.3d 1267 (D.C. Cir. 1995).......................23, 29

*Paul v. Davis*, 424 U.S. 693, 710, 711 (1976) .............................................22, 29, 44

*Reeve Aleutian Airways v. United States*, 982 F.2d 594 (D.C. Cir. 1993) ........26, 41

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000)..................................19

*Rosen v. Am. Isr. Pub. Affairs Comm., Inc.*, 41 A.3d 1250 (D.C. 2012)................36

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013)  ........................................39, 43

*Sciolino v. City of Newport News*, 480 F.3d 642 (4th Cir. 2007) ...........................33

*Shirvinski v. U.S. Coast Guard*, 673 F.3d 308 (4th Cir. 2012)...............................39

*Taylor v. Resolution Trust Corp.*, 56 F.3d 1497 (D.C. Cir. 1995) .............24, 42, 43

vi

*Thompson v. District of Columbia*, 832 F.3d 339 (D.C. Cir. 2016) .......................19

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. 2003) .....................42, 44

*United States v. Lovett*, 328 U.S. 303, 318 (1946) ...................................26

## Constitutional Provisions

U.S. Const. amend. I ..................................................................32

U.S. Const. amend. V.....................................................1, 16, 22, 39

## Statutes and Regulations

5 U.S.C. § 552 ........................................................................32

28 U.S.C. § 1291 .......................................................................1

28 U.S.C. § 1331 .......................................................................1

42 U.S.C. § 1983 .......................................................................1

42 U.S.C. § 18031 *et seq.* .............................................................2

D.C. Code § 1-615.51 *et seq.* ........................................................32

D.C. Code § 2-531 *et seq.* ...........................................................32

## Other

Fed. R. Civ. P. 50(a)..................................................................19

Restatement of the Law, Torts § 24.577 ................................................36

Restatement of the Law, Torts § 25.582 ................................................31

## GLOSSARY

| | |
|---|---|
| Administration | D.C. Department of Health Care Finance, Health Care Reform and Innovation Administration |
| DC Ex. | District of Columbia's Exhibit |
| Department | D.C. Department of Health Care Finance |
| Pl. Ex. | Plaintiff's Exhibit |
| RD | District Court ECF Record Document |
| Tr. | Trial Transcript |

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the complaint alleged a Fifth Amendment violation actionable under 42 U.S.C. § 1983.  This Court has jurisdiction under 28 U.S.C. § 1291 of this timely June 23, 2016 appeal of the district court's May 25, 2016 order denying the District of Columbia's motion judgment as a matter of law.

## STATEMENT OF THE ISSUES

Jennifer Campbell was responsible for managing the selection of contractors to implement the District of Columbia's healthcare exchange under the Affordable Care Act.  After two contractors accused her of illegally manipulating the selection process, the District terminated her at-will employment and answered press inquiries about the reasons for her termination.  Campbell claims that this release of information infringed on a Fifth Amendment liberty interest under both a "reputation-plus" theory and a "stigma or foreclosure" theory.  The jury found for the District on the "reputation-plus" claim, but for Campbell on the "stigma or foreclosure" claim.  The District's appeal raises the following issues:

1. Whether the District is entitled to judgment as a matter of law on the "stigma or foreclosure" claim because the claim is based entirely on the District's communication with the press, and speech-based claims should be recognized only under the "reputation-plus" theory.

2.  Alternatively, whether the District is entitled to judgment as a matter of law on the "stigma or foreclosure" claim because Campbell admitted that she was fully employed in her chosen field within two years of her termination, and therefore was not effectively foreclosed from future employment opportunities.

## STATEMENT OF THE CASE

**1.    Campbell Is Hired To Manage Implementation Of The District's Healthcare Exchange.**

In April 2008, Campbell began working for the District's Department of Health Care Finance ("Department"), the agency that administers the District's public health insurance programs.  12/7/15 Tr. 30; 12/9/15 Tr. 102.  She had ten years of experience in the healthcare field, having held high-ranking positions in a healthcare nonprofit organization, a healthcare access company, a community hospital, a healthcare consulting organization, and a healthcare think tank.  12/8/15 Tr. 18; Pl. Ex. 1 at 4-7.  The Department hired her as an at-will employee to manage a team investigating Medicaid fraud, and later detailed her to serve as the Deputy Mayor's senior health policy advisor.  12/8/15 Tr. 18-19; 12/9/15 Tr. 172.

In 2010, Congress passed the Affordable Care Act, 42 U.S.C. § 18031 *et seq.*, which gave the District an opportunity to create its own healthcare exchange, an online service that would connect residents with health insurance companies competing for their business.  12/7/15 Tr. 31.  In 2011, Campbell was promoted to serve as Director of the Department's Health Care Reform and Innovation

2

Administration ("Administration"), which would manage the contracting process for the District's healthcare exchange.  12/8/15 Tr. 19-20.

## 2.    A Contractor Accuses Campbell Of Refusing To Consider His "Phase 1" Bid Unless He Hired Her Friend.

The planning stages of the District's healthcare exchange were funded by a "Phase 1" grant, worth more than a million dollars.  12/7/15 Tr. 32.  In April 2012, the contract was awarded to Compass Solutions, an information technology company owned by Anthony Onyewuchi.  12/7/15 Tr. 33; 12/10/15 Tr. 37.

Onyewuchi learned about the grant from Carrie Brooks-Brown, whom he knew from previous projects.  12/10/15 Tr. 37.  She introduced him to Cedric Simon, and she and Simon told him that the unnamed "client" had specifically requested Simon as the project manager.  12/10/15 Tr. 39.  They refused to identify the "client," deleting her information from e-mails they forwarded to him.  12/10/15 Tr. 39-40.  Eventually, however, they forwarded him an e-mail that was signed "Jennifer" with an unredacted "reply to" address of "JBCampbell@yahoo.com."  12/10/15 Tr. 40; *see* DC Ex. 9.  "So at that point," he concluded that "the client" "was Jennifer Campbell."  12/10/15 Tr. 40.

Onyewuchi "didn't think [Simon] was qualified to be project manager," and his first bid "did not have [Simon] in that role."  12/10/15 Tr. 46.  But Simon and Brooks-Brown told him that when "the client" saw his bid, she was "concerned that some of the people she selected were not included" and would give him

3

"additional time to amend" it.  12/10/15 Tr. 46.  Onyewuchi compromised, hiring Simon as the "client liaison"—a high-ranking position that did not require him to supervise the day-to-day operations.  12/10/15 Tr. 46.

At trial, Campbell denied that she ever encouraged Simon to work for Onyewuchi or demanded that Onyewuchi hire him.  12/7/15 Tr. 34, 36.  She admitted, however, that she and Simon "ha[d] been acquaintances-slash-friends for about ten years," 12/9/15 Tr. 161, and her phone records established that she and Simon had spoken more than fifty times in the two weeks that Onyewuchi was putting together Compass's bid.  12/9/15 Tr. 161-65.

On March 27, 2012, Campbell met with four other members of a selection panel to choose the Phase 1 contractor.  DC Ex. 15.  She told the panel that she "knew th[e] individual" listed as "contract liaison" on one of the bids, 12/9/15 Tr. 169-70, but she did not disclose that he was a friend, or that she had spoken to him more than fifty times in the previous two weeks, 12/8/15 Tr. 113.  Campbell was the only panel member to give Compass a significantly higher score than its competitor—she scored Compass a "9" and its competitor a "3"—and, in fact, three of the other four members gave the competitor a higher score.  DC Ex. 15 at 1.  Despite this, according to Project Manager Bonnie Norton, Campbell persuaded the group to recommend Compass.  12/8/15 Tr. 106, 109.  At trial, Campbell denied that she made any effort to influence the panel's selection.  12/7/15 36, 51.

4

Soon after Compass began work on the Phase 1 contract, Brooks-Brown and Simon demanded that Onyewuchi add $250,000 to Simon's agreed-upon fee. 12/10/15 Tr. 49. 51. He "was making rain, was the word they used, and, therefore, they wanted a bump in their fee." 12/10/15 Tr. 49. When Onyewuchi refused, Simon "told [him] that invoices w[ould] not be paid" and that "[Simon] and the other subcontractors will not attend any meetings with their client . . . until [he] agreed to those terms." 12/10/15 Tr. 49-50. The next day, Onyewuchi received an e-mail from Campbell requesting "another meeting with [him] and all the sub[contractors]." 12/10/15 Tr. 87. Onyewuchi believed that Brooks-Brown and Simon had asked Campbell to send the e-mail to show him that, for "any disagreement we had, they had a way of pushing it or putting [him] on the spot." 12/10/15 Tr. 87.

### 3.     Another Contractor Accuses Campbell Of Pressuring Her Company To Partner With A Particular Company In Its "Phase 2" Bid.

On May 24, 2012, Campbell was promoted to the position of Chief Operating Officer of the Department, where she oversaw the operations of the entire agency. 12/7/15 Tr. 31; Pl. Ex. 3. At the time, the Department was seeking bids for Phase 2 of the healthcare exchange—a $70 million contract to create the online exchange itself. 12/7/15 Tr. 33; 12/9/15 Tr. 15-16.

Holli Ploog, Vice President of CGI Technologies and Solutions, testified that, in May 2012, she met with several District officials, including Campbell, to

5

discuss CGI's plan to bid on the project. 12/9/15 Tr. 15-17. A few days later, Campbell called her and "told [her] that she and Director [Wayne] Turnage thought [she] needed guidance and assistance on selecting" a minority partner, which CGI would need to qualify for the contract. 12/9/15 Tr. 18. Ploog was "surprised" that Campbell thought CGI needed guidance and that CGI "didn't understand how seriously" the District took the minority-partner requirement. 12/9/15 Tr. 18. Campbell already had been "very vocal" about the requirement during their meeting—"she had said it on several occasions"—and Ploog had told her that CGI "understood that and may have been talking to different potential partners." 12/9/15 Tr. 18.

Campbell "recommended that [Ploog] talk to . . . Document Managers," managed by Darryl Wiggins, who, she said, "had done good work for the District" and "wanted to form a joint venture" for the Phase 2 contract. 12/9/15 Tr. 19. This made Ploog suspicious, because she "had met with [Wiggins] on a couple of occasions" and he had been "very aggressive" about his desire to work with CGI. 12/9/15 Tr. 20. "[H]e texted me, e-mailed me, called me continuously, and he kept telling me that the District wanted us, CGI, to bid with him." 12/9/15 Tr. 20. In fact, only a few days before Campbell's call, Wiggins had asked Ploog, "Hasn't the District told you that they want you to bid with us?" 12/9/15 Tr. 20. "And [she] said, 'No, they would never do that. It is completely inappropriate.' And he

6

said, 'Well, they do.'" 12/9/15 Tr. 20. Ploog shared her suspicions with CGI's general counsel, and CGI decided "just to forego any business with the District." 12/9/15 Tr. 21, 24.

At trial, Campbell denied that she had tried to steer business to Wiggins, or suggested that CGI use any particular company to satisfy the minority-participation requirement. 12/7/15 Tr. 38, 45, 48. She testified that her "only dealings with [CGI] was on another contract they had been selected for." 12/7/15 Tr. 38.

## 4.    Both Contractors Tell The Department Director That Campbell Has Engaged In Unethical Conduct.

In late May 2012, around the same time as Brooks-Brown and Simon were demanding that Onyewuchi increase their fee, they approached him about another contract Compass had been awarded. 12/10/15 Tr. 87. "Nothing was happening" on the project, and they told Onyewuchi they could "get [the project] going" if he paid Simon more money. 12/10/15 Tr. 87-88. At that point, Onyewuchi concluded that they were "just shaking [him] down." 12/10/15 Tr. 88. He did not know whether he could trust Director Turnage, so he called the Department's previous Chief Operating Officer, Brenda Emanuel, who "assured [him] that Mr. Turnage was beyond reproach." 12/10/15 Tr. 56, 61.

Emanuel was the first to call Turnage about the evidence of Campbell's ethical violations—she told him that Onyewuchi had told her "that Jennifer Campbell was running illegal activities out of the contracting office." 12/9/15 Tr.

7

42-43.  Turnage then spoke to Onyewuchi, who "made a litany of allegations against [Campbell]."  12/9/15 Tr. 43.

> He told me . . . that [Brooks-Brown and Simon] had a draft copy of the [request for proposal], which should not have been outside of the agency, that there were e-mail communications from . . . Simon to him, touting his contacts in [the Department] as the source, and that these e-mail communications explained that they were going to win the bid, . . . and also outlined to him how he should request more money for business development.

12/9/15 Tr. 43-44.

Turnage was "very skeptical" of Onyewuchi's claims—he testified that "there's nothing more of a jungle than the District contracting process" and "the people who rely on it for their livelihood . . . will do anything, anything, to win a bid or benefit from a contract."  12/9/15 Tr. 44-45.  He asked for corroboration, and Onyewuchi gave him Ploog's number.  12/9/15 Tr. 49.  Turnage spoke to Ploog on June 2, 2012, "and she proceeded to lay out a very damning story that matched what Mr. Onyewuchi, in general, had been telling [him]."  12/9/15 Tr. 50.

The next morning, on June 3, 2012, Turnage e-mailed the Mayor's Chief of Staff Christopher Murphy, the Mayor's Director of Communications Pedro Ribeiro, and Deputy Mayor Brenda "BB" Otero.  Pl. Ex. 19.  The e-mail stated:

> Today I received a call from a Vice President of CGI informing me that she had been contacted, unsolicited, by Jennifer Campbell, our Chief Operating Officer.  In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman, Darryl Wiggins, as a minority partner.  When CGI's VP asked if I were aware of this, Jennifer reportedly told her that the

8

request is coming from both me and her and that she was in charge of this process, not me.  CGI's Vice President said that in her entire career she has never been approached that way by a government entity involved in a procurement.  She said this was a very difficult and awkward situation and is understandably concerned about the potential ramifications.

Related to this, I was shown an email by a lobbyist for CGI.  The email was from Darryl Wiggins to the CGI VP and he offered a scenario where he could work with CGI on a joint venture in a bid for the District's Exchange business.  In the email he admits to being unqualified but stated that his share would be 51% and CGI's 49% and that as a District resident he has seen this work before.

I have also been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange work.  Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in [the Department's] contracting office that will ensure a successful bid if they of course partner with the right persons.

Pl. Ex. 19 at 1.  Turnage concluded by explaining that, before he could "make a final decision on Jennifer's future," he "need[ed] to interview CGI's Vice President and the head of Compass Consulting who was allegedly approached by a Cedrick [sic] Simon offering a deal."  Pl. Ex. 19 at 2.

### 5.    Turnage Places Campbell On Administrative Leave And Investigates The Contractors' Allegations, Then Recommends Her Termination.

That same morning, Campbell flew to Nashville, Tennessee, to attend a conference.  12/8/15 Tr. 44.  Soon after she landed, however, the Department's Chief of Staff, Melisa Byrd, contacted her and told her to fly back immediately for a meeting.  12/8/15 Tr. 44-45.  When Campbell arrived at the office the next

9

morning, Byrd told her she was being placed on administrative leave pending an investigation.  12/8/15 Tr. 49; Pl. Ex. 4 at 1.  Campbell e-mailed back to request detailed allegations and an opportunity to refute them.  12/8/15 Tr. 52.  She was told that she could meet with Byrd and Turnage on that Thursday, June 7, 2012.  12/8/15 Tr. 52.  The meeting was later rescheduled for the next week.  12/8/15 Tr. 53.

Turnage testified that, in the meantime, he met with Onyewuchi, who "show[ed] [him] . . . e-mails from Cedric Simon that . . . laid out a fairly iniquitous scheme."  12/9/15 Tr. 47.  He testified that Onyewuchi "showed [him] text messages where . . . Simon was saying . . . , 'Now that we have given you this contract, you need to make political contributions of 'X' amount to certain people.'"  12/9/15 Tr. 47.  According to Turnage, "[i]t was really sordid."  12/9/15 Tr. 47.  "[T]he more and more Mr. Onyewuchi spoke, . . . it was clear that he was providing copious details that were troubling."  12/9/15 Tr. 48.  "And that's when I really started to get . . . this sinking feeling in my stomach that Jennifer had made a terrible, terrible mistake."  12/9/15 Tr. 47.

Turnage "asked [his] staff to call all of [the Department's] vendors and say, 'If you have hired anybody or you are dealing with anybody at the direction [of the Department], you are free to end those discussions or end their employment immediately.'"  12/9/15 Tr. 82.  Compass fired Simon the next day.  12/9/15 Tr.

10

82. To Turnage, "that gave more credibility" to Onyewuchi's allegations. 12/9/15 Tr. 82. "When they cut him off, that was a signal to me that they were dealing with him only because Jennifer was . . . asking them to do so." 12/9/15 Tr. 83.

Soon afterward, a staff member told Turnage that he had received a "very, very disturbing e-mail" from Campbell over the weekend, which "basically said she wanted more money"—an extra $210,000—"on [a] contract for which Compass is a sub[contractor]." 12/9/15 Tr. 52-53. Turnage testified that the request itself was a terminable offense, because "she was completely going around the rules of the . . . contracting process." 12/9/15 Tr. 56. Moreover, Turnage realized, the e-mail "matched up almost perfectly" with one of Onyewuchi's allegations: that Campbell had suggested he "talk to Cedric Simon" about stalled payments on a contract, and that Simon had offered to "free up" the stalled contract in exchange for "$210,000." 12/9/15 Tr. 55-56.

Turnage also heard reports that Campbell had gone out of her way to ensure that Compass was awarded the Phase 1 contract. Norton told him that, during the selection process, Campbell had "made this forceful case that Compass was the better vendor because she had been told by Brenda Emanuel, her predecessor, that if you hire [the competitor] for anything, they are not going to give you good work." 12/9/15 Tr. 61. When Turnage asked Emanuel about this, however, she told him that she had told Campbell just the opposite: "that [the competitor] does

11

good work." 12/9/15 Tr. 62. When Turnage put all this information together, "it was crystal clear . . . that Jennifer had made a horrible, horrible mistake," and that, "as the person responsible for the stewardship of the agency, [he] had no choice but to . . . recommend that she be fired." 12/9/15 Tr. 62.

On June 4, 2012, Turnage e-mailed Murphy, Otero, and Human Resources Director Shawn Stokes, reporting that he had "met separately with two vendors— COMPASS and CGI—to get in-person reports," and "was told again that Jennifer directed these companies to hire or partner with certain individuals or firms and took retaliatory action if push back occurred." Pl. Ex. 5 at 1-2. Moreover, "Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire." Pl. Ex. 5 at 2. He stated that his investigation was complete and he would "inform Director Stokes that [he was] firing Jennifer Campbell" and "send her notice of this action as soon as" the District's Department of Human Resources approved it. Pl. Ex. 5 at 2. On June 6, 2012, Turnage again e-mailed Murphy, Otero, and Stokes, informing them that he planned to "officially refer the case" to the District of Columbia Office of the Inspector General that day, and that "[a]s soon as [he got] clearance from Director Stokes [the agency would] process Jennifer's letter of termination." DC Ex. 70.

12

**6.    In Response To Press Inquiry, The Mayor's Office Releases Turnage's E-Mails Explaining The Reason For Campbell's Termination.**

It is not clear how the media heard there was an investigation into Campbell's misconduct. *See* 12/8/15 Tr. 91, 98. Ribeiro testified that, on June 7, 2012, Washington City Paper reporter Alan Suderman called him to ask if he "had heard anything" about Campbell. 12/8/15 Tr. 78-79. Later, Suderman e-mailed Ribeiro, again "prodding [him]" for information. 12/8/15 Tr. 78-79; Pl. Ex. 14. Ribeiro passed the inquiries on to Murphy. 12/8/15 Tr. 79.

Murphy testified that the City Paper, and Suderman in particular, were "always looking for a scandal." 12/8/15 Tr. 148. He told Ribeiro to "share with [Suderman] what was going on so . . . [Suderman] would communicate to the citizens of the District of Columbia that any kind of allegation of impropriety was taken really seriously and that we were not trying to hide that fact from anyone." 12/8/15 Tr. 120. Ribeiro and Murphy decided to show him Turnage's e-mails summarizing the investigation because, Murphy explained, they showed that the Department "had a director who was taking this seriously, but also trying to be fair." 12/8/15 Tr. 124, 128. Their "first concern was making sure that the citizens of the District of Columbia had information to make a sound judgment about how they are operating, their government was operating." 12/8/15 Tr. 139.

Suderman called Turnage late in the evening on Sunday, June 10, 2012. 12/9/15 Tr. 63. At first Turnage refused to answer his questions, but when

13

Suderman convinced Turnage he "already had the e-mails," Turnage's "focus shifted on making sure [he] did not . . . put information out in the public domain that . . . would be personally embarrassing to Jennifer Campbell."  12/9/15 Tr. 74. Turnage sent him several e-mails that evening, forwarding the e-mails with factual corrections and asking him to refrain from publishing anything about Campbell's personal relationship with Simon.  Pl. Ex. 15-18.

On June 11, 2012, the Washington City Paper published an article in its "Loose Lips" blog, titled "Health Care Finance COO Fired Over Contract Steering Allegations."  Pl. Ex. 7 at 1.  The article stated that Campbell had been "fired . . . over allegations that she tried to 'steer business towards some minority firms and away from others' in the bidding on the forthcoming contract for the District's health insurance exchange."  Pl. Ex. 7 at 1.  "In emails Turnage sent to senior members of the Gray administration last week, he explains that one contractor, CGI, approached him with allegations that Campbell was trying to force CGI to partner with Darryl Wiggins, a politically connected owner of a document management company."  Pl. Ex. 7 at 1.  "Turnage also writes that he'd received an allegation that Campbell was trying to steer another contractor, Compass Consulting, toward a different potential partner, Cedrick Simon."  Pl. Ex. 7 at 1.

The morning the article was published, Byrd called Campbell to warn her "that an article was coming out that would outline the fact that [she was] going to

14

be terminated, with cause." 12/7/15 Tr. 27. By then, however, Campbell had already read the story. 12/7/15 Tr. 35; 12/9/15 Tr. 90; *see* 12/9/15 Tr. 132. The District served Campbell a formal notice of termination later that day. Pl. Ex. 9.

That afternoon, a Washington Post reporter contacted Turnage to follow up on the story. 12/9/15 Tr. 133. Turnage gave him the same e-mails the District had released to Suderman. 12/9/15 Tr. 133. The next day, June 12, 2012, an article titled "D.C. official is fired over contract allegations" reported that Campbell "was fired this week after she was accused of trying to steer a lucrative city contract to favored minority business vendors." Pl. Ex. 8 at 1. It quoted Turnage's e-mails:

> "I have been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange network," Turnage wrote Gray administration officials. "Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in [the Department's] contracting office that will ensure a successful bid if they of course partner with the right persons."

Pl. Ex. 8 at 1. The article continued:

> On June 3, Turnage wrote to his chief of staff that a senior CGI official called him to say the company was being pressured into partnering with Document Managers, a business owned by Wiggins.

> "A call came from VP of CGI that she had been contacted, unsolicited by Jennifer Campbell, our chief operating officer," Turnage wrote. "In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman named Darryl Wiggins as a minority partner."

Pl. Ex. 8 at 2.

15

7.   **After Two Years Of Sporadic Consulting Work, Campbell Returns To Her Career In The Healthcare Industry.**

After her termination, Campbell looked to obtain full-time employment. 12/8/15 Tr. 55. While she conducted her search, she was able to secure small consulting contracts, which brought in $16,000 one year and $26,000 the next year. 12/8/15 Tr. 55-56.

In June 2014, Campbell was hired as a senior consultant for health care policy with "a health care and human services consulting firm with a national and international clientele." 12/8/15 Tr. 65; Pl. Ex. 1 at 2. She admitted at trial that her new job put her back in the same industry she had worked in before, "on the policy side more than the implementation side." 12/8/15 Tr. 65. At the time of trial, she was a "principal" in the company. Pl. Ex. 1 at 2.

8.   **The District Court Denies The District's Motion For Judgment As A Matter Of Law On Campbell's "Stigma Or Foreclosure" Claim.**

Campbell brought suit against the District, claiming that it violated her due process rights under the Fifth Amendment by releasing Turnage's e-mails to the press. District Court ECF Record Document ("RD") 1 at 12-13.[1] She pursued this claim under two distinct theories. *First*, under a "reputation-plus" theory, she

---

[1]   The suit also named Turnage in his official capacity. RD 1. Doing so simply restated the suit against the District. *Ky. v. Graham*, 473 U.S. 159, 165-66 (1985). The eventual judgment recognized as much, naming just the District as the liable defendant. RD 75.

claimed that "she was terminated from her government employment and that the District negligently, recklessly, or maliciously published a single false and defamatory statement about her which caused her to suffer financially and emotionally." RD 41-7 at 3-7. *Second*, under a "stigma or foreclosure" theory, she claimed that the "release of emails to the press and termination of her employment left a stigma on her and had the broad effect of largely precluding her from pursuing her chosen career." RD 41-7 at 3-7.

At the close of Campbell's evidence, the District moved for judgment as a matter of law on her "stigma or foreclosure" claim, arguing that she had offered insufficient evidence of "the type of . . . stigma that's envisioned by this constitutional tort." 12/8/15 Tr. 183. The District explained how relevant precedent established that, under a "stigma" claim, Campbell had to offer evidence of a legal disability based on government action, equivalent to "losing your bar license so you can never practice law again" or "[l]osing your security clearance so you can never work in the security field again." 12/8/15 Tr. 183. Moreover, the news articles could not have foreclosed her from finding employment in her chosen field because she was fully employed two years after her termination. 12/8/15 Tr. 184. The court denied the District's motion. 12/8/15 Tr. 186.

The District renewed its motion at the close of evidence. It noted the "high standard" to establish stigma, which a plaintiff "cannot meet . . . as a matter of law

17

by anything other than . . . a complete and total bar from practicing in your chosen profession." 12/10/15 Tr. 137. "[W]hat the cases . . . say is that to have the liberty interest, it is sort of equivalent of 'We are not going to give you a bar license.' 'We are not going to give you a liquor license.'" 12/10/15 Tr. 137. "[T]hat's the type of hurdle that has to be placed in your ability to practice in your chosen field or . . . profession." 12/10/15 Tr. 137-38.

The jury rejected Campbell's "reputation-plus" claim, finding that she failed to prove "that the District made a false and defamatory statement concerning her." RD 65 at 1. But it returned a verdict for Campbell on her "stigma or foreclosure" claim, finding that "the District's release of emails to the press and termination of her employment left a stigma on her by having the broad effect of largely precluding her from pursuing her chosen career." RD 65 at 2.

After trial, the District renewed its motion for judgment as a matter of law, again arguing that Campbell had not offered evidence "that she was stigmatized in the manner necessary to prevail on her claim" and explaining that her stigma claim was "nothing more than a reputation-plus claim in disguise." RD 83-1 at 5. The district court denied the motion, holding that "a reasonable jury could conclude that, by sharing and discussing e-mails with a reporter, the District facilitated the publication of media articles about Dr. Campbell's termination and the allegations

18

surrounding it" and that "those media articles seriously affected Dr. Campbell's ability to pursue her chosen profession."  RD 99 at 8.

## STANDARD OF REVIEW

Under Rule 50 of the Federal Rules of Civil Procedure, the district court "should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)).  The standard "mirrors" that for summary judgment.  *Id.* at 150 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)).  The Court therefore reviews a denial of judgment as a matter of law *de novo*, "view[ing] the evidence in the light most favorable to" the non-movant and "draw[ing] all reasonable inferences in that party's favor."  *Thompson v. District of Columbia*, 832 F.3d 339, 344 (D.C. Cir. 2016).

## SUMMARY OF ARGUMENT

1. The District is entitled to judgment as a matter of law on Campbell's "stigma or foreclosure" due process claim.  This Court has recognized two ways in which the government can infringe on an employee's occupational liberty interest.  Under a "reputation-plus" theory, an employee is entitled to a name-clearing hearing if, in the course of job termination, the government publicly disseminates a false and defamatory reasons for the termination.  Under a "stigma or foreclosure"

19

theory, an employee is entitled to a hearing if the government takes action that forecloses her freedom to take advantage of other employment opportunities.

Campbell brought a separate claim under each theory, basing both on the District's release of Turnage's e-mails to the press, which allegedly tarnished her reputation and made it difficult for her to find work. Her "reputation-plus" claim is not at issue here—it was rejected by the jury, which found that she failed to prove the District's statements were "false and defamatory." All that remains, then, is Campbell's "stigma or foreclosure" claim, which is based on exactly the same statements as her failed "reputation-plus" claim.

This Court should reject Campbell's attempt to base a "stigma or foreclosure" claim on the District's communication with the press. It should find this conduct actionable only under a "reputation-plus" theory, if at all. That theory appropriately requires proof that the published statement is false and defamatory. The Court has never recognized a liberty interest claim arising out of the government's communication of *truthful* statements to the press, and it should not do so here. The elements of common-law defamation, which are incorporated into the "reputation-plus" test, serve important policy interests, allowing the government to communicate openly with the public it serves and protecting the right of government officials to engage in constitutionally protected speech on matters of public concern. Because a claim based on government speech should

20

only be actionable under a "reputation-plus" theory, which Campbell brought and the jury rejected, the District is entitled to judgment as a matter of law on her "stigma or foreclosure" claim.

2.  Even if this Court recognizes a speech-based liberty interest claim under a "stigma or foreclosure" theory, it should find Campbell's evidence insufficient as a matter of law because she was not foreclosed from future employment opportunities in her field.  She admits that, within two years of her termination, she was fully employed in the healthcare industry.  Her claim therefore rests on her temporary inability to find full-time work.  These circumstances cannot, as a matter of law, satisfy the strict standard this Court has established for "stigma or foreclosure" claims.

**ARGUMENT**

**I.    The District Is Entitled To Judgment As A Matter Of Law On Campbell's "Stigma Or Foreclosure" Claim Because A Liberty Interest Claim Based On Government Speech Should Only Be Recognized Under A "Reputation-Plus" Theory.**

To sustain a procedural due process claim, a plaintiff must first demonstrate the existence of a protected liberty or property interest.  *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972).  As an at-will employee, Campbell had no property interest in her continued employment.  *See McCormick v. District of Columbia*, 752 F.3d 980, 987 (D.C. Cir. 2014) ("It has long been settled in the District of Columbia that an employer may discharge an at-will employee at any time and for

21

any reason, or for no reason at all.").  However, "there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of . . . 'liberty' . . . as meant in the Due Process Clause," and governmental action that "officially remov[es]" such an interest "from the recognition and protection previously afforded by the State" is "sufficient to invoke the [Fifth Amendment's] procedural guarantees."  *Paul v. Davis*, 424 U.S. 693, 710, 711 (1976); *see Bishop v. Wood*, 426 U.S. 341, 348 (1976).  One such interest is "an individual's 'right to follow a chosen trade or profession' without governmental interference."  *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998).

Campbell claims that the District infringed on this interest by releasing Turnage's e-mails to the press, effectively publishing the reasons for her termination.  A claim based on government speech, however, should only be actionable under a "reputation-plus" theory, which Campbell brought separately and the jury rejected.  The District is therefore entitled to judgment as a matter of law on her "stigma or foreclosure" claim—the only claim on which judgment was entered.

### A.     This Court recognizes two liberty-interest theories, each applicable to a particular type of governmental action.

"Government action that has the effect of 'seriously affecting, if not destroying' a plaintiff's ability to pursue his chosen profession . . . or 'substantially

22

reducing the value of his human capital . . . infringes a liberty interest.'"
*O'Donnell*, 148 F.3d at 1141 (internal citations omitted). To preserve this interest,
the Court recognizes "two theories . . . that provide limited circumstances under
which an at-will employee may establish a due process claim arising out of his
termination." *McCormick*, 752 F.3d at 987.

*First*, under a "reputation-plus"—also known as a "defamation-plus" or
"stigma-plus"—theory, the plaintiff must prove that the government published a
false and defamatory statement (the "reputation" prong), accompanied by a
tangible change in her legal status (the "plus" prong). *Orange v. District of
Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995); *Doe v. U.S. Dep't of Justice*, 753
F.2d 1092, 1114 (D.C. Cir. 1985). Although common-law defamation lies at the
heart of every "reputation-plus" claim, more is needed to infringe on a
constitutional right—"it is th[e] alteration of legal status which, combined with the
injury resulting from the defamation, [that] justif[ies] the invocation of procedural
safeguards." *GE v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010).

This Court has noted that "[o]ne such change in status . . . is an adverse
employment action," such as termination, *O'Donnell*, 148 F.3d at 1141, although it
has questioned whether termination will always be enough, *see Mosrie v. Barry*,
718 F.2d 1151, 1161 (D.C. Cir. 1983) (explaining that "it is necessary—*we need
not say when it is sufficient*—that the defamation be accompanied by a discharge"

23

(emphasis added)).  "[O]ther government action" also can "transform a defamation into a deprivation of liberty" if it "formally deprive[s] one of a legal right" or "so severely impair[s] one's ability to take advantage of a legal right . . . that the government can be said to have . . . extinguished the right."  *Id.* at 1161, 1162 (footnote omitted).  This "tangible change in status" occurs when the government "formally or automatically excludes [the plaintiff] from . . . other government employment opportunities," or "'precludes [her]—whether formally or informally—from such a broad range of opportunities that it interferes with [her] constitutionally protected right to follow a chosen trade or profession."  *Crooks v. Mabus*, No. 15-5212, 2016 U.S. App. LEXIS 23180, *18 (D.C. Cir. Dec. 23, 2016) (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995)); *see, e.g.*, *Old Dominion Dairy v. Sec'y of Def.*, 631 F.2d 953, 955-56 (D.C. Cir. 1980) (finding contractor's liberty interest infringed when "the Government effectively bar[red] [it] from virtually all Government work due to charges that the contractor lack[ed] honesty or integrity").

"The remedy for an established reputation-plus claim is 'an opportunity to refute the charge,' one which will 'provide the person an opportunity to clear his name.'"  *Amobi v. District of Columbia*, 755 F.3d 980, 994 (D.C. Cir. 2014) (quoting *Codd v. Velger*, 429 U.S. 624, 627 (1977)).  "The basic requirement in such a hearing is minimal: it must provide notice of the charges and an opportunity

24

to refute them effectively." *McCormick*, 752 F.3d at 989. The hearing "does not *in any way* affect actual government personnel decisions"—it simply affords an employee "*some* opportunity to clear her name when the government has terminated her amidst defamatory charges that, in effect, have destroyed her professional reputation." *Doe*, 753 F.2d at 1113 n.25.

*Second*, under a "stigma or disability" claim, a plaintiff's liberty interest is infringed if the government creates "'a stigma or other disability that foreclose[s] [her] freedom to take advantage of other employment opportunities.'" *O'Donnell*, 148 F.3d at 1140. "[U]nlike the reputation-plus claim," a "stigma or disability" claim "'does not depend on official speech'" but on "'official action.'" *McCormick*, 752 F.3d at 988 (quoting *O'Donnell*, 148 F.3d at 1140); *see, e.g.*, *Kartseva v. Dep't of State*, 37 F.3d 1524, 1526, 1527 (D.C. Cir. 1994) (holding that State Department may have infringed on Russian interpreter's liberty interest by declaring her "'ineligible for assignment to a [Department] contract or project,' and ask[ing] [her private-contractor employer] to 'act on' this determination"). To rise to a constitutional level, the action must "formally or automatically exclude[] [her] from work on some category of future . . . government employment opportunities," or "'preclude[] [her]—whether formally or informally—from such a broad range of opportunities that it interferes with [her] constitutionally protected right to follow a chosen trade or profession." *Crooks*, 2016 U.S. App. LEXIS

23180 at \*18; *see Kartseva*, 37 F.3d at 1528 (holding that whether Russian translator suffered "a status change of due process import" would depend on whether her ineligibility for a particular contract "would automatically preclude [her] from meeting eligibility criteria for other jobs" or "preclude[] her from pursuing her profession as a Russian language translator").  This Court has never held that the termination of an at-will employee, standing alone, can satisfy this high standard.

It is not clear what process is due an employee whose liberty interest is infringed under a "stigma or foreclosure" theory.  A name-clearing hearing is meaningful for a person injured by government speech, but does little to remedy an injury caused by government action.  *Cf. Codd*, 429 U.S. at 627 (noting that, "if the hearing . . . is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee").  Thus, a person whose reputation is damaged by government action, rather than speech, may well have a right to challenge the action itself.  *See, e.g.*, *United States v. Lovett*, 328 U.S. 303, 318 (1946) (reversing, as unconstitutional, a "congressional proscription of [certain employees], prohibiting their ever holding a government job") (cited by *Paul* and *Bishop* as an example of government action that violates a liberty interest); *Reeve Aleutian Airways v. United States*, 982 F.2d 594, 601 (D.C. Cir. 1993) (finding

26

hearing adequate because it provided suspended airline a "chance to engage in direct discussion of disputed issues with the ultimate decisionmakers").

**B.    A claim based on governmental speech should be cognizable only under a "reputation-plus" theory, because only that theory incorporates the essential elements of common-law defamation.**

Campbell's "stigma or foreclosure" claim is based on the District's release of Turnage's e-mails to the press.  *See* RD 89 at 9 (arguing, in opposition to the District's post-trial motion for judgment as a matter of law, that she had offered sufficient evidence "that her termination *in combination with* the surrounding publicity violated her right to Procedural Due Process under the 'Stigma or Disability' theory").  Indeed, she explicitly denied that her claim was based on the District's act of terminating her, and she made no effort to show that this action, standing alone, foreclosed her ability to find employment.  *See* RD 89 at 9 (distinguishing case holding that a "'termination of an at-will employee' cannot *on its own* 'infringe on the employee's liberty interest'" because, "[u]nlike [that case], the accusations against and termination of Dr. Campbell *were* publicized").  The conduct underlying her "stigma or foreclosure" claim is therefore identical to that underlying her "reputation-plus" claim, which the jury rejected because she did not show that the District had published a "false and defamatory" statement.  RD 65 at 1.  This Court should reject Campbell's attempt to base a "stigma or foreclosure" claim on the District's communication with the press.

27

1.   The Court has appropriately applied the "reputation-plus" theory to due process claims based on government speech.

Campbell's claim is actionable only under a "reputation-plus" theory, which incorporates the elements of common-law defamation, requiring proof that the government published a false and defamatory statement. The Court has explained that a "stigma or foreclosure" claim "differs from the [reputation-plus claim] in that it does not depend on official speech, but on a continuing stigma or disability arising from official action." *O'Donnell*, 148 F.3d at 1140; *see McCormick*, 752 F.3d at 988 (similar). Guided by this distinction, it has applied the "reputation-plus" test to claims arising out of speech—requiring the government's publication of a false and defamatory statement—while applying the "stigma or foreclosure" test to the corresponding, content-neutral action. *See, e.g.*, *Crooks*, 2016 U.S. App. LEXIS 23180 at *16-22 (considering allegations of a Junior Reserve Officers' Training Corps teacher's "dishonesty" under the "reputation-plus" test, while considering only his decertification from the Corps in his "stigma or foreclosure" claim); *O'Donnell*, 148 F.3d at 1140-41 (considering allegations of a police captain's "racis[m]" under the "reputation-plus" test, but considering only his demotion in his "stigma or foreclosure" claim).

The Court should therefore hold that Campbell's speech-based claim is cognizable only under the "reputation-plus" framework, and that speech that does not even meet the elements of common-law defamation cannot possibly rise to the

28

level of a constitutional violation.    A contrary holding would expose the government to litigation any time it publicly discloses the reasons for an employee's termination, *even if termination is justified and the disclosure is true*. This Court has never held that the government can violate the Constitution by making a truthful statement about a public servant's misconduct.  It should not do so here.

Applying the "reputation-plus" framework to all speech-based claims is consistent with the doctrine underlying the recognition of reputational liberty interests.    Like property interests, liberty interests arise out of protections established by state law.    *Paul*, 424 U.S. at 710-11.    That is why, although defamation law itself is "insufficient to create a liberty interest," the elements of this common-law tort lie at the heart of every "reputation-plus" claim.  *Orange*, 59 F.3d at 1274 (requiring publication of a false and stigmatizing statement).    After all, the "plus" prong of such a claim (often, as here, termination of at-will employment) involves a *lawful* change of the plaintiff's status—it is the violation of the common law that implicates state-law protections.    Indeed, several courts refer to speech-based liberty-interest claims as "*defamation*-plus."    *See, e.g.*, *Crowe v. Cty. of San Diego*, 608 F.3d 406, 442 (9th Cir. 2010); *Atwell v. Lisle Park Dist.*, 286 F.3d 987, 993 (7th Cir. 2002); *Aponte v. Calderon*, 284 F.3d 184, 196 (1st Cir. 2002).    And this Court has repeatedly explained that the "reputation-plus"

29

theory rests on the elements of common-law defamation.  *See Doe*, 753 F.2d at 1108-09 (describing the "reputation-plus" theory as "transform[ing] a [common law] defamation into a [constitutional] deprivation of liberty"); *see also Crooks*, 2016 U.S. App. LEXIS 23180, at *17 (describing the plaintiff's "'stigma-plus' case" as "a case involving a claim of defamation"); *Amobi*, 755 F.3d at 994 (describing the "reputation-plus" theory as "defamation . . . accompanied by a discharge from government employment"); *O'Donnell*, 148 F.3d at 1140 (describing the "reputation-plus" theory as "the conjunction of official defamation and adverse employment action").

It would make no sense to require a "reputation-plus" plaintiff to prove common-law defamation, but excuse her from these burdens of proof when she brings an identical claim under a different label.  The elements of common-law defamation serve important policy interests, allowing the government to communicate openly with the public it serves and protecting the right of government officials to engage in constitutionally protected speech on matters of public concern.  These interests apply *a fortiori* to constitutional claims, which expose the government and its employees to even greater liability.

      2.    Recognition of a speech-based claim under the "stigma or foreclosure" framework would eliminate the "truth" defense, which would stifle open governance and free speech.

To establish defamation under the common law, a plaintiff must prove that the published statement is false. *Competitive Enter. Inst. v. Mann*, Nos. 14-CV-101 & 14-CV-126, 2016 D.C. App. LEXIS 435, at \*49 (D.C. Dec. 22, 2016); *see Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013) (recognizing "'substantial truth' as a defense to defamation"); Restatement of the Law, Torts § 25.582 ("The truth of a defamatory statement of fact is a complete defense."). So too for a "reputation-plus" claim—this Court holds that, to establish liability, "the reputation-tarnishing statement must be *false*." *Aref v. Lynch*, 833 F.3d 242, 258 n.11 (D.C. Cir. 2016).

Recognizing a speech-based claim under a "stigma or foreclosure" theory would eliminate this requirement. This is what happened here: the recognition of Campbell's "stigma or foreclosure" claim allowed her to prevail even though the jury found the District had *not* made a "false and defamatory" statement. RD 65 at 1. Were this Court to affirm, the District would be penalized for providing *truthful* answers to the public about the integrity of the official responsible for the contracting process to plan and create the District's healthcare exchange—a matter of unquestionable public concern.

Such a ruling would be in tension with protections afforded by federal and local statute, which generally favor open governance. *See, e.g.*, United States Freedom of Information Act, 5 U.S.C. § 552; District of Columbia Freedom of Information Act, D.C. Code § 2-531 *et seq.*; District of Columbia Whistleblower Protection Act, D.C. Code § 1-615.51 *et seq.* In fact, Ribeiro and Murphy both testified that Turnage's e-mails were not privileged, and would have been subject to release in response to a request under the Freedom of Information Act. 12/8/15 Tr. 100, 124-25. And the District plainly "has a strong interest in preserving its officials' ability to make personnel decisions and communicate the reasons for those decisions to the public, particularly where, as here, the decisions implicate matters of heightened public concern." *Graham v. City of Phila*., 402 F.3d 139, 147 (3d Cir. 2005). Eliminating the falsity requirement could also implicate First Amendment freedoms. "[T]here are few more fundamental decisions that the public can make about its government than assessing the probity of a public official," and "[a] communication that provides information that might help the public to 'make informed decisions about the operation of their government merits the highest degree of *first amendment* protection.'" *O'Donnell*, 148 F.3d at 1134.

It is no answer that the government can avoid liability by holding a hearing before it releases information to the public. As the Supreme Court noted, a hearing should be required "[o]nly if the employer creates and disseminates a false and

defamatory impression about the employee." *Codd*, 429 U.S. at 628. Thus, as Fourth Circuit explained, all the government must do to avoid liability is "refrain from memorializing false and stigmatizing charges while dismissing an employee." *Sciolino v. City of Newport News*, 480 F.3d 642, 650 n.6 (4th Cir. 2007).

It takes days, if not weeks, to provide adequate notice and conduct a meaningful hearing, and that kind of time is rarely available to a government official responding to media inquiries about the ethical violations of a high-ranking official. Ribeiro testified that he needed to answer Suderman's questions about Campbell because "it was a serious allegation made against a political appointee, and the residents of the District have a right to know that the government takes these kinds of things very serious[ly]." 12/8/15 Tr. 91. Murphy testified that he authorized Ribeiro to answer Suderman's questions because "we didn't want any allegation out there that somehow we were trying to sweep some kind of misconduct under the rug." 12/8/15 Tr. 120. Turnage's e-mails "document[ed] a series of what seemed to me at the time and continue to seem like improper behavior, certainly violating District codes of ethics," and Murphy wanted to make the District's response to these allegations "crystal clear" so that Suderman "would communicate to the citizens of the District of Columbia that any kind of allegation of impropriety was taken really seriously and that we were not trying to hide that fact from anyone." 12/8/15 at 120, 124. Thus, his "first concern" was "making

33

sure that the citizens of the District of Columbia had information to make a sound judgment about how . . . their government was operating." 12/8/15 Tr. 139.

Ribeiro testified that he could not hold Suderman off for long, explaining that: "'No comment' is usually the last thing, as a public affairs person, that you want to say. It makes you look like you have something to hide." 12/8/15 Tr. 98. Murphy likewise testified to the "tough position" government officials are put in "when they get requests from reporters for information and they say 'We know there's some scandal.'" 12/8/15 Tr. 137-38. "You want to answer them . . . because you don't want people to lose faith in their government. That happens. People believe conspiracy theories about DC government, and so it was . . . important to me that we be able to provide a reporter with the substantive answer." 12/8/15 Tr. 138-39.

It is not even clear what type of a hearing the government would have to hold to avoid liability for the dissemination of truthful information. The purpose of a name-clearing hearing is "an opportunity to refute the charge," *Amobi*, 755 F.3d at 994, "[b]ut if the hearing . . . is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation," *Codd*, 429 U.S. at 627. If the plaintiff "cannot dispute the fact [that injured his reputation], a name-clearing hearing would be of no consequence to him." *Ersek v. Twp. of Springfield*, 102

F.3d 79, 83-85 (3d Cir. 1996). Meaningful process for dissemination of truthful speech could therefore require the government to consider the validity of the termination itself. This Court, however, has rejected the recognition of such a right for at-will employees. *See Doe*, 753 F.2d at 1113 n.25 (recognizing that decision ordering Department of Justice to grant a name-clearing hearing "does not *in any way* affect actual government personnel decisions"); *cf. O'Donnell*, 148 F.3d at 1139 ("[A]n at-will employee has no liberty or property interest in continued employment.") As the Supreme Court explained in *Bishop*:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error.

426 U.S. at 349-50. "Were [this Court] to hold that the termination of an at-will employee without hearing is a deprivation of due process, [it] would effectively eliminate from the law the well-recognized status of at-will employee." *McCormick*, 752 F.3d at 988.[2]

---

[2]    In *McCormick*, a terminated correctional official offered evidence that, because of his disciplinary termination, "he can never again be employed in the corrections field and that therefore, his termination implicates his liberty interest." 752 F.3d at 989. In *dicta*, the Court found this evidence "*arguably* sufficient" to infringe on his liberty interest, but it did not rule on the issue, instead affirming summary judgment because the plaintiff had been given all the process he was due. *Id.* at 989-90 (emphasis added).

   3.   Recognition of a speech-based claim under the "stigma or foreclosure" framework would eliminate the "publication" requirement, which could expose the government to liability for internal communications.

Common-law defamation requires proof of publication—"communication intentionally or by a negligent act to one other than the person defamed." Restatement of the Law, Torts § 24.577; *see Rosen v. Am. Isr. Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012) (requiring proof that "the defendant published the statement without privilege to a third party"). This element also is incorporated into the "reputation-plus" framework. In *Bishop*, the Supreme Court rejected a claim based on the private communication—to the employee—of allegedly false and defamatory reasons for his termination, explaining that "[a] contrary evaluation . . . would penalize forthright and truthful communication between employer and employee." 426 U.S. at 347-48. And in *Crooks*, this Court rejected the plaintiff's "reputation-plus" claim because it was a local school, not the defendant U.S. Navy, that published the stigmatizing statements regarding his decertification from the Junior Reserve Officers' Training Corps, and a defendant can only be liable if it is the "source of the defamatory allegations.'" *Crooks*, 2016 U.S. App. LEXIS 23180 at *17 (quoting *Doe*, 753 F.2d at 1108).

   Recognizing a speech-based claim under the "stigma or foreclosure" theory would eliminate this requirement. The government could be liable just for telling an employee the reasons for her termination, if the employee would then have to

36

reveal that reason to future employers. *But see Bishop*, 426 U.S. at 347-48. Or it could be held liable for publication by third parties—either those the government was privileged to inform or those who obtained the information without permission. *But see Crooks*, 2016 U.S. App. LEXIS 23180 at *17. To be sure, the District "published" the statements at issue here by emailing them to Suderman. But recognizing a speech-based claim under the broad "stigma or foreclosure" framework would open the door to claims arising out of speech that the government never meant to release to a third party.

> 4. Campbell did not base her "stigma or foreclosure" claim on a non-speech action, as the district court suggested.

The district court properly found that a "stigma or foreclosure" claim had to be based on "'official *action*,'" "not on 'official *speech*,'" RD 99 at 6 (quoting *O'Donnell*, 148 F.3d at 1140), and that Campbell's termination, standing alone, could not support such a claim, RD 99 at 9. It nevertheless denied the District's motion for judgment as a matter of law, holding that she had based her claim on the District's acts of "sharing and discussing e-mails with a reporter," which "facilitated the publication of media articles about [her] termination and the allegations surrounding it." RD 99 at 8. The court concluded that, "[e]ven if the District did not itself publicize the allegations surrounding [her] termination, it did take *actions* that led to the allegations' publication." RD 99 at 10.

This was error.  Of course the District took "actions" to communicate with the reporters—it is impossible to engage in "speech" without some sort of "action," be it appearing at a meeting, picking up a telephone, typing an e-mail, or even opening one's mouth to speak.  Surely this is not what this Court meant when it distinguished between claims arising out of speech and claims arising out of action.  *See O'Donnell*, 148 F.3d at 1140; *see McCormick*, 752 F.3d at 988.  Rather, the Court's plain intent was to distinguish between claims arising out of the *content* of a publicized statement, *see, e.g.*, *Doe*, 753 F.2d at 1110 (considering whether the plaintiff's liberty interest was infringed by her termination accompanied allegations of unprofessionalism and dishonesty), and those arising out of official government *action*, regardless of how it is communicated, *see, e.g.*, *Kartseva*, 37 F.3d at 1529 (considering whether the plaintiff's liberty interest was infringed by a determination of ineligibility to work on a sensitive government contract).

Campbell plainly is challenging the content—rather than the fact—of the District's communications with the press.  Her claim therefore arises out of government speech, not official action, and should only be recognized under the "reputation-plus" theory.

*     *     *

The Supreme Court "has repeatedly admonished judges to be wary of turning the Due Process Clause into 'a font of tort law' by permitting plaintiffs to

constitutionalize state tort claims." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (citing *Daniels v. Williams*, 474 U.S. 327, 332 (1986)).  This Court should apply this principle here and reject any "stigma or foreclosure" claim that is based on speech that does not even satisfy the elements of a common-law tort.

### C.     Even if Campbell had preserved a "stigma or foreclosure" claim arising out of her termination itself, the claim should be rejected as inconsistent with settled law underlying at-will employment.

As discussed, Campbell has waived any "stigma or foreclosure" claim arising out of her termination itself, insisting that this claim is based on "her termination *in combination with* the surrounding publicity."  RD 89 at 9.  As this Court has long recognized, "[i]t is imperative to an efficient and fair administration of justice that a litigant may not withhold his objections, await the outcome, and then complain that he was denied his rights if he does not approve the resulting decision."  *Bhd. of R. Trainmen v. Chi., M. & St. P. R. Co.*, 380 F.2d 605, 608-09 (D.C. Cir. 1967); *see also Schrader v. Holder*, 704 F.3d 980, 991 (D.C. Cir. 2013) (arguments not made in the district court are forfeited).

Moreover, even if she had pursued such a claim, the District would be entitled to judgment as a matter of law.  It is not clear whether the termination of an at-will employee, standing alone, can *ever* infringe on a Fifth Amendment liberty interest.  As this Court acknowledged in *McCormick*, "[w]ere [it] to hold

that the termination of an at-will employee without hearing is a deprivation of due process, [the Court] would effectively eliminate from the law the well-recognized status of at-will employee." 752 F.3d at 988. This would conflict with the Supreme Court's warning that "[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Bishop*, 426 U.S. at 349; *see id.* at 350 ("The Due Process Clause . . . is not a guarantee against incorrect or ill-advised personnel decisions." (emphasis omitted)). This Court has likewise explained that, "[a] government discharge does not by itself constitute an injury to an employee's liberty interest in reputation; a plaintiff must allege that the government has actually stigmatized his or her reputation by, for example, charging the employee with dishonesty." *Doe*, 753 F.2d at 1111. And, as discussed, that claim is actionable only under a "reputation-plus" theory, which Campbell brought separately and the jury rejected.

Even if this Court is willing to entertain a termination-alone "stigma or foreclosure" claim, the plaintiff would have to offer evidence that it was the termination itself—rather than publication of the reasons for it—that formally barred her from future government employment, or seriously damaged her ability to obtain employment in her field. *Crooks*, 2016 U.S. App. LEXIS 23180 at *18; *see Kartseva*, 37 F.3d at 1528 (holding that Russian translator could establish "a status change of due process import" with evidence that State Department's

40

determination of ineligibility to work on a particular contract "would automatically preclude [her] from meeting eligibility criteria for other jobs" or would effectively "preclude[] her from pursuing her profession as a Russian language translator"); *Reeve Aleutian Airways*, 982 F.2d at 598 (finding "significant liberty interest" infringed by agency's suspension of military contract with an air carrier—which had the effect of "branding [the] airline unsafe" and "creat[ing] a lasting blemish on [the] company's reputation, roughly the equivalent to Hawthorne's scarlet letter pinned across the heart of Hester Prynne"); *cf. Roth*, 408 U.S. at 573 (offering, as example of an action that would create a sufficient "stigma or foreclosure," the government's decision to "invoke . . . regulations to bar [a college professor] from all other public employment in state universities").

Campbell has offered no evidence suggesting that her termination, standing apart from the District's release of Turnage's e-mails to the press, would have created "a stigma or other disability that foreclose[s] [her] freedom to take advantage of other employment opportunities." *O'Donnell*, 148 F.3d at 1140 (quoting *Roth*, 408 U.S. at 573). She therefore cannot, as a matter of law, establish that her termination itself infringed on a constitutionally protected liberty interest.

**II.    Alternatively, The District Is Entitled To Judgment As A Matter Of Law On Campbell's "Stigma or Foreclosure" Claim Because Her Employment Opportunities Were Not Foreclosed.**

Even if this Court recognizes a speech-based liberty interest claim under a "stigma or foreclosure" theory, it should find Campbell's evidence insufficient as a matter of law because she was not foreclosed from future employment opportunities in her field. She does not suggest that she was formally excluded from government work—her claim rests entirely on whether "the agency took informal action against h[er] so broad that it infringed upon h[er] 'right to follow a chosen trade or profession.'" *Taylor*, 56 F.3d at 1506. "The key inquiry then is this: Has the government, by attacking personal . . . reputation, achieved in substance an alteration of status that, if accomplished through formal means, would constitute a deprivation of liberty?" *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. 2003).

The standard Campbell must "meet in this regard—showing that the government 'has seriously affected, if not destroyed, h[er] ability to obtain employment in [her] field . . . —is high." *Taylor*, 56 F.3d at 1506. The District's actions "must substantially reduce the value of h[er] human capital, as it would if h[er] skills were highly specialized and rendered largely unmarketable as a result of the agency's acts." *Id.* at 1507 (comparing *Greene v. McElroy*, 360 U.S. 474, 492, 494 (1959) (liberty interest implicated by exclusion of aerospace engineer

42

from work in all government-sponsored aeronautics facilities), with *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895-96 (1961) (liberty interest not implicated by revocation of short-order cook's permission to work on military base because she "remained entirely free to obtain employment as a short-order cook or to get any other job")).

Campbell's temporary inability to find full-time work in her field cannot, as a matter of law, satisfy this high evidentiary standard. She testified that, within two years of her termination, she was hired as a senior consultant for "a health care and human services consulting firm with a national and international clientele." 12/8/15 Tr. 55, 65; *see* Pl. Ex. 1 at 2. When asked whether this meant she was "back in the same industry," she responded, "Yes," clarifying that her new job was "on the policy side more than the implementation side." 12/8/15 Tr. 65. She never argued that the "policy side" was outside of her chosen field, or even that she was still foreclosed from employment on the "implementation side" of the industry. *See* 12/8/15 Tr. 184-86; 12/10/15 Tr. 139; RD 89 at 8-15. Any such argument is therefore forfeited. *See Schrader*, 704 F.3d at 991.

To be sure, in a footnote to her opposition to the District's post-trial motion, she noted the District's failure to "demonstrate" that her new job "is 'comparable' to the work she performed for the District." RD 89 at 4 n.1. But that is not the test. *See O'Donnell*, 148 F.3d at 1141 (rejecting claim of police captain even

43

though, when he moved his position as a District police captain to the position as police chief of a town with population of only 6,000, his "overall responsibilities ha[d] certainly dwindled"). Moreover, it is *Campbell*, not the District, who has the burden of proving that the government "'has seriously affected, if not destroyed, h[er] ability to obtain employment in [her] field." *Taylor*, 56 F.3d at 1506. As discussed, she did not even argue that her new job was not "employment in [her] field." *See* 12/8/15 Tr. 184-86; 12/10/15 Tr. 139; RD 89 at 8-15. Nor would the evidence support such an argument, considering her expertise on the "policy side" of the industry. Before taking a job with the District, she had served as the founding director of a non-profit healthcare organization, a principal of a health care consulting corporation, and an associate director of a "healthcare-focused best practice research think tank." Pl. Ex. 1 at 4-7. She also did "policy side" work with the District, serving as the Deputy Mayor's senior health care policy advisor—a position she "really enjoyed" and found "difficult" to leave when she was asked to manage the Administration. 12/8/12 Tr. 19.

Campbell's claim that she was "effectively foreclosed" from work in her field therefore rests entirely on the fact that it took her two years to find such work. This cannot, as a matter of law, clear the "'high' bar" established by the Court. *Evangelou v. Dist. of Columbia*, 639 F. App'x 1, 3 (D.C. Cir. 2016). "Financial loss and loss of some employment opportunities do not . . . amount to an alteration

44

of a legal right," "even if some of the job opportunities lost are for public jobs." *Mosrie*, 718 F.2d at 1162. Thus, "[e]ven if the [government action] did set [Campbell] back a step on h[er] career path . . . , that would fall markedly short of showing that h[er] ability to pursue his chosen profession has been 'seriously affected, if not destroyed.'" *O'Donnell*, 148 F.3d at 1141-42; *see also Trifax*, 314 F.3d at 644 (holding that "Trifax failed to show anything remotely close to 'broad preclusion'" where it "'won some and lost some' . . . in retaining and bidding on government contracts after the [stigmatizing] [r]eport was released"). "[M]any, if not all, persons defamed by public officials could allege such damages" and recognizing such a claim "would go a long way toward producing the result specifically disapproved by the [Supreme] Court: the constitutionalizing of the ordinary defamation action brought against a public official." *Mosrie*, 718 F.2d at 1158 (quoting *Paul*, 424 U.S. at 698-99). "The Court rejected such a consequence as having no foundation in the Constitution and, in particular, as inconsistent with the constitutional notion of 'liberty.'" *Id.*

45

**CONCLUSION**

The Court should reverse the district court's decision and direct entry of judgment in favor of the District of Columbia.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
holly.johnson@dc.gov

January 2017

46

## CERTIFICATE OF SERVICE

I certify that on January 31, 2017, electronic copies of this brief were served

through the Court's ECF system, to:

> Alan Lescht, Esq.
> 1050 17th Street, NW, Suite 400
> Washington, D.C. 20036

/s/ Holly M. Johnson
HOLLY M. JOHNSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in

Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 11,116

words, excluding exempted parts.  This brief complies with the typeface and type

style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because

it has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in Times New Roman 14 point.

/s/ Holly M. Johnson
HOLLY M. JOHNSON