NOT YET SCHEDULED FOR ORAL ARGUMENT

————————

No. 16-7077

————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

JENNIFER B. CAMPBELL,

APPELLEE,

V.

DISTRICT OF COLUMBIA,

APPELLANT.

————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

————————

**JOINT APPENDIX VOLUME I**

————————

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

## <u>TABLE OF CONTENTS</u>

**VOLUME I**

1. Docket .................................................................................................................... 1

2. Complaint, ECF Record Document ("RD") 1 ............................................. 18

3. Joint Pretrial Statement, RD 41 ................................................................. 34

4. Jury Verdict, RD 65 ..................................................................................... 115

5. Jury Instructions, RD 66 ............................................................................ 118

6. Memorandum Opinion Denying Plaintiff's Request for Equitable Relief and Entering Judgment for Plaintiff, RD 74 .................................................. 166

7. Judgment, RD 75 ......................................................................................... 170

8. District of Columbia's Motion for Judgment as a Matter of Law, RD 83 ................ 171

9. Plaintiff's Opposition to Defendant's Motion for Judgment as a Matter of Law, RD 89 ............................................................................................ 183

10. 5/25/16 Order Denying District of Columbia's Motion for Judgment as a Matter of Law, RD 98 ................................................................................ 199

11. 5/25/16 Memorandum Opinion Denying District of Columbia's Motion for Judgment as a Matter of Law, RD 99 ................................................... 200

12. Trial Transcript, December 7, 2015 .......................................................... 217

     a.   12/7/15, pages 25-52 (Jennifer Campbell testimony) ...................... 219

13. Trial Transcript, December 8, 2015 .......................................................... 247

     a.   12/8/15, pages 17-65 (Jennifer Campbell testimony) ...................... 251

     b.   12/8/15, pages 65-72 (Darryl Wiggins testimony) ........................... 299

## VOLUME II

13. Trial Transcript, December 8, 2015 (continued) ........................................ 307

    c.  12/8/15, pages 73-76 (Sam Walker testimony) ................................... 307

    d.  12/8/15, pages 76-105 (Pedro Ribeiro testimony) .............................. 310

    e.  12/8/15, pages 106-14 (Bonnie Norton testimony) ........................... 340

    f.  12/8/15, pages 114-51 (Christopher Murphy testimony) ................................. 348

    g.  12/8/15, pages 151-59 (Janene Jackson testimony) ........................... 385

    h.  12/8/15, pages 160-68 (Carol Rand-Campbell testimony) ............................... 394

    i.  12/8/15, pages 169-88 (Rule 50 motion and colloquy) ..................................... 403

14. Trial Transcript, December 9, 2015 ........................................................ 423

    a.  12/9/15, pages 8-12 (Rule 50 colloquy) ........................................... 430

    b.  12/9/15, pages 13-29 (Holli Ploog testimony) .................................... 435

    c.  12/9/15, pages 30-100 (Wayne Turnage testimony) ........................... 452

    d.  12/9/15, pages 100-53 (Melisa Suzane Byrd testimony)................................. 522

    e.  12/9/15, pages 159-88 (Jennifer Campbell testimony)........................ 581

## VOLUME III

15. Trial Transcript, December 10, 2015 ...................................................... 614

    a.  12/10/15, pages 4-35 (Jury Instruction colloquy)............................... 617

    b.  12/10/15, pages 36-99 (Anthony Onyewuchi testimony)................................. 649

    c.  12/10/15, pages 104-16 (Rule 50 motions and colloquy, Jury Instruction colloquy) ................................................................................ 717

    d.  12/10/15, pages 117-34 (Jennifer Campbell testimony)................................. 730

    e.  12/10/15, pages 135-40 (Rule 50 motions and colloquy).................................. 748

f.   12/10/15, pages 143-62 (Campbell closing argument).......................................756

g.   12/10/15, pages 162-80 (DC closing argument)...............................775

h.   12/10/15, pages 180-85 (Campbell closing argument).......................................793

16. Trial Transcript, December 11, 2015 ................................................614

a.   12/11/15, pages 3-10 (Verdict)............................................802

17.  Trial Exhibits .....................................................................811

a.   Plaintiff's Exhibit 1 .................................................811

b.   Plaintiff's Exhibit 3................................................820

c.   Plaintiff's Exhibit 4................................................822

d.   Plaintiff's Exhibit 5................................................826

e.   Plaintiff's Exhibit 6................................................828

f.   Plaintiff's Exhibit 7................................................830

g.   Plaintiff's Exhibit 8................................................836

h.   Plaintiff's Exhibit 9................................................839

i.   Plaintiff's Exhibit 12................................................842

j.   Plaintiff's Exhibit 14................................................843

k.   Plaintiff's Exhibit 15................................................844

l.   Plaintiff's Exhibit 16................................................847

m.  Plaintiff's Exhibit 17................................................852

n.   Plaintiff's Exhibit 18................................................857

o.   Plaintiff's Exhibit 19................................................868

p.   Plaintiff's Exhibit 35................................................871

q.  Plaintiff's Exhibit 37.................................................................................... 874

r.  District of Columbia Exhibit 9 ..................................................................... 877

s.  District of Columbia Exhibit 15 ................................................................... 879

t.  District of Columbia Exhibit 58 ................................................................... 883

u.  District of Columbia Exhibit 62 ................................................................... 884

v.  District of Columbia Exhibit 70 ................................................................... 887

w.  District of Columbia Exhibit 95 ................................................................... 890

USCA Case #16-7077     Document #1674230     Filed: 05/08/2017     Page 6 of 311

APPEAL,CLOSED,JURY,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:12-cv-01769-RC

CAMPBELL v. DISTRICT OF COLUMBIA et al
Assigned to: Judge Rudolph Contreras
Demand: $5,000,000
Case in other court:  USCA, 16-07077
Cause: 42:1983 Civil Rights Act

Date Filed: 10/31/2012
Date Terminated: 01/20/2016
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Non-Party Respondent**

COMP**ASS SOLUTIONS, LLC**

Plaintiff

**JENNIFER B. CAMPBELL**

represented by **Constance Travanty**
ALAN LESCHT & ASSOCIATES
1050 17th Street, NW
Suite 400
Washington, DC 20036
(202) 463-6036
Fax: (202) 463-6067
Email: constance.travanty@leschtlaw.com
*LEAD A*TTORNEY
AT*TORNEY TO BE NOTICED*

**Sara B. Safriet**
ALAN LESCHT & ASSOCIATES
1050 17th Street, NW
Suite 400
Washington, DC 20036
(202) 463-6036 x112
Fax: (202) 463-6067
Email: sara.safriet@leschtlaw.com
*LEAD A*TTORNEY
AT*TORNEY TO BE NOTICED*

**David C. Codell**
Law Offices of David C. Codell
8560 W. Sunset Blvd
Suite 500
West Hollywood, CA 90069
310-273-0306
Fax: 310-273-0307
*PRO HAC VICE*
AT*TORNEY TO BE NOTICED*

**Alan Lescht**
ALAN LESCHT & ASSOCIATES
1050 17th Street, NW
Suite 400

**JA 1**

Washington, DC 20036
(202) 463-6036
Fax: (202) 463-6067
Email: alan.lescht@leschtlaw.com
*ATTORNEY TO BE NOTICED*

V.

<u>Defendant</u>

**DISTRICT OF COLUMBIA**         represented by **Sarah L. Knapp**
*A Municipal Corporation*                   OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
441 4th Street, NW
Suite 630 South
Washington, DC 20001
(202) 724-6528
Fax: (202) 741-0559
Email: sarah.knapp@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Taylor Nicole Anvid**
D.C. OFFICE OF THE ATTORNEY
GENERAL
Civil Litigation
441 4th Street NW
630 South
Washington, DC 20001
202-724-6644
Email: taylor.anvid@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex Karpinski**
OFFICE OF ATTORNEY GENERAL/DC
441 Fourth Street, NW
6th Floor North
Washington, DC 20001
(202) 442-9866
Fax: (202) 715-7725
Email: alex.karpinski@dc.gov
*ATTORNEY TO BE NOTICED*

**Brant W. Martin**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
Civil Division
441 4th Street
6th Floor, South
Washington, DC 20001
(202) 724-6608
Email: brant.martin@dc.gov
*TERMINATED: 11/07/2014*

Defendant

**WAYNE M. TURNAGE**           represented by   **Sarah L. Knapp**
*In his official capacity as Director, District*                      (See above for address)
*of Columbia Department of Health Care*                   *LEAD ATTORNEY*
Finance                                       *ATTORNEY TO BE NOTICED*

                                               **Brant W. Martin**
                                               (See above for address)
                                               *TERMINATED: 11/07/2014*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/31/2012 | 1 | COMPLAINT against DISTRICT OF COLUMBIA, WAYNE M. TURNAGE ( Filing fee $ 350 receipt number 0090-3116633) filed by JENNIFER B. CAMPBELL. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Lescht, Alan) (Entered: 10/31/2012) |
| 10/31/2012 | | Case Assigned to Judge Rudolph Contreras. (mmh) (Entered: 11/01/2012) |
| 11/01/2012 | 2 | Electronic Summons Issued (3) as to DISTRICT OF COLUMBIA, WAYNE M. TURNAGE. (Attachments: # 1 Consent Notice)(mmh) (Entered: 11/01/2012) |
| 12/05/2012 | 3 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on the Mayor of the District of Columbia. Date of Service Upon the Mayor for the District of Columbia on 11/14/12. (Lescht, Alan) (Entered: 12/05/2012) |
| 12/05/2012 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DISTRICT OF COLUMBIA served on 11/14/2012 (Lescht, Alan) (Entered: 12/05/2012) |
| 12/05/2012 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WAYNE M. TURNAGE served on 11/14/2012 (Lescht, Alan) (Entered: 12/05/2012) |
| 12/11/2012 | 6 | Consent MOTION for Extension of Time to *respond to complaint* by DISTRICT OF COLUMBIA, WAYNE M. TURNAGE (Knapp, Sarah) (Entered: 12/11/2012) |
| 12/14/2012 | | MINUTE ORDER granting 6 Motion for Extension of Time. Defendants shall respond to the complaint no later than December 28, 2012, and plaintiff shall oppose any motion filed by that date no later than January 25, 2013. Signed by Judge Rudolph Contreras on December 14, 2012. (lcrc2) (Entered: 12/14/2012) |
| 12/28/2012 | 7 | MOTION to Dismiss by DISTRICT OF COLUMBIA, WAYNE M. TURNAGE (Knapp, Sarah) (Entered: 12/28/2012) |
| 12/31/2012 | 8 | NOTICE of Appearance by Brant Wood Martin on behalf of All Defendants (Martin, Brant) (Entered: 12/31/2012) |
| 01/22/2013 | 9 | Memorandum in opposition to re 7 MOTION to Dismiss filed by JENNIFER B. CAMPBELL. (Lescht, Alan) (Entered: 01/22/2013) |
| 01/31/2013 | 10 | REPLY to opposition to motion re 7 MOTION to Dismiss filed by DISTRICT OF COLUMBIA, WAYNE M. TURNAGE. (Knapp, Sarah) (Entered: 01/31/2013) |
| 09/23/2013 | 11 | ORDER granting in part and denying in part 7 Motion to Dismiss. See document for details. Signed by Judge Rudolph Contreras on 9/23/2013. (lcrc3) (Entered: 09/23/2013) |
| 09/23/2013 | 12 | MEMORANDUM OPINION granting in part and denying in part 7 Motion to Dismiss. See document for details. Signed by Judge Rudolph Contreras on 9/23/2013. (lcrc3) (Entered: 09/23/2013) |

USCA Case #17-7003 Document #1671336 Filed: 04/03/2017 Page 9 of 311

| 10/25/2013 | 13 | NOTICE Regarding Date of Answer Filing by DISTRICT OF COLUMBIA (Martin, Brant) (Entered: 10/25/2013) |
|---|---|---|
| 11/06/2013 | 14 | ANSWER to Complaint with Jury Demand by DISTRICT OF COLUMBIA.(Martin, Brant) (Entered: 11/06/2013) |
| 11/06/2013 | | MINUTE ORDER. It is hereby ORDERED that the parties shall meet, confer, and submit a joint report in accordance with Federal Rule of Civil Procedure 26(f) and Local Civil Rule 16.3 on or before November 20, 2013. SO ORDERED. Signed by Judge Rudolph Contreras on 11/06/2013. (lcrc1) (Entered: 11/06/2013) |
| 11/08/2013 | | Reset Deadlines: Meet & Confer Statement due by 11/20/2013. (tj) (Entered: 11/08/2013) |
| 11/19/2013 | 15 | MEET AND CONFER STATEMENT. (Martin, Brant) (Entered: 11/19/2013) |
| 11/19/2013 | 16 | SCHEDULING ORDER. See document for details. Signed by Judge Rudolph Contreras on 11/19/2013.(lcrc1) (Entered: 11/19/2013) |
| 12/02/2013 | 17 | NOTICE *of Objection of Subpoena from Plaintiff* by DISTRICT OF COLUMBIA (Horvath, Stephen) (Entered: 12/02/2013) |
| 01/29/2014 | | Reset Deadlines/Hearings: Discovery due by 4/30/2014; Status Conference set for 5/19/2014 @ 10:00 AM in Courtroom 14 before Judge Rudolph Contreras. (tj ) (Entered: 01/29/2014) |
| 02/18/2014 | 18 | NOTICE of Appearance by Constance Travanty on behalf of JENNIFER B. CAMPBELL (Travanty, Constance) (Entered: 02/18/2014) |
| 04/09/2014 | | MINUTE ORDER: Upon consideration of a joint telephonic request for a discovery dispute status conference, it is hereby ORDERED that the request is GRANTED, and it is FURTHER ORDERED that the parties shall appear for a status conference on April 11, 2014, at 10:00 a.m. in Courtroom 14. SO ORDERED. Signed by Judge Rudolph Contreras on 04/09/2014. (lcrc1) (Entered: 04/09/2014) |
| 04/10/2014 | | Set Hearings: Status Conference set for 4/11/2014 @ 10:00 AM in Courtroom 14 before Judge Rudolph Contreras. (tj ) (Entered: 04/10/2014) |
| 04/11/2014 | 19 | ORDER disposing of issues raised at today's discovery status conference. See document for details. Signed by Judge Rudolph Contreras on 04/11/2014. (lcrc1) (Entered: 04/11/2014) |
| 04/11/2014 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Status Conference held on 4/11/2014. Order to follow. (Court Reporter: Lisa Griffith.) (tj ) (Entered: 04/11/2014) |
| 04/28/2014 | 20 | Consent MOTION for Extension of Time to Complete Discovery by JENNIFER B. CAMPBELL (Travanty, Constance) (Entered: 04/28/2014) |
| 04/29/2014 | | MINUTE ORDER granting 20 Motion for Extension of Time to Complete Discovery. Upon consideration of the plaintiff's consent motion for extension of time to complete discovery, it is hereby ORDERED that the motion is GRANTED, and discovery in this case shall close on May 30, 2014. It is further ORDERED that the status conference currently scheduled for May 19, 2014 is CONTINUED to June 10, 2014, at 10:30 a.m. in Courtroom 14. SO ORDERED. Signed by Judge Rudolph Contreras on 04/29/2014. (lcrc1) (Entered: 04/29/2014) |
| 05/07/2014 | | Reset Hearings: Status Conference set for 6/10/2014 @ 10:30 AM in Courtroom 14 before Judge Rudolph Contreras. (tj) (Entered: 05/07/2014) |
| 05/14/2014 | 21 | MOTION to Take Deposition from Janene Jackson and Planned Parenthood Federation |

**JA 4**

USCA Case #16-7077 Document #1687480 Filed: 05/08/2017 Page 10 of 90

of America, Inc. by JENNIFER B. CAMPBELL (Travanty, Constance) Added MOTION to Continue on 5/15/2014 (znmw, ). (Entered: 05/14/2014)

| 05/19/2014 | | MINUTE ORDER granting 21 Motion to Take Depositions; denying without prejudice 21 Motion to Continue: Upon consideration of the plaintiff's motion to take depositions, it is hereby ORDERED that the motion is GRANTED, and leave is hereby granted for the plaintiff to take the depositions of Janene Jackson and Planned Parenthood. It is further ORDERED that the motion to continue the June 10, 2014 status conference is DENIED WITHOUT PREJUDICE because plaintiff has provided no additional information to the Court about how her scheduling conflict came about, and has not proposed alternative dates and times. SO ORDERED. Signed by Judge Rudolph Contreras on 05/19/2014. (lcrc1) (Entered: 05/19/2014) |
|---|---|---|
| 05/29/2014 | 22 | Consent MOTION for Extension of Time to Complete Discovery by JENNIFER B. CAMPBELL (Travanty, Constance) (Entered: 05/29/2014) |
| 05/29/2014 | | MINUTE ORDER granting 22 Motion for Extension of Time to Complete Discovery. Upon consideration of plaintiff's consent motion to extend discovery, it is hereby ORDERED that the motion is GRANTED, and that discovery shall close on June 20, 2014. It is further ORDERED that the status conference currently scheduled for June 10, 2014, is CONTINUED to June 27, 2014, at 9:00 a.m. in Courtroom 14. SO ORDERED. Signed by Judge Rudolph Contreras on 05/29/2014. (lcrc1) (Entered: 05/29/2014) |
| 06/12/2014 | | Reset Deadlines/Hearings: Discovery due by 6/20/2014; Status Conference set for 6/27/2014 @ 9:00 AM in Courtroom 14 before Judge Rudolph Contreras. (tj ) (Entered: 06/12/2014) |
| 06/24/2014 | | NOTICE of Hearing: Due to a change in the court's schedule, the status conference currently scheduled for Friday, June 27, 2014 at 9:00am is hereby RESCHEDULED for 10:00 AM on the same day in Courtroom 14 before Judge Rudolph Contreras. (tj ) (Entered: 06/24/2014) |
| 06/27/2014 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Status Conference held on 6/27/2014. Parties discuss the status of this action, and agree to the following briefing schedule: Summary Judgment motions due by 8/25/2014; Response to Motion for Summary Judgment due by 9/29/2014; Reply to Motion for Summary Judgment due by 10/13/2014. (Court Reporter: Bowles Reporting.) (tj ) (Entered: 06/27/2014) |
| 08/22/2014 | 23 | Consent MOTION for Extension of Time to *file motion for summary judgment* by DISTRICT OF COLUMBIA, WAYNE M. TURNAGE (Knapp, Sarah) (Entered: 08/22/2014) |
| 08/22/2014 | | MINUTE ORDER granting 23 Motion for Extension of Time. Upon consideration of Defendant's consent motion for additional time to file motion for summary judgment, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the following briefing schedule shall now govern: Defendant's summary judgment motion is due by 9/2/14; Plaintiff's opposition is due 10/6/14, and Defendant's reply is due 10/21/14. SO ORDERED. Signed by Judge Rudolph Contreras on 08/22/2014. (lcrc1) (Entered: 08/22/2014) |
| 08/27/2014 | | Set/Reset Deadlines: Summary Judgment motions due by 9/2/2014. Response to Motion for Summary Judgment due by 10/6/2014. Reply to Motion for Summary Judgment due by 10/21/2014. (tj ) (Entered: 08/27/2014) |
| 09/02/2014 | 24 | MOTION for Summary Judgment by DISTRICT OF COLUMBIA (Attachments: # 1 Statement of Facts, # 2 Exhibit A - J)(Knapp, Sarah) (Entered: 09/02/2014) |
| 10/01/2014 | 25 | Memorandum in opposition to re 24 MOTION for Summary Judgment filed by |

**JA 5**

JENNIFER B. CAMPBELL (Attachments: # 1 Statement of Facts, # 2 Exhibit 1-9, # 3 Exhibit 10, # 4 Exhibit 11-19, # 5 Exhibit 20-27, # 6 Exhibit 28-34)(Travanty, Constance) (Entered: 10/01/2014)

| | | |
|---|---|---|
| 10/21/2014 | 26 | Consent MOTION for Extension of Time to File Response/Reply as to 24 MOTION for Summary Judgment by DISTRICT OF COLUMBIA (Knapp, Sarah) (Entered: 10/21/2014) |
| 10/21/2014 | | MINUTE ORDER granting 26 Defendant's Consent Motion for Extension of Time to File Reply. It is hereby ORDERED that Defendant shall file its reply on or before October 24, 2014. SO ORDERED. Signed by Judge Rudolph Contreras on 10/21/2014. (lcrc1) (Entered: 10/21/2014) |
| 10/21/2014 | | Reset Deadlines: Replies due by 10/24/2014. (tj ) (Entered: 10/21/2014) |
| 10/24/2014 | 27 | REPLY to opposition to motion re 24 MOTION for Summary Judgment filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Exhibit)(Martin, Brant) (Entered: 10/24/2014) |
| 10/28/2014 | 28 | SUPPLEMENTAL MEMORANDUM to re 25 Memorandum in Opposition, filed by JENNIFER B. CAMPBELL. (Attachments: # 1 Exhibit)(Lescht, Alan) (Entered: 10/28/2014) |
| 11/07/2014 | 29 | NOTICE OF WITHDRAWAL OF APPEARANCE as to DISTRICT OF COLUMBIA. Attorney Brant W. Martin terminated. (Martin, Brant) (Entered: 11/07/2014) |
| 04/30/2015 | 30 | ORDER directing the parties to submit supplemental briefing. See document for details. Signed by Judge Rudolph Contreras on 4/30/2015. (lcrc1) (Entered: 04/30/2015) |
| 05/28/2015 | 31 | Consent MOTION for Extension of Time to *Respond to Court Or*der by DISTRICT OF COLUMBIA (Knapp, Sarah) (Entered: 05/28/2015) |
| 05/28/2015 | | MINUTE ORDER granting 31 Defendant's Consent Motion for Extension of Time: It is hereby ORDERED that the District of Columbia shall file its supplemental memorandum on or before June 19, 2015; Campbell shall file her supplemental memorandum in opposition on or before July 6, 2015; and the District shall file its supplemental reply on or before July 20, 2015. SO ORDERED. Signed by Judge Rudolph Contreras on 5/28/2015. (lcrc1) (Entered: 05/28/2015) |
| 06/19/2015 | 32 | RESPONSE TO ORDER OF THE COURT re 30 Order filed by DISTRICT OF COLUMBIA. (Knapp, Sarah) (Entered: 06/19/2015) |
| 07/06/2015 | 33 | RESPONSE TO ORDER OF THE COURT re 30 Order filed by JENNIFER B. CAMPBELL. (Lescht, Alan) (Entered: 07/06/2015) |
| 07/20/2015 | 34 | REPLY re 30 Order filed by DISTRICT OF COLUMBIA. (Knapp, Sarah) (Entered: 07/20/2015) |
| 09/04/2015 | 35 | ORDER granting in part and denying in part 24 Defendant's motion for summary judgment. See document for details. Signed by Judge Rudolph Contreras on 9/4/2015. (lcrc1) (Entered: 09/04/2015) |
| 09/04/2015 | 36 | MEMORANDUM OPINION granting in part and denying in part 24 Defendant's motion for summary judgment. See document for details. Signed by Judge Rudolph Contreras on 9/4/2015. (lcrc1) (Entered: 09/04/2015) |
| 09/08/2015 | | MINUTE ORDER: It is hereby ORDERED that the parties shall appear before the Court for a status conference at 4:00 PM on September 10, 2015, in Courtroom 14. SO ORDERED. Signed by Judge Rudolph Contreras on 9/8/2015. (lcrc1) (Entered: 09/08/2015) |

## JA 6

| | | |
|---|---|---|
| 09/10/2015 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Status Conference held on 9/10/2015. Parties advise the court of the status of this action. Jury Trial set for 12/7/2015 @ 10:00 AM in Courtroom 14 before Judge Rudolph Contreras. Parties agree to further mediation before a Magistrate Judge. (Court Reporter: Annette Montalvo.) (tj) (Entered: 09/11/2015) |
| 09/11/2015 | 37 | PRETRIAL ORDER: See document for details. Signed by Judge Rudolph Contreras on 9/11/2015. (lcrc1) (Entered: 09/11/2015) |
| 09/11/2015 | 38 | ORDER referring case to magistrate judge for mediation: See document for details. Signed by Judge Rudolph Contreras on 9/11/2015. (lcrc1) (Entered: 09/11/2015) |
| 09/11/2015 | | Set/Reset Deadlines: Motions in Limine due by 10/19/2015; Proposed Voir Dire due by 10/16/15; Exhibits due by 11/23/2015; Pretrial Conference set for 11/30/2015 @ 10:00 AM in Courtroom 14 before Judge Rudolph Contreras. (tj) (Entered: 09/11/2015) |
| 09/11/2015 | | MINUTE ORDER REFERRING CASE for Mediation to Magistrate Alan Kay. (Signed by Judge Rudolph Contreras on 9/11/15.) (tj) Modified event title on 10/8/2015 (znmw). (Entered: 10/07/2015) |
| 10/07/2015 | 39 | ORDER: Settlement Conference set for 10/23/2015 at 10:00 AM in Chambers [room 2333] before Magistrate Judge Alan Kay. Signed by Magistrate Judge Alan Kay on 10/07/15. (DM) (Entered: 10/07/2015) |
| 10/07/2015 | | CASE DIRECTLY REFERRED to Magistrate Judge Alan Kay for Mediation. (md) (Entered: 10/07/2015) |
| 10/16/2015 | | MINUTE ORDER: Per the request of counsel, the Settlement Conference is rescheduled from 10/23/2015 to 10/30/2015, at 10:00 AM in Chambers [room 2333] before Magistrate Judge Alan Kay. Signed by Magistrate Judge Alan Kay on 10/16/2015. (lcak1) (Entered: 10/16/2015) |
| 10/16/2015 | | Set/Reset Hearings: Settlement Conference set for 10/30/2015 at 02:00 PM in Chambers (room 2333) before Magistrate Judge Alan Kay. (lcak1) (Entered: 10/16/2015) |
| 10/19/2015 | 40 | MOTION in Limine by JENNIFER B. CAMPBELL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Lescht, Alan) (Entered: 10/19/2015) |
| 10/19/2015 | 41 | PRETRIAL STATEMENT by JENNIFER B. CAMPBELL. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Lescht, Alan) (Entered: 10/19/2015) |
| 10/26/2015 | | MINUTE ORDER: The settlement conference in this case is currently set for October 30, 2015. Because Magistrate Judge Kay will be covering criminal matters for that day, counsel are requested to please inform chambers (202-354-3030) as to whether they would prefer a 10:30 a.m. or 3:00 p.m. commencement time for the settlement conference. Signed by Magistrate Judge Alan Kay on 10/26/15. (DM) (Entered: 10/26/2015) |
| 10/26/2015 | | MINUTE ORDER: The Settlement Conference set for 10/30/2015 will begin at 10:30 AM in Chambers [room 2333] before Magistrate Judge Alan Kay. Signed by Magistrate Judge Alan Kay on 10/26/2015. (DM) (Entered: 10/26/2015) |
| 10/28/2015 | | MINUTE ORDER: The Settlement Conference set for 10/30/15 is cancelled per the request of counsel. Signed by Magistrate Judge Alan Kay on 10/28/15. (DM) (Entered: 10/28/2015) |
| 11/02/2015 | 42 | Consent MOTION for Extension of Time to File Response/Reply as to 40 MOTION in |

USCA Case #16-7077    District of Columbia by DISTRICT OF COLUMBIA (Knapp, Sarah) (Entered: 11/02/2015) of 311

| | | |
|---|---|---|
| 11/02/2015 | | MINUTE ORDER granting 42 Defendant's Consent Motion for Extension of Time: It is hereby ORDERED that the District of Columbia shall respond to 40 Plaintiff's Motion in Limine on or before November 4, 2015. SO ORDERED. Signed by Judge Rudolph Contreras on 11/2/2015. (lcrc1) (Entered: 11/02/2015) |
| 11/04/2015 | 43 | RESPONSE re 40 MOTION in Limine filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Knapp, Sarah) (Entered: 11/04/2015) |
| 11/11/2015 | 44 | REPLY to opposition to motion re 40 MOTION in Limine filed by JENNIFER B. CAMPBELL. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Lescht, Alan) (Entered: 11/11/2015) |
| 11/23/2015 | 45 | NOTICE of Demonstrative Exhibits by JENNIFER B. CAMPBELL. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit)(Lescht, Alan) Modified event title on 11/24/2015 (znmw). (Entered: 11/23/2015) |
| 11/24/2015 | 46 | Exhibit List Supplemental by DISTRICT OF COLUMBIA. (Knapp, Sarah) (Entered: 11/24/2015) |
| 11/27/2015 | 47 | NOTICE of Appearance by Alex Karpinski on behalf of DISTRICT OF COLUMBIA (Karpinski, Alex) (Entered: 11/27/2015) |
| 11/30/2015 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Final Pretrial Conference held on 11/30/2015. Joint pretrial statement addressed. Jury trial remains scheduled to commence on December 7, 2015 @ 10am. (Court Reporter: Annette Montalvo.) (tj) (Entered: 11/30/2015) |
| 11/30/2015 | 48 | ORDER granting in part and denying in part 40 Plaintiff's Motion in Limine, and including other rulings: See document for details. Signed by Judge Rudolph Contreras on 11/30/2015. (lcrc1) (Entered: 11/30/2015) |
| 11/30/2015 | 49 | PRETRIAL STATEMENT by DISTRICT OF COLUMBIA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Knapp, Sarah) (Entered: 11/30/2015) |
| 11/30/2015 | 50 | NOTICE of Appearance by Alan Lescht on behalf of JENNIFER B. CAMPBELL (Lescht, Alan) (Entered: 11/30/2015) |
| 11/30/2015 | | SCHEDULING MINUTE ORDER: It is hereby ORDERED that Plaintiff shall respond to 49 the District of Columbia's Renewed Objection to Plaintiff's Witnesses on or before December 3, 2015. SO ORDERED. Signed by Judge Rudolph Contreras on 11/30/2015. (lcrc1) (Entered: 11/30/2015) |
| 12/02/2015 | 51 | MOTION for Order Correcting Typo and Excluding Defendant's Exhibit 9 by JENNIFER B. CAMPBELL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7)(Lescht, Alan) (Entered: 12/02/2015) |
| 12/02/2015 | 52 | MOTION for Order Clarifying Court's Order (ECF No. 48), Imposing Deadline, Taking Judicial Notice of Plaintiff's Exhibits 10 and 11, and Plaintiff's Proposed Jury Instruction by JENNIFER B. CAMPBELL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit 1)(Lescht, Alan) (Entered: 12/02/2015) |
| 12/02/2015 | 53 | MEMORANDUM by JENNIFER B. CAMPBELL. (Lescht, Alan) (Entered: 12/02/2015) |
| 12/03/2015 | 54 | RESPONSE TO ORDER OF THE COURT re Order, District of Columbia's Renewed |

| | | |
|---|---|---|
| | | *Objection to Plaintiff's Witnesses* filed by JENNIFER B. CAMPBELL. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Lescht, Alan) (Entered: 12/03/2015) |
| 12/04/2015 | 55 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Sara McDonough, :Firm-Alan Lescht & Associates, PC, :Address- 1050 17th Street, NW, Suite 400, Washington, DC 20036. Phone No. - 202-463-6036. Fax No. - 202-463-6067 Filing fee $ 100, receipt number 0090-4337451. Fee Status: Fee Paid. by JENNIFER B. CAMPBELL (Attachments: # 1 Declaration Declaration of Sara McDonough)(Lescht, Alan) (Entered: 12/04/2015) |
| 12/04/2015 | 56 | RESPONSE TO ORDER OF THE COURT re 48 Order on Motion in Limine filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Exhibit A)(Knapp, Sarah) (Entered: 12/04/2015) |
| 12/04/2015 | 57 | REPLY to opposition to motion re 52 MOTION for Order *Clarifying Court's Order (ECF No. 48), Imposing Deadline, Taking Judicial Notice of Plaintiff's Exhibits 10 and 11, and Plaintiff's Proposed Jury Instruction,* 51 MOTION for Order Corr*ecting Typo and Excluding Defendant's Exhibit 9* filed by JENNIFER B. CAMPBELL. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Lescht, Alan) (Entered: 12/04/2015) |
| 12/04/2015 | 58 | NOTICE of Appearance by Taylor Nicole Anvid on behalf of DISTRICT OF COLUMBIA (znmw) (Entered: 12/07/2015) |
| 12/07/2015 | | Minute Entry for proceedings held before Judge Rudolph Contreras on 12/7/15: Jury selection held and concluded. 8 Jurors selected and sworn. Jury Trial begun and continued to 12/8/2015 @ 10:00 AM in Courtroom 14 before Judge Rudolph Contreras. Witness: Dr. Jennifer B. Campbell. (Court Reporter: Annette Montalvo) (tj ) (Entered: 12/07/2015) |
| 12/08/2015 | 59 | MOTION for Order *to Redact* by JENNIFER B. CAMPBELL (Attachments: # 1 Memorandum in Support, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B)(Lescht, Alan) (Entered: 12/08/2015) |
| 12/08/2015 | | MINUTE ORDER: The Court having impaneled the jury in this action, it is hereby ORDERED that during trial and deliberations all meals for said jury shall be paid by the Clerk of the Court for the U.S. District Court for the District of Columbia. (Approved by Judge Rudolph Contreras on 12/8/15). (tj) (Entered: 12/08/2015) |
| 12/08/2015 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Jury Trial held on 12/8/15. Same 8 jurors. Trial continued to 12/9/2015 @ 10:00 AM in Courtroom 14 before Judge Rudolph Contreras. Witnesses: Dr. Jennifer B. Campbell; Darryl Wiggins; Sam Walker; Pedro Ribiero; Bonnie Norton; Christopher Murphy; Janene Jackson; Carolyn Reed. (Court Reporter: Annette Montalvo). (tj) (Entered: 12/08/2015) |
| 12/09/2015 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Jury Trial held on 12/9/15. Same 8 jurors. Trial continued to 12/10/2015 @ 10:00 AM in Courtroom 14 before Judge Rudolph Contreras. Witnesses: Holly Ploog; Wayne Turnage; Melisa Byrd (Wrapp); Dr. Jennifer Campbell. (Court Reporter Annette Montalvo.) (tj) (Entered: 12/09/2015) |
| 12/10/2015 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Jury Trial resumed and concluded on 12/10/2015; Same 8 jurors. Jury Deliberations to begin on 12/11/2015 at 10:00 AM in Courtroom 14 before Judge Rudolph Contreras. Witnesses: Anthony Onyewuchi; Dr. Jennifer Campbell. (Court Reporter: Annette Montalvo.) (tj) (Entered: 12/10/2015) |
| 12/11/2015 | | MINUTE ORDER granting in part and denying in part 51 Plaintiff's Motion to Correct |

USCA Case #17-7077     Document #1672439     Filed: 05/09/2017     Page 15 of 321

| | | |
|---|---|---|
| | | Typo and to Exclude Defendant's Exhibit 9, granting in part and denying in part Plaintiff's Motion for various orders, granting [55](#) Motion for Admission Pro Hac Vice, and granting in part and denying in part [59](#) Plaintiff's Motion to Redact: This order memorializes the Court's oral rulings at trial. It is hereby ORDERED that "101" is replaced with "100" in Section V, Paragraph 2 of [48](#) the Court's November 30, 2015 Order. It is FURTHER ORDERED that Plaintiff's Motion to Exclude Defendant's Exhibit 9 is DENIED. It is FURTHER ORDERED that, for reasons set forth in open court at trial, [52](#) Plaintiff's Motion for various orders is GRANTED IN PART and DENIED IN PART. It is FURTHER ORDERED that Sara McDonough is admitted to represent Plaintiff pro hac vice in this case. It is FURTHER ORDERED that, for reasons set forth in open court at trial, [59](#) Plaintiff's Motion to Redact is GRANTED IN PART and DENIED IN PART. SO ORDERED. Signed by Judge Rudolph Contreras on 12/11/2015. (lcrc1) (Entered: 12/11/2015) |
| 12/11/2015 | [60](#) | ORDER referring case to a United States Magistrate Judge for mediation and directing the parties to submit a joint report: See document for details. Signed by Judge Rudolph Contreras on 12/11/2015. (lcrc1) (Entered: 12/11/2015) |
| 12/11/2015 | | SCHEDULING MINUTE ORDER: As stated today in open court, it is hereby ORDERED that, on or before December 18, 2015, Plaintiff shall indicate to the Court what equitable remedies she seeks. SO ORDERED. Signed by Judge Rudolph Contreras on 12/11/2015. (lcrc1) (Entered: 12/11/2015) |
| 12/11/2015 | [62](#) | Jury Notes #1. (tj) (Entered: 12/14/2015) |
| 12/11/2015 | [63](#) | Signatur **e Page of For**eperson<br><br>in Jury Note. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.). (tj) (Entered: 12/14/2015) |
| 12/11/2015 | [64](#) | Signatur **e Page of For**eperson<br><br>in Jury Verdict. (Access to the PDF Document is restricted pursuant to the E-Government Act. (Access is limited to Counsel of Record and the Court) (tj) (Entered: 12/14/2015) |
| 12/11/2015 | [65](#) | JURY VERDICT in favor of plaintiff and against the defendant. (tj) (Entered: 12/14/2015) |
| 12/11/2015 | [66](#) | FIAT ORDER "let this be filed" re: Jury Instructions. (Signed by Judge Rudolph Contreras on 12/11/15). (tj) (Entered: 12/14/2015) |
| 12/11/2015 | [67](#) | Exhibit Lists by plaintiff JENNIFER B. CAMPBELL and defendant DISTRICT OF COLUMBIA. (tj) (Entered: 12/14/2015) |
| 12/11/2015 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Jury Deliberations begun and concluded on 12/11/2015. Same 8 Jurors. Jury Verdict rendered in favor of plaintiff, and Jurors Discharged. (Court Reporter: Annette Montalvo.) (tj) (Entered: 01/08/2016) |
| 12/17/2015 | [68](#) | ORDER: Settlement Conference set for 1/13/2016 at 10:30 AM in Chambers [room 2333] before Magistrate Judge Alan Kay. Signed by Magistrate Judge Alan Kay on 12/17/15. (DM) (Entered: 12/17/2015) |
| 12/18/2015 | [69](#) | MEMORANDUM by JENNIFER B. CAMPBELL. (Safriet, Sara) (Entered: 12/18/2015) |
| 12/30/2015 | [70](#) | WITHDRAWN PURSUANT TO NOTICE FILED 10/18/2016..... MOTION for Order *Granting Plaintiff Leave to Contact Jur*ors by JENNIFER B. CAMPBELL (Attachments: # [1](#) Memorandum in Support, # [2](#) Text of Proposed Order)(Lescht, Alan) Modified on 10/19/2016 (znmw). (Entered: 12/30/2015) |

JA 10

| | | |
|---|---|---|
| 01/04/2016 | 71 | RESPONSE re 69 Memorandum filed by DISTRICT OF COLUMBIA. (Knapp, Sarah) (Entered: 01/04/2016) |
| 01/11/2016 | 72 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- David Codell, :Firm- Law Office of David C. Codell, :Address- 8560 W. Sunset Blvd, Suite 500, West Hollywood, CA 90069. Phone No. - 310-273-0306. Fax No. - 310-273-0307 Filing fee $ 100, receipt number 0090-4373919. Fee Status: Fee Paid. by JENNIFER B. CAMPBELL (Attachments: # 1 Affidavit, # 2 Text of Proposed Order)(Lescht, Alan) (Entered: 01/11/2016) |
| 01/11/2016 | | MINUTE ORDER granting 72 Motion for Leave to Appear Pro Hac Vice: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that David Codell is admitted to represent Plaintiff pro hac vice in this case. SO ORDERED. Signed by Judge Rudolph Contreras on 1/11/2016. (lcrc1) (Entered: 01/11/2016) |
| 01/13/2016 | | Minute Entry for proceedings held before Magistrate Judge Alan Kay: Settlement Conference held on 1/13/2016. (DM) (Entered: 01/29/2016) |
| 01/14/2016 | 73 | RESPONSE re 70 MOTION for Order *Granting Plaintiff Leave to Contact Jur*ors filed by DISTRICT OF COLUMBIA. (Knapp, Sarah) (Entered: 01/14/2016) |
| 01/20/2016 | 74 | MEMORANDUM OPINION denying 69 Plaintiff's request for equitable relief and entering judgment for Plaintiff. See document for details. Signed by Judge Rudolph Contreras on 1/20/2016. (lcrc1) (Entered: 01/20/2016) |
| 01/20/2016 | 75 | FINAL JUDGMENT in favor of Plaintiff against Defendant. Signed by Judge Rudolph Contreras on 1/20/2016. (lcrc1) (Entered: 01/20/2016) |
| 01/29/2016 | 76 | Joint STATUS REPORT by JENNIFER B. CAMPBELL. (Safriet, Sara) (Entered: 01/29/2016) |
| 02/01/2016 | 77 | Consent MOTION for Extension of Time to *File Motion for Attorney's Fees and Costs* by JENNIFER B. CAMPBELL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Lescht, Alan) (Entered: 02/01/2016) |
| 02/01/2016 | | MINUTE ORDER granting 77 Plaintiff's Consent Motion for Extension of Time: It is hereby ORDERED that Plaintiff shall fill her Motion for Attorney's Fees and Costs on or before February 16, 2016. SO ORDERED. Signed by Judge Rudolph Contreras on 2/1/2016. (lcrc1) (Entered: 02/01/2016) |
| 02/04/2016 | | Set/Reset Deadlines: Motions due by 2/16/2016. (tj) (Entered: 02/04/2016) |
| 02/16/2016 | 78 | Second MOTION for Extension of Time to *File Motion for Attorney's Fees and Costs* by JENNIFER B. CAMPBELL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Lescht, Alan) (Entered: 02/16/2016) |
| 02/16/2016 | 79 | TRANSCRIPT OF JURY TRIAL DAY 1-EXCERPT before Judge Rudolph Contreras held on 12-7-2015; Page Numbers: 1-65. Date of Issuance:2-16-2016. Court Reporter/Transcriber Annette M. Montalvo, Telephone number 718-804-2711, Transcripts may be ordered by submitting the <a href=http://www.dcd.uscourts.gov/dcd/node/2189>Transcript Order Form.</a><P></P> <P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to |

the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 3/8/2016. Redacted Transcript Deadline set for 3/18/2016. Release of Transcript Restriction set for 5/16/2016. (Montalvo, Annette) (Entered: 02/16/2016)

| | | |
|---|---|---|
| 02/16/2016 | 80 | TRANSCRIPT OF FURTHER JURY TRIAL-DAY 2 before Judge Rudolph Contreras held on 12-8-2015; Page Numbers: 1-213. Date of Issuance:2-16-2016. Court Reporter/Transcriber Annette M. Montalvo, Telephone number 718-804-2711, Transcripts may be ordered by submitting the <a href=http://www.dcd.uscourts.gov/dcd/node/2189>Transcript Order Form.</a><P></P> <P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 3/8/2016. Redacted Transcript Deadline set for 3/18/2016. Release of Transcript Restriction set for 5/16/2016. (Montalvo, Annette) (Entered: 02/16/2016) |
| 02/16/2016 | 81 | TRANSCRIPT OF FURTHER JURY TRIAL-DAY3 before Judge Rudolph Contreras held on 12-9-2015; Page Numbers: 1-217. Date of Issuance:2-16-2016. Court Reporter/Transcriber Annette M. Montalvo, Telephone number 718-804-2711, Transcripts may be ordered by submitting the <a href=http://www.dcd.uscourts.gov/dcd/node/2189>Transcript Order Form.</a><P></P> <P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 3/8/2016. Redacted Transcript Deadline set for 3/18/2016. Release of Transcript Restriction set for 5/16/2016. (Montalvo, Annette) (Entered: 02/16/2016) |
| 02/16/2016 | 82 | TRANSCRIPT OF EXCERPT OF FURTHER JURY TRIAL-DAY 4 before Judge Rudolph Contreras held on 12-10-2015; Page Numbers: 1-212. Date of Issuance:2-16-2016. Court Reporter/Transcriber Annette M. Montalvo, Telephone number 718-804-2711, Transcripts may be ordered by submitting the <a href=http://www.dcd.uscourts.gov/dcd/node/2189>Transcript Order Form.</a><P></P> <P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the |

**JA 12**

USCA Case #16-7077    Document #1671230    Filed: 05/03/2017    Page 18 of 311

| | | |
|---|---|---|
| | | five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 3/8/2016. Redacted Transcript Deadline set for 3/18/2016. Release of Transcript Restriction set for 5/16/2016. (Montalvo, Annette) (Entered: 02/16/2016) |
| 02/16/2016 | | MINUTE ORDER granting 78 Plaintiff's Consent Motion for Extension of Time: It is hereby ORDERED that Plaintiff shall file her Motion for Attorney's Fees and Costs on or before February 23, 2016. (So Ordered Judge Rudolph Contreras on 2/16/2016. (lcrc1) (Entered: 02/16/2016) |
| 02/17/2016 | 83 | MOTION for Judgment as a Matter of Law by DISTRICT OF COLUMBIA (Attachments: # 1 Memorandum in Support)(Knapp, Sarah) (Entered: 02/17/2016) |
| 02/23/2016 | 84 | MOTION for Attorney Fees by JENNIFER B. CAMPBELL (Attachments: # 1 Text of Proposed Order, # 2 Memorandum in Support, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P)(Lescht, Alan) (Entered: 02/23/2016) |
| 02/24/2016 | 85 | Consent MOTION for Extension of Time to *File Opposition to the District of Columbias Motion for Judgment as a Matter of Law* by JENNIFER B. CAMPBELL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Safriet, Sara) (Entered: 02/24/2016) |
| 02/24/2016 | 86 | LARGE ADDITIONAL ATTACHMENT(S) *Exhibit Q to Motion for Attorney's Fees* by JENNIFER B. CAMPBELL 84 MOTION for Attorney Fees filed by JENNIFER B. CAMPBELL. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Lescht, Alan) (Entered: 02/24/2016) |
| 02/26/2016 | | MINUTE ORDER granting 85 Plaintiff's Consent Motion for Extension of Time: It is hereby ORDERED that Plaintiff shall file her Opposition to 83 Defendant's Motion for Judgment as a Matter of Law on or before March 11, 2016. SO ORDERED. Signed by Judge Rudolph Contreras on 2/26/2016. (lcrc1) (Entered: 02/26/2016) |
| 03/08/2016 | 87 | Consent MOTION for Extension of Time to *File Opposition to the District of Columbias Motion for Judgment as a Matter of Law* by JENNIFER B. CAMPBELL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Safriet, Sara) (Entered: 03/08/2016) |
| 03/08/2016 | | MINUTE ORDER granting 87 Plaintiff's Consent Motion for Extension of Time: It is hereby ORDERED that Plaintiff shall file her Opposition to 83 Defendant's Motion for Judgment as a Matter of Law on or before March 25, 2016. SO ORDERED. Signed by Judge Rudolph Contreras on 3/8/2016. (lcrc1) (Entered: 03/08/2016) |
| 03/08/2016 | 88 | Consent MOTION for Extension of Time to File Response/Reply as to 84 MOTION for Attorney Fees by DISTRICT OF COLUMBIA (Knapp, Sarah) (Entered: 03/08/2016) |
| 03/08/2016 | | MINUTE ORDER granting 88 Defendant's Consent Motion for Extension of Time: It is hereby ORDERED that Defendant shall respond to 84 Plaintiff's Motion for Fees and Costs on or before March 29, 2016. SO ORDERED. Signed by Judge Rudolph Contreras on 3/8/2016. (lcrc1) (Entered: 03/08/2016) |
| 03/25/2016 | 89 | Memorandum in opposition to re 83 MOTION for Judgment as a Matter of Law filed by JENNIFER B. CAMPBELL. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8, # 9 Exhibit Exhibit 9, # 10 Exhibit Exhibit 10, # 11 Exhibit Exhibit 11, # 12 Exhibit Exhibit 12, # 13 Exhibit Exhibit 13, # 14 Exhibit Exhibit 14, # 15 Exhibit Exhibit 15, # 16 Exhibit Exhibit 16, # 17 Exhibit Exhibit |

USCA Case #17-7003   Document #1674990   Filed: 05/02/2017   Page 20 of 311

| | | |
|---|---|---|
| | | 17, # 18 Exhibit Exhibit 18, # 19 Exhibit Exhibit 19, # 20 Exhibit Exhibit 20, # 21 Exhibit Exhibit 21, # 22 Exhibit Exhibit 22, # 23 Exhibit Exhibit 23, # 24 Exhibit Exhibit 24, # 25 Exhibit Exhibit 25, # 26 Exhibit Exhibit 26, # 27 Exhibit Exhibit 27, # 28 Exhibit Exhibit 28, # 29 Exhibit Exhibit 29, # 30 Exhibit Exhibit 30, # 31 Exhibit Exhibit 31, # 32 Exhibit Exhibit 32, # 33 Exhibit Exhibit 33, # 34 Exhibit Exhibit 34, # 35 Exhibit Exhibit 35, # 36 Exhibit Exhibit 36, # 37 Text of Proposed Order)(Lescht, Alan) (Entered: 03/25/2016) |
| 03/29/2016 | 90 | ENTERED IN ERROR.....Consent MOTION for Extension of Time to File Response/Reply as to 84 MOTION for Attorney Fees by DISTRICT OF COLUMBIA (Knapp, Sarah) Modified on 3/30/2016 (znmw). (Entered: 03/29/2016) |
| 03/30/2016 | | NOTICE OF ERROR re 90 Motion for Extension of Time to File Response/Reply; emailed to sarah.knapp@dc.gov, cc'd 8 associated attorneys -- The PDF file you docketed contained errors: 1. Incorrect header/caption/case number, 2. Incorrect document/case, 3. Please refile document, 4. Entered in error; Incorrect document/case caption; Please refile. (znmw, ) (Entered: 03/30/2016) |
| 03/30/2016 | 91 | Consent MOTION for Extension of Time to File Response/Reply as to 84 MOTION for Attorney Fees by DISTRICT OF COLUMBIA (Knapp, Sarah) (Entered: 03/30/2016) |
| 03/30/2016 | | MINUTE ORDER granting 91 Defendant's Second Consent Motion for Extension of Time: It is hereby ORDERED that Defendant shall respond to 84 Plaintiff's Motion for Fees and Costs on or before April 8, 2016. SO ORDERED. Signed by Judge Rudolph Contreras on 3/30/2016. (lcrc1) (Entered: 03/30/2016) |
| 04/04/2016 | 92 | TRANSCRIPT OF PROCEEDINGS before Judge Rudolph Contreras held on December 11, 2015; Page Numbers: 1 - 10. Court Reporter/Transcriber Cathryn Jones, Telephone number 2023543246, Transcripts may be ordered by submitting the <a href=http://www.dcd.uscourts.gov/dcd/node/2189>Transcript Order Form.</a><P></P> <P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 4/25/2016. Redacted Transcript Deadline set for 5/5/2016. Release of Transcript Restriction set for 7/3/2016.(Jones, Cathryn) (Entered: 04/04/2016) |
| 04/04/2016 | 93 | Consent MOTION for Extension of Time to File Response/Reply as to 83 MOTION for Judgment as a Matter of Law by DISTRICT OF COLUMBIA (Knapp, Sarah) (Entered: 04/04/2016) |
| 04/04/2016 | | MINUTE ORDER granting 93 Defendant's Consent Motion for Extension of Time: It is hereby ORDERED that, on or before April 11, 2016, Defendant shall file its Reply to 89 Plaintiff's Opposition to 83 Defendant's Motion for Judgment as a Matter of Law. SO ORDERED. Signed by Judge Rudolph Contreras on 4/4/2016. (lcrc1) (Entered: 04/04/2016) |
| 04/08/2016 | 94 | Consent MOTION for Extension of Time to File Response/Reply as to 84 MOTION for Attorney Fees by DISTRICT OF COLUMBIA (Knapp, Sarah) (Entered: 04/08/2016) |
| 04/08/2016 | | MINUTE ORDER granting 94 Defendant's Consent Motion for Extension of Time: It is |

JA 14

| | | |
|---|---|---|
| | | hereby ORDERED that Defendant shall respond to Plaintiff's Motion for Fees and Costs on or before April 27, 2016. SO ORDERED. Signed by Judge Rudolph Contreras on 4/8/2016. (lcrc1) (Entered: 04/08/2016) |
| 04/11/2016 | 95 | REPLY to opposition to motion re 83 MOTION for Judgment as a Matter of Law filed by DISTRICT OF COLUMBIA. (Knapp, Sarah) (Entered: 04/11/2016) |
| 04/13/2016 | | Set/Reset Deadlines: Responses due by 4/27/2016 (tj) (Entered: 04/13/2016) |
| 04/27/2016 | 96 | Memorandum in opposition to re 84 MOTION for Attorney Fees filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Knapp, Sarah) (Entered: 04/27/2016) |
| 04/28/2016 | 97 | Consent MOTION for Extension of Time to *Reply to Defendant's Opposition to Plaintiff's Motion for Attorneys' Fees and Costs* by JENNIFER B. CAMPBELL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Lescht, Alan) (Entered: 04/28/2016) |
| 04/28/2016 | | MINUTE ORDER granting 97 Plaintiff's Consent Motion for Extension of Time: It is hereby ORDERED that, on or before May 30, 2016, Plaintiff shall file her Reply to 96 Defendant's Opposition to 84 Plaintiff's Motion for Attorney's Fees and Costs. SO ORDERED. Signed by Judge Rudolph Contreras on 4/28/2016. (lcrc1) (Entered: 04/28/2016) |
| 05/25/2016 | 98 | ORDER denying 83 Defendant's Motion for Judgment as a Matter of Law. See document for details. Signed by Judge Rudolph Contreras on 5/25/2016. (lcrc1) (Entered: 05/25/2016) |
| 05/25/2016 | 99 | MEMORANDUM OPINION denying 83 Defendant's Motion for Judgment as a Matter of Law. See document for details. Signed by Judge Rudolph Contreras on 5/25/2016. (lcrc1) (Entered: 05/25/2016) |
| 05/31/2016 | 100 | Consent MOTION for Extension of Time to File Response/Reply *to the Defendant's Opposition to Plaintiff's Motion for Attorney's Fees* by JENNIFER B. CAMPBELL (Attachments: # 1 Text of Proposed Order, # 2 Memorandum in Support)(Lescht, Alan) (Entered: 05/31/2016) |
| 05/31/2016 | | MINUTE ORDER granting 100 Plaintiff's Consent Motion for Extension of Time: It is hereby ORDERED that, on or before June 3, 2016, Plaintiff shall file her Reply to 96 Defendant's Opposition to 84 Plaintiff's Motion for Attorney's Fees and Costs. SO ORDERED. Signed by Judge Rudolph Contreras on 5/31/2016. (lcrc1) (Entered: 05/31/2016) |
| 06/03/2016 | 101 | REPLY to opposition to motion re 84 MOTION for Attorney Fees filed by JENNIFER B. CAMPBELL. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Exh. A - Billing Records, # 3 Exhibit Exh. B - Johannsen Decl., # 4 Exhibit Exh. C - McDonough Supp. Decl., # 5 Exhibit Exh. D - Rolston Supp. Decl., # 6 Exhibit Exh. E - Safriet Supp. Decl., # 7 Exhibit Exh F - Valiente Supp. Decl., # 8 Exhibit Exh. G - Fee Calculations, # 9 Exhibit Exh. H - Lescht Supp. Decl., # 10 Exhibit Exh. I - Damages Reports, # 11 Exhibit Exh. J - Travel Expenses)(Lescht, Alan) (Entered: 06/03/2016) |
| 06/23/2016 | 102 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 75 Judgment, 98 Order on Motion for Judgment as a Matter of Law by DISTRICT OF COLUMBIA. Fee Status: No Fee Paid. Parties have been notified. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Knapp, Sarah) (Entered: 06/23/2016) |
| 06/24/2016 | 103 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the fee was an Appeal |

USCA Case #16-7077    Document #1674800    Filed: 05/08/2017    Page 21 of 311

| 06/27/2016 | [104](#) | by the DC Government re [102] Notice of Appeal to DC Circuit Court. (znmw) (Entered: 06/24/2016) |
|---|---|---|
| 06/27/2016 | [102](#) | USCA Case Number 16-7077 for [102] Notice of Appeal to DC Circuit Court, filed by DISTRICT OF COLUMBIA. (zrdj) (Entered: 06/27/2016) |
| 07/29/2016 | [104](#) | ORDER granting in part and denying in part [84] Plaintiff's Motion for Fees and Costs. See document for details. Signed by Judge Rudolph Contreras on 7/29/2016. (lcrc1) (Entered: 07/29/2016) |
| 07/29/2016 | [105](#) | MEMORANDUM OPINION granting in part and denying in part [84] Plaintiff's Motion for Fees and Costs. See document for details. Signed by Judge Rudolph Contreras on 7/29/2016. (lcrc1) (Entered: 07/29/2016) |
| 08/25/2016 | [106](#) | TRANSCRIPT OF PRETRIAL CONFERENCE before Judge Rudolph Contreras held on 11-30-2015; Page Numbers: 1-71. Date of Issuance:8-25-2016. Court Reporter/Transcriber Annette M. Montalvo, Telephone number 718-804-2711, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-days days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 9/15/2016. Redacted Transcript Deadline set for 9/25/2016. Release of Transcript Restriction set for 11/23/2016. (Montalvo, Annette) (Entered: 08/25/2016) |
| 08/29/2016 | [107](#) | WITHDRAWN PURSUANT TO NOTICE FILED 10/18/2016..... MOTION for Order by JENNIFER B. CAMPBELL (Attachments: # [1] Memorandum in Support, # [2] Text of Proposed Order, # [3] Exhibit 1-3)(Lescht, Alan) Modified on 10/19/2016 (znmw). (Entered: 08/29/2016) |
| 10/11/2016 | | MINUTE ORDER directing Plaintiff to submit a notice regarding mootness of motions: In light of the apparent settlement of Plaintiff's District of Columbia Superior Court Case, it is HEREBY ORDERED that Plaintiff shall submit a notice to the Court by October 18, 2016, as to whether [70] Motion for Leave to Contact Jurors and [107] Motion for a Ruling on Plaintiff's Motion for Leave to Contact Jurors are now moot. Signed by Judge Rudolph Contreras on 10/11/2016. (lcrc2) (Entered: 10/11/2016) |
| 10/18/2016 | [108](#) | NOTICE OF WITHDRAWAL OF MOTION by JENNIFER B. CAMPBELL re [107] MOTION for Order *and re [70] Motion for Leave* (Lescht, Alan) (Entered: 10/18/2016) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/01/2017 14:06:47 | | |
| PACER Login: | dcoagpacer:2656424:0 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:12-cv-01769-RC |

# JA 16

USCA Case #16-1077    Document #1674230    Filed: 05/08/2017    Page 22 of 311

| Billable Pages: | 14 | Cost: | 1.40 |
|---|---|---|---|

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JENNIFER B. CAMPBELL, DR. PH | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | COMPLAINT |
| | * | |
| DISTRICT OF COLUMBIA, | * | |
| A Municipal Corporation, | * | |
| John A. Wilson Building | * | JURY TRIAL DEMANDED |
| 1350 Pennsylvania Avenue, N.W. | * | |
| Washington, D.C. 20004 | * | |
| | * | |
| Serve:  Mayor Adrian M. Fenty | * | |
| 1350 Pennsylvania Ave., N.W. | * | |
| Room 419 | * | |
| Washington, D.C.  20004 | * | |
| | * | |
| Office of the Attorney General | * | |
| 441 4th Street, N.W. | * | |
| Suite 600 S | * | |
| Washington, D.C.  20001 | * | |
| | * | |
| WAYNE TURNAGE, | * | |
| In his official capacity as Director, | * | |
| District of Columbia Department of | * | |
| Health Care Finance | * | |
| 899 North Capitol Street, NE | * | |
| Suite 6039 | * | |
| Washington, DC 20002 | * | |
| | * | |
| Serve:  Mayor Adrian M. Fenty | * | |
| 1350 Pennsylvania Ave., N.W. | * | |
| Room 419 | * | |
| Washington, D.C.  20004 | * | |
| | * | |
| Office of the Attorney General | * | |
| 441 4th Street, N.W. | * | |
| Suite 600 S | * | |
| Washington, D.C.  20001 | * | |
| | * | |
| Defendants. | * | |

**JA 18**

## COMPLAINT

**COMES NOW PLAINTIFF,** Jennifer B. Campbell, Dr. PH, by and through the

undersigned counsel, and respectfully files this civil action against the above captioned

Defendants.

## JURISDICTION AND VENUE

1.  Jurisdiction is based upon 42 U.S.C. § 1983, 28 U.S.C. §§ 1343(a)(3), and 28 U.S.C. §1367,

    as to the supplemental jurisdiction over pendent state law claims.

2.  Venue is based on 28 U.S.C. § 1343(a)(3), as the incidents which give rise to this case

    occurred in the District of Columbia.  Plaintiff has timely filed notice upon the District

    consistent with D.C. Code § 12-309.

## PARTIES

3.  Plaintiff, Jennifer B. Campbell, Dr.PH ("Dr. Campbell" or "Plaintiff"), is the former District

    of Columbia Chief Operating Officer for the Department of Health Care Finance, the state's

    Medicaid agency.   Plaintiff is a resident of the District of Columbia.

4.  Defendant, the District of Columbia (the "District"), is a municipal entity.  The District's

    agency, the Department of Health Care Finance ("DHCF") is responsible, inter alia, for

    administering the state's Medicaid plan, insurance programs for immigrant children, the State

    Child Health Insurance Program, and Medical Charities (a locally funded program).

5.  Defendant Wayne Turnage ("Defendant Turnage") is the Director of the DHCF and is named

    as a defendant in his official capacity.

## FACTS

6.  This is a case about a woman who was terminated from her employment, defamed in the

    press, and unjustly deprived not only her job, her good name, and her source of income, but

2

**JA 19**

her entire career was wrongfully destroyed.   Jennifer Campbell did not behave in the unethical manner her employer described in the Washington City Paper, nor in the Washington Post, nor in any other media outlet.  She was a valuable, law abiding employee of the District of Columbia and the DHCF, and she deserves to be vindicated.

7.  This case also centers on the District's efforts to implement the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. 111-148, 124 Stat. 119.  The PPACA, signed into law on March 23, 2010 by President Barak Obama, seeks to decrease the number of uninsured Americans and reduce the cost of health care.

8.  Even before the United States Supreme Court upheld the PPACA as constitutional on June 28, 2012, the District had already begun its efforts to fulfill the PPACA's mandate.  On December 20, 2011, the District passed legislation entitled the "Health Benefit Exchange Authority Establishment Act of 2011," (the "HBX Act") which established the Districts' authority to create a health care exchange.

9.  According to the District's website: "Exchanges are the central mechanisms created by the health reform bill to help individuals and small businesses purchase health insurance coverage. Beginning in 2014, an Exchange will be established in each state to help consumers make valid comparisons between plans that are certified to have met benchmarks for quality and affordability."

10. Also, the DC website compares its exchange to "Travelocity" or "Orbitz."  It describes the benefits to the Districts citizens:  "Starting January 1, 2014, those who want to buy private health insurance for themselves and their families will be able to use these state-run exchanges to find better deals. Instead of searching individually for an insurer, you'll be able to use the exchange to choose a private plan from a menu of options."

3

**JA 20**

11. Building this "Orbitz"-type Exchange is a valuable governmental contract, estimated at over
    $70 million to complete.

12. As such, the HBX Act created an eleven-person Board of Directors to oversee the creation
    of the exchange.

13. One of the *ex officio* members of the Authority is the Director of the DHCF, Wayne
    Turnage.

14. Thus, the District began its preliminary search for a contractor to provide and implement
    the District of Columbia Access System ("DCAS"), which provides the District's Health
    Benefit Exchange ("HBX") with "a new integrated eligibility system for Medicaid, private
    health insurance and other programs with new case management capabilities that span
    programs and agencies."

15. Plaintiff had worked for the District of Columbia since 2008, when she joined the DHCF's
    Health Care Accountability Administration as Associate Director of the Office of
    Utilization Management.  Prior to this position, she was Associate Director of a healthcare-
    focused best-practice think tank and a principal in a healthcare consulting corporation, both
    in Washington DC.

16. Plaintiff later worked as the Director of Health Care Reform and Innovation
    Administration for the DCHF, the administration charged with planning, establishing and
    implementing each portion of the PPACA.  On May 7, 2012, she received a promotion to
    the Chief Operating Officer ("COO") of the DCHF, the top advisor to Defendant Wayne
    Turnage, the Director of DHCF.

17. Plaintiff's COO responsibilities included managing seven departments and approximately
    48 employees.  She handled all DCHF administrative operations and assumed the lead role

4

**JA 21**

in recommending and formulating related policies and strategies. She also met with
contractors and reviewed contracts.

18. Oftentimes, Defendant Turnage would hold meetings with contractors in accordance with
his "open door policy." Plaintiff had, in the past, asked to Defendant Turnage to open his
door to all vendors, not to a preselected few as was occurring. She urged a modification to
his policy to allow all contractors visitation, or none.

19. In August of 2011, in conjunction with this open door policy, Defendant Turnage asked
Plaintiff to speak with a corporation called CGI Group, Inc. ("CGI"). CGI made two
presentations for the HBX project. At the time, CGI also was in negotiations with DCHF
for an $11 million contract for a health information technology ("HIT") project.

20. At the time, Plaintiff did not know that, on information and belief, Defendant Turnage had
a pre-established relationship with CGI. Defendant Turnage, former Chief of Staff to
Virginia's Governor at that time, and CGI had worked together on the Virginia Interest
Technology Agency ("VITA"), a $300 million project, in 2005 and beyond.

21. In addition, Plaintiff was unaware that, on information and belief, when the commonwealth
of Virginia partnered with CGI to create a statewide electronic procurement system called
"eVA," Defendant Turnage headed that project.

22. Plaintiff also did not know CGI had talked with a company called COMPASS Consulting
Services, Inc. in an effort to partner on the HBX project. On information and belief,
Defendant Turnage's Deputy Director of Medicaid Finance consulted for COMPASS.

23. On May 10, 2012, Plaintiff called a meeting to discuss the HIT project. Plaintiff had
reviewed CGI's proposed contract and had several issues with it. She discussed these with
DHCF's contract division lead and other members of the office of the COO staff whom had

5

**JA 22**

knowledge of the contract, including a missing liquidated damages clause and inconsistencies with the best and final offer and the contract.

24. The contracts division staff then had multiple correspondences with CGI to discuss outstanding concerns regarding the contract, to which CGI was resistant.

25. Plaintiff alleges this was the impetus for the events of the following weeks, as she was coming to the conclusion that CGI might not be the best contractor for the DCAS project, in light of the HIT contract's progress.

26. Five days later, CGI met with Defendant Turnage, Plaintiff, and other personnel from DHCF to give another presentation for the DCAS.

27. During this second demonstration, the District's requirement of use of 35% certified business enterprises ("CBEs") was discussed.

28. CBE certification gives local disadvantaged businesses preference to compete in contract and procurement opportunities.   Contractors may obtain preferences in the form of two to 12 points (maximum) on their submission of Request for Proposals ("RFPs") and/or a 2 to 12 percent reduction (maximum) on their response to bids.  For the DCAS project, the eventual winner of the Request for Proposal would have to partner with a CBE company in order to be awarded the contract.

29. CGI was not CBE certified.

30. At this second demonstration, Plaintiff and Defendant Turnage reminded CGI of the District's CBE requirement.  CGI asked questions regarding the requirement and said they were looking into potential CBE partners.

31. In some instances in the past, the District had waived this requirement.

6

**JA 23**

32. Plaintiff reminded CGI that given the magnitude of the contract, a waiver would not occur. Defendant Turnage concurred.

33. On May 17, 2012, Plaintiff received a telephone call from Holli Ploog, Vice President of CGI. Ploog asked Plaintiff for feedback regarding a list of potential CBE partners. Plaintiff said that she could only share which ones she knew did work for DHCF in the past but could not speak to the company's performance. Plaintiff said that the District contractors have performance reviews conducted and are publicly available upon request.

34. Plaintiff then referred CGI's team to the District's Department of Small and Local Business Development ("DSLBD") for additional information on CBE partners. Ploog responded that she had tried this department, but had not received an answer. The conversation then concluded.

35. Suddenly, Plaintiff's world was turned upside down. Plaintiff was unaware that DHCF, Defendant Turnage included, had met with CGI on Saturday, June 2, 2012 when the DHCF offices are closed. Such weekend meetings are unheard of.

36. Plaintiff had just arrived in Nashville, Tennessee for a two-day health reform conference. Plaintiff received six phone calls from Melissa Byrd, Turnage's Chief of Staff, commanding her to return to Byrd's office on Monday morning. Plaintiff was not given a reason for the urgency.

37. Sunday night, Plaintiff's staff e-mailed her asking why there was an urgent meeting called for Monday morning with Defendant Turnage. Plaintiff had not been apprised of this meeting and was therefore unable to offer any feedback.

7

**JA 24**

38. On Monday, Plaintiff went to her office at DCHF with her suitcase in tow. As she entered her office, one of her staff members told her that she had been instructed not to let Dr. Campbell into her own office and she must wait in Byrd's office.

39. Plaintiff waited for more than an hour in Byrd's office, with her suitcase beside her, as DHCF's staff members passed by the office to see what was happening.

40. Upon Byrd's arrival, she told Dr. Campbell to wait in the large conference room that is the center of all DHCF activity, and in full view of the staff.

41. Byrd and a representative of the District's Human Resources appeared in the conference room and told Plaintiff just she was being placed on administrative leave. Plaintiff pressed for a reason why this occurred, but was given only ambiguous answers.

42. Plaintiff gave her Blackberry and identification badge to Byrd. Attached to the badge was a piece of personal property: a portable thumb drive Dr. Campbell carried with her containing personal information, such as copies of tax returns, wedding pictures, resumes, biographies, and teaching lectures/materials, accumulated since 2005, which she used for her professorial positions.

43. As of the date of this filing, and after several documented requests since the first day of her administrative leave, Defendants have not returned the thumb drive to Plaintiff.

44. A mere two days later, as Plaintiff remained on administrative leave and uninformed as to what precipitated the leave, a meeting of the DHCF was held. The District announced it was looking for a new COO and that the internal investigation of Dr. Campbell did not "look good."

**JA 25**

45. Also unbeknownst to Plaintiff, DHCF had already contacted Alan Suderman, author of the "Loose Lips" column, via email, to transmit documents about Plaintiff and her eventual termination from employment.

46. Plaintiff continued to attempt to arrange a meeting with Defendant Turnage, but was incapable of doing so.

47. A meeting scheduled for June 7, 2012 was inexplicably cancelled.  Plaintiff requested for the new time and date via email but did not receive an answer for two more days.   She then received an email scheduling another meeting for Monday, June 11, 2012 at 6 p.m.

48. That Monday, Plaintiff received an early morning call from Byrd stating the "media ha[d] received wind of the story."  Furthermore, Byrd informed Plaintiff that the purpose of that evening's meeting was to terminate her with cause.

49. On Tuesday, June 12, 2012, the "Loose Lips" column of the Washington City Paper published an article, written by Alan Suderman, entitled *Health Care Finance COO Fired over Contract Steering Allegations."*

50. According to the article, the District and Defendant Turnage had fired Plaintiff (who, but for Byrd's 7:30 a.m. call, thought she was still on administrative leave).

51. The article went on to state Plaintiff had been fired for trying to "'steer business toward some minority firms and away from others' in the bidding on the forthcoming contract for the Districts' health insurance exchange. . . "

52. The article accused Plaintiff of trying to force CGI to partner with Darryl Wiggins, the owner of a document management company and a CBE.

53. This allegation is untrue.

**JA 26**

54. Plaintiff had only met Wiggins on a single occasion, in the company of Defendant Turnage earlier in the year, and never referred anyone to CGI.

55. After reading the published article, Plaintiff declined to attend that evening's meeting. She requested her termination letter be sent to her via mail.

56. When her letter arrived, it stated she was being separated from her position as COO, ES341-10 with the DHCF for cause.

57. Defendants claimed she had "acted inappropriately and violated District ethical standards cited in Section 1810 of Chapter 18 of the District Personnel Manual by giving preferential treatment to any person, impeding government efficiency or economy; and by affecting adversely the confidence of the public in the integrity of the government."

58. The District accused Plaintiff of making unethical comments to CGI:

> "Wayne Turnage received call from a Vice-President of CGI informing him that she had been contacted, unsolicited, by you. You told the VP that it was in CGI's interest to take a look at Darryl Wiggins as a minority partner for the Level 2 grant for the District's Health Insurance Exchange . . ."

59. This accusation is untrue.

60. Secondly, the District accused Plaintiff of conducting unethical and illegal behavior with COMPASS. This was the first time Plaintiff had heard such an allegation as well.

61. The letter stated:

> "Mr. Turnage met with the owner of COMPASS. . . the owner of COMPASS reported that you approached him and made it very clear which employees in his organization should continue to have a job. . . Shortly thereafter, COMPASS noted their payments from DHCF for services rendered began to be delayed."

62. This accusation is untrue.

63. Lastly, the District's letter stated that,

> "COMPASS indicated it is widely known that you have been meeting with minority vendors in an effort to put together a team that would submit a bid as prime contractor for the health insurance exchange... COMPAS indicated that COMPASS and CGI were

**JA 27**

considering a partnership until CGI called and informed COMPASS they would not be partnering with CGI pursuant to instructions received by you."

64. This accusation is untrue.

65. These conversations with COMPASS never occurred.

66. The next day, the Washington Post ran a story about Plaintiff's departure from DCHF. Again, this article made use of documents turned over by the District.

67. While Plaintiff continued to protest her innocence, the Post reported that in a meeting between Defendant Turnage and Wiggins, Defendant stated, "[I]tis my job to protect the integrity of the contracting process for one of the District's most significant procurements and because of that, we take the charges against Jennifer quite seriously."

68. Plaintiff was bewildered by these comments given her knowledge of Defendant Turnage's reaction to and handling of an egregious act of misconduct by the former DHCF Director of Human Resources.

69. On information and belief, in September of 2011, it was brought to Defendant Turnage's attention that the Director of Human Resources had hired her own son and had him misrepresent himself on the District's employment application. On information and belief, during the time her son was employed by DHCF, he received promotions and severe salary increases through the insistence of the Director of Human Resources for DHCF, his mother.

70. Defendant Turnage met with the Director of Human Resources personally, not just Byrd, where she admitted to her wrongdoings. It was not until January that the Inspector General was given the information and complaint by a group of DHCF employees who recognized Defendant Turnage's disinterest in addressing the issue although it is was his duty to protect the integrity of the employment process. On information and belief, only as a result of the District's Department of Human Resource's (DCHR) and the Inspector General's

11

**JA 28**

investigations did Defendant Turnage take action and place the Director of Human Resources on administrative leave and then terminate her in April of 2012.

71. On information and belief, it took Defendant Turnage six months and the insistence of the Inspector General and DCHR to take action on known and blatant misconduct; however, it took him one weekend day, one conversation with a large vendor with whom, on information and belief, he has had prior business dealings, and no conversations with Dr. Campbell, to take action on mere accusations.

72. Weeks following the Plaintiff's formal termination, she was allowed back into her office, escorted by Melisa Byrd and the General Counsel to DHCF.

73. While it was after hours, the office had not been cleared. Plaintiff was forced to walk to her office, in full view of the remaining employees, and clear her desk of personal items.

74. Plaintiff was then commanded to show every piece of paper she wanted to remove to Byrd and receive Byrd's approval. Humiliated, Plaintiff placed her personal items in a cardboard box and was escorted out, again in full view of the remaining staff.

75. Plaintiff has sustained damages as a result of the foregoing including without limitation lost wages, lost benefits, pain and suffering, emotional distress, mental anguish, and damage to her reputation.

<div align="center">

**COUNT I**
**CONSTITUTIONAL DEFAMATION**
**VIOLATION OF FIFTH AMENDMENT LIBERTY INTEREST**
**42 U.S.C. §1983**

</div>

76. Plaintiff hereby incorporates by reference paragraphs 1 through 75 as if fully set forth herein.

77. Defendants' termination of Plaintiff and the publicity attached thereto, including but not limited to Turnage's comments to members of the press and the release of Plaintiff's emails

<div align="center">12</div>

<div align="center">

**JA 29**

</div>

to Loose Lips, suggested that Plaintiff was dishonest, a liar, unethical, and terminated for reasons related to her performance of her job.

78. Furthermore, Defendant Turnage's comments and actions made to Suderman and the Washington Post, staff, the District's Mayor's staff, the Deputy Mayor (for whom she once worked) among others, impugned Plaintiff's professional competence and reputation and placed a significant roadblock on her ability to obtain permanent full time employment in her chosen field of healthcare finance.

79. In fact, recently Plaintiff was told by a potential employer that while she is talented, skilled, and a perfect fit for the position they wish for her to fill, given the publicity of the termination and the severity of the accusations, it would be a risk and possible public and/or political liability for them to hire her.

80. Said actions created a stigma that foreclosed Plaintiff's freedom to take advantage of other employment opportunities, including losing her wages and pursuing employment in her chosen field in healthcare finance.

81. Defendant's termination of her employment, public vilification, and chastisement substantially reduced the value of Plaintiff's human capital and her professional responsibilities.

82. As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer from injury to her liberty interest under the Fifth Amendment, including embarrassment, humiliation, mental anguish, and loss of reputation.

83. Defendants' wrongful conduct has had significant effects on Plaintiff's overall physical and emotional wellbeing due to a preexisting condition that is exacerbated by stress.

## COUNT II

13

**JA 30**

### D.C. FALSE CLAIMS ACT
### D.C. CODE § 2-381.04
### (Retaliatory Termination)

84. Plaintiff hereby incorporates by reference paragraphs 1 through 83 as if fully set forth herein.

85. Pursuant to the D.C. False Claims Act, Defendants are prohibited, *inter alia,* from discharging, demoting, suspending, harassing, or in any manner discriminating against an employee because of a lawful act done in disclosing corruption.

86. Plaintiff engaged in lawful activity by reporting the contractual oversights in the CGI-HIT contract to her supervisor, Defendant Wayne Turnage and DCHF.

87. Defendants continuously violated the above referenced Act and its violations culminated in Plaintiff's termination from her employment.

88. Defendants illegally terminated Plaintiff based upon Plaintiff's exercise of a protected activity under the statute.

89. As a consequence of the termination and other actions, Plaintiff suffered significant economic and emotional damages.

### COUNT III
### D.C. WHISTLEBLOWER ACT
### D.C. CODE § 1-615.54 et seq.

90. Plaintiff hereby incorporates by reference paragraphs 1 through 89 as if fully set forth herein.

91. Pursuant to the D.C. Whistleblower Act (DCWA), Defendants are prohibited from reassigning, terminating, or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

**JA 31**

92. Plaintiff is an employee who, as a result of her disclosures to her supervisor about the CGI-HIT contractual abnormalities, enjoyed the protection of DCWPA.

93. As a direct result of Plaintiff's protected disclosures, Defendants retaliated against her, including but not limited to the release of emails to Suderman, and ultimately the termination of her employment.

94. As a result of Defendants' actions, Plaintiff suffered significant economic harm in the form of lost employment, corresponding salary, lost employment opportunities, damages to her professional reputation, and significant physical, mental, and emotional distress.

<div align="center">

**COUNT IV**
**WRONGFUL TERMINATION AGAINST PUBLIC POLICY**

</div>

95. Plaintiff hereby incorporates by reference paragraphs 1 through 94 as if fully set forth herein.

96. Defendants urged Plaintiff to perform certain actions concerning CGI and the HBX contract.

97. Plaintiff refused to modify the CBE guidelines for the DCAS policy and overlook the discrepancies in contracts pending before the DCHF.

98. As a rest of the aforementioned actions, Defendants terminated Plaintiff in violation of public policy in the District of Columbia.

99. As a result of Defendants' actions, Plaintiff suffered significant economic harm in the form of lost employment, corresponding salary, lost employment opportunities, damages to her professional reputation, and significant physical, mental, and emotional distress.

<div align="center">

**JURY DEMAND**

</div>

Plaintiff seeks a trial by jury on all counts.

<div align="center">

**DEMAND FOR RELIEF**

</div>

Plaintiff seeks judgment against Defendants on Counts I-IV, jointly and severally as follows:

<div align="center">

**JA 32**

</div>

(a)     Compensatory Damages in the amount of $5,000,000, or such other amount as

determined at trial;

(b)     Lost wages and benefits and future lost wages and benefits (front pay and

benefits), in an amount to be determined at trial, plus two times the amount of back pay per DC

Code 2-381.04(c);

(c)     Punitive damages, where appropriate, in the exact amount to be determined at

trial;

(d)     Order defendants to retract their false statements and issue an apology and publish

same in the City Paper and Washington Post;

(e)     Interest, attorney's fees and costs; and

(f)     Such further relief as this Court deems just and fair.

Dated: October, 3| 2012                    Respectfully Submitted,

                                           _____
                                           Alan Lescht, DC Bar # 441691
                                           Susan L. Kruger, DC Bar # 414566
                                           Rani Rolston, DC Bar # 974052
                                           Alan Lescht & Assoc., PC
                                           1050 17th St., NW, Suite 400
                                           Wash., D.C. 20036
                                           Tel (202) 463-6036
                                           Fax (202) 463-6067
                                           Attorneys for Plaintiff

**JA 33**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL, DR. PH.        )
                                     )
                Plaintiff,           )        Case No. 1:12-cv-01769-RC
                                     )
v.                                   )
                                     )
DISTRICT OF COLUMBIA                 )
                                     )
                Defendant.           )

**JOINT PRETRIAL STATEMENT**

Pursuant to Local Civil Rule 16.5(a), (b) and (d)5, the parties submit their Joint Pretrial

Statement as follows:

I.        **Statement of the Case**

The plaintiff Dr. Jennifer Campbell is the former Chief Operating Officer for the

District of Columbia Department of Health Care Finance.  She filed this lawsuit to

recover damages suffered as a result of the termination of her employment and

damage to her reputation from communications District officials made to the press

about her.  The District denies Plaintiff's claims.

II.       **Statement of Claims**

There are two counts.  First, Dr. Campbell alleges that the District violated her rights

under 42 U.S.C. § 1983, which prohibits the government from terminating employment

without due process.  Second, Dr. Campbell alleges that the District violated her rights

under the D.C. Whistleblower Act, D.C. Code § 1-1615.54, *et seq.*, which prohibits the

District from retaliating against an employee for engaging in protected activity.

III.   **Stipulations**

**The parties stipulate to the following facts:**

1.   Plaintiff's annual salary as COO was $146,000.

2.   The amount of Plaintiff's lost wages relating to her claims is $304,823.

**Plaintiff's requested stipulations:**

1.   Former Gray Administration Director of Communications, Pedro Ribeiro, spoke with reporter Alan Suderman of the Washington City Paper on June 7, 2012 and allowed him to come in and review Wayne Turnage's emails relating to Plaintiff's employment.

2.   Wayne Turnage sent reporter Suderman additional emails relating to Plaintiff's employment the evening of June 20, 2012.

3.   Plaintiff did not receive constitutionally adequate due process.

IV.   **Statement of Defendant's Defenses**

1.   Plaintiff cannot prove her *prima facie* case on any of her claims.

2.   Plaintiff did not make a protected disclosure under the DCWPA, nor was she given an illegal order.

3.   The District had legitimate a legitimate, non-retaliatory reason for all personnel actions taken against Plaintiff.

4.   Plaintiff failed to mitigate her damages.

5.   The District denies any allegation of wrongdoing, intentional or otherwise, and argues that it did not violate Plaintiff's rights pursuant to the DCWPA.

6.   Any statement made by the District about Plaintiff was neither defamatory nor false.

**JA 35**

7. The District denies any allegation of wrongdoing, intentional or otherwise, and argues that it did not violate Plaintiff's rights under the Constitution.

8. The District had a good faith belief that its conduct relating to Plaintiff was lawful.

9. Punitive damages are not available against the District of Columbia.

**V.    Schedule of Witnesses**

*See* Attachment 1 for Plaintiff's list of witnesses for trial.

*See* Attachment 2 for Defendant's list of witnesses for trial.

**VI.    List of Exhibits**

*See* Attachment 3 for Plaintiff's exhibit list.

*See* Attachment 4 for Defendant's exhibit list.

**The parties' joint exhibit list:**

1. Email from Mr. Turnage, dated Jan. 28, 2012; Subject: *Re: Our Appointment* (DC Campbell 8023–24); Pl. Ex. 36, Def. Ex. 4;

2. Email from Ms. Payne, dated May 9, 2012; Subject: *FW: CGI EHR Contract Clarifications* (DC Campbell 5814–17); Pl. Ex. 25, Def. Ex. 37;

3. Email from Ms. Alpert, dated May 11, 2012; Subject: *FW: CGI EHR Contract Clarifications* (DC Campbell 5821–25); Pl. Ex. 26, Def. Ex. 38;

4. Email from Ms. Alpert, dated May 16, 2012; Subject: FW: *CGI Contract from OCP* (DC Campbell 5806–07); Pl. Ex. 27, Def. Ex. 43;

5. Email from Dr. Campbell, dated May 23, 2012; Subject: *FW: Draft Language for Liquidated Damages Justification.docx* (DC Campbell 6492); Pl Ex. 28, Def. Ex. 46;

3

**JA 36**

6. Letter from Mr. Stokes, dated June 4, 2012; Subject: *RE: Placing Dr. Jennifer Campbell, COO, on Administrative Leave and Notice of Contemplation of Termination*; Pl. Ex. 4, Def. Ex. 67;

7. Email from Mr. Murphy, dated June 7, 2012; Subject: *Re: how we doing on* (DC Campbell 4621); Pl. Ex. 14, Def. Ex. 72;

8. Email from Mr. Turnage, dated June 12, 2012; Subject: *Re: Follow-up on CGI Contract* (DC Campbell 7909–10); Pl. Ex. 32, Def. Ex. 85;

9. Email from Mr. Turnage, dated June 13, 2012; Subject: *RE:* (DC Campbell 8208–09); Pl. Ex. 20, Def. Ex. 87;

10. Email from Ms. Alpert, dated June 15, 2012; Subject: *Wash. Post Article – Private* (DC Campbell 8225); Pl. Ex. 31, Def. Ex. 90;

11. Organizational Chart with hand-written notation on bottom stating "(a)ny proposed changes must be approved by the contract administrator" (DC Campbell 6824); Pl. Ex. 33, Def. Ex. 98;

12. Email from Ms. Emanuel, dated April 19, 2012; Subject: *FW: CGI Contract* (DC Campbell 5811-13); Pl. Ex. 46, Def. Ex. 31;

13. Email from Ms. Payne, dated May 11, 2012; Subject: *RE: CGI Contract Clarifications* (DC Campbell 7354-59); Pl. Ex. 47, Def. Ex. 39;

14. Memorandum from Ms. Albert to Mr. Staton, dated May 22, 2012; Subject: *RE: Liquidated Damage Provision Justification Memo to File Task Order Award DCPO-2012-F-0372* (DC Campbell 6898-903); Pl. Ex. 48, Def. Ex. 44;

15. Email from Ms. Payne, dated May 23, 2012; Subject: *Draft Language for Liquidated Damages Justification.docx* (DC Campbell 5273); Pl. Ex. 49, Def. Ex.

45;

16. Email from Ms. Payne, dated May 23, 2012; Subject: *FW: GSA Contract CGI*
    (DC Campbell 6822); Pl. Ex. 50, Def. Ex. 47;

17. Email from Ms. Alpert, dated May 23, 2012; Subject: *GS-35f-479H CGI GSA*
    *Contract Inquiry* (DC Campbell 6997); Pl. Ex. 51, Def. 48;

18. Email from Ms. Alpert, dated May 23, 2012; Subject: *RE: Update in sign contract*
    *– CGI* (DC Campbell 8174); Pl. Ex. 52, Def. Ex. 49;

19. Email from Ms. Payne, dated May 23, 2012; Subject: *RE: Update in sign contract*
    *– CGI* (DC Campbell 8175); Pl. Ex. 53, Def. Ex. 50;

20. Email from Dr. Campbell, dated May 28, 2012; Subject: *RE: Update in sign*
    *contract – CGI* (DC Campbell 8173); Pl. Ex. 54, Def. Ex. 53;

21. Email from Mr. Woodson, dated May 29, 2012; Subject: *FW: Update in sign*
    *contract – CGI* (DC Campbell 6956-57); Pl. Ex. 55, Def. Ex. 54;

22. Email from Ms. Alpert, dated May 29, 2012; Subject: *Re: Update in sign contract*
    *– CGI* (DC Campbell 8168-70); Pl. Ex. 56, Def. Ex. 55;

23. Email from Ms. Payne, dated May 31, 2012; Subject: *Fw: Update in sign contract*
    *– CGI* (DC Campbell 6958-63); Pl. Ex. 57, Def. Ex. 56;

24. Draft Language for Liquidate Damages Justification (DC Campbell 5274); Pl. Ex.
    58, Def. Ex. 57;

25. Email from Ms. Alpert, dated June 7, 2012; Subject: *Re: differences in the CGI*
    *contract and liquidated damages* (DC Campbell 7653); Pl. Ex. 59, Def. Ex. 75

26. Email from Ms. Alpert, dated June 22, 2012; Subject: *Re: CGI Contract Update*
    (DC Campbell 7329-31); Pl. Ex. 60, Def. Ex. 91;

**JA 38**

27. Email from Ms. Alpert, dated June 22, 2012; Subject: *Re: CGI Contract Update* (DC Campbell 7338-40); Pl. Ex. 61, Def. Ex. 92;

28. Email from Ms. Mack, dated June 29, 2012; Subject: *RE: CGI* (DC Campbell 7310-12); Pl. Ex. 62, Def. Ex. 95.

**VII.**   **Depositions**

*See* Attachment 5 for Plaintiff's deposition designations.

*See* Attachment 6 for Defendant's deposition designations.

**VIII.**   **Itemization of Damages**

**On her Procedural Due Process claim, Dr. Campbell seeks:**

10. Compensatory damages for pain and suffering, emotional distress, mental anguish, humiliation, damage to reputation:  in an amount to be determined by the jury;

11. Special damages:  lost wages in the amount of $304,823

12. Punitive damages:  in an amount to be determined by the jury; and

13. Reasonable attorney fees and costs.

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (U.S. 1986).

**On her Whistleblower Protection Act Claim, Dr. Campbell seeks:**

1. Reinstatement to the same position Dr. Campbell held before the prohibited personnel action or to an equivalent position.

2. Reinstatement of Dr. Campbell's seniority rights.

3. Restoration of Dr. Campbell's lost benefits.

4. Back pay and interest on back pay.

5. Compensatory damages in an amount to be determined by the jury.

6. Reasonable costs and attorney fees.

**JA 39**

*See* D.C. Code § 1-615.54.

**IX.**     **Request for Other Relief Sought**

Dr. Campbell seeks an Order from the Court directing the District to retract its

statements and to publish an apology in the *Washington City Paper* and the *Washington*

*Post*.

**X.**     **Proposed *Voir Dire* Questions**

**The parties' jointly proposed *voir dire*:**

1.   Do you know any of the attorneys in this case, Alan Lescht, or Sarah Knapp?

2.   Do you know Jennifer Campbell or any of the following witnesses:

>     Jennifer B. Campbell, Dr. Ph.
>
>     Darryl Wiggins
>
>     Cedric Simon
>
>     Cynthia Morgan, MD, Rheumatology
>
>     Carolyn Rand
>
>     Keli Sobers
>
>     Janene Jackson
>
>     Anthony Bird
>
>     Richard B. Edelman
>
>     Wayne Turnage
>
>     Anthony Onyewuchi
>
>     Holli Ploog
>
>     Carrie Brooks-Brown
>
>     Bonnie Norton

**JA 40**

Sam Walker

Pedro Ribiero

Chris Murphy

Melissa Byrd

Cleveland Woodson

Brenda Emmanuel

3.  Do you know any other member of the jury panel?

4.  Have you or any member of your family ever been a plaintiff, a defendant, or a witness in a civil lawsuit?  If there anything about that experience that would prevent you from rendering a fair and impartial verdict?

5.  Have you ever served as a juror?  Is there anything about that experience that would prevent you from rendering a fair and impartial verdict?

6.  Do you think you would have difficulty rendering a verdict based solely on the evidence and the law, even if you felt sympathy toward one side?

7.  Do you have any personal knowledge of this case?

8.  Do you know of any other matter which you believe should be called to the Court's attention as having some bearing upon your qualifications or ability to sit as a juror, or which you think may prevent you from rendering a fair and impartial verdict based solely upon the evidence and my instructions as to the law?

9.  Do you or any member of your immediate family have any legal training?  Is there anything about that experience that would prevent you from listening to the evidence and then rendering a fair and impartial verdict in this case?

**JA 41**

10. Have you or any member of your family been employed by a state or federal court system, administrative law judge or arbitrator?  Is there anything about that experience that would prevent you from listening to the evidence and then rendering a fair and impartial verdict in this case?

**Defendant's additional proposed *voir dire*:**

1. The Defendant in this case is the District of Columbia.  Plaintiff was employed with the D.C. Department of Health Care Finance.  Do you work for or have family or close friends who work or did work for the D.C. Government including its Department of Health Care Finance.  If so, please describe.

2. Have you or any close friends or family members ever worked for an agency such as the U.S. Equal Employment Opportunity Commission, the D.C. Office of Human Rights or Civil Rights Division of the U.S. Department of Justice? Do you or any close friends or family members have training or experience in labor relations, in equal employment opportunity ("EEO") matters, or in dealing with complaints of discrimination or retaliation?

    **<u>Plaintiff's objection</u>**:  Plaintiff requests the following follow-up question: Would your experience with any of the listed agencies or in the listed fields prevent you from rendering a fair and impartial verdict based solely upon the evidence and the law?

3. Have any of you, members of your family, or friends ever had an experience with any employee or an agency of the District of Columbia which would make it difficult for you to fairly judge the facts of this case because the District is the defendant and the actions of some of its employees are involved?

9

**JA 42**

4.  Have you or any close friends or family members ever worked in government

   contracting?  Do you have any education or experience in government

   contracting?

**XI.   Jury Instructions**

**The parties' jointly proposed Standard Jury Instructions:**

1-1:  Function of the Court

1-2:  Function of the Jury

1-3:  Significance of Party Designations

1-4:  Juror's Duty to Deliberate

1-5:  Attitude and Conduct of Jurors

1-6:  Instructions to be Considered as a Whole

1-7:  Court's Commenting on the Evidence

1-8:  Court's Questions to Witnesses

1-9:  Jury Not to Take Cue From Judge

1-10:  Rulings on Objections

1-11 & 1-12:  Equality of Litigants

2-1:  Evidence in the Case

2-3:  Inferences

2-4:  Inadmissible and Stricken Evidence

2-5:  Statements of Counsel

2-6:  Jury's Recollection Controls

2-8:  Burden of Proof

2-9:  Evidence Produced by Adversary

**JA 43**

2-10:  Direct and Circumstantial Evidence

3-1:  Jury to Determine Credibility of Witnesses

3-2:  Number of Witnesses

3-5:  Depositions as Evidence

3-8:  Impeachment by Prior Inconsistent Statements

3-9:  Adopting Prior Inconsistent Statements

**Non-Standard Jury Instructions:**

*See* Attachment 7 for Plaintiff's proposed non-standard jury instructions.

*See* Attachment 8 for Defendant's proposed non-standard jury instructions.

**XII.   Verdict Form**

*See* Attachment 9 for Plaintiff's proposed verdict form.

*See* Attachment 10 for Defendant's proposed verdict form.

Respectfully submitted,

Alan Lescht & Associates, P.D.

By:___/s/_____
Alan Lescht
1050 17th Street, NW, Suite 400
Washington, DC 20036
alan.lescht@leschtlaw.com
T: 202.463.6036
F: 202.463.6067
*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on this 19th day of October 2015 via ECF on the following persons:

Sarah L. Knapp, Esquire
Brant Martin, Esquire
Assistant Attorney General

**JA 44**

Civil Litigation Section III
Office of the Attorney General for the District of Columbia
441 4th Street, NW, Suite 630 Main
Washington, DC 20001
*Counsel for Defendants*

_____/s/_____
Alan Lescht

**JA 45**

## ATTACHMENT 1
## PLAINTIFF'S SCHEDULE OF WITNESSES

**Plaintiff's list of definite witnesses for trial:**

1. Jennifer B. Campbell, Dr. Ph., formerly, Chief Operating Officer for the District of Columbia Department of Health Care Finance ("DHCF").  Address: c/o Alan Lescht & Associates, P.C., 1050 17th Street NW, Suite 400, Washington, DC 20036. Direct exam approximately 60 minutes;

2. Darryl Wiggins, President, Document Managers dba Digidocs.  Mr. Wiggins will testify as to the false allegations that Dr. Campbell attempted to steer CGI to partner with Digidocs on the HIX contract.  Direct exam approximately 30 minutes;

3. Cedric Simon, Consultant for CBBS; client liaison for CBBS.  Mr. Simon will testify as to his conversations with Mr. Onyewuchi and any knowledge of contract steering by Dr. Campbell.  Direct exam approximately 20 minutes;

4. *Cynthia Morgan, MD,[1] Rheumatology.  Dr. Morgan will testify as to the effect Dr. Campbell's termination had on her health.  Specifically, Dr. Morgan will testify that Dr. Campbell's antibodies for Lupus spiked as a result of her termination.  Direct exam approximately 10 minutes;

5. Carolyn Rand, mother of Dr. Campbell.  Ms. Rand will testify as to Dr. Campbell's pain and suffering resulting from her termination from DHCF.  Address: 1077 Largo Road, Apt. 503, Upper Marlboro, MD 20774.  Direct exam approximately 10 minutes;

---

[1]     Expert witnesses are designated using an asterisk (*).

**JA 46**

6.  Keli Sobers, sister of Dr. Campbell.  Ms. Sobers will testify as to Dr. Campbell's

pain and suffering resulting from her termination from DHCF.  Address:  16212

Aveston Place, Bowie, MD 20716.  Direct exam approximately 10 minutes.

**Plaintiff's list of witnesses who will be called if the need arises:**

7.  Janene Jackson, Director, Office of Policy and Legislative Affairs.  Ms. Jackson will

testify as to her email exchanges with Mr. Turnage regarding Dr. Campbell's alleged

contract steering.  Address:  441 4th Street NW, Suite 900, Washington DC 20001;

8.  *Anthony Bird, Vocational-Rehabilitation Counselor and Vocational Consultant.

Mr. Bird will testify as to Dr. Campbell's ability to secure future employment and

earning power after her termination from DHCF.  Address:  1420 Spring Hill Road,

Suite 600, McLean, VA 22102;

9.  *Richard B. Edelman, Ph.D., Economic Expert.  Mr. Edelman will testify regarding

Dr. Campbell's lost income and benefits caused by the loss of her employment with

DHCF and the false allegations reported by the media that Dr. Campbell engaged in

contract steering.  Address:  8515 Whittier Boulevard, Bethesda, MD 20817-6816;

10. Wayne Turnage, Director of DHCF.  Mr. Turnage will testify as to his false

allegations that Dr. Campbell participated in contract steering and his decision to

terminate her.  Address:  441 4th Street NW, Suite 900, Washington DC 20001;

11. Anthony Onyewuchi, CEO of Compass Solutions, LLC.  Mr. Onyewuchi will testify

as to the false allegations that Dr. Campbell attempted to steer CGI to partner with

Digidocs rather than Compass on the HIX contract;

**JA 47**

12. Holli Ploog, Vice President of Business Development at CGI Technologies and Solutions, Inc.  Ms. Ploog will testify as to the false allegations that Dr. Campbell attempted to steer CGI to partner with Digidocs on the HIX contract;

13. Carrie Brooks-Brown, owner of Carrie Brooks Brown Consulting Services ("CBBS").  Ms. Brooks-Brown will testify as to her conversations with Mr. Onyewuchi regarding Mr. Simon and her knowledge of any alleged contract steering by Dr. Campbell;

14. Bonnie Norton, Project Manager for DHCF.  Ms. Norton will testify as to the contract kickoff meeting on April 10, 2012 and her knowledge of whether Dr. Campbell acted inappropriately by awarding Compass Phase II of the HIX contract.  Address:  441 4th Street NW, Suite 900, Washington DC 20001;

15. Sam Walker, a Medicaid Manage Information System Contractor who worked with the District.  Mr. Walker will testify as to the contract kickoff meeting on April 10, 2012;

16. Pedro Ribiero, Director of Communications in the Executive Office of the Mayor.  Mr. Ribiero will testify regarding receipt of Mr. Turnage's emails and allowing reporters to view the leaked emails.  Address:  441 4th Street NW, Suite 900, Washington DC 20001;

17. Chris Murphy, formerly, Chief of Staff to Mayor Vincent Gray.  Mr. Murphy will testify regarding receipt of Mr. Turnage's emails and allowing reporters to view the leaked emails.  Address:  441 4th Street NW, Suite 900, Washington DC 20001;

**JA 48**

18. Melissa Byrd, Chief of Staff, DHCF.  Ms. Byrd will testify as to her conversations with Mr. Turnage prior to his meeting with Mr. Craig.  Address:  441 4th Street NW, Suite 900, Washington DC 20001;

19. Former Mayor Vincent Gray.  Mayor Gray will testify as to his knowledge that his administration violated Dr. Campbell's due process rights to privacy. Address:  441 4th Street NW, Suite 900, Washington DC 20001;

20. Director of Personnel for the District of Columbia Department of Health Care Finance.  The Director will testify as to the procedures, policies, and rules governing personnel information and other private information.  Address:  441 4th Street NW, Suite 900, Washington DC 20001.  Direct exam approximately 20 minutes;

21. Any person who the District has named with information relevant to the allegations of the Complaint.


**The District objects to the following witnesses named by Plaintiff:**

__Plaintiff's Witness 4__:  Cynthia Morgan, MD, Rheumatology.  – The District objects to this witness providing any opinion testimony because Plaintiff did not provide a disclosure in compliance with FRCP 26 (a)(2)(C).

__Plaintiff's Witness 5__:  Carolyn Rand, mother of Dr. Campbell. – The District objects to this witness because she was not identified in discovery.

__Plaintiff's Witness 6__:  Keli Sobers, sister of Dr. Campbell. – The District objects to this witness because she was not identified in discovery.

__Plaintiff's Witness 7__:  Janene Jackson, former Director, Office of Policy and Legislative Affairs. – The District objects to this witness because she has no personal knowledge of the facts

**JA 49**

and circumstances surrounding the termination of Plaintiff's employment or the publication of statements about Plaintiff.

**Plaintiff's Witnesses 8 & 9**:  Plaintiff's damages experts.  The District agreed to the stipulations about Plaintiff's earnings listed in the pretrial because of Plaintiff's representation that she would not be calling these witnesses at trial.

**Plaintiff's Witness 20**:  Director of Personnel for the District of Columbia Department of Health Care Finance.  The District objects to this witness for lack of relevance and because the witness was not identified in discovery.

**JA 50**

**ATTACHMENT 2**
**DEFENDANT'S SCHEDULE OF WITNESSES**

**The Defendant anticipates calling the following witnesses at trial:**

1.     Jenifer Campbell
       Plaintiff in this action.  (Estimated Time: one hour)

2.     Wayne Turnage
       441 4th Street NW, Suite 900
       Washington DC 20001

       Director of the Department of Healthcare Finance (DHCF).  Turnage will testify
       about his decision to terminate Plaintiff's employment including the credible
       allegations of contract steering that were made against her.  Turnage will testify
       about his referral of these allegations to the Office of the Inspector General (OIG)
       and his participation in OIG's subsequent investigation.   He will also testify
       about the contracts for the DC Healthcare Exchange.  (Estimated Time: three
       hours)

               **Plaintiff's Objections**:  For the reasons set forth in Plaintiff's Motion *in
               Limine*, Plaintiff objects:  to eliciting testimony that in any way references
               the Office of Inspector General ("OIG"), the OIG report, the Inspector
               General ("IG"), the FBI, a grand jury, an investigation and any other
               mention of alleged criminal activity, including but not limited to:  a) any
               reference to the referral to the Inspector General and any conclusions
               reached in the OIG Report; b) any reference to the purported facts
               underlying the OIG Report; c) any reference that allegations contained in
               the OIG Report were or were not proven meritorious; and d) any reference
               about any employee's participation in or knowledge of the OIG
               investigation.

3.     Melissa Byrd
       441 4th Street NW, Suite 900
       Washington DC 20001

       Chief of Staff, Office of the Director, DHCF.  Byrd will testify about her
       participation in the investigation of the contract steering investigation against
       Plaintiff and the decision to terminate Plaintiff.  Byrd will also testify as a
       representative of DHCF about its policies and practices regarding contracting and
       personnel issues. (Estimated Time:  two hours)

               **Plaintiff's Objections**:  For the reasons set forth in Plaintiff's Motion *in
               Limine*, Plaintiff objects:  to eliciting testimony that in any way references
               the Office of Inspector General ("OIG"), the OIG report, the Inspector

**JA 51**

General ("IG"), the FBI, a grand jury, an investigation and any other mention of alleged criminal activity, including but not limited to: a) any reference to the referral to the Inspector General and any conclusions reached in the OIG Report; b) any reference to the purported facts underlying the OIG Report; c) any reference that allegations contained in the OIG Report were or were not proven meritorious; and d) any reference about any employee's participation in or knowledge of the OIG investigation.

4.  Bonnie Norton
    Former DC Employee

    Ms. Norton was on the team that reviewed bids for the Healthcare Exchange Contract.  Ms. Norton is expected to testify about the bidding process and the events immediately following the award of the contract. (Estimated Time: one hours)

5.  Cleveland Woodson
    441 4th Street NW, Suite 900
    Washington DC 20001

    DHCF Employee.  Will testify regarding the Healthcare Exchange bidding and implementation process and his interactions with Plaintiff regarding same. (Estimated Time: one hour)

6.  Sam Walker
    441 4th Street NW, Suite 900
    Washington DC 20001

    DHCF Employee.  Will testify regarding the Healthcare Exchange bidding and implementation process and his interactions with Plaintiff regarding same. (Estimated Time: one hour)

7.  Anthony Onyewuchi
    COMPASS Solutions

    Will testify about his interactions with Plaintiff and conversations with Turnage regarding same.  (Estimated Time: two hours)

8.  Brenda Emmanuel
    Former DC Employee

    Will testify regarding her conversations with Onyewuchi and Turnage about the allegations against Plaintiff. (Estimated Time: less than one hour)

9.  Holly Ploog

Vice President
CGI

Will testify regarding her conversations with Onyewuchi and Turnage about the allegations against Plaintiff. (Estimated Time:  less than one hour)

10.   Pedro Ribeiro
      Assistant Director Office of Public Affairs
      U.S. Immigration and Customs Enforcement
      Former Director, Office of Communications, Government of the District of Columbia.  Ribeiro will testify regarding his interactions with the press regarding Plaintiff's termination.  (Estimated Time:  one hour)

11.   Chris Murphy
      Former DC Employee

      Former Chief of Staff for Mayor Grey.  Murphy will testify regarding his interactions with Turnage and Ribeiro regarding Plaintiff's termination. (Estimated Time:  one hour)

12.   DHCF Custodian of Records
      441 4th Street NW, Suite 900
      Washington DC 20001

      A custodian of records will be appointed to authenticate any record from DHCF and testify about records kept in the ordinary course of business.  (Estimated Time:  less than one hour)

13.   Investigators, Office of the Inspector General
      717 14th Street, N.W., 5th Floor
      Washington, D.C.  20005

      One or more investigator(s) who participated in the investigation into the allegations against Plaintiff.  He or she will testify about the agency's investigation into the allegations against Plaintiff and her refusal to cooperate with that investigation.  (Estimated Time:  two hours)

      **Plaintiff's Objections**:  For the reasons set forth in Plaintiff's Motion *in Limine*, Plaintiff objects:  to eliciting testimony that in any way references the Office of Inspector General ("OIG"), the OIG report, the Inspector General ("IG"), the FBI, a grand jury, an investigation and any other mention of alleged criminal activity, including but not limited to:  a) any reference to the referral to the Inspector General and any conclusions reached in the OIG Report; b) any reference to the purported facts underlying the OIG Report; c) any reference that allegations contained in the OIG Report were or were not proven meritorious; and d) any reference

**JA 53**

about any employee's participation in or knowledge of the OIG investigation.

14.     Any person who Plaintiff has named with information relevant to the allegations of the Complaint.

**ATTACHMENT 3**
**PLAINTIFF'S EXHIBIT LIST**

**Plaintiff expects to offer any exhibit *not* designated by an asterisk (\*).  Plaintiff may offer, but does not expect to offer, the exhibits designated by an asterisk (\*).**

1. Dr. Campbell's Resume (Campbell v. DC – Fed. Ct. 43-51);

   **Objection** – Hearsay[1]

2. Email from Mr. Turnage, dated April 24, 2012, Subject: *Staff Hiring* (DHCF FY13-12, Pages 178-79);

3. Email from Ms. Cook, dated May 24, 2012, Subject:  *Offer of Employment* (DHCF FY13-12, Pages 149-50);

4. Letter from Mr. Stokes, dated June 4, 2012, RE: *Letter Placing Dr. Jennifer Campbell, Chief Operating Officer, on Administrative Leave and Notice of Contemplation of Termination*;

5. Email from Mr. Turnage, dated June 4, 2012, RE: *FW: STATUS OF PERSONNEL ISSUE* (DHCF FY13-12, Pages 133-34);

6. Email from Dr. Campbell, dated June 4, 2012 to Ms. Byrd, Subject: *Another item* (DHCF FY13-12, Pages 87-91);

7. Article in Washington City Paper titled *Health Care Finance COO Fired Over Contract Steering Allegations* by Alan Suderman, dated June 11, 2012, including comments posted online;

8. Article in Washington Post titled *D.C. official is fired over contract allegations* by Tim Craig, dated June 12, 2012;

---

[1] The District has only noted hearsay objections where it believes that Plaintiff intend to use the item for the truth of the matter asserted and it does not obviously fit into an exception under Rule 803.  It does not intend to waive any objection where Plaintiff cannot make a proper showing that emails and other documents are not hearsay or otherwise admissible at trial.

9.  Termination Letter from Mr. Stokes, June 11, 2012 (Pages 1-3);

10. D.C. Code § 1-615.58 – Employee responsibilities; DCMR Title 6-B, Chapter 6-B1

§ 3106; DC ST § 1-631.01;

      **Objection** – Relevance and it is inappropriate to introduce the law into

      evidence.

11. Chapter 31A Records Management and Privacy of Records, Electronic-District

Personnel Manual;

      **Objection** – Relevance and it is inappropriate to introduce the law into

      evidence.

12. Email from Mr. Otero, dated June 10, 2012, Subject: *Re: Official heads Up* (DC

Campbell 4620);

13. Email from VCG, dated June 4, 2012, Subject: *Re: Personnel Issue* (DC Campbell

4640-43);

14. Email from Mr. Murphy, dated June 7, 2012, Subject: Re: *how we doing on* (DC

Campbell 4621);

15. Email from Mr. Turnage, dated June 10, 2012, Subject: Re: *my email* (DHCF FY13-

12, Pages 114-116);

16. Email from Mr. Turnage, dated June 10, 2012, Subject: *RE: my email* (DHCF FY14-

03, Pages 20-24);

17. Email from Mr. Turnage, dated June 10, 2012, Subject: *RE: my email* (DHCF FY14-

03, Pages 12-16);

18. Email from Mr. Turnage, dated June 10, 2012, Subject: *On Background* (DHCF

FY13-12, Pages 106-116);

2

**JA 56**

19. Email from Mr. Turnage, dated June 11, 2012, Subject: *Corrections* (DC Campbell 4614-16);

20. Email from Mr. Turnage, dated June 13, 2012, Subject: *Re:* (DC Campbell 8208-09);

21. D.C. Code § 2-218.43 - Bid and proposal preferences;

> **Objection** – Relevance and it is inappropriate to introduce the law into evidence.  Also, this statute has been amended since Plaintiff's termination.

22. D.C. Code § 2-218.46 – Performance and subcontracting requirements for construction and non-construction contracts; subcontracting plans;

> **Objection** – Relevance and it is inappropriate to introduce the law into evidence.  Also, this statute has been amended since Plaintiff's termination.

23. Example Subcontracting Plan;

> **Objection** – Relevance, Hearsay and authenticity.  This internet page is dated 10/8/2015.  There is no indication that a similar page was available prior to Plaintiff's termination or was reviewed by any person with personal knowledge of this case.

24. Department of Small and Local Business Development – Certification FAQs;

> **Objection** – Relevance, Hearsay and authenticity.  This internet page is dated 10/8/2015.  There is no indication that a similar page was available prior to Plaintiff's termination or was reviewed by any person with personal knowledge of this case.

25. Email from Ms. Payne, dated May 9, 2012, Subject: *FW: CGI EHR Contract Clarifications* (DC Campbell 5814-17);

3

**JA 57**

26. Email from Ms. Alpert, dated May 11, 2012, Subject: *FW: CGI EHR Contract Clarifications* (DC Campbell 5821-25);

27. Email from Ms. Alpert, dated May 16, 2012, Subject: *FW: CGI Contract ? from OCP* (DC Campbell 5806-07);

28. Email from Dr. Campbell, dated May 23, 2012, Subject: *Fw: Draft Language for Liquidate Damages Justification.docx* (DC Campbell 6492);

29. Email from Ms. Alpert, dated May 23, 2012, Subject: *RE:* (DHCF FY13-12, Page 154);

30. Email from Mr. Yi, dated May 29, 2012, Subject: *RE: Update in sign contract – CGI* (DC Campbell 8149-50);

31. Email from Ms. Alpert, dated June 15, 2012, Subject: *Wash Post Article-Private* (DC Campbell 8225);

32. Email from Mr. Turnage, dated June 12, 2012, Subject: *Re: Follow-up on CGI Contract* (DC Campbell 7909-10);

33. Organizational chart with hand-written notation on bottom stating "[a]ny proposed changes must be approved by the contract administrator."  (DC Campbell 06824);

34. HBX Non-IT Technical Panel Evaluation Summary and supporting documents (Pages 1-5);

35. Email from Ms. Jackson, dated June 11, 2012, Subject: *Re: Official Heads Up* (DC Campbell 4617-4619);

   **Objection**:  Relevance, hearsay and speculation.

36. Email from Mr. Turnage, dated January 28, 2012, Subject: *Re: Our Appointment* (DC Campbell 8023-24);

37. Email from Ms. Byrd, dated June 4, 2012, Subject: *JCampbell Email* (DHCF FY13-12, Pages 145-47);

38. [Intentionally left blank – duplicate]

39. *Anthony K. Bird's Vocational Assessment, dated March 13, 2013;

     **Objection** – hearsay and unnecessary due to parties' stipulation.

40. *Expert Report by Richard B. Edelman, Ph.D., dated March 26, 2013, and attached Valuation of Lost Income and Benefits, dated March 2013, Tables 1-6, References, and Testimony List, Education and Experience, and Publications;

     **Objection** – hearsay and unnecessary due to parties' stipulation.

41. *Expert Report by Richard B. Edelman, Ph.D., dated November 25, 2014, and attached Tables 1-3;

     **Objection** – hearsay and unnecessary due to parties' stipulation.

42. *Dr. Campbell's job search log (Pages 1-2);

43. *Planned Parenthood emails (400001, 800090-93, 700038, 700046-49, 800088-89, 700003);

44. *Health Dimensions Group Consulting Services Agreement and Exhibits;

45. *The Wright Group, Contract Addendum #1 as of September 2012;

46. Email from Ms. Emanuel, dated April 19, 2012; Subject: *FW: CGI Contract* (DC Campbell 5811-13);

47. Email from Ms. Payne, dated May 11, 2012; Subject: *RE: CGI Contract Clarifications* (DC Campbell 7354-59);

48. Memorandum from Ms. Albert to Mr. Staton, dated May 22, 2012; Subject: *RE: Liquidated Damage Provision Justification Memo to File Task Order Award*

**JA 59**

*DCPO-2012-F-0372* (DC Campbell 6898-903);

49. Email from Ms. Payne, dated May 23, 2012; Subject: *Draft Language for Liquidated Damages Justification.docx* (DC Campbell 5273);

50. Email from Ms. Payne, dated May 23, 2012; Subject: *FW: GSA Contract CGI* (DC Campbell 6822);

51. Email from Ms. Alpert, dated May 23, 2012; Subject: *GS-35f-479H CGI GSA Contract Inquiry* (DC Campbell 6997);

52. Email from Ms. Alpert, dated May 23, 2012; Subject: *RE: Update in sign contract – CGI* (DC Campbell 8174);

53. Email from Ms. Payne, dated May 23, 2012; Subject: *RE: Update in sign contract – CGI* (DC Campbell 8175);

54. Email from Dr. Campbell, dated May 28, 2012; Subject: *RE: Update in sign contract – CGI* (DC Campbell 8173);

55. Email from Mr. Woodson, dated May 29, 2012; Subject: *FW: Update in sign contract – CGI* (DC Campbell 6956-57);

56. Email from Ms. Alpert, dated May 29, 2012; Subject: *Re: Update in sign contract – CGI* (DC Campbell 8168-70);

57. Email from Ms. Payne, dated May 31, 2012; Subject: *Fw: Update in sign contract – CGI* (DC Campbell 6958-63);

58. Draft Language for Liquidate Damages Justification (DC Campbell 5274);

59. Email from Ms. Alpert, dated June 7, 2012; Subject: *Re: differences in the CGI contract and liquidated damages* (DC Campbell 7653);

60. Email from Ms. Alpert, dated June 22, 2012; Subject: *Re: CGI Contract Update*

(DC Campbell 7329-31);

61. Email from Ms. Alpert, dated June 22, 2012; Subject: *Re: CGI Contract Update*

(DC Campbell 7338-40);

62. Email from Ms. Mack, dated June 29, 2012; Subject: *RE: CGI* (DC Campbell

7310-12);

63. Any exhibit set forth in the District's Exhibit List.

**JA 61**

**ATTACHMENT 4**
**DEFENDANT'S EXHIBIT LIST**

Defendants anticipate using the following exhibits as evidence at trial:[1]

|  | **Date** | **Document Description** | **Bates #** |
|---|---|---|---|
| 1. | 8/15/2010 | Jennifer Campbell personal action request Competitive Reassignment | 006691 |
| 2. | 9/25/2011 | Campbell Employee personal action information sheet: Pending Salary Approval | 006825 |
| 3. | 1/10/2012 | Letter appointing to Contract Administrator and caution that Campbell will be personally liable for actions taken | 004671 |
| 4. | 1/28/2012 | Email about meeting between Campbell and Turnage | 008023 |
| 5. | 1/31/2012 | Email: panel has been set for bid | 008110 |
| 6. | 2/3/2012 | Email about panel evaluators for contract | 007255 |
| 7. | 3/2/2012 | Email to Murphy about final Accenture item and award letter | 005632 |
| 8. | 3/8/2012 | Email stating delivery dates cannot be modified and are due May 31 | 006995 |
| 9. | 3/14/2012 | Email regarding questions for compass |  |
| 10. | 3/21/2012 | Letter to Compass stating ability to modify Offer by March 22, 2012 | 006063 |
| 11. | 3/21/2012 | Email Campbell stating moving forward with new Best Offer | 006122 |
| 12. | 3/21/2012 | Email moving forward with contract | 006127 |
| 13. | 3/27/2012 | Email stating the need to go through council for contract approval. | 005611 |
| 14. | 3/27/2012 | Evaluation panel and list of final offers for contract | 005612 |
| 15. | 3/27/2012 | Technical Evaluation Panel Report | 006055 |
| 16. | 3/27/2012 | Email selecting Compass and next steps request. | 006680 |
| 17. | 3/27/2012 | Email stating email sent to OCP asking for next steps and timeline | 007903 |
| 18. | 3/30/2012 | Email asking contract update sent to Dir. Staton | 007003 |

---

[1] Plaintiff's specific objections to Defendant's exhibits are designated by an asterisk (*).
Objections are set forth below Defendant's table of exhibits.

**JA 62**

| 19. | 4/3/2012 | Email explaining gravity of contract situation for district and OCP staff members | 007932 |
|---|---|---|---|
| 20. | 4/5/2012 | Letter to Compass Solutions stating ability to provide second Best and Final Offer | 006059 |
| 21. | 4/5/2012 | Letter stating compliance with tax filing and payment requirements of DC | 006023 |
| 22. | 4/5/2012 | Letter to Navigant Consulting giving ability to modify offer by 4/6/2012 | 006065 |
| 23. | 4/5/2012 | Email suggesting meeting with Staton and modifying contract or getting two contracts if modification cannot occur | 006887 |
| 24. | 4/5/2012 | Email: Grant Agreement reference in DCMR for HIX Non IT | 007913 |
| 25. | 4/5/2012 | Email asking if they should negotiate with Compass of wait for further notice | 007955 |
| 26. | 4/5/2012 | Email stating two contracts can be rewarded and asking when grant money ends | 007970 |
| 27. | 4/10/2012 | Letter contact to Compass Solutions | 005945 |
| 28. | 4/10/2012 | Letter contract to Compass Solutions | 006060 |
| 29. | 4/10/2012 | Letter contract to Onyewuchi | 007014 |
| 30. | 4/11/2012 | Email regarding understanding timing of council and first set of required deliverables | |
| 31. | 4/19/2012 | Email ensuring CGO contract includes the federal regulations code | 005811 |
| 32. | 4/23/2012 | Email about Campbell qualifications for COO | 004657 |
| 33. | 4/23/2012 | Email to Deputy Mayor asking for salary approval for Campbell as COO | 007262 |
| 34. | 4/24/2012 | Email to Oneywuchi and Simon regarding deliverable schedule | |
| 35. | 4/27/2012 | Email about change in CGI proposal | 006490 |
| 36. | 5/4/2012 | Email stating CGI is going back and forth on 4 month time frame to 6 month for implementation | 005818 |
| 37. | 5/9/2012 | Email stating need for meeting with Dr. Campbell and Operations about CGI clarifications | 005814 |
| 38. | 5/11/2012 | Email asking for review of proposals | 005821 |
| 39. | 5/11/2012 | Email wanting CGI to start and not wanting to get into back and forth with OCP | 007354 |
| 40. | 5/15/2012 | Email: signed contract with Orion but not CGI | 008020 |
| 41. | 5/17/2012 | Letter of offer as COO of Dept. of Health Finance | 007064 |
| 42. | 5/18/2012 | Email regarding opening for DHCF positions | 004653 |

**JA 63**

| 43. | 5/16/2012 | Email asking to add language "contingent on receipt of such information from MD and VA | 005806 |
| 44. | 5/22/2012 | Liquidated Damages Memo | 006898 |
| 45. | 5/23/2012 | Email with list of liquidated damages issue in CGO contract | 005273 |
| 46. | 5/23/2012 | Email: Last issue before CGI gets an executed contract. Liquidated Damages | 006492 |
| 47. | 5/23/2012 | Email asking for boilerplate language that could adopt to CGI for liquidated damages | 006882 |
| 48. | 5/23/2012 | Email asking for standard liquidated damages or service level agreements | 006997 |
| 49. | 5/23/2012 | Email stating CGI contract nearly finalized | 008174 |
| 50. | 5/23/2012 | Email stating Liquidated Damages section is sticking point on K now | 008175 |
| 51. | 5/23/2012 | Email asking if CGI agreed to BAFO feedback | 008224 |
| 52. | 5/24/2012 | Email asking when Compass contract goes to council | 007009 |
| 53. | 5/28/2012 | Email asking if contract has been signed | 008173 |
| 54. | 5/29/2012 | Email asking status of CGI contract | 006956 |
| 55. | 5/29/2012 | Email asking for memo updating contract | 008168 |
| 56. | 5/31/2012 | Email asking for clarification for CGI service level in contract | 006958 |
| 57. | 5/2012 | Drave language for liquidated damages justifications | 005274 |
| 58. | 6/2/2012 | Email concerning charge against staff member | 004675 |
| 59. | 6/2/2012 | Email on disturbing charge on staff member | 007317 |
| 60. | 6/3/2012 | Email about Campbell procuring minority partners | 004614 |
| 61. | 6/3/2012 | Email stating change to a more inclusive working inappropriate conduct of Campbell | 004943 |
| 62. | 6/3/2012 | Email Personnel Issue Campbell | 004650 |
| 63. | 6/4/2012 | Email updating the actions taken regarding Jennifer Campbell | 004612 |
| 64. | 6/4/2012 | Email regarding possible criminal nature of Campbell's action and OAG referral | 004638 |
| 65. | 6/4/2012 | Email asking if referral to OAG is proper and for a more formal referral letter. | 004633 |
| 66. | 6/4-6/5/2012 | Email regarding actions taken regarding Jennifer Campbell | 004605 |
| 67. | 6/4/2012 | Letter placing Campbell on administrative leave | 006777 |
| 68. | 6/4/2012 | Email saying OAG has been informed | 008122 |

3

# JA 64

| 69. | 6/6/2012 | Email about meeting with Mr. Wiggins | 004610 |
|---|---|---|---|
| 70. | 6/6/2012 | Email from Murhpy asking if Campbell termination effective immediately. | 004625 |
| 71. | 6/6/2012 | Email replying to actions taken. Thanks for update. | 004628 |
| 72. | 6/7/2012 | Christopher to Pedro Ribeiro "Word travels fast in this town" | 004621 |
| 73. | 6/7/2012 | Email from Suderman to Ribeiro "how we doing on…Dr. Jennifer Campbell." | 004624 |
| 74. | 6/7/2012 | Email of draft separation letter to Campbell | 006945 |
| 75. | 6/7/2012 | Email asking for review of CGI final draft | 007653 |
| 76. | 6/7/2012 | Email saying if changes are not material we should move on this | 007657 |
| 77. | 6/10/2012 | Email wanted to letter of separation finished. | 007248 |
| 78. | 6/10/2012 | Email announcement that Campbell's tenure as COO is over | 007251 |
| 79. | 6/11/2012 | Email regarding actions taken regarding Campbell | 004608 |
| 80. | 6/11/2012 | Email regarding newspaper article by Mr. Wiggins | 004666 |
| 81. | 6/11/2012 | Letter outlining causes for termination of excepted service | 006686 |
| 82. | 6/11/2012 | Email asking to fill out final contract information and delivery schedule | 006988 |
| 83. | 6/11/2012 | Email asking to include more departments on final separation letter | 007995 |
| 84. | 6/11/2012 | Email with link to info on certified business enterprises and standard conditions for contracts | 007055 |
| 85. | 6/12/2012 | Email Follow up on CGI contract | 007909 |
| 86. | 6/12/2012 | Email with article in Wash. Post about DC official being fired | 008183 |
| 87. | 6/13/2012 | Email stating CGI furious over article and bad publicity | 008208 |
| 88. | 6/13/2012 | Email asking for any updates from CGI call Wayne and learned CGI was only offerer on the procurement | 007908 |
| 89.* | 6/15/2012 | Email stating meeting with OIG to discuss chronology of Campbell events | 007994 |
| 90. | 6/22/2012 | Email wanting new contractor. CGI did not sign after 10 days | 007329 |
| 91. | 6/22/2012 | Email concerning OCP can sign contract, CGI still has not signed | 007328 |
| 92. | 2012 | Letter outlining COO inappropriate actions and violation of law | 004667 |

**JA 65**

| 93. | 6/25/2012 | Email outline of meeting altering Campbell and Compass contract | 006689 |
| 94. | 6/29/2012 | Email asking if CGI has not signed, and putting word out for new contractor | 007310 |
| 95. | 6/2012 | Chronology of events related to Compass contract and Campbell | 006835 |
| 96. | 2012 | Technical Assistance flow chart | 006824 |
| 97.* | 9/24/2013 | Letter from OIG stating investigation is finished | |
| 98.* | 11/6/2013 | FOIA request OIG | |

**Plaintiff's Objections**:  For the reasons set forth in Plaintiff's Motion *in Limine*, Plaintiff objects to introducing:

    a)  Defendant's Exhibit 97 (Letter from OIG stating investigation is finished);

    b)  Defendant's Exhibit 89 (Email stating meeting with OIG to discuss chronology of Campbell events); and

    c)  Defendant's Exhibit 98 (FOIA request OIG).

Further, Plaintiff objects to any exhibits that in any way references the Office of Inspector General ("OIG"), the OIG report, the Inspector General ("IG"), the FBI, a grand jury, an investigation and any other mention of alleged criminal activity, including but not limited to:  a) any reference to the referral to the Inspector General and any conclusions reached in the OIG Report; b) any reference to the purported facts underlying the OIG Report; c) any reference that allegations contained in the OIG Report were or were not proven meritorious; and d) any reference about any employee's participation in or knowledge of the OIG investigation.

**JA 66**

**ATTACHMENT 5**
**PLAINTIFF'S DEPOSITION DESIGNATIONS**

1. **Chris Murphy**, April 24, 2014:  6:8-8:22; 10:11-10:21; 14:15-18:19;

2. **Pedro Ribeiro**, April 30, 2014:  5:16-9:2; 11:16-12:6;

3. **Wayne Turnage**, March 27, 2014:  8:1-9:22; 11:12-13:22; 17:1-20:22; 22:1-22:22; 30:6-35:16; 42:20-62:16; 64:20-65:4; 67:21-69:11;

4. **Anthony Onyewuchi**, January 29, 2014:  8:13-12:6; 13:5-20:19; 22:9-22:11; 23:10-27:6; 36:8-38:4; 38:10-48:6;

5. **Holli Ploog**, April 23, 2014:  45:1-46:13;

6. **Sam Walker**, April 15, 2014:  7:3-14:22;

7. **Bonnie Norton**, March 27, 2014:  9:8-17:22; 21:8-21:22;

8. **Carrie Brooks-Brown**, January 19, 2015:  11:14-11:21; 81:20-84:23; 125:17-126:16; 131:4-131:16; 138:11-138:13; 139:4-140:7; 141:25-142:1; 142:8-142:11; 150:1-150:5; 151:4-151:10; 152:5-152:8; 152:15-152:25; 153:7-153:9; 154:21-154:22;

9. **Janene Jackson**, June 11, 2014: 5:9-6:1; 10:11-11:12; 12:13-13:17;

10. **Derrick White**, April 15, 2014:  6:2-6:6; 8:17-8:20; 9:14-9:20; 10:11-10:18.

**The District objects to the inclusion Plaintiff's following deposition designations:**

1. **Anthony Onyewuchi**, CEO of COMPASS Solutions. – The District objects to this testimony because it is hearsay.

2. **Holli Ploog**, Vice President of CGI. – The District objects to this testimony because it is hearsay.

3. **Carrie Brooks-Brown**, owner of Carrie Brooks Brown Consulting Services ("CBBS"). – The District objects to this testimony because it is hearsay.

4. **Janene Jackson**, former Director, Office of Policy and Legislative Affairs. – The District objects to this witness because she has no personal knowledge of the facts and circumstances surrounding the termination of Plaintiff's employment or the publication of statements about Plaintiff.

5. **Sam Walker and Derik White**.  The District has ordered these deposition transcripts. Defendant will provide objections to this deposition designation as soon as practical upon receipt of the deposition transcript.

**JA 68**

<u>**ATTACHMENT 6**</u>
<u>**DEFENDANT'S DEPOSITION DESIGNATIONS**</u>

The District designates the following portions of depositions to be presented at trial:

**Deposition of Jenifer Campbell**:  22:2 – 24: 17; 25:14 – 26:2; 42:3 - 20; 44:19 - 45:6; 45:7 - 51:8; 51:22 – 52:4; 53:9 - 56:9; 57:12 - 60:8; 66:3 – 66:17; 81:6 – 83:22.

**Deposition of Molly Egan**:  P 7:5 – 8:22; 16:10 – 19.  Ms. Egan qualifies and an unavailable witness because she is outside the subpoena power of the Court.

**<u>Plaintiff's Cross Designation</u>**:  14:18-15:14.

**<u>Plaintiff's Cross Designation of Exhibits</u>**:  Plaintiff's Exhibit No. 43 – Planned Parenthood emails (400001, 800090-93, 700038, 700046-49, 800088-89, 700003);

**JA 69**

**ATTACHMENT 7.1**
**PLAINTIFF'S REQUESTED NON-STANDARD JURY INSTRUCTION ON**
**THE DISTRICT'S PERSONNEL RULES**


**PERSONNEL RULES**

The first area of law that I want to address with you is the right of government employees to personal privacy.  The District has a set of rules that govern the safeguarding and handling of personnel information.  These rules apply to all District Government employees responsible for the use, dissemination, and safeguarding of personnel records from the Mayor on down, and require that these employees are familiar with and follow the rules.

These rules prohibit District employees from disclosing documents and information contained in employee personnel files.  Indeed, under the District's rules, managers have the responsibility to ensure that private information is not disclosed and all employees whose official duties involve personnel records shall be sensitive to a District employee's individual right to personal privacy.  Managers and others are prohibited from disclosing personnel information not available to the public, gained through official duties, for personal gain.

In this case, Wayne Turnage, Director of the Department of Health Care Finance and Dr. Campbell's manager, Chris Murphy, the Mayor's Chief of Staff, and Pedro Ribiero, Director of Communications in the Executive Office of the Mayor, disclosed private information and documents regarding Dr. Campbell to the press in violation of these rules.


**SOURCES**:  D.C. Code § 1-615.58; CDCR 6-B3101, Chapter 31A – Records Management and Privacy of Records, Electronic District Personnel Manual §§ 3106, 3112, 3113; DCMR, Title 6-B, Chapter 6-B1 § 3106; DC ST § 1-631.01


**JA 70**

**Objection**:  The District objects to this instruction because it inaccurately states the law.  Also, Plaintiff is not seeking damages under this rule and there has been no finding that the District violated any personnel rule.

## ATTACHMENT 7.2
## PLAINTIFF'S REQUESTED NON-STANDARD JURY INSTRUCTIONS FOR HER PROCEDURAL DUE PROCESS CLAIM

### THE DUE PROCESS CLAIMS

The first claim Dr. Campbell asserts is that Defendant violated her federal due process rights as a government employee when it disclosed Mr. Turnage's emails to the press and terminated her employment.

There are two ways for Dr. Campbell to prevail on this claim:

First, you may find in Dr. Campbell's favor if she demonstrates that she was terminated from her government employment and that the District negligently, recklessly, or maliciously published a single false and defamatory statement about her which caused her to suffer financially and emotionally.  The District concedes that it published statements about her and that it terminated her government employment.

Alternatively, you may find in Dr. Campbell's favor if she demonstrates that the District's release of emails to the press and termination of her employment left a stigma on her and had the broad effect of largely precluding her from pursuing her chosen career.

**SOURCES**:  *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573–74 (1972); *O'Donnell v. Barry*, 148 F.3d 1126, 1139–41 (D.C. Cir. 1998); *Campbell v. District of Columbia*, 972 F. Supp. 2d 38, 45 (D.D.C. 2013); *Codd v. Velger*, 429 U.S. 624, 627 (1977); *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014); *Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012); *Lewis v. Elliott*, 628 F. Supp. 512, 515 (D.D.C. 1986); *Fonville v. District of Columbia*, 38 F. Supp. 3d 1, 13 (D.D.C. 2014); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506–07 (D.C. Cir. 1995); Standard Jury Instruction §§ 5.02, 17.01; the Court's Memorandum Opinion, Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, September 4, 2015 (ECF No. 36).

**Objection:** The District object because instructing the jury on both theories of liability for Plaintiff's due process claim in a single instruction is confusing and could lead to an inconsistent verdict.  The District also objects to the language instructing the jury that it "concedes" basic facts.

**REPUTATION PLUS THEORY**

A statement is considered to be false when it is not substantially true.  Dr. Campbell

contends that information contained in Mr. Turnage's emails that were sent or shown to Alan

Suderman and Tim Craig, journalists from the *Washington City Paper* and the *Washington Post*,

contained three false and defamatory statements:

> a) that Dr. Campbell intended to organize a team of vendors to bid as a prime
>
>    contractor on Phase II of the health insurance exchange contract herself;
>
> b) that Dr. Campbell required Compass to hire consultant Cedric Simon; and
>
> c) that Dr. Campbell requested CGI to abandon plans to partner with Compass in
>
>    bidding on Phase II and to partner instead with Document Managers, which
>
>    was owned by Darryl Wiggins, Campaign Chairman to then D.C.
>
>    Councilmember and now Mayor Muriel Bowser.

A statement is considered to be defamatory if it tends to injure one in her trade,

profession or community standing, or lower her in the estimation of the community.  The false

imputation of criminal conduct is inherently defamatory.

Dr. Campbell contends that the three statements were inherently defamatory because they

falsely implied that she engaged in criminal conduct.  Further, Dr. Campbell was defamed if

even one of the statements impute any misconduct whatsoever in the conduct of her calling.  Dr.

Campbell further contends that these statements had a devastatingly negative impact on her

reputation in the community.

To publish a statement means to communicate the statement to a third person.  Here, no privilege protects the District's publication.  This means that the District did not have the right to publish them to the press.  To the contrary, the District's own rules prohibited it from disclosing the emails to the press and provide that employees who violate the rules can be subject to disciplinary action and criminal penalties.

To negligently publish a statement means to unreasonably fail, under the circumstances, to take care that the statement was true.  To maliciously publish a statement means to publish a statement either knowing that the statement was false or with reckless disregard of whether it was false.  Reckless disregard means not showing proper concern about the possible bad results that may arise from one's action; recklessness does not require knowledge or intent.  Extreme recklessness is an action done with indifference to the truth.

Dr. Campbell contends that Mr. Turnage, Mr. Murphy, and Mr. Ribiero did not take reasonable care in sharing with the press the unfounded and serious allegations that Dr. Campbell engaged in unethical conduct without first ensuring the truthfulness of the statements.  Further, Mr. Turnage himself believed that at least one of the allegations sent to the press was not true and therefore acted recklessly by sharing that statement to the press.


In order to prevail, Dr. Campbell does not have to prove that all three of the statements published were false and defamatory.  Dr. Campbell only has to prove that one published statement was false and defamatory.  For example, if you find that the published statement that Dr. Campbell attempted to organize a team of vendors to bid as a prime contractor on Phase II of the health insurance exchange contract is false and defamatory, then you should find in favor of

Dr. Campbell on her Due Process claim even if you find the other two statements were not false and defamatory.

In determining whether the statements defamed Dr. Campbell, you must consider how those persons who heard and/or read the statement reasonably understood the meaning that the statements were intended to express.  You must consider the plain and natural meaning of the words of the statements, and you must consider the statements in the context of the entire publication taken as a whole.

**SOURCES**:  *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998); *Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012); *Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012); *Lewis v. Elliott*, 628 F. Supp. 512, 515 (D.D.C. 1986); *Fonville v. District of Columbia*, 38 F. Supp. 3d 1, 13 (D.D.C. 2014); *Williams v. D.C.*, 9 A.3d 484, 491 (DC 2010); *Guildford Transp. Indus., Inc. v. Wilner*, 760 A. 2d 580 (D.C. 2000); *Moldea v. New York Times Co.*, 15 F.3d 1137, 1150 (DC Cir 1994); *Fleming v. AT&T Information Services, Inc.*, 878 F.2d 1472, 1475 (DC Cir. 1989), *citing Washington Annapolis Hotel Co., v. Riddle*, 171 F.2d 732, 736 (DC Cir. 1948); *Columbia First Bank v. Ferguson*, 665 A.2d 650, 656 (DC 1995); *Carter v. Hahn*, 821 A2d 890, 894-895 (DC 2003); *Brodie v. United States HHS*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010); Standard Jury Instruction §§ 5.02, 17.01; the Court's Memorandum Opinion, Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, September 4, 2015 (ECF No. 36); Merriam-Webster Dictionary

**Objection**:  The District objects to this instruction because it is unnecessarily long and repetitive. The District also objects because it includes a number of issues that should be set out separately. In addition, portions of the instruction do not reflect the facts in this case.  Finally, instruction the jury separately on only one of Plaintiff's two theories of liability is confusing.

**ATTACHMENT 7.3**
**PLAINTIFF'S REQUESTED NON-STANDARD JURY INSTRUCTIONS FOR HER**
**WHISTLEBLOWER PROTECTION ACT CLAIM**

**WHISTLEBLOWER**

Under the Whistleblower Protection Act, it is unlawful for a supervisor to retaliate against a subordinate who either refuses to comply with what she reasonably believes to be an illegal order or discloses what she in reasonable good faith believes to be gross mismanagement, gross misuse of public resources, abuse of authority, waste, fraud or abuse, or a violation of the law or term of a contract, and the protected activity was a contributing factor in the retaliation.

In this case, Dr. Campbell alleges that she engaged in two types of protected activities.

First, Dr. Campbell contends that her former supervisor Wayne Turnage pressured her to approve the award of a contract to CGI without a liquidated damages clause and she refused to comply because she believed to do so would be illegal and a gross misuse or waste of taxpayer funds.

Second, Dr. Campbell contends that she protested against Mr. Turnage's desire to award CGI a contract without a liquidated damages clause because she in reasonable good faith believed that to do so would be gross mismanagement or abuse of authority.

It is undisputed that Mr. Turnage conducted an investigation of Dr. Campbell without asking for her side of the story, unlawfully disclosed his emails about her to the press, and caused her employment to terminate.

Consequently, you should find in favor of Dr. Campbell if you find that any one of her protected activities contributed to Mr. Turnage's actions.

9

**JA 78**

**SOURCES**:  D.C. Code §§ 1-615.51 through 1-615.54; *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-1260 (D.C. 2003); *Wilburn v. District of Columbia*, 957 A.2d 921, 924-925 (D.C. 2008)

**Objection**:  Plaintiff's second contended protected disclosure is not properly part of this suit because it was not in her complaint or interrogatory responses. Also, the following statement is not supported by the facts in this case and is not relevant to Plaintiff's claim: "It is undisputed that Mr. Turnage conducted an investigation of Dr. Campbell without asking for her side of the story, unlawfully disclosed his emails about her to the press."  Finally, the last sentence in this instruction is not an accurate statement of the law.  A Plaintiff makes a prima facie case by showing that the protected disclosure was a contributing factor in the prohibited personnel action, but a jury must find "but for" causation in order to impose liability. J*ohnson v. District of Columbia*, 935 A.2d 1113 (D.C.2007).

**PROTECTED DISCLOSURE**

Under the Whistleblower Protection Act, a "protected disclosure" is defined as a refusal to comply with what the employee believes is an illegal order or any disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure, made to any person by an employee, including a disclosure made in the ordinary course of an employee's duties by an employee to a supervisor, that the employee reasonably believes evidences:

    a)  gross mismanagement;

    b)  gross misuse or waste of public resources or funds;

    c)  abuse of authority in connection with the administration of a public program or the execution of a public contract;

    d)  a violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or

    e)  a substantial and specific danger to the public health and safety.

Dr. Campbell does not have to prove that her belief was correct.  That is, you may find in favor of Dr. Campbell if her belief was wrong, but reasonable.

**SOURCES**:  D.C. Code § 1-615.52; *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-1260 (D.C. 2003)

**Objection**:  The last sentence is duplicative of the next instruction.

**REASONABLE BELIEF**

Under the Whistleblower Protection Act, a belief is reasonable when a disinterested observer with knowledge of the essential facts known to and readily ascertainable by Dr. Campbell could reasonably conclude that the actions of Defendants evidence gross mismanagement; gross misuse or waste of public resources or funds; abuse of authority in connection with the administration of a public program or the execution of a public contract; a violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District of Columbia government and a District of Columbia government contractor that is not of a merely technical or minimal nature; or a substantial and specific danger to the public health and safety.

**SOURCES**:  *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-1260 (D.C. 2003)

**<u>RETALIATION</u>**

Under the Whistleblower Protection Act, "retaliation" includes conducting or causing to be conducted an investigation of an employee because of a protected disclosure made by the employee who is a whistleblower.

**SOURCES**:  D.C. Code § 1-615.52

**Objection**:  Plaintiff cannot at this late date add a claim that she was inappropriately investigated because of her purported protected disclosures.  Her complaint and interrogatory responses only include her placement on administrative leave and ultimate termination as the alleged prohibited personnel actions taken against her because of her protected disclosures.

## CONTRIBUTING FACTOR

Under the Whistleblower Protection Act, "contributing factor" means any factor which, alone or in connection with other facts, tends to affect in any way the outcome of the decision.  A factor contributes if it plays a role in the decision.

**SOURCES**:  D.C. Code § 1-615.52

**Objection**:  The last sentence is redundant.

**TEMPORAL PROXIMITY**

Close temporal proximity of a protected activity to a retaliatory act or a prohibited personnel action can suffice to establish that a protected disclosure was a contributing factor to such act or actions.

This means that evidence showing that Mr. Turnage shared emails with the media, investigated, and ultimately terminated Dr. Campbell in the space of only a few days and soon after Dr. Campbell refused to approve the CGI contract, could support a finding that Dr. Campbell's expression of her concerns about the CGI contract was a contributing factor to Mr. Turnage's alleged unlawful actions.

**SOURCES**:  *Saint-Jean v. District of Columbia*, 846 F. Supp. 2d 247, 262 (D.D.C. 2012)

**Objection**:  The instruction places too much emphasis on a single aspect of causation.

**BURDEN OF PROOF SHIFTING**

If Dr. Campbell has demonstrated by a preponderance of the evidence that her protected activities were a contributing factor in the alleged retaliation or prohibited personnel action against her, the burden of proof shifts to the District to prove, by clear and convincing evidence, that the alleged action would have occurred for legitimate, independent reasons even if Dr. Campbell had not engaged in protected activity.

That is, you must decide whether the District has proven by clear and convincing evidence that:

a) the District would have shared emails with the media regarding Dr. Campbell; and

b) the District would have accepted as true allegations made by vendors competing for a multi-million dollar contract without even asking Dr. Campbell for her side of the story; and

c) the District would have investigated and/or terminated Dr. Campbell if she had not engaged in protected activity. If you determine that an action set forth in (a), (b), or (c) would not have occurred if Dr. Campbell had not engaged in protected activities, you must find for her on this claim.


**SOURCES**:  D.C Code § 1-615.54(b); *Johnson v. District of Columbia*, 935 A.2d 1113, 1117-1118 (D.C. 2007); *Bowyer v. District of Columbia*, 793 F.3d 49, 52 (D.C. Cir. 2015)


**Objection**:  Plaintiff cannot at this late date add a claim that she was inappropriately investigated because of her purported protected disclosures.  Her complaint and interrogatory responses only include her placement on administrative leave and ultimate termination as the alleged prohibited personnel actions taken against her because of her protected disclosures.

## CLEAR AND CONVINCING EVIDENCE

Clear and convincing evidence requires a degree of persuasion much higher than mere preponderance of the evidence.  That is, the District must produce in your mind a firm belief or conviction that it is highly probable that:

a) Mr. Turnage would have shared emails with the media regarding Dr. Campbell; and

b) the District would have accepted as true allegations made by vendors competing for a multi-million dollar contract without even asking Dr. Campbell for her side of the story; and

c) Mr. Turnage would have investigated and/or terminated Dr. Campbell even if she had not engaged in protected activities.


**SOURCES**:  *Williams v. District of Columbia*, 818 F. Supp. 2d 202, 204 (D.D.C. 2011); *Wood v. Neuman*, 979 A.2d 64, 73 (D.C. 2009); *Henson v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 560 A.2d 543, 545 (D.C. 1989)


**Objection**:  Plaintiff cannot at this late date add a claim that she was inappropriately investigated because of her purported protected disclosures.  Her complaint and interrogatory responses only include her placement on administrative leave and ultimate termination as the alleged prohibited personnel actions taken against her because of her protected disclosures.

**ATTACHMENT 7.4**
**PLAINTIFF'S REQUESTED NON-STANDARD JURY INSTRUCTIONS ON**
**DAMAGES**

**COMPENSATORY DAMAGES**

If you find for Dr. Campbell, then you must award her a sum of money that will fairly and reasonably compensate her for all of the damage she experienced that was proximately caused by Defendants. Compensatory damages consist of damages for any mental anguish, emotional distress, lost wages, humiliation, damage to reputation, and loss of enjoyment of life which Dr. Campbell suffered as a result of the District's wrongful conduct.

The burden of proof is upon Dr. Campbell to establish all elements of her damages by a preponderance of the evidence. Dr. Campbell must prove her damages with reasonable certainty. You may only award Dr. Campbell damages for past, present or future injury that is not speculative. Speculative damages are those that might be possible but are remote or based on guesswork.

By the same token, Dr. Campbell does not have to prove her exact damages. No evidence of monetary value of such intangible things as pain and suffering has been nor needs to be introduced into evidence. No exact standard exists for fixing the amount to be awarded for such damages. You may award Dr. Campbell damages that are based on a just and reasonable estimate derived from relevant evidence.

You may award monetary damages for any of the following items that you find Defendants proximately caused:

1. any physical pain or emotional distress that Dr. Campbell has suffered in the past;

2.  any physical pain or emotional distress that Dr. Campbell may suffer in the future;

3.  any humiliation or embarrassment Dr. Campbell has suffered in the past;

4.  any humiliation or embarrassment Dr. Campbell may suffer in the future;

5.  any inconvenience Dr. Campbell has experienced in the past;

6.  any inconvenience Dr. Campbell may experience in the future;

7.  any medical expenses Dr. Campbell incurred in the past;

8.  any medical expenses that Dr. Campbell may incur in the future;

9.  any loss of earnings Dr. Campbell incurred in the past and interest on her loss of earnings; and

10. any loss of earnings or earning capacity that Dr. Campbell may incur in the future.

In addition, you may award Dr. Campbell:

1.  reinstatement to the same position held before the prohibited personnel action or to an equivalent position;

2.  reinstatement of the employee's seniority rights; and

3.  restoration of lost benefits.


**SOURCES**:  Standard Jury Instruction §§ 12.01, 12.02, 12.03, 13.01; D.C. Code § 1-615.54;

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (U.S. 1986); *Carey v. Piphus*, 435 U.S. 247 (U.S. 1978)

USCA Case #16-7077      Document #1674230          Filed: 05/08/2017      Page 94 of 311

**Objection**:  The District objects to the inclusion of equitable remedies in this instruction, which are for the Court to award.

**PUNITIVE DAMAGES**

In addition to compensatory damages, Dr. Campbell also seeks an award of punitive damages against the District.  Punitive damages are damages above and beyond the amount of compensatory damages you may award.  Punitive damages are awarded to punish the District for its conduct and to serve as an example to prevent it and others from acting in a similar way in the future.

You may award punitive damages only if Dr. Campbell has proved with clear and convincing evidence:

1. that the District's employees acted with evil motive, actual malice, or with intent to injure, or in willful disregard for the rights of Dr. Campbell; and

2. that the District's employees' conduct itself was outrageous, reckless toward the well-being of Dr. Campbell, or showed maliciousness, spite, ill will, vengeance or deliberate intent to harm Dr. Campbell.


Evil motive is defined as an intention to cause harm or injury to someone.  Willful disregard is defined as ignoring something or treating something as unimportant.  Malice is the doing of an act without just cause or excuse, with such a conscious indifference or recklesss disregard as to its results or effect upon the rights or feeling of others as to constitute ill will.  A knowingly false or recklessly made false statement that results in defamation is evidence for a jury to find malice.


You may conclude that the District acted with a state of mind justifying punitive damages based on direct evidence or based on circumstantial evidence from the facts of the case.  This

means that the requisite state of mind need not and usually cannot be proven by direct evidence, but may be inferred from all the facts and circumstances of the case.  Egregious or outrageous acts may serve as evidence supporting an inference of evil motive, actual malice, and willful disregard.

**SOURCES**:  Standard Jury Instruction §§ 16.01, 17.04; *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (U.S. 1986); *Smith v. Wade*, 461 U.S. 30 (1983); *Robinson v. Sarisky*, 535 A.2d 901 (D.C. 1988); *Kolstad v. ADA*, 527 U.S. 526 (U.S. 1999); *Columbia First Bank v. Ferguson*, 665 A.2d 650, 656 (DC 1995); *Carter v. Hahn*, 821 A2d 890, 894-895 (DC 2003); Merriam-Webster Dictionary

**Objection**:  Punitive damages are generally not available against the District of Columbia. *See Butera v. Dist. of Columbia*, 235 F.3d 637, 658 (D.C. Cir. 2001).

## ATTACHMENT 8
## DEFENDANT'S REQUESTED NON-STANDARD JURY INSTRUCTIONS

### Whistleblower Claim- Elements

To prevail on her whistleblower claim, plaintiff must prove by a preponderance of the evidence that:

1.       She made a protected disclosure.

2.       A supervisor took or threatened to take a prohibited personnel action against her.

3.       The prohibited personnel action would not have been taken in the absence of the protected disclosure.

For the purposes of this case, termination of employment counts as a prohibited personnel actions and you are only being asked to decide whether Plaintiff made a protected disclosure and whether the protected disclosure caused her termination.

**Citations**:  D.C. Code §§ 1-615.53 and 1-615.54(b) (2001 ed.); *Johnson v. DC*, 935 A.2D 1113 (D.C. 2007).

**Plaintiff's Objections**:  Elements (2) and (3) are too limited.  The Whistleblower Protection Act prohibits a supervisor from taking a prohibited personnel action as well as from retaliating – this instruction does not mention retaliation.  Specifically, under D.C. Code § 1-615.53(a), "[a] supervisor shall not take, or threaten to take, a prohibited personnel action *or otherwise retaliate against an employee* because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order."  (Emphasis added.)

## JA 92

Further, the last sentence is a misstatement of the law and the facts of this case.  Plaintiff is arguing that Defendant not only terminated Dr. Campbell but also investigated her and leaked unfounded allegations contained in emails to the press in retaliation for Dr. Campbell's protected activity.

Further, Dr. Campbell only must show by a preponderance of the evidence that her protected activity was a *contributing factor* to the prohibited personal action or retaliation.  Contributing factor "means any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision."  This instruction raises the burden of proof by making it seem that Dr. Campbell's protected activity has to be the sole cause of the prohibited personnel action and/or retaliation.  See D.C. Code § 1-615.52(a)(2), 1-615.54(b).

### Whistleblower Claim - Protected Disclosure

A "protected disclosure" means any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences:

    a.  Gross mismanagement;

    b.  Gross misuse or waste of public resources or funds;

    c.  Abuse of authority in connection with the administration of a public program or the execution of a public contract;

    d.  A violation of federal, state or local law, rule, or regulation, or of a contract term between the District government and a District government contractor which is not merely technical or minimal nature;  or

    e.  A substantial and specific danger to the public health and safety.

**Citations**:  D.C. Code § 1-615.52(a)(6) (2001 ed.); *Zirkle v. District of Columbia*, 830 A.2d 1250, 1260 (D.C.2003); *Freeman v. District of Columbia*, 60 A.3d 1131, 1141 (D.C. 2012).

**Plaintiff's Objections**:  Pursuant to D.C. Code § 1-615.52(a)(6), a protected disclosure can be made "to any person," including to a supervisor.

**JA 94**

## Whistleblower Claim - Reasonable Belief

An employee's belief that information she discloses to a supervisor or public body that evidences gross mismanagement, abuse of authority or violation of relevant law is reasonable when a disinterested observer with knowledge of the essential facts, known to and readily ascertainable by the employee, could reasonably conclude that the government's actions evidence gross mismanagement, abuse of authority or violations of relevant law.

**Citations**:  D.C. Official Code, 2001 Ed. § 1-615.53; *Zirkle v. District of Columbia,* 830 A.2d 1250, 1260 (D.C.2003); *Freeman v. District of Columbia,* 60 A.3d 1131, 1141 (D.C. 2012).

**Plaintiff's Objections**:  D.C. Code § 1-615.52(6) makes clear that what must be reasonable is an employee's belief that she is making a protected disclosure. Plaintiff's instruction defining reasonable belief fully captures the definition of protected disclosure, whereas Defendant's instruction excludes relevant portions of that definition.  *See* Plaintiff's proposed instruction *Reasonable Belief* and D.C. Code § 1-615.52(6).

**JA 95**

## Whistleblower Claim – Causation/Clear and Convincing Evidence

To prevail on her claim, Plaintiff must first prove that a protected disclosure was a contributing factor in her termination. "Contributing factor" means any factor which, alone or in connection with other facts, tends to affect in any way the outcome of the decision. Like almost everything else in this trial, Plaintiff must prove this by a preponderance of the evidence. You have already heard the Judge explain what this means.

If the Plaintiff meets this burden, you must next consider whether the District would have terminated Plaintiff for legitimate, independent reasons even if she had not engaged in protected activity. The District must prove this by clear and convincing evidence. Clear and convincing evidence is evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.

You may conclude that the District would have taken the same action based on direct evidence or based on reasonable inferences drawn from circumstantial evidence.

**Citations**:  *Wood v. Neuman*, 979 A.2d 64, 73 (D.C. 2009) has the standard for clear and convincing evidence. The second paragraph is modeled after Standard Jury Instructions 16-1 (punitive damages) and 20-3 (fraudulent misrepresentation – burden of proof).

**Plaintiff's Objections**:  Plaintiff believes her proposed instructions on Defendant's affirmative defense more clearly capture the law.  *See* Plaintiff's proposed instructions titled, *Burden of Proof Shifting* and *Clear and Convincing Evidence*.

**JA 96**

### **Whistleblower Claim – Business Judgment**

An employer has the right to make personnel decisions for any reason that is not unlawful.  You may not return a verdict for Plaintiff just because you might disagree with the District's conduct or believe it to be unfair or unreasonable.

**Citations**:  42 U.S.C. § 2000e; Waterhouse v. District of Columbia, 298 F.3d 989, 995 (D.C. Cir. 2002) ("courts are without authority to 'second-guess an employer's personnel decision absent demonstrably discriminatory motive'"); *Fishbach v. District of Columbia Dep't of Corr.,* 86 F.3d 1180, 1183 (D.C. Cir. 1996) (noting that to rebut the employer's nondiscriminatory explanation for its conduct, "it is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible."); *Walker v. AT&T Technologies*, 995 F.2d 846 (8th Cir. 1993); *see Freedman v. MCI Telecommunications Corp.,* 255 F.3d 840, 845 (D.C. Cir. 2001).

**Plaintiff's Objections**:  Neither 42 U.S.C. § 2000e nor any of the cases cited by Defendant above pertain to actions under a Whistleblower Protection Act, but rather pertain to actions under Title VII.  Plaintiff objects to this instruction as nothing in the D.C. Whistleblower Act, D.C. Code § 1-615.53, *et seq.* speaks to "business judgment" but rather to "legitimate, independent reasons" for the personnel action.  Further, the WPA requires differing burdens of proof to the employee's and employer's showings.  *See* DC Code § 1-615.54(b).  Defendant must prove its affirmative defense that it had legitimate, independent reasons by clear and convincing evidence – which this instruction does not mention.  Therefore, this instruction is misleading, would confuse the jury, and is improper.  *See* D.C. Code § 1-615.54(b).

**JA 97**

## **Reputation Plus Claim - Elements of Defamation**

To prevail on her defamation claim, Plaintiff must prove the following:

(1) that the defendant made a false and defamatory statement concerning the plaintiff;

(2) that the defendant published the statement without privilege to a third party;

(3) that the defendant's fault in publishing the statement amounted to at least negligence; and

(4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

**Citations**:  *Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012); *Campbell v. Dist. of Columbia,* CV 12-1769 (RC), 2015 WL 5188618 (D.D.C. Sept. 4, 2015).

**Plaintiff's Objections**:  There are numerous terms in this instruction that are not defined and which a lay person would not understand – including, negligence, special harm, actionable as a matter of law, and published.

**JA 98**

**Reputation Plus – False Defamatory Statements**

A publication is defamatory if it tends to injure plaintiff in her trade, profession or community standing, or lower her in the estimation of the community. However, an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous.  The defamatory nature of a statement cannot be ascertained, moreover, unless it is capable of bearing a defamatory meaning.

The statement must be false as well as defamatory.  In determining whether factual statements in an allegedly defamatory communication are false you should discount minor inaccuracies so long as the substance, the gist, the sting, of the statement is justified.  If the communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, than it is true for the purposes of Plaintiff's defamation claim.

In addition, a statement on matters of public concern must be provable as false for it to be actionable.  A statement of fact may be the basis for a defamation claim, a statement of pure opinion cannot.  Statements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false.  Thus, a statement of opinion is actionable if—but only if—it has an explicit or implicit factual foundation and is therefore objectively verifiable. On the other hand, if it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.

**JA 99**

**Citations**: *Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012*);

*Armstrong v. Thompson*, 80 A.3d 177, 183-84 (D.C. 2013); *Campbell v. Dist. of Columbia,* CV

12-1769 (RC), 2015 WL 5188618 (D.D.C. Sept. 4, 2015).


**Plaintiff's Objections:**

***Re: Paragraph 1 ("defamatory"):***  With regard to the following sentence, taken from *Rosen v.*

*Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012*)*, Plaintiff objects to

including it in the jury instruction on grounds that it will confuse the jury:  "[t]he defamatory

nature of a statement cannot be ascertained, moreover, unless it is capable of bearing a

defamatory meaning."


***Re: Paragraph 2 ("false"):***  Plaintiff believes her proposed instruction defining a "false

statement" is clearer and less confusing.  *See* Plaintiff's proposed instructions titled, *Reputation*

*Plus Theory* (stating that "[a] statement is considered to be false when it is not substantially true"

quoting  *Lewis v. Elliott*, 628 F. Supp. 512, 520 (D.D.C. 1986)).

With regard to the following sentence, it misstates the rule in *Armstrong v. Thompson*, 80 A.3d

177, 183-84 (D.C. 2013), which speaks of a true statement rather than a false statement:  "[i]n

determining whether factual statements in an allegedly defamatory communication are false you

should discount minor inaccuracies so long as the substance, the gist, the sting, of the statement

is justified."

**JA 100**

With regard to the following sentence, taken from *Armstrong v. Thompson*, 80 A.3d 177, 183-84 (D.C. 2013), Plaintiff objects on grounds that it will confuse the jury: "[i]f the communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, than it is true for the purposes of Plaintiff's defamation claim." However, if this instruction is given, Plaintiff requests the following sentence be added for completeness: "[e]ven if conveying only true facts, a communication can be defamatory by implication if, "by the particular manner or language in which the true facts are conveyed, [the communication] supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference." *White v. Fraternal Order of Police*, 909 F.2d 512, 520, 285 U.S. App. D.C. 273 (D.C. Cir. 1990).

10

**JA 101**

## Reputation Plus – Common Interest Privilege

You must also decide whether the District's statements were protected by a common interest privileged.  A statement is protected by the common interest privilege if it is (1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has or honestly believes he has a duty (3) to a person who has such a corresponding interest or duty.

**Citations**:  *Campbell v. Dist. of Columbia*, CV 12-1769 (RC), 2015 WL 5188618, at *7 (D.D.C. Sept. 4, 2015); *Payne v. Clark,* 25 A.3d 918, 925 (D.C.2011).

**Plaintiff's Objections**:  As set forth in the Court's Memorandum Opinion, dated September 4, 2015 (Docket # 36) at Page 16, the common interest privilege does not apply to the facts of this case.  Specifically, the Court stated that:

> the employment-based common interest privilege recognized by the D.C. Court of Appeals, the common interest at stake when an employer "giv[es ] the character," *Wallace*, 715 A.2d at 879, or describes "the conduct" of an employee, *Payne*, 25 A.3d at 926, is conceptually distinct from the District's asserted interest in showing the public "*how seriously [it] took allegations* of impropriety regarding its employees," Mem. Supp. Def.'s Mot. Summ. J. 13 (emphasis added).  In contrast to an employer's interest in opining on *an employee's character*, the District's asserted interest here is one of managing public perceptions of *the employer's* own character. Moreover, the D.C. Circuit, in a decision cited approvingly by the D.C. Court of Appeals, has recognized the employment-based common interest privilege when the statement is "made in good faith *in answer to an inquiry by one contemplating employment of the servant*"—a condition clearly not evinced by the record in this case. *Wash. Times Co. v. Bonner*, 86 F.2d 836, 840 (D.C. Cir. 1936) (emphasis added); *accord Wallace*, 715 A.2d at 879.

# JA 102

If the Court does allow Defendant to assert this defense at trial, Defendant bears the burden of proving this affirmative defense by the preponderance of the evidence.  *Cloonan v. Holder*, 602 F. Supp. 2d 25, 32 (D.D.C. 2009).  If Defendant is able to satisfy this burden, Plaintiff may still defeat the privilege by a showing a showing of malice or bad faith on part of the Defendant. *Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990).

**JA 103**

**Stigma or Disability**

Plaintiff can also prevail on her defamation claim if she can show that the government took action that has the effect of seriously affecting, if not destroying her ability to pursue his chosen profession or substantially reducing the value of her human capital.

To prevail on this claim, Plaintiff must prove the following things by a preponderance of the evidence:

1) Plaintiff was discharged from government employment;

2) Plaintiff was not given an opportunity to clear her name; and

3) As the result of the discharge, plaintiff's ability to pursue her chosen profession was seriously affected or destroyed or the value of her human capital was substantially reduced.

**Citations**:  *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998); 3B Fed. Jury Prac. & Instr. § 168:100 (6th ed.)(Elements of a Public Employees Due Process Claim).

**Plaintiff's Objections**:  Plaintiff objects on grounds that the government action in this case was not only the termination of Dr. Campbell's employment, but also the action of investigating Dr. Campbell and sharing information in emails that contained unfounded allegations with journalists.

Further, Defendant has conceded that Plaintiff was deprived of an opportunity to clear her name.  *See* Defendant's Supplemental Brief, dated June 19, 2015, (Docket # 32).  Therefore, the Court should instruct the jury that Defendant has conceded element (2).

**JA 104**

In the event this instruction is given by the Court, Plaintiff requests that element (2) read: Plaintiff was not given an opportunity to refute the charge and clear her name.  *See* Memorandum Opinion, dated September 4, 2015 (Docket # 36) at Page 10.  Plaintiff is not required to demonstrate that she must have affirmatively sought a name clearing hearing.  *See* *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998) ("[w]e reject the District's claim that O'Donnell's due process claims should be denied because he did not expressly seek a name clearing hearing. There is no need for a plaintiff to make such a request explicitly, so long as it is reasonably clear that what the plaintiff complains of includes the lack of a hearing).

**JA 105**

## ATTACHMENT 9
## PLAINTIFF'SPROPOSED VERDICT FORM

## DUE PROCESS RIGHTS

### *REPUTATION PLUS THEORY*

1.  Do you find that Defendant's statement that Dr. Campbell intended to organize a team of vendors to bid herself as a prime contractor on Phase II of the health insurance exchange contract was false and defamatory?

    Yes _____          No _____

    *Please answer question No. 2.*

2.  Do you find that Defendant's statement that Dr. Campbell requested CGI to abandon plans to partner with Compass in bidding on Phase II and to partner instead with Document Managers was false and defamatory?

    Yes _____          No _____

    *Please answer question No. 3.*

3.  Do you find that Defendant's statement that Dr. Campbell required Compass to hire Cedric Simon was false and defamatory?

    Yes _____          No _____

    *Please answer question No. 4.*

### *STIGMA OR DISABILITY THEORY*

4.  Do you find that the circumstances of her termination from employment caused Dr. Campbell to be impaired in her career?

    Yes _____          No _____

    *If you answered "yes" to question No. 1, No. 2, No. 3, or No. 4, please answer question No. 5.*
    *If you answered "no" to question No. 1, No. 2, No. 3, and No. 4, please answer question No. 6.*

### *DAMAGES*

5.  What monetary damages do you award Dr. Campbell for the District's violation of her right to due process:

    Compensatory damages for pain and suffering, mental anguish, emotional distress, damage to reputation, and humiliation: _____

Lost wages: _____

Lost benefits: _____

Front pay: _____

Punitive damages: _____

***Please answer question No. 6.***

## D.C. WHISTLEBLOWER PROTECTION ACT

6. Do you find in favor of Dr. Campbell on her claim that the District violated the D.C. Whistleblower Protection Act?

    Yes _____          No _____

*If you answered "yes" to question No. 6, please answer question No. 7.*
*If you answered "no" to question No. 6, please stop; your verdict is complete.*

7. What damages do you award Dr. Campbell for the District's violation of the D.C. Whistleblower Protection Act:

    Monetary Damages:

    Compensatory damages for pain and suffering, mental anguish, emotional distress, damage to reputation, and humiliation: _____

    Lost wages: _____

    Lost benefits: _____

    Front pay: _____

    Punitive damages: _____

    Other Damages:

    *Please write "yes" if you award Dr. Campbell the following:*

    Reinstatement to the position of Chief Operating Officer or to an equivalent position: _____

    Reinstatement of Dr. Campbell's seniority rights: _____

    Restoration of Dr. Campbell's lost benefits: _____

_____          _____
DATE                                               FOREPERSON

2

# JA 107

**Defendant's Objection**:  The District objects to the questions on Plaintiff's verdict form on the same bases that it objects to her special jury instructions.

**JA 108**

**ATTACHMENT 10**
**DEFENDANT'S PROPOSED VERDICT FORM**

**Part I**

1.      Did Plaintiff prove by a preponderance of the evidence that she made a protected

disclosure?

_____ Yes    _____No

If your answer is yes, go on to the next question.  If your answer is no, go on to Part II.

2.      Did Plaintiff prove by a preponderance of the evidence that her protected disclosure

contributed to the decision to terminate her employment with DHCF?

_____ Yes    _____No

If your answer is yes, go on to the next question.  If your answer is no, go on to Part II.

> **Plaintiff's objection**:  No. 2 is too limited.  Plaintiff is arguing that her protected
> disclosure was a contributing factor to:  a) Defendant's decision to terminate Dr.
> Campbell; b) Defendant's decision to investigate Dr. Campbell; and c)
> Defendant's decision to leak unfounded allegations contained in emails to the
> press.

3.      Did the District prove by clear and convincing evidence that Plaintiff would have been

terminated even if she had not made a protected disclosure?

_____ Yes    _____No

If your answer is no, go on to the next question.  If your answer is no, go on to Part II.

**Plaintiff's objection**:  No. 3 is too limited.  This question should read:  "Did the District prove by clear and convincing evidence that:
   a)  Plaintiff would have been terminated;
   b)  Plaintiff would have been investigated; or
   c)  Defendant would have leaked unfounded allegations contained in emails to the press
even if she had not made a protected disclosure

4.      What amount of compensatory damages, if any, did Plaintiff prove that she suffered as

result of the District's violation of the Whistleblower Protection Act?

$ _____

**Plaintiff's objection**:  This instruction is misleading.  If the jury gets to question No. 4, Plaintiff has already proven her claim, and the question should ask:  "what amount of damages do you award Plaintiff?"  Further, in addition to compensatory damages, Plaintiff seeks punitive damages, lost wages, lost benefits, and front pay as well as reinstatement to the position of Chief Operating Officer or to an equivalent position, reinstatement of her seniority rights, and restoration of her lost benefits.

Go on to Part II

2

**JA 110**

**Part II – Due Process/Reputation Plus**

1. Did Plaintiff prove that the District made a false and defamatory statement concerning her?

_____ Yes    _____No

If your answer is yes, go on to the next question, if your answer is no, skip the rest of the

questions in Part II and go on to Part III.

2.  Did Plaintiff prove that the District published the false and defamatory statement without

privilege to a third party?

_____ Yes    _____No

If your answer is yes, go on to the next question.  If your answer is no, skip the rest of the

questions in Part II and go on to Part III.

> **Plaintiff's objection**:  As set forth in the Court's Memorandum Opinion, dated
> September 4, 2015 (Docket # 36) at Page 16, the common interest privilege does
> not apply to the facts of this case.  Specifically, the Court stated that:
>
> > the employment-based common interest privilege recognized by the D.C.
> > Court of Appeals, the common interest at stake when an employer "giv[es
> > ] the character," *Wallace*, 715 A.2d at 879, or describes "the conduct" of
> > an employee, *Payne*, 25 A.3d at 926, is conceptually distinct from the
> > District's asserted interest in showing the public "*how seriously [it] took
> > allegations* of impropriety regarding its employees," Mem. Supp. Def.'s
> > Mot. Summ. J. 13 (emphasis added).  In contrast to an employer's interest
> > in opining on *an employee's character*, the District's asserted interest here
> > is one of managing public perceptions of *the employer's* own character.
> > Moreover, the D.C. Circuit, in a decision cited approvingly by the D.C.
> > Court of Appeals, has recognized the employment-based common interest
> > privilege when the statement is "made in good faith *in answer to an
> > inquiry by one contemplating employment of the servant*"—a condition
> > clearly not evinced by the record in this case. *Wash. Times Co. v. Bonner*,
> > 86 F.2d 836, 840 (D.C. Cir. 1936) (emphasis added); *accord Wallace*, 715
> > A.2d at 879.

**JA 111**

3. Did Plaintiff prove that the District's fault in publishing the false and defamatory statement amounted to at least negligence?

_____ Yes    _____No

If your answer is yes, go on to the next question.  If your answer is no, skip the rest of the questions in Part II and go on to Part III.


4. Did Plaintiff prove that the publication of the false and defamatory statement caused her special harm?

_____ Yes    _____No

Regardless of your answer, go on to Part III.

4

**JA 112**

**Part III – Due Process/Stigma**

1. Did Plaintiff prove that she was not given an opportunity to clear her name when she was fired from the DHCF?

_____ Yes     _____No

If your answer is yes, go on to the next question, if your answer is no, skip the rest of the questions in Part III and go on to Part IV.

> **Plaintiff's objection**:  Defendant has conceded that Plaintiff was deprived of an opportunity to clear her name.  *See* Defendant's Supplemental Brief, dated June 19, 2015, (Docket # 32).  Therefore, the Court should instruct the jury that Defendant has conceded this element, and the jury should not have to decide this question.

2.  Did Plaintiff prove her ability to pursue her chosen profession was seriously affected or destroyed or the value of her human capital was substantially reduced because of her termination from the DHCF ?

_____ Yes     _____No

Regardless of your answer, go on to Part IV.

> **Plaintiff's objection**:  This instruction is too limited.  It should read:  ". . . because of her termination in combination with emails containing unfounded allegations leaked to the press and published in the *Washington City Paper* and the *Washington Post*."

5

**JA 113**

**Part IV – Due Process Damages**

**Only answer this question if your answer to Part II Question 4 *OR* Part III Question 2 was yes. If neither answer was yes then sign and date this form and return it to the clerk.**

What amount of compensatory damages, if any, did Plaintiff prove that she suffered as result of the stigma or damage to her reputation when she was terminated from her position with the DHCF?

$ _____

> **Plaintiff's objection**:  This instruction is misleading.  If the jury gets to Part IV, Plaintiff has already proven her due process claim, and the question should ask: "what amount of damages do you award Plaintiff?"  Further, in addition to compensatory damages, Plaintiff seeks punitive damages, lost wages, lost benefits, and front pay.

Date:                                      Foreperson:

6

**JA 114**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL,                          :
                                                 :

    Plaintiff,                                 :

                                                 :

    v.                                         :        Civil Action No.:     12-1769 (RC)

                                                 :

DISTRICT OF COLUMBIA, *et al.*,                 :

                                                 :

    Defendants.                                :

## <u>VERDICT FORM</u>

**THE JURY MUST UNANIMOUSLY AGREE ON THE ANSWERS TO ALL OF THE QUESTIONS.  THE COMPLETED VERDICT FORM MUST BE SIGNED AND DATED BY THE FOREPERSON.**

1. **42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: Deprivation of Liberty Interest**

    *a.* *"Reputation-Plus"*

      A. Did Dr. Campbell prove by a preponderance of the evidence that the District made a false and defamatory statement concerning her?

        Yes _____          No _____✗_____

      If your answer is "Yes," go on to the next question. If your answer is "No," skip to the question about "Stigma or Disability" on the next page (Question 1.b).

      B. Did Dr. Campbell prove by a preponderance of the evidence that the District published the false and defamatory statement, to a third party?

        Yes _____          No _____

      If your answer is "Yes," go on to the next question. If your answer is "No," skip to the question about "Stigma or Disability" on the next page (Question 1.b).



C. Did Dr. Campbell prove by a preponderance of the evidence that the District's fault in publishing the false and defamatory statement amounted to at least negligence?

Yes _____          No _____

If your answer is "Yes," go on to the next question. If your answer is "No," skip to the question about "Stigma or Disability" below (Question 1.b).

D. Did Dr. Campbell prove by a preponderance of the evidence that the publication of the false and defamatory statement caused her special harm, or that the false and defamatory statement was actionable as a matter of law?

Yes _____          No _____

Regardless of your answer, go on to the question about "Stigma or Disability" below (Question 1.b).

b.   *"Stigma or Disability"*

Did Dr. Campbell prove by a preponderance of the evidence that the District's release of emails to the press and termination of her employment left a stigma on her by having the broad effect of largely precluding her from pursuing her chosen career?

Yes ✗          No _____

If you answered "Yes" to this question, *or* if you answered "Yes" to *all* of the questions in the "Reputation-Plus" section, go on to the next question.

If you answered "No" to this question *and* you also answered "No" to *any* of the questions in the "Reputation-Plus" section, then your deliberations are over.  The foreperson should sign this form on the next page and return it to the Court.

2. **42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process:
   Lack of Sufficient Process**

Did Dr. Campbell prove by a preponderance of the evidence that the District deprived her of her constitutionally protected liberty interest without due process?

Yes ✗          No _____

If you answered "Yes" to this question, go on to the next question.

If you answered "No" to this question, then your deliberations are over.  The foreperson should sign this form on the next page and return it to the Court.

2

**JA 116**

3. **Compensatory Damages**

What amount of compensatory damages, if any, did Dr. Campbell prove by a preponderance of the evidence that she suffered as a result of the District's violation of her right to due process?

$ *250,000 00*

UNIANIMOUSLY AGREED TO THIS *11TH* DAY OF *DECEMBER*, 2015.

_____ Foreperson

**JA 117**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL                 :
                                     :
    Plaintiff,               :
                                     :
    v.                       :        Civ. No.:        12-1769 (RC)
                                     :
DISTRICT OF COLUMBIA,                :
*et al.*,                            :
                                     :
    Defendants.              :

## JURY INSTRUCTIONS

LET THIS BE FILED

12/11/2015

**JA 118**

# PREAMBLE

Now that you have heard the evidence and the arguments of counsel, it is my duty to instruct you on the law applicable to this case. It is your duty as jurors to follow the law as I shall state it to you, and to apply that law to the facts as you find them from the evidence in the case. You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. Nor are you to be concerned with the wisdom of any rule of law stated by me.

Counsel have quite properly referred to some of the governing rules of law in their arguments. If, however, any difference appears to you between the law as stated by counsel and as stated by me in these instructions, you are, of course, to be governed by my instructions. Nothing I say is to be taken as an indication that I have any opinions about the facts of the case. It is not my function to determine the facts; rather, it is your responsibility.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be governed by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all of the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

My instructions will be roughly divided into four parts. First, I will talk about some general principles of law. Next, I will instruct you on evaluating the evidence. Then, I will discuss with you instructions that apply to the elements of the particular claims in this case. Finally, I will have some closing instructions about how you are to conduct your deliberations.

For those of you taking notes, I want to let you know that, if you request them, a written copy of these instructions will be available for you as you start your deliberations.

**JA 119**

**Function of the Court**

The function of the judge is to conduct the trial of the case in an orderly, fair, and efficient manner. The judge also must rule upon questions of law arising during the trial, and must tell you the law that applies to this case. It is your duty to accept the law as I state it to you without questioning the wisdom of these instructions. In other words, even if you disagree or do not understand the reasons for any of the instructions, you are bound to follow them.

## Function of the Jury

Your function as jurors is to decide the facts. You are the exclusive judges of the facts. You alone determine the weight, the effect and the value of the evidence, and the believability of the witnesses.

You should decide the facts only from a fair evaluation of all of the evidence, without prejudice, sympathy, fear or favor.

4

**JA 121**

**Significance of Party Designations**

During the course of the trial, you have heard references to the terms plaintiff and defendant. To put it as simply as possible, the plaintiff is the person who starts a lawsuit and the defendant is the person who is sued by the plaintiff.

During your deliberations, however, you must not attach any significance in weighing the evidence to the terms plaintiff and defendant. In other words, the fact that the plaintiff has filed a lawsuit against the defendant does not mean that the plaintiff is entitled to your verdict or that her evidence is entitled to greater weight than the defendant's evidence. A plaintiff must prove every element of her claim against a defendant by a preponderance of the evidence before she is entitled to prevail.

**JA 122**

**Juror's Duty to Deliberate**

It is your duty as jurors to consult with one another and to deliberate
expecting to reach an agreement. You must decide the case for yourself
but you should do so only after thoroughly discussing it with your fellow
jurors. You should not hesitate to change an opinion when convinced
that it is wrong. You should not be influenced to vote in any way on any
question just because another juror favors a particular decision or holds
an opinion different from your own. You should reach an agreement
only if you can do so in good conscience. In other words, you should not
surrender your honest beliefs about the effect or weight of evidence
merely to return a verdict or solely because of other jurors' opinions.

**JA 123**

**Attitude and Conduct of Jurors**

Remember that you are not advocates in this matter. You are neutral
judges of the facts. The final test of the quality of your service will lie in
the verdict that you return to this courtroom. You will make an
important contribution to the cause of justice if you arrive at a just and
proper verdict in this case. Therefore, during your deliberations in the
jury room, your purpose should not be to support your own opinion but
to determine the facts.

## Instructions to be Considered as a Whole

You must treat and consider all of these instructions as a whole. You must not single out any particular instruction or sentence while ignoring others. You must give each instruction equal importance and consider each one equally with all other instructions.

## JA 125

**Court's Commenting on the Evidence**

The law permits me to comment to you about the evidence in this case. My comments are only my opinions about the facts, and you are not bound by my opinions. If, during the course of this trial, or the giving of these instructions, I have made or make any comment on any evidence, you are free to disregard the comment. Remember, you are the sole and exclusive judges of all questions of fact in this case.

**JA 126**

**Court's Questions to Witnesses**

During the course of the trial, I may have asked questions of a witness, to obtain information or to bring out facts. You should not take my questions to witnesses as any indication of my opinion about how you should determine the facts.

10

**JA 127**

## Jury Not to Take Cue from Judge

If I have said or done anything at any time during this case, including giving these instructions, which seemed to indicate my opinion on any of these matters, then I instruct you to disregard that indication. Nothing I have said or done should influence or suggest to you that I favor any party in this case.

I have not meant to express, or to suggest, any opinion about which witnesses should be believed, or which facts are established.

## Rulings on Objections

There may have been times during the trial when a lawyer made an objection to a question asked by another lawyer or to an answer given by a witness. It is the duty of a lawyer to make objections if the lawyer believes something improper is being done. When I sustained an objection to a question, the witness was not allowed to answer it. Do not attempt to guess what the answer might have been had I allowed the question to be answered. Similarly, when I told you to disregard a particular answer--when I ordered it stricken--you should have put that statement out of your mind, and you may not refer to that stricken answer during your deliberations.

While it may have been natural for you to become impatient with the delay caused by objections or other portions of the proceedings, you must not let your feelings in any way affect your deliberations. Those interruptions concerned legal matters, while your job is to decide the facts. You should not be influenced by any lawyer's objections, no matter how I ruled upon them.

**Equality of Litigants**

Our system of justice requires that you decide the facts of this case in an impartial manner. You must not be influenced by bias, sympathy, prejudice or public opinion. It is a violation of your sworn duty to base your verdict upon anything other than the evidence in the case.

In reaching a just verdict, you must consider and decide this case as an action between persons of equal standing in the community and of equal worth. A government, whether large or small, has the same right to a fair trial as a private individual. All parties, including government parties, stand equal before the law and are to be treated as equals in this court. In other words, whether a party is an individual or the government must not affect your decision.

13

**JA 130**

**Evidence in the Case**

You may consider only the evidence properly admitted in the case. Evidence includes the sworn testimony of witnesses, exhibits admitted into evidence, and facts stipulated and agreed to by counsel. You may consider any facts to which all counsel have agreed or stipulated to be undisputed evidence.

**JA 131**

## Inferences

In arriving at your verdict, you are to consider only the evidence in the case. When you are considering the evidence, however, you are not limited solely to the statements of the witnesses. You are permitted to draw from the evidence any inferences or conclusions that reason and common sense lead you to make. You should not engage in speculation or make a decision based upon conjecture, however.

**JA 132**

**Inadmissible and Stricken Evidence**

It is the duty of the lawyers to object when the other side offers testimony or other materials that a lawyer believes are not properly admissible in evidence.

If, during the course of the trial, I sustained an objection by one lawyer to a question asked by the other lawyer, you are to disregard the question and you must not guess about what the answer would have been. If a question was asked and the witness answered it, and I ruled that you should not consider the answer, then you must disregard both the question and the answer in your deliberations just as if the question and answer had never been spoken.

Likewise, if I sustained an objection to any exhibits or ordered them stricken, then those stricken exhibits are not evidence and you must not consider them.

**JA 133**

## Statements of Counsel

Statements and arguments of the lawyers, such as their opening statements and closing arguments, are not evidence. They are intended only to help you understand and interpret the evidence from each party's perspective.

The questions that the lawyers ask are not evidence. A lawyer's question that contains an assertion of a fact does not provide evidence of that fact.

**Jury's Recollection Controls**

During this case, I or the lawyers may have called your attention to certain evidence. If you remember that evidence differently from the way I or the lawyers stated it, then you should disregard our characterization of the evidence and rely upon your own memory.

**Burden of Proof**

The party who makes a claim has the burden of proving it. This burden of proof means that the plaintiff must prove every element of her claim by a preponderance of the evidence. To establish a fact by a preponderance of the evidence is to prove that it is more likely so than not so. In other words, a preponderance of the evidence means that the evidence produces in your mind the belief that the thing in question is more likely true than not true.

If, after considering all of the evidence, the evidence favoring the plaintiff's side of an issue is more convincing to you, and causes you to believe that the probability of truth favors the plaintiff on that issue, then the plaintiff will have succeeded in carrying the burden of proof on that issue.

The term "preponderance of the evidence" does not mean that the proof must produce absolute or mathematical certainty. For example, it does not mean proof beyond a reasonable doubt as is required in criminal cases.

Whether there is a preponderance of the evidence depends on the quality, and not the quantity, of evidence. In other words, merely having a greater number of witnesses or documents bearing on a certain version of the facts does not necessarily constitute a preponderance of the evidence.

If you believe that the evidence is evenly balanced, on an issue the plaintiff had to prove, then the plaintiff has not carried the burden of proof and your finding on that issue must be for the defendant.

**Evidence Produced by Adversary**

In determining whether any fact has been proved by a preponderance of the evidence, you should consider all the evidence bearing upon that fact, regardless of who produced it. A party is entitled to benefit from all evidence that favors her whether she produced it or her adversary produced it.

**JA 137**

**Direct and Circumstantial Evidence**

There are two types of evidence: direct and circumstantial. Direct evidence is the direct proof of a fact, such as the testimony of an eyewitness. Circumstantial evidence is indirect evidence of a fact which is established or logically inferred from a chain of other facts or circumstances. For example, direct evidence of whether an animal was running in the snow might be the testimony of a person who actually saw the animal in the snow. Circumstantial evidence might be the testimony of a person who saw the tracks of the animal in the snow, rather than the animal itself.

You may consider both types of evidence equally. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. The law does not require a greater degree of certainty for circumstantial evidence than of direct evidence. You should weigh all the evidence in the case, both direct and circumstantial, and find the facts in accordance with that evidence.

**JA 138**

**Jury to Determine Credibility of Witnesses**

In evaluating the evidence and deciding what the facts are, you must consider and weigh the testimony of all the witnesses who have appeared before you. You are the sole judges of the credibility of the witnesses. In other words, you alone are to determine whether to believe any witness and to what extent any witness should be believed. If there is any conflict in the testimony between a witness's testimony and other evidence, it is your function to resolve the conflict and to determine where the truth lies.

In deciding the credibility of any witness, you may consider any matter that may have a bearing on the subject. You may consider the appearance and the behavior of the witness on the witness stand; whether the witness impresses you as a truthful individual; whether the witness impresses you as having an accurate memory and recollection; whether the witness has any motive for not telling the truth; whether the witness had full opportunity to observe the matters about which he or she has testified; whether the witness has any interest in the outcome of this case; or whether the witness has any friendship or animosity toward other persons concerned in this case.

You may consider the reasonableness or unreasonableness, and the probability or improbability, of the testimony of a witness in determining whether to accept it as true and accurate. You may consider whether the witness has been contradicted or corroborated by other credible evidence.

If you believe that any witness has shown himself to be biased or prejudiced, either for or against either side in this trial, you may consider and decide whether that bias or prejudice has colored the testimony of the witness so as to affect the witness's desire and capability to tell the truth.

You should give the testimony of each witness as much weight as in your judgment it is fairly entitled to receive.

**Number of Witnesses**

The relative weight of the evidence on a particular issue is not determined by the number of witnesses testifying for either side. You should consider all the facts and circumstances in evidence to determine which of the witnesses are worthy of greater belief. You may find that the testimony of a smaller number of witnesses on one side is more believable than the testimony of a greater number of witnesses on the other side. Indeed, the testimony of a single witness, which you believe to be the truth, is enough to prove any fact.

If, after considering all the evidence in the case, you hold a greater belief in the accuracy and reliability of one or a few witnesses' testimony, then you may base your verdict on that testimony, even though a larger number of witnesses may have testified to the contrary.

## Depositions as Evidence

Certain testimony from deposition transcripts will be provided to you as documents for your consideration. You should give to this testimony the same consideration as to its weight and credibility as you give to the testimony of witnesses who testified here in court. You must not discount any testimony merely because it was provided to you as a paper document.

**Impeachment by Prior Inconsistent Statements**

The testimony of a witness may be discredited or impeached by showing that he or she has previously made statements which are inconsistent with his or her present courtroom testimony. It is for you to decide whether a witness made a statement on an earlier occasion and whether it was in fact inconsistent with the witness's testimony in court here.

If a witness at trial has been confronted with a prior statement which that witness made, and that prior statement is inconsistent with his or her testimony here in court, then you may consider the prior statement when you assess the truthfulness of the testimony he or she gave in court.

If the witness made the prior inconsistent statement under oath subject to the penalty of perjury or at a deposition, then you may also treat that prior statement as evidence in this case--that is, you may treat what the witness said in that prior statement as evidence like any other evidence in this case.

If the witness was not under oath subject to the penalty of perjury or was not at a deposition when he or she made the statement, then you may not treat the prior statement as evidence of the facts in the statement. You may consider the statement only to evaluate the witness's credibility, that is, you may use the prior statement only to determine whether to believe the witness's present testimony in court.

If you believe that any witness has been discredited or impeached, then you should give his or her testimony the weight, if any, that you judge it is fairly entitled to receive.

**JA 142**

## Adopting Prior Inconsistent Statements

If a witness testifies that a prior inconsistent statement is the truth, then you may consider the prior statement both to evaluate the witness's credibility and as evidence of the truth of any fact contained in that statement.

**JA 143**

**Nature of the Plaintiff's Claim**

In this case, the plaintiff, Dr. Campbell, brings a claim pursuant to 42 U.S.C. § 1983 against her former employer, the defendant, the District of Columbia. Dr. Campbell alleges that the District deprived her of a liberty interest without due process of law. The District denies the allegations.

This claim arises from this alleged constitutional violation. You are not deciding whether Dr. Campbell's termination was appropriate. This is not a wrongful discharge case.

**JA 144**

## 42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: Basic Elements

Dr. Campbell's claim is that the District violated her federal due process rights as a government employee when it disclosed Mr. Turnage's emails to the press and terminated her employment.

Dr. Campbell has brought this claim under a federal law that gives her a cause of action for the deprivation of, in this case, constitutional rights. That statute is found in Title 42 of the United States Code, section 1983. Dr. Campbell seeks money damages against the District of Columbia on the basis that the termination of her employment and the publicity surrounding it unconstitutionally deprived her, without due process, of her Fifth Amendment liberty interest in pursuing her chosen field of employment.

To prevail, Dr. Campbell must prove by a preponderance of the evidence that (1) the District deprived her of a liberty or property interest protected by the Fifth Amendment, and (2) if it did, the deprivation occurred without the procedures, or "process," required by the Fifth Amendment.

I will instruct you on these two elements in turn.

**42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: First Element—Deprivation of Liberty Interest**

First, I will instruct you on the liberty or property interest that Dr. Campbell must prove.

The Due Process Clause of the Fifth Amendment protects a District of Columbia employee's liberty interest in choosing her field of private employment. When the District takes an adverse employment action against an employee, it can deprive her of this liberty interest in two ways: "reputation-plus" and "stigma or disability."

**JA 146**

## 42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: First Element—Deprivation of Liberty Interest ("Reputation-Plus")

Under the "reputation-plus" theory, Dr. Campbell must show that the District deprived her of her liberty interest in pursuing her chosen profession by proving (1) defamation and (2) a discharge from government employment, or at least a demotion in rank and pay.

**42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: First Element—Deprivation of Liberty Interest ("Reputation-Plus," Defamation)**

To prove defamation, Dr. Campbell must establish:

(1) That the District made a false and defamatory statement about her;

(2) That the District published the statement to a third party;

(3) That the District's fault in publishing the statement amounted to at least negligence; and

(4) Either that the statement caused Dr. Campbell special harm, or if it did not cause Dr. Campbell special harm, the statement was actionable as a matter of law.

**42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process:
First Element—Deprivation of Liberty Interest ("Reputation-Plus,"
Defamation, False and Defamatory Statement)**

A statement is defamatory if it tends to injure the plaintiff in her trade,
profession or community standing, or lower her in the estimation of the
community.

A false and defamatory statement must be false as well as defamatory. A
false statement is one that is not substantially true. In determining
whether factual statements in an allegedly defamatory communication
are false you should discount minor inaccuracies so long as the
substance, the gist, the sting, of the statement is justified.

Because falsity is required for liability, a statement of fact may be the
basis for a defamation claim, but a statement of pure opinion typically
cannot. A statement of opinion qualifies as a false and defamatory
statement if, but only if, it has an explicit or implicit factual foundation
and is therefore objectively verifiable. A statement of opinion does not
qualify as a false and defamatory statement if it is a subjective view, an
interpretation, a theory, conjecture, or surmise.

**42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process:
First Element—Deprivation of Liberty Interest ("Reputation-Plus,"
Defamation, Publication)**

To publish a statement means to communicate the statement to a third
person.

**JA 150**

**42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process:
First Element—Deprivation of Liberty Interest ("Reputation-Plus,"
Defamation, Negligence)**

To negligently publish a statement means to unreasonably fail, under the
circumstances, to take care that the statement was true.

**42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: First Element—Deprivation of Liberty Interest ("Reputation-Plus," Defamation, Special Harm and Statements that are Actionable as a Matter of Law)**

Special harm means actual financial loss. You are not being asked to decide whether Dr. Campbell suffered an actual financial loss (the Court will decide that). You are being asked to decide only whether the alleged constitutional violation caused the actual financial loss.

A statement is actionable as a matter of law if it is so likely to cause degrading harm to the subject's reputation that proof of that harm is not required. For instance, when an allegedly defamatory statement is a false allegation of criminal wrongdoing, it is actionable as a matter of law and the plaintiff does not need to prove special harm.

**42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process:
First Element—Deprivation of Liberty Interest ("Reputation-Plus,"
Discharge or Demotion)**

As I explained earlier, for Dr. Campbell to prove a deprivation of her
Fifth Amendment liberty interest in pursuing her chosen field of
employment under the "reputation-plus" theory, Dr. Campbell must also
show a discharge from government employment, or at least a demotion
in rank and pay. In this case, there is no dispute that such a discharge
occurred.

**42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: First Element—Deprivation of Liberty Interest ("Stigma or Disability")**

Dr. Campbell has also presented evidence to show that the District has deprived her of Fifth Amendment liberty interest in choosing her field of private employment under the "stigma or disability" theory.

Under the "stigma or disability" theory, you may find that Dr. Campbell was deprived of her liberty interest if the District's release of emails to the press and termination of her employment left a stigma on her by having the broad effect of largely precluding her from pursuing her chosen career.

To prove a liberty interest deprivation under the "stigma or disability" theory, Dr. Campbell must show that the District's actions seriously affected, if not destroyed, her ability to pursue her chosen profession or substantially reduced the value of her human capital.

**42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: Second Element—Lack of Sufficient Process**

To prove her Fifth Amendment procedural due process claim, Dr. Campbell must prove both (1) that the District deprived her of her constitutionally protected liberty interest, and (2) that the deprivation occurred without the procedures, or "process," required by the Fifth Amendment.

The proper remedy for an employer's infringement of an employee's liberty interest in reputation, or when an employee has been stigmatized in the course of a decision to terminate her employment, is an opportunity for the employee to refute the charges and clear her name. For the opportunity to be meaningful, the employee must be given notice before the hearing.

The law requires the "name-clearing" hearing to have procedures that take into account three factors.

First, the private interest affected by the employer's actions—here, that is Dr. Campbell's liberty interest in choosing her field of private employment.

Second, the value that procedural safeguards would provide to the employee's liberty interest, and the risk of erroneously depriving her of that liberty interest without procedural safeguards.

Third, the government employer's interest, which includes the financial or administrative burden of providing the employee with procedural safeguards.

To show that the District did not provide her with due process, Dr. Campbell must prove that the procedures the District provided her were not appropriate in light of those three factors.

38

**JA 155**

**Compensatory Damages**

I will now give you instructions about how to calculate damages. You should not consider the fact that I am giving you this instruction as suggesting any view of mine as to which party is entitled to your verdict in this case, or that I think you should award any damages to plaintiff if you feel she is entitled to your verdict. Those decisions are entirely yours to make. I am giving you these instructions solely for your guidance, in the event that you find in favor of plaintiff on her claim against the District of Columbia.

If you find for Dr. Campbell, then you must award her a sum of money that will fairly and reasonably compensate her for all of the damage she experienced that was proximately caused by the District. Compensatory damages consist of damages for any mental anguish, emotional distress, humiliation, damage to reputation, and loss of enjoyment of life which Dr. Campbell suffered as a result of the District's wrongful conduct.

The burden of proof is upon Dr. Campbell to establish all elements of her damages by a preponderance of the evidence. Dr. Campbell must prove her damages with reasonable certainty. You may only award Dr. Campbell damages for past, present or future injury that is not speculative. Speculative damages are those that might be possible but are remote or based on guesswork.

By the same token, Dr. Campbell does not have to prove her exact damages. No evidence of monetary value of such intangible things as pain and suffering has been nor needs to be introduced into evidence. No exact standard exists for fixing the amount to be awarded for such damages. You may award Dr. Campbell damages that are based on a just and reasonable estimate derived from relevant evidence.

You may award monetary damages for any of the following items that you find the District proximately caused:

(1)   Any physical pain or emotional distress that Dr. Campbell has suffered in the past;

(2)   Any physical pain or emotional distress that Dr. Campbell may suffer in the future;

(3)   Any humiliation or embarrassment Dr. Campbell has suffered in the past;

(4)   Any humiliation or embarrassment Dr. Campbell may suffer in the future;

(5)   Any inconvenience Dr. Campbell has experienced in the past;

(6)   Any inconvenience Dr. Campbell may experience in the future;

(7)   Any medical expenses Dr. Campbell incurred in the past; and

(8)   Any medical expenses that Dr. Campbell may incur in the future.

You may not consider the amount of lost wages or other benefits, if any, claimed by the plaintiff in this case. Likewise, you may not consider the cost to plaintiff of hiring an attorney. These attorneys' fees and lost wages are determined by the Court, if necessary, and may not be included in your damages award.

**JA 157**

## Selection of Foreperson

When you return to the jury room, you should first select a foreperson to preside over your deliberations and to be your spokesperson here in court. There are no specific rules regarding how you should select a foreperson. That is up to you. However, as you go about the task, be mindful of your mission—to reach a fair and just verdict based on the evidence. Consider selecting a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, who will encourage civility and mutual respect among all of you, who will invite each juror to speak up regarding his or her views about the evidence, and who will promote a full and fair consideration of that evidence.

41

**Notetaking by Jurors**

During the trial, I have permitted those jurors who wanted to do so to take notes.  You may take your notebooks with you to the jury room and use them during your deliberations if you wish.  As I told you at the beginning of the trial, your notes are only to be an aid to your memory. They are not evidence in the case, and they should not replace your own memory of the evidence.  Those jurors who have not taken notes should rely on their own memory of the evidence.  The notes are intended to be for the notetaker's own personal use.

JA 159

## Unanimity

A verdict must represent the considered judgment of each juror, and in order to return a verdict, each juror must agree on the verdict.  In other words, your verdict must be unanimous.

**Exhibits During Deliberations**

I will be sending into the jury room with you the exhibits that have been admitted into evidence.  You may examine any or all of the exhibits as you consider your verdict.  Ms. Johnson will advise you of the procedure.  Please keep in mind that exhibits that were only marked for identification but were not admitted into evidence will not be given to you to examine or consider in reaching your verdict.

**JA 161**

**Communications Between Court and Jury During Jury's Deliberations**

If it becomes necessary during your deliberations to communicate with me, you may send a note by Ms. Johnson or the marshal, signed by your foreperson or by one or more members of the jury.  No member of the jury should try to communicate with me except by such a signed note, and I will never communicate with any member of the jury on any matter concerning the merits of this case, except in writing or orally here in open court.

Bear in mind also that you are never, under any circumstances, to reveal to any person—not Ms. Johnson, the marshal, or me—how jurors are voting until after you have reached a unanimous verdict.  This means that you should never tell me, in writing or in open court, how the jury is divided on any matter—for example, 3–5 or 4–4, or in any other fashion—whether the vote is for plaintiff or defendant or on any other issue in the case.

**JA 162**

**Verdict Form Explanation**

You will be provided with a Verdict Form for use when you have concluded your deliberations.  The form is not evidence in this case, and nothing in it should be taken to suggest or convey any opinion by me as to what the verdict should be.  Nothing in the form replaces the instructions of law I have already given you, and nothing in it replaces or modifies the instructions about what the plaintiff or the defendant must prove by a preponderance of the evidence. The form is meant only to assist you in recording your verdict.

The form consists of some questions that you must answer.  You should record your verdict on that form only after you have reached a unanimous verdict.  It should then be signed and dated by the foreperson.

If you think it might help you in your deliberations, you may consider reviewing the verdict form early in your deliberations to get a sense of the issues you will need to address.

46

**JA 163**

## Cautionary Instruction on Publicity, Communication and Research

I would like to remind you again that, in some cases, and likely this one, there may be reports in the newspaper or on the radio, internet, or television concerning this case. If there should be such media coverage in this case, you may be tempted to read, listen to, or watch it. As I have told you before, you must not read, listen to, or watch such reports because you must decide this case solely on the evidence presented in this courtroom. If any publicity about this trial inadvertently comes to your attention, do not discuss it with other jurors or anyone else. Just let me or Ms. Johnson know as soon after it happens as you can, and I will then briefly discuss it with you.

As you retire to the jury room to deliberate, I also wish to remind you of an instruction I gave you at the beginning of the trial. During deliberations, you may not communicate with anyone not on the jury about this case or provide any information to them by any means. This includes any electronic communication such as email, text or Facebook or any blogging about the case. In other words, you cannot talk to anyone on the phone, correspond with anyone, or communicate with anyone, in any way, about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

In addition, you may not conduct any independent investigation during deliberations. This means you may not conduct any research in person or electronically via the internet or in another way.

In fairness to both sides, it is essential that you comply with this instruction. Thus, I expect that one of you will inform me as soon as you become aware of another juror's violation of these instructions.

**Furnishing the Jury with a Copy of the Instructions**

Upon your request, I will furnish you with a copy of these instructions.
During your deliberations, you may, if you want to, refer to these
instructions.  While you may refer to any particular portion of the
instructions, you are to consider the instructions as a whole and you may
not follow some and ignore others.  The fact that you have been
provided a copy of these instructions should not discourage you from
making an inquiry regarding the meaning of these instructions if
necessary.  Please return the instructions to Ms. Johnson when your
verdict is rendered.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL,                      :
                                           :
        Plaintiff,                         :
                                           :
        v.                                 :       Civil Action No.:       12-1769 (RC)
                                           :
DISTRICT OF COLUMBIA,                      :
                                           :
        Defendant.                         :

## MEMORANDUM OPINION

### DENYING PLAINTIFF'S REQUEST FOR EQUITABLE RELIEF AND
### ENTERING JUDGMENT FOR THE PLAINTIFF

## I.  BACKGROUND

Dr. Jennifer Campbell, the plaintiff in this case, brought suit against her former employer, the District of Columbia, in 2012. *See* Compl., ECF No.1. Dr. Campbell alleged that the District acted unlawfully when, amidst allegations that Dr. Campbell had steered contracts, the District terminated her employment as Chief Operating Officer of the District's Department of Health Care Finance. *See id.* ¶¶ 6–99.

After a five-day jury trial held in December 2015, a jury found for Dr. Campbell on her constitutional claim brought under 42 U.S.C. § 1983. *See* Verdict Form 2, ECF No. 65. Specifically, the jury found that, by terminating Dr. Campbell's employment without due process and in a manner that "left a stigma on her by having the broad effect of largely precluding her from pursuing her chosen career," the District deprived Dr. Campbell of her constitutionally protected right to pursue her chosen field of employment. *See id.*; *see also* Jury Instructions 28–38, ECF No. 66. The jury awarded Dr. Campbell $250,000.00 in compensatory damages. *See* Verdict Form 3.

# JA 166

Dr. Campbell's post-trial memorandum requests equitable relief in the form of an apology from the District. *See* Pl.'s Mem. Requesting Equitable Relief, ECF No. 69. The District opposes such relief. *See* District of Columbia's Resp. Pl.'s Mem. Requesting Equitable Relief, ECF No. 71. Because it is unclear whether the Court has the authority to order the apology—and because, in any event, the requested apology is not a remedy tailored to fit the constitutional violation in this case—the Court will deny Dr. Campbell's request. The Court will nonetheless enter judgment for Dr. Campbell and award her damages that include the compensatory damages found by the jury, as well as the financial damages to which the parties stipulated before trial. *See* Verdict Form 3; Joint Pretrial Statement 2, ECF No. 41.

## II.  EQUITABLE RELIEF

When exercising its equitable powers, this Court must look to precedent "no less than" when it pronounces the law. *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)). Although the Court may flexibly tailor equitable relief to meet new situations, "courts of equity can and do draw upon decisions made in other similar cases for guidance." *Id.* at 650.

In this case, neither party has pointed to authority justifying or rejecting Dr. Campbell's request for an apology. *See* Pl.'s Mem. Requesting Equitable Relief 1 (establishing only that 42 U.S.C. § 1983 authorizes equitable relief generally); District of Columbia's Resp. Pl.'s Mem. Requesting Equitable Relief 1 (citing to case law that alludes to separation of powers principles, rather than to precedents about this Court's equitable powers). Absent citation to applicable precedent, the Court lacks grounds upon which to grant the apology Dr. Campbell wants. And, based on the Court's independent inquiry, it is far from clear that the Court has the authority to order an apology in this case. *See Woodruff v. Ohman*, 29 F. App'x 337, 346 (6th Cir. 2002)

## JA 167

(concluding, in a case brought under 42 U.S.C. § 1983, that "the district court abused its discretion in ordering [the defendant] to issue an apology to [the plaintiff]"); *see also McKee v. Turner*, 491 F.2d 1106, 1107 (9th Cir. 1974) ("We are not commissioned to run around getting apologies.").

Even if the Court did have the authority to order an apology, doing so would not be appropriate here. In constitutional cases, "the scope of the remedy is determined by the nature and extent of the constitutional violation." *Inmates of Occoquan v. Barry*, 844 F.2d 828, 841 (D.C. Cir. 1988) (internal quotation mark omitted) (quoting *Milliken v. Bradley*, 418 U.S. 717, 744 (1974)). In other words, "once a right is established the remedy chosen must be tailored to fit the violation." *Id.*; *see also Woodruff*, 29 F. App'x at 346 (explaining that an apology is designed to address a moral wrong rather than a legal wrong).

Here, the constitutional violation originated principally from "the District's release of emails to the press." *See* Verdict Form 2. To tailor the remedy to fit the violation, therefore, any apology awarded to Dr. Campbell should come from the persons most responsible for the release of those emails. Based on the record presented in open court at trial, the evidence showed that the individuals who initially provided information to the press—and are thus, in the Court's view, most culpable for leaks to the press—are not parties to this case and are no longer employed by the District. The Court thus lacks any direct or indirect authority to order their apology.

Absent an apology from the most culpable individuals, an apology letter from the District is not a remedy tailored to fit the constitutional violation in this case. Accordingly, the Court will deny Dr. Campbell's request for equitable relief.

**JA 168**

### III.  DAMAGES

The damages due to Dr. Campbell are straightforward. Because the jury awarded Dr.
Campbell $250,000.00 in compensatory damages for her physical pain, emotional distress,
humiliation, embarrassment, inconvenience, and medical expenses, the Court will enter judgment
against the District in that amount. *See* Verdict Form 3; *see also* Jury Instructions 39–40
(instructing the jury to award monetary damages for physical pain, emotional distress,
humiliation, embarrassment, inconvenience, and medical expenses, but not for lost wages or
other benefits). And because the parties stipulated before trial that Dr. Campbell suffered
$304,823.00 in financial damages resulting from the reputational harm caused by the District, the
Court will also enter judgment against the District in that amount.[1] *See* Joint Pretrial Statement 2.
In sum, therefore, the Court will enter judgment against the District in the amount of
$554,823.00.

### IV.  CONCLUSION

For the foregoing reasons, Plaintiff's request for equitable relief (ECF No. 69) is
**DENIED**. As for damages, the Court will enter judgment against the District in the amount of
$554,823.00. A judgment consistent with this Memorandum Opinion is separately and
contemporaneously issued.

Dated:  January 20, 2016                                   RUDOLPH CONTRERAS
                                                          United States District Judge

---

[1] The District's objection that a portion of these damages should not be attributed to the
District's constitutional violation came far too late in the proceedings to disavow the prior
concession upon which the trial presentation proceeded.

4

**JA 169**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JENNIFER B. CAMPBELL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.:    12-1769 (RC) |
| | : | |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |

## **FINAL JUDGMENT**

For the reasons stated in the Court's Memorandum Opinion separately and

contemporaneously issued, Plaintiff's request for equitable relief (ECF No. 69) is **DENIED**.

It is hereby **ORDERED** that, on Plaintiff's Fifth Amendment procedural due process

claim under 42 U.S.C. § 1983, **JUDGMENT IS ENTERED** against Defendant in the amount of

$554,823.00.

**SO ORDERED.**

Dated:  January 20, 2016                              RUDOLPH CONTRERAS
                                                      United States District Judge

**JA 170**

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL

               Plaintiff,

      v.                                          Case No. 1:12-cv-01769-RC

DISTRICT OF COLUMBIA,

             Defendant.

## THE DISTRICT OF COLUMBIA'S
## MOTION FOR JUDGEMENT AS A MATTER OF LAW

Plaintiff claims that the District of Columbia violated her right to due process when it terminated

her employment for cause and released information about the reasons for the termination to a

reporter.  At trial, the jury found that the District had not made a defamatory statement against

Plaintiff.  But Plaintiff prevailed on her claim that as a result of her termination she was

stigmatized and broadly precluded from practicing her chosen profession.  This finding was

flawed because it was premised on the publicity surrounding her termination, rather than the

termination itself.   Also, based on the evidence presented at trial that Plaintiff had obtained

contract work within months of her termination and was fully employed within slightly more

than two years of losing her job, no reasonable juror could find that Plaintiff could have suffered

the broad stigma necessary to sustain this claim.  Finally, the Court added $304,823 in back pay

to Plaintiff's recovery despite the fact that Plaintiff presented no evidence that the alleged stigma

caused her loss of income.  As discussed in the accompanying memorandum, the Court should

enter judgment as a matter of law in favor of the Defendant on these issues pursuant to Fed. R.

Civ. P 50(b)(2).

February 17, 2016

                   Respectfully submitted,

# JA 171

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

JONATHAN H. PITTMAN
Acting Assistant Deputy Attorney General
Civil Litigation Division

*/s/ Sarah L. Knapp*
SARAH L. KNAPP [470008]
Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
(202) 724-6528
Email:  sarah.knapp@dc.gov

Counsel for Defendant

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

JENNIFER B. CAMPBELL

                    Plaintiff,

        v.                              Case No. 1:12-cv-01769-RC

DISTRICT OF COLUMBIA,

                    Defendant.

PROPOSED ORDER

Upon consideration of the District's Motion for Judgment as a Matter of Law, the Memorandum of Points and Authorities in Support thereof, any opposition thereto and the entire record herein, it is this _____ day of _____, 2016,

ORDERED, that DEFENDANTS' MOTION is hereby GRANTED; and it is,

FURTHER ORDERED, that Judgement is entered in favor of the Defendant.

_____
Judge
United States District Court
for the District of Columbia

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL

                Plaintiff,

    v.                             Case No. 1:12-cv-01769-RC

DISTRICT OF COLUMBIA,

                Defendant.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DISTRICT OF COLUMBIA'S MOTION FOR JUDGEMENT AS A MATTER OF LAW

Plaintiff claims that the District of Columbia violated her right to due process when it terminated her employment for cause and released information about the reasons for the termination to a reporter. At trial, the jury found that the District had not made a defamatory statement against Plaintiff. But Plaintiff prevailed on her claim that as a result of her termination she was stigmatized and broadly precluded from practicing her chosen profession. This finding was flawed because it was premised on the publicity surrounding her termination, rather than the termination itself. Also, based on the evidence presented at trial that Plaintiff had obtained contract work within months of her termination and was fully employed within slightly more than two years of losing her job, no reasonable juror could find that Plaintiff could have suffered the broad stigma necessary to sustain this claim. Finally, the Court added $304,823 in back pay to Plaintiff's recovery despite the fact that Plaintiff presented no evidence that the alleged stigma caused her loss of income. As discussed further below, the Court should enter judgment as a matter of law in favor of the Defendant on these issues pursuant to Fed. R. Civ. P 50(b)(2).

I.      **Background**

Jennifer Campbell brought suit against her former employer, the District of Columbia, in

2012.  *See Compl.*, ECF No.1.   In June of 2012, Campbell was terminated from her position as

the Chief Operating Officer of the District of Columbia Department of Health Care Finance after

third-party contractors complained that she had attempted to steer contracts to preferred bidders.

Certain former government employees provided details about these accusations to a reporter

immediately prior to Campbell's termination.  Plaintiff's boss, Wayne Turnage, then provided

the reporter with copies of emails that the reporter had already reviewed.  Plaintiff claims that she

learned about her termination from reading a blog post by the reporter.

The Complaint started with five counts for relief.  Only two survived summary judgment:

 Plaintiff's claim that her termination violated the D.C. Whistleblower Protection Act ("WPA")

and her claim that the publication of reasons for the termination violated her due process rights.

Prior to the start of trial, the District and Plaintiff stipulated that "[t]he amount of Plaintiff's lost

wages relating to her claims is $304,823."

 At the close of Plaintiff's case-in-chief, the District moved for judgment as a matter of

law.  The Court granted the motion as to Plaintiff's WPA claims, agreeing with the District that

Plaintiff's testimony at trial did not show that she engaged in protected activity under the statute.

 At the close of evidence, Plaintiff's due process claim was presented to the jury as two distinct

claims. First, the Jury was asked to consider whether Plaintiff had been defamed in the course of

her termination, a "reputation plus" claim.  *See* Verdict Form 1, ECF No. 65.  The Jury was next

presented with a claim under the "stigma theory" and asked to decide whether Plaintiff's

termination "left a stigma on her by having the broad effect of largely precluding her from

pursuing her chosen career." *Id.* at 2.  The Jury found for Plaintiff on the second theory and awarded $250,000.00 in compensatory damages.  *See id.*

The testimony at trial on Plaintiff's stigma claims was essentially the same as the evidence at summary judgment.  Plaintiff's evidence showed that she worked on healthcare contracts shortly after her termination.  *See* Pl.'s Tr. Ex. 1(Plaintiff's resume) (attached hereto as Exhibit A).  Plaintiff also testified that she began working full-time as a Senior Consultant with Cognosante, on issues related to healthcare finance starting in July of 2014.

The Court entered judgment in favor of the Plaintiff on January 20, 2016.  In addition to the compensatory damages awarded by the jury, the Court added $304,823 in back pay to the judgment.  Thus, the total award to Plaintiff was $554,823.00.

## II.   STANDARD OF REVIEW

A court should grant a motion for judgment as a matter of law made under Rule 50(b) if, "no reasonable juror could reach the verdict rendered in th[e] case." *C&E Services v. Ashland, Inc.,* 601 F. Supp. 2d 262, 267 (D.D.C. 2009) (quoting *United States ex rel. Yesudian v. Howard University*, 153 F.3d 731, 735 (D.C. Cir. 1998)).  Thus, "[j]udgment as a matter of law is appropriate if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." *Novak v. Capital Management & Development Corp.,* 570 F.3d 305, 311 (D.C. Cir. 2009) (quoting *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007)).  A moving party is "entitled to judgment as a matter of law" against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. District of*

3

**JA 176**

*Columbia*, 298 F.3d 989, 992–993 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 322–323 (1986)).  The evidence presented by the plaintiff must be "significantly probative,"

rather than "merely colorable" for the jury's verdict to stand.  S*mith v. Washington Sheraton

Corp.,* 135 F.3d 779, 782 (D.C. Cir. 1998) (*quoting Siegel v. Mazda Motor Corp.,* 878 F.2d 435,

437 (D.C. Cir. 1989).  In entertaining a motion for judgment as a matter of law, the court should

review all of the evidence in the record.  *Breeden v. Novartis Pharmaceuticals Corporation,* 714

F.Supp.2d 33, 35 (D.D.C. 2010) (quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S.

133, 150 (2000)).

## III.   ARGUMENT

To sustain a procedural due process claim, a plaintiff must first demonstrate the existence

of a protected liberty or property interest.  *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972).

"The Constitution protects an individual's 'right to follow a chosen trade or profession' without

governmental interference."  *O'Donnell v. Barry*, 148 F.3d 1126, 1139 (D.C. 1998).

"Government action that has the effect of 'seriously affecting, if not destroying' a plaintiff's

ability to pursue his chosen profession, . . . or 'substantially reducing the value of his human

capital, . . . thus infringes a liberty interest.'"  *Id.* at 1142 (internal citations omitted).

The D.C. Circuit has recognized two ways in which this liberty interest can be infringed.

The first occurs when a government employee is "defamed in the course of job termination."

*Doe v. U.S. Dep't of Justice ("Doe I")*, 753 F.2d 1092, 1108 (D.C. Cir. 1985).  This "is usually

termed a "reputation-plus claim," *O'Donnell*, 148 F.3d at 1140, and is actionable only if the

government publicly disseminates the reasons for the termination, *Orange v. District of

Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995).

4

**JA 177**

The second occurs when the government imposes "'a stigma or other disability that forecloses[s] [a person's] freedom to take advantage of other employment opportunities.'" *O'Donnell*, 148 F.3d at 1140. Referred to as a "stigma" claim, this "differs from the [reputation-plus claim] in that it does not depend on official speech," but on a "stigma or disability arising from official action." *Id.*

Plaintiff's claim was presented to the jury under both theories. The jury found that the District had not defamed Plaintiff, thus she did not prevail on her "reputation plus" claim. The Jury found for Plaintiff on her "stigma" claim and awarded compensatory damages of $250,000. The Court added $304,823 to this award based on the parties stipulation regarding the amount of back pay associated with Plaintiff's claims.

The jury erred in finding for Plaintiff on her stigma claim. First, Plaintiff failed to present a stigma claim that was separate from her reputation plus claim. Second, Plaintiff did not put on sufficient evidence to prove that she was stigmatized in the manner necessary to prevail on her claim. Finally, the Court erred in adding damages for back pay to the judgment. For these reasons discussed below, the Court should grant the District judgment as a matter of law, or reduce the judgment to the $250,000 awarded by the jury.

**A.    Plaintiff's stigma claim fails because she presented no evidence that her "for cause" termination, rather than the publicity surrounding the termination, foreclosed her ability to practice in chosen profession.**

Plaintiff argued that the stigma occurred because of the reason she was terminated. She did not present any evidence that the fact of the termination itself caused her damages. Plaintiff's stigma claim is therefore nothing more than a reputation-plus claim in disguise, which, as the jury found, is untenable because there was no defamatory statement.

5

**JA 178**

The DC Circuit has never held that the for-cause termination of an at-will employee can itself infringe on the employee's liberty interest.[1]  No circuit court has held that the disciplinary termination of an at-will employee, standing alone, can deprive him of a liberty interest.  And the Ninth Circuit has held that such a claim is impossible, explaining that "[u]npublicized accusations do not infringe constitutional liberty interests because, by definition, they cannot harm 'good name, reputation, honor, or integrity.'"  *Bollow v. Fed'l Reserve Bank*, 650 F.2d 1093, 1101 (9th Cir. 1981) (citing *Bishop*, 426 U.S. at 348).  "When reasons are not given, inferences drawn from dismissal alone are simply insufficient to implicate liberty interests."  *Id.* (citing *Roth*, 408 U.S. at 574).  The court acknowledged that "[n]early any reason assigned for dismissal is likely to be to some extent a negative reflection on an individual's ability, temperament, or character," but "not every dismissal assumes a constitutional magnitude."  *Haimowitz v. Univ. of Nevada*, 579 F.2d 526, 529 (9th Cir. 1978); *accord Simpkins v. Sandwich Community Hosp.*, 854 F.2d 215, 217-18 (7th Cir. 1988) ("Denial of a liberty interest requires more than just being fired.").  As the Supreme Court explained in *Roth*, "mere proof" that an employee's termination "might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'"  408 U.S. at 574 n.13.

In *Bishop*, the Supreme Court explained why the liberty-interest protection should not be further expanded:

---

[1]  *O'Donnell* suggests in *dicta* that such a claim is possible, assuming the employee can prove that his termination actually rendered him "unemployable in much of [his] field."  148 F.3d at 1141.  But *O'Donnell* had no reason to seriously consider the question, because in that case, like here, the plaintiff's new job "demonstrate[d] that the stigma he suffered cannot have been too disabling."  *Id.*

The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies.  We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs.  The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. . . .  The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

426 U.S. at 349-50.

> **B.    No reasonable jury could find that Plaintiff's termination broadly foreclosed her ability to practice in her chosen field because Plaintiff had significant employment in her field shortly after her termination and was employed full-time in a little more than two years.**

As noted above, the liberty interest at issue was Plaintiff's ability to practice her chosen profession.  This interest is impaired where the District has "so severely impaired [her] ability to take advantage of a legal right [to seek employment in her chosen field] that the government can be said to have 'foreclosed' [her] ability to take advantage of it and thus extinguished the right." *Holman v. Williams*, 436 F. Supp. 2d 68, 79 (D.D.C. 2006) (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983).  To make this showing, Plaintiff needed to show that her termination "seriously affect[ed], if not destroy[ed her] ability to pursue [her] chosen profession, or substantially reduc[ed] the value of [her] human capital." *Id.* at 80 (internal citation and formatting omitted).  Importantly, she must demonstrate an injurious impact on her employment prospects that is "beyond a disadvantage or impediment." *Mazaleski v. Treusdell,* 562 F.2d 701, 713 (D.C.Cir.1977).

At trial, the evidence showed that Plaintiff worked on health care related contracts shortly after her termination and was reemployed in a comparable position in just over two years. *See, e.g.*, Pl.'s Tr. Ex. 1(Plaintiff's resume) (attached hereto as Exhibit A).  This is comparable to other cases where courts have found as a matter of law that terminated employees were not

7

**JA 180**

sufficiently stigmatized to a due process claim.  For example, in *Alexis v. District of Columbia*, the court opined that two plaintiffs who admitted having found temporary work in their field, "failed to make an arguable showing of foreclosure."  44 F.Supp.2d 331, 342 (D.D.C. 1999). The court reached this conclusion" notwithstanding the fact that the positions each plaintiff secured were not permanent, and thus were understandably unsatisfactory to them." *Id*.  In *O'Donnell*, a demoted police officer who found a job as the chief of police of a small town—as opposed to a "major city or municipality"—could not prevail on a constitutional defamation claim. 148 F.3d at 1141-1142; *see also Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644-645 (D.C. Cir. 2003) (holding that a government contractor that had "won some and lost some" government contracts "failed to show anything remotely close" to the broad preclusion necessary to satisfy a constitutional defamation claim).

The evidence at trial showed that Plaintiff had worked on contracts in her chosen field of "healthcare finance" and had full-time employment at a comparable pay rate just over two years after her termination.  In light of these facts, it was unreasonable for the jury to find that her right to practice in her chosen field was "foreclosed."

**C.     Plaintiff did not show that she was entitled to back-pay.**

The parties agreed on an amount of lost wages arising from Plaintiff's termination.  At the time this agreement was made, Plaintiff's challenge to her termination under the DC Whistleblower Protection Act was still part of the case.  This claim did not go to the jury.   No evidence was presented at trial showing that Plaintiff's lost wages were a result of the lack of due process in connection with her termination, rather than the termination itself.

Consequently, the proper remedy is a name clearing hearing.  *Doe v. U.S. Dept. of Justice*, 753 F.2d 1092, 1112 (D.C. Cir. 1985).  If the government has infringed plaintiff's liberty

8

**JA 181**

interests by disclosing the reasons for her dismissal, "the remedy mandated by the Due Process

Clause of the [Fifth] Amendment is 'an opportunity to refute the charge.' [*Roth,*] 408 U.S., at

573." *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977).   Plaintiff did

not request this type of relief.  *See* Compl.  at 16, ECF No. 1; Pl.'s Mem. Requesting Equitable

Relief, ECF No. 69.

**CONCLUSION**

For these reasons the Court should grant the District's Motion for Judgment as a Matter

of Law.  In the alternative, the Court should reduce the judgment to the $250,000 awarded by the

jury.

February 17, 2016

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

JONATHAN H. PITTMAN
Acting Assistant Deputy Attorney General
Civil Litigation Division

*/s/ Sarah L. Knapp*
SARAH L. KNAPP [470008]
Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
(202) 724-6528
Email:  sarah.knapp@dc.gov

Counsel for Defendant

9

**JA 182**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| JENNIFER B. CAMPBELL, DR. PH., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12-cv-01769-RC |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT AS A MATTER OF LAW**

This is the ***fifth*** time the District has argued that its actions did not seriously affect Dr. Campbell's ability to pursue her chosen profession or substantially reduce the value of her human capital. The Court has already considered and rejected the District's argument on four separate occasions. The doctrine of the law of the case requires the Court to reject this same argument now raised for the fifth time.

Second, the District's argument that it did not stipulate to lost wages on Plaintiff's Procedural Due Process claim is false. In the Joint Pretrial Statement and at the Pretrial Conference on November 30, 2015, the District stipulated to $304,823 in lost wages. After the Pretrial Conference, the Court entered its Order memorializing this stipulation and that Plaintiff agreed not to call damages experts because of the District's stipulation. The District is bound by its stipulation, and its argument to the contrary is, at best, disingenuous.

Third, the District's attempt to recast Plaintiff's "Stigma or Disability" Procedural Due Process claim as a "Reputation-Plus" claim "in disguise" should also be rejected. Plaintiff presented ample evidence at trial that her termination *in combination with the surrounding*

**JA 183**

*publicity* violated her right to Procedural Due Process and caused her damages.  In fact, it was the District's own counsel who requested that this exact language —"termination of her employment and the publicity surrounding it"— be included in the final jury instructions on the Procedural Due Process claim.

Fourth, during the trial and post-trial proceedings, the District never raised any objection that the "Stigma or Disability" Procedural Due Process claim was not supported by the evidence.  And it does not object to the final jury instructions in the instant Motion.

Having been being properly instructed by the Court on Dr. Campbell's claims, the jury entered a finding in Plaintiff's favor on the "Stigma or Disability" Procedural Due Process claim. The jury's findings were reasonable given presentation of evidence and the Court's instruction on the law.  There is no basis for granting the instant Motion for Judgment.

## <u>LEGAL ARGUMENT</u>

I.   **The law of the case doctrine requires that this Court deny, for the <u>*fifth*</u> time, the District's argument that its actions did not seriously affect Dr. Campbell's ability to pursue her chosen profession or substantially reduce the value of her human capital.**

On four separate occasions, this Court considered and rejected the same argument the District makes here — that its actions did not seriously affect Dr. Campbell's ability to pursue her chosen profession or substantially reduce the value of her human capital (*see* Def. Mem. at 7–8):

1.   The District first presented its argument in its Motion for Summary Judgment.  The Court rejected the District's argument in the Memorandum Opinion Granting in Part and denying in Part Defendant's Motion for Summary Judgment.  (ECF No. 36, Mem. Opp. at 18–21, attached as <u>Exhibit 1</u>.)

2.   After Plaintiff closed her case at trial, the District moved for judgment as a matter of law on the same grounds.  The Court rejected the District's argument for the ***second*** time. (Trial Transcript Day 2 at 182–86; Trial Transcript Day 3 at 12, attached as <u>Exhibit 2</u>.)

2

# JA 184

3.  After presenting its case at trial, the District again moved for judgment as a matter of law, presenting the same argument.  The Court took the District's motion under advisement and ultimately denied it for the ***third*** time.  (Trial Transcript Day 4 at 108–12; Trial Transcript Day 5 at 7, attached as <u>Exhibit 3</u>.)

4.  After the close of evidence at trial, the District presented the exact same argument and renewed its motion for judgment as a matter of law, making the exact same argument.  The Court took the District's motion under advisement, and ultimately denied its argument for the ***fourth*** time.  (Trial Transcript Day 4 at 135, 137–40; Trial Transcript Day 5 at 7, <u>Exhibit 4</u>.)

The District's argument must be rejected for the ***fifth*** time, pursuant to the doctrine of the law of the case, which "serves the judicial system's need to dispose of cases efficiently by discouraging [. . .] multiple attempts to prevail on a single question." *Kritsidimas v. Sheskin*, 411 A.2d 370, 371–72 (D.C. 1980).  As explained by Judge Lamberth:

> [T]he doctrine of "law of the case," [] is a prudential rule under which courts refuse to reopen issues that have been previously decided in the same case. *Crocker v. Piedmont Aviation*, 49 F.3d 735, 739, 311 U.S. App. D.C. 1 (D.C. Cir. 1995).  The D.C. Circuit expresses this rule in the following terms: "[T]he same issue presented a second time in the same case in the same court should lead to the same result." *United States v. Thomas*, 572 F.3d 945, 949, 387 U.S. App. D.C. 300 (D.C. Cir. 2009).  Under the law of the case doctrine, this Court may not revisit any issues that it has previously resolved . . . .

*Nattah v. Bush*, 770 F. Supp. 2d 193, 201 (D.D.C. 2011) (alterations in original).

Further, there has not been an intervening change in the law that would affect the Court's previous four rulings on this issue.  *See United States v. Thomas*, 572 F.3d 945, 949 (D.C. Cir. 2009).  The most recent case the District cites to in support of its argument was issued in 2006 — long before this case was filed in 2012 and well before each of the District's previous motions for

**JA 185**

judgment.  (*See* Def. Mem.)[1]  The District has presented absolutely no basis for this Court to reconsider its previous four rulings on this issue.

## II.   The District stipulated to Plaintiff's lost wages in the amount of $304,823.

The District's argument that it stipulated to Dr. Campbell's wages *only* as to the DC Whistleblower Protection Act claim is false.  (*See* Def. Mem. at 8–9.)  The Joint Pretrial Statement states as follows:

> **The parties stipulate to the following facts:**
>
> 1.   Plaintiff's annual salary as COO was $146,000.
>
> 2.   The amount of Plaintiff's lost wages relating to her claims is $304,823.

(ECF No. 41, Joint Pretrial Statement at 2, attached as <u>Exhibit 7</u>.)

In the Joint Pretrial Statement, Plaintiff specifically claimed lost wages in the amount of $304,823 under her Procedural Due Process Claim:[2]

> On her Procedural Due Process claim, Dr. Campbell seeks:
>
> …
>
> [2].  Special damages:  lost wages in the amount of $304,823.

 (*See id.* at 6.)  The District did not raise any objection in the Joint Pretrial Statement to Plaintiff's intention to collect lost wages in the amount of $304,823 on her Procedural Due Process claim.

---

[1]  It should be noted that, although the District makes representations as to what the evidence at trial showed, Plaintiff's Trial Exhibit 1, Dr. Campbell's resume, was the *only* record evidence it cited.  For example, the District cites to Plaintiff's Trial Exhibit 1 to support its representation that "[a]t trial, the evidence showed that Plaintiff worked on health care related contracts shortly after her termination and was reemployed in a comparable position in just over two years." (Def. Mem. at 7 (*citing* Attachment A).)  The District, however, failed to attach the exhibit, which, contrary to the District's assertion, does not reference her employment with Cognosante or demonstrate that her work with J. Blakely Campbell & Associates, LLC, is "comparable" to the work she performed for the District. *See* Plaintiff's Trial Exhibit 1, attached as <u>Exhibit 5</u>; Trial Transcript Day 1 at 30, attached as <u>Exhibit 6</u>.  Any representation as to what the evidence at trial showed that is not supported by the record itself should be disregarded by this Court.  *C.f.*, *Bush v. Dist. of Columbia*, 595 F.3d 384, 388 (D.C. Cir. 2010); *Shelton v. Maya Angelou Pub. Charter Sch.*, 578 F. Supp. 2d 83, 87 (D.D.C. 2008).

[2]  In setting forth her damages, Plaintiff cited to *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (U.S. 1986), which makes clear that lost wages are available under such a claim.

4

# JA 186

(*See id*.)

In fact, the District objected to Plaintiff calling damages experts at trial, given the District's stipulation to the amount of lost wages:

> **The District objects to the following witnesses named by Plaintiff.**
>
> . . .
>
> **Plaintiff's Witnesses 8 & 9:**  Plaintiff's damages experts.  The District agreed to the stipulations about Plaintiff's earnings listed in the pretrial because of Plaintiff's representation that she would not be calling these witnesses at trial.

(ECF No. 41-1 at 4–5, attached as Exhibit 8.)

At the Pretrial Conference on November 30, 2015, the District's counsel again objected to Plaintiff calling damages experts because the District had stipulated to lost wages in the Joint Pretrial Statement.  Based on the stipulation, Plaintiff's counsel agreed not to call damages experts. The Court memorialized its rulings from the Pretrial Conference in its Order, entered on November 30, 2015:

> The District of Columbia's objection to Ms. Campbell's damages experts (Plaintiff's Witnesses 8 and 9) is **SUSTAINED**.  In light of the stipulation about Ms. Campbell's lost wages, *see* Joint Pretrial Statement 2, ECF No. 41, Ms. Campbell agreed not to call these witnesses at trial.

(*See* ECF No. 48 at 2, attached as Exhibit 9.)

It is long settled that pretrial stipulations, like admissions in the pleadings, bind the parties and the court.  *United States v. Kanu*, 695 F.3d 74, 78 (D.C. Cir. 2012).  These binding admissions serve to expedite the litigation by simplifying the issues and avoiding unnecessary proof.  *See* Fed. R. Civ. Pro. 16.  Any stipulation set forth in the Pretrial Order "controls the course of the action unless the court modifies it."  *Id*.

Absent "manifest injustice," a pretrial stipulation serves as a binding admission or recognition

of undisputed evidence and is therefore treated as a legally proven fact that cannot be challenged. *See United States v. Harrison*, 204 F.3d 236, 240 (D.C. Cir. 2000) ("[a] stipulation constitutes an express waiver made preparatory to trial by the party or his attorney conceding for the purposes of trial the truth of some alleged fact . . . thereafter to be taken for granted; so that the one party need offer no evidence to prove it and the other is not allowed to disprove it."). Here, the District makes no argument of manifest injustice, and it is bound by its stipulation that Dr. Campbell's lost wages under her Procedural Due Process claim amounted to $304,823.

The District *never* objected to awarding the stipulated lost wages, should Plaintiff succeed on her Procedural Due Process Claim. Nor did the District object to the Final Jury Instructions, which provided for recovery of the stipulated lost wages on the due process claims. The discussion at trial about the jury instructions clearly shows that the stipulated lost wages applied to Dr. Campbell's Procedural Due Process claim:

> **The Court:** … Given that the District has already stipulated as to the 300,000 or so dollars of economic harm, is this [causation of special harm] an issue that the jury has to decide?
>
> **District counsel:** Yes, your honor…
>
> **The Court:** … I think I can add, 'You are not being asked to decide whether plaintiff suffered an actual financial loss, paren, the Court will decide that, only whether the alleged constitutional violation caused that actual financial loss."

(*See* Trial Transcript Day 4 at 18, 23, attached as Exhibit 10.) The Final Jury Instructions reflect the District's stipulation. For example, the instruction relating to special harm under the Reputation-Plus claim stated:

> Special harm means actual financial loss. You are not being asked to decide whether Dr. Campbell suffered an actual financial loss (the Court will decide

**JA 188**

that).   You are being asked to decide only whether the alleged constitutional violation caused the actual financial loss.

(ECF No. 66, Jury Instructions at 35, attached as <u>Exhibit 11</u>.)

The District further consented to the Compensatory Damages instruction, which stated that "lost wages are determined by the Court, if necessary, and may not be included in your damages award":

> **The Court:**  Compensatory Damages?

> **District counsel:**  No Objection from the District.

(Trial Transcript Day 4 at 27; ECF No. 66, Jury Instructions at 40, attached as <u>Exhibit 12</u>.)

It is important to note that at the time the jury instructions were finalized, the whistleblower claim had *already* been dismissed.   In other words, if the District did not stipulate lost wages for the Procedural Due Process claims, as it claims here, it would not have consented to jury instructions about lost wages.[3]

The District did not object to Plaintiff's claim for lost wages in the amount of $304,823 under her Procedural Due Process claim until ***after*** the jury reached its verdict in this case.   (*See* Trial Transcript Day 5 at 7–8, attached as <u>Exhibit 15</u>.)   The Court rejected during post-trial proceedings the same argument that the District presents here:

> **District counsel:**  And I would like to point out I think that the District may be submitting some briefing.   When we agreed to the back pay amount there was a wrongful termination claim in the case.   There was the whistle blower termination claim.   And I think it's not, you know, her loss from day one of back pay is not cause from the reputational harm alone.

---

[3]   The Court dismissed the DC Whistleblower Protection Act claim on the third day of trial.   The parties discussed the Jury Instructions on the fourth day of trial.   (*See* Trial Transcript Day 3 at 1, 9, attached as <u>Exhibit 13</u>; Trial Transcript Day 4 at 1, 4, attached as <u>Exhibit 14</u>.)

**JA 189**

**The Court:** You know, when you stipulated there were two claims in there, and you said that they didn't, you actually argued they couldn't present their witnesses, or shouldn't present their witnesses because you had stipulated to those amounts so they created their strategy around the stipulation.

**Defense counsel:** We stipulated to the amount, but I understand what you're saying, your Honor.

(Trial Transcript Day 5 at 7–9, attached as Exhibit 16.)

On January 20, 2016, the Court entered Final Judgment in the amount of $554,823.00. (ECF No. 75, Final Judgment, attached as Exhibit 17.)   In the Memorandum Entering Judgment for Plaintiff, the Court explained that "because the parties stipulated before trial that Dr. Campbell suffered $304,823.00 in financial damages resulting from the reputational harm caused by the District, the Court will also enter judgment against the District in that amount." (ECF No. 74 at 4, attached as Exhibit 18.)   The Court further noted that "[t]he District's objection that [] these damages should not be attributed to the District's constitutional violation came far too late in the proceedings to disavow the prior concession upon which the trial presentation proceeded." (*Id.* at 4 n.4.)   This is the law of the case. *See Nattah v. Bush*, 770 F. Supp. 2d 193 (D.D.C. 2011).

The record makes clear that the District stipulated to Dr. Campbell's lost wages in the amount of $304,823 under her Procedural Due Process claim, and this stipulation is binding.  The District's argument to the contrary is even more frivolous and disingenuous now than it was during post-trial proceedings.

**III.  The District's argument that Plaintiff's "Stigma or Disability" Procedural Due Process claim is nothing more than a "Reputation-Plus" claim in disguise is without merit.**

The Court should reject the District's argument that Plaintiff's "Stigma or Disability" Procedural Due Process claim is "nothing more than a reputation-plus claim in disguise." (Def.

Mem. at 5.)  The cases to which the District cites, in an attempt to support its argument that a "for-cause termination of an at-will employee" cannot *on its own* "infringe on the employee's liberty interest[,]" are inapposite.  For example, the Ninth Circuit's decision in *Bollow,* which holds that "*[u]npublicized* accusations do not infringe constitutional liberty interests . . . ." clearly does not apply.  (Def. Mem. at 6 (emphasis added).)  Unlike in *Bollow*, the accusations against and termination of Dr. Campbell *were* publicized.[4]

The District's recasting of both the evidence presented at trial and Plaintiff's argument under her "Stigma or Disability" Procedural Due Process claim is off the mark.  Dr. Campbell asserted at trial that her termination *in combination with* the surrounding publicity violated her right to Procedural Due Process under the "Stigma or Disability" theory.

Dr. Campbell testified that she went from earning $146,000 to being unemployed for more than two years, supporting herself from small contracts (on which she made less than the federal poverty level) and charity from her church.  (Trial Transcript Day 2 at 55–57, attached as <u>Exhibit 19</u>.)  She also testified that the media coverage made it impossible for her to find work for more than two years, stating "[n]o one really wanted to deal with me because of the newspaper article." (*Id.* at 55.)  As Darryl Wiggins testified, "the first thing that comes up in Google is that, you know . . . this lady was fired for trying to steer a contract to me."  (*Id.* at 72.)

Further, the newspapers articles, which were admitted into evidence as Plaintiff's Exhibits 7 and 8, state that Dr. Campbell was terminated because of allegations that she engaged in unlawful conduct.  The *Washington City Paper* article, "Health Care Finance COO Fired Over Contract

---

[4]  For the same reasons as set forth in this Section, there is no merit to the District's perfunctory argument that "[n]o evidence was presented at trial showing that Plaintiff's lost wages were a result of the lack of due process in connection with her termination, rather than the termination itself." (Def. Mem. at 8).  To the contrary, and as shown below, Dr. Campbell testified that her damages were a direct result of her termination *in combination with* the surrounding publicity.

9

# JA 191

Steering Allegations," stated:

> The chief operating officer of the Department of Health Care Finance was fired today over allegations that she tried to "steer business towards some minority firms and away from others" in the bidding on the forthcoming contract for the District's Health Insurance Exchange.
>
> …
>
> Jennifer Campbell, the COO, was placed on administrative leave early last week by her boss, DHCF Director Wayne Turnage.
>
> …
>
> In emails Turnage sent to senior members of the Gray administration last week, he explains that one contractor, CGI, approached him with allegations that Campbell was trying to force CGI to partner with Darryl Wiggins, a politically connected owner of a document management company.
>
> …
>
> Turnage also writes that he'd received an allegations that Campbell was trying to steer another contractor, Compass Consulting, toward a different potential partner, Cederick [sic] Simon.

(*See* Alan Suderman, "Health Care Finance COO Fired Over Contract Steering Allegations," *Washington City Paper,* June 11, 2012, attached as <u>Exhibit 20</u>.)

Similarly, *The Washington Post* article, "D.C. official is fired over contract allegations," stated:

> A top deputy of the District agency that oversees billions of dollars of federal and local health-care spending was fired this week after she was accused of trying to steer a lucrative city contract to favored minority business vendors, according to documents reviewed by *The Washington Post.*
>
> …
>
> Jennifer Campbell, a four-year employee at the D.C Department of Health Care Finance and the agency's most recent chief operating officer, was dismissed on Monday after she was placed on administrative leave last week, city officials said.  Agency Director Wayne Turnage confirmed Campbell's termination . . .

**JA 192**

…

But documents indicate that Turnage was concerned that Campbell attempted to steer part of a pending contract to create a health-care exchange to Darryl Wiggins, a businessman who chairs the reelection campaign of D.C. Council member Muriel Bower (D-Ward 4).

…

The dismissal demonstrates the growing sensitivity within city government over allegations of improper or unethical behavior . . . .

…

"I have been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange network," Turnage wrote Gray administration officials.  "Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in DHCF contracting office that will ensure a successful bid if they of course partner with the right persons."

…

On June 3, Turnage wrote to his chief of that a senior CGI official called him to say the company was being pressured into partnering with Document Managers, a business owned by Wiggins.

…

"A call came from VP of CGI that she had been contacted, unsolicited by Jennifer Campbell, our chief operating officer," Turnage wrote.  "In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman named Darryl Wiggins as a minority partner."  Turnage added: "CGI's vice-president said . . . this was a very difficult and awkward situation and is understandably concerned about the potential ramifications."

…

[Turnage wrote:] "I closed the meeting by telling Mr. Wiggins that it was my job to protect the integrity of the contracting process for one of the District's

11

**JA 193**

most significant procurements and, because of that, we take the charges against Jennifer quite seriously."

(*See* Tim Craig, "D.C. official is fired over contract allegations," *The Washington Post*, June 12, 2012, attached as Exhibit 21.)

Pedro Ribeiro, Director of Communications for Mayor Vincent Gray during 2012, testified that he invited reporter Alan Suderman to his office and showed him emails that were quoted in Mr. Suderman's *Washington City Paper* article. (Trial Transcript Day 2 at 76–77, 81–86, 96, 103–04, attached as Exhibit 22.) Christopher Murphy, Mayor Gray's Chief of Staff in 2012, also testified that he and Mr. Ribeiro agreed to share the emails about the allegations against Dr. Campbell with Mr. Suderman. (*Id.* at 114–15, 123–36, 144–45.)

Wayne Turnage, Director of the District of Columbia Department of Health Care Finance, also admitted forwarding Mr. Suderman the emails[5] about the allegations against Dr. Campbell and the District's decision to fire her. Mr. Suderman quoted from those emails in the article published in the Washington City Paper. (Trial Transcript Day 3 at 30, 63–76, attached as Exhibit 24.)

In fact, it was the District's own attorney who specifically requested that the jury be instructed that the Stigma or Disability claim was premised on the termination of Dr. Campbell's employment *in combination with* the newspaper articles described above. (Trial Transcript Day 4 at 16–17, attached as Exhibit 25 (Agency counsel stated: "I think it needs to say that the termination of her employment and the publicity surrounding it.").) The Court acquiesced to the District's request and amended the Final Jury Instruction accordingly:

---

[5] These emails were admitted into evidence on the third day of the trial as Plaintiff's Exhibits 15–18. (*See* Exhibits and Trial Transcript Day 3 at 30, attached as Exhibit 23.)

| The Court's Proposed Jury Instruction | The Final Jury Instruction |
|---|---|
| Dr. Campbell seeks money damages against the District of Columbia on the basis that the termination of her employment unconstitutionally deprived her, without due process, of her Fifth Amendment liberty interest in pursuing her chosen field of employment. | Dr. Campbell seeks money damages against the District of Columbia on the basis that her termination of her employment ***and the publicity surrounding it*** unconstitutionally deprived her, without due process, of her Fifth Amendment liberty interest in pursuing her chosen field of employment. |
| (Trial Transcript Day 4 at 16, attached as <u>Exhibit 26</u>.) | (ECF No. 66, Jury Instructions at 28, attached as <u>Exhibit 27</u> (emphasis added).) |

The Final Jury Instructions on Dr. Campbell's "Stigma or Disability" claim further reflected the District's request:

> Under the 'stigma or disability' theory, you may find that Dr. Campbell was deprived of her liberty interest ***if the District's release of emails to the press and termination of her employment left a stigma*** on her by having the broad effect of largely precluding her from pursuing her chosen career. To prove a liberty interest deprivation under the 'stigma or disability' theory, Dr. Campbell must show that the District's actions seriously affected, if not destroyed, her ability to pursue her chosen profession or substantially reduced the value of her human capital.

(ECF No. 66, Jury Instructions at 37, attached as <u>Exhibit 28</u> (emphasis added).)

After hearing all of the evidence and being correctly instructed on the law, the jury found in Dr. Campbell's favor on her "Stigma or Disability" Due Process claim. (ECF No. 65, Jury Verdict Sheet, attached as <u>Exhibit 29</u>.) It is clear that Dr. Campbell presented ample evidence for a reasonable jury to find in her favor on this claim, and the District's argument should be rejected.

## IV.   The District did not object to the Final Jury Instructions on the Stigma or Disability claim.

If the District truly believed that the "Stigma or Disability" claim was not supported by the evidence, it should have raised an objection. The District did not set forth any such objection

## JA 195

during the trial or the post-trial proceedings.

Further, in the instant Motion, the District does not once take issue with the Court's Final Jury Instructions, including the instruction on the Stigma or Disability claim. Indeed, the Court edited the instructions pursuant to the District's specific requests made in open court and as set forth in the Draft Jury Instructions attached to the Joint Pretrial Statement. (*See* Synthesis of Nature of Plaintiff's Claim Instruction, attached as Exhibit 30; Synthesis of 42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: Basic Elements Instruction, attached as Exhibit 31; Synthesis of 42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: First Element—Deprivation of Liberty Interest Instruction, attached as Exhibit 32; Synthesis of 42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: First Element—Deprivation of Liberty Interest ("Stigma or Disability") Instruction, attached as Exhibit 33; Synthesis of 42 U.S.C. § 1983 and Fifth Amendment Procedural Due Process: Second Element—Lack of Sufficient Process Instruction, attached as Exhibit 34; Synthesis of Compensatory Damages Instruction, attached as Exhibit 35.)[6]  The Final Verdict Sheet similarly incorporated the language from the District's Proposed Verdict Sheet, with regard to the Stigma or Disability claim. (*See* Synthesis of the Verdict Form, attached as Exhibit 36.)  As such, the District cannot assert a good faith objection to the Final Jury Instructions.

---

[6]  Plaintiff notes that the District requested language from *Mosrie v. Barry*, 718 F.2d 1151 (D.C. Cir. 1983), arguing that "the jury need[ed] to know what a high standard it is" under the "Stigma or Disability" theory. (*See* Exhibit 33 at 10–13 (*i.e.*, Trial Transcript Day 4 at 32–33).)  The Court acquiesced in adding language setting forth the "high" standard under this claim, and included the following sentence:  "[t]o prove a liberty interest deprivation under the 'stigma or disability' theory, Dr. Campbell must show that the District's actions seriously affected, if not destroyed, her ability to pursue her chosen profession or substantially reduced the value of her human capital." (*Compare* Proposed Jury Instruction (Exhibit 33 at 4.) *with* Final Jury Instruction (Exhibit 33 at 19 (*i.e.*, ECF No. 66 at 37).)  The language added was taken directly from the District's Proposed Instruction on this claim. (*See* Exhibit 33 at 14–16 (*i.e.*, ECF No. 41-8 at 13–14).)  Plaintiff further notes that the language requested by the District from *Mosrie* did not fit the facts of this case given that the Appellant in *Mosrie*, unlike Dr. Campbell, did "not . . . even allege[] that he had been deprived of a legal right to engage in an occupation or to seek any particular position." *Mosrie* at 1162.

14

**JA 196**

Rule 51 of the Federal Rules of Civil Procedure provides that an objection to a jury instruction is timely if, "a party objects at the opportunity provided under Rule 51(b)(2) or a party was not informed of an instruction or action on a request before that opportunity to object, and the party objects promptly after learning that the instruction or request will be, or has been, given or refused."  Fed. R. Civ. P. 51(c)(2).

By failing to raise any objection to the Court's Final Jury Instructions, the District waived any argument that the Court's Final Jury Instructions, including but not limited to the instruction on the Stigma or Disability claim, were improper in any way.  *See Walker v. Pharm. Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006).  The District's objection, set forth for the first time in the instant Motion, is untimely.

## CONCLUSION

For the foregoing reasons, Dr. Campbell respectfully requests that the Court deny the District's Motion for Judgment as a Matter of Law.

March 25, 2015                                    Respectfully submitted,

                                                 _____/s/_____
                                                 Alan Lescht
                                                 Alan Lescht & Associates, PC
                                                 1050 17th Street, NW, Suite 400
                                                 Washington, DC 20036
                                                 Tel:  (202) 463-6036
                                                 Fax:  (202) 463-6067
                                                 alan.lescht@leschtlaw.com
                                                 *Counsel for Plaintiff*

**JA 197**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 25th day of March 2016, I caused the foregoing to be served via

ECF on the following persons:

Sarah L. Knapp, Esq.
Assistant Attorney General
Civil Litigation Section III
Office of the Attorney General for the District of Columbia
441 4th Street, NW, Suite 630 Main
Washington, DC 20001
*Counsel for Defendant*

_____/s/_____
Alan Lescht

**JA 198**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL,  : 
                                : 

    Plaintiff,  : 
                                :     Civil Action No.:     12-1769 (RC)

    v.  : 
                                :     Re Document No.:     83

DISTRICT OF COLUMBIA,  : 
                                : 

    Defendant.  : 

## ORDER

**DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

For the reasons stated in the Court's Memorandum Opinion separately and

contemporaneously issued, Defendant's motion for judgment as a matter of law (ECF No. 83) is

**DENIED**.

    **SO ORDERED**.

Dated:  May 25, 2016                       RUDOLPH CONTRERAS
                                            United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JENNIFER B. CAMPBELL,                    :
                                         :
          Plaintiff,                     :
                                         :        Civil Action No.:      12-1769 (RC)
          v.                             :
                                         :        Re Document No.:       83
DISTRICT OF COLUMBIA,                    :
                                         :
          Defendant.                     :

**<u>MEMORANDUM OPINION</u>**

**DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

**I.  INTRODUCTION**

After a five-day trial, a jury found that, in the process of terminating Plaintiff Dr. Jennifer

Campbell's employment, Defendant District of Columbia denied her the procedural due process

that it owed her under the Fifth Amendment of the Constitution. The Court entered judgment

against the District in the amount of $554,823, which reflected (1) the jury's award of

compensatory damages for Dr. Campbell's physical pain, emotional distress, humiliation,

embarrassment, inconvenience, and medical expenses ($250,000); and (2) Dr. Campbell's

financial damages in the amount to which the parties stipulated before trial ($304,823).

The District now moves to set aside the jury's verdict, or, alternatively, to reduce the

judgment to just $250,000, the jury's compensatory damages award. Because the District has

shown neither that no reasonable jury could have reached a verdict in Dr. Campbell's favor, nor

that the Court must set aside the parties' stipulation of financial damages to prevent manifest

injustice, the Court will deny the District's motion.

**JA 200**

## II.  BACKGROUND

Dr. Campbell brought suit against her former employer, the District of Columbia, in

2012. *See* Compl., ECF No. 1. Dr. Campbell alleged that the District acted unlawfully when,

amidst allegations that Dr. Campbell had steered contracts, and in the wake of media articles

publicizing those allegations, the District terminated her employment as Chief Operating Officer

of the District's Department of Health Care Finance. *See id.* ¶¶ 6–99.

After the Court resolved the District's dispositive motions, the parties prepared for trial

on Dr. Campbell's constitutional claims brought under 42 U.S.C. § 1983 and on her claims under

the District of Columbia's Whistleblower Protection Act (WPA), D.C. Code §§ 1-615.51 to

-615.59. *See* Joint Pretrial Statement 1, ¶ II, ECF No. 41 (stating Dr. Campbell's claims for trial).

Before trial, the parties stipulated that "[t]he amount of [Dr. Campbell's] lost wages relating to

her claims is $304,823." *Id.* at 2, ¶ III.2. In light of that stipulation, Dr. Campbell agreed not to

call expert witnesses to testify at trial about her damages. Nov. 30, 2015 Order 2, ¶ I.4, ECF

No. 48.

The parties tried Dr. Campbell's case before a jury for five days in December 2015. After

Dr. Campbell presented her case-in-chief, the Court granted the District's motion for judgment

as a matter of law on Dr. Campbell's WPA claim. *See* Dec. 9, 2015 Trial Tr. 9:18–11:21, ECF

No. 81. But Dr. Campbell's constitutional claims were submitted to the jury for consideration,

and the jury found for Dr. Campbell on one of those claims. *See* Verdict Form 2, ECF No. 65.

The jury found that, by terminating Dr. Campbell's employment without due process and in a

manner that "left a stigma on her by having the broad effect of largely precluding her from

pursuing her chosen career," the District denied Dr. Campbell procedural due process and

deprived her of her constitutionally protected right to pursue her chosen field of employment.

## JA 201

*See id.*; *see also* Jury Instructions 28–38, ECF No. 66. The jury awarded Dr. Campbell $250,000 in compensatory damages for her physical pain, emotional distress, humiliation, embarrassment, inconvenience, and medical expenses. *See* Verdict Form 3; *see also* Jury Instructions 39–40 (instructing the jury to award monetary damages for physical pain, emotional distress, humiliation, embarrassment, inconvenience, and medical expenses, but not for lost wages or other benefits).

The Court entered judgment against the District in the amount of $554,823. *See* Final J., ECF No. 75. The final judgment reflected (1) the jury's compensatory damages award ($250,000) and (2) Dr. Campbell's financial damages in the amount to which the parties stipulated before trial ($304,823). *See Campbell v. District of Columbia*, No. 12-1769, 2016 WL 247560, at *2 (D.D.C. Jan. 20, 2016) (explaining the components of Dr. Campbell's damages award).

The District now argues, as it did at trial, that "no reasonable juror could find that [Dr. Campbell] could have suffered the broad stigma necessary to sustain" the constitutional claim on which she received a favorable jury verdict. Def.'s Mot. J. Matter of Law 1, ECF No. 83 [hereinafter Def.'s Mot]; *see* Dec. 10, 2015 Trial Tr. 137:8–139:19, ECF No. 82 (making the argument at trial). Moving under Federal Rule of Civil Procedure 50, the District asks the Court to set aside the jury's verdict and enter judgment as a matter of law in favor of the District. *See* Def.'s Mot. 1.

The District also asserts that Dr. Campbell should not receive a financial damages award of $304,823. *See* Mem. P. & A. Supp. Def.'s Mot. J. Matter of Law 8–9, ECF No. 83-1 [hereinafter Def.'s Mem.]. In support, the District (1) notes that the parties stipulated to Dr. Campbell's lost wages when her WPA claim was still part of the case, (2) asserts that

3

**JA 202**

Dr. Campbell did not present evidence at trial showing that "her lost wages were a result of the lack of due process in connection with her termination," and (3) argues that any additional remedy for Dr. Campbell's procedural due process claim should be a "name clearing hearing." *See id.* The District contends that, if the Court refuses to set aside the jury's verdict, the Court should "reduce the judgment to the $250,000 awarded by the jury." *See id.* at 9.

The Court addresses both of the District's requests in turn.

### III.  REQUEST TO SET ASIDE THE JURY VERDICT

#### A.  Legal Standard

Federal Rule of Civil Procedure 50(a) allows a party in a jury trial to make a motion for judgment as a matter of law after "a party has been fully heard on an issue" and "before the case is submitted to the jury." Fed. R. Civ. P. 50(a). If the Court finds that "a reasonable jury would not have a legally sufficient evidentiary basis" to find for the nonmoving party on that issue, then the Court may grant the motion for judgment as a matter of law on any "claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." *Id.* If the Court does not grant the motion, however, the Court "is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b).

After the jury renders its verdict, Federal Rule of Civil Procedure 50(b) allows the moving party, "[n]o later than 28 days after the entry of judgment," to renew the motion for judgment as a matter of law that it made before. *Id.* "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment; *accord Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("A motion under Rule 50(b) is not allowed

4

**JA 203**

unless the movant sought relief on similar grounds under Rule 50(a) before the case was

submitted to the jury.").

      In ruling on a Rule 50(b) motion, however, the Court "do[es] not . . . lightly disturb a jury

verdict." *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 163 (D.C. Cir. 2015) (ellipsis in

original) (quoting *Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007)). If the

Rule 50(b) motion attacks a plaintiff's jury verdict, the Court must resolve all reasonable

inferences in the plaintiff's favor. *Id.* The Court cannot substitute its view for the jury's, assess

witnesses' credibility, or weigh the evidence. *Scott v. District of Columbia*, 101 F.3d 748, 753

(D.C. Cir. 1996). The jury's verdict will stand if the evidence in its support is "'significantly

probative' and 'more than merely colorable.'" *Id.* (quoting *Ferguson v. F.R. Winkler GMBH &*

*Co. KG*, 79 F.3d 1221, 1224 (D.C. Cir. 1996)). "Judgment as a matter of law is appropriate only

if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that

reasonable men and women could not have reached a verdict in plaintiff's favor." *Muldrow*, 493

F.3d at 165 (internal quotation mark omitted) (quoting *McGill v. Muñoz*, 203 F.3d 843, 845

(D.C. Cir. 2000)).[1]

## B. Analysis

      The District makes two arguments for setting aside Dr. Campbell's favorable jury

verdict: one alleges that Dr. Campbell presented insufficient evidence, and the other argues that

---

[1] Rule 50(b) also allows a party to include "an alternative or joint request for a new trial" with its motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(b). If a party does so, Rule 50(b)(2) allows the Court to order a new trial. *See* Fed. R. Civ. P. 50(b)(2).

      Here, however, the District has not requested a new trial. *See* Def.'s Mot. 1–2; Def.'s Mem. 1–9. The Court therefore presumes that the District inadvertently wrote that it seeks judgment as a matter of law "pursuant to Fed. R. Civ. P[.] 50(b)(*2*)." Def.'s Mot. 1 (emphasis added). The Court assumes that the District instead seeks "entry of judgment as a matter of law" in its favor under Federal Rule of Civil Procedure 50(b)(*3*). *See* Fed. R. Civ. P. 50(b)(3).

**JA 204**

no reasonable jury could find for Dr. Campbell on the facts presented. *See* Def.'s Mem. 5–8. The

Court addresses each argument in turn.

> 1. Whether Evidence Presented at Trial Was Sufficient to Sustain the Verdict

The District first argues that it should receive judgment as a matter of law because, at

trial, Dr. Campbell "did not present any evidence that the fact of the termination [of her

employment] caused her damages." Def.'s Mem. 5. Without that evidence, the District contends

that Dr. Campbell's stigma-based constitutional claim "is . . . nothing more than a reputation-plus

claim in disguise." *Id.*[2] The District appears to believe that Dr. Campbell therefore could not

have received a favorable verdict, given that she did not prevail at trial on her "reputation-plus"

claim. *See* Def.'s Mem. 5 (arguing that the "reputation-plus claim . . . , as the jury found, is

untenable"); Verdict Form 1–2 (showing that the jury found against Dr. Campbell on her

reputation-plus claim).

But the District misunderstands the "stigma or disability" theory of claims alleging that a

government's actions deprived an individual of her constitutionally protected liberty interest in

pursuing a chosen profession. As the Court already articulated in ruling on the District's

summary judgment motion, "the 'stigma or disability' theory hinges not on 'official *speech*, but

on a continuing stigma or disability arising from official *action*.'" *Campbell v. District of

Columbia*, 126 F. Supp. 3d 141, 153 (D.D.C. 2015) (quoting *O'Donnell v. Barry*, 148 F.3d 1126,

1140 (D.C. Cir. 1998)). If government action seriously affects or destroys a plaintiff's ability to

---

[2] The law contemplates two ways in which a government can deprive an individual of her liberty interest in pursuing a chosen profession. *See generally Bd. of Regents v. Roth*, 408 U.S. 564, 572–75 (1972). The first is reputation-based and arises when a government makes a charge against an individual "that might seriously damage [her] standing and associations in the community." *See id.* at 573. The second is stigma-based and arises when the government imposes on the individual "a stigma or other disability" that forecloses her "freedom to take advantage of other employment opportunities." *See id.* at 573–74.

**JA 205**

pursue her chosen profession, or substantially reduces the value of her human capital, then that action infringes a constitutionally protected liberty interest. *See O'Donnell*, 148 F.3d at 1141. To prevail under the "stigma or disability" theory, of course, the plaintiff must also show that the harm she suffered "occurred in conjunction with, or flowed from, some tangible change in status," such as an adverse employment action. *Id.* But the plaintiff need not show that the harm flowed *solely* from that tangible change in status. *See id.*

Thus, here, the Court may not disturb Dr. Campbell's verdict if she presented evidence showing that (1) the District's actions seriously affected her ability to pursue her chosen profession or substantially reduced the value of her human capital, and (2) the consequences of the District's actions "occurred in conjunction with, or flowed from," her termination. *See O'Donnell*, 148 F.3d at 1140–41. The law did not require Dr. Campbell to present evidence that her termination, standing alone, seriously affected her ability to pursue her chosen profession or substantially reduced the value of her human capital. *Contra* Def.'s Mem. 5. By arguing that Dr. Campbell had to present such narrowly tailored evidence, the District improperly merges two independent requirements for a successful "stigma or disability" claim: (1) government actions from which the plaintiff's harm flowed, and (2) an adverse employment action that occurred in conjunction with, or created, the harm. *See O'Donnell*, 148 F.3d at 1140–41; *cf.* Def.'s Mem. 5.

Disregarding the District's inaccurate view of the law, the Court is satisfied that Dr. Campbell presented sufficient evidence on which a reasonable jury could return a verdict for Dr. Campbell on her "stigma or disability" claim. District officials stated at trial that they allowed a reporter to view internal District e-mails that discussed Dr. Campbell, the allegations made against her, and how the District anticipated terminating Dr. Campbell in response to those

7

**JA 206**

allegations.[3] And Wayne Turnage, Dr. Campbell's former supervisor and the Director of the

District's Department of Health Care Finance, stated that he corresponded with that reporter

about e-mails concerning Dr. Campbell and the allegations made against her. *See* Dec. 9, 2015

Trial Tr. 30:1–36:9, 63:14–68:2.

Based on this trial testimony, a reasonable jury could conclude that, by sharing and

discussing e-mails with a reporter, the District facilitated the publication of media articles about

Dr. Campbell's termination and the allegations surrounding it. *See* Pl.'s Opp'n Def.'s Mot. J.

Matter of Law Exs. 20, 21, ECF Nos. 89-20, 89-21 [hereinafter Pl.'s Opp'n Exs. 20, 21]

(reproducing the *Washington City Paper*'s and *The Washington Post*'s articles about

Dr. Campbell); *see also* Dec. 7, 2015 Trial Tr. 34:15–38:18, 46:24–49:24, ECF No. 79 (moving

both articles into evidence at trial). And based on Dr. Campbell's testimony at trial, a reasonable

jury could further conclude that those media articles seriously affected Dr. Campbell's ability to

pursue her chosen profession. *See* Dec. 8, 2015 Trial Tr. 55:17–57:7, ECF No. 80 (stating that

Dr. Campbell was out of work for "[t]wo years," and that, even though Dr. Campbell tried to

find work as an independent consultant, "[n]o one really wanted to deal with [her] because of the

newspaper article"). Dr. Campbell therefore presented sufficient evidence from which a jury

could conclude that the District's actions seriously affected Dr. Campbell's constitutionally

protected liberty interest in pursuing her chosen profession.

---

[3] The District's Director of Communications, Pedro Ribeiro, stated that after he received a reporter's inquiry about Dr. Campbell, he "talked to the mayor's chief of staff," obtained e-mails about Dr. Campbell, and "shared them with the reporter." Dec. 8, 2015 Trial Tr. 76:20–77:12, 78:15–91:6. And the Chief of Staff for the Mayor of the District of Columbia, Christopher Murphy, stated that he gave Mr. Ribeiro e-mails about Dr. Campbell's employment status so that Mr. Ribeiro could "shar[e] with the reporter from the City Paper what had happened, [and] what was going on." *Id.* at 114:18–115:24, 117:12–119:19.

8

**JA 207**

Trial testimony also indicated that the effects of the District's actions occurred in conjunction with Dr. Campbell's termination. The District placed Dr. Campbell on administrative leave about three days before its Director of Communications spoke with a reporter about her. *Compare* Dec. 8, 2015 Trial Tr. 41:6–10 (stating that the District placed Dr. Campbell on administrative leave on June 4), *with id.* at 78:15–79:3 (stating that the Director of Communications spoke with reporter Alan Suderman around June 7). And the District terminated Dr. Campbell's employment just one day after her former supervisor corresponded with that reporter. *Compare* Dec. 8, 2015 Trial Tr. 64:21–22 (stating that the District terminated Dr. Campbell's employment on June 11, 2012), *with* Dec. 9, 2015 Trial Tr. 67:13–24 (stating that Mr. Turnage emailed Mr. Suderman on June 10). And the media articles about Dr. Campbell surfaced the day of and the day after the District terminated her employment. *See* Pl.'s Opp'n Exs. 20, 21. Evidence presented at trial was hence sufficient for a reasonable jury to find (1) government actions from which Dr. Campbell's harm flowed, and (2) an adverse employment action that occurred in conjunction with the harm. Because Dr. Campbell's evidence was thus sufficient to establish a successful "stigma or disability" claim, *see O'Donnell*, 148 F.3d at 1140–41 (discussing the requirements for "stigma or disability" claims), the Court lacks any reason to set aside the jury's verdict.

The District cites cases to support its view of the matter, *see* Def.'s Mem. 5–7, but those cases do not change the Court's conclusion. The District's cases merely indicate that a termination, standing alone or in conjunction with *unpublicized* statements about the plaintiff, cannot infringe the plaintiff's liberty interest in pursuing her chosen profession. *See Bishop v. Wood*, 426 U.S. 341, 348 (1976) (holding that the plaintiff was not deprived of any liberty interest in a case in which "there is no public disclosure of the reasons for the discharge");

9

**JA 208**

*Simpkins v. Sandwich Cmty. Hosp.*, 854 F.2d 215, 217–18 (7th Cir. 1988) (same, in a case in which the plaintiff did not allege "that the defendants publicized her suspected failure to account for drugs"); *Haimowitz v. Univ. of Nev.*, 579 F.2d 526, 529 (9th Cir. 1978) (same, in a case in which the plaintiff did not allege "that the [defendant] in any way publicized false, defamatory, or stigmatizing statements about him"); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 574 & n.13 (1972) ("Mere proof . . . that [the plaintiff's] record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure opportunities amounting to a deprivation of 'liberty.'"); *Bollow v. Fed. Res. Bank of S.F.*, 650 F.2d 1093, 1101 (9th Cir. 1981) ("Unpublicized accusations do not infringe constitutional liberty interests . . . ."). Those cases do not address situations like Dr. Campbell's, in which *publicized* statements flowed from government action and affected Dr. Campbell's ability to pursue her chosen profession. Even if the District did not itself publicize the allegations surrounding Dr. Campbell's termination, it did take *actions* that led to the allegations' publication. As discussed above, based on the evidence presented at trial, a reasonable jury could conclude that those actions, in conjunction with Dr. Campbell's termination, seriously affected Dr. Campbell's constitutionally protected right to pursue her chosen profession. Because the District's cited cases rely on different underlying facts, they provide no reason to set aside Dr. Campbell's jury verdict.[4]

---

[4] The Court does not quarrel with the District's assertions that "the liberty-interest protection should not be further expanded," Def.'s Mem. 6, and that "[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions," *id.* at 7 (quoting *Bishop v. Wood*, 426 U.S. 341, 359 (1976)).

The Court's conclusions here, however, rely on the pre-existing principles that "[t]he Constitution protects an individual's 'right to follow a chosen trade or profession' without governmental interference" and that "[g]overnment action that has the effect of 'seriously affecting, if not destroying' a plaintiff's ability to pursue [her] chosen profession, or

**JA 209**

2.  Whether a Reasonable Jury Could Find that the District's Actions Precluded Dr. Campbell
from a Sufficiently Broad Range of Employment Opportunities

The District's alternative argument for judgment as a matter of law also lacks merit. In arguing that "[n]o reasonable jury could find that [Dr. Campbell's] termination broadly for[e]closed her ability to practice in her chosen field," Def.'s Mem. 7, the District merely restates unsuccessful arguments it made in previous motions. In making its arguments, the District appears to present two implicit challenges to the jury's verdict: (1) a two-year period of unemployment or underemployment is insufficient to establish an actionable liberty deprivation, and (2) during her two-year period of unemployment or underemployment, Dr. Campbell's temporary work as a contractor means the District did not interfere with Dr. Campbell's ability to pursue her chosen profession. *See id.* at 7–8. The Court has already rejected both these challenges, and neither persuades the Court to change course now.

To the extent that the District argues that an actionable liberty deprivation must last longer than two years, the Court rejected the argument for "a bright-line minimum duration rule" in ruling on the District's motion for summary judgment, and the Court rejected it again at trial. *See Campbell v. District of Columbia*, 126 F. Supp. 3d 141, 154 (D.D.C. 2015); Dec. 8, 2015 Trial Tr. 182:25–186:6; Dec. 9, 2015 Trial Tr. 9:18–12:3. And, to the extent that the District argues that Dr. Campbell's temporary work during the two-year period precludes judgment in

---

'substantially reducing the value of [her] human capital,' . . . infringes a liberty interest." *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998) (brackets and citations omitted) (first quoting *Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995); and then quoting *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994)). Thus, if a government employer's personnel decisions seriously affect a plaintiff's ability to pursue her chosen profession or substantially reduce the value of her human capital, *O'Donnell*, 148 F.3d at 1141, then, unless she receives constitutionally adequate procedures, the plaintiff has a viable procedural due process claim against her government employer.

# JA 210

her favor, the Court also rejected that argument at trial. *See* Dec. 10, 2015 Trial Tr. 137:8–140:1;

Dec. 11, 2015 Trial Tr. 7:13–20, ECF No. 92.

The Court declines to reopen the law of the case as set forth in these previous rulings. *See*

*generally Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) (explaining that "[t]he law-of-

the-case doctrine . . . 'expresses the practice of courts generally to refuse to reopen what has been

decided,' but it does not 'limit courts' power . . .'" (quoting *Messenger v. Anderson*, 225 U.S.

436, 444 (1912))). The Court properly submitted to the jury the question of whether the District's

actions precluded Dr. Campbell "from such a broad range of opportunities" that the District's

actions interfered with her constitutionally protected right to follow a chosen trade or profession.

*See Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995) (discussing the "broad

range of opportunities" that, to allege a stigma-based procedural due process claim, the plaintiff

must show that she lost). A reasonable jury could have found either for or against Dr. Campbell

on that issue. *See generally Williams v. Johnson*, 776 F.3d 865, 869–70 (D.C. Cir. 2015) ("The

jury performs its quintessential function when it decides the magnitude of a misdeed."). The

Court therefore declines to enter judgment as a matter of law in the District's favor.

## IV.  REQUEST TO REDUCE THE JUDGMENT

### A.  Legal Standard

Within its motion for judgment as a matter of law under Federal Rule of Civil Procedure

Rule 50(b), the District also asks the Court to "reduce the judgment to the $250,000 awarded by

the jury," Def.'s Mem. 8–9, because "the Court added $304,823 in back pay to [Dr. Campbell's]

recovery despite the fact that [she] presented no evidence that the alleged stigma caused her loss

of income," Def.'s Mot. J. 1. But even though the District styles its request as one under Rule

50(b), the District never made its request before the jury rendered its verdict. *See Exxon Shipping*

# JA 211

*Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("A motion under Rule 50(b) is not allowed unless

the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to

the jury."); *supra* Part III.A (discussing the legal standard for motions under Rule 50(b)).

Accordingly, because the District's request is, in essence, a request to alter or amend a judgment

under Rule 59(e), the Court analyzes it under Rule 59(e)'s legal standard. *See* Fed. R. Civ. P.

59(e) (allowing parties to file a "motion to alter or amend a judgment . . . no later than 28 days

after the entry of the judgment").

Rule 59(e) motions "need not be granted unless the district court finds that there is an

intervening change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent manifest injustice." *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004)

(quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). Such motions cannot be

used as "an opportunity to reargue facts and theories upon which a court has already ruled, nor as

a vehicle for presenting theories or arguments that could have been advanced earlier." *Estate of

Gaither ex rel. Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (quoting

*SEC v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010)). "The burden is on the moving party to

show that reconsideration is appropriate and that harm or injustice would result if reconsideration

were denied." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp.

2d 258, 268 (D.D.C. 2012) (placing the burden on the movant in the context of a Rule 54(b)

motion for reconsideration); *see Kittner v. Gates*, 783 F. Supp. 2d 170, 172 (D.D.C. 2011) (same,

for motions under Rules 59(e) and 60(b)).

## B.  Analysis

In seeking a reduction of the judgment, the District begins from an incorrect premise: that

the Court's award of $304,823 in financial damages was "back-pay." *See* Def.'s Mem. 8. But, in

## JA 212

their pretrial stipulations, the parties themselves characterized the $304,823 as Dr. Campbell's

"lost wages relating to her claims," Joint Pretrial Statement 2, ¶ III.2, and the Court accordingly

awarded Dr. Campbell that amount in "financial damages," *see Campbell v. District of*

*Columbia*, No. 12-1769, 2016 WL 247560, at *2 (D.D.C. Jan. 20, 2016).

In cases alleging procedural due process violations under 42 U.S.C. § 1983 and monetary

harm flowing from those violations, financial damages like those awarded here may be

appropriate. "[T]he basic purpose of a § 1983 damages award should be to compensate persons

for injuries caused by the deprivation of constitutional rights." *Farrar v. Hobby*, 506 U.S. 103,

112 (1992) (quoting *Carey v. Piphus*, 435 U.S. 247, 254 (1978)). Because § 1983 creates "a

species of tort liability," damages are "ordinarily determined according to principles derived

from the common law of torts." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–06

(1986) (internal quotation marks omitted) (quoting *Carey*, 435 U.S. at 253). And because

damages in tort cases seek to compensate the plaintiff for harms caused by the defendant's

breach of duty, compensatory damages in § 1983 cases may include compensation for both

"monetary harms" and emotional harm. *Id.* at 307. Thus, here, because Dr. Campbell prevailed

on a constitutional claim under § 1983, she was entitled to an award of damages to compensate

her for any monetary harms she suffered because of the District's constitutional violation.

Of course, in a typical case, a § 1983 plaintiff must still prove her damages. *See Carey*,

435 U.S. at 263–64 (holding that, for procedural due process claims brought under § 1983, the

plaintiff must convince the factfinder that the plaintiff actually suffered harm "because of the

denial of procedural due process itself"). But here, because the District stipulated to

Dr. Campbell's lost wages, Dr. Campbell agreed not to call witnesses to corroborate her damages

claims at trial. *See* Pl.'s Schedule of Witnesses 5, Joint Pretrial Statement Attach. 1, ECF

No. 41-1 ("The District agreed to the stipulations about Plaintiff's earnings . . . because of [Dr. Campbell's] representation that she would not be calling these witnesses at trial."); Nov. 30, 2015 Order 2, ¶ I.4 ("In light of the stipulation about Ms. Campbell's lost wages, . . . Ms. Campbell agreed not to call these witnesses at trial."). Because a stipulation is an express waiver "conceding for the purposes of trial the truth of some alleged fact . . . so that the one party need offer no evidence to prove it and the other is not allowed to disprove it," Dr. Campbell did not need to present evidence establishing her financial damages or evidence linking those damages to her constitutional claims. *See United States v. Harrison*, 204 F.3d 236, 240 (D.C. Cir. 2000) (internal quotation marks omitted) (quoting *Vander Linden v. Hodges*, 193 F.3d 268, 279 (4th Cir. 1999)).

The District therefore cannot argue that "[n]o evidence was presented at trial showing that [Dr. Campbell's] lost wages were a result of the lack of due process in connection with her termination." Def.'s Mem. 8. As the Court has already noted, "[t]he District's objection that a portion of [Dr. Campbell's] damages should not be attributed to the District's constitutional violation came far too late in the proceedings to disavow the prior concession upon which the trial presentation proceeded." *Campbell*, 2016 WL 247560, at *2 n.1. Unless the Court sets aside the parties' pretrial stipulation, no reason exists to reduce the judgment in accordance with the District's request.[5]

---

[5] Furthermore, though the evidence at trial did not touch on the *amount* of Dr. Campbell's financial damages, the evidence did show that her financial damages (in the form of lost wages) flowed from the District's actions. *See* Dec. 8, 2015 Trial Tr. 55:17–57:7 (describing how Dr. Campbell struggled for two years to find work "because of the newspaper article" that reported on why she was terminated); *supra* Part III.B.1 (explaining how a reasonable jury could find, based on trial testimony, that the District's actions led to the newspaper article's publication). Thus, the District is simply incorrect when it alleges that "[n]o evidence was presented at trial showing that [Dr. Campbell's] lost wages were a result of the lack of due process in connection with her termination." Def.'s Mem. 8.

**JA 214**

A court may set aside a pretrial stipulation only "to prevent manifest injustice." *Coop.*

*Servs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 562 F.2d 1292 (D.C. Cir. 1977) (per curiam)

(internal quotation marks omitted) (quoting Fed. R. Civ. P. 16(e))). In an attempt to meet this

standard, the District mentions that it stipulated to Dr. Campbell's lost wages when

Dr. Campbell's WPA claim "was still part of the case." Def.'s Mem. 8. But the District does not

allege that the Court should have interpreted the stipulation as valid only for purposes of

Dr. Campbell's WPA claim. *See id.* The District has therefore waived that argument. *See*

*Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[U]ndeveloped arguments . . . are

deemed waived."). Furthermore, nothing in the preverdict record indicates that the District

intended its stipulation to apply to only Dr. Campbell's WPA claim. *See* Joint Pretrial Statement

2, ¶ III.2 ("The amount of Plaintiff's lost wages relating to her *claims* is $304,823." (emphasis

added)); Pl.'s Schedule of Witnesses 5 (discussing "the stipulations about [Dr. Campbell's]

earnings" without referencing Dr. Campbell's WPA claim in particular).

The District also alludes to an argument that "the parties cannot stipulate to an incorrect

legal finding" and that "as a matter of law the remedy for a due process claim is a name clearing

hearing." Def.'s Reply Pl.'s Opp'n Def.'s Mot. 2, ECF No. 95 [hereinafter Def.'s Reply]; *see*

*also* Def.'s Mem. 8–9 (arguing that "the proper remedy is a name clearing hearing"). But

because the District waited until after trial to raise it, the District has waived this argument also.

*See generally Estate of Gaither ex rel. Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 10

(D.D.C. 2011) (explaining that Rule 59(e) motions cannot be used as "as a vehicle for presenting

theories or arguments that could have been advanced earlier" (quoting *SEC v. Bilzerian*, 729 F.

Supp. 2d 9, 14 (D.D.C. 2010))). Indeed, at the September 10, 2015 status conference in this case,

the Court raised the very issue of whether anything "limits a plaintiff['s remedy] to just the

**JA 215**

process that [was] denied." At the status conference, the Court invited the District to submit briefing on this issue before trial, but it did not. Having declined to brief this issue before trial, the District cannot now use its post-trial motion to make an argument "that could have been advanced earlier." *Estate of Gaither*, 771 F. Supp. 2d at 10 (quoting *Bilzerian*, 729 F. Supp. 2d at 14). The Court therefore disregards the District's assertion that a name-clearing hearing, to the exclusion of lost wages or other financial damages, is "as a matter of law the remedy for a due process claim." Def.'s Reply 2.

The District has not otherwise argued that the Court must set aside the parties' pretrial stipulation about Dr. Campbell's lost wages to prevent manifest injustice. *See* Def.'s Mem. 8–9. Accordingly, because "valid stipulations entered into freely and fairly . . . should not be lightly set aside," *United States v. Kanu*, 695 F.3d 74, 78 (D.C. Cir. 2012) (internal quotation marks omitted) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 617 (3d Cir. 1998)), the Court will hold the District to its stipulation. The Court declines to reduce the judgment by $304,823.

## V.  CONCLUSION

For the foregoing reasons, the District's Motion for Judgment as a Matter of Law (ECF No. 83) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 25, 2016                                 RUDOLPH CONTRERAS
                                                     United States District Judge

**JA 216**

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA
2

3    JENNIFER B. CAMPBELL,          ) Civil Action
                                    ) No. 12-1769 (RC)
4                Plaintiff,         ) EXCERPT TRANSCRIPT OF
                                    ) JURY TRIAL-DAY 1
5    vs.                            ) (Proceedings beginning
                                    ) with Opening Statements)
6    DISTRICT OF COLUMBIA,          )
                                    ) Washington, DC
7                Defendant.         ) Date:  December 7, 2015
                                    ) Time:  4:00 p.m.
8    _____

9        EXCERPT TRANSCRIPT OF JURY TRIAL-DAY 1
         (Proceedings beginning with Opening Statements)
10                    HELD BEFORE
       THE HONORABLE JUDGE RUDOLPH CONTRERAS
11            UNITED STATES DISTRICT JUDGE
     _____

12                  A P P E A R A N C E S

13   For the Plaintiff:      Alan Lescht, Esq.
                             Sara Nunley McDonough, Esq.
14                           Sara B. Safriet, Esq.
                             Alan Lescht & Associates, PD
15                           1050 17th Street, NW, Suite 400
                             Washington, DC  20036
16                           202-463-6036

17   For the Defendant:      Sarah L. Knapp, Esq.
                             Alex Karpinski, Esq.
18                           Office of the Attorney General for
                             the District of Columbia
19                           441 4th Street, NW, Suite 630 Main
                             Washington, DC  20001
20                           202-724-6528

21

     Proceedings reported by machine shorthand, transcript produced
22   by computer-aided transcription.
     _____

23   Court Reporter:         Annette M. Montalvo, CSR, RDR
                             Official Court Reporter
24                           United States Courthouse, Room 6722
                             333 Constitution Avenue, NW
25                           Washington, DC  20001
                             202-354-3111

2

1                              INDEX

2                                                      PAGE

3      OPENING STATEMENT ON BEHALF OF THE PLAINTIFF        3

4      BY MR. LESCHT                                      3

5

6      OPENING STATEMENT ON BEHALF OF THE DEFENDANT       17

7      BY MS. KNAPP                                       17

8

9

10     JENNIFER CAMPBELL                                  26

11     DIRECT EXAMINATION                                 27

12     BY MR. LESCHT                                      27

13

14

15

16   EXHIBITS                                         RECEIVED

17     Plaintiff Exhibit 1                              30

18     Plaintiff Exhibit 7                              35

19     Plaintiff Exhibit 8                              47

20

21

22

23

24

25

1  that Turnage was concerned that Campbell attempted to steer

2  part of a pending contract to create a health care exchange to

3  Darryl Wiggins.

4        Again, that's true.  Mr. Turnage was concerned about

5  that and the allegations that led him to believe that.

6        And then, finally, the last quote is:  I have been

7  told that it is widely known that Jennifer Campbell has been

8  meeting with minority vendors in an effort to put together a

9  team that would submit a bid as prime for the insurance

10 exchange, Turnage wrote Gray administration officials.

11 Moreover, there are allegedly persons shopping themselves to

12 minority business owners, stating that they have contacts in

13 DHCF contracting office that will ensure a successful bid if

14 they partner with the right person.

15       Again, this is true.  It was alleged to Wayne

16 Turnage, and that's what he was reporting.  He was reporting

17 the allegations.  He doesn't say at any point that these

18 allegations are true.  And not only were these statements

19 accurate, they are not as damaging to Ms. Campbell as she

20 would have you believe.

21       Ms. Campbell was not unemployed for long, and, in

22 fact, within months of her termination, she was working on

23 contracts related to health care and health care financing.

24 Less than two years later -- actually, she was terminated in

25 May -- or, I'm sorry, in June, and by May, two years later,

1  she had a job with a major health care consulting company

2  where she was making $140,000 a year, almost as much as she

3  had been making with the District of Columbia government.  And

4  now she's making as much money as she was when she was working

5  with the District.

6          So as I explained earlier, the evidence will show

7  that Ms. Campbell was fired because there were credible

8  allegations that were made against her, and these allegations

9  made it impossible for her to stay on as a high-ranking

10  District of Columbia employee.

11          The evidence will also show that no one within the

12  District of Columbia government leaked a story to the media.

13  Instead, city officials provided truthful information to a

14  reporter who already knew that something was going on.

15          Mr. Karpinski and I look forward to presenting this

16  evidence to you, and thank you very much for your service.

17          THE COURT:  Thank you.

18          Are you ready to present your first witness?

19          MR. LESCHT:  Yes.  We call Dr. Jennifer Campbell.

20          THE COURTROOM DEPUTY:  Please raise your right hand.

21          (WHEREUPON, the witness was duly sworn.)

22          THE COURT:  Good afternoon.

23          THE WITNESS:  Good afternoon, Your Honor.

24                  JENNIFER CAMPBELL,

25  called as a witness herein by the Plaintiff, having been first

 1  duly sworn, was examined and testified as follows:

 2                      DIRECT EXAMINATION

 3  BY MR. LESCHT:

 4  Q    Dr. Campbell, let's get right to it.  Tell us what

 5  happened the day you found out you were going to get fired.

 6  A    The day I found out I was going to get fired was -- the

 7  day started around 9:00 a.m.  I received a call from Melisa

 8  Byrd, who is the chief of staff for the Department of Health

 9  Care Finance, and she stated that the meeting that we were

10  supposed to have that evening, we had a 6:00 p.m. meeting

11  scheduled, that we would not -- we would no longer have that

12  meeting, and she wanted, in her words, to give me a heads up

13  that an article was coming out that would outline the fact

14  that I am going to be terminated, with cause.

15            I asked her for the specifics, because, to date,

16  between being on administrative leave on the 4th and getting

17  this call on the 11th, I still had not been told what the

18  allegations were.  She gave me the option -- she did say they

19  had a formal termination letter.  She gave me the option of

20  coming in to receive it at another date, or for her to send it

21  to me and overnight it.  So I received the official

22  termination letter either by FedEx or by UPS the next day.

23  Q    That would have been June 11?

24  A    I received the call on June 11.  I received the actual

25  letter on June 12.

CAMPBELL - DIRECT - LESCHT                                    28

1   Q    Now, you heard Ms. Knapp say that this person was trying
2   to reach you.  Did she ever e-mail you?
3   A    No, she never e-mailed me.
4   Q    Didn't she have your e-mail?
5   A    She had my e-mail.
6   Q    Did she text you?
7   A    No, she never sent me a text.
8   Q    Didn't she have your cell phone number?
9   A    Yes, she did.
10           THE COURT:  Mr. Lescht, could you come to the
11  podium, please.
12  BY MR. LESCHT:
13  Q    So going back to that day --
14  A    Yes.
15  Q    -- you get the call to let you know you are going to be
16  fired.  You didn't get the termination letter e-mailed to you,
17  right?
18  A    No, I did not.
19  Q    And she didn't fax it to you?
20  A    No, she did not.
21  Q    So you hadn't seen it?
22  A    No.
23  Q    What's the next call you get?
24  A    The next call I get, actually after reading the
25  Washington City Paper article, was a call from -- I believe

1    Tim Craig is the author of the Washington Post article.

2    Q    Did you pick up the phone?

3    A    Not the first couple of times he called.  I did not

4    recognize the number, but he left a message.

5    Q    And did you call him back?

6    A    I eventually did.  It took me a while to determine

7    whether it was a good idea or not.  But to that point, no one

8    had asked me my side, so I figured I should call him back, and

9    maybe I would have an actual opportunity to give my side.

10   Q    Okay.  So what did he tell you when you called him back?

11   A    He said that he was in receipt of e-mails that had been

12   exchanged between the mayor's office and Wayne Turnage, and he

13   wanted to know my -- he asked me more specific questions.  It

14   was, "Are these allegations true," and I said, absolutely not.

15   Q    Now, at that point, had you seen these e-mails?

16   A    At that point -- well, in the City Paper article that

17   morning, yes.

18   Q    You had seen quotes from it?

19   A    I saw quotes, correct.

20   Q    But up to that point that you are on the phone with

21   Craig, had you seen the actual e-mails?

22   A    No, I had not seen --

23   Q    And had Mr. Turnage called and said -- told you what

24   these allegations were?

25   A    No.  I have not spoken to Mr. Turnage since probably the

CAMPBELL - DIRECT - LESCHT                              30

1   first, the Friday before all of this happened.

2   Q    Now, is it true that you had been employed by the

3   District for about four years at that time?

4   A    A little over four years.  I began with the District as

5   of April of 2008.

6   Q    And is it true that you had been promoted about a month

7   earlier?

8   A    Yes.  My promotion was effective May 7, and I was put on

9   administrative leave June 4.

10  Q    Now, what was the job that you were promoted to?

11  A    Chief operating officer of the agency of the department.

12  Q    Take a look at Plaintiff Exhibit 1.  Is this your resume?

13  A    Yes, this is my resume.

14  Q    And does this reflect the jobs that you performed for the

15  District?

16  A    Yes, it does.

17          MR. LESCHT:  Your Honor, we move for Exhibit 1 to be

18  admitted.

19          THE COURT:  Any objection?

20          MS. KNAPP:  No, Your Honor.

21          THE COURT:  It is admitted.

22          (Plaintiff Exhibit 1 was received in evidence.)

23  BY MR. LESCHT:

24  Q    Now, what was the job that you were promoted to?

25  A    The chief operating officer of the agency.

1   Q    And what did that job require you to do?

2   A    I was responsible for day-to-day operations of the

3   agency.  There were about seven departments -- yes.  Seven

4   departments that reported to me, and one of them was the

5   health reform and innovation administration.

6   Q    Okay.  So before we get to the allegations in the

7   articles, explain to the jury what we have been talking about

8   with this Phase 1 and Phase 2 and the roll out of ObamaCare.

9   What was it that were you doing, and what was the District

10  doing that provides context to what we're talking about in

11  this case?

12  A    Sure.

13       So in 2010, the Affordable Care Act was passed.  It

14  had and it still is being rolled out as we speak.  It was

15  purposely written so that certain portions would be rolled out

16  in certain years.  So the states had to choose to either have

17  their own exchange or to use the federal exchange, and the

18  states had to make the decision by 2012.  So there were a

19  series of grants that were awarded to states in order to

20  either do the research to determine whether they wanted to

21  have the exchange and to assess their readiness, and then

22  there were a couple of other grants that were around planning,

23  and then the very last one was the largest bucket of money, if

24  you will, and that was around the implementation.  And that

25  was largely IT, because part of what the Affordable Care Act

1   calls for is that there's supposed to be a one-stop shop or

2   one -- a single application that would help consumers and

3   citizens to enroll in all health care and human services

4   related programs.

5   Q    What was your job in relation to that endeavor?

6   A    I came on -- before I was chief operating officer, I was

7   director of that department.  So director of the health reform

8   and innovation administration.  And at that point, we were

9   awarded the smaller contract to determine our readiness, and

10  so I had to build the team that would write the subsequent two

11  grants, and then we also basically built the infrastructure of

12  what now is the health benefit exchange for the District of

13  Columbia.

14  Q    Would you explain what's meant by Phase 1 and Phase 2?

15  A    Sure.  So Phase 1 was the planning phase that I was

16  explaining.  So that was once a state determined that they

17  wanted to stand up, which is the language used, to stand up

18  their own exchange and not necessarily use the federal

19  exchange, the state could apply for the second grant, which

20  was considered a Phase 1 grant, Phase 1 of basically

21  implementing the state-based exchange.

22         And so the Phase 1 was planning.  And so it had a

23  lot to do with bringing together all of the entities that

24  would need to have portions completed in order for the

25  establishment to even happen.

CAMPBELL - DIRECT - LESCHT                     33

1   Q    Was a contract awarded for Phase 1?

2   A    Yes.  A contract was awarded.

3   Q    And what was the value of that contract?

4   A    That contract was, I believe, a little over a million.

5   Q    And what about the Phase 2?  What was the value of that

6   contract?

7   A    Phase 2 was in excess of 70 million.

8   Q    So when was Phase 1 awarded?

9   A    Phase 1 was awarded in April sometime.

10  Q    April of 2012?

11  A    Of 2012, yes.

12  Q    So that's about two months before the Loose Lips article

13  comes out; is that right?

14  A    Correct.

15  Q    And who was Phase 1 awarded to?

16  A    It was awarded to Compass.

17  Q    And did Compass joint venture with Cedric Simon before

18  you got the allegations made?

19  A    My understanding is that they did, because the bid that

20  was submitted had Cedric Simon's name on it.

21  Q    And what was the amount of money that Compass' joint

22  venture partner, which was Carrie Brooks-Brown Consulting,

23  what was the amount of money she was going to earn under the

24  contract?

25  A    We are not privy to that.  We just know the total

CAMPBELL - DIRECT - LESCHT                              34

1   contract amount, and however they spend it, they spend it.

2   Q    Is it correct that before these allegations came out,

3   that Compass had set in place its own apparatus to fulfill the

4   contract, and by fulfilling it, they had hired Cedric Simon

5   and Carrie Brooks-Brown?

6   A    Yes.  Both bids that we received, part of the requirement

7   was to list all subject matter experts and anyone that would

8   be playing a pivotal role in that contract.

9   Q    And had Compass identified Carrie Brooks-Brown and Cedric

10  Simon in that contract?

11  A    Yes, they were included on the bid that they submitted,

12  the proposal.

13  Q    Now, did you tell Compass to hire Cedric Simon?

14  A    No.  I never even heard of Compass.

15  Q    Now, let's turn to Plaintiff Exhibit 7.

16       This is the Loose Lips article?

17  A    Yes.

18  Q    In reading this article, was this the first time you saw

19  in black-and-white the allegations that were made against you?

20  A    Yes, it is.

21       MR. LESCHT:  Your Honor, we move for admission.

22       THE COURT:  Any objection?

23       MS. KNAPP:  Your Honor, I have no objection to the

24  article; however, there are a couple of pages --

25       THE COURT:  The comments.

1          MS. KNAPP:  -- that are --

2          THE COURT:  I agree, remove the comments before they

3    are submitted to the jury.

4          MR. LESCHT:  Okay.

5          (Plaintiff Exhibit 7 was received in evidence.)

6    BY MR. LESCHT:

7    Q    So let's take a look at this now, Dr. Campbell.

8          Again, when you read this article, was this the

9    first time you had seen the allegations made against you?

10   A    Yes.  This is the first time.

11   Q    Prior to reading this article on June 11, had you ever

12   been given the opportunity to confront these allegations with

13   anyone that you worked for?

14   A    No, I had not.

15   Q    So when the District said that Wayne Turnage was trying

16   to get a meeting with you, is that true?

17   A    That's not true.

18   Q    Did you, yourself, actually ask for the opportunity to

19   confront these?

20   A    I did, on the day that I had the meeting with Ms. Byrd,

21   and it was a representative from the department of human

22   resources, when they asked me to hand in my keys and all of --

23   anything that had to do with the District, and they sent me

24   home with the administrative leave letter.  When I got home, I

25   sent an e-mail from my personal address to Ms. Byrd requesting

*CAMPBELL - DIRECT - LESCHT*                                    36

1   a meeting.

2   Q    Now, taking a look at this article now, viewing this as

3   your opportunity, what is your response to these allegations?

4   A    They are absolutely not true.

5   Q    Let's take them one at a time.

6            Were you, to use Ms. Knapp's words, playing

7   favorites in the award of this contract?

8   A    No, I was not.

9   Q    Were you favoring one company over another?

10  A    No, I was not.

11  Q    Did you stand to gain financially or in any other way by

12  favoring one company over another?

13  A    No, absolutely not.

14  Q    You were working for Vincent Gray at the time, right?

15  A    Yes.

16  Q    And he had just promoted you to this position, right?

17  A    Yes.

18  Q    So did you have an interest to benefit Muriel Bowser's

19  friend at that time?

20  A    No.

21  Q    Did you have any reason to favor Darryl Wiggins?

22  A    No.

23  Q    Let's talk about why Compass complained to Wayne Turnage.

24  A    Okay.

25  Q    What is your belief?

1  A    I think they complained because they found out that there

2  was going to be a conflict of interest for them to bid on

3  Phase 3 -- or Phase 2 of the exchange.

4  Q    Now, would you explain what you mean by that?

5  A    So they were awarded it, as I mentioned, they were

6  awarded the Phase 2 contract.  What we found out --

7  Q    You mean the Phase 1 contract?

8  A    Phase 1.  I apologize.  I think of it in three parts.

9  But there were, as far as phases, the Phase 1 was planning,

10 Phase 2 was implementation.  The Phase 1 contract, which was

11 the planning one, they had already been awarded in April.

12 What we found out, just because all of this is really new to

13 everyone, including Mr. Turnage, was that anyone who worked on

14 Phase 1 could not bid or be a part of the bid for Phase 2.

15 Q    And who was it that made that decision?

16 A    The Office of Contracts and Procurement.

17 Q    And did you at any time mislead Compass to believe that

18 they could still bid on Phase 2 if they got Phase 1?

19 A    No.

20 Q    And was the decision that whoever got Phase 1 was

21 disqualified from bidding on Phase 2, was that made by you?

22 A    No.

23 Q    Who was it made by?

24 A    The direction was given by the Office of Contracts and

25 Procurement, and I assume it is somewhere in their policies

1  and procedures.

2  Q    Now, the allegation contained in the Loose Lips article

3  also states that you were trying to force CGI to partner with

4  Darryl Wiggins, a politically-connected owner of a company,

5  and it says:  Wiggins was a political advisor to former Mayor

6  Fenty and has been the chairman of all three of Ward 4 Council

7  Member Muriel Bowser's campaigns.

8        Were you trying to favor or give business to Darryl

9  Wiggins?

10  A    No.

11  Q    Did you and he discuss some sort of scheme where you were

12  going to get him into this Phase 2 contract?

13  A    No.

14  Q    Did you stand to gain financially from having Darryl

15  Wiggins get a contract?

16  A    No, not at all.

17  Q    Since this complaint came from CGI, what's your belief as

18  to why CGI would come up with this?

19  A    At the point that these allegations were made, my only

20  dealings with them was on another contract that they had been

21  selected for, but the contract had not been executed, and my

22  predecessor had not signed off on it before I assumed the

23  position of chief operating officer.

24        So it was essentially on my desk as the first thing

25  for me to do and to take care of in my new role as chief

1  operating officer, and I asked all of the parties who were now

2  reporting to me to come together and explain to me and just

3  provide background so we could move forward, because the work

4  needed to start, because as with all of our federal dollars,

5  there are timelines associated with it.

6          And when I reviewed it, I recognized that there were

7  some pieces that were not material that needed some changes,

8  but I wasn't really concerned about those.  But the main one

9  was that it was missing a liquidated damages clause, which is

10 typically standard in most DC contracts, especially related to

11 IT, deliverables, and especially related to anything that's

12 federally funded, it has a timeline associated with it.

13 Q    So when you got promoted, this contract was put on your

14 desk --

15 A    Yes.

16 Q    -- is that right?

17         And you say you identified a problem with it?

18 A    Yes.

19 Q    Did you articulate that problem to CGI?

20 A    I did not directly.  I actually worked with -- there was

21 a contract administrator, which was Dr. Payne, who had been

22 working with them since they were awarded the contract.  And

23 then we had an internal contracts administrator, who is a

24 contracts attorney that was assigned for the Department of

25 Health Care Finance.

1          So the two of them then started having conversations

2    with the Office of Contracts and Procurement to get this

3    language inserted.

4    Q    And what was CGI's response?

5    A    From the e-mails that I was either copied on or the

6    conversations, because I would ask for updates frequently of

7    who was now my staff, they were saying that CGI was pushing

8    back and did not want to insert the language.

9    Q    And how about, did you ever have any conversations with

10   your boss Turnage about this?

11   A    Yes, I did.

12   Q    And tell us about those conversations?

13   A    He would frequently come by my office and say, "What's

14   going on with the CGI contract," and/or, you know, "Where is

15   it," "What's happening with it," "Have you signed off on it,"

16   "Have they gotten started."

17         So I knew it was something that was kind of top of

18   mind for him.  And because I was new to this position, I

19   wanted to make sure I got it done, but I wanted to make sure I

20   got it done correctly.  So I did tell him that the only issue

21   that we are having now is that we need to insert the

22   liquidated damages language that was actually originally in

23   their bid, but somehow when it got to the contract was not

24   there anymore.

25   Q    And how many conversations on this subject did you have

1  with Turnage?

2  A    Numerous.  I am not sure how many.  I had several

3  verbally, and then maybe one or two e-mail exchanges as well.

4  Q    And what do you think he wanted you to do?

5  A    I think he wanted me to just sign it and move on.

6  Q    And what makes you say that?

7  A    The frequency with which he was asking me about it, and I

8  just got this feeling that he wasn't really concerned about

9  what was missing from it.  It just seemed to me that it was

10  just he wanted it done.

11  Q    Now, are there documents that reflect any e-mails you had

12  on this subject of the liquidated damages and your desire for

13  it to be included and the back and forth?

14  A    Yes.  Several.

15  Q    I refer you to Plaintiff Exhibits 25 through 30.  Are

16  these part of the e-mails?

17  A    Yes, they are.

18        MR. LESCHT:  Your Honor, we move for admission of 25

19  through 30.

20        THE COURT:  Any objection?

21        MS. KNAPP:  I need to take a minute to look at them

22  all.

23        THE COURT:  Of course.

24        MS. KNAPP:  25 through 30?

25        MR. LESCHT:  Yes.  There's 25 through 30.  I can

CAMPBELL - DIRECT - LESCHT                                    42

1   give you the other citations, 47 to 49, and 52 through 58, all

2   deal with the issue that we're talking about.  25 through 30,

3   47 through 49, and then 52 through 58.

4           MS. KNAPP:  Your Honor, I think we need to -- some

5   of them aren't e-mails that the plaintiff is copied on all of,

6   and we need to go through them one at a time.

7           THE COURT:  So you want the plaintiff to discuss

8   them one at a time?

9           MS. KNAPP:  Or we can go through them -- if he's not

10  planning on asking his client about them now, we can go

11  through them outside the court hours to make sure that they

12  are all things --

13          THE COURT:  Mr. Lescht, do you plan on going through

14  each one with your --

15          MR. LESCHT:  No.  The point I just wanted to make

16  was just to have them admitted so the jury would have them to

17  take them back.  I just wanted her to identify written

18  communications on this subject.  That was it.

19          THE COURT:  All right.  What would you like to do,

20  Ms. Knapp?

21          MS. KNAPP:  I think that we should -- before

22  admitting them, we should go through them and find out which

23  ones actually are this witness' e-mails, but we can do that

24  outside the court's time, if that's acceptable to the

25  plaintiff.

*CAMPBELL - DIRECT - LESCHT*                      43

1        THE COURT:  If you have any objection, let me know
2  first thing in the morning.  You still expect your witness to
3  resume tomorrow morning?
4        MR. LESCHT:  That's right.
5        THE COURT:  Okay.  Let me know before tomorrow
6  morning.
7        MS. KNAPP:  All right.  Thank you, Your Honor.
8  BY MR. LESCHT:
9  Q    Okay.  So, Dr. Campbell, going back to CGI?
10 A    Yes.
11 Q    You have identified this issue with liquidated damages?
12 A    Yes.
13 Q    All right.  Now, in the opening, Ms. Knapp stated that
14 Holli Ploog is going to testify that she got a call from you.
15 A    Okay.
16 Q    Now, according to Ms. Knapp, you told her that she needs
17 to contract with Darryl Wiggins.  Did you tell her that?
18 A    No, I did not.
19 Q    Did you tell her that she needed to contract with any
20 particular company?
21 A    No, I did not.
22 Q    Did you even care what company she was contracting with?
23 A    No, I did not.
24 Q    Why is it that CGI, this big multinational company, would
25 need to partner with another company?

*CAMPBELL - DIRECT - LESCHT*                              44

1  A    Originally it was a mayoral order around certified

2  business entities, which are basically defined as minority and

3  small businesses, and any contract that's over $250,000, if it

4  is awarded to a prime that is not a CBE, they must dedicate 35

5  percent of that dollar volume to a certified business

6  enterprise.

7  Q    Did you ever have a conversation with Holli Ploog about

8  that requirement?

9  A    Yes, I did, as well as Mr. Turnage.  We brought it up in

10 several different meetings with any vendor who had a question

11 about that.  It is now not a mayoral order, I believe it is

12 actually DC code now.

13 Q    Well, back in 2012, did you ever have a specific

14 conversation with Holli Ploog about CGI's need to comply with

15 that requirement?

16 A    Not -- yes, during a meeting.

17 Q    And what was said?

18 A    We said again, and I say "we" because actually

19 Mr. Turnage said it, and then I think he incorrectly said 30

20 percent and then I corrected him on 35, but it was, basically,

21 during a meeting that we had with CGI, there were a number of

22 DHCF members there, including myself, and they were expressing

23 that they are new to contracting with the District, and they

24 were unfamiliar with this requirement, and they were asking

25 for a little bit of clarification on it.  And Mr. Turnage

1    provided an answer, and he was saying that it's required 30

2    percent.  And I chimed in and said it is actually 35.  And

3    that was the extent of that conversation.  And they said that

4    they were in the process of vetting possible CBEs and had

5    expressed because they are new to the District, they weren't

6    really familiar with many.

7    Q    Did you ever get a call from her for a request that you

8    bend on that requirement?

9    A    I never did, but one of my staff members said that she

10   had --

11            MS. KNAPP:  Objection, Your Honor.  Hearsay.

12            THE COURT:  Hearsay.  Sustained.

13   BY MR. LESCHT:

14   Q    Did Holli Ploog ever ask you for suggestions on companies

15   that they could do business with to satisfy the 35 percent

16   minority participation?

17   A    No, she never asked me for suggestions.

18   Q    And you never offered any suggestions?

19   A    I never offered any suggestions.

20   Q    Where do you think she got the idea you were trying to

21   force her to do business with Darryl Wiggins?

22            MS. KNAPP:  Objection, Your Honor.

23            THE COURT:  Speculation.  Lay some foundation.

24   BY MR. LESCHT:

25   Q    Why is it that you think Holli Ploog complained about you

1    to your boss, that you were trying to force her company to do

2    business with Darryl Wiggins?

3                MS. KNAPP:  Same objection, Your Honor.

4                THE COURT:  Have you developed a theory as to why

5    that complaint came?

6                THE WITNESS:  Yes.

7                THE COURT:  What is that based on?

8                THE WITNESS:  Because I had not executed the

9    contract -- the first contract that they actually already had

10   been awarded.

11               THE COURT:  And why do you believe that?

12               THE WITNESS:  I believe that because it is the

13   only -- it is the only kind of, I guess, negative interaction

14   that I could have possibly had with them, and because it

15   had -- you know, I think that was a $10 million contract, so

16   there's definitely -- to me it felt that there would be a

17   reason for them to not be happy with me not signing that

18   contract.

19               THE COURT:  But did they ever express displeasure

20   directly to you?

21               THE WITNESS:  Directly to me, no.

22               THE COURT:  Go ahead.

23   BY MR. LESCHT:

24   Q    Dr. Campbell, let's turn now to the Washington Post

25   article identified as Plaintiff Exhibit 8.

1    A     Yes.

2              MR. LESCHT:  Your Honor, I move for admission.

3              THE COURT:  Any objection?

4              MS. KNAPP:  No, Your Honor.  It is 8?

5              THE COURT:  8, yes, the Washington Post article.

6              MS. KNAPP:  Okay.

7              THE COURT:  It is admitted.

8              (Plaintiff Exhibit 8 was received in evidence.)

9    BY MR. LESCHT:

10   Q     Now, Dr. Campbell, this is the article written by Tim

11   Craig?

12   A     Yes.

13   Q     And he's the reporter that had called you on that day; is

14   that right?

15   A     He called me on the 11th, yes.

16   Q     Now, in this article, first it states that documents

17   indicate Turnage was concerned that you were attempting to

18   steer part of a pending contract to create a health care

19   exchange to Darryl Wiggins.

20              And we have talked about that allegation?

21   A     Yes.

22   Q     A few paragraphs down it talks about the dismissal

23   demonstrates the growing sensitivity within city government

24   over allegations of improper or unethical behavior after two

25   council members pleaded guilty and resigned over wrongdoing

1   during the past six months.  A separate federal probe of Mayor

2   Vincent Gray's 2010 campaign continues.

3          MS. KNAPP:  Objection, Your Honor.  This is not

4   something that --

5          THE COURT:  Yes.  This is not evidence, Mr. Lescht.

6   BY MR. LESCHT:

7   Q    Okay.  The next paragraph is a quote, and is this one of

8   the allegations made against you here.  It says:  I have been

9   told that is widely known that you have been meeting with

10  minority vendors in an effort to put together a team that

11  would submit a bid as a prime for the insurance exchange

12  network.  Do you see that?

13  A    Yes.

14  Q    Is that true?

15  A    That's not true at all.

16  Q    Well, is there anything to this?

17  A    No.  There's not.

18  Q    Were you putting together a team of companies to seek the

19  award of that Phase 2 contract that you are responsible for

20  implementing?

21  A    No, I was not.

22  Q    Were you looking around for minority vendors that you

23  preferred in some respects to go and bid on the contract?

24  A    No, I was not.

25  Q    What would it take for a company to be able to bid on a

1  $75 million contract?

2  A    They would -- anyone could bid, I would say that.  They

3  would have to complete the bid -- the proposal, but, for the

4  most part, those who -- across all states, those who have won

5  these contracts have had experience building large IT systems

6  that are very complicated in architecture and infrastructure.

7  And it would take a lot of background in doing that and

8  expertise, and, really, honestly, upfront capital.

9  Q    Well, at this point in time back in June, I mean, before

10  all this broke, were you planning on staying with your job?

11  A    Absolutely.  I was happy where I was.

12  Q    Did you have any plans on leaving?

13  A    No, I had not planned on leaving.

14          MR. LESCHT:  Your Honor, can we publish the

15  articles?

16          THE COURT:  Any objection?

17          MS. KNAPP:  No, Your Honor.

18          THE COURT:  Okay.  You may.

19  BY MR. LESCHT:

20  Q    Now, later in this paragraph, Dr. Campbell, it talks

21  about you influencing the award of contracts.  Can you explain

22  to the jury, first, were you the person who made the decision

23  who would be awarded these contracts?

24  A    No, I was not.

25  Q    So the Phase 1 contract that was awarded to Compass --

1    A    Yes.

2    Q    -- what was the process?

3    A    The process for awarding any contract -- well, not any

4    contract.  There are different ways, but on this particular

5    contract, there is an evaluation panel.  That panel is

6    comprised of five people.  It actually can be three, five,

7    seven.  We chose five.  And you review all bids that are

8    submitted.  The bids are submitted through the Office of

9    Contracts and Procurement.  They are reviewed first by that

10   department, and then they pass them to the department of

11   interest, the one that they would be doing the work for, and

12   then a panel is selected, and OCP goes through a series of

13   rules of how you can -- sorry, Office of Contracts and

14   Procurement goes through a series of rules of how that

15   evaluation panel needs to work, and the policies and

16   procedures around the evaluation process, and then the panel

17   reads all submissions, all proposals that have been submitted.

18   And you are to individually score, and then the panel gets

19   back together, and you discuss your scores.  You actually

20   submit them to the Office of Contracts and Procurement

21   individually, so the panel doesn't know how the others scored.

22   And then they compile it into a report, and then you have a

23   second, what they call a consensus meeting.

24           So if there seems to be deviations that need to be

25   discussed, there's a consensus meeting, and then the panel is

1  able to do a second review.  And those scores are then

2  averaged.  And the contract administrator, who was Bonnie

3  Norton, writes the report and the summary of the evaluation

4  panel.

5  Q    Now, was this process followed in the award of Phase 1 to

6  Compass?

7         THE COURT:  Can I get a copy of what was just passed

8  out to the jury?

9         MS. KNAPP:  Can we have a copy, too?  I thought it

10  was going to be up on the screen.

11         THE COURT:  If one of the jurors can pass me what

12  they actually received.  Thank you.

13         (WHEREUPON, the document was tendered to the Court.)

14         THE COURT:  Okay.  Thank you.

15  BY MR. LESCHT:

16  Q    So getting back to the process, the allegation was made

17  in the opening statement that you somehow were responsible --

18  or you were somehow able to influence to whom a contract would

19  be awarded; is that true?

20  A    No.  It is a panel of five.

21  Q    Five people?

22  A    Five people.

23  Q    Did you somehow influence other people to award this

24  contract to Compass over their objections?

25  A    No, I did not.

1  Q    And what about with respect to the $75 million contract,

2  was this going to be awarded in the same way?

3  A    Yes.  A panel would have been formed.  I am not sure, it

4  probably would have been a larger panel, due to the size of

5  the contract.  But we had not gotten that far.  We were

6  actually still developing the RFP for it.

7  Q    Did you ever tell people that you had that power and you

8  were able to award these types of contracts on your own?

9  A    No.  Never.

10  Q    How many people worked for you?

11  A    There were six divisions -- at the time that I was chief

12  operating officer?

13  Q    Yes.

14  A    Six different divisions, probably about 42 individuals at

15  this time.

16        THE COURT:  Whenever you come to a natural break,

17  Mr. Lescht.

18        MR. LESCHT:  This would be fine, I see people

19  yawning.

20        THE COURT:  All right.  Thank you.  We will be

21  starting up tomorrow at 10:00 sharp.  So be here early enough

22  that we can get started at 10:00.

23        Again, I remind you about the media.  There has been

24  a reporter in the courtroom.  If I would guess, there might be

25  something in the Washington Post.  Please do not -- if you

1

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
2

3    JENNIFER B. CAMPBELL,          ) Civil Action
                                    ) No. 12-1769 (RC)
4             Plaintiff,            )
                                    ) FURTHER JURY TRIAL-DAY 2
5    vs.                            )
                                    ) Washington, DC
6    DISTRICT OF COLUMBIA,          ) Date:  December 8, 2015
                                    ) Time:  10:00 a.m.
7             Defendant.            )
     _____
8
          TRANSCRIPT OF FURTHER JURY TRIAL-DAY 2
9                    HELD BEFORE
       THE HONORABLE JUDGE RUDOLPH CONTRERAS
10          UNITED STATES DISTRICT JUDGE
     _____
11
               A P P E A R A N C E S
12
For the Plaintiff:        Alan Lescht, Esq.
13                        Sara Nunley McDonough, Esq.
                          Sara B. Safriet, Esq.
14                        Alan Lescht & Associates, PD
                          1050 17th Street, NW, Suite 400
15                        Washington, DC  20036
                          202-463-6036
16
For the Defendant:        Sarah L. Knapp, Esq.
17                        Alex Karpinski, Esq.
                          Office of the Attorney General for
18                        the District of Columbia
                          441 4th Street, NW, Suite 630 Main
19                        Washington, DC  20001
                          202-724-6528
20

21   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
22   _____

23   Court Reporter:          Annette M. Montalvo, CSR, RDR
                              Official Court Reporter
24                            United States Courthouse, Room 6722
                              333 Constitution Avenue, NW
25                            Washington, DC  20001
                              202-354-3111

2

1                          INDEX

2                                                    PAGE

3    JENNIFER CAMPBELL                                 17

4    DIRECT EXAMINATION (Resumed)                      17

5    BY MR. LESCHT                                     17

6

7    DARRYL WIGGINS                                    65

8    DIRECT EXAMINATION                                65

9    BY MR. LESCHT                                     66

10   CROSS-EXAMINATION                                 69

11   BY MR. KARPINSKI                                  69

12   REDIRECT-EXAMINATION                              71

13   BY MR. LESCHT                                     71

14

15   SAM WALKER                                        73

16   DIRECT EXAMINATION                                73

17   BY MR. LESCHT                                     73

18

19   PEDRO RIBEIRO                                     76

20   DIRECT EXAMINATION                                76

21   BY MR. LESCHT                                     76

22   CROSS-EXAMINATION                                 97

23   BY MR. KARPINSKI                                  97

24   REDIRECT EXAMINATION                             102

25   BY MR. LESCHT                                    102

3

| | | |
|---|---|---|
| 1 | BONNIE NORTON | 106 |
| 2 | DIRECT EXAMINATION | 106 |
| 3 | BY MR. LESCHT | 106 |
| 4 | CROSS-EXAMINATION | 112 |
| 5 | BY MS. KNAPP | 112 |
| 6 | REDIRECT EXAMINATION | 113 |
| 7 | BY MR. LESCHT | 113 |
| 8 | | |
| 9 | CHRISTOPHER MURPHY | 114 |
| 10 | DIRECT EXAMINATION | 114 |
| 11 | BY MR. LESCHT | 114 |
| 12 | CROSS-EXAMINATION | 147 |
| 13 | BY MS. KNAPP | 147 |
| 14 | REDIRECT EXAMINATION | 149 |
| 15 | BY MR. LESCHT | 149 |
| 16 | RECROSS-EXAMINATION | 150 |
| 17 | BY MS. KNAPP | 150 |
| 18 | | |
| 19 | JANENE JACKSON | 151 |
| 20 | DIRECT EXAMINATION | 151 |
| 21 | BY MR. LESCHT | 151 |
| 22 | CROSS-EXAMINATION | 158 |
| 23 | BY MS. KNAPP | 158 |
| 24 | REDIRECT EXAMINATION | 159 |
| 25 | BY MR. LESCHT | 159 |

4

```
1    CAROL RAND-CAMPBELL                              160

2    DIRECT EXAMINATION                               160

3    BY MS. SAFRIET                                   160

4    CROSS-EXAMINATION                                167

5    BY MS. KNAPP                                     167

6

7

8    EXHIBITS                                    RECEIVED

9     Plaintiff Exhibits 25, 26, and 27            6

10    Plaintiff Exhibits 28 and 29                  8

11    Plaintiff Exhibit 3                          22

12    Plaintiff Exhibits 25-30 and 51             31

13    Plaintiff Exhibit 32                         31

14    Plaintiff Exhibit 4                          49

15    Plaintiff Exhibit 9                          63

16    Plaintiff Exhibit 14                         82

17    Plaintiff Exhibits 15-19                     85

18

19

20   Defendant Exhibits 49 and 53                 14

21   Defendant Exhibits 47, 48, 49, and 53-58     31

22   Defendant Exhibit 62, Bates pages 4617 and 4618  156

23

24

25
```

1           MR. LESCHT:  Judge, can we hand you the redacted

2    exhibits at a break?  Is that all right?

3           THE COURT:  Yes.

4           Is there anything else we need to resolve before we

5    bring the jury in?

6           MR. LESCHT:  No.

7           THE COURT:  Okay.

8           (WHEREUPON, the jury entered the court room, and the

9    following further proceedings were had in open court, in the

10   presence and hearing of the jury, to wit:)

11          THE COURT:  Good morning.  We are going to continue

12   with the testimony of the plaintiff this morning.

13          THE COURTROOM DEPUTY:  Please raise your right hand.

14          (WHEREUPON, the witness was duly re-sworn.)

15          THE COURT:  Go ahead.

16          MR. LESCHT:  Thank you.

17                    JENNIFER CAMPBELL,

18   called as a witness herein by the Plaintiff, having been

19   previously duly sworn and having testified, was examined and

20   testified further as follows:

21                DIRECT EXAMINATION (Resumed)

22   BY MR. LESCHT:

23   Q    Ms. Campbell, when we left off yesterday, you had

24   discussed the office of compliance rules for awarding

25   contracts --

1  A    Yes.

2  Q    -- right?

3         All right.  So let's switch gears just a little bit,

4  and tell the jury a little bit about your background and how

5  you came to the District to work during the first place.

6  A    Okay.  I have approximately 18 years in health care

7  management and public health.  I received my bachelors in

8  chemistry and math and my masters from George Washington in

9  health care administration, and my doctorate in public health

10  from the University of Illinois at Chicago.

11        I came to the District after working with hospitals,

12  as well as being on the consulting side.  My passion has

13  always been around access to care issues.  And so I felt that

14  when I was coming to work with the District in what they were

15  about to do, embarking upon the Affordable Care Act, I really

16  wanted to be a part of that because at the foundation of it,

17  it is about access to care.

18        I came to the District in April of 2008, originally

19  with the department of -- I was the associate director of

20  utilization management and third party liability, and,

21  basically, that examines fraud and abuse through the Medicaid

22  system.

23        And in that first year, I established a team or a

24  staff, trained them, because there was not a lot of training

25  dollars at the time, and also put in place some policies and

1  procedures that did not exist before.  And within about 13

2  months, we recovered about $250 million in Medicaid fraud and

3  abuse.  And so it was a very rewarding position.  And then I

4  was reclassified into another position, but still doing

5  largely the same thing around fraud and abuse.

6          Shortly after that, I was asked and requested by

7  Deputy Mayor Otero, who is the deputy mayor of health and

8  human services, to come and be detailed to her office in the

9  executive office of the mayor as the senior health policy

10  advisor, and I worked in Deputy Mayor Otero's office on

11  detail.  So detail for the District is usually a short-term

12  assignment, so you are really still employed with DHCF, but

13  you are just detailed somewhere else.  So I was still an

14  employee of DHCF, and that's where my salary was drawn from,

15  but I was working with the deputy mayor.

16          And shortly after that -- well, not shortly, about

17  six to eight months later, when the District or the mayor

18  established the health care reform task force and established

19  the division of health care innovation -- health care reform

20  innovation administration, the position became open for the

21  director, and it was a difficult decision for me, really,

22  because I really enjoyed the work I was doing at the deputy

23  mayor's office.  It was a very collegial environment.  There

24  were about four of us who are actually all detailed from other

25  agencies, some from social services, some from -- a couple of

CAMPBELL - DIRECT - LESCHT                                    20

1   people from child and family services.  I was the only one

2   detailed from the department of the health care finance.  So I

3   was enjoying my time, and I really enjoyed working with Deputy

4   Mayor Otero.  I was learning a lot from her.

5           So it was a difficult decision to apply for this

6   position, and I did because, again, that's just where my heart

7   is, it is health care reform, it is access for all, and so I

8   was really excited about being able to be a part of that.  And

9   so I applied, and there was a selection process, and I

10  received that position.  I believe that was August of 2011.

11  Q    And what was the position's title?

12  A    Director of health care reform innovation administration.

13  Q    And what were your duties in that role?

14  A    At that point we did not really have a staff, so I had to

15  hire approximately eight people.  We had received one part of

16  the grant, which was the exploratory grant to see if we had

17  the bandwidth and were able to or really wanted to build our

18  own exchange.  So that had already been awarded to the

19  District.  So I had to manage that grant, and we had a

20  contractor already in place for that piece of the grant.  And

21  then I also had to write the subsequent two grants, and then

22  also help with building the infrastructure of what is now the

23  health benefit exchange, along with the staff.

24  Q    What period of time did you spend in that job?

25  A    I was in that position from August of 2011 until I was

CAMPBELL - DIRECT - LESCHT                              21

1   appointed to chief operating officer in May of 2012.

2   Q    And what year did you join the District?

3   A    In 2008.

4   Q    2008.  So 2008, to the time that you were appointed chief

5   operating officer in the spring, summer of 2012 --

6   A    Yes.

7   Q    -- had you ever had complaints made about you regarding

8   contractors?

9   A    No, I had not.

10  Q    And what were your evaluations at work like?

11  A    Very favorable.

12  Q    And did you work with independent companies that the

13  District would contract with?

14  A    Yes.

15  Q    Ever have any --

16  A    Current contractors.

17  Q    -- complaints about any of them?

18  A    No complaints from them, no.

19  Q    Any complaints that you showed favoritism toward any of

20  them?

21  A    No.

22  Q    I show you what's been marked as Plaintiff Exhibit 3.  Is

23  this the e-mail that you received on your selection to chief

24  operating officer?

25  A    Yes.  On May 24.

1   Q    And who sent it to you?

2   A    Shalonda Frazier.  She was over human resources for the

3   department.

4   Q    And during the time that you worked for the District of

5   Columbia, did you and the people you worked with and for

6   exchange communications by e-mail?

7   A    Yes.  Absolutely.

8   Q    And did you each use your e-mail addresses?

9   A    Yes, we did.

10        MR. LESCHT:  Your Honor, I move for admission of

11   Plaintiff Exhibit 3.

12        THE COURT:  Any objection?

13        MS. KNAPP:  No objection.

14        THE COURT:  It will be admitted.

15        (Plaintiff Exhibit 3 was received in evidence.)

16   BY MR. LESCHT:

17   Q    In the course of your employment while you are chief

18   operating officer, did you continue to use your e-mail address

19   from the District?

20   A    Yes.

21   Q    And did you continue to communicate with the people you

22   worked with --

23   A    Yes.

24   Q    -- about business related matters?

25   A    Yes.

CAMPBELL - DIRECT - LESCHT                              23

1   Q    Including matters involving the negotiation of contracts?

2   A    Yes.

3   Q    And were you copied on e-mails from people regarding the

4   negotiation of the CGI contract?

5   A    Yes.

6   Q    This would be the one I had mentioned yesterday, where

7   you talked about the liquidated damages clause?

8   A    Correct.

9   Q    And would you receive communications from the people you

10  worked with about that?

11  A    Yes.

12       MR. LESCHT:  Your Honor, I move for admission of the

13  other exhibits we had discussed yesterday as well.

14       THE COURT:  Any objection?

15       MS. KNAPP:  The District has no objection to

16  Plaintiff's 27, 30, or 51 or Defendant's 47 -- sorry.  The

17  District objects to Plaintiff Exhibit 27, 30, 51, 47 --

18  Defendant's 47, 48, and 54 through 58, on the grounds we

19  talked about this morning.

20       THE COURT:  Okay.  Why do you assert that it has not

21  been established that these are business records?

22       MS. KNAPP:  May we do this outside the hearing of

23  the jury?

24       THE COURT:  You may.  Come to the bench.

25       (WHEREUPON, the following proceedings were had at

1  sidebar, out of the hearing of the jury, to wit:)

2         THE COURT:  One second.  I think you need to go back

3  and flesh that out.  Do you have the rule?  I looked at the

4  rule.

5         MR. LESCHT:  Okay.

6         MS. KNAPP:  One of the witnesses that you have under

7  subpoena sent a note back with one of our lawyers about some

8  scheduling issues.  It is Bonnie Norton.  I don't know if you

9  want to ask Ms. Safriet to go out and speak with her.  She

10 asked if I can release her and I can't answer that.

11        MR. LESCHT:  Okay.

12        (WHEREUPON, the sidebar ended, and the following

13 further proceedings were had in open court, in the presence

14 and hearing of the jury, to wit:)

15 BY MR. LESCHT:

16 Q    Dr. Campbell, let's go back to the e-mail communications

17 that you have had during the time you worked for the District

18 of Columbia.

19 A    Okay.

20 Q    You had a District of Columbia e-mail address assigned to

21 you?

22 A    Yes.

23 Q    And was that through the District of Columbia, your

24 employment with the District of Columbia?

25 A    Yes, it was.

CAMPBELL - DIRECT - LESCHT                    25

1  Q    And did you receive e-mail communications from other
2  people that worked for the District of Columbia during the
3  time you worked there?
4  A    Yes, I did.
5  Q    And were these -- did the e-mails include communications
6  regarding business related matters?
7  A    Yes.
8  Q    And was the e-mail server located within the property of
9  the District of Columbia?
10 A    Yes.
11 Q    And were the e-mails kept by the District of Columbia on
12 the server in the regular course of your job?
13 A    Yes.
14 Q    And were the communications that you had with these
15 people regarding business matters?
16 A    Yes.
17 Q    And did you receive them on your District of Columbia
18 e-mail?
19 A    Yes.
20 Q    And were there times that people who worked for you would
21 copy you on communications regarding work related matters that
22 they were having with other people?
23 A    Yes, absolutely.
24 Q    And were these communications sent to you at your
25 direction?

1    A    Yes.

2    Q    For example, were there people on the OCP that were

3    working on your behalf in regards to the negotiation of the

4    CGI contract?

5    A    Yes.

6    Q    And did you tell them to keep you up to date on the

7    progress of that contract?

8    A    Yes, I did.

9    Q    And so were there e-mails that you received from the

10    people in the contracting office on the issue of liquidated

11    damages in CGI's contract, where they would copy you and

12    update you on the status of that matter?

13    A    Yes.

14          MR. LESCHT:  Your Honor, I move again for admission

15    of these e-mail communications.

16          MS. KNAPP:  We still have no objection to the

17    e-mails that this witness was actually copied on.

18          THE COURT:  Okay.  Come to the bench again.

19          (WHEREUPON, proceedings were had at sidebar, out of

20    the hearing of the jury, to wit:)

21          THE COURT:  What is your specific objection as to

22    why he hasn't established these are business records?

23          MS. KNAPP:  He's only talked about the plaintiff and

24    about e-mails that she directed to be -- e-mails that were

25    coming back and forth to her.  There's no foundation

1   established for how people who were not directly corresponding

2   with the plaintiff used their e-mail accounts and whether

3   those raise to the level of being business records.

4              THE COURT:  Did the contracting group report to her

5   as COO?

6              MR. LESCHT:  Well, they were a separate group that

7   reported to her in terms of the -- they did her bidding for

8   negotiating -- she directed them to negotiate the contract,

9   that's what those e-mails are.  She's asking them what's the

10  status of the contract.

11             THE COURT:  Why don't you establish a little further

12  what the rule was of the contracting group and also e-mails to

13  GSA.  Cover that, and you also -- there's -- you have to

14  establish that the record was made at or near the time.

15             MR. LESCHT:  Okay.

16             (WHEREUPON, the sidebar ended, and the following

17  further proceedings were had in open court, in the presence

18  and hearing of the jury, to wit:)

19  BY MR. LESCHT:

20  Q    Dr. Campbell, OCP stands for what?

21  A    Office of Contracts and Procurement.

22  Q    And were they, in effect, your negotiators for your

23  office?

24  A    Yes.

25  Q    In other words, that you told them what to do and they

1    would go negotiate the contract?

2    A    It was more of a partnership.  They would lead us in what

3    was -- you know, by regulation what we could do, what we could

4    not do, but we had to, in most cases, communicate with any

5    contractor through them.  And they had someone assigned to the

6    Department of Health Care Finance who was a contracts officer.

7    So she was somewhat, I guess you could say, matrixed to the

8    Office of Contracts and Procurement, but assigned and actually

9    physically located in our office.

10   Q    Who is that person?

11   A    Jackie Alpert.

12   Q    And did you communicate with Ms. Alpert?

13   A    Yes, frequently.

14   Q    Did you communicate with her in regards to the

15   negotiation of the CGI contract?

16   A    Yes, I did.

17   Q    And was she the person that you communicated with by

18   e-mail regarding getting updates on the status of what she was

19   doing?

20   A    Yes.

21   Q    And were the communications that you had with her, were

22   they at or about the time that this negotiation was going on?

23   A    Yes, it was.

24   Q    So the e-mails that we're discussing here today, that we

25   mentioned yesterday, about the CGI contract, were these

1  e-mails that you sent or received or were copied on all about

2  the same time as that contract was being negotiated?

3  A    Yes, they were.

4  Q    And it was all about the same time that CGI was pushing

5  back on inclusion of a liquidated damage clause?

6  A    Yes.

7           MR. LESCHT:  Your Honor, I move for admission.

8           THE COURT:  Any objection?

9           MS. KNAPP:  Same objection.

10           THE COURT:  Come to the bench.

11           (WHEREUPON, the following proceedings were had at

12  sidebar, out of the hearing of the jury, to wit:)

13           THE COURT:  What is the specific objection as to why

14  he hasn't established that these are business records?

15           MS. KNAPP:  The same objection.  He hasn't

16  established that -- he keeps asking her, "Were these e-mails

17  that were sent to you," "Were these e-mails that came from

18  you," were these -- and the problem is not with any e-mails

19  that came to her or went to her.  It is the fact that he

20  hasn't established again that she has a basis for knowing

21  about e-mails that she wasn't copied on and e-mails that she

22  didn't direct, but she has no direct knowledge of are they

23  contemporaneous, were they used in the course of business,

24  were they regular means of communication within the business.

25  And so that's what the issue continues to be.

*CAMPBELL - DIRECT - LESCHT*                                        30

```
1          THE COURT:  Okay.  Hasn't he established her group

2    and the contract group worked together as partners, as she

3    said, to make these things happen?  And that they did, in

4    fact, use e-mail to communicate those things?

5          MS. KNAPP:  I believe he established the first part

6    of that.  I am not sure he established the second part of

7    that.

8          THE COURT:  All right.  Go a little bit further

9    about the normal means of communication by e-mails with both

10   groups, not just her group.

11         MR. LESCHT:  Okay.

12         (WHEREUPON, the sidebar ended, and the following

13   further proceedings were had in open court, in the presence

14   and hearing of the jury, to wit:)

15   BY MR. LESCHT:

16   Q    So was e-mail the normal use of -- means of communication

17   between your group and the OCP?

18   A    Yes.  Because they were located in a different office.

19         MR. LESCHT:  Your Honor, I move for admission.

20         THE COURT:  Did OCP use e-mail to communicate about

21   these contract issues in the same way as your group did?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.  Any objection?

24         MS. KNAPP:  The same objection.

25         THE COURT:  They are admitted.
```

*Annette M. Montalvo, CSR, RDR, CRR*

**JA 264**

1          MR. LESCHT:  Thank you.

2          THE COURT:  So that's Plaintiff Exhibit 25 through

3    30, 51.  Defendant Exhibit 47, 48, 49, and 53 through 58.

4          MR. LESCHT:  Thank you.

5          (Plaintiff Exhibits 25-30 and 51 were received in

6    evidence.)

7          (Defendant Exhibits 47, 48, 49, and 53-58 were

8    received in evidence.)

9    BY MR. LESCHT:

10   Q    So, now, Dr. Campbell, let's go back to the -- to where

11   we left off on your employment with the District.  You had

12   talked about getting promoted to the chief operating officer?

13   A    Yes.

14         MR. LESCHT:  And, Your Honor, I move for admission

15   of Plaintiff Exhibit 32.

16         THE COURT:  Did we do that one already?

17         MR. LESCHT:  I just want to make sure we did.

18         (Plaintiff Exhibit 32 was received in evidence.)

19   BY MR. LESCHT:

20   Q    All right.  So you get promoted to this position.  And

21   what was the position you were promoted to?

22   A    Chief operating officer.

23   Q    And what were the duties of that role?

24   A    Day-to-day operations, working very closely with the

25   director of the department, Director Turnage, and also I still

 1  had oversight of the health care reform innovation

 2  administration.  So that was still under me, as well as six

 3  other divisions.

 4  Q    Now, up to that point in time, had you served as a

 5  supervisor during your employment by the District?

 6  A    Yes.  When I originally came into the District in the

 7  Department of Health Care Finance, I was a supervisor, I was a

 8  manager.

 9  Q    How many people did you supervise?

10  A    I supervised -- that was a staff of about 12, but in my

11  career I have supervised as many as 200.

12  Q    And how many people were you supervising after you got

13  promoted to chief operating officer?

14  A    Approximately 46, 47.

15  Q    Now, as a supervisor for the District of Columbia, did

16  you receive any kind of a training from the District, either

17  when you came on board or at any point in time?

18  A    Yes.  There's an orientation, an employment orientation.

19  It is kind of cohort based.  There's an orientation specific

20  to the department, but before you even get there, there's an

21  orientation for all employees who start on that date.

22          So my orientation included people from all agencies,

23  the mayor's office, or CFSA, and human services.  So we all

24  were oriented together, and I believe in 441, across the

25  street.  And then there's a separate specific or department

1    specific orientation as well as part of your on boarding.

2    Q    Did you receive training on how to handle confidential

3    personnel information of the people who worked for you?

4    A    Yes.

5    Q    What was that training and what did they tell you?

6    A    They -- everyone, as just an employee of the District,

7    received the personnel manual, the District personnel manual.

8    But there were subsequent mandatory trainings that supervisors

9    or managers had to attend.  And they would go through various

10   portions of the DPM that really -- sorry, the District

11   personnel manual, that we really needed to know as

12   supervisors.  So there were kind of some -- some of those were

13   half-day trainings, some of them were two or three hours.  So

14   there were specific trainings for not just being an employee,

15   but being a supervisor.

16   Q    Well, what was it that you were told or was your

17   understanding during the time that you worked there

18   regarding --

19               MS. KNAPP:  Objection, Your Honor.

20               THE COURT:  Why don't you rephrase that question.

21   BY MR. LESCHT:

22   Q    You have mentioned the DPM.

23   A    Yes.

24   Q    That stands for the District personnel manual?

25   A    Yes.

1  Q    What is the District personnel manual?

2  A    It includes, basically, a code of conduct and rules and

3  regulations, policies and procedures, for both employees --

4  well, employees, supervisors, and then also it speaks to the

5  District's responsibility to you as an employee.

6  Q    And did that DPM, did that apply to you during your

7  employment?

8  A    Yes, absolutely.

9  Q    And, in fact, did it apply to everyone who worked for the

10 District?

11 A    Yes, it did.

12         MS. KNAPP:  Objection, Your Honor.

13         THE COURT:  She can only speak to the people she

14 worked for.

15 BY MR. LESCHT:

16 Q    Did the DPM apply to the people you worked with and

17 people you worked for?

18 A    Yes.

19         MS. KNAPP:  Objection.

20         THE COURT:  Overruled.

21 BY MR. LESCHT:

22 Q    Now, did you have an understanding of what the DPM stated

23 in terms of your duty as a supervisor to safeguard personnel

24 information --

25         MS. KNAPP:  Objection.  Relevance, Your Honor.

*CAMPBELL - DIRECT - LESCHT*                    35

1           THE COURT:  It is overruled.

2   BY MR. LESCHT:

3   Q    -- of the people that you supervised?

4   A    Yes.

5   Q    And what was that?

6   A    There were rules around disclosures and privacy records

7   management, to the extent of how long you can keep a personnel

8   record, how you -- if there was a personnel action, the steps

9   you had to take.  There were records about kind of employee

10  protection, and the steps that an employee could take if they

11  had complaints about their supervisor.

12          So there are a number of things, and it is a rather

13  large manual, and they also have it available electronically.

14  So they tell you, you know, if you want to search by something

15  specific, it is best to do it online, and, you know, use a key

16  word search.  But it covers everything.

17  Q    Let's focus on the issue of disclosure, of private, which

18  would be nonpublic information --

19  A    Yes.

20  Q    -- contained within personnel files or personnel matters

21  of employees.

22          What's your understanding of the role?

23          MS. KNAPP:  Objection, Your Honor.

24          THE COURT:  Relevance?  Overruled.

25          THE WITNESS:  My understanding is that there are

1  only maybe four or five items that could be shared with the

2  public in reference to -- as it pertains to a District

3  employee.  That's name, position, I believe since you are a

4  government employee, all salaries are public knowledge.  And I

5  am not sure, it is four or five.  But I know, name, position,

6  grade, and salary were for public consumption.

7  BY MR. LESCHT:

8  Q    Now, what about the fact that someone that worked for you

9  was put on suspension pending investigation?  Were you able,

10 under these rules, to simply disclose that fact to a third

11 party that's not employed by the District of Columbia?

12          MS. KNAPP:  Objection, Your Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  No, it was not listed as one of the

15 four or five items that you could share with the public.

16 BY MR. LESCHT:

17 Q    How about if you got a complaint from someone about one

18 of the people who worked for you, did the DPM prohibit you

19 from disclosing that complaint to a third party not employed

20 by the District of Columbia?

21 A    Yes, it prohibits you from doing that.

22 Q    Can you turn to Plaintiff Exhibit 11.

23 A    Yes.

24 Q    Is this the rule that you were describing?

25 A    Yes.  It looks as though it is.  Yes.

1  Q    Is this the DPM that you have been describing to the jury

2  this morning?

3  A    Yes, it is.

4  Q    And is this the DPM that was in place during the time

5  that you were employed by the District of Columbia?

6  A    Yes, it is.

7         MR. LESCHT:  Your Honor, we move for admission into

8  evidence of Plaintiff Exhibit 11.

9         THE COURT:  Any objection other than relevance?

10         MS. KNAPP:  The District actually doesn't have a

11  relevance objection, Your Honor, but we do object on the basis

12  we have discussed prior to the trial.  We can come up and talk

13  more, if you like.

14         THE COURT:  Why don't you come up and talk more.

15         (WHEREUPON, the following proceedings were had at

16  sidebar, out of the hearing of the jury, to wit:)

17         MS. KNAPP:  You know, the plaintiff has not --

18  again, this -- it is more prejudicial than it is probative.

19  It is likely to confuse the jury.  What we have now had is the

20  plaintiff, whose knowledge of the personnel records is not at

21  issue in this case.  It is whether or not the parties who are

22  actually accused of providing information knew about the

23  personnel regs and what their understanding of them are.

24  She's testifying about a very complicated legal document, and

25  next -- now what we want to do is admit this.  You know, the

1   rule that's -- I didn't look before I came up here, but 15 or

2   20 pages of type that's about that big, and just have it

3   submitted to the jury, you know, for them to figure out.  And

4   so the District continues to maintain that this is more

5   prejudicial than it is probative, and it is likely to confuse

6   the jury.

7              THE COURT:  It is rather long.  Are you -- is your

8   position that it all applies in this case?

9              MR. LESCHT:  Well, there are about four of the

10  sections that she's talked about that we -- you could before

11  we submit to the jury just pull out those four sections.

12             But just for the record, this is no different than a

13  personnel manual, in any trial --

14             THE COURT:  I understand.  My concern is that

15  there's lawyers on the jury, and I don't want them to rummage

16  through things that --

17             MR. LESCHT:  What we can do is I think I have

18  written down the four sections that talk about the privacy,

19  and they can't be disclosed.  And what we can do is instead of

20  submitting this in Lexis, we can print out the specific -- I

21  just have to cut and paste it on a particular page, and that

22  way --

23             THE COURT:  If you want to put in other parts, you

24  can do that.  The rule of completeness.

25             MS. KNAPP:  Okay.  Thank you, Your Honor.

*CAMPBELL - DIRECT - LESCHT*                                    39

1          (WHEREUPON, the sidebar ended, and the following

2    further proceedings were had in open court, in the presence

3    and hearing of the jury, to wit:)

4    BY MR. LESCHT:

5    Q    So, Dr. Campbell, this DPM in the rules and regulations

6    you have been describing, these govern the way that you handle

7    information of the people who worked for you, correct?

8    A    Correct.

9    Q    And these rules govern the people that you reported to as

10   well, didn't it?

11   A    Yes.

12   Q    Now, did you comply with these rules while you worked

13   there?

14   A    Yes, I did.

15   Q    Did the people who you worked for comply with these

16   rules?

17   A    No.

18   Q    Why?

19   A    Because during -- well, there was not due process, there

20   was not an investigation, one.  Secondly, they shared

21   information that's listed in here that should not have been

22   shared.  And --

23   Q    What information was shared about you to Alan Suderman,

24   the reporter, by the mayor's office, that you believe was

25   prohibited?

1  A    There's a section here on the disclosure of official

2  information to personnel and law enforcement authorities.

3  There also is a section on safeguarding information about

4  individuals, and there's a rules of conduct section --

5  Q    And did the rules prohibit the use of nonpublic

6  information for personal gain?

7  A    Did it prohibit?  Yes.

8  Q    Now, when you were -- during your employment -- and you

9  were told you were being placed on suspension pending

10  investigation; is that correct?

11  A    Yes.  Correct.

12  Q    Did anyone outside the District of Columbia know that

13  fact?

14  A    Yes.

15  Q    Who?

16  A    Well, all of the public, through the newspaper article.

17  Q    Right.

18         It was published in the newspaper article?

19  A    Yes.

20  Q    But for the District providing that information, isn't it

21  true that no one else would have known about that?

22  A    No.  Typically -- I mean, I had actually, as a

23  supervisor, had to investigate an employee, and, no, it was

24  always internal and actually was kept within the executive

25  tier.

1  Q    In the allegations that the newspaper reporter published

2  and was given by the mayor's office, isn't it correct, we have

3  gone through this yesterday, you didn't even know the nature

4  of the allegations?

5  A    I did not.

6  Q    Now, you get promoted to this job as chief operating

7  officer about May; is that right?

8  A    Correct.

9  Q    So you are in the job for, what, three weeks, four weeks?

10 A    Approximately.  I was put on administrative leave June 4.

11 Q    June 4.  So you are in the job for less than a month?

12 A    Yes.

13 Q    And you were promoted to this job; is that correct?

14 A    Yes, I was.

15        MS. KNAPP:  Objection, Your Honor.  Counsel keeps

16 leading.

17        THE COURT:  Your questions have been fairly leading.

18        MR. LESCHT:  Okay.

19 BY MR. LESCHT:

20 Q    Were you promoted to this job?

21 A    Yes, I was.

22 Q    Now, during the opening statement yesterday, Ms. Knapp

23 suggested that you were a political appointee.  Were you some

24 sort of political appointee, or were you a civil servant?

25 A    So the process for this position actually was not -- it

CAMPBELL - DIRECT - LESCHT                    42

1  is not an application process.  The direct --

2  Q    Up to that point in time?

3  A    Yes, I was a civil employee, civil servant.

4  Q    And how was it that your name or your -- you were put

5  into place for this chief operating officer job?

6  A    Director Turnage at the time was looking for someone to

7  replace -- the former COO had announced that she was leaving,

8  and I think she gave maybe a month's notice.  So he was at the

9  time looking -- and, actually, we had a conversation.  He was

10 asking my opinion on who might be a good fit.  And then maybe

11 a couple of weeks later, he and his chief of staff, Melisa

12 Byrd, asked to meet with me after a meeting and said "We have

13 been really considering who might be a good fit, and we feel

14 that you would be."

15 Q    Now, before you were appointed into this position, did

16 you have anything to do with the negotiation of the CGI

17 contract and the liquidated damages provision?

18 A    No, I had not.

19 Q    So this was completely new for you after you took the new

20 job?

21 A    Absolutely.

22 Q    So in the three weeks or so that you are in this

23 position, how did the job go?

24 A    It was somewhat of a whirlwind, quite honestly.  There

25 were some outstanding things, such as the CGI contract that

CAMPBELL - DIRECT - LESCHT                                    43

1   still needed to be executed so that we could begin the work.

2   So there were a lot of timelines that I was working against.

3        We also were in the midst of switching offices.  So

4   the District was trying to consolidate a lot of departments

5   and move them across the street to 441, and so we were going

6   through a construction process.  So that fell under me as

7   well, facilities was with me, so I was doing a lot of back and

8   forth between where we were housed on North Capitol and the

9   construction project in 441, and managing that budget.  I also

10  had risk management, and the District was retooling how each

11  department had to do -- manage their risk management

12  procedures.  And I only had a staff of one for risk

13  management, so it really fell on the two of us to retool all

14  the policies and procedures around that.

15       So there were a number of missing pieces.  In fact,

16  I had a white board that was probably like 72 inches that

17  covered most of my office.  And I just took markers and just

18  put things in sections just so I could keep up with what I

19  needed to do, and kind of -- and make it, you know, make

20  sense, so that I was not just haphazardly approaching

21  everything.  And I would have -- I then set up meetings.

22  Since there were six departments, I would have two meetings on

23  one day and a meeting each day with each director or person

24  over that department to just be brought up to speed.  But I

25  admittedly spent a lot more time with contracts because that

CAMPBELL - DIRECT - LESCHT                    44

1  contract, the deliverable was supposed to be for May 31.

2  Q    Is your answer in regards to the contract the same in

3  regard to the Compass award?

4  A    The Compass award actually had already been awarded by

5  the time.

6  Q    It had already been done?

7  A    Yes, it had already been done, and that one had already

8  been executed, so that wasn't -- and the contract

9  administrator was Bonnie Norton, who's absolutely more than

10  capable.

11  Q    So now tell the jury how you found out that you were

12  under investigation.

13  A    I was asked probably a few weeks prior, there was a

14  health reform, Affordable Care Act, focus conference, and it

15  was in Nashville, and I was asked to attend that on behalf of

16  the District.

17          And so it started very early on a Monday morning.

18  And so I left on Sunday, so the -- and everyone knew that I

19  would be out of the office for three days.  The conference was

20  Monday through Wednesday.  So I left on the 3rd, the evening

21  of the 3rd.  By the time I landed, I had a couple of

22  e-mails -- no, I had a couple of missed calls on my work

23  phone.  And once I turned it on, I saw the missed calls, and

24  received a message from Melisa Byrd.  She asked me to call her

25  back.  I called her back, and I think this was probably by

1  5:00 or 6:00 in the evening.  And she said, "Wayne and I need

2  to meet with you first thing in the morning."

3          And I said, "Okay, but do you remember that I am

4  attending the conference in Nashville?"  And she said, "Oh,

5  well, okay.  I completely forgot about that.  Let me call you

6  back."

7          About a half an hour later she called me back and

8  said, "You need to fly back."  And I said, "Okay," you know,

9  "Melisa, what's going on, what's wrong?"

10         To this point we had a very collegial relationship,

11 and so I wasn't sure -- we were actually borderline

12 acquaintance friends, so I was really kind of caught off guard

13 by the tone and the fact that she was not telling me anything.

14         So it concerned me, but I just assumed it was just

15 some fire that needed to be put out, and the executive team or

16 senior leadership team needed to be put together.  So I was

17 trying to convince myself of that, but just the tone of the

18 conversation just kept kind of resonating with me.

19         So I remember calling my husband and calling my

20 mother and just saying, "I don't -- this is just really

21 bizarre, it has never happened, I am not sure, but at any

22 rate, I will be back tomorrow."  So I had to immediately get

23 on the computer and find the first flight out of Nashville

24 back to DC.

25         She asked me -- "she" being Melisa Byrd, asked me to

1   let her know when I had made the arrangements and to forward

2   my itinerary to her.  And so I did.  And I landed at Reagan

3   National, and I had my suitcase with me, and I went directly

4   to the office.  And so I took a cab because I -- my husband

5   had dropped me off at the airport when I left on Sunday.

6           And I -- in the cab, I was getting a lot of e-mails,

7   and the night before.  So I didn't sleep at all, but I was

8   getting e-mails from some of my staff saying "What's going on?

9   We have been asked to be in a meeting tomorrow, early in the

10  morning."  And I said, you know, "I am not sure."

11          So they were concerned that it may be some kind of,

12  you know, reduction in force or something like that, so, you

13  know, I think they were looking to me to give them some

14  guidance, and I said "I am not sure what the meeting is about

15  myself."  So then that just made me even more nervous.

16          And then I remember being in the cab from -- and I

17  was about to turn onto North Capitol to get to the office, and

18  I received a call from Sam Walker.  And he said, "I'm walking

19  back from a meeting, and it was with Wayne.  And Wayne was

20  asking -- Wayne Turnage was asking a lot of questions, and we

21  were told not to talk to you, and we were told not to talk

22  about it, but I just feel uncomfortable with people being

23  caught off guard."

24          THE COURT:  Who is Sam Walker?

25          THE WITNESS:  Sorry.  Sam Walker is an IT contractor

1  with the District.  He's not a full employee, but he's a

2  contractor, but works a full week.  And he's been with them

3  for a while.  Sam was the IT -- kind of took on all of the IT

4  parts of building the exchange, so we worked very closely

5  together.

6  BY MR. LESCHT:

7  Q    Did you meet with Turnage or Melisa Byrd?

8  A    Yes.  I thanked Sam for letting me know.  By that time I

9  was pulling up to the office.  I got out with my suitcase, I

10  went to the -- I went into the office, and part of my

11  responsibility, you know, as part of facilities management,

12  all of the receptionists and all of the administrative staff

13  reported to me.  So when I walked in, the receptionist said,

14  you know, "Dr. Campbell, Condelia," who is the -- she was a

15  facilities manager, "she said she wants me to call her as soon

16  as you walk in."  And I said, "Okay.  You know, let me get to

17  my office.  Tell her" -- I said, "I have to meet with Wayne

18  and Melisa first.  Let her know that I will try to fit her in

19  after that."

20        My assumption was that she needed to talk to me on

21  something about the construction project because we had a lot

22  of things we were working on with that.  And she said, "Well,

23  I have to call her now."  And so I just kind of ignored it and

24  headed to my office.  By the time I got to my office, Condelia

25  from state was there, and I had just put the key in the door.

1  And she said -- you know, they would call me by different

2  names -- "Dr. J, I am not sure what's going on, but something

3  is happening, and they told me I can't let you in your

4  office."

5           And I was -- my heart dropped, really.  I didn't

6  know what to think.  Things just went blank.  She said, "I was

7  told that I have to have you wait in Melisa's office."

8           So I went and waited in Melisa's office, and I was

9  there for probably an hour and a half.  And I still had my

10  suitcase.  I am dragging my suitcase through this open area of

11  all these cubicles of people that report to me, and I noted

12  that no one would give me eye contact.

13           And so I got to Melisa's office, and I sat there for

14  an hour and a half waiting for her.  She finally kind of comes

15  rushing in, and she said, you know, "I am sorry, I am late.  I

16  thought you were getting in at a different time."  I said, "I

17  sent you the itinerary."  And she said, "Okay."  I said,

18  "Melisa, really, what is going on?"  It is just the two of us

19  in her office.  "Tell me what's going on."  She says, "We are

20  going to meet in a minute.  Can you just go wait in the

21  conference room."

22           So then I am dragging my suitcase from Melisa's

23  office, back across the bullpen to the conference room, which

24  has windows on it, feeling kind of like a fishbowl effect,

25  people are looking in.  And I just started to cry.  I didn't

CAMPBELL - DIRECT - LESCHT                    49

1  know what was going on.  I felt completely caught off guard.

2  I waited there probably another half an hour to 45 minutes.

3  And she comes in and says, "Sorry for the delay.  We are

4  waiting for one more person, and then we will be back in."

5  They left me there for another half an hour, 45 minutes.

6        And then Melisa enters with a representative from

7  human resources, at which time they start discussing that

8  there have been some allegations made against me, and I asked

9  for the specifics around those allegations.  She said, "I

10 can't tell you, but there's about five things that we're

11 investigating, and so for now, we are going to put you on

12 administrative leave," and they handed me a letter.

13 Q   Is that Plaintiff Exhibit 4, is that what they handed

14 you?

15 A   Yes, it is.

16        MR. LESCHT:  Your Honor, we move for admission for

17 Plaintiff Exhibit 4.

18        MS. KNAPP:  No objection.

19        THE COURT:  It's admitted.

20        (Plaintiff Exhibit 4 was received in evidence.)

21 BY MR. LESCHT:

22 Q   So at that point you meet with Melisa Byrd, she hands you

23 this letter.  Had she told you about the allegations that were

24 made against you?

25 A   No, she just said that they were allegations, and she

1  gave an approximate number.

2  Q    And this letter is dated June 4?

3  A    Correct.

4  Q    Did you call Turnage?

5  A    No, because I actually anticipated he was going to join

6  us.  From the conversation I had with her the previous night,

7  she said "we."  And because she was his chief of staff, my

8  assumption was, you know, whenever she would say "we need to

9  meet with you," it was always Melisa and Director Turnage.  So

10  I thought he would be joining in this meeting, and he did not.

11  I was waiting for him to walk in, he never did.

12        They asked me to read the letter.  And so they gave

13  me time to read the letter.  I read it, and then there was a

14  checklist.  I don't know if that's a part of this.  But there

15  was a checklist of items that I needed -- yes, here it is.

16  Checklist of items or property that I needed to return while I

17  am on leave.  And then they asked me to sign the letter.  I

18  did ask about did my signature -- was my signature an

19  admission of guilt or what was the purpose of my signature,

20  and the HR representative said, "No, this is really just to

21  acknowledge that you received the letter."  And I still was

22  asking -- so I turned to the HR representative, since Melisa

23  wasn't willing to tell me, and I said, "Can you or anyone tell

24  me what this is about, or what the specific allegations are?"

25  And she said, "No."  And I turned in what I had with me at the

*CAMPBELL - DIRECT - LESCHT*                                    51

1  time, which was my District Blackberry, my key card, and my

2  badge, and my badge had attached to it a zip drive, a USB

3  drive that was my personal USB drive, and then keys to the

4  office.  So I gave them that.

5          And because I was on travel, I didn't have the

6  District laptop with me.  So they checked off the items I gave

7  them.  And I asked, "What are the next steps?"  Melisa said,

8  "I will be in touch."  And --

9  Q    Did you hear from her further that day?

10 A    I did not hear from her that day.  I actually -- when I

11 went home, because Wayne never joined us, so they walked me to

12 the door, obviously.  And I was dragging my suitcase, and I

13 just walked to the corner, caught a cab and went home.

14 Q    So turn to Plaintiff Exhibit 6.  This is an e-mail

15 exchange between you and Ms. Byrd?

16 A    Yes.

17 Q    Turn to the second page.

18 A    Yes.

19 Q    Is that the e-mail you sent her?

20 A    Yes.  I sent from my personal e-mail account --

21 Q    Was this on -- this was the same day, right?

22 A    That was the same day.

23 Q    At 12:30.  So you get home?

24 A    Yes.

25 Q    And you send her an e-mail.  What did you say?

1  A    I asked her -- I reminded her that I had two additional

2  items that were actually not on the checklist.  One was a

3  wireless card that went with the laptop.  And so I just -- and

4  the parking pass.  So since I had not driven, I just said, "I

5  wanted to let you know that I owe you actually three things,

6  the laptop, the parking pass, and the wireless card."  And

7  then I asked for a meeting.  I said, "I hope to be able to

8  defend the accusations outlined during our meeting today," and

9  I asked to meet with her, Wayne, and Linda Elam, who is a

10  person that I used to report to, she's the deputy director for

11  Medicaid.  And I sent that on the 4th.

12  Q    And did she respond?

13  A    She did respond on the 5th.

14  Q    And what did she say?

15  A    She said, "We are available to meet on Thursday, at 6:30.

16  Please let me know if you are available."

17  Q    Did you respond?

18  A    I responded and said "I am available."

19  Q    Did that meeting take place?

20  A    No, they called to reschedule that meeting.

21  Q    So they cancelled it?

22  A    They cancelled it.

23  Q    So that meeting would have been the 7th; is that right?

24  A    I believe so.  Yes.  The Monday was the 4th.  So, yes.

25  Q    The 7th.

CAMPBELL - DIRECT - LESCHT                              53

1          So they cancelled that meeting.  Did they reschedule

2    it with you?

3    A    They rescheduled it for Monday at 6:30 p.m.  At first

4    they were -- they wanted it to be during the day.  I asked,

5    because of the humiliation I had already suffered, I asked for

6    it to be after business hours.

7    Q    So the 7th, by then, did you know they had been already

8    talking to the reporters?

9    A    By the 7th?

10   Q    We now know, but did you know back then?

11   A    No, I had no idea.

12   Q    So they scheduled to meet with you in person, at which

13   point you understood that you were going to be told the

14   details?

15   A    Yes.

16   Q    And they cancelled?

17   A    They did.

18          MR. LESCHT:  Plaintiff moves for admission of

19   Exhibits -- I believe we admitted the suspension letter.  We

20   move for admission of Plaintiff Exhibit 6 as well, Your Honor.

21          MS. KNAPP:  Your Honor, the first page of that would

22   be all right, but there are other materials attached to it

23   that I don't think --

24          THE COURT:  Well, I mean, is it all part of the same

25   e-mail?  That was unclear to me, myself.

1        MR. LESCHT:  Judge, what we will do, we will

2   redact -- this is how it was produced to us.  But we will cut

3   off the bottom.  It's the e-mail between Ms. Byrd and

4   Ms. Campbell that we will put back to the jury that we

5   discussed.

6        THE COURT:  Were the other materials attached to

7   that e-mail?  Was it all forwarded to her?

8        MS. KNAPP:  If you look at the top e-mail, it is

9   actually something from Ms. Byrd to someone else within the

10  department of Department of Health Care Finance.  So I think

11  all of those pieces were forwarded to that person.

12       MR. LESCHT:  What the Judge is referencing is just

13  the back.  That's just how it was produced.  That was four

14  days later.  We will cut it off and redact it.

15       THE COURT:  Okay.  So all we are admitting is page

16  87, or page 87 and the top part of 88?

17       MR. LESCHT:  That's correct.

18       MS. KNAPP:  And, Your Honor, but there is an e-mail

19  on June 11 of the top of page 87 as well.

20       MR. LESCHT:  We can cut that off, too, because that

21  is four days later.

22  BY MR. LESCHT:

23  Q    So getting back to the timeline here again, they

24  cancelled the meeting on 7th, and they rescheduled it for 6:30

25  p.m. the following Monday?

CAMPBELL - DIRECT - LESCHT                    55

1    A    Yes, for the 11th.

2    Q    Is that the Monday we talked about yesterday?

3    A    Yes, it is.

4    Q    Where you got the call in the morning saying the

5    article's coming out?

6    A    Yes.

7    Q    Okay.  And that's the day you found out you were being

8    fired?

9    A    Yes.

10   Q    Now, Dr. Campbell, let's talk about how your experience

11   has impacted you.

12   A    Okay.

13   Q    What was your salary as the chief operating officer?

14   A    I believe it was 146.  146,000.

15   Q    Did you find a job quickly?

16   A    No.

17   Q    How long were you out of work?

18   A    Two years.

19   Q    How did you support yourself during that time?

20   A    I had done some independent consulting before, so I went

21   back to that.  But it was hard to find engagements with that

22   because I was kind of persona non grata.  No one really wanted

23   to deal with me because of the newspaper article.  So I had

24   small engagements, but I think one year I was -- I made less

25   than 16,000, and another year I made less -- somewhere around

1   26,000.  Actually, less than the federal poverty level.

2           I have been an adjunct professor for Johns Hopkins

3   and University of Maryland and George Washington since 2003,

4   and so that was one source of income.  But they -- I was --

5   University of Maryland is the only one who extended the offer

6   for me to teach a class.  George Washington and Hopkins were a

7   little hesitant, and I was never told why.  I just made my own

8   assumptions.  But University of Maryland had me teach one

9   course.  And I had to -- because I had been teaching with them

10  so long, all of that information was in that jump drive that I

11  was asking the District to return to me that just happened to

12  be attached to my badge, and they never returned it to me.

13  Q    So is this when the business about you having a lawyer

14  contact them occurred?

15  A    Yes.

16  Q    Who was that lawyer?

17  A    It is actually my mother.

18  Q    And what was it that you had your mother ask them to do?

19  A    To return my personal property, which was my USB drive.

20  It had all of my -- well, it actually had wedding pictures, it

21  had vacation pictures, it had -- I mean, it was personal

22  information.  And what I typically did was I saved things to

23  that drive rather than saving it to my computer because I was

24  always afraid of my computer crashing.

25          So all of my teaching materials were on there.  I

1   had to recreate, basically, what's nine years of teaching

2   material.  So because of that, I was not even able to teach

3   that first semester that University of Maryland was extending

4   to me because I had to get everything back together.  So that

5   was a source of income that I wasn't able to take advantage of

6   until later.  But that was around, I want to say, $800 a

7   month.

8   Q    So in the two years that you were essentially without a

9   fixed job, a permanent job, did your life change economically?

10  A    Oh, absolutely.

11  Q    Can you explain to the jury the difference before -- the

12  difference between when you were employed and then when you

13  were unemployed for those two years?  How did your life

14  change?

15  A    Well, we went from being a two-income household to one.

16  We -- I ended up -- I had owned my home since 2006, and I was

17  two months away from foreclosure.  I received a

18  pre-foreclosure letter.  And so that really affected my

19  credit.  So to this day, my credit is destroyed.  The only way

20  that I was able not to -- or to save my home was actually my

21  church gave me money to make my mortgage payment.  And that

22  was humbling because I used to be on the other side of that,

23  where I would help families that needed it.  And, I mean, I am

24  thankful that they were able to.  And then I was able to work

25  out a payment plan with the mortgage company.  So, you know,

1  definite financial implications that took a toll.

2  Q    How about the publicity surrounding these articles?  Did

3  people you know mention them to you?  Look at you differently?

4  A    Yes.  I actually had turned off my phone for a while.  I

5  just did not want to answer any of the questions.  I mean,

6  some people were well meaning.  Most people were just, in my

7  estimation, were just being nosy.  So I cut off my friends, I

8  really didn't talk to my family.  I didn't know how to explain

9  what was going on.

10         To this point, I had been -- everyone was really

11  proud of me and the things I accomplished.  And to just go

12  from that to being kind of like a pariah, I didn't want to

13  deal with anyone, so I stayed home.  I was pretty depressed

14  for a while, and couldn't cry -- I just actually couldn't stop

15  crying a lot.  So it just -- I couldn't maintain a lot of my

16  relationships.  I'm still trying to rebuild some of them.

17  Luckily, I did have some really tremendous friends who

18  understood what I was going through and didn't take it

19  personally, and were really supportive, and are supportive to

20  this day.

21         But it was also very telling of who were my true

22  friends.  There were some people that were at the agency that

23  I thought were my true friends, who I literally have seen some

24  of them, you know, just walking on the street, and they would

25  cross to the other side just to avoid me.  And I am not sure

CAMPBELL - DIRECT - LESCHT                                    59

1    why, if they just thought that talking to me would, you know,

2    hurt their careers.  Or I don't know why, but just it was --

3    it really opened my eyes.  And I know that just happens

4    sometimes in life, but the way in which this happened just

5    was -- it took a toll on several different levels of my life.

6    Q    How about your physical well-being?  Do you suffer from

7    any conditions?

8    A    Yes.  I have three autoimmune conditions.  I have lupus,

9    and Sjogren's disease, as well as fibromyalgia.  All of them

10   are autoimmune conditions.  I was --

11   Q    You suffered from them before you went to work there?

12   A    Yes, I was diagnosed in 2008, actually.

13   Q    And how did you treat them?

14   A    Lupus is an interesting kind of disease to have.  On

15   average, it takes about seven years to even diagnose, and it

16   takes upwards of ten years for specialists to get the right

17   medication regiment together.  So they were actually still

18   trying to figure out what was working for me.

19          At the time, I was on three medications.  After all

20   of this happened -- so stress is also one of the main triggers

21   of lupus, and what happens is that you have flare-ups.  And a

22   flare-up means that you -- well, for me -- it manifests itself

23   differently for different people, but so, for me, a flare-up

24   is kind of chronic fatigue.  It's feeling like someone's

25   sitting on you, and you can't get up.  It is entirely

CAMPBELL - DIRECT - LESCHT                          60

1   impossible to do just day-to-day activities.  There's a lot of

2   joint pain.  I have been living with that pain since 2008, but

3   it certainly --

4   Q    How about this experience, how did that impact your

5   condition?

6   A    The stress of everything affected my condition in that I

7   believe it was even the week of the 12th, after receiving my

8   termination letter, I had a flare-up that was so bad I

9   couldn't really move.  My husband had to carry me to the car

10  to take me to the doctor.  And the doctor suggested that I go

11  to the hospital, but I just always have typically been private

12  and a very kind of proud person and considered myself strong,

13  and this just kind of tore me down.  But I still didn't want

14  to go to the hospital.  So from that -- since then I have

15  actually gone from three medications to seven, twice a day.

16         And I have had several procedures.  Lupus attacks

17  your body.  So it attacks good things and bad things.  Lupus

18  is about -- it overproduces antibodies in your system, and so

19  your body gets confused, and it doesn't know what's good and

20  what's bad.  And so it's essentially like your body fighting

21  itself.  So it will attack different parts of your system, of

22  your body, at any given time.  And so during one period it was

23  attacking my GI system, so I had an erosion of my stomach

24  lining and ended up with an ulcer, which is also

25  stress-induced.  A hiatal hernia, which is when your lining is

CAMPBELL - DIRECT - LESCHT                                   61

1    eroded so much that your whole stomach is lifted.  And that

2    created an erosion in my esophagus.  I couldn't really swallow

3    for a while, and I had to have several procedures around that.

4    It also attacked my nervous system.  I was diagnosed with a

5    mild neuropathy, and had to have some procedures around that.

6    And for a while I was using a cane, and I couldn't really get

7    around that well.

8    Q    How about your professional life, your reputation,

9    your -- how did this experience affect that?

10   A    It still is affecting.  So I was trying to get a job.

11   Once I kind of pulled myself together and somewhat lifted

12   myself from the depression, I started -- I got in front of my

13   computer and just made a promise to myself that I would just

14   at least start looking for -- take the moment, take the

15   motions to try to find a job.  And so I started sending

16   e-mails to colleagues that were once very close colleagues who

17   really respected my work.  I mean, I am published in peer

18   reviewed articles, I was a speaker on health reform, I have

19   been an invited speaker to several conferences.

20              And so I was well regarded in my professional

21   community, and 90 percent of those people stopped returning my

22   calls.  The ones who did were the ones who were willing to

23   give me smaller contracts, and so those were the two or three

24   contracts that I had across the -- excuse me, I'm sorry.

25              THE WITNESS:  Your Honor, may I have a moment?

*CAMPBELL - DIRECT - LESCHT*                                    62

1         THE COURT:  Let's take a five-minute break.

2         (WHEREUPON, jury exited the courtroom, and a recess

3   was had from 11:47 a.m. to 12:00 p.m., at which time the

4   following further proceedings were had in open court, outside

5   the presence and hearing of the jury, to wit:)

6         THE COURT:  Mr. Lescht, if you are going to continue

7   to ask me to exclude the attorney, you are going to have to

8   provide a little more authority on that.

9         MR. LESCHT:  It is a new one for me, too.

10        THE COURT:  Okay.  Are we ready for the jury?

11        MR. LESCHT:  Yes.

12        (WHEREUPON, the jury re-entered the courtroom, and

13  the following further proceedings were had in open court, in

14  the presence and hearing of the jury, to wit:)

15        MR. LESCHT:  Thank you, Judge.

16  BY MR. LESCHT:

17  Q    Dr. Campbell, I would like to go back to one of the

18  documents we hadn't mentioned before.  I opened to Plaintiff

19  Exhibit 9.  Take a look at that.

20  A    Yes.

21  Q    Is that the termination letter you received?

22  A    Yes, it is.

23        MR. LESCHT:  Your Honor, we move for admission of

24  Plaintiff Exhibit 9.

25        MS. KNAPP:  That's fine, Your Honor.

*CAMPBELL - DIRECT - LESCHT*                                    63

1          THE COURT:  It's admitted.

2          (Plaintiff Exhibit 9 was received in evidence.)

3  BY MR. LESCHT:

4  Q    This is the letter you received.  Is it the 12th; is that

5  right?

6  A    I received it on the 12th.  It is dated for the 11th.

7  Q    And in this letter they finally do put together some

8  notice to you of the allegations, is that right, on the

9  bottom?

10  A    Yes.

11  Q    And, again, what is your position on these allegations?

12  A    That none of them are true.

13  Q    Now, when we broke, you had been talking about how this

14  experience has affected you.

15  A    And I apologize for that.

16  Q    That's all right.

17          You had mentioned your husband earlier.  How has

18  this experience affected your personal life?  Are you still

19  married?

20  A    No.  We are divorced now.

21  Q    And did this experience contribute to acrimony in your

22  relationship?

23  A    Yes, unfortunately, it did.

24  Q    In what way?

25  A    I think the financial burden was a large part of it,

1  quite honestly.  I think, you know, it is just -- it is hard

2  to try to manage a household.  I think he felt some issues

3  with how do I -- you know, he couldn't fill the gap, and I

4  wouldn't have expected him to.  We went from a two-income

5  household to one.  And so he started working more, and I think

6  he also just felt helpless.  I think there's some -- when you

7  can't do anything about what your spouse is going through --

8  and, admittedly, I played a part because I was so frustrated

9  and I was so depressed, and, you know, he would try to console

10  me and say, "It is going to be okay, and you will get through

11  this."  And I would say, "You just don't understand."  And so

12  I had my -- I played my part in being kind of snappy and just

13  not -- okay.  We did a lot of things and said a lot of things

14  that hurt each other, but it was all out of the frustration of

15  life changing so suddenly.  And we tried a lot.  We went to

16  counseling, and it just -- we could not find a way back to

17  where we were.

18  Q    Now, at present, though, you have a job, right?

19  A    Yes, I do.

20  Q    And how long did it take to get this position?

21  A    So I was terminated June 11.  I started this job late

22  June -- sorry.  June 11 of 2012.  I started this job late June

23  of 2014.

24  Q    So about two years?

25  A    Yes.

CAMPBELL - DIRECT - LESCHT                                    65

1  Q    And what is the job that you are doing?

2  A    I am a consultant.  I am a senior consultant for health

3  care policy.

4  Q    So you are back in the same industry?

5  A    Yes.  I am on the policy side more than the

6  implementation side.

7          MR. LESCHT:  Okay.  I have no further questions,

8  Your Honor.

9          THE COURT:  Thank you.

10          Ms. Knapp?

11          MS. KNAPP:  The District has no questions at this

12  time.

13          THE COURT:  Thank you.

14          THE WITNESS:  Thank you.

15          (WHEREUPON, the witness was excused.)

16          MR. LESCHT:  Plaintiff calls Darryl Wiggins.

17          THE COURTROOM DEPUTY:  Please step into the box and

18  raise your right hand.

19          (WHEREUPON, the witness was duly sworn.)

20          THE COURT:  Good afternoon.

21          THE WITNESS:  Afternoon.

22                  DARRYL WIGGINS,

23  called as a witness herein by the Plaintiff, having been first

24  duly sworn, was examined and testified as follows:

25                  DIRECT EXAMINATION

1    BY MR. LESCHT:

2    Q    Mr. Wiggins, do you own a business?

3    A    Yes.

4    Q    What's the name of that business?

5    A    Our legal name is DigiDoc.  We trade as Document

6    Managers.

7    Q    And I am going to ask you some questions about articles

8    that were published that mentioned your name.  Are you

9    familiar with those articles?

10   A    Yes.

11   Q    Are you familiar with the allegations made against you?

12   A    Yes.

13   Q    The allegations are that Dr. Campbell was involved in

14   some scheme to have you do business with another company.

15        Did you have any relationship with Dr. Campbell?

16   A    No.

17   Q    Did you and she discuss her somehow forcing some other

18   company to get business for you?

19   A    No.

20   Q    All right.  Are you familiar with now mayor Muriel

21   Bowser?

22   A    Yes.

23   Q    And back in 2012, were you familiar with Muriel Bowser?

24   A    Yes.

25   Q    And did you play a role in her campaigns?

1  A    Yes, I was volunteer, but I was the also the chairman of

2  her campaign.

3  Q    Do you know the name of the company called CGI?

4  A    Yes.

5  Q    And do you recall they were mentioned in that article --

6  A    Yes.

7  Q    -- along with you?

8         Can you tell the jury what was your experience or

9  how did you come to know CGI?

10 A    So, I, with Dell Computers, went after the health

11 exchange contracts in other states, and we had a team to do

12 that.  And one of the members of the team was this health IT

13 company called Cognosante.  And one of their development

14 managers was a lady named Davis Foster.

15        And so we went after the opportunity in the state of

16 Maryland, and we went after the opportunity in New York, and

17 we lost both of them.  And so when we were looking at the

18 opportunity in the District of Columbia, Davis Foster came to

19 me and said, "Hey, there's this company called CGI that won

20 the federal exchange, and would you be interested in talking

21 to them about partnering with them to go after the DC

22 exchange."

23        So she set up a meeting between myself and other

24 members of the team, and a woman named Holli Ploog, who worked

25 for CGI.  And so that's how I was introduced to CGI.

1  Q    So during this introduction in these communications, did

2  you ever get a call from Dr. Campbell saying that she was

3  going to be the one to make this deal happen for you?

4  A    Never.

5  Q    Did you think that she was behind the scenes trying to

6  get business for you?

7  A    No.  I didn't know her.  So I met Dr. Campbell when Wayne

8  Turnage introduced her to me.  One of my employees set up the

9  meeting to meet with Wayne Turnage, who was the director of

10 health care finance, so we could introduce our process

11 capabilities as a team when we were looking at going after the

12 exchange.  And when I got there, Wayne Turnage said, "This is

13 Dr. Jennifer Campbell.  We have hired her to lead the exchange

14 project."  That was the first day I met her.

15 Q    Now, had you ever been told about allegations that

16 Dr. Campbell was involved to get your company to do business

17 with CGI before this article was published?

18 A    Never heard of it -- let me take a step back.  Someone

19 called me and told me that she had been fired.  That was

20 before the article came out.  They said she had been fired.

21 And I said, "Why?"  And they said, "Because she was accused of

22 trying to steer a contract to you."  And then I immediately

23 asked Wayne Turnage for a meeting because I was like "What's

24 going on?"

25        And so I met with Wayne Turnage.  And I said to him,

1  "Listen, I don't -- you introduced her to me, and I haven't

2  had any communication with her since.  So I really don't

3  understand this."  And he didn't really elaborate any further.

4  And then a couple of days later, right, then the articles

5  start coming out, the folks from the Washington Post had my

6  home number, which is not listed, so I was curious how they

7  got my home number, unless somebody from the government gave

8  it to them.  So all of these articles came out about it.  And

9  that the article was after I talked to Wayne Turnage.

10 Q    And did you tell Turnage that the allegations involving

11 Dr. Campbell, you, and CGI were not true?

12 A    Absolutely.

13         THE COURT:  Who is it that told you she had been

14 fired?

15         THE WITNESS:  I don't remember the person's name.

16 Because I started swirling when they told me, and I just

17 picked up the phone and said, "I need to see you right away."

18 So I just don't remember that person's name.

19         MR. LESCHT:  I have no further questions,

20 Your Honor.

21         THE COURT:  Okay.

22                    CROSS-EXAMINATION

23 BY MR. KARPINSKI:

24 Q    Good afternoon, Mr. Wiggins.

25 A    How are you?

1    Q    How you doing?

2    A    Good.

3    Q    Mr. Wiggins, you were never part of any communication

4    between Holli Ploog and Ms. Campbell, correct?

5    A    No.

6    Q    And so isn't it true that you have no idea what

7    Ms. Campbell may or may not have said to Holli Ploog about

8    working with your company DigiDoc, correct?

9    A    I wouldn't know.

10   Q    Okay.  You have never alleged that CGI made up any

11   allegations about Ms. Campbell, have you?

12   A    No.

13   Q    And at least at the time of your deposition in this case,

14   you hadn't really put any thought into that, had you?

15   A    No.

16   Q    You don't have any reason to believe that CGI made up any

17   allegations about Ms. Campbell, do you?

18   A    Not CGI, no.

19   Q    And you wouldn't know, would you?

20   A    No.

21   Q    You don't have any reason to think that CGI had some

22   political reason to single you out, do you?

23   A    No.

24   Q    I mean, what does CGI care about the politics of DC,

25   right?

1   A    Nothing.  I don't believe that they do.

2   Q    Okay.  Aside from the allegations relating to DigiDoc,

3   your company, you don't have any knowledge of any allegations

4   against Ms. Campbell relating to steering of other individuals

5   for contractors, correct?

6   A    No, I don't.

7   Q    So you don't know anything about whether or not she may

8   have steered Cedric Simon to Compass Solutions, do you?

9   A    No.

10  Q    And Jennifer Campbell works at Cognosante now; isn't that

11  right?

12  A    As far as I know, yes.

13          MR. KARPINSKI:  Okay.  Nothing else, Your Honor.

14          THE COURT:  Any redirect?

15                  REDIRECT-EXAMINATION

16  BY MR. LESCHT:

17  Q    What about the allegations that were made by Compass, do

18  you think that those were false?

19  A    I don't remember what they are.  I mean, I was so -- I

20  was so focused on the allegation, the political allegation,

21  that I didn't drill that far down in it.  So the allegations

22  about Compass, I don't know what they are.

23  Q    The allegations about you being involved in the newspaper

24  tied you to Muriel Bowser, didn't they?

25  A    Right.

1  Q    And were you upset by reading your name in the paper?

2  A    You could imagine that years later I am still upset.  As

3  you can imagine, the first thing people do when they want to

4  do business with me is they research me, right.  And the first

5  thing that comes up in Google is that, you know, Darryl

6  Wiggins and DigiDoc, this lady was fired for trying to steer a

7  contract to me.  So you can imagine my business reputation has

8  been impugned significantly.

9         Every business partnership I go in I have to explain

10  that to people.  I have been a business owner for over 15

11  years.  I'm a native Washingtonian, worked at Xerox for 12

12  years, and just tried to do it the right way.  And so you can

13  imagine, having to have to explain that every time, for a

14  woman I only met one time, and something that I know nothing

15  about, is problematic, to say the least.

16  Q    Isn't it true that she never introduced you to clients

17  before?

18  A    No, I met her when Wayne Turnage introduced me.

19  Q    And she's never introduced you to clients since?

20  A    No.

21         MR. LESCHT:  No further questions, Your Honor.

22         THE COURT:  Okay.

23         MR. KARPINSKI:  Nothing further, Your Honor.

24         THE COURT:  Thank you, Mr. Wiggins.  You are

25  excused.