NOT YET SCHEDULED FOR ORAL ARGUMENT

———————

No. 16-7077

———————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

JENNIFER B. CAMPBELL,

APPELLEE,

v.

DISTRICT OF COLUMBIA,

APPELLANT.

———————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————

**JOINT APPENDIX VOLUME III**

———————

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

## **TABLE OF CONTENTS**

**VOLUME I**

1. Docket .......................................................................................................... 1

2. Complaint, ECF Record Document ("RD") 1 ........................................... 18

3. Joint Pretrial Statement, RD 41 ............................................................... 34

4. Jury Verdict, RD 65 ................................................................................. 115

5. Jury Instructions, RD 66 ......................................................................... 118

6. Memorandum Opinion Denying Plaintiff's Request for Equitable Relief and Entering Judgment for Plaintiff, RD 74 ................................................. 166

7. Judgment, RD 75 ..................................................................................... 170

8. District of Columbia's Motion for Judgment as a Matter of Law, RD 83 ................ 171

9. Plaintiff's Opposition to Defendant's Motion for Judgment as a Matter of Law, RD 89 ................................................................................................. 183

10. 5/25/16 Order Denying District of Columbia's Motion for Judgment as a Matter of Law, RD 98 ............................................................................... 199

11. 5/25/16 Memorandum Opinion Denying District of Columbia's Motion for Judgment as a Matter of Law, RD 99 ..................................................... 200

12. Trial Transcript, December 7, 2015 ........................................................ 217

    a.  12/7/15, pages 25-52 (Jennifer Campbell testimony) ....................... 219

13. Trial Transcript, December 8, 2015 ........................................................ 247

    a.  12/8/15, pages 17-65 (Jennifer Campbell testimony) ...................... 251

    b.  12/8/15, pages 65-72 (Darryl Wiggins testimony) ........................... 299

**VOLUME II**

13. Trial Transcript, December 8, 2015 (continued) ........................................................ 307

    c.  12/8/15, pages 73-76 (Sam Walker testimony) ..................................................... 307

    d.  12/8/15, pages 76-105 (Pedro Ribeiro testimony).............................................. 310

    e.  12/8/15, pages 106-14 (Bonnie Norton testimony) ............................................ 340

    f.  12/8/15, pages 114-51 (Christopher Murphy testimony) ................................... 348

    g.  12/8/15, pages 151-59 (Janene Jackson testimony) ........................................... 385

    h.  12/8/15, pages 160-68 (Carol Rand-Campbell testimony)................................. 394

    i.  12/8/15, pages 169-88 (Rule 50 motion and colloquy) ..................................... 403

14. Trial Transcript, December 9, 2015 ......................................................................... 423

    a.  12/9/15, pages 8-12 (Rule 50 colloquy) ........................................................... 430

    b.  12/9/15, pages 13-29 (Holli Ploog testimony).................................................. 435

    c.  12/9/15, pages 30-100 (Wayne Turnage testimony) ......................................... 452

    d.  12/9/15, pages 100-53 (Melisa Suzane Byrd testimony).................................. 522

    e.  12/9/15, pages 159-88 (Jennifer Campbell testimony)...................................... 581

**VOLUME III**

15. Trial Transcript, December 10, 2015 ....................................................................... 614

    a.  12/10/15, pages 4-35 (Jury Instruction colloquy).............................................. 617

    b.  12/10/15, pages 36-99 (Anthony Onyewuchi testimony).................................. 649

    c.  12/10/15, pages 104-16 (Rule 50 motions and colloquy, Jury Instruction colloquy) ........................................................................................................... 717

    d.  12/10/15, pages 117-34 (Jennifer Campbell testimony)................................... 730

    e.  12/10/15, pages 135-40 (Rule 50 motions and colloquy)................................. 748

f.  12/10/15, pages 143-62 (Campbell closing argument)......................................756

g.  12/10/15, pages 162-80 (DC closing argument)..........................................775

h.  12/10/15, pages 180-85 (Campbell closing argument)...................................793

16. Trial Transcript, December 11, 2015 .....................................................614

a.  12/11/15, pages 3-10 (Verdict) .........................................................802

17.  Trial Exhibits ..........................................................................811

a.  Plaintiff's Exhibit 1....................................................................811

b.  Plaintiff's Exhibit 3....................................................................820

c.  Plaintiff's Exhibit 4....................................................................822

d.  Plaintiff's Exhibit 5....................................................................826

e.  Plaintiff's Exhibit 6....................................................................828

f.  Plaintiff's Exhibit 7....................................................................830

g.  Plaintiff's Exhibit 8....................................................................836

h.  Plaintiff's Exhibit 9....................................................................839

i.  Plaintiff's Exhibit 12...................................................................842

j.  Plaintiff's Exhibit 14...................................................................843

k.  Plaintiff's Exhibit 15...................................................................844

l.  Plaintiff's Exhibit 16...................................................................847

m. Plaintiff's Exhibit 17...................................................................852

n.  Plaintiff's Exhibit 18...................................................................857

o.  Plaintiff's Exhibit 19...................................................................868

p.  Plaintiff's Exhibit 35...................................................................871

q.  Plaintiff's Exhibit 37.......................................................................... 874

r.  District of Columbia Exhibit 9 ............................................................ 877

s.  District of Columbia Exhibit 15 .......................................................... 879

t.  District of Columbia Exhibit 58 .......................................................... 883

u.  District of Columbia Exhibit 62 .......................................................... 884

v.  District of Columbia Exhibit 70 .......................................................... 887

w.  District of Columbia Exhibit 95 ......................................................... 890

1

1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2

3    JENNIFER B. CAMPBELL,          ) Civil Action
                                    ) No. 12-1769 (RC)
4                 Plaintiff,        ) EXCERPT TRANSCRIPT OF
                                    ) JURY TRIAL-DAY 4
5    vs.                            ) (Proceedings ending with
                                    ) Closing Arguments)
6    DISTRICT OF COLUMBIA,          )
                                    ) Washington, DC
7                 Defendant.        ) Date:  December 10, 2015
                                    ) Time:  10:00 a.m.
8    _____

9           EXCERPT TRANSCRIPT OF JURY TRIAL-DAY 4
         (Proceedings ending with Closing Arguments)
10                    HELD BEFORE
        THE HONORABLE JUDGE RUDOLPH CONTRERAS
11            UNITED STATES DISTRICT JUDGE

12   _____
                    A P P E A R A N C E S

13   For the Plaintiff:       Alan Lescht, Esq.
                              Sara Nunley McDonough, Esq.
14                            Sara B. Safriet, Esq.
                              Alan Lescht & Associates, PD
15                            1050 17th Street, NW, Suite 400
                              Washington, DC  20036
16                            202-463-6036

17   For the Defendant:       Sarah L. Knapp, Esq.
                              Alex Karpinski, Esq.
18                            Office of the Attorney General for
                              the District of Columbia
19                            441 4th Street, NW, Suite 630 Main
                              Washington, DC  20001
20                            202-724-6528

21

     Proceedings reported by machine shorthand, transcript produced
22   by computer-aided transcription.
     _____
23   Court Reporter:          Annette M. Montalvo, CSR, RDR
                              Official Court Reporter
24                            United States Courthouse, Room 6722
                              333 Constitution Avenue, NW
25                            Washington, DC  20001
                              202-354-3111

2

1                        INDEX

2                                                   PAGE

3   ANTHONY ONYEWUCHI                               36

4   DIRECT EXAMINATION                              36

5   BY MR. KARPINSKI                                36

6   CROSS-EXAMINATION                               56

7   BY MS. McDONOUGH

8

9   JENNIFER CAMPBELL                               117

10  DIRECT EXAMINATION                              117

11  BY MS. SAFRIET

12

13  OPENING ARGUMENT ON BEHALF OF PLAINTIFF         143

14  MR. LESCHT                                      143

15

16  CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT     162

17  MS. KNAPP

18

19  CLOSING ARGUMENT ON BEHALF OF PLAINTIFF         180

20  (REBUTTAL)

21  MR. LESCHT

22

23

24

25

3

```
1   EXHIBITS                              RECEIVED
2     Plaintiff Exhibit 33                  45
3     Plaintiff Exhibit 32                  133
4
5
6   Defendant Exhibit 9                     43
7   Defendant Exhibit 99                    43
8   Defendant Exhibit 70                    142
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*PROCEEDINGS*                                                    4

1          (WHEREUPON, commencing at 10:05 a.m., the following

2    further proceedings were had in open court, outside the

3    presence and hearing of the jury, to wit:)

4          THE COURTROOM DEPUTY:  Civil Action 12-1769,

5    *Jennifer B. Campbell v. District of Columbia.*

6          Alan Lescht for plaintiff.

7          Sarah Knapp for defendant.

8          Both parties are present.

9          THE COURT:  All right.  How should we go about doing

10   this?  Do you want to go one by one with the jury

11   instructions, or just focus on the ones that you are

12   interested in?

13         MR. LESCHT:  Either way works.

14         MS. KNAPP:  I have no --

15         THE COURT:  All right.  I will thumb through it, one

16   page at a time, and I will read the labels, and you can tell

17   me if there's any objections.  Does that make sense?

18         MR. LESCHT:  Sure.

19         THE COURT:  Preamble?

20         MR. LESCHT:  No.

21         THE COURT:  Function of the court?

22         MR. LESCHT:  No.

23         THE COURT:  Function of the jury?

24         MR. LESCHT:  No.

25         THE COURT:  Significance of party designations?

*PROCEEDINGS*                                                        5

1        MR. LESCHT:  No.

2        THE COURT:  Jurors duty to deliberate?

3        MR. LESCHT:  No.

4        THE COURT:  Attitude and conduct of jurors?

5        MR. LESCHT:  No.

6        THE COURT:  Instructions to be considered as a

7   whole?

8        MR. LESCHT:  No.

9        THE COURT:  Court's commenting on the evidence?

10       MR. LESCHT:  No.

11       THE COURT:  Court's questions to witnesses?

12       MR. LESCHT:  No.

13       THE COURT:  Jury not to take cue from judge?

14       MR. LESCHT:  No.

15       THE COURT:  Ruling on objections?

16       MR. LESCHT:  No.

17       THE COURT:  Equality of litigants?

18       MR. LESCHT:  No.

19       MS. KNAPP:  No.

20       THE COURT:  Evidence in the case?

21       MR. LESCHT:  None.

22       THE COURT:  Inferences?

23       MR. LESCHT:  No.

24       THE COURT:  Inadmissible and stricken evidence?

25       MR. LESCHT:  No.

*PROCEEDINGS*                                            6

1           THE COURT:  Statements of counsel?

2           MR. LESCHT:  No.

3           THE COURT:  Jury's recollection controls?

4           MR. LESCHT:  No.

5           THE COURT:  Burden of proof?  And that's the one

6     where we have the issue of the affirmative defense.

7           MS. KNAPP:  I think we -- so I think we have two

8     issues with the affirmative defense.  There's the question of

9     how (inaudible) and the question of truth.

10          THE COURT REPORTER:  You have to speak louder.

11          MS. KNAPP:  So there's the question of whether

12    there's privilege.

13          THE COURT:  Right.

14          MS. KNAPP:  And then there's also the question of --

15    so there's also a question of truth.  So the truth would be,

16    as I understand it, in defamation, truth is an affirmative

17    defense.  Untruth is not something that the plaintiff has to

18    prove.

19          THE COURT:  Doesn't the plaintiff have to prove

20    falsity?

21          MS. KNAPP:  Certainly don't want to give myself a

22    higher burden than I need to.  I thought that there was a

23    burden shifting in there.  I will take a look at it really

24    quickly when we come back, but we do need to talk about an

25    affirmative defense, regardless.

1          THE COURT:  Okay.  Hold on.

2          When I look on page 32, which is the elements of

3    proving defamation, element number 1 is that the District made

4    a false and defamatory statement about her.

5          MS. KNAPP:  Well, then, I think I am mistaken.

6          THE COURT:  Okay.  All right.  Let's talk about the

7    common interest privilege then.

8          MS. KNAPP:  So although the common interest

9    privilege has appeared most often in the -- in a much narrower

10   way than it is here, so, you know, I think Your Honor pointed

11   out in the summary judgment opinion that, you know, for the

12   most part, it is, you know, a former employer and a future

13   employer, and that type of thing.

14         The way that the privilege is stated is broad, and

15   the way that it has been stated in the case law is broad.  And

16   I think that simply based on the first principles of it, it is

17   broad enough to encompass what we have talked about, what the

18   various parties have talked about here, which is the

19   public's -- I think the public officials have a common

20   interest with the public to keep them informed about the

21   activities of public officials, and the -- the bidding here,

22   sort of -- and that would be broad enough to cover sort of the

23   bidding of these very important contracts.

24         And so I think that, you know, not sort of in the

25   traditional statements about an employee, but here we have the

*PROCEEDINGS*                                                        8

1    broader statements made to the public at large, where the

2    public has a right -- and I think Mr. Ribeiro was, in fact,

3    very adamant about the fact that this was the type of thing

4    that he truly believed the public had a right to know.  And so

5    I think that the privilege is broad enough to encompass that.

6             I also think that there's another privilege at issue

7    here, and I have been trying to sort of figure out how it

8    works vis-à-vis the claims that we've got here.  So government

9    officials do enjoy a privilege when they are acting within the

10   outer scopes of their duties and within -- they are acting in

11   the outer scopes of their duties and when they are -- and when

12   those duties are not merely ministerial.

13            And I think that that privilege should apply, but I

14   also recognize that if that privilege applies, it sort of in a

15   way eliminates any kind of a -- it sort of would perhaps

16   swallow the reputation plus claim, as it has been stated.  And

17   so -- but I haven't found -- I didn't find any case law

18   suggesting that --

19            THE COURT:  That almost sounds like a qualified

20   immunity defense, which would apply to the individuals.

21            MS. KNAPP:  It is absolute immunity.  And I think

22   the absolute immunity goes beyond just the individuals.  And

23   it is the immunity that has been talked about in *Barr v.*

24   *Matteo*, and it is an absolute immunity for common-law

25   defamation.

*PROCEEDINGS*                                                    9

1        And what I was really struggling with last night is

2   how that would apply here where, you know, in the context that

3   we have here, in a due process claim for, you know, for a

4   reputation plus style defamation case, it would seem to sort

5   of -- then it must always apply.  So, you know, and I couldn't

6   find a case that sort of resolved that tension.  I looked at

7   some of the restatements as well, but I think I at least need

8   to put on the record that the District is entitled to that as

9   well.

10       THE COURT:  Okay.  I think it is way late in the

11  game for such an amorphous assertion.

12       Mr. Lescht, what do you say about the common

13  interest privilege?

14       MR. LESCHT:  I think it absolutely does not apply.

15       THE COURT:  I think what you should do is at the

16  close of the case move for judgment on that claim.

17       MR. LESCHT:  I had thought, Judge -- I will just

18  point out, I went back to look at the rulings last night.  I

19  thought that you had ruled in the summary judgment decision

20  that it was dismissed because they had not provided any

21  evidence to support it.  And I was kind of surprised when I

22  saw it in the jury instructions.

23       So I can move right now.  I will move to dismiss it.

24       THE COURT:  They haven't rested it.

25       MR. LESCHT:  Okay.  All right.  I will remember.

*PROCEEDINGS*                                              10

 1          THE COURT:  Okay.  All right.  So that's an open

 2   issue as of now.

 3          And if I dismiss, Ms. Knapp, if I dismiss the common

 4   interest privilege affirmative defense, does that instruction

 5   come out?

 6          MS. KNAPP:  I believe so.

 7          THE COURT:  Okay.  Evidence produced by adversary?

 8          MR. LESCHT:  No objection.

 9          THE COURT:  Direct and circumstantial evidence?

10          MR. LESCHT:  No.

11          THE COURT:  Jury to determine credibility of

12   witnesses?

13          MR. LESCHT:  No.

14          THE COURT:  Number of witnesses?

15          MR. LESCHT:  No.

16          THE COURT:  Depositions as evidence?  We haven't had

17   any.

18          MR. LESCHT:  Judge, we may read in some brief

19   portions of transcripts as our part of our rebuttal.  So if we

20   do, we can leave it.  If not, I have no problem.

21          THE COURT:  Okay.  Ms. Knapp, do you plan to read

22   any before you rest your case?

23          MS. KNAPP:  No, Your Honor.

24          THE COURT:  Okay.  So if Mr. Lescht does not read

25   any as part of rebuttal, then we can remove that one?

 1                MS. KNAPP:  Correct.

 2                THE COURT:  Do you agree with that?

 3                MR. LESCHT:  That's right.

 4                THE COURT:  Impeachment by prior inconsistent

 5     statements?

 6                MR. LESCHT:  No objection.

 7                THE COURT:  Adopting prior inconsistent statements?

 8                MR. LESCHT:  No objection.

 9                THE COURT:  Nature of the plaintiff's claim?

10                MS. KNAPP:  The District objects to this

11     instruction, Your Honor.

12                THE COURT:  Okay.  What do you object about it?

13                MS. KNAPP:  So what the instruction says is that

14     the -- the second sentence:  Dr. Campbell alleges that the

15     District violated her rights under 42 USC 1983, which

16     prohibits the government from terminating her employment

17     without due process.

18                That's not the type of due process claim we are

19     talking about here.

20                THE COURT:  No, no.  I agree.

21                MS. KNAPP:  Okay.

22                THE COURT:  I agree.  I do note that that came

23     directly out of the joint pretrial statement -- the statement

24     of the claims, but I agree with your statement that it is an

25     incorrect statement of the law.

1          Okay.  What -- how should we word that?  From --

2     prohibits the government from depriving her of the liberty

3     interest without due process of law, and then the rest of it

4     is explained further?

5          MS. KNAPP:  I think that's fine, Your Honor,

6     although -- then this is a technicality, but, you know, she

7     doesn't have -- actually have any rights under 42 USC 1983.

8     The rights are under the Fifth Amendment.  1983 is a

9     procedural mechanism.

10          THE COURT:  So in this case, the plaintiff,

11     Dr. Campbell, brings a claim pursuant to 42 USC 1983 against

12     her former employer in which she claims that --

13          MS. KNAPP:  Her right, yeah.

14          And, Your Honor, I don't know whether the jury will

15     remember that at one point in time there were two claims, and

16     now there's only one.  I have had that happen in a case

17     before.  It has been a while, and I don't remember how we have

18     handled it in the past.  But it may be appropriate to say that

19     is the only claim currently at issue in this proceeding.

20          MR. LESCHT:  I object to that.  There's no need for

21     that.  They are going to only be given jury instructions on

22     these two claims.  The verdict sheet is crystal clear.

23          The only thing I would add, either if you could add

24     here or somewhere in these instructions, is that I would like

25     you to explain, at least say to the jury, "This is not a

1  wrongful discharge of employment case," because they have

2  tried it like one.  Under the jury instructions, the

3  termination of her employment is conceded.  You have that

4  throughout, but this is conceded.

5         And so I don't think there's any need to reference

6  the Whistleblower claim that you dismissed, and I would just

7  like somewhere, somewhere in here, it can be in the nature of

8  the claim or somewhere, that you just simply say, "You are not

9  here to decide whether or not, you know, this was a wrongful

10 discharge case.  This is not -- the claims that were brought

11 here are because of the disclosures in the newspapers."

12        MS. KNAPP:  I have no problem with that, Your Honor.

13        THE COURT:  Where would that go?

14        MS. KNAPP:  I am --

15        MR. LESCHT:  I think right there.

16        THE COURT:  Right there?

17        MR. LESCHT:  Yeah.

18        THE COURT:  Do you have any objection?

19        MS. KNAPP:  I don't think so.

20        THE COURT:  Okay.  So the way I look -- see it

21 reading now is, "In this case, the plaintiff, Dr. Campbell,

22 brings a claim pursuant to 42 USC 1983 against her former

23 employer, the defendant, the District of Columbia.

24 Dr. Campbell alleges that the District deprived her of a

25 liberty interest without due process of law.  The District

1    denies the allegations."  And then a line?

2              MR. LESCHT:  That would be fine.

3              THE COURT:  That says what?

4              MR. LESCHT:  Something to the effect that "The

5    claims asserted arise from the publications" -- I guess maybe

6    that's -- I don't know what word you use in here, "Publication

7    or disclosures of information to the newspapers and not -- and

8    this is not a wrongful discharge case.  You are not tasked" --

9    I guess if you are going to write them like instructions, just

10   say, "It is not your job to determine whether or not she

11   should have been terminated from employment, it is your job to

12   determine whether the disclosures were reckless, negligent,

13   and for cause."

14             MS. KNAPP:  I think that's a little more than we

15   need to do here because we think about those things later on.

16   What I do think would be appropriate is, "You are not being

17   asked to determine whether or not the plaintiff's termination

18   was appropriate or was legal," or whatever Your Honor wants to

19   use, and then the bits and pieces about the publicity come

20   later in the instructions.

21             MR. LESCHT:  You have done a lot better job writing

22   these things than we did, so I am happy to see what you come

23   up with.

24             THE COURT:  Well, how about, "This claim arises

25   from" -- because it follows the due process claim.  "This

1  claim arises from this alleged constitutional violation.  You

2  are not deciding whether plaintiff's termination was

3  appropriate or legal."

4          MS. KNAPP:  I think you could put both of them.

5          THE COURT:  "Was appropriate or legal"?

6          MS. KNAPP:  Uh-huh.

7          MR. LESCHT:  I don't know, "appropriate or legal."

8          THE COURT:  Dr. Campbell agrees with me.  She's

9  nodding her head.

10          MS. KNAPP:  You know, it is her case.

11          THE COURT:  She has been with the case longer than

12  anybody.

13          DR. CAMPBELL:  I apologize, Your Honor.

14          MR. LESCHT:  All right.  If she's good with it,

15  she's good with it.  I just want the notion being that they

16  don't think we are here because of a wrongful discharge claim.

17          THE COURT:  "You are not deciding whether

18  plaintiff" --

19          MR. LESCHT:  Maybe, "You are not deciding a wrongful

20  discharge claim," period, "You are deciding" --

21          MS. KNAPP:  Your Honor, I think "You are not

22  deciding a wrongful discharge claim" is --

23          THE COURT:  How about, "You are not deciding whether

24  plaintiff's termination was appropriate.  This is not a

25  wrongful discharge case."

*PROCEEDINGS*                                                     16

1          MS. KNAPP:  Sure.

2          THE COURT:  Mr. Lescht, did you think about the IG?

3          MR. LESCHT:  Out.

4          THE COURT:  You want it out?

5          MR. LESCHT:  Yes.

6          THE COURT:  Page 29, which is the first 1983

7     instruction?

8          MR. LESCHT:  No objection.

9          MS. KNAPP:  I think that we need to do something

10    similar to the second paragraph as we did to sort of the

11    nature of the case instruction.  "Dr. Campbell seeks money

12    damages against the District of Columbia on the basis that the

13    termination of her employment unconstitutionality deprived her

14    without due process of her Fifth Amendment liberty interest in

15    her chosen field of employment."

16          I think it needs to say that "the termination of her

17    employment and the publicity surrounding it."

18          MR. LESCHT:  I think that due process needs to come

19    in there somehow because that's the nature of the claim.

20          THE COURT:  No, no.  I think she's saying --

21          MS. KNAPP:  I am just saying add the word --

22          MR. LESCHT:  Oh.

23          THE COURT:  Just that the basis -- "the termination

24    of her employment and the publicity surrounding it," is her

25    words, "unconstitutionally deprived her without due process of

*PROCEEDINGS*                                                    17

1   her" --

2          MR. LESCHT:  Okay.  That's fine.

3          THE COURT:  Page 30, the first element?

4          MR. LESCHT:  I have really no other objection.  I

5   don't know if Sarah has an objection.

6          THE COURT:  You didn't have any other objections to

7   the instructions?

8          MR. LESCHT:  35, you got this thing we talked about

9   earlier.

10          THE COURT:  Okay.

11          MR. LESCHT:  And the rest I thought --

12          THE COURT:  All right.  We will go page by page.

13          Page 30, Ms. Knapp?

14          MS. KNAPP:  30 is fine.

15          THE COURT:  31?

16          MS. KNAPP:  Fine.

17          THE COURT:  32?

18          MS. KNAPP:  I just want to see -- okay.  No

19   objection, Your Honor.

20          THE COURT:  33?

21          MS. KNAPP:  No objection, Your Honor.

22          THE COURT:  34?

23          MS. KNAPP:  No objection, Your Honor.

24          THE COURT:  And then 35 is the common interest

25   privilege.  Aside from the issue as to whether it is read, do

1   you have any objections to -- either of you have any

2   objections to the substance?

3           MR. LESCHT:  Which number is that?

4           THE COURT:  Page 35.

5           MS. KNAPP:  Not to the substance, Your Honor.

6           THE COURT:  Page 36?

7           MS. KNAPP:  36 is fine.

8           THE COURT:  Page 37?  Now, I had a question, more in

9   the context of the verdict form than here, but I might as well

10  raise it here about special harm.

11          Given that the District has already stipulated as to

12  the 300,000 or so dollars of economic harm, is this an issue

13  that the jury has to decide?

14          MS. KNAPP:  Yes, Your Honor.  Because I think the

15  jury needs to decide what statements caused the special harm,

16  and so they need to find a causal link between -- and this is

17  sort of along the lines of what we were discussing in the

18  District's Rule 50 motion.  The defamatory statement has to

19  have caused the special harm.  And so, you know, it is the

20  District's position, and I think the jury could rightly find,

21  that only the publications in the actual news articles caused

22  the special harm, and the jury could find that none of those

23  statements were false and defamatory.  So I think the jury

24  does need to be instructed about special harm.

25          MR. LESCHT:  Well, Judge, I would point out that in

1   your order, you found that we had established special harm

2   under the cases that were cited.  And since -- I actually was

3   going to ask about this, I'd forgotten what I started.  I

4   think we agreed the award of the backpay was going to be from

5   the Court, so the reality is, you have already ruled there was

6   special harm.  They have stipulated to the amount.  This is

7   not for the jury.  The jury is just going to be deciding

8   compensatory damages for pain and suffering other than the

9   lost wages.  And that was one of the things I was thinking

10  that doesn't need to be in here, and maybe even the jury needs

11  to be told that they are not compensating her.  The lost wages

12  is a decision on your end, you know, and it is not something

13  that they need to include.  Because I will be talking about

14  what her lost wages are just as a measure of damages.  But

15  she's out of work for two years -- and they have heard this

16  over and over again.

17          So as long as -- I think, honestly, they should just

18  be told they are awarding money for pain and suffering and

19  reputation and what have you, but the Court will decide

20  whether to award the lost wages.

21          MS. KNAPP:  And I think that's two separate issues,

22  Your Honor.  One is a question of how we tell them what

23  damages they are awarding, and the other one is essentially

24  the elements of tort.  And there has to be a causal connection

25  between the special damages, her inability to get work, and

 1  those -- and the actual statements.  So there is no -- the

 2  amount of her special damages is not at issue, whether or not

 3  they are attributable to the alleged harm is.

 4         THE COURT:  Is there a way we can bridge that?

 5  "That the District concedes that the plaintiff made less

 6  salary during that two-year period, but disputes that the

 7  publications caused that" or --

 8         MS. KNAPP:  I think we can say that the District

 9  agrees that -- "You are not being asked to decide whether or

10  not the plaintiff suffered a financial loss.  You are being

11  asked to decide whether any financial loss she did suffer was

12  attributable to the statement -- to the publication."

13         MR. LESCHT:  Judge, it sounds to me like she's

14  arguing causation.  She's arguing whether or not there is

15  causation.  You have this in the damages instruction, and I

16  think that will be confusing because special harm only has to

17  do, as far as I can tell, and I may be wrong, to the lost

18  wages, and that's up to you, that's up to the Court.

19            So why do we have to give the jury an instruction on

20  the law of special harm that applies to lost wages that you

21  are going to be awarding and that they are not going to be

22  awarding.  They are going to read that and think that that

23  applies to the pain and suffering damages.  And you have

24  already ruled at summary judgment that being out of work for

25  two years constitutes the special harm because they brought

1   that claim on their summary judgment motion, and you ruled

2   against them on that.

3          So I think that this would just be read by the jury

4   and we have, you know, a jury that's going to read your

5   instructions, and they are going to read this and believe that

6   it is in there for a reason.  But the reality is is that since

7   you are going to be awarding the money, if there's a causation

8   issue that you determine, just like if the jury would

9   determine a causation issue, they wouldn't have to award the

10  full amount and neither would the Court because it sounds like

11  she's arguing the causation on an issue that's for the Court

12  to decide, not for the jury.

13         MS. KNAPP:  I think I am making a different

14  distinction.  And I am not sure, if you need me to -- I think

15  you get that.

16         THE COURT:  Hold on one second.

17         All right.  You were asking -- before I decide, let

18  me make sure I understand what you are asking.  You were

19  asking in response to my inquiry about whether there's some

20  way to bridge your positions, to include something along the

21  lines of "You are not being asked to decide whether plaintiff

22  suffered an actual financial loss, only whether the alleged

23  constitutional violation caused that actual financial loss."

24         MS. KNAPP:  Yes, I think that's fine.

25         THE COURT:  All right.  Before, Mr. Lescht, I ask

1  you whether or not -- I know you don't want that included, but

2  would that be accurate?

3           MR. LESCHT:  I think it would be accurate if you

4  give to the jury whether or not to award lost wages.  If you

5  don't, it is not accurate, because it is putting a restriction

6  on their consideration of the case, and they are going to

7  consider that in terms of something else.  I mean, I don't --

8  you know, it is hard enough in these cases, we don't need the

9  jury to be told that they can only award damages for special

10 harm when they are not awarding the lost wages, and they are

11 going to read that instruction and it is going to influence

12 the way they award any damages, if they award damages at all.

13 I think if you give it back to the jury, you put a line item

14 in the verdict sheet.  You know, "In order to award, you know,

15 lost wages, you have to find this special harm.  Here's the

16 instruction," and put a line item in there.  Then she's right,

17 she -- but, I mean, I had thought you had ruled that we had

18 satisfied the burden of special harm at summary judgment.

19          But if you are going to keep that for yourself, then

20 I don't think that you need that instruction, and, you know,

21 you know what the law is and you are going to award it,

22 whether you want to or not, and the jury's not going to award

23 it so why do they have to be told about special harm.

24          THE COURT:  I think, for one, because it is already

25 in the instruction of the defamation, that it is one of the

1    elements in which they have to decide what it occurred, not

2    the amount.  And the fourth element of defamation, they have

3    to decide either that the statement caused special harm, or if

4    it did not cause special harm, the statement was actionable as

5    a matter of law.

6              MR. LESCHT:  You could very easily just simply state

7    that "The Court has determined special harm has occurred and

8    damages that are attributable to the special harm, you know,

9    common lost wages, will be awarded by the Court, and you don't

10    need -- that will not be an issue for you to decide."

11              THE COURT:  I don't think I have decided that.  The

12    summary judgment stage is a different part of the process at

13    which there's different burdens.

14              MR. LESCHT:  At least have something in there, if

15    you are leaning towards this, to say that the damages on the

16    verdict sheet, right, that you have right now, has -- this

17    special harm instruction does not apply to it.

18              MS. KNAPP:  Your Honor, I wouldn't have any

19    objection to crafting something like that when we get to the

20    damages portion of the instructions.

21              THE COURT:  Okay.  And here, I think I can add, "You

22    are not being asked to decide whether plaintiff suffered an

23    actual financial loss, paren, the Court will decide that, only

24    whether the alleged constitutional violation caused that

25    actual financial loss."

*PROCEEDINGS*                                                    24

```
 1          MR. LESCHT:  Is that going to be a separate question
 2   on the verdict sheet?
 3          THE COURT:  No.  Well, we will get to the verdict
 4   sheet.
 5          All right.  Page 39 -- sorry.  Page 38?
 6          MS. KNAPP:  Your Honor, here, I don't know if we
 7   need the instruction.  I think that, you know, like in a --
 8   for example, in a Title VII case where termination is the, you
 9   know, is the alleged adverse action, you know, the jury
10   doesn't have to decide if that's an adverse action, and I
11   think here -- I don't think the jury -- I mean, these were
12   published on the day of her termination.  So I don't think
13   that there's any -- I certainly wouldn't try to make an
14   argument that she didn't suffer a -- that she didn't suffer --
15   you know, that there wasn't a discharge or demotion and that
16   that wasn't close in time to the -- the accompanying
17   statements were not close in time.  If you want to tell the
18   jury they're not being asked to decide that, that's fine with
19   me.
20          THE COURT:  All right.  How about if I include the
21   first paragraph, and I will say, "In this case, there's no
22   dispute that such a termination occurred"?
23          MS. KNAPP:  Sure.  Yes, Your Honor.  I keep saying
24   "sure."  I apologize.
25          THE COURT:  Okay.  Now page 39?
```

```
 1          MS. KNAPP:  No objection, Your Honor.

 2          THE COURT:  Page 40?

 3          MR. LESCHT:  I think the only thing we notice here,

 4   Judge, the paragraph starts with "second," "second, the

 5   value," and the word at the end of it says, "would provide,"

 6   maybe that should be "would protect."

 7          THE COURT:  I'm sorry, where are we looking?  Oh.

 8   It says, "first private interests affected," and then

 9   "second"?

10          MR. LESCHT:  "The value of that procedural

11   safeguards would provide," instead maybe, "would protect."

12          THE COURT:  I will double check on that.  I am sure

13   this language came from somewhere.

14          MR. LESCHT:  Okay.

15          MS. KNAPP:  The District has no objection to the

16   damages instruction.

17          THE COURT:  Okay.  Compensatory damages?

18          MR. LESCHT:  The only thing I point out, Judge, is

19   that the sentence at the end of the first paragraph, which is

20   the fact that -- it seems to be, you have already said that up

21   front, the second sentence, "You should not consider the

22   fact," saying the same thing twice.

23          THE COURT:  So it is the last sentence of the first

24   paragraph, and where else?

25          MR. LESCHT:  That was it.
```

*PROCEEDINGS*                                                    26

1          THE COURT:  I'm sorry?

2          MR. LESCHT:  I would just strike the last sentence

3   of the first paragraph.  I was just pointing out that same --

4   more or less the same thing there is said in the second

5   sentence of the first paragraph.

6          MS. KNAPP:  I think that's fine, Your Honor.

7          THE COURT:  Okay.  So remove the last sentence of

8   the first paragraph on page 41 that says -- begins "The fact

9   that I do."

10         MS. KNAPP:  Correct.

11         THE COURT:  Correct, Mr. Lescht?

12         MR. LESCHT:  Yes.

13         THE COURT:  Any other objections to the instruction

14  on compensatory damages?

15         MR. LESCHT:  Judge, if I could point one thing out.

16  On page 40, this is --

17         THE COURT:  Back to page 40?

18         MR. LESCHT:  Yes.  This is where you say that

19  there's -- third paragraph, "The law requires the name

20  clearing hearing."  If you would just put in there, and I

21  think it is conceded, that there was none available to

22  Dr. Campbell in this case.

23         THE COURT:  I don't think -- what is your position,

24  Ms. Knapp?

25         MS. KNAPP:  Our position is that it needs to be in

1   there.  I don't think that's entirely clear.

2          THE COURT:  Yeah.  I don't think they have conceded

3   it; I think they put on very little evidence to that effect,

4   but --

5          MR. LESCHT:  Didn't they -- wasn't this the issue in

6   the briefing, Your Honor, where they briefed it as if

7   initially that they argued that point, and then they withdrew

8   on a supplemental brief, and then --

9          THE COURT:  Well, they withdrew the argument that

10  that process through the superior court was the process that

11  was adequate.  I don't think they have withdrawn the argument

12  entirely.  I don't think they have much to stand on on

13  process, but I think the jury still has to decide it.

14          All right.  Compensatory damages?

15          MS. KNAPP:  No objection from the District.

16          THE COURT:  Okay.  And then selection of foreperson?

17          MR. LESCHT:  That's fine.  Judge, I will just point

18  out in 42, for comp damages, you say in here that -- the last

19  paragraph says, "You may not consider the amount of lost

20  wages."  So, again, I think that you should say that, "You may

21  not consider lost wages.  The Court will award that."  And

22  that "The special harm instruction that you will be getting

23  has no bearing on the award of any pain and suffering

24  damages."

25          THE COURT:  Okay.  Well, it says, "You may not

*PROCEEDINGS*                                                    28

1   consider the amount of lost wages," and I think there's

2   distinction between determining the fact and causation of lost

3   wages, which is an element of the defamation, but not the

4   amount.

5            Selection of foreperson?

6            MS. KNAPP:  Nothing from the District.

7            THE COURT:  And I think from here on out they are

8   standard jury instructions.

9            Note taking by jurors?

10           MS. KNAPP:  No objection.

11           MR. LESCHT:  We have no objection to the balance.

12           THE COURT:  Unanimity?

13           MS. KNAPP:  No objection.

14           THE COURT:  Exhibits during deliberations?  This is

15  the one that has about the issue about recordings.  I assume

16  there's not going to be any recordings in your last witness?

17           MS. KNAPP:  Not that I am aware of.

18           THE COURT:  Mr. Lescht, can we take that last --

19           MR. LESCHT:  Yes, that's fine.

20           THE COURT:  Okay.  I assume if you do put on a

21  rebuttal case, there will be no recordings?

22           MR. LESCHT:  That's right.

23           THE COURT:  Communications between Court and jury

24  during jury's deliberations?

25           MR. LESCHT:  That's fine.

*PROCEEDINGS*                                                    29

1          MS. KNAPP:  Fine.

2          THE COURT:  Verdict form explanation?

3          MR. LESCHT:  Fine.

4          MS. KNAPP:  Your Honor, I will point out, I don't

5   know if you care, but in the communications between the Court

6   and the jury during the deliberations, the way you have the

7   breakdowns, three to six or five to four --

8          THE COURT:  Are different --

9          MS. KNAPP:  Imply nine jurors.  I don't know that it

10  matters, but --

11         THE COURT:  I don't think it matters, but I will go

12  ahead and change it.  So I will just change it to three to

13  five or four to four.

14         All right.  Cautionary instruction on publicity,

15  communication, and research, which is the same one I read at

16  the beginning?

17         MS. KNAPP:  No objection.

18         THE COURT:  Furnishing the jury with a copy of the

19  instructions?

20         MS. KNAPP:  Yes.

21         THE COURT:  Okay.

22         MS. KNAPP:  I request -- I have not dealt with an

23  instruction like this before, in particular, the idea of

24  giving the jury a portion of the instructions.  I mean, my

25  preference would be that if the jury gets the instructions,

*PROCEEDINGS*

30

 1  the jury gets the instructions.

 2          THE COURT:  Portion of the instructions?

 3          MS. KNAPP:  Sure.  It says, "During your

 4  deliberations, you may prefer" -- oh, I apologize.  I was

 5  reading it too fast.  I was reading it as providing a portion

 6  of the instructions which seemed -- okay.

 7          THE COURT:  My experience has been that they ask for

 8  it even before they look at it, for the entire set.

 9          Okay.  The verdict form.  Let's start with the

10  reputation plus portion first.

11          MR. LESCHT:  One thing I would ask, Judge, in the

12  jury instructions, we already talked about special harm

13  privilege.  On page 2, paragraph 2, isn't that sort of just

14  redundant of the other claims?

15          THE COURT:  Sorry?

16          MR. LESCHT:  Where you talk about -- because you

17  have the claims, you know, you have the reputation plus and

18  the stigma, right, the two claims.  And then paragraph 2

19  states again, "Did she prove that" -- you know, "deprived of

20  her liberty, without due process."  Isn't that basically the

21  general overall claim of the two claims?

22          THE COURT:  Right.  One is whether she was -- the

23  first section is whether she was deprived of the liberty

24  interest, and then the second question is whether she was

25  provided due process.

1          MR. LESCHT:  Okay.  Other than that, without -- you

2   know, we have already talked about these other things.  It

3   looks fine to me.

4          MS. KNAPP:  I just want to take a look at the --

5   think about the stigma piece just a second longer.

6          THE COURT:  Okay.

7          MS. KNAPP:  If I can have one moment, Your Honor.

8          (Short pause.)

9          MS. KNAPP:  I am trying to take a quick look at the

10  *O'Donnell* case, Your Honor, just because we have this

11  formulated as "employment left a stigma and had the broad

12  effect of largely precluding her from her chosen career."

13         I am not sure if that's -- I think that might be a

14  "that" instead of an "and," but I want it take a look at the

15  case law.

16         THE COURT:  Take a look.

17         (Short pause.)

18         MR. LESCHT:  Judge, can I be excused for a minute

19  while she's looking?

20         THE COURT:  Sorry?

21         MR. LESCHT:  Can I use the rest room?

22         THE COURT:  Of course.

23         (WHEREUPON, a recess was had from 10:57 a.m. to

24  10:59 a.m.)

25         MS. KNAPP:  Your Honor, I don't think see anything

1  that actually speaks to whether it is an "and" or a "that,"

2  but I would like to request some additional language in the

3  jury instruction on page 39.

4          THE COURT:  Hold on a second.

5          So your question was whether the sentence was

6  amended that this was a stigma or disability?

7          MS. KNAPP:  Right.  The reason I originally started

8  looking at cases was because it says "and termination of" --

9  that --

10          THE COURT:  "Left a stigma on her," and now it says

11  "and had the broad," and you think "that had the broad"?

12          MS. KNAPP:  No, I wasn't -- I had the thought that

13  it might be "that," but I don't think the cases say anything

14  either way.

15          THE COURT:  Regardless, we will double check whether

16  any of the cases -- I know you just had a minute to look.

17          MS. KNAPP:  Yeah.  But in looking, I think that --

18          THE COURT:  I don't think it changes the meaning.

19          MS. KNAPP:  Yeah.  But we lawyers and the word

20  "and."

21          THE COURT:  No, no, I understand.

22          MS. KNAPP:  But I would like to suggest --

23          THE COURT:  I think "that" may be actually more

24  accurate.

25          MS. KNAPP:  I would like to ask to add language to

1    page 39 of the jury instructions, which is the corresponding

2    jury instruction.

3                THE COURT:  Okay.

4                MS. KNAPP:  And I think it is appropriate to take

5    the language from the *Mosrie* case, M-o-s-r-i-e, that specifies

6    "financial loss and loss of some employment opportunities do

7    not amount to an alteration of a legal right."  And so I think

8    how I would put it is "financial loss and loss of some

9    employment opportunities is not alone sufficient to meet this

10   requirement."

11               THE COURT:  What is -- quote the language from

12   *Mosrie*.

13               MS. KNAPP:  "Financial loss and loss of some

14   employment opportunities do not, therefore, amount to an

15   alteration of a legal right.  That must be so, even if some of

16   the job opportunities are lost for public jobs, at least

17   whereas in this case the stigmatizing government has no legal

18   authority to alter the legal rights to seek employment with

19   another government."

20               So we are not talking about a case where the

21   District has put up an actual bar.  We are talking about the

22   stigma sort of creating a bar, and I think that, you know,

23   that the jury could use more guidance on what it takes to

24   reach that level.

25               THE COURT:  Mr. Lescht?

1          MR. LESCHT:  That would make it altogether too

2    confusing, and, essentially, in a practical sense, I think

3    they would read this, and if they read it literally, like they

4    are going to read the instructions, they won't find for us

5    because there's no explanation.  It is making it sound like it

6    is impossible.  There's a claim there, but financial loss

7    doesn't satisfy it?  Then what does?  Because I think that

8    this is an issue that was decided by the Court at summary

9    judgment when you ruled that the two-year stretch was

10   sufficient to satisfy this.  And --

11         THE COURT:  I didn't rule that it was sufficient, I

12   ruled that it was -- there was a dispute of fact, there was a

13   question for the jury.

14         MR. LESCHT:  Right.  And now if you add this type of

15   language, the jury is going to read this, and they're going to

16   say, "Well, jeez, we can't award anything because just being

17   out of work and having suffered a financial loss is not

18   sufficient to satisfy the burden."  I mean, it is not going to

19   tell them that being out of work without firm and fixed

20   employment for two years is sufficient.

21         MS. KNAPP:  And it may not be.  The *Barry* court

22   said -- and I think Your Honor also said it in the *Dave* case,

23   this is a very high standard.  And you have ruled that the

24   plaintiff has put on enough evidence to get that to a jury,

25   but I think the jury needs to know what a high standard it is.

*PROCEEDINGS*                                          35

1            THE COURT:  All right.  Let me consider that one

2      further.  All right.  Anything else from either the jury

3      instructions or the verdict form?

4            Mr. Lescht?

5            MR. LESCHT:  Nothing.

6            MS. KNAPP:  No, Your Honor.  Just a question, it is

7      not what I have seen before.  So you are contemplating all

8      jurors signing the verdict form?

9            THE COURT:  I am, but I can do just the foreperson,

10     if you prefer.

11           MS. KNAPP:  I have no strong preference.  I just

12     hadn't seen it before, and I just wanted to make sure that

13     that's what --

14           THE COURT:  What do you prefer?

15           THE COURTROOM DEPUTY:  Just the foreperson.

16           THE COURT:  Just foreperson?  All right.  We will do

17     just the foreperson.

18           Okay.  We will take a five-minute break, and you can

19     bring back the jury.

20           (WHEREUPON, a recess was had from 11:05 a.m. to

21     11:21 a.m.)

22           THE COURT:  Are we ready to bring the jury in?

23           MR. LESCHT:  Yes.

24           MS. KNAPP:  Yes.

25           THE COURT:  Okay.

*ONYEWUCHI - DIRECT - KARPINSKI*                                    36

1          (WHEREUPON, the jury entered the courtroom, and the

2    following further proceedings were had in open court, in the

3    presence and hearing of the jury, to wit:)

4          THE COURT:  All right.  Sorry about the delay.  We

5    had to cover a lot of ground this morning.  We are moving

6    towards the conclusion of the case.  So the District is going

7    to call its last witness now, and then we will go from there.

8          MR. KARPINSKI:  Your Honor, the District calls

9    Anthony Onyewuchi.

10         THE COURTROOM DEPUTY:  Please raise your right hand.

11         (WHEREUPON, the witness was duly sworn.)

12         THE COURT:  Good morning, sir.

13         THE WITNESS:  Good morning.

14                    ANTHONY ONYEWUCHI,

15   called as a witness herein by the Defendant, having been first

16   duly sworn, was examined and testified as follows:

17                    DIRECT EXAMINATION

18   BY MR. KARPINSKI:

19   Q    Good morning, Mr. Onyewuchi.

20   A    Good morning.

21   Q    Am I pronouncing your name correctly?

22   A    Yes, you are.

23   Q    Can you introduce yourself to the jury?

24   A    My name is Anthony Onyewuchi.

25   Q    And can you tell the jury a little bit about yourself?

1  A    Okay.  My name is Anthony Onyewuchi, again.  I own a

2  company called Compass Solutions, founded about 11 years ago.

3  And we do technology consulting, IT work, those kind of

4  things, for a lot of -- for federal government and commercial

5  clients.

6  Q    What is your educational background?

7  A    I have a bachelors degree and an MBA, masters of business

8  administration, from Georgetown University.

9  Q    And you have been CEO of Compass Solutions, you said,

10  about 11 years?

11  A    Yes, since I founded the company I have been CEO.

12  Q    Were you involved in Compass' bids for the DC health

13  insurers exchange contract?

14  A    Yes, I am.  I was.

15  Q    How many phases were there to be in the insurance

16  exchange contract?

17  A    There were two phases, Phase 1 and Phase 2.

18  Q    Were those planning and implementing?

19  A    Planning and implementing, yes.

20  Q    When did you first learn about Phase 1?

21  A    I learned about Phase 1 probably at the end -- towards

22  the end of January 2012.

23  Q    How did you learn about it?

24  A    I got a phone call from Carrie Brooks-Brown, who works

25  for -- owns a company call CBBCS.  She contacted me to tell me

ONYEWUCHI - DIRECT - KARPINSKI                    38

1  there was a potential opportunity.  It was probably around the

2  28th of January 2012.

3  Q    Okay.  Did you discuss partnering with her on Phase 1?

4  A    So when she called, she told me there was a federal

5  government contract that was -- that they were working on, and

6  that they expected to be released soon.  Was I interested.  I

7  said, yes, I was.  She said was I interested in partnering.  I

8  said, yes, I was.

9           And then, subsequently, I think on the 7th --

10           MR. LESCHT:  Objection, Judge.  It looks like he is

11  reading from something.

12           THE WITNESS:  So what I did was I have dates.  I

13  wanted to --

14           THE COURT:  Okay.  Why don't you flip it over, and

15  if you can't recollect, the lawyer can assist you in

16  refreshing your recollection.

17           THE WITNESS:  Okay.

18  BY MR. KARPINSKI:

19  Q    Was anyone else involved in the discussions you had with

20  Ms. Brooks-Brown?

21  A    Initially it was she and I on the phone, but around the

22  7th, she sent me what was a draft of an RFP.  And it turned

23  out that it was not the federal government, it was the DC

24  government.  At that point, I told her I was not interested.

25  And she said they wanted to come and talk about it, and they

1    did come to the office.  "They," being Ms. Brooks-Brown.  She

2    brought along Cedric Simon.

3    Q    Did either Carrie Brooks-Brown or Cedric Simon ever

4    indicate that DC was going to require that Mr. Simon be a

5    project manager?

6    A    They did.  Both at that meeting, and in the follow-up

7    e-mail, they said Mr. Simon has been requested by the client

8    to be the project manager on the project.

9    Q    Did they say who the client was?

10   A    They didn't mention a name.  They just said a client.

11   And they said a client, the contact, or the customer.

12   Q    So they indicated once in the meeting with Simon and

13   Carrie Brooks-Brown?

14   A    Correct.

15   Q    And then separately in an e-mail?

16   A    Correct.

17   Q    Did you eventually figure out who they were referring to

18   when they said "the client"?

19   A    I did.

20   Q    How did you figure that out?

21   A    So they kept saying "the client," and they kept referring

22   to "the client."  And then they would send me e-mail with

23   instructions.  And it would be an e-mail forwarded from

24   somebody who's giving instructions.  And they would delete the

25   from, who it is from, or whatever signature.  And so I would

1    get those.

2              On one of the e-mails -- actually, there were two

3    e-mails.  The first e-mail -- actually, step back.

4              On one of the discussions, they said "the client,"

5    and then they said "she."  So at that point I realized the

6    client was a female.  And then they sent an e-mail, and they

7    did a pretty good job of deleting who it was from and omitted

8    the signature at the bottom, and they said "Jennifer."  That

9    was the first e-mail.

10             The second e-mail, probably around the same time,

11   was also forwarded.  And they deleted the "from" and "to," but

12   then there was another that said "reply to."  And it says

13   reply to JBCampbell@yahoo.com.  So at that point I knew it was

14   Jennifer Campbell.

15   Q    I would like to show you a document.

16             MR. LESCHT:  Judge, we object to publishing this

17   before it has been put into evidence.

18             THE COURT:  It hasn't been published.

19             MR. LESCHT:  It is on the screen.

20             THE COURT:  It is on our screen, not theirs.

21             What number?

22             MR. KARPINSKI:  Defendant Exhibit 9.

23             THE COURT:  9?

24             MR. KARPINSKI:  Yes.  May I proceed?

25             THE COURT:  Yes.

1  BY MR. KARPINSKI:

2  Q    Mr. Simon, can you see the document on your screen?

3  A    Mr. Onyewuchi, you mean?

4  Q    Sorry.  Mr. Onyewuchi?

5  A    Yes, I can.

6  Q    Is this one of the e-mails you were referring to that had

7  the name of the person with the "from" blocked out?

8  A    Exactly.  Yes, it is.

9          MR. KARPINSKI:  Your Honor, I move for admission of

10 Defendant Exhibit 9.

11         MR. LESCHT:  Objection.

12         THE COURT:  Why don't you approach.

13         (WHEREUPON, the following proceedings were had at

14 sidebar, out of the hearing of the jury, to wit:)

15         THE COURT:  And your objection?

16         MR. LESCHT:  Same objection we had yesterday.

17         THE COURT:  Authenticity and to hearsay?

18         MR. LESCHT:  And to the fact that this is a

19 forwarded document.  They have not laid the foundation.

20 Cedric Simon is not here to testify as to any of this, where

21 it comes from, and this person is just going to testify he was

22 forwarded a document, and we have no idea that anything in

23 here is authentic or true.

24         THE COURT:  Okay.  You want to respond?

25         MR. KARPINSKI:  Yes.  It is actually forwarded to

1  him, and he produced the document to us in discovery.  So he's

2  authenticated it.  This is the way he received it.

3          THE COURT:  Okay.  I am going to admit it.

4          MR. LESCHT:  It contains hearsay as well.

5          THE COURT:  I am going to admit it.

6          MR. KARPINSKI:  And also move to admit 99, which is

7  essentially the second page of this one.  We will flash

8  forward.  This one actually doesn't have the "from" blocked

9  out so I don't think there's any objection to that one.

10          MR. LESCHT:  I would state the same objections,

11  continuous, so I don't have to get up.

12          MR. KARPINSKI:  There's like two --

13          THE COURT:  Just make clear -- lay the foundation

14  that he received them in this way.

15          (WHEREUPON, the sidebar ended, and the following

16  further proceedings were had in open court, in the presence

17  and hearing of the jury, to wit:)

18  BY MR. KARPINSKI:

19  Q    Mr. Onyewuchi, so if I could direct your attention to

20  Defendant Exhibit 9.  This is the form in which you received

21  this e-mail; is that correct?

22  A    That's correct.

23          MR. KARPINSKI:  Your Honor, I move for admission of

24  Defendant Exhibit 9.

25          THE COURT:  Subject to the objection, it is

1  admitted.

2         (Defendant Exhibit 9 was received in evidence.)

3  BY MR. KARPINSKI:

4  Q    Mr. Onyewuchi, I know I already asked you this, but for

5  the benefit of the jurors, up at the top, where you can't see

6  who the e-mail is from, that's how you received the e-mail?

7  A    Correct.

8  Q    Now, did Jennifer Campbell -- well, strike that.  I would

9  like to show you another document first.

10 A    Okay.

11 Q    Similarly, Mr. Onyewuchi, I am showing you a document

12 that's been marked as Defendant Exhibit 99.  Is this the

13 e-mail that you were referring to where you could see the name

14 of the person at the bottom of the e-mail?

15 A    Yes, that's the e-mail I was referring to.

16        MR. KARPINSKI:  Your Honor, I move for admission of

17 Exhibit 99.

18        THE COURT:  Same objection?

19        MR. LESCHT:  Yes.

20        THE COURT:  Okay.  It is admitted.

21        (Defendant Exhibit 99 was received in evidence.)

22 BY MR. KARPINSKI:

23 Q    So, Mr. Onyewuchi -- well, I will wait until it is

24 published.

25        You received this e-mail, it appears, on March 14,

1   2012?

2   A    That's correct.

3   Q    And it was when you saw the name at the bottom of the

4   e-mail down here that you realized who the client was?

5   A    Exactly right.

6   Q    Now, did Jennifer Campbell herself ever specifically

7   inform you that Cedric Simon was required to be on the

8   contract?

9   A    No, he did not, not at that time.

10  Q    Okay.  Why don't you tell the jury what happened later.

11  A    Okay.  So soon after that e-mail, we had turned in our

12  proposal, and we got the award, and we had a kickoff.  And

13  they said it was a kickoff meeting to start a project and lay

14  the ground rules for how we are going to do the work.

15          And Ms. Campbell ran the meeting.  And so myself and

16  some team members and subcontractors were together at the

17  kickoff meeting.  And one of the pages of our proposal was a

18  proposed organizational chart, who was going to do what.  And

19  I think we had a couple names in there.  And one of the names,

20  one or two names that was on there was Cedric Simon.

21          Ms. Campbell held up the chart to me and said, "I do

22  not want any name removed" -- I don't remember her exact

23  words, but it was to the effect of "I don't want anything to

24  change on this org chart," and "I don't want any changes made

25  to the personnel on this org chart."

1   Q    Mr. Onyewuchi, I am going to show you what's been marked

2   as Plaintiff Exhibit 33 and ask you if this is the

3   organizational chart that you were referring to?

4   A    Yes, it is.

5         MR. KARPINSKI:  Your Honor, I would move for

6   admission of Plaintiff 33.

7         THE COURT:  Any objection?

8         MR. LESCHT:  No.

9         THE COURT:  It is admitted.

10        (Plaintiff Exhibit 33 was received in evidence.)

11  BY MR. KARPINSKI:

12  Q    The copy is not the best, Mr. Onyewuchi.  For the jury's

13  benefit, can you point out where Cedric Simon was listed?

14  A    I can't see it clear myself, but I think it is on here,

15  on the top right, client liaison.

16  Q    Would that be over here on the right?

17  A    Correct.

18        THE COURT:  Is there no clearer version than this?

19        MR. KARPINSKI:  I don't believe so.  Ms. Knapp might

20  know better than me.

21  BY MR. KARPINSKI:

22  Q    Regardless, Mr. Onyewuchi, you recognize this as the

23  organizational chart that was being referenced at the kickoff

24  meeting?

25  A    It is, but it was clearer.

1  Q    Did you have a problem with Mr. Simon being on the

2  contract?

3  A    I did, and I told him so.  I told him so.

4  Q    Okay.  Did you think he was qualified?

5  A    I didn't think he was qualified to be project manager,

6  definitely not, and I said I wasn't -- I said I refused.  So,

7  actually, the initial proposal we turned in did not have him

8  in that role at all.  And then I got another e-mail, a

9  notification that said the client is concerned that some of

10 the people she selected were not included in our proposal.

11 And, subsequently, we were given additional time to amend our

12 proposal.

13         And so when I met with Ms. Brooks and Mr. Simon, we

14 discussed an alternate role for Mr. Simon that did not have

15 him in a key position.  And so that's how we came up with the

16 title of "client liaison" as opposed to "project manager."

17 Q    And how was that different from project manager?

18 A    So a project manager oversees the project.  They provide

19 technical direction, they review all the deliverables so to

20 make sure that the project is working.  So they are required

21 to be technical, to understand the subject matter, and to be

22 able to approve the final deliverable.  Mr. Simon didn't have

23 those skills.

24         A client liaison, on the other hand, is somebody who

25 liaises with a customer, goes to all the meetings,

1  communicates with the client, finds out what the requirements

2  are and brings it back to the team.

3  Q    Okay.  And before we move on, I did locate a better copy

4  of the organizational chart.

5  A    Yes.

6  Q    Referencing this copy, Mr. Onyewuchi, do you recognize

7  this is the organizational chart that was used at the kickoff

8  meeting?

9  A    Yes, it was.

10  Q    Okay.  Cedric Simon is listed here as the project

11  liaison?

12  A    Correct.

13  Q    After Compass was awarded the contract, did there come a

14  time when there was an issue regarding invoices being

15  submitted by Compass that were not being paid timely?

16  A    Yes.

17  Q    When was this?

18  A    So can I look at the date?  You want an exact date?

19       THE COURT:  Why don't you go through the routine of

20  refreshing his recollection.

21  BY MR. KARPINSKI:

22  Q    Mr. Onyewuchi, do you have documents with you that will

23  refresh your recollection as to the date?

24  A    I do.

25       MR. KARPINSKI:  Okay.  I would ask that he be

ONYEWUCHI - DIRECT - KARPINSKI                            48

1   permitted to reference those documents so that he can provide

2   accurate testimony.

3           THE COURT:  Any objection?  You do want to see the

4   document?

5           MR. LESCHT:  If he provides us with the

6   documentation.

7           THE COURT:  Why don't you take a look at it.

8           MR. LESCHT:  Do you have a copy for us?  Unless we

9   are provided a copy, I don't think he can present anything to

10  refresh his recollection.

11          THE COURT:  Do you have a copy?

12          THE WITNESS:  Just one copy with my scribblings on

13  it.

14          THE COURT:  Mr. Lescht, why don't you take a look at

15  it and see if you find anything objectionable, and then I can

16  have a copy made for you.

17          MR. LESCHT:  Judge, I would ask we be given a copy

18  at a break after -- before we do the cross, so we can use

19  this, because that's the only way -- I have never seen a

20  witness walk up with something.

21          THE COURT:  Can you make a copy?

22          Can you ask something else before we get back to

23  that?

24          MR. KARPINSKI:  Sure.

25          MS. KNAPP:  Can I ask for two copies?  It is the

1  witness'.  Do you want three so that you can have one?

2        THE COURT:  Three copies.  Thank you.

3  BY MR. KARPINSKI:

4  Q    So regardless of exactly when it happened, can you

5  describe to the jury what was happening regarding the unpaid

6  invoice?

7  A    Yes.  So soon after the award, we had started doing work.

8  We had agreed on responsibilities and fee sharing.  And

9  Ms. Brooks and Mr. Simon came back, and they wanted a change

10  in that arrangement.  They wanted a higher fee.  And their

11  argument was Mr. Simon was more involved than was expected.

12  He was doing the client liaison.  He was making rain, was the

13  word they used, and, therefore, they wanted a bump in their

14  fee.

15        So I disagreed.  I said, "We have an agreement.  We

16  went in with an understanding."  And so at that point, it got

17  very tense.  And Mr. Simon told me that --

18        MR. LESCHT:  Objection.  Hearsay.

19        MR. KARPINSKI:  Your Honor, he's describing what he

20  was told by Mr. Simon.  It is not necessarily being offered

21  for the truth of the matter as much as its effect on

22  Mr. Onyewuchi.

23        THE COURT:  You can answer.

24        THE WITNESS:  Mr. Simon told me that invoices will

25  not be paid until we agreed.  And he also said that he and the

1   other subcontractors will not attend any meetings with their

2   client until they had a resolution in place, until I agreed to

3   those terms.

4           And, actually, I think there's also an e-mail from

5   Ms. Brooks saying that -- actually, that was before, saying

6   that award will not be met to Compass until we have an

7   agreement in place.

8   BY MR. KARPINSKI:

9   Q    Okay.  Was the agreement that you eventually reached, was

10  that some sort of compromise, or was it just basically what

11  Mr. Simon and Ms. Brooks-Brown wanted?

12  A    It was initially what I wanted.  The contract wound up

13  with -- it happened sometime in June, after Mr. Simon had been

14  terminated.  And so we had adjusted what would have been his

15  fee.  So I guess it was a compromise.

16  Q    Moving on to Phase 2 of the contract, was Compass

17  considering partnering with anyone on Phase 2?

18  A    Yes.  So at this point, Phase 2 hadn't come out.  But we

19  knew that there was going to be this Phase 2.  So I started

20  researching companies in this space, and I met with three

21  firms and talked with them, shared our capabilities, and one

22  of the companies was CGI.  And we agreed, CGI and I agreed, to

23  partner, and we signed an NDA, a nondisclosure agreement and

24  also signed a teaming agreement.  This was even earlier on.

25  So at that point, yes, I already was on a team with CGI.

ONYEWUCHI - DIRECT - KARPINSKI                    51

1  Q    Okay.  And, I'm sorry to back up, but I just wanted to

2  ask one more question about your dealings with Mr. Simon

3  before we go to Phase 2.

4         How much money was it that Mr. Simon wanted when the

5  invoice was being held up?

6  A    Mr. Simon wanted an additional quarter of a million

7  dollars.

8  Q    $250,000?

9  A    $250,000.

10  Q    And I apologize for going out of order.

11         So who was it that Compass was considering

12  partnering with on Phase 2?

13  A    Compass was partnering with CGI.

14  Q    Okay.  And at some point did anyone inform you that

15  Jennifer Campbell had asked CGI to partner with a different

16  company?

17  A    Yes.

18  Q    Who was that?

19  A    Ploog.

20  Q    Holli Ploog?

21  A    Ploog.  Holli Ploog.  Sorry.

22  Q    Did she contact you or did you contact her?

23  A    I contacted her.  So what we will do is sporadically I

24  would check in with her.  There was no RFP yet, but I will

25  check in, ask questions.  But after a while, she stopped

1  returning my call, so I knew something was wrong.

2          So I did call her.  Eventually, I got her on the

3  phone, and she told me that they had been directed not to

4  partner with me, but to partner with another group of DC

5  firms.

6  Q    Did she say who the other -- I'm sorry, were you

7  finished?

8  A    And then she -- I asked who instructed her.  She says

9  she's been asked by -- she was asked -- she was instructed by

10 Jennifer Campbell not to partner with Compass, but to instead

11 partner with another firm, and was apologetic and kept saying

12 "my hands are tied."

13 Q    Did she say who the other firm was?

14 A    Yes.  And I don't remember the names exactly, but I think

15 it was Document Management System.

16 Q    Now, did you ever have discussions with Wayne Turnage

17 about Ms. Campbell?

18 A    Eventually, I did, yes.

19 Q    How many?

20 A    So I had three, maybe four discussions.  The first one

21 was just to request a meeting, and the second was actually a

22 sit-down meeting where I went over all the concerns I had.

23 And then the third was a follow-up where he asked questions.

24 And I think that was probably -- I don't remember, maybe there

25 was a fourth one.

1  Q    Okay.  Let's see if we can break them down.  At the first

2  meeting what did you tell him?

3  A    So, the first meeting, I called to say, "I wanted a

4  meeting, I wanted to meet with you because I have some

5  concerns about events happening within your department, both

6  with my team members, Ms. Brown and Mr. Simon, as well as your

7  employee, Ms. Campbell."

8  Q    Okay.  Did you discuss the allegations at that first --

9  during that first phone conversation?

10  A    Enough so he knew -- he wanted to know what the subject

11  matter was going to be.  So I told him.  I said -- I told him

12  that invoices were delayed.  I told him that those two were,

13  in effect, extorting money from me.  I didn't use those words,

14  but that's what I conveyed, and that I believed they were in

15  cahoots with Ms. Campbell.

16  Q    Okay.  Did you ultimately meet with him in person?

17  A    I'm sorry?

18  Q    Did you ultimately meet with Mr. Turnage in person?

19  A    I did.

20  Q    Okay.  And when -- how long after the phone call did that

21  meeting take place?

22  A    As soon as I told him those things, he said we needed to

23  meet right away.  He actually wanted to meet the same day.  So

24  I said, "Well, how about the next day?"  And so the next day

25  we met.

ONYEWUCHI - DIRECT - KARPINSKI                           54

1   Q    Okay.  And at that meeting, did you tell him more

2   specifically what had happened?

3   A    I told him more specifically what happened, and I showed

4   him some e-mails, I think.  And I -- so I laid out exactly

5   what I have been telling you, which is how it started, and the

6   demands and the fact that our invoices are not getting paid.

7   Q    So you told him that Ms. Campbell had asked CGI not to

8   partner with Compass?

9   A    I did, yes.

10  Q    And you told him that Ms. Campbell had demanded Cedric

11  Simon be on the contract with Compass?

12  A    I did, yes.

13  Q    And you told him that you believed invoices were being

14  delayed because you weren't playing ball, so to speak?

15  A    I did, yes.

16  Q    What did he say?

17  A    He asked a bunch of questions.  He asked -- he wanted to

18  know why I thought it was Ms. Campbell.  And I gave him the

19  same.  I said, you know, "Here's how we started.  Initially, I

20  didn't know it was her.  Eventually, I figured it out based on

21  the e-mails and based on the discussions."  And so -- and what

22  else did he ask?  He asked for time, dates, he wanted to know

23  more about Simon.  I told him what I knew.  He asked about

24  Carrie Brooks-Brown.  I told him all of that.  So he had me go

25  over my story maybe two or three times.  And then he said, you

1  know, he will get back with me, and I think a couple days

2  later he called.  He asked some more clarification, he asked

3  about dates, he asked about times.

4  Q    Did you also inform Mr. Turnage that CGI had told you

5  Ms. Campbell had been meeting with minority vendors to create

6  a team to bid on the health insurance contract?

7  A    What I told Mr. Turnage was that Holli Ploog had told me

8  that she has been instructed to partner with another

9  minority -- another local firm and not partner with Compass,

10  and have met with that group, and they were no longer going to

11  continue a relationship.  I told him that, yes.

12  Q    Do you know Brenda Emanuel?

13  A    I do, yes.

14  Q    Who is she?

15  A    Brenda Emanuel was the chief information officer for the

16  same department, for health care finance.  And she was

17  responsible for another program called health information

18  exchange.  And health information exchange, a few months

19  before, several months before, had been awarded to Orion

20  Health, as a prime, and us, Compass Solutions.  So in the

21  course of doing that work, I met her and I got to know her

22  because she was the client.

23  Q    Did you speak with her before you contacted Mr. Turnage?

24  A    I did.

25  Q    Why?

ONYEWUCHI - DIRECT - KARPINSKI                                56

1   A    I didn't know who Mr. Turnage was.  And I was getting
2   increasingly concerned about irregularities.  And so I called
3   her.  She had actually left the District at this point, I
4   think she was now a federal government employee, but had
5   stayed in touch.  So I called her up and I said, "Here's my
6   problem.  What's going on?"  And she was very alarmed.  I
7   said, "The reason I am calling you is I don't know who
8   Mr. Turnage is, and I am concerned he may also be part of this
9   group."
10          So I wasn't sure if he was in cahoots or if he was
11  not.  So Ms. Emanuel assured me that Mr. Turnage was beyond
12  reproach, was a professional, that I had to go to.  So after
13  that is when I called Mr. Turnage.
14          MR. KARPINSKI:  Okay.  No further questions,
15  Your Honor.
16          THE COURT:  Okay.  Thank you.
17          Ms. McDonough?
18                      CROSS-EXAMINATION
19  BY MS. McDONOUGH:
20  Q    Hello, Mr. Onyewuchi.
21  A    Hello.
22  Q    So I wanted to discuss the e-mails that the District's
23  counsel had presented, and so let me grab that.  And so,
24  Mr. Onyewuchi, this is one of the e-mails that Mr. Simon sent
25  to you that he represented was forwarded to him from

ONYEWUCHI - CROSS - McDONOUGH                    57

1  Dr. Campbell; is that right?

2  A    Correct.

3  Q    It is 9, Defendant Exhibit 9.

4        And, Mr. Onyewuchi, you had testified, and I think

5  it is evident here, that where it says "from," Mr. Simon had

6  deleted the sender's name; is that correct?

7  A    Had been deleted, yes.

8  Q    Right.

9        And so, also, if there was some kind of subject

10 line, that was also deleted, right?

11 A    Correct.

12 Q    And so you knew that Mr. Simon had been altering these

13 e-mails before he gave them to you; is that correct?

14 A    Had been removing the source, yes.

15 Q    Right.  So he had been altering the e-mails?

16       And then couldn't he have altered them in other ways

17 as well to make it appear that Dr. Campbell had sent them when

18 she actually hadn't?

19 A    My impression was he was just hiding the source.

20 Q    Okay.  But, yes, you do admit these were altered by

21 Mr. Simon?

22       THE COURT:  You have to answer.

23       THE WITNESS:  Yes.  He was hiding the source, yes.

24 BY MS. McDONOUGH:

25 Q    I believe this is Defendant Exhibit 99, which has already

ONYEWUCHI - CROSS - McDONOUGH                                    58

1  been admitted as well.  And so this is another e-mail that

2  Mr. Simon forwarded you or sent to you and said was from

3  Dr. Campbell?

4  A    Could you scroll up.

5  Q    Absolutely.  This is one of those e-mails?

6  A    This is the one that has "Jennifer" at the bottom?

7  Q    Yes, sir.

8  A    Yes, that is one of the e-mails.

9  Q    And so the only indication from this e-mail that this was

10 from Dr. Campbell is because it has "Jennifer" typed at the

11 bottom of the page?

12 A    This particular e-mail, yes.

13 Q    And so does this -- doesn't this e-mail appear to look a

14 little strange to you?  Does it look like this content, this

15 information here, has been copied and pasted from another

16 document?

17 A    It looks forwarded from another document, yes.

18 Q    Okay.  But it looks --

19 A    Not copied and pasted, it just looks like a previous

20 e-mail that was forwarded.

21 Q    No, but I am asking you, does it look like it has been

22 copied and pasted from another document, copied somewhere --

23 the author copied it from one document and then pasted into

24 this e-mail?

25 A    I can't tell from this, but it just looks from the

1  header, it just -- somebody forwarded an e-mail.

2  Q    Okay.

3  A    And just removed the source.

4  Q    But you acknowledge that it is in a different typeface

5  and font than the signature?

6  A    No, it looks the same.

7  Q    Okay.  If that's what you think.

8        Okay.  And so, Mr. Onyewuchi, you had said that

9  before you called Mr. Turnage, you called Brenda Emanuel; is

10 that correct?

11 A    Correct.

12 Q    And Ms. Emanuel, she was Dr. Campbell's predecessor; is

13 that right?

14 A    That's not my understanding.  I think they worked

15 together.

16 Q    I'm sorry.  I apologize.

17 A    They were peers.

18 Q    So Dr. Campbell, the position she was removed from was

19 the chief operating officer, you understand that, correct?

20 A    Correct.

21 Q    And Dr. Campbell did not -- was not promoted to that

22 position until, I believe, May of 2012; did you know that?

23 A    I didn't know that.

24 Q    Okay.  And so then were you aware that Ms. Emanuel was

25 the one who was COO at the time during the time that you are

1  talking to Carrie Brooks-Brown and Cedric Simon?

2  A    Her title, from my understanding, was chief information

3  officer.  Is that not correct?

4  Q    And so you had said before, you -- she was your client,

5  when you worked with her before, and I am referring to

6  Ms. Emanuel?

7  A    Correct.

8  Q    Okay.  When you called Ms. Emanuel to ask her whether

9  Mr. Turnage was trustworthy, you called her on her personal

10 cell phone; is that right?

11 A    I called her on the same cell phone, yes, same number.

12 Q    And that was her personal cell phone number?

13 A    It was the same number she always had, yes.

14 Q    But she was no longer a District employee?

15 A    She kept the same number.

16 Q    Oh, I'm sorry.

17        So it could not have been her District phone number,

18 her work phone number?

19 A    It was not her District phone number.

20 Q    And did you only -- you only called Ms. Emanuel to say

21 that you had some concerns that you wished to address with

22 Mr. Turnage; is that right?

23 A    Yes.  So I gave a summary.  I said, "Here's what I

24 suspect is going on.  And what I suspect is that Ms. Campbell

25 is favoring or steering -- helping these guys along, and I am

ONYEWUCHI - CROSS - McDONOUGH                              61

1    concerned that it is unethical and bad behavior, basically."

2    But I --

3    Q    So you -- please go ahead.  Sorry.

4    A    But that I wanted to make sure whoever I reported it to

5    was somebody who was not a part of this group.

6    Q    And so -- okay.  So you did discuss that it was

7    specifically Jennifer Campbell who was causing these issues,

8    you discussed that with Ms. Emanuel?

9    A    Yes.  I didn't give Ms. Emanuel any details, but I told

10   her what I wanted to talk to Mr. Turnage about, yes.

11   Q    All right.  And, Mr. Onyewuchi, do you remember when you

12   were deposed for this case?  I believe it was on January 29,

13   2014?

14   A    I remember.  Correct.

15   Q    Can you please turn to page 57 of that deposition

16   transcript.

17   A    Page 57, you say?

18   Q    That's right.

19   A    Okay.

20   Q    And so -- well, first of all, when you were deposed, did

21   you swear to tell the truth?

22   A    I did, yes.

23   Q    And so I am going to start at page 57, line 14.

24        "QUESTION:  Did you talk to Ms. Emanuel about

25        Jennifer Campbell?

1        "ANSWER:  No."

2            And so here it appears that you are saying that you

3    did talk to Ms. Emanuel about Jennifer Campbell; is that true?

4    A    Yes.

5    Q    But you just testified that you did not talk to -- or,

6    I'm sorry, you just testified that you did talk to

7    Ms. Emanuel?

8    A    I did talk to Ms. Emanuel.

9    Q    But here it says you did not in your deposition, you

10   denied talking to Ms. Emanuel about Dr. Campbell.  Would you

11   agree that that's what your deposition says?

12   A    Yes, that's what it says.

13   Q    And so did you talk to her about Jennifer Campbell or

14   not?

15   A    I did.  So what I have done since is I have gone back

16   over my notes and over e-mails, and so they -- what I did say,

17   what happened was, when I called her, I said I needed to go to

18   the head of the department.  So I had to tell her why.  And as

19   soon as I told her, she's like, "You need to talk to him right

20   away.  He is an upright guy," and all of that.

21   Q    Okay.  I just want to confirm what you said in your

22   deposition on January 29.  That was not true, was it?

23   A    No, that was incorrect.  So what's correct is that I did

24   have to tell her what I wanted to talk to Mr. Turnage about.

25   Q    Okay.

ONYEWUCHI - CROSS - McDONOUGH                          63

1  A    Can I make another point?

2  Q    Sure.

3  A    This is almost four years ago.  And that's why I brought

4  this.  So I go back and look at e-mails and look at notes

5  because I don't always remember the specifics.

6  Q    Okay.  But you do admit that this was not a correct

7  statement you gave in your deposition?

8  A    That I didn't discuss Ms. Campbell?

9  Q    Right.

10 A    Yes, I did.

11 Q    Okay.  So then based on Ms. Emanuel's assurance that

12 Mr. Turnage was a trustworthy person -- well, first of all,

13 did you feel that Mr. Turnage was trustworthy?

14 A    Very much so, when I talked to him.

15 Q    Okay.  So based on Ms. Emanuel's assurance, you contacted

16 Mr. Turnage then on June 2, 2012; does that sound right?

17 A    Yes, that sounds about right.  I think that 1st or 2nd,

18 yes.

19 Q    And you discussed with him then these concerns about

20 Dr. Campbell?

21 A    Yes.

22 Q    So one of the things -- the allegations at issue here is

23 whether or not Dr. Campbell was putting together a team of

24 minority vendors to bid as a prime contractor on Phase 2.  Are

25 you aware of that?

ONYEWUCHI - CROSS - McDONOUGH                                    64

1    A    Yes.

2    Q    And so you didn't personally know that Dr. Campbell was

3    putting this team together, did you?  Did you have any

4    personal knowledge?

5    A    No, I didn't have any personal knowledge.

6    Q    And in your deposition for the case, you said that you --

7    that, yes, you did report this allegation to Mr. Turnage; is

8    that correct?

9    A    No, what I did report was that Holli Ploog, from CGI, had

10   told me that they were directed to partner with another group

11   that Ms. Campbell recommended or directed her to, and that her

12   hands were tied, so they weren't going to work with Compass

13   any more.

14   Q    But you did tell Mr. Turnage that you had heard from CGI

15   that Dr. Campbell was putting together this team to bid on the

16   contract; is that right?

17   A    No.  Had directed Holli Ploog to meet with this new group

18   instead of -- to work with them instead of Compass, yes.

19   Q    So you never made any allegation to Mr. Turnage about her

20   forming this team to bid on the contract?

21   A    That she's the one that formed it?

22   Q    That's correct.

23   A    I didn't phrase it that way.

24   Q    Okay.  And so, Mr. Onyewuchi, can you turn to page 47 of

25   that deposition transcript I handed you?  Let me know when you

1   are at that page.

2   A    Okay.

3   Q    I am going to start at page 47, line 20.

4        "QUESTION:  Did you inform Mr. Turnage during that

5        meeting that Jennifer Campbell had been meeting with

6        minority vendors to create a team to bid on the health

7        insurance contract?

8        "ANSWER:  Have a meeting?  No.  Outside the context

9        of CGI said.

10       "QUESTION:  So all you would have reported is CGI

11       told me?

12       "ANSWER:  Exactly."

13       So, there, aren't you confirming that you did tell

14  Mr. Turnage, "CGI told me, Jennifer's putting together this

15  team to bid on the contract"?

16  A    No.  You skipped over something.

17  Q    What was that part?

18  A    My attorney says, "other than what" --

19            MR. LESCHT:  Objection.

20            THE COURT:  Don't read what your attorney said.

21            THE WITNESS:  I'm sorry?  I am reading what it says

22  here.  She skipped over this line.

23            THE COURT:  Don't read that.

24            THE WITNESS:  Don't read that?  Okay.

25  BY MS. McDONOUGH:

ONYEWUCHI - CROSS - McDONOUGH                                66

1   Q     Would you agree that that's what this means?

2   A     No.

3   Q     What --

4   A     Page 47?

5   Q     That's right.  Page 47, starting at line 20.

6   A     Sorry.  Yes.

7   Q     So that's what he said, is that you told Mr. Turnage "CGI

8   told me that Jennifer Campbell was putting together this team

9   to bid on the contract"?

10  A     No, that Jennifer Campbell had directed them to work with

11  this new team, as opposed to Compass.

12  Q     Okay.  But you are saying that you did say this

13  statement?

14  A     It is not possible to do this unless I responded to your

15  question as well as the comment from my attorney, is what I am

16  saying.  You are saying don't say that, right?  Do you see why

17  it is difficult?  Because the question -- there were two

18  questions and a redirect from my attorney.

19          THE COURT:  If you need to put your response to that

20  question in context by referring to another question, you can

21  do that.  But don't testify as to what your attorney said.

22          THE WITNESS:  Okay.

23          Ask me again, I'm sorry.

24  BY MS. McDONOUGH:

25  Q     So I am saying here at line 20, the question that you

1    were asked was:  "Did you inform Mr. Turnage during the

2    meeting that Jennifer Campbell had been meeting with minority

3    vendors to create a team to bid on the health insurance

4    contract?"

5         Your answer here says:  "Have a meeting, no.

6    Outside of the context of CGI said."

7         And then the next question, the follow-up is:  "So

8    all you would have reported is CGI told me?"

9         And you said:  "Exactly."

10   A    Right.

11   Q    Okay.  I am going to move onto the second allegation,

12   which was that Dr. Campbell required Compass, your company, to

13   hire Cedric Simon; is that correct?

14   A    Correct.

15   Q    And so you told Mr. Turnage that this is what happened

16   when you talked to him on June 2, June 1 through June 2; is

17   that right?

18   A    I did, yes.

19   Q    And so just to be clear, Mr. Simon, he was never a

20   Compass employee, was he?

21   A    No, he was a subcontractor.

22   Q    And he was actually employed by CBBCS, Carrie

23   Brooks-Brown's company?

24   A    That's correct.

25   Q    So Compass never hired him as an employee?

ONYEWUCHI - CROSS - McDONOUGH                           68

1    A    As an employee, no.

2    Q    And is it true that you never discussed with Dr. Campbell

3    whether Mr. Simon was required to be on the contract?

4    A    No, I did not.

5    Q    And she never actually told you that Mr. Simon had to be

6    on the contract, did she?

7    A    No, she didn't.

8    Q    And she never sent you any e-mail saying Mr. Simon needs

9    to be on the contract?

10   A    No, but both Mr. Simon and Ms. Brooks sent e-mails saying

11   "the client has directed" or "the client has asked."

12   Q    But that was from Ms. Brooks-Brown and Mr. Simon?

13   A    From Ms. Brooks and Mr. Simon.

14   Q    And not from Dr. Campbell?

15   A    Not directly from Dr. Campbell, no.

16   Q    And did any other District employees indicate to you that

17   Dr. Campbell required Mr. Simon to be on the contract?

18   A    No.  Can I make another point?

19   Q    Well, I haven't asked you a question.

20        And so your -- then are you saying that your belief

21   that Dr. Campbell required Mr. Simon to be on that contract is

22   based on the representations made to you by Mr. Simon and

23   Ms. Brooks-Brown; is that right?

24   A    That's correct.

25   Q    And then also what you believe to be Dr. Campbell's

1   conduct at this kickoff meeting; is that also correct?

2   A    That is also correct.

3   Q    So I want to start with your interactions with Mr. Simon

4   and Ms. Brooks-Brown.

5            So you partnered on Phase 1 on the health insurance

6   exchange with this company CBBCS, which is owned by Carrie

7   Brooks-Brown; is that right?

8   A    Correct.

9   Q    And you said that you had begun discussing partnership

10  with Ms. Brooks-Brown and Mr. Simon in January 2012; is that

11  also right?

12  A    That's about right, yeah.

13  Q    And you had a meeting with Ms. Brooks-Brown and Mr. Simon

14  in the beginning of February 2012; is that correct?

15  A    Can I look at my notes?  I think so.  I don't know the

16  exact dates.  But, yes.  But I did make a note on those dates.

17  Q    You knew Ms. Brooks-Brown previously; is that right?

18  A    I did, yes.

19  Q    Because you had worked together with her on another

20  contract for the District several years prior?

21  A    I did, yes.

22  Q    And isn't it true that you wanted to partner with CBBCS

23  because you believed that they produced outstanding, high

24  quality work?

25  A    Yes.

ONYEWUCHI - CROSS - McDONOUGH                    70

1   Q    So that was the reason you wanted to partner with them?

2   A    They wanted to partner with me.  I initially said no

3   because I wasn't interested in this piece of work.  But when I

4   did say yes, Ms. Brooks-Brown did go to work on a previous

5   engagement.  Yes.

6   Q    In fact, you didn't even talk to any other companies

7   about partnering on Phase 1; is that right?

8   A    No, I didn't.

9   Q    And even you had said that Ms. Brooks-Brown and

10  Mr. Simon, they never actually told you that Dr. Campbell

11  required Compass to hire Simon; is that right?

12  A    No.  They wanted Simon to be the project manager on the

13  project.

14  Q    So they told you that.  And they told --

15  A    They told me that in writing, too, in an e-mail.

16  Q    And it was just the one e-mail, right?

17  A    Actually, it is two, maybe three.

18  Q    So I will ask you to turn to page 14 of your deposition

19  transcript.

20  A    Okay.  Page 14, okay.

21  Q    I'm starting at line 20.

22       The question says:  "So there was an e-mail from

23  Ms. Brooks-Brown to you, stating that the client wants

24  Mr. Simon to be on the contract?

25            "ANSWER:  Correct.

ONYEWUCHI - CROSS - McDONOUGH                    71

1          "QUESTION:  Okay.  Do you recall when this e-mail

2     was sent?

3          "ANSWER:  Yes.  I will say not exactly the date, but

4     it would be probably middle of February.

5          "QUESTION:  Mid February of 2012?

6          "ANSWER:  2012, correct.

7          "QUESTION:  Okay.  Were there any other e-mails that

8     were sent to you by either Ms. Brooks-Brown or Mr. Simon

9     about his role on the project?

10          "ANSWER:  No, I think that was the only one."

11          And so do you agree that here in your deposition you

12     are saying you only received one e-mail about Mr. Simon's role

13     in the project?

14     A    Yes, that's what I say here.  But I have a stack of

15     e-mails, and that's more than one, is what I am saying today.

16     Q    So, I'm sorry, though, in your deposition you said there

17     was just one e-mail; is that right?

18     A    Yes.

19     Q    But then a moment ago you said that there were two or

20     maybe three e-mails; is that right?

21     A    Correct.

22     Q    And so then which is true?  Was there one e-mail or were

23     there multiples?

24     A    So I went back and I looked at the series of e-mails, and

25     I printed them out, if you want to see them, and it is more

1   than one.  It is at least two, maybe three.

2   Q    So then the statement you gave in your deposition, that

3   was not truthful?

4   A    That was not accurate.  It was more than one, yes.

5   Q    And that one -- or the e-mail that you discussed in the

6   deposition -- or I will ask you:  You never got any e-mails

7   from Dr. Campbell saying Mr. Simon must be on the project,

8   right, directly from her?

9   A    No.

10  Q    Compass' proposal that you submitted for Phase 1 of the

11  project, that proposal showed that Mr. Simon would be the

12  client liaison, not the project manager; is that correct?

13  A    That is correct.

14  Q    And then the District selected -- sorry.  Strike that.

15       Previously you had said, unequivocally, Mr. Simon --

16  Ms. Brooks-Brown said the client wants Mr. Simon to be the

17  project manager; is that right?

18  A    That's correct.

19  Q    And then the District selected Compass for the contract,

20  even though Mr. Simon was not the project manager; is that

21  right?

22  A    That is correct.  But I also said I pushed back because I

23  said he was not competent to be project manager.  And then the

24  compromise between me and Ms. Brooks and Mr. Simon was another

25  role for -- another visible role for Mr. Simon, where he

1   wouldn't be running the project.  So that's why we put him in

2   that role.

3   Q    That was a compromise -- I'm sorry.

4   A    Yes.

5   Q    That was a compromise between you and Ms. Brooks-Brown

6   and Cedric Simon, not a compromise between you and Jennifer

7   Campbell; is that correct?

8   A    No, not with Jennifer Campbell, no.

9   Q    Tracy Prigmore was the person who was actually going to

10  be project manager on your project; is that right?

11  A    That's who was project manager, yes.

12  Q    And Compass, not Brooks-Brown, not Mr. Simon, not

13  Dr. Campbell -- sorry, your company was the one who hired

14  Ms. Prigmore; is that correct?

15  A    That is correct.  But, again, she was recommended to us.

16  So what I do is I evaluate the candidates, and I choose who I

17  think is qualified to do the work.  So, ultimately, I wanted

18  the work well done.  I didn't think Mr. Simon could do the

19  work.  I thought Ms. Prigmore could do the work, yes.

20  Q    So even though Ms. Brooks-Brown and Mr. Simon claim that

21  Jennifer Campbell wanted you to have Simon as a project

22  manager, you still won the contract even though he wasn't?

23  A    Yes.  But I still put him on the project as a project

24  liaison.  That was the role that was acceptable.

25  Q    But not in the role that Dr. Campbell allegedly wanted

ONYEWUCHI - CROSS - McDONOUGH                    74

1   him to be in?

2   A    No.

3   Q    And then the only time that Dr. Campbell herself

4   indicated to you that Mr. Simon was required to be on the

5   contract was at that kickoff meeting in April 2012?

6   A    That's correct.

7   Q    And at that meeting, you claim that Dr. Campbell held up

8   the org chart that Compass created; is that correct?

9   A    Correct.

10  Q    And Dr. Campbell didn't make that org chart, right,

11  Compass made it?

12  A    Yes, it was in a proposal.

13  Q    And then Dr. Campbell held up the org chart, and you said

14  she pointed to it and said "nothing on this should change," or

15  something like that?

16  A    Uh-huh.  Yes.

17  Q    And the org chart that we have seen, that also had

18  Ms. Prigmore's name on it?

19  A    That's correct.

20  Q    And so did Dr. Campbell say -- indicate that Ms. Prigmore

21  could be taken off the contract?

22  A    No.  She said nothing on this page should change.

23  Q    Her comments indicated that neither -- that no changes

24  should be made, not just that Mr. Simon shouldn't be changed?

25  A    No, she didn't mention Mr. Simon by name.

ONYEWUCHI - CROSS - McDONOUGH                    75

1  Q    But you didn't complain to Mr. Turnage that she wouldn't
2  let you take -- that Dr. Campbell forced you to hire Tracy
3  Prigmore, you didn't tell Mr. Turnage that, did you?
4  A    No.
5  Q    At that meeting, the kickoff meeting, Dr. Campbell never
6  said that Mr. Simon had to remain on the contract, did she?
7  A    Sorry?
8  Q    During that kickoff meeting, did Dr. Campbell ever say
9  that Mr. Simon had to remain on the contract?
10 A    No, other than the fact that she says nobody on this org
11 chart should be removed.
12 Q    And that was --
13 A    And that included Mr. Simon on the list.
14 Q    And the org chart, that was part of the proposal, right?
15 A    Correct.
16 Q    And at that point, because you had been selected, was the
17 proposal considered a binding contract?
18 A    Correct.
19 Q    Did Dr. Campbell indicate during the meeting that you
20 could make other changes to the proposal without notifying
21 her?
22 A    I think she said changes to schedule, she had to approve.
23 There was some conditions.
24 Q    So it wasn't just the staffing that couldn't be changed,
25 it was the whole proposal that you would need approval for?

1    A    I don't think she said the whole proposal.  I think she

2    said changes needed to be approved.

3    Q    So any changes --

4    A    Changes to schedules needed to be approved --

5    Q    Okay.  So it wasn't just changes to staffing that needed

6    to be approved?

7    A    No, it wasn't just.

8    Q    And then the third allegation is that Dr. Campbell asked

9    CGI to partner with Darryl Wiggins on Phase 2; is that

10   correct?

11   A    Correct.

12   Q    So even though Compass had already won Phase 1, you also

13   wanted Phase 2?

14   A    Yes.  I mean, we wanted to participate in Phase 2.

15   Q    And how much was the award for Phase 1?

16   A    Phase 1 was $2 million.

17   Q    $2 million?

18   A    A few dollars under $2 million.

19   Q    In fact, you were much more interested in bidding on

20   Phase 2 because it was the larger and more lucrative part of

21   the contract; is that right?

22   A    Correct.  But I only had a small piece of it because it

23   was a large team, and we were sub, as opposed to being a

24   prime, yes.

25   Q    And so Phase 2, was that worth about $75 million?

ONYEWUCHI - CROSS - McDONOUGH                    77

1   A     About, yes.

2   Q     And you, if you had been on that contract, you would have

3   gotten 35 percent of that; is that right?

4   A     No.

5   Q     How much would you have gotten?

6   A     Because I was a team of small businesses, so the 35

7   percent would have been split among six members, seven

8   members.

9   Q     Six or seven, and so I am not great at math, but that

10  would put you at about $4 million?

11          THE COURT:  Do you say six or seven or 16 or 17?

12          THE WITNESS:  Six or seven.

13  BY MS. McDONOUGH:

14  Q     You had claimed that Compass and CGI had already signed a

15  teaming agreement to work on Phase 2; is that right?

16  A     That's correct.

17  Q     Now, yesterday Ms. Ploog told us that there was no

18  teaming agreement between CGI and Compass?

19          MR. KARPINSKI:  Objection, Your Honor.  She

20  shouldn't be quoting other testimony.

21          MS. McDONOUGH:  I can rephrase.

22          THE COURT:  Okay.  Rephrase the question.

23  BY MS. McDONOUGH:

24  Q     If Ms. Ploog denied that you had a teaming agreement,

25  would that be a lie?

1  A    My recollection is different.  There is a teaming

2  agreement.  And I think I have it.  Can I show it?

3  Q    No.

4           You allege that you had this teaming agreement, but

5  your plans with CGI ultimately fell through; is that correct?

6  A    That's correct.

7  Q    And you found out about that around the end of May 2012;

8  is that right?

9  A    I don't remember.  April.

10  Q    April?

11  A    Yeah.  I don't remember the exact date.  Do you want me

12  to --

13  Q    No, I don't.

14  A    Okay.

15  Q    And so you actually had no firsthand knowledge that

16  Dr. Campbell had asked CGI to partner with Darryl Wiggins, did

17  you?

18  A    No, other than what CGI told me.

19  Q    So it is just what Ms. Ploog told you?

20  A    Correct.

21  Q    And that conversation with Ms. Ploog, did you say that

22  happened over the phone?

23  A    It did, yes.

24  Q    So if Ms. Ploog denied ever talking to you about Jennifer

25  Campbell, would that, in your opinion, be a lie?

1    A    My recollection is different.  I did talk with her.

2    Q    If Ms. Ploog denied ever telling you that Dr. Campbell

3    had asked CGI to partner with Darryl Wiggins, would you also

4    disagree with Ms. Ploog then?

5    A    Sorry, if she had told me that --

6    Q    Is your recollection that Ms. Ploog -- your recollection

7    is that Ms. Ploog told you that Jennifer Campbell had asked

8    her company to partner with Darryl Wiggins; is that right?

9    A    That's correct.

10   Q    So if Ms. Ploog denied that, she would be lying; isn't

11   that true?

12   A    Her recollection is just different than mine.

13   Q    So yes?

14   A    So yes what?

15   Q    So, yes, she would be lying, in your opinion?

16        THE COURT:  I think he answered the question.

17   BY MS. McDONOUGH:

18   Q    The conversation you had with Ms. Ploog about Darryl

19   Wiggins' company, that was the only reason you believed that

20   Dr. Campbell had actually asked CGI to partner with

21   Mr. Wiggins; isn't that correct?

22   A    No, the only reason I believe was CGI told me that, that

23   exactly.  They said she directed -- Dr. Campbell directed him

24   to partner with another firm instead of Compass.

25   Q    But other than that conversation with Ms. Ploog, did

1  anyone else tell you that that was the case?

2  A    No.

3  Q    And so shortly after that conversation with Ms. Ploog,

4  you reached out to Brenda Emanuel; is that right?

5  A    Again, I don't know how soon after that, that I did.

6  Q    But you reached out to Mr. Turnage shortly after that; is

7  that correct?

8  A    I don't know, again, how long that was.  I can tell you,

9  if you'd like me to tell you.  I can look --

10  Q    I would like you to tell me.  I don't want you to look at

11  your notes.  You are not permitted to do that.

12  A    I don't recall.  It has been four years, or three, three

13  and a half years.

14          But at some point between the conversation with CGI,

15  I did go to Mr. Turnage, as I said.  I just don't remember if

16  it was a week after or two weeks after or three weeks after.

17  Q    But we are still talking in the May 2012 time frame?

18  A    April or May, yes.

19  Q    And so then at that point you went to Mr. Turnage on June

20  2 or on or about June 2?

21  A    Correct.

22  Q    You discussed these invoices you complained to

23  Mr. Turnage about?  And you believe that Dr. Campbell was

24  holding up those invoices; is that right?

25  A    Yes.  So I said -- what I told him was "Mr. Simon told me

1   that no invoices would be paid until I agreed to the new

2   terms."

3   Q    But you did ultimately receive payment, right?

4   A    Yes.  But only after I agreed to the terms, though.

5   Q    Now, is your position that CGI refused to partner with

6   you because they had been asked to partner with Darryl

7   Wiggins?

8   A    Is it my belief?

9   Q    Yes.

10  A    That's what they told me, yes, and I believed it, yes.

11  Q    Isn't it true, though, that you could not have bid on

12  Phase 2 no matter what?

13  A    Some of the e-mails that you have say that the client,

14  this is from Simon and from Ms. Brooks, that they have checked

15  with their contacts, and they were told that I could be on

16  both, as long as I didn't prime on both.  So I could be prime

17  on Phase 1 and a sub on Phase 2.  That was accepted.

18  Q    So that was information provided to you by

19  Ms. Brooks-Brown and Mr. Simon?

20  A    Exactly right.  And that had come from Ms. Campbell.

21  Q    They said it came from Ms. Campbell?

22  A    Yes.

23  Q    But other than what they told you, you had no reason to

24  believe that?

25  A    I had no -- other than what they told me, yes.

1  Q    But did you later find out that that wasn't true, that

2  because you won Phase 1, you couldn't bid on Phase 2?

3  A    No.  CGI told me that Ms. Campbell told them that they

4  should not work with Compass, they should work with another

5  firm.  And that Compass already has a lot of work with the

6  District, and that Compass is conflicted out of Phase 2.

7  Q    So then, I'm sorry, so then you did understand that you

8  could not bid on Phase 2?

9  A    Yes.  That's what CGI told me.  Sorry.  Am I not

10 answering that question?

11 Q    Well, what I am asking --

12 A    Are you asking me how I know that I cannot?

13 Q    What I am asking you is, is it your belief that if

14 Dr. Campbell had not gone to CGI and said "Don't partner with

15 Compass," that you could have partnered with them on Phase 2?

16 A    Yes.

17 Q    And so you said Mr. Turnage, he was a trustworthy guy,

18 right?

19 A    Yes.

20 Q    So if he said Compass was disqualified from Phase 2

21 because they won Phase 1, that wouldn't be true?

22 A    What time frame are we talking about?

23 Q    At any time frame.  Would that not be true?

24 A    Up to this point, Mr. Turnage hadn't said that.

25 Q    No, I am saying, if he did, would you disagree with that?

ONYEWUCHI - CROSS - McDONOUGH                    83

1    A    If Mr. Turnage said that?  Of course I will agree.  I

2    have no -- yeah.  I would believe that.  I don't think we

3    are -- that I am understanding the question.

4          You are asking me if I understood that I could not

5    work on Phase 1 and Phase 2?  Initially, no, I didn't

6    understand that.  They told me that the client told them that

7    I could, as long as I didn't prime in both.  So I could be a

8    prime in 1 and a sub in 2, and that was okay.  And I believed

9    that.

10          Sometime in April, May, CGI told me that they had

11   been asked not to work with Compass but to instead work with

12   another firm.  And they -- and I asked why, and the reason was

13   Compass already has work, quite a bit of work, and also

14   Compass is conflicted out.  That was the first that I heard

15   that working on Phase 1 meant we couldn't work on Phase 2 in

16   any capacity.

17   Q    So you did learn that you were conflicted out?

18   A    Yes, from CGI, yes.

19   Q    And that was in that April, May phone call?

20   A    Correct.

21   Q    And so that meant that you would not be eligible to get

22   this $4 million on Phase 2; is that right?

23   A    That's correct.

24   Q    And you believed that that was caused by Dr. Campbell?

25   A    Yes.  They told me.

ONYEWUCHI - CROSS - McDONOUGH                                    84

1   Q    At the time that you went to complain to Mr. Turnage, you

2   had only met Dr. Campbell once; is that right?

3   A    That's correct.

4   Q    And you had never raised any of your concerns with

5   Dr. Campbell to try to resolve them, did you?

6   A    With Dr. Campbell, no.

7   Q    You never asked Dr. Campbell if she had asked CGI to

8   partner with Mr. Wiggins, did you?

9   A    No, I didn't.

10  Q    And you didn't report any of your concerns to Bonnie

11  Norton, who was the contract administrator?

12  A    Bonnie reported to Ms. Campbell, so I didn't think that

13  was --

14  Q    So no?

15  A    No.

16  Q    And you went straight to Mr. Turnage?

17  A    Sorry, yes.  So I went to her boss.

18  Q    To be clear, you have testified that you agreed to

19  partner with Ms. Brooks-Brown and Mr. Simon in January 2012;

20  is that right?

21  A    Or February.

22  Q    January, February, 2012?

23  A    Yes.

24  Q    And that your friend or acquaintance Ms. Emanuel was the

25  COO, she was in the position of authority at that time?

1   A    In February?

2   Q    Uh-huh.  Yes.

3   A    Yes.  I think -- I don't know if she had left or she was

4   still there.

5   Q    You -- so you --

6   A    Sorry.

7   Q    When you talked to -- when Mr. Simon and

8   Ms. Brooks-Brown, when they initially told you in January,

9   February, 2012 that the client, you know, wanted all these

10  things, that made you feel uneasy you said, right?

11  A    Yes.

12  Q    But you didn't complain in January 2012, right?

13  A    No, in January 2012, I said, no, I didn't want to work on

14  the project.

15  Q    But you did not complain to Mr. Turnage or anyone at the

16  District?

17  A    No.

18  Q    And you didn't complain to Mr. Turnage in February

19  2012 -- I'm sorry, January, February, you didn't complain?

20  A    No.

21  Q    And you didn't complain to Mr. Turnage in March when you

22  got these e-mails that were allegedly from Dr. Campbell, you

23  didn't complain then, did you?

24  A    No, I didn't.

25  Q    And you didn't complain in April when this kickoff

ONYEWUCHI - CROSS - McDONOUGH                          86

1  meeting occurred?

2  A    No.

3  Q    You didn't complain in May when you found out that you

4  couldn't bid on this $75 million contract?

5  A    I did not complain you said?  No.

6  Q    You waited to complain until June, right after you had

7  found out that you couldn't bid on that contract; is that

8  right?

9  A    No.  Would you like me to explain, or just yes or no?

10  Q    I mean, did you -- why did you wait?  Why did you wait

11  six months to complain if you were uneasy with things?

12  A    So there has been a pattern of escalating demands.  One,

13  more money.  We need to change the terms of that agreement.

14  And that kept going, and I kept managing it.  I would push

15  back, I will cave on some occasions.  So that kept happening.

16  Two things actually happened to kind of tip it over that I

17  decided this needed to stop.

18        The first was a benign e-mail that I got from

19  Ms. Campbell.  And it so happened I got an e-mail, I think it

20  was like the 24th of April, and Mr. Simon and I had had an

21  argument about his new fee of $250,000.  And he said to me,

22  "We are not going to honor any client meeting until you agree

23  to the $250,000."

24        A day or so after that, I got an e-mail from

25  Ms. Campbell, and the e-mail said, "At some point in the

ONYEWUCHI - CROSS - McDONOUGH                    87

1   future, I am going to want to have another meeting with you

2   and all the subs, to put faces to the names." So I realized

3   that I could not produce my subs because --

4   Q    Because you were having a disagreement with Mr. Simon?

5   A    Mr. Simon.  That --

6   Q    And so then, what I wanted to --

7          MR. KARPINSKI:  Your Honor, let him finish the

8   explanation.

9          THE COURT:  You can finish.

10          You asked for it, so.

11          THE WITNESS:  What also led me to believe was any

12   disagreement we had, they had a way of pushing it or putting

13   me on the spot.  So I thought that was, you know, one of the

14   things.  So that was one reason.

15          The second reason was, remember, I had mentioned

16   this other project we had, we are working with Ms. Emanuel.

17   It was called a health information exchange project.  Nothing

18   was happening with it, it just wasn't doing any work, nothing

19   was happening.  Ms. Brooks and Mr. Simon approached me and

20   said, "We understand your project is stuck."  I said, "Yes.

21   We have done the proposal, and it was been awarded, but we are

22   not doing any work."  They said, "Well, you know, we can get

23   it going for you again."  So I said that will be very helpful.

24   And Mr. Simon came to meet with me and said, "You know,

25   business development costs money."  So, basically, saying that

1   he needed to -- he wanted money to get this project going.

2           I found that very expensive at different levels.

3   One was there was no margins in it.  We are doing it for -- I

4   explained all of this.  I said, you know, we are not making

5   any money.  But the second was that escalating demand.  So at

6   that point I was like, okay, these guys are just shaking me

7   down.  I needed --

8   BY MS. McDONOUGH:

9   Q    Sorry.  Who do you mean by "these guys"?

10  A    Mr. Simon and Ms. Brooks.

11          So that's when I decided -- so that's what spurred

12  me to seek a solution right away, as opposed to try to manage

13  it and finish the contract and --

14  Q    So you are saying that you then sought a solution through

15  Mr. Turnage because Ms. Brooks-Brown and Mr. Simon were trying

16  to shake you down?

17  A    Yes.

18  Q    So you then complained about Ms. Campbell?

19  A    No, you asked me about timing.  Why did I not do it

20  initially --

21  Q    Right.  This is my question now, though:  So then

22  Ms. Brooks-Brown and Mr. Simon are trying to shake you down,

23  and then you went and complained to Mr. Turnage about

24  Dr. Campbell; is that what you just said?

25  A    No.  So what I said was, one of the reasons, the timing,

ONYEWUCHI - CROSS - McDONOUGH                    89

1    you asked me about timing.  The reason I went when I did, you

2    said you didn't go in April, you didn't go in February, you

3    went in May.  I said the reason May, that happened in May or

4    in June, was because of all these series of escalating

5    demands.  That was one.

6            Then the second reason, also, was I started getting

7    really concerned because Compass was the company on record.

8    Compass was the prime.  And there were all these

9    irregularities happening.  So I got fearful that this could

10   really be a problem for us as a company.  So I feel I needed

11   to tell somebody at that point.

12   Q    So then these things that made you uncomfortable that

13   could compromise Compass' position, it is okay that they

14   happened for the first couple of months, but then when you got

15   to month six, you couldn't deal with it anymore?

16   A    Because it kept escalating.  Yes.

17   Q    So it was okay in the beginning?

18   A    The demands kept increasing.  Yes.

19   Q    I just want to make sure I understand.  All of these

20   issues with Mr. Simon asking for more money, Carrie

21   Brooks-Brown, Mr. Simon, wanting you, Compass, to agree to

22   more conditions, that was all coming right from Carrie

23   Brooks-Brown and Mr. Simon, right?

24   A    That's correct.

25   Q    There was nothing direct from Jennifer Campbell?

1  A    No, except for what I just mentioned, which is "I may

2  want to see you guys soon."

3  Q    Because she wanted to get to know the people who were on

4  the project?

5  A    Exactly.

6  Q    Okay.

7  A    But I thought the timing and coincidence was interesting.

8  Q    Based on what Carrie Brooks-Brown and Mr. Simon were

9  doing?

10         And I understand that you have a pending lawsuit

11  against CBBCS, against Ms. Brooks-Brown and Mr. Simon; isn't

12  that right?  Sorry, not pending, but you did have a lawsuit

13  against them?

14  A    We -- CBBCS sued me, and I countersued them, and we

15  settled.  So there is no lawsuit.

16  Q    And so you had said they sued you.  So CBBCS, they sued

17  you because you weren't paying them; is that their allegation?

18  A    No, they sued me because I terminated them.  And we

19  disagreed about how much they should earn for the work they

20  had done up until that point.

21  Q    But they claim that you hadn't paid them for that work;

22  is that right?

23  A    That's not correct.  We just disagreed on the amount that

24  they had earned, based on how much work they had done up until

25  that point.

1  Q    Mr. Onyewuchi, is the document I just handed you, is that

2  the complaint that Carrie Brooks-Brown and Cedric Simon filed

3  against you?

4  A    Yes, it is.

5  Q    And so you had just said --

6         MR. KARPINSKI:  Your Honor, I'm going to object.

7  Relevance.

8         THE COURT:  You can go on.

9  BY MS. McDONOUGH:

10  Q    And so you had just said that they did not sue you

11  because you hadn't paid them?

12  A    I'm sorry?

13  Q    You just said that they sued you because you hadn't paid

14  them; is that right?

15  A    Yes.  Sorry.  That they sued me because I didn't pay

16  them?

17  Q    You said that's not true?

18  A    No, I said we disagreed on how much money.

19  Q    Could you turn --

20         MR. KARPINSKI:  Can we have a copy of the document

21  they are using?

22  BY MS. McDONOUGH:

23  Q    On page 4 of this -- I am going by the page numbers at

24  the bottom of the page, paragraph 13.  So this says here:

25  Accordingly, as of October 1, 2012, the value of the completed

1  work is, and I am just paraphrasing here, $210,000 --

2  $210,065 -- sorry.

3  A    Number 13, you said?

4  Q    I'm sorry.  No. 13.

5        They are saying the value of the work they completed

6  was $210,065.84.  Is that what you read there?

7  A    Yes.

8  Q    And the second sentence says:  At the time, however,

9  Compass has not paid CBBCS a single dime for any of the

10  completed CLINS; is that right, that's what it says?

11        And so paragraph 14, it says:  There is no question

12  that by October 1, 2012, Compass had received payment from the

13  District for the $210,065.84 of work completed by CBBCS.

14  According to Compass' principal, Mr. Anthony Onyewuchi,

15  Compass received payment for the completed CLINS, but used the

16  funds to pay other subcontractors.  In an e-mail to CBBCS

17  dated September 12, 2012, Mr. Onyewuchi confirmed that Compass

18  had been paid.

19        And they have listed here the text from the e-mail:

20  "Good news is" -- this is the e-mail that you are sending

21  them.  "Good news is we got paid the 210K, which was the

22  invoice amount approved and submitted.  The bad news is I have

23  paid out 184,000 to the consultants and for expenses.  I have

24  an additional 24K due out to the consultants.  Question, can

25  you wait for me to receive payment for the next set of

1   deliverables?"

2         And you did send that e-mail; isn't that right?

3   A    I did, yes.

4   Q    So there was dispute over whether Compass had paid or

5   not?

6   A    There was dispute over whether we had paid?

7         MS. McDONOUGH:  And, Your Honor, we will move to --

8   request that you take judicial notice of this pleading.

9         THE COURT:  For what purpose?

10        MS. McDONOUGH:  Well, I mean, I guess it's going to

11  come out here in a minute.  Just to show that there was a

12  dispute between Carrie Brooks-Brown and Cedric Simon, that the

13  real dispute was between Mr. Onyewuchi, Carrie Brooks-Brown,

14  and Cedric Simon, not between Mr. Onyewuchi and Jennifer

15  Campbell.

16        MR. KARPINSKI:  Your Honor, I object.  This lawsuit

17  doesn't involve Jennifer Campbell.  It has zero probative

18  value.

19        MS. McDONOUGH:  That's actually exactly the point.

20        THE COURT:  And you want to publish it now?

21        MS. McDONOUGH:  I'd just like to move it into

22  evidence, yes.

23        THE COURT:  And it is a new document, right?  It

24  hasn't been previously disclosed?

25        MS. McDONOUGH:  It was discussed yesterday during

1   Mr. Turnage's testimony.

2           THE COURT:  It wasn't part of the pretrial document?

3           MS. McDONOUGH:  No, sir.

4           THE COURT:  And the reason you are moving it in now

5   is?

6           MS. McDONOUGH:  Just to show that the actual dispute

7   that Mr. Onyewuchi had was not with Dr. Campbell, as he

8   alleged.

9           THE COURT:  I think you have made your point.

10          MS. McDONOUGH:  Okay.

11  BY MS. McDONOUGH:

12  Q    And so, Mr. Onyewuchi, you testified that you filed

13  counterclaims against Carrie Brooks-Brown and Mr. Simon; is

14  that right?

15  A    Not -- I filed against CBBCS.

16  Q    And so I am going to give you a copy of the answer that

17  you filed.

18          MR. KARPINSKI:  Your Honor, we have a continuing

19  objection to the relevance of all this.  This is irrelevant

20  material.

21          THE COURT:  Okay.

22          THE WITNESS:  Okay.  Go ahead.

23  BY MS. McDONOUGH:

24  Q    And so just to make sure, Mr. Onyewuchi, you signed a

25  contract with Carrie Brooks-Brown and Cedric Simon to work on

1   Phase 1; is that right?

2   A    With CBBCS, yes.

3   Q    And could you please turn to page 9 of this, of the

4   answer that I just handed you.  And going by --

5   A    Of my -- of the counter --

6   Q    Yes.  Of the Compass Solutions LLC's answer.

7   A    Page 9.  Okay.

8   Q    Yes, sir.

9        And I am looking at paragraph 24, which says -- and

10  this is the document you wrote and submitted to the Court --

11  or, I'm sorry, your attorney, it was submitted on your behalf;

12  is that right?

13  A    Yes, that's correct.

14  Q    So paragraph 24, it says:  CBBCS, and that's Carrie

15  Brooks-Brown and Cedric Simon, through its employees and

16  subcontractors, including without limitations, Cedric Simon,

17  breached the subcontract with Compass as follows.

18        Is that what you read there?

19  A    Yes.

20  Q    And so here, it is true then that you list a bunch of

21  different ways that they breached your contract; is that

22  right?

23  A    Correct.

24  Q    And so I am looking on the next page, page 10, paragraph

25  F.  And paragraph F says that they breached the contract,

1   Cedric Simon and Carrie Brooks-Brown, CBBCS --

2   A    I'm sorry, which paragraph are you reading?

3   Q    Looking at page 10, paragraph F at the top.

4   A    "F," as in "Frank."

5   Q    Yes.

6          It says that they breached the contract by making

7   material misrepresentations to Compass concerning Compass'

8   performing follow-on contracts with the District of Columbia;

9   is that right?

10  A    Correct.

11  Q    And that follow-on contract, are you talking about

12  Phase 2?

13  A    Yes, I am.

14  Q    And isn't that what you told -- what you complained about

15  to Mr. Turnage, that it was Dr. Campbell, who had made

16  material misrepresentations about your ability to get Phase 2?

17  A    Yes.  So what -- and I actually had the e-mail.  I said

18  to Carrie, "Can you tell me, who in the District told you we

19  could bid on 1 and 2?"  And she says, "I didn't tell you that.

20  Cedric did."

21  Q    So Cedric told you that?

22  A    Correct.  No, that's what Carrie -- Ms. Brooks denied

23  telling me that.  That's why this is.

24  Q    So you sued her for making that material representation.

25  But you had told Mr. Turnage that Jennifer Campbell made the

1  material representation; is that right?

2  A    Correct.  Are you ignoring the dates on this?

3  Q    I am just asking you these questions based on what you

4  are suing them for.  You said it was about Phase 2, right?

5  A    Okay.

6  Q    And so then I am looking here at paragraph H, and this

7  says that you're alleging that --

8  A    Paragraph?

9  Q    Sorry.  Same page, H.  This says you are alleging that --

10  sorry.  CBBCS, so Carrie Brooks-Brown, Cedric Simon, breached

11  your contract by interfering with Compass' relations with the

12  CGI Group, Inc.

13  A    Correct.

14  Q    And didn't you tell Mr. Turnage that it was actually

15  Jennifer Campbell who interfered with your relationship with

16  CGI?

17  A    Correct.

18  Q    And so then --

19  A    Can I answer that?

20  Q    I think you answered the question.

21  A    You asked the question.

22         MR. KARPINSKI:  Your Honor, he should be allowed to

23  respond to the question.

24         THE COURT:  Ask your next question.

25  BY MS. McDONOUGH:

1  Q     So I am looking also here at paragraph I, the same page,

2  right underneath.  And you are alleging that Carrie

3  Brooks-Brown and Cedric Simon breached the contract by

4  interfering with Compass' providing services as a

5  subcontractor on Phase 2, HIX/eligibility contract; is that

6  right?

7  A     That's correct.

8  Q     So then you are saying that Carrie Brooks-Brown and

9  Mr. Simon, they interfered with your ability to bid on

10 Phase 2; is that what this says?

11 A     Working with Ms. Campbell, yes, that's what this says.

12 Q     But Ms. Campbell is not named in this lawsuit, is she?

13 A     No, she is not.

14 Q     And you never -- so you filed this counter lawsuit

15 against Carrie Brooks-Brown and Mr. Simon, right?

16 A     Correct.

17 Q     And you never filed any claims making these allegations

18 against Dr. Campbell, did you?

19 A     No.  I reported Dr. Campbell to Mr. Turnage.

20 Q     Couldn't you have listed her in a lawsuit?  You hadn't

21 gotten any legal relief against Dr. Campbell, had you?

22 A     No, I hadn't.

23 Q     So you could have named her in the lawsuit?

24 A     I don't know.

25 Q     You didn't, did you?

ONYEWUCHI - CROSS - McDONOUGH                    99

1  A    That's a question for the attorneys.  I didn't, yes.

2  Q    And so I understand, this is a counterclaim that you

3  filed, you didn't initiate this lawsuit; is that correct?

4  A    No, I did not.

5  Q    And so didn't Jennifer Campbell actually sue you for

6  making defamatory statements against her to -- about her to

7  Wayne Turnage; isn't that right?

8  A    That's correct.

9  Q    But you didn't file any counterclaims in that case

10  against Ms. Campbell, did you?

11  A    That's -- can he answer that?  Can the attorney answer

12  that?

13  Q    No, he can't.

14  A    You are asking me about legal tactics.

15  Q    Are you aware that you filed any counterclaims or that

16  your attorney has?

17  A    Not aware.

18          MS. McDONOUGH:  No further questions.

19          THE COURT:  Mr. Karpinski?

20          MR. KARPINSKI:  Nothing, Your Honor.

21          THE COURT:  Terrific.  Thank you.

22          THE WITNESS:  Thank you.

23          THE COURT:  Have a good afternoon.

24          (WHEREUPON, the witness was excused.)

25          MS. KNAPP:  Your Honor, the defense does not have

1   any further witnesses.  We do have some evidence that we would

2   like to move in.  In particular, we have now marked the second

3   copy of the org chart as Plaintiff Exhibit 103.  And it is not

4   on the list we previously provided, but we would move that

5   into evidence at this point in time.

6              THE COURT:  Any objection?

7              MR. LESCHT:  No objection, Judge.  I would just ask,

8   if there are any other exhibits that we moved in, that they be

9   moved in as well.

10             THE COURTROOM DEPUTY:  We have to go over the whole

11  list.  Everybody's all over the place.

12             MR. LESCHT:  We can do that out of the presence of

13  the jury.

14             THE COURT:  Okay.

15             MS. KNAPP:  And the defendant would like to talk to

16  Your Honor about another exhibit that you previously ruled on.

17             THE COURTROOM DEPUTY:  Ms. Knapp, your 103, is that

18  Plaintiff Exhibit 33, the organizational chart?

19             MS. KNAPP:  No, it is a new copy of the

20  organizational chart that Mr. Onyewuchi's lawyer handed us

21  during his testimony.

22             THE COURTROOM DEPUTY:  But is that the same as

23  Plaintiff's 33?

24             MS. KNAPP:  No, it is a different document.

25             THE COURTROOM DEPUTY:  Okay.

1          THE COURT:  All right.  So other than that one

2     document that you wanted to discuss, is the District done with

3     their case?

4          MS. KNAPP:  The District will be done with their

5     case, yes.

6          THE COURT:  Okay.  We are going to take a lunch

7     break.  Why don't you go back to the jury room now, and I will

8     very shortly tell you in how much time to come back.

9          (WHEREUPON, the jury exited the courtroom, and the

10    following further proceedings were had in open court, outside

11    the presence and hearing of the jury, to wit:)

12         THE COURT:  What is the issue with the document,

13    Ms. Knapp?

14         MS. KNAPP:  Yes, Your Honor.  The District would

15    like to, once again, offer the -- it is exhibit -- not knowing

16    the number off the top of my head, but the Office of the

17    Inspector General's summary letter.  And I didn't ask

18    Ms. Campbell about this because of Your Honor's order, but in

19    reviewing some of her deposition testimony, it was clear that

20    she believed that the report itself, the finding that it had

21    and the publicity surrounding that, that there was at least

22    one article published about it, contributed to her

23    reputational damages.

24         And so while, you know, I understand Your Honor's

25    previous ruling, I think that that provides another basis for

 1    its admissibility.

 2              THE COURT:  Mr. Lescht?

 3              MR. LESCHT:  The Court's already ruled.  It has been

 4    excluded.  Evidence has come in based upon that ruling.  I

 5    know what she was talking about.  There was some follow-on

 6    article written online about, I don't know, a year ago, where

 7    the District gave the report to the reporting, quoted it from

 8    chapter and verse.  If you are going to ask a witness, "Are

 9    you upset about things," they are going to sit and tell you

10    they are upset about quite a few things.  And this is not the

11    subject of this lawsuit, all right.  The basis of the lawsuit

12    are the allegations that are made in those two articles.

13              I think this article they are talking about came out

14    about a year ago, a couple years after this lawsuit has been

15    filed.  It's never been in the pleadings.  If a lawyer decides

16    to question a witness, we have no control over questions

17    asked.  You can ask anything.

18              I think that the Court's already ruled, this is

19    just, you know, another attempt to try to get in something

20    that there's no basis to get in, and it was never part of this

21    lawsuit.

22              THE COURT:  It was in the deposition in this case?

23              MS. KNAPP:  No, in the other case, Your Honor, that

24    I got a copy of last week.

25              THE COURT:  Last week.  Before I ruled on the IG

1  report?

2        MS. KNAPP:  It was after the pretrial, Your Honor.

3  I can't remember whether or not -- where it was in terms of

4  when your ruling came out.  I will also say that, you know,

5  one of the things that the plaintiff did testify about is how

6  when you Google her name, what comes up is these newspaper

7  articles.  And Ms. Ambed, our junior lawyer, was trying to

8  explain to me the complex algorithm that Google uses when you

9  pull up these things.  So my experience may not be the same as

10  everybody else's, but if I put in the plaintiff's name and put

11  in "Dr. Jennifer Campbell" and "DC," one of the things that

12  comes up is the article about the OIG report.  I think it

13  comes up actually before the Post article.

14        THE COURT:  It is just too little, too late.

15  Mr. Lescht is correct that the strategies and the evidence

16  that has come in have been based on my pretrial rulings, and

17  that was one of them.  So it stays out.

18        Are you going to put on a rebuttal case, Mr. Lescht?

19        MR. LESCHT:  Yes, but before we do, Judge, let me

20  ask to dismiss the common interest privilege claim.  Is that

21  after the rebuttal?

22        THE COURT:  Well, tell me what the rebuttal is going

23  to be.

24        MR. LESCHT:  I would like to talk to my client, but

25  if we do have a rebuttal, at least in my mind, it will be ten

1    minutes of her on the stand, like sort of yesterday.

2              THE COURT:  Okay.

3              MR. LESCHT:  And I think, too, though, I would

4    say -- I pulled out I think like a couple questions from a

5    couple of witnesses that I would like to read in from their

6    depositions.  That would take three minutes, too.  So it is

7    not a lot to do.

8              THE COURT:  Does the District seek to make a motion

9    at the end as well?

10             MS. KNAPP:  Yes, Your Honor.

11             THE COURT:  Okay.  Let's come back at 2:00.  You can

12   make your motion, Mr. Lescht.

13             And then have the jury come back at 2:15, Tanya.

14   All right.  Thank you.

15             (WHEREUPON, a recess was had from 1:02 p.m. to 2:06

16   p.m.)

17             (WHEREUPON, the following further proceedings were

18   had in open court, outside the presence and hearing of the

19   jury, to wit:)

20             THE COURT:  Mr. Lescht, are you going to make a

21   motion?

22             MR. LESCHT:  Yes.  Do it before rebuttal?

23             THE COURT:  Yes.

24             MR. LESCHT:  Okay.  We move to dismiss the common

25   interest, affirmative defense, for the reasons previously

1  argued and stated in our brief.

2          Also, we move for judgment as a matter of law on the

3  stigma aspect of the claim.  Thinking about the evidence as it

4  has come in here, in order to prevail on that claim, we need

5  to show that there was a termination, which is conceded,

6  accompanied by publication that carries a stigma.  And I

7  believe that the testimony that's been presented to the Court

8  is sufficient to not just make a prima facie case, but for a

9  judgment as a matter of law.

10          The publications are in evidence.  Any reasonable

11  person reading them will conclude that the District put out

12  information that they received allegations, investigated, and

13  concluded that Ms. Campbell was guilty, and that this stigma,

14  according to her, in her testimony, which was, if you recall,

15  not cross-examined at all.  This stigma has carried forward to

16  this day.  There's been no cross-examination of Dr. Campbell's

17  testimony on the stigma, the effect it has had on her life.

18  There's not been a single witness to testify to contradict

19  what she said.  None.  The District called Dr. Campbell for a

20  couple of factual points, having absolutely nothing to do with

21  the publications, the stigma, or how it has affected her.

22          And I believe that under the facts of this case,

23  that the Court would be within its rights to grant judgment to

24  us on that aspect of the claim.  I understand the defamation,

25  the reputation plus is for the jury, but I understand on the

1  stigma part of the claim, we've established enough evidence

2  for a judgment in our favor, and let the jury award damages.

3          THE COURT:  Thank you.

4          Ms. Knapp?  Let's address the common interest

5  privilege first.

6          MS. KNAPP:  Sure.

7          On the common interest privilege, the District has

8  introduced evidence and, indeed, the plaintiff introduced

9  evidence that supports the fact that the people who made the

10  disclosures, and, in particular, the testimony of Mr. Ribeiro,

11  but I believe that it was also supported by the testimony of

12  Mr. Turnage, that they believed that they were acting in

13  common interests because with the public, who they had the

14  responsibility of governing, and that this is a privilege that

15  generally doesn't come up in the common interest, per se,

16  privilege, per se.  It comes up as sort of more in the idea of

17  official immunity.  There's both -- and there are two levels

18  of official immunity in terms of defamation, there's an

19  absolute, and then there's also a qualified immunity.  And the

20  qualified immunity is slightly different than the 1938

21  qualified immunity, and I think it's for the city as a whole,

22  it just doesn't project just individuals.  And that that's why

23  you don't see sort of the common interests as the District had

24  previously formulated as sort of the common interest with the

25  public at large, because it sort of gets subsumed by those

1    other privileges.  But I think it is a different way of

2    stating it.

3           And what public officials have is a common interest

4    with the public to show that, you know, again, that they're

5    governing correctly, and that's what was done here.  The

6    information was released, was released by highly placed public

7    officials to show -- to allow the citizens of the District of

8    Columbia to know that their leaders were doing the right

9    things.

10          THE COURT:  Does it make a difference that they

11   didn't release it to the public, they released it to the

12   reporters?

13          MS. KNAPP:  I think the understanding was that the

14   reporters were going to be releasing it to the public.

15          THE COURT:  But they were going to put whatever spin

16   they thought appropriate.

17          MS. KNAPP:  I don't know that -- I think that the

18   mode of releasor is the important piece of this to look at,

19   and the motive of the releasor and the beliefs of the

20   releasor.  I believe that's where the cases focus is, it is

21   whether the person believed they had a common interest.  And

22   so I don't think that the fact that it was released through a

23   third party it -- other than the fact that it was released

24   through a third party -- what's the word I am looking for --

25   extinguishes that interest as a matter of law.

1    THE COURT:  Okay.  I am going to grant that motion

2    on both the law as I had it in my motion for summary judgment,

3    and on the facts there's no evidence whatsoever as to what the

4    media -- the information was released to media.  There's no

5    evidence whatsoever presented on what the media's interest

6    was, and what little evidence was presented shows that Alan

7    Suderman had an interest in making salacious scandals, which

8    was not the District's interest.  If anything, the information

9    was released to him to control what scandal he was going to

10   insinuate or report.  So I grant that motion in that respect.

11         All right.  Let's talk about the stigma.

12         MS. KNAPP:  So stigma in this type of claim has a

13   special meaning, and it is not a -- it is not the inchoate

14   type of stigma that the plaintiff's counsel has described.

15   The stigma here means that you are completely -- that you are

16   basically completely and totally barred from practicing in

17   your chosen field or profession, and we know that that's not

18   the case.  If anything, actually, the District should be

19   awarded judgment on this point because the plaintiff is now,

20   you know, after two years, was fully -- you know, was back

21   into a position.  It wasn't the same position, it wasn't a

22   position that she maybe liked as much, but it was a position

23   in her chosen field at very comparable pay.  I think the

24   testimony is that now she's making the same amount of money.

25         In the interim, her own evidence shows that, you

1  know, she was not a -- yes, there were some opportunities that

2  were denied to her, but not every opportunity was denied to

3  her.  And, in fact, she had contracts in her chosen field, and

4  then she also was able to do a host of other work in that

5  field that may or may not have been paid, as demonstrated by

6  her resume, that she put into evidence.

7        And so not only should the plaintiff not be awarded

8  the -- should not be awarded judgment on the stigma claim, I

9  think the way the evidence has come in, it is the District who

10  is entitled to judgment on that claim.

11        THE COURT:  Okay.  Thank you.

12        Mr. Lescht, do you want to respond?

13        MR. LESCHT:  The job that Jennifer Campbell has

14  today is as a consultant.  The job that she was fired from was

15  in the government where she -- it's the difference between

16  people who do things and people who think about and give

17  advice as to what you should consider.  Completely different.

18        Her trajectory while she worked for the District of

19  Columbia was to be the people that make decisions, put things

20  into action and do things.  After two years and a loss of some

21  $305,000 in income, she was lucky enough to get a job in the

22  consulting field.  The reality was, is that as she testified

23  uncontradicted, is that she couldn't get any jobs in the

24  field.  Governments weren't hiring her.  She couldn't get the

25  position.  Her career trajectory, completely different.

1          And the Court ruled at the summary judgment stage

2    that the two-year window is sufficient for a jury to award

3    damages on special harm.  And the reason that I ask at this

4    stage for the Court to make this ruling is because that aspect

5    of the claim really has not been addressed by the District.

6    They have spent their entire case arguing that the statements

7    were allegations, and if they weren't allegations, they --

8    some of it may be true, some of it may have been investigated,

9    or some of it -- I think Mr. Turnage said he didn't need to

10   investigate.  He made his mind up already.  But none of

11   this -- none of their testimony or none of their examination

12   of the plaintiff, or through their own witnesses, contradicted

13   the plaintiff's testimony on the stigma aspect of this case.

14          There always were two elements to the claim from the

15   time that you denied summary judgment, and it was spelled out.

16   It is not like this was a surprise.  The District chose not to

17   contradict the plaintiff at all, and that was their choice.

18   They could have called any witnesses, and they could have

19   cross-examined her.  And, in fact, they called her in their

20   own case.  They could have asked her about it.  But I think if

21   you go back and look at the record here, you are going to find

22   that the elements of the damages that we need -- excuse me.

23   The elements of the burden of proof on our part has been

24   established, and there's nothing to defend against it.

25          The only thing that the District now argues is this

1   legal argument that they made at summary judgment stage, which

2   Your Honor refuted then.  It just had to do with whether or

3   not being out of work for two years satisfies the test for

4   damages.  And that being the case, it is really not a matter

5   of fact any more because the District hasn't contradicted

6   anything that we have said.

7           So it occurred to me this morning that if they

8   didn't do this today, this would be the appropriate time.  I

9   never moved for judgment as a plaintiff, but I do believe

10  since Your Honor has reserved to yourself the award of the

11  damages on this, it is essentially a bench trial.  And the

12  reality is, is that go back and see, but I don't recall them

13  asking her any questions.  They left all of her testimony

14  about the stigma aspect, the elements of the claim, alone.

15  They didn't question her on any of that stuff.

16          THE COURT:  Okay.

17          MS. KNAPP:  May I respond briefly?

18          THE COURT:  Sure.

19          MS. KNAPP:  I believe that what the plaintiff

20  testified to was that her chosen field was health care, health

21  care finance.  The argument that Mr. Lescht just made is that

22  her chosen field is government.  And there has not been any

23  testimony that she was denied government jobs.  There was no

24  testimony that she applied for government jobs --

25          THE COURT:  And that's not what -- broad enough to

*PROCEEDINGS*                                                      112

1    fall into the category.  I agree with you.

2                    MS. KNAPP:  Okay.

3                    THE COURT:  I am going to take that motion under

4    advisement.  Are you ready to put on your rebuttal case?

5                    MR. LESCHT:  Yes.  We are going to read in excerpts

6    from Sam Walker, Bonnie Norton, and Carrie Brooks-Brown.

7                    THE COURT:  Okay.  And how are we going to do that?

8                    MR. LESCHT:  We are going to have Ms. McDonough read

9    it in.

10                   THE COURT:  Read it from the podium or from the

11   witness stand?

12                   MR. LESCHT:  I thought she would stand here or read

13   it in.  Or we could submit the pages.  Would you rather us

14   just give the pages to the jury and take it back that way?

15                   THE COURT:  I want everyone to be on the same page.

16                   MR. LESCHT:  Yes.  I am open to it.

17                   The other thing, Judge, while we are at it, I had

18   this morning printed out the pages of those privacy rules that

19   we had talked about and gave them to Ms. Knapp and she read

20   them through, and she said she'd rather just go with the big

21   document that's in there already.  I have no --

22                   THE COURT:  Okay.  How would you like to do the

23   reading in of the deposition transcript?

24                   MS. KNAPP:  I don't have a strong preference.

25                   THE COURT:  Do you want her to read it from the

1  podium, sit as a witness, or just submit the pages?

2            MS. KNAPP:  Why don't we just submit the pages.  I

3  think that's easier.

4            THE COURT:  And you will agree on redacting what's

5  necessary?

6            MR. LESCHT:  Yes, we can do that.

7            MS. KNAPP:  I have redaction tape.

8            THE COURT:  Does that mean we are done?

9            MR. LESCHT:  We are just going to put Ms. Campbell

10  on for five minutes.

11            THE COURT:  Okay.  So are we ready to bring the jury

12  in?

13            MR. LESCHT:  Can you just give me two minutes?

14            THE COURT:  Of course.

15            (Short pause.)

16            MS. KNAPP:  There was a question, you were still

17  deciding about the jury instruction.

18            THE COURT:  About whether to add anything to the

19  stigma?

20            MS. KNAPP:  Yes.

21            THE COURT:  The instructions, I have added one

22  sentence.  It is not what you asked for, but it adds some

23  clarity.  And once I get a new copy, I will provide that to

24  you.

25            MS. KNAPP:  Okay.  And then, as long as we are

1  waiting for the jury, I think I would like to ask the Court to

2  put in additional language at page 33, which is the

3  explanation of a false and defamatory statement.

4          THE COURT:  I'm sorry, the pages may have changed.

5          MS. KNAPP:  Well, now it just reads, "A false and

6  defamatory statement must be false as well as defamatory.  A

7  false statement" --

8          THE COURT:  Hold on.  So which instruction?

9          MS. KNAPP:  Fifth Amendment procedural due process,

10 first element, deprivation of liberty interest --

11         THE COURT:  Okay.  What is it that you would want to

12 add?

13         MS. KNAPP:  I would want to add further exposition

14 on what it means to be false and --

15         THE COURT:  Hold on.  Was this in your proposed jury

16 instructions at the pretrial?

17         MS. KNAPP:  Yes, Your Honor.

18         THE COURT:  What is the statement you want to put

19 in?

20         MS. KNAPP:  The statement I would like to put in is

21 I believe drawn from *Rosen* -- no, actually, I think it is from

22 *Armstrong v. Thompson*, which is a DC Court of Appeals case

23 from 2013.  And in determining whether factual statements in

24 an allegedly defamatory communication are false, you should

25 discount minor inaccuracies so long as the substance, the

1  gist, the sting, of the statement is justified.

2       THE COURT:  Okay.  And that's a DC Court of Appeals

3  opinion?

4       MS. KNAPP:  Yes.

5       THE COURT:  Which provides the defamation law?

6       MS. KNAPP:  Yes.

7       THE COURT:  Mr. Lescht, do you want to respond to

8  that?

9       MR. LESCHT:  Do you have a copy?

10      THE COURT:  It is page 8 of her proposed --

11      MS. KNAPP:  The District's proposed jury instruction

12  that was in the pretrial.

13      THE COURT:  Second paragraph, second sentence of the

14  second paragraph.

15      MS. KNAPP:  And, actually, what I read was from

16  Mr. Lescht's objection, where he said that we had done it, and

17  had said the sentence wrong.  So I actually read from this

18  last paragraph on page 9.

19      MR. LESCHT:  I think the problem with this

20  instruction here in this case, Judge, is that we are dealing

21  with an article that's taken statements from documents that

22  the reporter was given from the District of Columbia, and that

23  language about whether it overall seems true or whatever it

24  is, that's the whole point of this case, is that the -- we are

25  going to argue, and I think you noted in the summary judgment

1   ruling, that anyone reading this will walk away with the

2   impression that the District concluded these things and fired

3   her because they concluded that she had done these things.

4          So to say that they are minor inaccuracies is

5   neither here nor there.  We are talking about statements

6   that -- and a spin given to them by the District to a

7   reporter, and the reporter writes the article the way the

8   reporter's asked to write it.  I don't know about minor

9   inaccuracies.  I don't know.  I don't even know that there's

10  been any argument that there's minor inaccuracies.  I think

11  what the witnesses have testified is that the guy wrote

12  exactly what he told him to write.  I don't think there are

13  any.

14          THE COURT:  Okay.  I am going to add that line.  I

15  don't think it changes anything, and it wasn't objected to at

16  the pretrial.

17          All right.  Ready?

18          Tanya, if you can get the jury.

19          (WHEREUPON, the jury re-entered the courtroom, and

20  the following further proceedings were had in open court, in

21  the presence and hearing of the jury, to wit:)

22          THE COURT:  We are winding up, and the plaintiff is

23  going to put on a brief rebuttal case, very brief, and then we

24  will be done with the presentation of the evidence.

25          Go ahead, Mr. Lescht.

1          MR. LESCHT:  Thank you.

2          MS. SAFRIET:  I would like to call Dr. Jennifer

3    Campbell.

4          THE COURTROOM DEPUTY:  Please raise your right hand.

5          (WHEREUPON, the witness was duly re-sworn.)

6                    JENNIFER CAMPBELL,

7    called as a witness herein by the Plaintiff, having been

8    previously duly sworn and having testified, was re-sworn and

9    examined and testified further as follows:

10                   DIRECT EXAMINATION

11   BY MS. SAFRIET:

12   Q    Good afternoon, Dr. Campbell.

13   A    Good afternoon.

14   Q    I just want to first show you an e-mail that came up

15   earlier today, Defendant's Exhibit 9, page 1.

16   A    Okay.

17          MS. SAFRIET:  I apologize.  Is this admitted,

18   Defendant Exhibit 9?

19          THE COURTROOM DEPUTY:  Yes.

20   BY MS. SAFRIET:

21   Q    So this e-mail, have you seen this e-mail before?

22   A    Yes, I saw it earlier today.

23   Q    Did you send the e-mail where there's a "from" line that

24   is missing?

25   A    No, I did not.

CAMPBELL - DIRECT - SAFRIET                    118

1  Q    Does this e-mail look authentic to you, or does it look

2  like it has been doctored?

3  A    It does not look authentic to me, primarily because of

4  the "reply to" line.

5  Q    Can you explain?

6  A    So, well, for the first thing, I have never really seen a

7  "reply to" line on any e-mail I have sent and received a

8  response to.  But, also, the name that's in front of my e-mail

9  address.  So, admittedly, this is my e-mail address, but the

10 name --

11 Q    "This" being?

12 A    Sorry.  JBCampbell, and that's an underscore,

13 22@yahoo.com, was my former e-mail address during the time of

14 this case.

15        The name in front of it is my first initial, my

16 middle initial, and then what was my married name.  And I

17 never used my married name.  And, actually, I never legally

18 changed my name.  I used Campbell-Fitzgerald only socially,

19 but I never changed it.  You will even see on other e-mails

20 that -- and my signature line, when I was with DHCF, I was

21 married at the time, and I still never used

22 Campbell-Fitzgerald.

23        And there are other, as I recall, if you want to see

24 how it really comes from my e-mail, I recall two exhibits

25 where -- that I sent that reflect how a "to" line looks, how a

CAMPBELL - DIRECT - SAFRIET                    119

1  "from" line looks.
2  Q    Let me just --
3            MS. SAFRIET:  Is Defendant Exhibit 30 in evidence?
4            THE COURTROOM DEPUTY:  Yes.
5  BY MS. SAFRIET:
6  Q    This is Defendant Exhibit 30.  Is this the e-mail or
7  exhibit that you are speaking of that also shows an e-mail
8  from your Yahoo account?
9  A    Yes.
10 Q    And can you explain, I guess, the difference you are
11 talking about?
12 A    So when coming from my phone, so at the bottom, when
13 coming from my phone, you will see that it says "Jennifer,"
14 and it says "sent from my iPhone."  So that's always together,
15 when coming from my phone.  And then --
16 Q    Are you talking -- sorry.  Are you talking about this
17 one?
18 A    Yes.  But it also shows the same at the very top.
19           And then the "from" --
20 Q    You can point to the screen.
21 A    There, from my phone, it just says "JC," and then it has
22 my e-mail address in parens.  So that's how an actual e-mail
23 from me looks.  And that's from my phone, and I believe our
24 Exhibit 6 shows what it looks like when I send it from a
25 computer.

1    Q    Okay.  So just so the jury understands, these e-mails

2    show how your e-mail shows up from your personal Yahoo account

3    without the "Fitzgerald"?

4    A    Without the "Fitzgerald," and how the signature -- how

5    the "to" line appears, how the "from" line appears, as well as

6    how the signature line appears when sent from my iPhone.

7              MS. SAFRIET:  Is Plaintiff Exhibit 6 admitted?

8              THE COURTROOM DEPUTY:  Yes.

9    BY MS. SAFRIET:

10   Q    So we are looking at Plaintiff Exhibit 6.  And can you

11   explain -- I guess we are talking about this one?

12   A    Yes.  So that's the e-mail that I sent Melisa Byrd when I

13   was requesting a meeting with Mr. Turnage.  This is the day of

14   my administrative leave.  So this is how my e-mail appears

15   when I am sending it from home or from a computer and not from

16   my iPhone.

17              So two things that I noted in comparison to what was

18   shared earlier is that, again, my "from" line from my computer

19   says "Jennifer Campbell," and then it says "mail to," as one

20   word, and then it has my e-mail address.  The other item of

21   note is at the bottom.  My signature line on my computer, I

22   think everyone has a -- you know, you can put in your own

23   signature line.  So without me even having to type anything,

24   my signature line on my computer is also "Best, Jennifer," and

25   it is italicized.

CAMPBELL - DIRECT - SAFRIET                    121

1   Q    So I am just going to place Defendant Exhibit 9 back on.

2   A    Okay.

3   Q    So, once more, that didn't show up in the other e-mails,

4   did it?

5   A    No, it does not show up in any other e-mail I send.

6   Q    And does Cedric Simon have your personal e-mail address?

7   A    He does have my personal e-mail address.

8   Q    Is it possible that he could have just stuck your --

9   A    Yes.

10  Q    -- e-mail address in there to make it look like it is

11  coming from you?

12  A    Yes, he could have inserted it and basically made it

13  appear as though I sent it.

14  Q    Can we talk about the substance of this e-mail?  Can you

15  please explain, I guess, the substance of this e-mail?

16  A    Yes.  So these questions were questions -- as I was

17  explaining before, there's the first round of scoring, and

18  then everything in the questions or the strengths and

19  weaknesses are also there, sent back to OCP, or Office of

20  Contracts and Procurement.

21        They then compile the questions that the panel had

22  for each vendor.  So these are the questions that Compass

23  received from Office of Contracts and Procurement that they

24  had to respond to in their second offer, which is called your

25  best and final.  So both Compass and Navigant received a set

*CAMPBELL - DIRECT - SAFRIET*                                    122

1  of questions that they had to respond to, and it was somewhat

2  of a tight turnaround time.  I think it was like 24 hours or

3  48 hours.  So this is something that they had in their

4  possession as someone who had already submitted a bid.

5  Q    So is there anything else you want to explain about this

6  e-mail?

7  A    Nothing of note.

8  Q    Now I want to go to Defendant Exhibit 99.

9  A    Okay.

10 Q    Page 2.  Do you recognize this exhibit?

11 A    Yes.

12 Q    And at the bottom of the exhibit it says "Jennifer"?

13 A    Yes.

14 Q    And it says "begin forwarded message"?

15 A    Yes.

16 Q    The "from" line, "sent to" and subject has been deleted,

17 as you can see.  The question is, there's no "from" line so no

18 one knows who sent this.  Did you send this e-mail?

19 A    No, I did not send this e-mail.

20 Q    This is Defendant Exhibit 99.  So do you recognize this

21 exhibit as well?

22 A    Yes, I have seen this.

23 Q    Is this the same e-mail but with a different format as

24 the other e-mail?

25 A    Yes, it is.

1   Q    Can you point out if this -- can you state if you think

2   this e-mail looks authentic, and can you explain why?

3   A    I don't believe it is authentic, for a couple of reasons.

4   One is, as we pointed out in the other exhibit, it is missing

5   just a header about "begin forwarded message."  So there's

6   nothing about who forwarded it.  And then, also, there just --

7   it is a lot of shadowing where it actually doesn't just look

8   as if someone cut and paste from an electronic version.

9   Q    You can touch the screen if you want.

10  A    Particularly around this section, it does not, and this

11  line here.  So it does not look like someone just simply used

12  a computer and took the electronic version and cut and paste

13  into another.  This actually looks as though someone, as we

14  did back in the day, where someone actually cut something,

15  paste it, and copy it, with the shadowing and the lines, as

16  well as the lines down the side.

17          And then, again, my signature line, if I had ever

18  forwarded anything, my signature line does not look like that.

19  Q    Do you know anything about the substance of this, under

20  "begin forwarded message"?

21  A    Yes.  This, too, is actually something that not only the

22  vendors -- the vendors who chose to bid had, but this is

23  actually language from the RFP that was published to the

24  public.

25  Q    And when was that published to the public?

CAMPBELL - DIRECT - SAFRIET                              124

1   A    The RFP went out in late January, early February.

2   Q    Of?

3   A    I'm sorry.  Of 2012.

4   Q    And when is this e-mail sent?

5   A    This says Wednesday, March 14, 2012.

6   Q    So is your testimony that this e-mail was public in

7   January 2012?

8   A    The content, yes.  Section -- yes.  So that is typically

9   the section where we write scope of work in any RFP.

10  Q    Okay.  One more question about these e-mails.

11         All of these e-mails, this is 99, have Cedric

12  Simon's name on the "from" line; is that correct?

13  A    Yes.

14  Q    Are you friends with Cedric Simon anymore?

15  A    Anymore?

16  Q    Are you friends with him?

17  A    No.  Not anymore.

18  Q    Can you explain why?

19  A    After seeing these e-mails and kind of learning where

20  these allegations came from, I have too many other issues that

21  I need to deal with because I have friends who are really

22  enemies or using me for their good.  I mean, I know I live

23  in -- the District is kind of, I guess, par for the course,

24  people always name drop, but this was more than just name

25  dropping.

1  Q    I am going to move to Plaintiff Exhibit 32.

2           MS. SAFRIET:  Is that --

3           THE COURTROOM DEPUTY:  That's not admitted.

4           MS. SAFRIET:  Okay.  Do you guys have the better

5  copy we can use?

6           MS. KNAPP:  Yes.  103.

7           THE COURTROOM DEPUTY:  Defendant Exhibit?

8           MS. SAFRIET:  103, yes.  It is a better copy.

9  BY MS. SAFRIET:

10  Q    So the first question is, do you recognize this exhibit?

11  A    Yes.

12  Q    And can you explain what this exhibit is?

13  A    This is the organizational chart that was submitted as a

14  part of their proposal, as part of Compass' proposal.

15  Q    And was this, I guess, chart at the kickoff meeting that

16  was talked about earlier today?

17  A    Yes, the entire proposal was at the kickoff meeting.

18  Q    Can you --

19  A    I believe this was page 12 of the proposal.

20  Q    Can you explain what you did at the kickoff meeting with

21  this proposal?

22  A    Yes.  We went through the proposal from the beginning to

23  the end, which included deliverable dates.

24  Q    Who is "we"?  Can you explain "we"?

25  A    I'm sorry?

CAMPBELL - DIRECT - SAFRIET                    126

1   Q    You said "we went."

2   A    I apologize.  "We" would be -- I know it was myself and

3   Bonnie Norton, Sam Walker, two other members of the health

4   reform staff.  I believe two people from our IT side, and then

5   I don't think it was all 12 of the individuals they describe

6   at the top when they say "our team of 12 professionals."  I

7   don't believe it was all 12.  I believe it was five to six of

8   them.  And so we are all in our larger conference room, and

9   that was the kickoff meeting.

10  Q    So five or six Compass employees?

11  A    Mr. Onyewuchi, and then at least five or six of his

12  contractors out of the 12 that he has identified here on the

13  org chart.

14  Q    And what is this document?

15  A    So each vendor has to submit not only a listing of key

16  personnel, in that they list the name of the key personnel and

17  they give a brief bio, but in their appendixes, they can

18  attach the resumes for each.  But we also ask for it in kind

19  of a graphical way so we can understand what the

20  organizational structure is going to be.  So this shows the

21  program manager being in the middle, which I was discussing

22  yesterday why that's, you know, kind of -- that's the most

23  important piece.  And the piece that I paid the closest

24  attention to was who was going to be the program manager.

25         And then here he lists other key positions --

1  Q    Can you point on the chart with your finger?

2  A    Sorry.  Here.  Here.  Here.  And then all through here,

3  actually, I think in the first one you showed me, this had --

4  the deliverable section had a clear picture, but it is just

5  listing the deliverables.

6          So it gives you an idea of how many deliverables

7  there are, and the project manager would be responsible for

8  all of those, and then she would also manage Compass

9  Solutions, who I believe in that writing was saying that they

10  would take responsibility for the IT portions, they list

11  Management Solutions Consulting Group as doing the support

12  services.  I can't read it completely.  And then they list

13  Tuba Group and CBBCS as handling three components, data

14  collection reporting, financial research, and audit and

15  compliance experts.

16          And then to the right of the program manager, they

17  have Cedric Simon listed as project liaison, and then District

18  representative, which I believe was us, as the District.

19  Q    And you said Compass prepared this document?

20  A    Yes.  Compass prepared this.

21  Q    And submitted it with?

22  A    They submitted as a part of their initial bid and as a

23  part of their opportunity to submit their best and final.

24  Q    And did you hold this up and point to it and say nothing

25  could change on this?

1    A    My recollection is that I actually took -- I pointed to

2    the proposal.  I don't remember ever even lifting it.  The

3    proposal was to the right, my notes -- I believe I actually

4    had an iPad at that time.  I was taking notes on my iPad.  And

5    I just -- I put my hand on it, and I said, "It is -- I just

6    want to make sure we have an understanding that nothing can

7    change within this because this is a binding contract at this

8    point.  Nothing can change in this without it being written

9    and put in writing and approved by Bonnie Norton and

10   throughout the chain of command within the Department of

11   Health Care Finance and OCP," just as Mr. Turnage alluded to.

12   Q    Why did you say that?

13   A    I say that with all of my contractor meetings.  I was a

14   contract administrator on another contract.  I told them the

15   same thing, and they actually understood that.  They had a

16   change of staff once, and they actually had to submit, you

17   know, why they were experiencing the change of staff, they had

18   to also submit the resume of the person they were proposing to

19   take that place, and I had to approve it as a contract

20   administrator, then I had to get my supervisor to approve it.

21   We even had to -- we even had the opportunity, we had the

22   right, to interview the new candidate.  So it is typical of

23   contracting in the District, that if anything material is

24   changing, they have to tell us in writing.

25   Q    Okay.  Thank you.

```
 1              So Ms. Ploog was here yesterday from CGI.  Did you
 2   ever have any telephone conversations with Ms. Ploog about
 3   minority vendors?
 4   A    Yes, I did.
 5   Q    Can you please explain the conversation and the context?
 6              MS. KNAPP:  Objection, Your Honor.  This was covered
 7   in the plaintiff's testimony.
 8              MS. SAFRIET:  We didn't bring this up in our own
 9   case.
10              THE COURT:  Go ahead and answer.
11              THE WITNESS:  Ms. Ploog is correct that we had a
12   phone conversation; however, she initiated the conversation.
13   From my memory, Ms. Ploog called me either on the evening
14   of -- I don't know what day it was, but it was in the evening.
15   I wasn't there.  I received the message, actually, from my
16   assistant, and, you know, a pink message slip.  The next day I
17   wasn't feeling well so I actually worked from home.  But I
18   remember returning her call, and so the -- I returned her call
19   from my Blackberry, my District cell phone.
20              At that time, from what I recall, she was at a
21   conference or somewhere that was a little noisy.  She put me
22   on hold, asked me -- said she would need to get to a place
23   where it is not as loud, do I mind holding for a moment.  She
24   comes back, and she says, "Well, you know, we had the meeting
25   earlier this week about CBEs, and you and Wayne stressed that
```

1  we have to have a CBE.  And I just wanted you to know, we are

2  vetting them."  I said, "Yes, I remember you mentioning that

3  you were vetting some CBEs."  She said, "Well, I have narrowed

4  it down to six," and then she rattled off the six.  And I

5  said, "Well, I don't know what you want me to tell you."  And

6  she said, "Well, do you know any of them."

7         I did -- I was familiar with two of them at that

8  time because both of them had worked with the District.  At

9  this point, Compass had that Phase 1 award, and Document

10  Managers was one of the six she rattled off.  The other ones I

11  told her I was not familiar with.  She then asked --

12  BY MS. SAFRIET:

13  Q    Who were you familiar with?

14  A    Yes.  Compass and Document Managers.

15  Q    Okay.

16  A    She then asked do I -- can I tell her anything about

17  them, and I told her I can't tell her anything about them.  I

18  told her that there is a public record of work product, and

19  that's the department of -- well, they always change their

20  acronym, DSLBD, I believe.  But it's the department that's

21  over small and minority businesses.  And so I said that you

22  could contact them for any information about CBEs, and I

23  believe that they collect information about any complaints

24  that they have received or anything about them.

25         She then went on to ask me about how these

1  arrangements usually work.  And I honestly didn't even know

2  how the arrangements usually work.  I just knew that 35

3  percent of the dollar volume had to go to a CBE.  But I wasn't

4  sure of kind of the legalities of it.  So I said, "That would

5  be an appropriate question for OCP."  And I am not sure

6  whether I directed her to the office for minority and small

7  business or whether when I directed her to OCP that she

8  said -- and I think she stated it yesterday, that she said,

9  "Yeah, I did call, but I didn't get an answer."  I said,

10  "That's really all I can discuss with you."  And that was the

11  end of that call.

12  Q    Did you ever mention Darryl Wiggins specifically by name

13  in the phone call?

14  A    No, I never mentioned Darryl Wiggins.  Nor did she.  She

15  said Compass, Document Managers, and then four other companies

16  that I did not recognize.

17  Q    The allegation that you attempted to steer CGI to

18  Wiggins, this appeared in your termination letter, correct?

19  A    Yes.

20  Q    And this allegation that you attempted to steer CGI to

21  Wiggins, it appeared in the articles published?

22  A    Yes.

23  Q    Did you ever come to learn that Mr. Turnage did not even

24  believe the allegations Ploog told him?

25  A    Yes.  And when I was looking through all of these

1  documents in preparation for the case, I saw an e-mail that

2  the District provided where Mr. Turnage indicated something --

3  I'm paraphrasing, but something to the extent he says, "I

4  don't believe this to be true" or "I don't believe this."

5  Q    I would like to show you Plaintiff Exhibit 32.

6           THE COURTROOM DEPUTY:  That's not in.

7  BY MS. SAFRIET:

8  Q    Do you recognize this document?

9  A    Yes, I do.

10          MS. SAFRIET:  And, Judge, we move now to admit this

11  into evidence.

12          MS. KNAPP:  Objection.  This is a document that this

13  witness was -- an e-mail that this witness was neither copied

14  on nor sent.

15          THE COURT:  Okay.  This hasn't been previously --

16          MS. SAFRIET:  The District produced this in its

17  admissions.  And, also, it's a statement against interest, and

18  my recollection --

19          MS. KNAPP:  The objection isn't on the basis of

20  hearsay, Your Honor, it is on the basis that this witness

21  isn't the appropriate witness.

22          THE COURT:  Hold on.  This is Plaintiff Exhibit 32?

23          MS. SAFRIET:  Yes.

24          THE COURT:  And what is the date of the e-mail on

25  the top?  I want to make sure I am looking at the right thing.

*CAMPBELL - DIRECT - SAFRIET*                          133

1          MS. SAFRIET:  Tuesday, June 12.

2          THE COURT:  Okay.

3          MS. KNAPP:  Your Honor, the District doesn't object

4    to this document coming in.  The District does object to this

5    witness testifying about this document.

6          THE COURT:  We will admit the document.  What is

7    your question to her?

8          MS. SAFRIET:  My question is, did she ever come to

9    learn that Mr. Turnage did not even believe the allegation he

10   made in her termination was accurate or true.

11         THE COURT:  Have you ever seen this document before?

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  When?

14         THE WITNESS:  In preparation for the trial.

15         THE COURT:  All right.  You can enter the document

16   and refer to it in closing, but not through this witness.

17         (Plaintiff Exhibit 32 was received in evidence.)

18         MS. SAFRIET:  Can I approach for one minute?

19         THE COURT:  Yes.

20         (WHEREUPON, the following proceedings were had at

21   sidebar, out of the hearing of the jury, to wit:)

22         MS. SAFRIET:  My understanding is I can't talk about

23   the document with her.

24         THE COURT:  Right.

25         MS. SAFRIET:  Okay.  I just want to be clear.

CAMPBELL - DIRECT - SAFRIET                    134

1          (WHEREUPON, the sidebar ended, and the following

2    further proceedings were had in open court, in the presence

3    and hearing of the jury, to wit:)

4    BY MS. SAFRIET:

5    Q    So I have one or two more questions for you.

6    A    Okay.

7    Q    Between June 4, 2012, the day you were put on suspension,

8    and June 11, the day you were fired, did you ever get an

9    opportunity to clear your name?

10          MS. KNAPP:  Objection, Your Honor.  We are way

11    outside the scope of rebuttal now.

12          THE COURT:  You can answer that question.

13          THE WITNESS:  No.

14          THE COURT:  All right.

15          MS. SAFRIET:  That's all.

16          THE COURT:  Okay.  Ms. Knapp, any other questions?

17          MS. KNAPP:  One moment.

18          (Short pause.)

19          MS. KNAPP:  No, Your Honor.

20          THE COURT:  All right.  Thank you.

21          THE WITNESS:  Thank you, Your Honor.

22          (WHEREUPON, the witness was excused.)

23          THE COURT:  All right.

24          MR. LESCHT:  Plaintiff rests.

25          THE COURT:  Both parties have rested now.  We are

1   going to do some lawyer things.  Why don't you -- it is 3:02

2   now.  Why don't you come back around 3:25 or so.

3          (WHEREUPON, the jury exited the courtroom, and the

4   following further proceedings were had in open court, outside

5   the presence and hearing of the jury, to wit:)

6          THE COURT:  The District is going to make a motion?

7          MS. KNAPP:  Yes, Your Honor.

8          THE COURT:  All right.

9          MS. KNAPP:  Your Honor, the District renews its

10  motion for judgment, as a matter of law, pursuant to Rule 50,

11  on both plaintiff's reputation plus and plaintiff's stigma

12  claim.

13         As we previously discussed, in the reputation plus

14  claim, the plaintiff has not -- in order to establish her

15  damages in this case -- in order to prevail on her reputation

16  plus theory, the plaintiff has to establish that a false

17  statement -- a false defamatory statement caused her special

18  harm.  And the three statements that she has pointed to that

19  were in the newspaper articles are neither false nor

20  defamatory, because they are put forth in the form of

21  allegations.

22         They were also -- and I know you and I discussed

23  this on Rule 50, and you confused me, but I am less confused

24  now.  They were not negligently published.  And negligently

25  doesn't go to the intent to publish them, it goes to

1 unreasonable fail under the circumstances to take care that

2 the statement was true.

3         Mr. Ribeiro and Mr. Murphy both testified they

4 relied on Mr. Turnage, and they looked at the pieces that

5 Mr. Turnage -- the steps that Mr. Turnage had outlined and had

6 taken in the e-mails.  Mr. Turnage was a member of the mayor's

7 cabinet.  They had, I think, both stated they had no reason to

8 disbelieve that what Mr. Turnage said would be true, and the

9 plaintiff hasn't put on any evidence that shows that their

10 trust in Mr. Turnage was negligent, let alone --

11         THE COURT:  Isn't that a quintessential question for

12 a jury?

13         MS. KNAPP:  If there were evidence.

14         THE COURT:  There's evidence that they didn't hear

15 her side of the story, and it is up to the jury to decide

16 whether it was negligent to do that.

17         MS. KNAPP:  I am not sure I agree with you, as a

18 matter of law, but I understand that.  And then if that's the

19 case, I think that's also up to the jury to decide whether --

20 I mean, and that's the only thing they have pointed to,

21 basically, was negligence, and that is true of Mr. Turnage, as

22 well, and his publication to Alan Suderman on the City Paper.

23 And, in fact, he took some pains to see that they were true.

24 He corrected some things before they went out.  He also took

25 some pains to ask that that reporter not expose the most

1    damaging of those communications.  And the communications that

2    he published -- he relied on the communications that were

3    shown to him and allegations that were made to him that even

4    now the plaintiff has admitted give the appearance of

5    impropriety.  And so under those circumstances, I think that

6    the plaintiff's reputation plus claim fails as a matter of

7    law.

8            The plaintiff's stigma claim, and I alluded to this

9    when we were talking about the plaintiff's motion on stigma,

10   again, I don't know what language Your Honor added to the jury

11   instruction, but, you know, it is a high standard, and it is

12   not -- there certainly isn't -- it certainly cannot meet that

13   standard as a matter of law by anything other than, you know,

14   a complete and total bar from practicing in your chosen

15   profession, which we simply do not have here.

16           THE COURT:  So that's complete and total, is not the

17   standard, but it is a high standard.

18           MS. KNAPP:  It is a high standard.  It is closer to

19   complete and total than not, I would say.

20           And, again, what the cases sort of say is that to

21   have the liberty interest, it is sort of equivalent of "We are

22   not going to give you a bar license."  "We are not going to

23   give you a liquor license."  "We are not going to" -- you

24   know, that's the type of hurdle that has to be placed in your

25   ability to practice in your chosen field or practice in your

*PROCEEDINGS*                                                    138

1   chosen profession.  And, again, what we have here is a time

2   period of two years where the plaintiff applied to 30 jobs.  I

3   think that -- and between 2012 and 2014.  You know, there's no

4   evidence that -- let me take a step back.

5           And so there's evidence that in the interim period

6   she worked, and she worked in her chosen field.  And, you

7   know, there are other courts -- I wasn't able to find anything

8   in the Court of Appeals that was directly on point, but there

9   is the case -- there are a number of *Payne v. The District of*

10  *Columbia* cases in this court, but one in particular, which is

11  *Eric Payne v. The District of Columbia*, and where Chief Judge

12  Roberts ruled that that plaintiff's temporary employment in

13  the field of government contracting was sufficient to show

14  that he did not have the type of injury required to meet the

15  stigma claim.

16          THE COURT:  And what were the facts of that?

17          MS. KNAPP:  The facts of that case were Mr. Payne

18  was terminated from his job as the --

19          THE COURT:  You have a cite for that particular

20  *Payne* case?

21          MS. KNAPP:  I thought I did, and I don't think I do.

22          MR. LESCHT:  Judge, I think that was discussed in

23  their brief --

24          THE COURT:  No, no, I know.  But I owe it to them,

25  and to the extent you point me in the direction of a

1    particular case, I will look at it as well.

2            MS. KNAPP:  I will get you the cite to that

3    particular *Payne* case.  It's Judge Roberts, and I believe it

4    was in 2014.  And there the plaintiff was fired from the

5    Office of Contracts and Procurement, and he claimed that --

6    and there was some minimal publicity about his termination.

7    We don't have the direct link that we have here, but that's

8    not where this comes down.  This really comes down to what it

9    takes to be stigma, and he claims he was stigmatized by it.

10   And he had worked on a couple of consulting contracts on

11   issues that related to government procurement.  They were not

12   directly the type of work that he had been doing before, but

13   Judge Roberts ruled in favor of the District on our summary

14   judgment motion, saying that that was sufficient to show that

15   he was not fully and totally barred from practicing in his

16   chosen profession or whatever the correct -- I have been using

17   words that you think are too high of a standard -- that that

18   didn't mean the high threshold established by *Roth* and the

19   case by the court of -- the DC circuit case.

20           THE COURT:  Okay.  Mr. Lescht?

21           MR. LESCHT:  I stand on the previous arguments that

22   we have made.  I think as I said before, I think we should get

23   judgment.  I know it is unusual, but I don't think they have

24   touched the evidence that we have put in.

25           THE COURT:  Okay.  I will take both motions under

1    advisement.

2              Will we be ready to do your closings at 3:25 or so?

3              MR. LESCHT:  Yes.  I would just like to glance at

4    the jury instructions and be able to have them with me, if you

5    don't mind.

6              MS. KNAPP:  Yes, Your Honor.  I would also like a

7    final copy.

8              THE COURT:  That's perfectly fair, and I will

9    arrange for that occur shortly.

10             MS. KNAPP:  Do you have any objection to my showing

11   the verdict form to the jury during closing?

12             THE COURT:  Mr. Lescht, do you have a --

13             MR. LESCHT:  I intended to do the same.

14             THE COURT:  Okay.  Fine.  I am pleased to do that.

15             MS. KNAPP:  And then will you be taking off the

16   question about -- I guess question 1-B, "Did Dr. Campbell

17   prove by a preponderance of the evidence that the District

18   published the false and defamatory statement without privilege

19   to a third party."

20             THE COURT:  I am taking out "without privilege."

21             MS. KNAPP:  I don't think that we will --

22             THE COURT:  You still have to show published.

23             MS. KNAPP:  It was published.

24             THE COURT:  Okay.

25             MR. LESCHT:  There's a concession.

1          MS. KNAPP:  Don't tell my boss.

2          MR. LESCHT:  Just to be clear, Judge -- everyone's

3    different.  Is it closing, I go first, she goes, and I can

4    reserve like 10 or 15 minutes, does that sound right?

5          THE COURT:  Do you have any opposition to that?

6          MS. KNAPP:  Well, when I spoke to Mr. Lescht about

7    it, I was asking him generally about timing.  He said he

8    thought he was going to need 20 minutes, and then 15 minutes

9    for rebuttal.  I think that that's close to being -- closing,

10   me closing, and him closing again.  So I think that that's an

11   excessive amount of rebuttal, particularly since rebuttal is

12   supposed to be things he can't predict, and he seems to

13   think -- know what our case is about.

14         THE COURT:  How much time do you think your main

15   closing --

16         MR. LESCHT:  I'm always quicker than I estimate.

17         THE COURT:  How much time do you think your main

18   closing will be?

19         MR. LESCHT:  I think the first, maybe 15, 20

20   minutes, and then like 10, 15 minutes to rebut.

21         THE COURT:  And how long do you think your closing

22   will be?

23         MS. KNAPP:  Perhaps half an hour, but that's --

24         THE COURT:  All right.  I will give you 25, 30, 10.

25         All right.  I will get copies of the jury

1    instructions and the verdict form to you shortly.  And I will

2    just put it on -- have someone put it on your chair if you

3    want to take a break right now.

4          MR. LESCHT:  Thank you.

5          THE COURT:  Okay.  We will be back at 3:25 or so.

6          (WHEREUPON, a recess was had from 3:13 p.m. to 3:33

7    p.m.)

8          THE COURT:  Mr. Lescht, are you ready?

9          MR. LESCHT:  Yes.  One minor matter.  We have agreed

10   to move to admit Defendant Exhibit 70.  Apparently, it was not

11   moved to admit on the record, just to make that motion on the

12   record.

13         THE COURT:  Which one?

14         MR. LESCHT:  Defendant Exhibit 70.  Apparently, it

15   was identified, but not moved to admit.

16         MS. KNAPP:  Your Honor, I will hand your law clerk

17   the cite to the *Payne* case.

18         THE COURT:  Great.  I think she already has it, but,

19   okay.

20         It is admitted.

21         (Defendant Exhibit 70 was received in evidence.)

22         MS. KNAPP:  Your Honor, Mr. Lescht and I spoke about

23   the personnel regulations.  The District still objects to them

24   coming in, full stop.  But he had suggested -- he gave me sort

25   of a modification that took some out and left some out, and I

1  decided I would rather have the whole thing go in.

2       THE COURT:  Okay.

3       (WHEREUPON, the jury re-entered the courtroom, and

4  the following further proceedings were had in open court, in

5  the presence and hearing of the jury, to wit:)

6       THE COURT:  So we are having closing arguments now.

7  The plaintiff will go first because it is her burden, and the

8  District will go, and then there will be a short rebuttal by

9  the plaintiff, and then it will be submitted to you.  I will

10 give you your instructions, and then you can start your

11 deliberations.

12       OPENING ARGUMENT ON BEHALF OF PLAINTIFF

13       MR. LESCHT:  Thank you, Judge.

14       Jennifer's mom got it right.  If you remember when

15 she testified, she told you that if they, being the District,

16 had just called Jennifer into a room and said, "Things aren't

17 working out, we are going to have to part ways," shake hands,

18 go your separate ways, what did she say?  She said that she

19 raised Jennifer as the type of person where you take

20 responsibility, lick your wounds, and pick yourself up.

21       If the District had just fired her without

22 publishing the statements in the newspapers, we would not be

23 here.  There would be no lawsuit, and there would have been no

24 trial.  This case arose not because she was fired, but because

25 they took it upon themselves to contact the media and give the

1  reporter their information so they could put the spin on the

2  information into the newspaper that they wanted.

3          That's why we are here.  This is not a wrongful

4  discharge case.  You will hear from the judge in the

5  instructions when we are all done.  This is about the

6  reckless, negligent, disclosure of private, confidential

7  information by the District to a reporter, who you heard from

8  Ribeiro and Murphy, they gave contradicting accounts of this,

9  but they did say this guy Suderman apparently liked to publish

10 salacious articles, as I think is the word that they used.

11         So they went to a person that they knew all he

12 wanted to do was publish salacious articles.  He was chasing

13 scandal, I think one of them said.  So they got to him, and

14 they gave him confidential, personal information.  A call

15 comes into the mayor's office about Jennifer Campbell, other

16 witnesses, you heard from the District, they said that the

17 mayor's office tipped off the reporter.  That's what they

18 said.  A call comes in from the reporter, and Murphy says he

19 tells Ribeiro, "You need to respond."

20         And you remember when I had Murphy up there, I said,

21 "Well, did you tell him to give him the e-mails?"  And he was

22 contradictory.  He said -- I think he wanted to blame Ribeiro,

23 and he didn't quite do it, but he thought he would give

24 Ribeiro the e-mails, Ribeiro would call the reporter and give

25 an answer.  Either, you know, "It is under investigation," "We

1  have it under control," "she's" -- whatever.  Whatever it

2  would be.

3        But Ribeiro goes and has the reporter come into his

4  office and take notes on these e-mails.  What did he think the

5  reporter was going to write?  He knew.  It is not like you

6  have to go into these people's minds.  They took a reporter

7  who writes salacious articles, gave him information and put

8  their spin so that the article was published the way that they

9  wanted it to.

10        And even Murphy seemed -- like I said, he almost

11  came this close to saying he should not have let him read

12  those e-mails.  He came that close to that because anyone, any

13  reasonable person would know that when you have a government

14  employee and you have personal, confidential information,

15  allegations made by government contractors, you heard the

16  contradiction here the last two days between Ploog and

17  Onyewuchi.  These are people who are chasing money.  Chasing

18  money.

19        They are chasing money, they are chasing government

20  contracts, and they are complaining about the very people who

21  are supposed to be awarding these contracts.  These are the

22  types of complaints that probably always come in.  Government

23  contractors want government contracts.  And they are going to

24  complain if they don't get them.

25        So Murphy and Ribeiro present this reporter with

1   like a present.  They give him the documents to take notes on.

2   The documents, as you have seen, and you will see when you go

3   back to the jury room, these are not allegations.  The

4   District has tried each of the last couple days to say these

5   are allegations, "We don't know if they are true.  They are

6   made by third parties."

7           Well, when you go and read Turnage's e-mails, he

8   says "I have investigated," "I have concluded," "I am firing

9   her," based upon the information that he got.  And that's

10  exactly what he gave to these reporters.

11          Now, the second -- the first article comes out.

12  This is the Loose Lips article.  This is the first reporter

13  who is allowed to come in and to read the e-mails, right?  So

14  this reporter supposedly is the one, according to Ribeiro and

15  Murphy, who was like relentless.  I think one of them said,

16  "We have to give it to him because he's relentless."  Well, he

17  came in, they gave him the information, he wrote the article.

18  In this article he quoted verbatim from Wayne Turnage's

19  e-mails.  He's identifying here that Jennifer Campbell's

20  placed on administrative leave.  That's a personnel matter.

21  Turnage admitted as much in his e-mails.  He kept saying it is

22  personnel, HR issues.

23          What makes things even worse here is that you have

24  this Loose Lips article come out.  Big deal.  Jennifer learned

25  she's fired in the newspapers.  You think that the District

1  would learn their lesson, right?  Why are you doing this?  At

2  any rate, they get a call from a Washington Post reporter, Tim

3  Craig, and Turnage decides that to be fair, he meets with him,

4  and then they go and give him the e-mails.

5         Turnage and Melisa Byrd testified yesterday they sat

6  down with Tim Craig, the Washington post reporter, and the

7  Washington Post, unlike the City Paper, the Washington Post is

8  an international newspaper.  I don't know if you remember, you

9  hear all this testimony, but Ribeiro or Murphy said, "Yeah,

10 the City Paper is a little pick on you newspaper," I don't

11 know, he used some word to be dismissive.  The Washington Post

12 is not.

13        So he goes and gives the information to the

14 Washington Post.  And the difference between the first article

15 and the second is that the reporter in the second one had

16 different interests.  He looked at the e-mails, right, and

17 he's going to write whatever he wants with the e-mails.  And I

18 have highlighted here, "I have been told that it is widely

19 known that Jennifer Campbell has been meeting with minority

20 vendors in an effort to put together a team that would submit

21 a bid as a prime for the insurance exchange network, Turnage

22 wrote," quote.

23        So the second article actually has more damaging,

24 prejudicial defamatory statements about Jennifer than the

25 first one.  So this notion that you heard from Turnage

1   yesterday that he was all about protecting Jennifer's privacy

2   and her innocence and her this and her that, why would he go

3   and meet with the Washington Post reporter after the first

4   article came out?  He's claiming that it would only be fair?

5   It is not fair.  The Washington Post reporter read those

6   e-mails and got more information out of him than the first guy

7   did.  And so now you have all this information out there.  And

8   this is published June 12.

9         And don't forget that Ribeiro and Murphy were the

10  starting point with the reporter.  Ribeiro and Murphy allowed

11  the reporter to take notes.  If you remember, Ribeiro or

12  Murphy or both of them said, "You can't walk out with copies,"

13  right?  This was apparently a big deal.  I guess even in the

14  mayor's office, from that point, there's a red line you don't

15  cross, right?

16        Turnage gets a call Sunday night from the reporter

17  reading excerpts of his e-mails, and what does Turnage do?  He

18  crosses that red line.  He faxed -- excuse me, he e-mailed his

19  documents, the actual documents to the reporter.  And you will

20  see Turnage's e-mail.  He e-mailed him between 10:00 and 11:00

21  at night, five or six times.  And the last one he's sending an

22  e-mail saying, "Make sure that you have -- my grammar is right

23  and don't get my syntax wrong."  He crossed the line.  He had

24  no business sending out those e-mails.  If Ribeiro and Murphy

25  said that they would not give the reporter the e-mails, and

1  that was like the line that they would not cross, well, that's

2  certainly a lot that Turnage shouldn't have crossed.

3       Now Turnage, interestingly, on June 12, when he's

4  discussing this with a coworker and his boss, describes it --

5  can you see that?  "Consequences of reckless decision making."

6  This is in an e-mail exchange with Bonnie Norton.  You heard

7  from her yesterday.  They are talking about the article coming

8  out in the Washington Post.  And Turnage describes it, "the

9  consequence of reckless decision making," dot, dot, dot.  It

10  is a kind of thing he would say.  Remember, he was the one

11  with Janene Jackson who described this whole episode as the

12  Wilson building special.  Remember in my opening, I talked

13  about the Wilson building special.  Here he's talking about

14  the consequences of reckless decision making.  I could have

15  used that for the opening because reckless decision making

16  means that it was reckless, in other words, this was not

17  unintentional, and it was not by accident that this

18  information wound out in the reporter's hands.  It was

19  reckless.  It was reckless in the sense that it was beyond the

20  pale.

21       Now, look what else he says in here.  This is his

22  report to Brenda Otero, and I have highlighted it.  His report

23  to Brenda Otero, who is, I believe, the deputy mayor.  And

24  this is at June 12, Tuesday, June 12, at 10:36 p.m.  He's

25  e-mailing her, "CGI got into a dispute with JC," this is

1    Jennifer Campbell, "over contract language for this project."

2    Isn't that exactly what we presented through Jennifer and they

3    denied?

4         Here, after the articles are published, the damage

5    is done, Jennifer been fired, he's getting introspective.

6    He's getting introspective.  And he says, "CGI got into a

7    dispute with Jennifer over contract language for this

8    project."  And he goes on to say -- and this is unbelievable.

9    "They quietly believed she was stalling the contract until

10   they would agree to take on Wiggins' firm as a partner in the

11   exchange."  This is the unbelievable part.  "I don't believe

12   that."  This is in his own words.  He's saying right here, he

13   does not believe this.  Outrageous.  He's the one that gave

14   the reporter the information.  He's the one that put this out

15   into the public, and now he's getting introspective and he's

16   telling us his true feelings.  He doesn't believe this.

17        Now, if he doesn't believe this, why didn't he tell

18   that to Alan Suderman?  Why didn't he tell that to Tim Craig?

19   Because it is beyond reckless.  It is malicious.  When you do

20   things like this, you know you are going to ruin somebody.

21   And ruin her, they did.  Absolutely outrageous.  This is why

22   we are here.  This is why we are here.  Because this has

23   created a stigma that has followed her for years, and will

24   follow her to the grave.  She was out -- she lost some

25   $300,000 in income over the last two years.  It took her two

1   years to get real, full-time comparable employment.  And you

2   heard her talk about what her life has been like the last two

3   years.  Outrageous.

4          Now, these allegations that came in through

5   Onyewuchi, I mean, you heard this morning, this man had a beef

6   with Carrie Brooks-Brown, his partner, and Cedric Simon.  Now,

7   whether Simon held himself out as knowing Jennifer and trading

8   on that, Jennifer didn't know.  But this man had a beef with

9   them, they got into a dispute, and they sued each other.

10  Right?  I guess this is what government contractors do.  And

11  on cross-examination he admitted that the only lawsuit he's

12  ever filed accusing anybody of interfering with his contract

13  with CGI was the lawsuit against Carrie Brooks-Brown.  And in

14  that lawsuit, which he read for you, he stated he did not even

15  mention Jennifer's name in the lawsuit.  Forget about suing

16  her, her name doesn't even appear.  He says it was Carrie

17  Brooks-Brown and Simon who interfered with his contract with

18  CGI, who sabotaged his ability to get the contract with the

19  District, who sabotaged his ability to get Phase 2.  It had

20  nothing to do with Jennifer.  And do you really believe that

21  he would have complained if he had gotten Phase 2?

22         This man -- the supposed e-mails that they went

23  through with him, he went through with them, he apparently got

24  these in March of 2012.  Never complained.  April of 2012, he

25  gets the Phase 1 contract.  Never complained.  May comes

1    along, never complains.  Everything is going great for him.

2    Everything is going great for him.  He's getting money.  And

3    then come the end of May, he finds out from CGI that they are

4    not going to do business with him because he's disqualified

5    because he got the Phase 1 contract.  Then he goes and

6    complains.  Then he goes and complains.  Right?  Because he

7    missed out on a huge payday.  That's what happened here.

8            And, look.  He -- you know, Holli Ploog came in

9    here.  She's a corporate person, works for a gigantic

10   corporation.  But it is no different.  She's just seeking much

11   larger government contracts than Onyewuchi's company was, all

12   right.  She's looking for $75 million contracts all across the

13   country, all right.  But look what she said.  She said that

14   she never talked about Jennifer Campbell to Onyewuchi.  She

15   also said she did not have a teaming agreement with him.  She

16   said, when I showed her Onyewuchi's affidavit where he says he

17   had a teaming agreement, she said that's a lie.  All right?

18   She also -- her testimony is completely at odds with

19   Onyewuchi's testimony.  And vice versa.  The two of them are

20   inconsistent.  You know why?  Because neither of them are

21   probably telling the truth.  They are both contractors upset

22   with not making the money that they wanted to make.  That's

23   what happened here.

24           And the shame of this whole thing is that if only

25   Turnage or the District had given the common courtesy to

1  Jennifer to come in, sit down, and say, "Jennifer, here's what

2  we got, what do you have to say for yourself?"  What employer

3  doesn't behave that way?  The District.  They had a meeting

4  with her set up, and they cancelled it.  Now, they want to

5  make it sound like she cancelled it.  The last meeting set up

6  was to hand her the termination letter, which she had already

7  read in the papers about why she was going to be fired.  Why

8  subject herself to any more humiliation than she's already

9  been through?  All they had to do was to sit down with her and

10  say, "Jennifer, here's the story we got.  What's your side of

11  the story?"  And, then, all they would have needed to have

12  done was a normal investigation.

13         You know, a normal investigation, it's not much

14  unlike what goes on in these cases.  You sit down with people,

15  you figure out what their motivations are, you figure out why

16  they are complaining, and you ask for evidence.  We asked

17  Onyewuchi, "Did Jennifer ever tell you that Simon needed to be

18  on the contract?"  No.  "Do you have any e-mails?"  No.  "Do

19  you have any proof of any of these things?"  No.  "Do you have

20  any proof that Jennifer was telling CGI not to do business

21  with you?"  No.  Nothing.  Nothing.

22         So if Turnage had done this, right -- now Turnage

23  came in, seems like a very accomplished guy.  He also seems

24  like a very busy guy.  He obviously wasn't following the rules

25  here.  But if someone in the investigation office there, if

1   someone would have done this, they would have found this out

2   pretty quickly.  Remember when I was asking Turnage, "Did you

3   know that Onyewuchi had just missed out on a $75 million

4   contract?"  He said, "I don't know.  Didn't matter."  Who

5   behaves this way?  Who behaves this way?

6          They never gave Jennifer the opportunity to clear

7   her name between the time that the told her to gather her

8   stuff and get out on suspension and she found out she was

9   fired in the newspaper.  Never once.  And the allegation that

10  she's -- that this one, that it's widely known that she was

11  going to gather a team together, this has got to be the

12  craziest one.  Because even Turnage, remember when I was

13  asking him about these things, I think he said that by the

14  time he got to this allegation, he just decided he didn't have

15  the time to do it.  He didn't have the time to -- he didn't

16  feel like he needed to investigate.

17         Well, this was the lead story for the Washington

18  Post.  Look at this.  It is unbelievable.  Unbelievable.  He

19  didn't have the time.  But, remember, Melisa Byrd went through

20  how much time he had to meet with other people.  He had time

21  to meet with Onyewuchi twice, he had time to meet with Ploog.

22  He actually took time out of his weekend to meet with these

23  people.  Then he goes and meets with various people at work,

24  right?  But he doesn't have the time to talk about the person

25  accused.

1        And let's just talk about the conversations he had.

2   And you are going to be given excerpts of the depositions.

3   This is the sworn testimony of Bonnie Norton and Sam Walker.

4   They both testified here, but they testified before Turnage,

5   and it was out of order, and maybe it made no sense to you.

6   But I asked them questions, "Did you say anything to Turnage

7   that anything was out of the ordinary with Jennifer, either at

8   the award of the contract or the kickoff meeting" or this or

9   that.  And they said no.

10        He says the opposite.  He's calling them liars.  You

11  are going to be able to look at their testimony and compare it

12  because their testimony about their conversations with Turnage

13  is 180 degrees from what he says.  Completely at odds.  The

14  net result of this, though, is that Jennifer's life is ruined.

15  There's no other way to look at this.

16        You know, on cross-examination or at some point, the

17  District was talking about her doing contract jobs here and

18  there.  Being out of work for two years, this woman had hit

19  the pinnacle of her career.  She was in the position of doing

20  things.  She was a doer.  She was making decisions.  She had

21  to go home and have these articles published in print and then

22  on the Internet, and her friends and -- you know, the pain and

23  her self-esteem, the depression.  Losing your job is on these

24  lists of like some of the worst things that can ever happen to

25  you.  There's death, there's divorce, there's loss of a child.

1   Losing your job is up there.  Losing your job, coupled with

2   false statements in the newspaper following you to the grave.

3   That's what we got here.  And that's why we are in court.

4   That's exactly what has happened here.

5           The other aspect you should consider in this case,

6   and I went through with a variety of these witnesses, is that

7   there are rules that govern how you use personal information.

8   The District has tried to make it sound like this is like, you

9   know, these e-mails would have been available to everybody if

10  they just go on the Internet and hit a button, like a FOIA

11  request is automatic.  That's not how it works.  That's not

12  how it works.  First of all, FOIA requests go through an

13  office, they are reviewed.  If something's under

14  investigation, they are generally declined.  And then at some

15  point, yes, these administrations have to turn over their

16  records.  But we are talking about personal information.  And

17  the privacy rules, you go back and look at them, I think it is

18  Exhibit 12, we included the whole stack.  No question.

19  Information of this type, being placed on suspension, I mean,

20  my God.  The reporter knew she was fired before she did.  How

21  much more personal can they get than the loss of your job?

22  Your boss has decided to fire you, and they are claiming that

23  that document is not personal and confidential?

24          You look through these rules, you will see that they

25  violated their very privacy rules.  Each of them did.  You

1   know why?  Because I don't think they cared.  I don't think

2   they cared about personal privacy.  They certainly didn't care

3   about Jennifer.  Remember, when I came to you in the opening,

4   talked about this Wilson building special, this is what

5   happened.  What they did here is they disregarded her privacy,

6   they disregarded due process.  Due process is a word we throw

7   out a lot.  But what it means is you have a chance to hear

8   what you're accused of and give your side of the story.

9   Didn't happen here.  Didn't happen.

10          The judge is going to read to you instructions.  I

11   am just going to show you two pages here.  I think there's

12   like 50 pages of instructions, but there's essentially two

13   claims in this lawsuit.  They both arise from what I have

14   talked about.  Being fired, coupled with the false statements

15   and with the stigma of newspaper articles.

16          So the two claims -- this is the first claim.  You

17   see in the paren, the judge has referred to it as reputation

18   plus defamation.  So, here, what Jennifer needs to prove is

19   that the District made false and defamatory statements about

20   her.  And I refer back here to this.  Turnage is saying he

21   doesn't believe the statement that he gave the newspaper

22   article.  How much more proof do you need that that statement

23   was false?

24          And there are other false statements, but this here

25   is what you call a smoking gun.  He doesn't believe it.  He

1  never called the reporters to let them know to file a

2  correction.  So we have to prove they made false statements,

3  they published it.  You know, they've obviously published it,

4  it is in the newspaper.  And that the fault in publishing the

5  statement amounted to at least negligence.  I have gone

6  through that.  They did nothing to verify the accuracy of this

7  information.  Here it is, this man thinks that what he's

8  already given the paper is wrong.  And either the statement

9  caused special harm, or if it did not cause special harm, the

10  statement was actionable as a matter of law.

11       Well, the statements in here are accusing Jennifer

12  of being a criminal.  Nothing else.  They are accusing her of

13  corruption of the worst kind, of being a criminal.  And the

14  reality is that these statements caused special harm in a

15  sense that she was out of work for roughly two years.  I am

16  talking about meaningful work.  Outrageous to be without

17  income for two years, to have to rely on your mother and the

18  church to make your mortgage payment to stave off foreclosure.

19       Now, here is the second type of claim that we have.

20  And here you see in the paren the judge calls this stigma.

21  Under the stigma theory, you may find in her favor, and here's

22  where I am reading, if the District's release of e-mails to

23  the press and termination of her employment left a stigma on

24  her by having the broad effect of largely precluding her from

25  pursuing her chosen career.

1       And down here the judge says, "Dr. Campbell must

2   show that the District's actions seriously affected, if not

3   destroyed, her ability to pursue her chosen profession or

4   substantially reduced the value of her human capital."  Again,

5   what worse stigma is there than to have your name in the

6   newspaper, in an article on the Internet?  This will follow

7   her forever.  Forever.  And you heard her testify about the

8   damage that it did to her.

9       I am going to show you what's called the verdict

10  form.  When you read these things, they are complicated,

11  there's no -- they are complicated for lawyers to draft, they

12  are complicated to read.  But what the judge has done is he's

13  broken up questions based upon those two claims, this

14  reputation plus and the stigma.  And so the first question,

15  reputation plus 1-A says, "Did Dr. Campbell prove by a

16  preponderance of the evidence" -- and preponderance of the

17  evidence is this.  It is not -- we are not talking about

18  beyond a reasonable doubt, we are not in criminal court.  This

19  is it.  Whatever's slightly higher.  "That the District made a

20  false and defamatory statement about her."

21      And, again, we have testimony about the falsity of

22  these statements.  But here we have it in the man's own words.

23  "I don't believe it."  And so your answer here should be yes.

24  "Did Dr. Campbell prove" -- in, B, "Did Dr. Campbell prove by

25  a preponderance of the evidence that the District published

1    the statement to a third party."  Again, yes.  They gave --

2    publishing means giving it to the newspaper.  And the

3    newspaper obviously published what they gave them.

4         The next question, C, "Did Dr. Campbell prove by a

5    preponderance of the evidence that the District's fault in

6    publishing the false and defamatory statement amounted to at

7    least negligence."  Again, it is yes.  Negligence would be a

8    compliment for what they did here.  This was malicious the way

9    they behaved with her.  Negligence would be, "Oh, it was

10   accidental," like to say, "Oh, we didn't know what was in the

11   e-mails," you know, like the reporter found them on the floor

12   or somewhere.  That's not what happened.  They were giving him

13   the information.

14        D, "Did Dr. Campbell prove by a preponderance of the

15   evidence that publication caused her special harm."  Again, of

16   course it did.  Answer yes.

17        The next question is for the stigma or disability.

18   "Did Dr. Campbell prove by a preponderance of the evidence

19   that the District's release of e-mails to the press and

20   termination of her employment left a stigma on her."  Yes.

21   Just listen to her testimony about the stigma it has left.  It

22   stained her for life.

23        Question 2 talks about the lack of due process.  And

24   here it is procedural due process, lack of sufficient process.

25   She had no due process.  She had none.  The District cancelled

1    those meetings with her.  They never ever asked her for her

2    side of the story before they fired her.

3    So "Did Dr. Campbell prove that she was deprived of

4    her constitutionally protected liberty interest without due

5    process."  The liberty interest is what we have been talking

6    about because these claims come from the constitution and

7    federal law.  The answer is yes.

8    And then, here, and this is the one that you are

9    going to have to struggle with, "What amount of the

10   compensatory damages, if any, did Dr. Campbell prove?"  And I

11   suggest to you, and the judge will tell you in his

12   instructions, that he's going to award the lost wages.  So,

13   here, this is your opportunity to compensate her for pain and

14   suffering.  For the humiliation.  For the damage to her as a

15   person.  For her life being ruined.  Forever.  Forever.  She

16   lost in two years $300,000 in income.  She had to go to her

17   mother and the church to get money for a last mortgage

18   payment.  This is a woman that suffers from lupus.  Her life

19   was destroyed.  She told you what happened to her.  Her soul

20   was crushed by what they did.

21   And you got to see her three times, all right,

22   testify.  You got to take a measure of her for a long time.

23   And you got to peel back to see what's in her head, what's in

24   her heart, and determine if she -- what type of person she is.

25   And I submit to you that she testified consistently, she

1   answered every question, and she proved to be, as far as I

2   could tell, the subject matter expert of anything in this

3   case.  She was able to answer every question.  She was able to

4   tell you how the rules worked.  She was able to tell you what

5   was going on in that department.  And she told you how what

6   happened to her here has completely crushed her.  And when you

7   get to this question, you should think about what it would

8   take to compensate her for the destruction that the District

9   has done to her.

10        Thank you.

11        THE COURT:  Ms. Knapp?

12        CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

13        MS. KNAPP:  Good afternoon, ladies and gentlemen.

14   Thank you for bearing with us on this.  I know you have seen a

15   lot of testimony, you have heard a lot of evidence.  And the

16   way that the evidence sometimes comes in in these cases, it

17   sort of seems likes somebody took a bunch of noodles and threw

18   them at the wall, and now you are asked to pick through them.

19   But I want to help you to sort of look through the noodles a

20   little bit before we send you back there.

21        And you also have some tools the judge is going to

22   give you.  Mr. Lescht spoke a little bit about them.  But what

23   you are going to be given are a set of jury instructions.

24   He's going to read them to you, but you can take a copy back

25   into the jury room with you.  And then you are also going to

1   get a verdict form.  And Mr. Lescht showed you the verdict

2   form, but I am going to do that as well.  So the verdict form

3   is a series of questions, and I would like to go through them

4   with you one at the time and sort through some of the

5   evidence, some of these noodles.

6           So the first question that you are going to have to

7   answer is did Dr. Campbell prove by a preponderance of the

8   evidence that the District made a false and defamatory

9   statement concerning her.

10          Now, "false" is a term of art here.  It has a

11  special meaning, and that special meaning is in the jury

12  instructions.  And what the jury instruction says is "A false

13  and defamatory statement must be false as well as defamatory,"

14  which is a little obvious.  "A false statement is one that is

15  not substantially true.  In determining whether factual

16  statements in an allegedly defamatory communication are false,

17  you should discount minor inaccuracies, so long as the

18  substance, the gist, the sting of the statement is justified."

19          So we are not talking about every letter, you know,

20  every "I" dotted and "T" crossed.  It is the gist of what was

21  said.  And when you look at the gist of what was said, it was

22  true.  You will have the opportunity to look at the e-mails

23  that were given to the reporter.  What they included is sort

24  of a step by step of Director Turnage's investigation into the

25  allegations that were made against Dr. Campbell.  There is no

1    question.   These allegations were made.   There is no question

2    that Mr. Onyewuchi, for whatever reason, and he's not a

3    defendant in this case, but for whatever reason, whether his

4    motive was because he had been left out of this contract or

5    not, there's no question that Mr. Onyewuchi came to

6    Mr. Turnage, unbidden, and made certain allegations.   There is

7    also no question that Mr. Turnage followed up with Ms. Ploog,

8    and that she made certain allegations about the plaintiff as

9    well.   And then what else was released in those e-mails to the

10   reporter was the step by step inquiry into it that Mr. Turnage

11   made.

12           And one of the things to keep in mind is the e-mails

13   going to the reporter in and of themselves are not what caused

14   the damage to Dr. Campbell.   And I am skipping ahead in a

15   question here.   So one of the questions that you will have

16   to -- I am going to go in order and I will come back to that

17   point.

18           So the next -- there is a question that you are

19   going to have to answer about whether or not the -- about

20   whether or not the statements were published.   But the

21   District isn't going to try and convince you that the

22   statements weren't published.   Right?   The statements were

23   published, and the publication is just giving it over to

24   somebody, but here we have more traditional publication.

25   Published in a newspaper.   Not going to spend any time talking

1   to you about that.

2       The next question is, "Did Dr. Campbell prove by a

3   preponderance of the evidence that the District's fault in

4   publishing the false and defamatory statements amounted to at

5   least negligence."  Now, the plaintiff wants you to believe

6   that, no, this wasn't negligent, it was reckless.  Although,

7   they've backed off it a little bit that this was the Wilson

8   building special.  And, in particular, Mr. Lescht just showed

9   you that exhibit where Mr. Turnage was talking about how there

10  was something -- an allegation that was made against

11  Ms. Campbell that he didn't believe.

12      Now take a look at that when you get back in the

13  jury room, and, really, you know, take a look at all the

14  evidence, and that one in particular.  Because what the

15  statement said was that CGI told him that Ms. Campbell was

16  holding up contracts to get Mr. Wiggins -- until Mr. Wiggins's

17  group was put as part of that.  And he did not believe that.

18  It doesn't say that he didn't believe that Ms. Campbell was

19  putting together a group of people to bid on the contract,

20  which is what was actually reported in the newspaper.

21      And the negligence in it is not the negligence in

22  publication because, as Mr. Lescht pointed out, yes, this was

23  purposeful.  They knew that they were letting the City Paper

24  person read this, they knew that the -- Wayne Turnage knew

25  that he was sending them those e-mails, and they knew that

 1   they shared the e-mails with the Washington Post.  Where the

 2   negligence comes in is with the falsity.  So were they

 3   negligent in not making sure that these statements were true.

 4          So the first question is, do you find that these

 5   statements were false?  The nature of the statements, they are

 6   allegations, you should say no.  But if you say yes, then you

 7   have to go on to think about were they -- negligently false.

 8   So did Director Turnage at the time he was making them, was

 9   he -- was he blase-blah about making sure that they were true,

10   or did he do an investigation.  And I think from what you have

11   learned is that he was pretty thorough.  He talked to the

12   people who were making the allegations, he talked to the

13   people that those allegations were being made about,

14   Mr. Wiggins and Mr. Simon.  He spoke to people internally

15   about whether those allegations might be true.  And he got a

16   lot of information that indicated to him that they possibly

17   could be.

18          And one of the pieces that we looked at quite a bit

19   during the trial, and I think it is worth it for you all to

20   pull out again when you are back in the jury room, is this bid

21   document.  And this is Defendant Exhibit 15.  And this is

22   something that's dated March 27.  And what it does is it

23   reports how Compass got the contract.  And if you remember,

24   the allegation was that Cedric Simon and Carrie Brooks-Brown,

25   these two people who we haven't seen and we haven't heard

1  from, were saying that Ms. Campbell wanted them to be on this

2  contract, and Ms. Campbell wanted them to get this contract.

3  And so then Wayne Turnage goes and he says, "There's paper on

4  this.  I will look at the paper."  And this is the paper that

5  he finds.  And the paper shows that Jennifer gave Compass a 4

6  and Navigant a 1, whereas everybody else rated Navigant higher

7  than Compass.  And then Jennifer gave Compass a 5 and Navigant

8  a 2, on this part of it, and again, everybody else rated

9  Navigant higher than Compass, and yet Compass ended up getting

10  the contract.  Okay?

11         Those two things are facts.  And Mr. Turnage learned

12  those facts.  He had also been shown by Mr. Onyewuchi e-mails

13  purporting to come from the plaintiff that were dated March

14  14, which was the day that the people who were on this bidding

15  team were supposed to provide their evaluations to the

16  contract specialist.  So the plaintiff told you today that

17  "Oh, that was public information, they already had that by

18  then."  Look carefully at the dates and times on those

19  e-mails.  They were actually during the contract bidding

20  process -- they were during the award making process.  They

21  were while this team was looking to try to decide -- was still

22  deciding who they were going to award the contract to.

23         And so what Mr. Turnage knew was that this team was

24  working on these things on March 13 and 14, the same day that

25  Mr. Onyewuchi got e-mails purporting to be from the plaintiff,

1  that he believed were from the plaintiff, with information

2  about the bidding and contracting process.  And even the

3  plaintiff has now admitted that this looked suspicious to her.

4  She said that this is why she's no longer friendly with

5  Mr. Simon, because she has seen e-mails like these, and says

6  that he was trading on her good name inappropriately.  So,

7  plainly, there was something believable about these e-mails.

8        Another piece of evidence we didn't spend too much

9  time talking about, but that I would command to your attention

10  when you get back in the jury room, is this timeline of

11  Mr. Turnage's investigation.  And that's Defendant Exhibit 95.

12  And it is a -- I think he testified that this is a hybrid of

13  things that Mr. Onyewuchi told him.  And, again, he said he

14  did some due diligence to make sure Onyewuchi was a standup

15  guy, he talked to a couple people who they knew in common,

16  maybe he, you know, had some of the same suspicions that

17  Mr. Lescht put out there about government contractors.  But,

18  in any event, he talked to a mutual friend of theirs, he

19  talked to the former COO, who had been the plaintiff's boss,

20  who told them that they should talk to Onyewuchi and they

21  should listen to him.

22        And so Onyewuchi in this details a lot of the

23  various things that, you know, his allegations against the

24  plaintiff or against Simon and Brooks-Brown, who he thought

25  the plaintiff -- I think someone used the word "cahoots," it's

1    not a technical legal term, but who he thought the plaintiff

2    was in cahoots with.

3           And one of the ones that the plaintiff took -- that

4    Mr. Turnage was particularly concerned about, and this was

5    something he added to the timeline, was this allegation that

6    Cedric Simon told Mr. Onyewuchi that he wasn't getting paid

7    because Mr. Simon wasn't on the contract yet, and that he

8    wouldn't get paid until Mr. Onyewuchi was on the contract.

9    And, apparently, this was happening, or until -- I'm sorry.

10   He wouldn't get paid until he agreed to pay the $250,000 on

11   the contract that Mr. Simon wanted.

12          And so Mr. Turnage said he went back, and he talked

13   to the person who was the administrator of that other

14   contract.  And he said, "Yes, actually, on June -- Saturday,

15   June 2, I got an e-mail from Jennifer Campbell, and Jennifer

16   Campbell told me that Orion should move a portion of their

17   current contract to pay Compass; however, if funding is

18   required, we can always go up to an additional $210,000."

19          So Mr. Turnage saw this e-mail where the plaintiff

20   was saying, "Give Compass more money," right at the same time

21   that Onyewuchi said that he was being shaken down, that was

22   his word, because his bills weren't getting paid.  Now, even

23   if Ms. Campbell didn't know what was going on, this looks

24   incredibly suspicious.  Again, there wasn't negligence in

25   following up in these allegations.  Mr. Turnage did a thorough

1    investigation.

2            And so as you are considering the question of "Did

3    Dr. Campbell prove by a preponderance of the evidence that the

4    District's fault in publishing the false and defamatory

5    statement amounted to at least negligence," the answer to that

6    is going to be no because of the thoroughness with which

7    Mr. Turnage vetted the facts that he was given.  And, as I

8    said, please take some time with this document that

9    Mr. Turnage compiled.  And, you know, this is what he knew,

10   when he knew it, what he believed, what he didn't believe, who

11   he talked to, and it is a seven-page document, and pretty

12   small type.  And that's Defendant Exhibit 95.

13           And you heard from the other people who released

14   this information to the press.  You heard from Chris Murphy

15   and Pedro Ribeiro.  And they talked about releasing it, and

16   the plaintiff's lawyer cross-examined both of them pretty

17   thoroughly about, "Well, why did they believe that this was

18   accurate."  And I think they both said that they had every

19   reason to trust Wayne Turnage, that Wayne Turnage was a good

20   manager, he was a member of the mayor's cabinet, and they had

21   no reason to distrust him.  And so their reliance on

22   Mr. Turnage's investigation was not negligent.  It simply

23   wasn't.  And for that reason, when you get to question 1-C,

24   your answer should be no.

25           But if it is not no for some reason, and you have to

1  move on to question 1-D, "Did plaintiff prove by a

2  preponderance of the evidence that publication of the false

3  and defamatory statement caused her special harm," again, this

4  is one of those -- "special harm" has a special legal meaning.

5  This is one of the places where you are going to want to turn

6  to your jury instructions.  And your jury instructions will

7  tell you that the special harm in this case is stigma.  And it

8  is the stigma that Mr. Lescht talked to you about briefly.

9  This is a special kind of stigma.

10        Under the stigma or disability theory, you may find

11  that Dr. Campbell was -- actually, I apologize.  That's not

12  where you want to go with this.  You want to see -- it's

13  complicated even for lawyers.

14        So, "Did Dr. Campbell prove by a preponderance of

15  the evidence that the publication of the false and defamatory

16  statement caused her special harm."  So the special harm has

17  to be actual monetary harm, or especially high reputational

18  harm.  And there is a jury instruction about that.

19        But here's the thing to think about here.  And what

20  I want you to keep in mind is we have four different

21  publications, right?  We have the publication from Pedro

22  Ribeiro where he allowed the City Paper -- I think it is only

23  three.  But where he allowed the City Paper reporter to read

24  the e-mails.  That's technically a publication.  And then you

25  have the instance where Wayne Turnage, believing that the City

1    Paper reporter has the e-mails already, gives them to him

2    again.  And so that's a publication.  And then there's the

3    incident where Wayne Turnage and Melisa Byrd allow the

4    reporter from the Washington Post to look at those e-mails.

5    And that's also a publication.  But then there are two other

6    publications, and those are the article in the City Paper and

7    the article in the Post.  Now, those are the only publications

8    that caused the plaintiff's special harm.

9         So if the e-mails had simply gone to the reporter,

10   the plaintiff wouldn't have the stigma that's following her

11   around every time someone will Google her, and those types of

12   things.  Right?  There wouldn't have been any harm.  There

13   wouldn't have been any special harm from merely sending these

14   to either reporter.  The special harm comes only from the

15   statements that are actually published in the newspaper, that

16   are published in the traditional sense.

17        So when you are thinking about whether or not these

18   statements are true or false, and whether the statements are

19   true in terms of the gist of the statements are true, those

20   are the ones you need to focus on.  You need to focus not on

21   all of the different things that Mr. Turnage has ever said

22   about the plaintiff, not on the things in her termination

23   letter and in the letter that put her on admin leave.

24   Because, again, this isn't a wrongful termination case, right?

25   She's not saying that she was fired inappropriately.  What

1  she's saying is the publicity surrounding her firing caused

2  her special harm.  Well, the only thing that could have done

3  that are the articles that were actually published about her.

4        So when you are thinking about question 1, you need

5  to be -- question 1-A, the preponderance of the evidence that

6  the District made a false and defamatory statement concerning

7  her, it has to be those statements that caused the harm.  And

8  so pay special attention to the statements that are in the

9  newspaper articles.  And plaintiff highlighted some of those

10 in her opening argument, and they were the ones that she said

11 were patently false.  And when you look at them, look at what

12 is actually said in these about -- and attributed Mr. Turnage.

13        Turnage writes that he received an allegation.

14 "Health care finance COO fired over contract steering

15 allegations."  And throughout here, you are going to see, "I

16 was told."  It says that CGI approached him about a

17 forthcoming partnership.  "In his e-mails, Turnage said that

18 after meeting with CGI" -- and I think the other ones are in

19 the Washington Post article.

20        "Turnage was concerned that Campbell attempted to

21 steer part of the pending contract."  Well, that's true.

22 Turnage was concerned.  He told you why he was concerned.  And

23 you will see the evidence showing that his concerns were

24 valid.  Even if it wasn't true that the plaintiff was steering

25 a contract, Turnage was concerned about it, and his concern

1    was reasonable.

2         And so for those reasons, when you get to part 1-D,

3    "Did Dr. Campbell prove by a preponderance of the evidence

4    that the publication of the false and defamatory statement

5    caused her special harm," the answer should be no.  Because

6    they were not published -- there may -- you know, somewhere,

7    again, in the spaghetti on the wall, perhaps plaintiff can

8    point to something that's said in the e-mails that isn't

9    absolutely true.  But none of the things that were published

10   in the newspaper can be shown to be false.  And those are the

11   things that resulted in her special harm.

12        Also, one thing, and it really isn't relevant, but I

13   think it needs to be addressed, is the plaintiff told you in

14   the opening argument that the evidence was going to show that

15   these e-mails were leaked by someone within the District

16   government.  And he said, again, without sort of pointing to

17   any evidence, that -- in this closing, that the District

18   government leaked these e-mails.  There is no evidence that it

19   was anyone from within the District of Columbia government who

20   went to Alan Suderman and said, "Hey, there's a story here."

21   Absolutely no evidence.

22        The one person who testified that she made a

23   statement to that effect was Janene Jackson.  And when I asked

24   her if she was speculating, she said, "I wasn't even

25   speculating.  I was guessing."  There's no actual evidence

1 that anyone at the Wilson building leaked this story.  And as

2 you heard Mr. Ribeiro, he said, "Why would we leak a negative

3 story?  Why would we leak a negative story about someone who

4 reported directly to a cabinet member?  Why would we do that?"

5 That just doesn't make sense, ladies and gentlemen.  And it is

6 something you should consider when evaluating the evidence as

7 a whole.

8          The next piece of this is the stigma or disability

9 claim.  "Did Dr. Campbell prove by a preponderance of the

10 evidence that the District's release of e-mails to the press

11 and the termination of her employment left a stigma on her,

12 having the broad effect of largely precluding her from

13 pursuing her chosen career."  And, again, this isn't -- this

14 is a special kind of stigma.  This isn't a stigma that

15 surrounds you.  It has to do with your ability to practice

16 your chosen profession or your chosen field.  That's what it

17 is limited to.  And you will get a jury instruction on that as

18 well, which, again, is one I encourage you to look at.

19          And on page 37 of the jury instructions, because

20 they are quite long, "Under the stigma or disability theory,

21 you may find that Dr. Campbell was deprived of her liberty

22 interest if the District's release of e-mail to the press and

23 termination of her employment left a stigma on her by having

24 the broad effect of largely precluding her from her chosen

25 career."  Largely precluding her from her chosen career.

1          Now, Dr. Campbell is working again in her chosen

2     area.  She's working in health care finance.  She used to be a

3     doer and now she's a consultant, but she hasn't been broadly

4     precluded from the field of health care finance.  It is what

5     she's doing now.  And she wasn't even broadly precluded from

6     it for the two years that she didn't have a steady job.  She

7     told you that she worked on some consulting contracts.  And

8     one of the things that you will see in evidence is the

9     plaintiff's resume.

10          And far from being a pariah in the industry, between

11    2012 and the present, which I am assuming before she got her

12    current job, where she is, again, making close to $150,000,

13    you know, here's a whole list of things that she took part in.

14    Some of them paid, some of them unpaid, but this is not

15    someone who has been barred from the profession of health care

16    finance.

17          We all puff a little bit on our resumes, but that's

18    an entire page of health care finance type things that she's

19    done in the past two years.  Some of it, some of it is paid,

20    and, you know, much of it is directly relevant to what she was

21    doing before.  It is not exactly what she would choose to do,

22    but it is work and projects, and even if some of them are

23    volunteer projects, in her chosen profession.  So, yes, she

24    has had a significant financial downfall for the past two

25    years.  But one year, you know, she did make $20,000 or

1  $30,000 during that time frame, and is now again making

2  $150,000, which is what she used to make, or approximately

3  $150,000, which is approximately what she made when she was

4  the chief operating officer of the Department of Health Care

5  Finance.

6          So when you get to the question, which is question

7  1, small letter B, "Did Dr. Campbell prove by a preponderance

8  of the evidence that the District's release of e-mails to the

9  press and the termination of her employment left a stigma on

10  her by having the broad effect of largely precluding her from

11  her chosen career," the answer to that has to be no.  But if

12  you answer something yes, then you have to go onto the next

13  question.  "Did Dr. Campbell prove by a preponderance of the

14  evidence that the District deprived her of her

15  constitutionally protected liberty interest without due

16  process."

17          Well, what the plaintiff has said is, "They

18  cancelled the meeting before they fired me."  Well, we heard

19  some testimony about why that meeting was cancelled.  The

20  meeting was cancelled because a lawyer, who happened to be her

21  mother, but who identified herself as a lawyer, sent letters

22  on her behalf.  And the plaintiff said, "Oh, that was just to

23  get my thumb drive back."  But when her mother was testifying,

24  she said there was nothing in the letters about the thumb

25  drive.  And so Mr. Turnage and Ms. Byrd testified they

1    weren't -- they were advised not to speak to her.  And then

2    they set up a meeting with her.  And she says, "Oh, that was

3    just to get my termination letter, and I was already

4    terminated, so why should I go in and get humiliated."  But

5    you will remember, actually, the first of the three times she

6    testified, what she said was she had set that meeting up for

7    6:30 at night so that she didn't have to be humiliated again.

8           And so that was her opportunity to tell her side of

9    the story.  Yes, it might not have changed the fact that she

10   was getting terminated.  But that's not the issue here.  The

11   issue isn't whether she was terminated without due process.

12   The question is, did she get a chance to clear her name.  And

13   the one chance she might have had, she cancelled.

14          And so I think I am almost done, but I want to ask

15   Mr. Karpinski and make sure I didn't miss anything

16   significant.

17          (Short pause.)

18          MS. KNAPP:  I did talk a little bit about the

19   supposed smoking gun, which I don't have in front of me.  It

20   was from the plaintiff's evidence.  But, really, take a close

21   look at that e-mail and see what Director Turnage is saying he

22   does not believe because it is not the allegation that was

23   actually printed in the City Paper or the Washington Post.  It

24   is the allegation that the plaintiff was holding up a contract

25   because of that, which wasn't printed in the Washington Post

1  or the Washington City Paper.

2      I also want to talk to you briefly about the

3  plaintiff's regulations that they say, you know, were

4  violated, that her personnel file was published and things

5  like that.  This is really more spaghetti.  This is 18 pages

6  of teeny, tiny print.  There's no allegation in this case --

7  this case is not about whether or not these things were

8  violated.  They talk about, for the most part, personnel

9  files.  These e-mails were not in anyone's personnel file.

10  They talk about personal identifying information.  Your Social

11  Security number, your home address, home telephone number.

12  Those types of things that were in the personnel file.  You

13  heard -- and that was another thing.  At the beginning of this

14  case, you were told that the District of Columbia published

15  the plaintiff's personnel file, gave information from her

16  personnel file to a reporter.  We now know that's not what

17  happened.  What happened was the plaintiff was -- e-mails

18  about the plaintiff's termination were shared with a reporter,

19  but that's -- there's nothing in here, again, you can go

20  through the noodles if you want, but there's nothing in here

21  that says all e-mails discussing personnel matters are, you

22  know, are not published.  It is just not in here.

23      And so that's where I am going to leave you today,

24  except I have one thing to ask you.  The plaintiff gets to

25  talk to you again, and I don't.  And so what I would like you

1   to remember -- this is the last time I am going to talk to

2   you.  So what I want you to remember as Mr. Lescht is talking

3   is to think about the individual questions, and just because I

4   can't resist a food analogy, think about the noodles, and

5   think about whether what he's saying is mashing the noodles

6   back together or helping you define which noodles actually

7   answer the question.

8           And I would like to thank you again for your service

9   on behalf of myself and on behalf of Mr. Karpinski, and I wish

10  you the best with your deliberations.  Thank you.

11          THE COURT:  Mr. Lescht?

12      CLOSING ARGUMENT ON BEHALF OF PLAINTIFF (REBUTTAL)

13          MR. LESCHT:  Now, calling the District personnel

14  regulations that govern everyone that works for the District

15  noodles and just sort of just like, you know, by-the-way stuff

16  is really doing a disservice to what these rules are.

17          Here's one you are going to see.  I have highlighted

18  it.  "Employee shall be prohibited from using personnel

19  information not available to the public, gained through

20  official duties, for commercial solicitation or sale or for

21  personal gain."

22          Here's another one.  "These rules of conduct shall

23  apply to all District employees."

24          Disclosure of information.  "The following

25  information about most present and former government employees

1  shall be available to the public.  Name, present and past

2  position titles, present and past grades, present and past

3  salaries, present and past duties stations." Period.  That's

4  not what they gave this reporter.

5          Now, Defendant Exhibit 32, you hear about this award

6  with the panel.  You have only really been shown page 1 by the

7  District, but it is a multi-page document.  And you will look

8  at page 2, it says consensus review.  And look at this.  The

9  panel consensus review results are summarized below.

10         Jennifer wasn't the only one grading these numbers.

11 They are not too far off.  And the last page is signed by

12 everybody.  And Bonnie Norton told you that this thing was

13 done by the book on the consensus.

14         Now, to say that, you know, being out of work for

15 two years and facing foreclosure and having to take money from

16 your mother and the church is, you know, largely not that big

17 a deal, I mean, this woman was earning $150,000 a year.  In

18 two years she made about $40,000.  She was on unemployment.

19 She was just barely getting by.  Those two years were

20 horrible.

21         And one thing here, too, keep in mind, you know,

22 what motivation did Jennifer have to do all these things?

23 Think about all these allegations.  She's alleged to have

24 tried to help Darryl Wiggins, a man she doesn't know.  He came

25 in and told you he doesn't know her.  And remember what she

*PROCEEDINGS - CLOSING ARGUMENT (REBUTTAL) - LESCHT*        182

1   was suggesting?  It was because apparently, Jennifer and

2   Janel, I don't know, whoever it is that works for Darryl,

3   attended Howard University ten years apart and were members of

4   the same sorority.  That was the motivation.  It's not alleged

5   that she was in a relationship with Darryl Wiggins where she

6   was going to make money.  Generally, people are motivated by

7   money.  Where is Jennifer motivated to help Darryl Wiggins?

8            Darryl Wiggins was a fund-raiser to Muriel Bowser.

9   If anything, helping Muriel Bowser would make her current boss

10  Vincent Gray mad.  What's the motivation for her to help

11  Darryl Wiggins?  And then what's the motivation for her in any

12  of this stuff?  To force CGI to do business with Darryl

13  Wiggins?  To Onyewuchi?  If you read between the lines here,

14  he was happy when apparently she was favoring him, according

15  to him, and then when he found out he couldn't bid on Phase 2,

16  all the sudden she's horrible.  What's the motivation for her

17  to help Compass or not help Compass or this or one or that

18  one?  She couldn't care less.  She got the same paycheck every

19  two weeks.  No motivation for her to do any of these things.

20           Now, this claim that the e-mails contained true

21  statements is equally -- is just not right.  Those e-mails

22  contained information that came in from Onyewuchi, all right.

23  What happened here is that the District had no filter.  What

24  do they do?  They take information that comes in on complaints

25  and just send it to the newspapers without reading it?  That's

*PROCEEDINGS - CLOSING ARGUMENT (REBUTTAL) - LESCHT*    183

1   what happened here, apparently.  They had zero reason to turn

2   this stuff over to the press.  Zero.  Some guy from some tiny

3   little paper, according to Ribeiro, calls and says he wants to

4   know about something, and they decide, on that, to turn over

5   the documentation?  They were the ones motivated to get this

6   story out.

7        And the suggestion that the e-mails going to the

8   reporter are not what damaged Jennifer, they knew exactly what

9   was going to happen.  They went to a guy that chases salacious

10  stories so that he would publish a salacious story.  And then

11  when the Washington Post came the next day, they gave they guy

12  all the records.  So to say that the e-mails didn't damage

13  her, they just wrote from the e-mails and they just copied

14  what Turnage had written.

15       This timeline that she showed you before?  Onyewuchi

16  wrote that timeline.  And Turnage just copied from it.  And,

17  again, we hear about Turnage taking the time to seek out

18  people who know Onyewuchi before he talks to him.  He has time

19  for everybody but Jennifer Campbell.  And this claim now, I

20  hear Onyewuchi, I think he made this, too, that Simon asked

21  for $250,000 more?  I saw no evidence of this.  There's not a

22  single e-mail, not a single piece of paper.  Nothing.  Nothing

23  was put in about this stuff.

24       Now, Onyewuchi, look what this -- this guy said he

25  had a teaming agreement with CGI.  Turned out to be false.  He

1  said Ploog told him about Jennifer Campbell.  Ploog says he is

2  a liar.  He accused Carrie Brooks-Brown Consulting of the very

3  things he's accused Jennifer of in here.  And he accused

4  Carrie Brooks-Brown in court, under oath, and he sued her for

5  money, and he settled that claim against her.

6         This guy, he has no credibility.  And the claim that

7  he's interpreted attending this kickoff meeting, and Jennifer

8  says, "Here's your proposal, no changes without our approval,"

9  that means he has to keep Cedric Simon, again, this makes no

10 sense.  Jennifer told you she was interested in Tracy Prigmore

11 more than anyone else because that was the person who was

12 going to do the work.

13        This notion that there's no evidence that the

14 government leaked the e-mails, again, it just defies common

15 sense.  Who knows about the e-mails?  The District.  Who knows

16 about all of this information?  The District.  The District

17 knew about all this stuff.  Only the District employees had

18 access to these e-mails.

19        Remember, Janene Jackson worked for Chris Murphy.

20 She was the one in the e-mail with the Wilson building

21 special.  She said this is how Murphy and Ribeiro operate.

22 She gave some kind of weird analogy to say, you know, if it

23 quacks like a duck, it must be a duck, or something about

24 dropping a pen.  But she was essentially saying, "I have seen

25 them do this to people before.  I know this is how they

1  operate." That was what she based -- she based her statement

2  that she thought it came from them because she had worked for

3  them.

4         When you go back into that jury room, you read those

5  instructions, you get to that verdict sheet, and you take this

6  as an opportunity to correct a wrong. Thank you.

7         THE COURT: Thank you.

8         All right. You have heard the closing arguments.

9  The last thing before the deliberations is for me to read you

10 your instructions. Both attorneys have kind of scared you

11 about those, about how long they are. It is 40-some pages,

12 but some of them are very short. So it is not -- some of them

13 you have heard already. Some of them, that I read to you at

14 the beginning, I will repeat.

15        So let's take a five-minute break so everyone can go

16 to the rest room, if they need to, and then we will come back,

17 and I will read those to you, and then you can start

18 deliberating.

19        (WHEREUPON, the jury exited the courtroom, and the

20 following further proceedings were had in open court, outside

21 the presence and hearing of the jury, to wit:)

22        THE COURT: Thank you. You both stayed within your

23 times. You both did a very good job. Thank you.

24        (WHEREUPON, a recess was had from 4:50 p.m. to 4:59

25 p.m.)

*PROCEEDINGS*                                              186

1           (WHEREUPON, further proceedings were had (jury

2   instructions read by Court) which are not herein transcribed.)

3           (WHEREUPON, at 5:46 p.m. the proceedings were

4   concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3    JENNIFER B. CAMPBELL              .
                        Plaintiff,     .
4    vs.                              .   Docket No. CV 12-1769
                                      .
5    DISTRICT OF COLUMBIA             .   Washington, D.C.
                                      .   Friday, December 11, 2015
6               Defendant.            .
     . . . . . . . . . . . . . . .x   3:48 p.m.
7

8            TRANSCRIPT OF JURY TRIAL/DELIBERATIONS

9        BEFORE THE HONORABLE JUDGE RUDOLPH CONTRERAS

10               UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:   Alan Lescht, Esquire
                          Sara Safiet, Esquire
13                        Sara McDonough, Esquire
                          ALAN LESCHT & ASSOCIATES
14                        1050 17th Street, NW - Suite 400
                          Washington, DC 20036
15

16   For the Defendant:   Sarah L. Knapp
                          Alex Karpinski
17                        OFFICE OF THE ATTORNEY GENERAL FOR THE
                           DISTRICT OF COLUMBIA
18                        441 Fourth Street, NW
                          Sixth Floor
19                        Washington, DC 20001

20

21   Court Reporter:   Cathryn J. Jones, RPR
                       Official Court Reporter
22                     Room 6521, U.S. District Court
                       333 Constitution Avenue, N.W.
23                     Washington, D.C. 20001

24
     Proceedings recorded by machine shorthand, transcript
25   produced by computer-aided transcription.

**JA 800**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**JA 801**

                        P R O C E E D I N G S

1

2          THE DEPUTY CLERK:  Civil Action Number 12-1769,

3   Jennifer B. Campbell versus District of Columbia.  Alan

4   Lescht, Sara Safriet and Sara McDonough representing the

5   plaintiff and Sarah Knapp and Alex Karpinski representing

6   the defendant.  All parties are present.

7          THE COURT:  All right.  Is everyone ready to bring

8   them in?  All right, bring them in.

9          THE DEPUTY CLERK:  Okay.

10         [Thereupon, Jury enters courtroom at 3:49 p.m.]

11         THE COURT:  Good afternoon.

12         THE DEPUTY CLERK:  Will the Foreperson please

13  raise.  In Civil Action 12-1769, Jennifer B. Campbell versus

14  the District of Columbia, question one pursuant to 42 U.S.C.

15  Section 1983 and Fifth Amendment Procedural Due Process:

16  Deprivation of Liberty Interest, Reputation Plus claim (a)

17  Did Dr. Campbell prove by a preponderance of the evidence

18  that the District made a false and defamatory statement

19  concerning her?

20         THE FOREPERSON:  No.

21         THE DEPUTY CLERK:  Part (b) Stigma or Disability

22  claim:  Did Dr. Campbell prove by a preponderance of the

23  evidence that the District's release of emails to the press

24  and termination of her employment left a stigma on her by

25  having a broad effect of largely precluding her from

**JA 802**

1    pursuing her chosen career?

2              THE FOREPERSON:  Yes.

3              THE DEPUTY CLERK:  Question two, Pursuant to 42

4    U.S.C., Section 1983 and the Fifth Amendment Due Process:

5    Lack of Sufficient Process, Did Dr. Campbell prove by a

6    preponderance of the evidence that the District deprived her

7    of her constitutionality protected liberty interest without

8    due process?

9              THE FOREPERSON:  Yes.

10             THE DEPUTY CLERK:  Question 3, Compensatory

11   Damages:  What amount of compensatory damages, if any, did

12   Dr. Campbell prove by a preponderance of the evidence that

13   she suffered as a result of the District's violation of her

14   receipt to due process?

15             THE FOREPERSON:  $250,000.

16             THE DEPUTY CLERK:  Is this your verdict, Juror

17   number one?

18             THE JUROR:  Yes.

19             THE DEPUTY CLERK:  Is this your verdict, Juror

20   number 2?

21             THE JUROR:  Yes.

22             THE DEPUTY CLERK:  Is this your verdict, Juror

23   number three?

24             THE JUROR:  Yes.

25             THE DEPUTY CLERK:  Is this your verdict, Juror

```
 1  number four?

 2          THE JUROR:  Yes.

 3          THE DEPUTY CLERK:  Is this your verdict, Juror

 4  number five?

 5          THE JUROR:  Yes.

 6          THE DEPUTY CLERK:  Is this your verdict, Juror

 7  number six?

 8          THE JUROR:  Yes.

 9          THE DEPUTY CLERK:  Is this your verdict, Juror

10  number seven?

11          THE JUROR:  Yes.

12          THE DEPUTY CLERK:  Is this your verdict, Juror

13  number eight?

14          THE JUROR:  Yes.

15          THE DEPUTY CLERK:  Thank you.  The jury has been

16  polled.

17          THE COURT:  Okay.  As I said at the beginning, I

18  greatly appreciate your time.  The system wouldn't work

19  without the voluntary participation as good citizens such as

20  yourself.  I typically go back and have a discussion with

21  the jurors, but it's a Friday afternoon and I want to get

22  you on your way.  I'll just thank you for your service here

23  and excuse you.  And I hope it was a pleasurable experience.

24  The jury instructions were more complicated than normal, so

25  I greatly appreciate you taking the time and giving it the
```

**JA 804**

1  seriousness that it deserved and working your way through

2  it.

3           Thank you very much for your service.

4           [Thereupon, Jury exits courtroom at 3:51 p.m.]

5           THE COURT:  All right.  So Mr. Lescht, what do you

6  propose doing next as far as remedy?

7           MR. LESCHT:  Equitable remedies are with Your

8  Honor.  We ask that you award the $305,000, I think plus --

9           THE COURT:  Which has been stipulated.  That's

10  goes without saying.

11           MR. LESCHT:  I think equitable remedy we ask is

12  for an apology, right, wasn't it?  Something like that.  I

13  have to go back and look.

14           THE COURT:  Okay.  I think at various points I

15  think you made some noises about reinstatement.  My view of

16  the law was that because it's not a wrongful termination

17  case it's reputational harm that that's not available, but

18  I'll let you brief it if you wish.

19           MR. LESCHT:  If you don't mind, you know, I have

20  to think about this.

21           THE COURT:  Okay.

22           MR. LESCHT:  But I do obviously we would like the

23  back pay awarded, and we'll make an attorney's fee

24  application in accordance with the local rules.  I think we

25  have 14 days.

**JA 805**

```
 1                THE COURT:  Right.

 2                MR. LESCHT:  And maybe what we can do is we'll

 3     take a look at the pleadings and let you know if there's any

 4     other relief we had requested that I haven't thought of.

 5                THE COURT:  All right.  Why don't you do this,

 6     I'll give you a week's time to let me know.  I can't enter a

 7     judgment which starts all the other things running until --

 8                MR. LESCHT:  I'll let you know by Tuesday.

 9                THE COURT:  Okay.  I'll give you a week's time as

10     to what you propose doing next as far as equitable remedies.

11                MR. LESCHT:  All right.  Thank you, Judge.

12                THE COURT:  All right.  And, go ahead, Ms. Knapp.

13                MS. KNAPP:  I think I need to renew the District's

14     motion.

15                THE COURT:  Okay.

16                MS. KNAPP:  Take under advisement or --

17                THE COURT:  The Rule 50 motion I'm going to deny

18     for all the reasons I previously said.  I took a look at

19     Payne.  It's very thinly supported.  I disagree with it.

20     And it's on motion for reconsideration.  So --

21                MS. KNAPP:  And I would like to point out I think

22     that the District may be submitting some briefing.  When we

23     agreed to the back pay amount there was a wrongful

24     termination claim in the case.  There was the whistle blower

25     termination claim.  And I think it's not, you know, her loss
```

**JA 806**

```
 1   from day one of back pay is not cause from the reputational
 2   harm alone.
 3            THE COURT:  You know, when you stipulated there
 4   were two claims in there, and you said that they didn't, you
 5   actually argued they couldn't present their witnesses, or
 6   shouldn't present their witnesses because you had stipulated
 7   to those amounts so they created their strategy around the
 8   stipulation.
 9            MS. KNAPP:  Okay.  We stipulated to the amount,
10   but I understand what you're saying, your Honor.
11            THE COURT:  Okay.  And I don't think you have to
12   worry about Rule 59 until I enter a judgment.
13            MS. KNAPP:  I don't know that my office agrees
14   with you, but --
15            THE COURT:  As to what?
16            MS. KNAPP:  As to when the clock starts ticking.
17   They always want us to count from the day of verdict.  We
18   have more time in federal court now so it's -- yeah.
19            THE COURT:  I will say this, Mr. Lescht, this is a
20   good judgment.  It's not a great judgment for you.  It would
21   have been better for you if they had ruled in your favor on
22   the first count.  The second one as you know on the law is
23   much shakier.  That was a big, gray area.  And the Circuit
24   may disagree with me.  I'm happy to send you guys to -- you
25   never met with Magistrate Judge Kay.  If you're interested
```

**JA 807**

1    in the short term in meeting with him, I can arrange that if

2    folks are interested.

3           I assume the District will be more interested now

4    than they were before.

5           MR. LESCHT:  Judge, I was going to suggest that to

6    Ms. Knapp as soon as we walked out of here.  The ball's in

7    your court.  It's neither here nor there, but I tried up

8    until the day of the trial to settle the case.

9           THE COURT:  And I have had a number of cases with

10   Ms. Knapp.  She at least in my experience she has settled

11   more cases than any of her peers.  So it's not, you know,

12   I'm assuming --

13          MR. LESCHT:  We settled another case two weeks

14   ago.  They didn't want to try, now maybe if you want I'm

15   happy to.

16          THE COURT:  Okay.  So do you want me to make that

17   referral and you cancel like last time if you don't --

18          MS. KNAPP:  I think that makes more sense.  As one

19   of my colleagues says you get to deal with the smarter

20   lawyers in our appellate decision.

21          THE COURT:  Okay.  I'll go ahead and make that

22   referral and have you call his chambers within a week's time

23   to set up a date.  You don't have to meet within a week's

24   time, but call his chambers within a week's time to set up a

25   date.

**JA 808**

19

```
1              Is there anything else we need to resolve today?
2              MR. LESCHT:  No.
3              MS. KNAPP:  No, your Honor.
4              THE COURT:  Dr. Campbell, congratulations.  Thank
5    you all, it was a pleasure to try the case.  I had a case in
6    September that was a nightmare and it was three weeks of
7    pain on my part.  This was a pleasure, and I appreciate --
8    You guys are repeat players, so you'll be welcome back.  And
9    if I don't see you again before the holidays, happy
10   holidays.
11              [Thereupon, the proceedings adjourned at 3:57
12              p.m.]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**JA 809**

```
1                        CERTIFICATE

2           I, Cathryn J. Jones, an Official Court Reporter

3  for the United States District Court of the District of

4  Columbia, do hereby certify that I reported, by machine

5  shorthand, the proceedings had and testimony adduced in the

6  above case.

7           I further certify that the foregoing 10 pages

8  constitute the official transcript of said proceedings as

9  transcribed from my machine shorthand notes.

10          In witness whereof, I have hereto subscribed my

11  name, this the 23rd day of February, 2016.

12

13

14                         /s/ Cathryn J. Jones
                           Cathryn J. Jones, RPR
15                         Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

**JA 810**

## Jennifer B. Campbell-Fitzgerald, DrPH, MHSA, FACHE

611 Pennsylvania Avenue, SE * Washington, DC * 20003 * 202-246-8893 * jbcampbell_22@yahoo.com

### KEY CAREER ACHIEVEMENTS

- Performed strategic market assessment for home health and hospice agency resulting in a financial turn-around
- Launched the start-up efforts of home health agencies in effort to expand market base
- Lead change-management and turn-around efforts for post-acute facilities
- Lead the District of Columbia's efforts to plan, establish, and implement each portion of the Patient Protection and Affordable Care Act 2010 (PPACA)
- Coordinated interagency activities and initiatives across 11 District of Columbia Health and Human Services agencies
- Launched integrative health network strategic and clinical services plans to serve all of the District of Columbia's uninsured. Negotiated and collaborated with government agencies, managed care organizations, six hospitals, two skilled nursing facilities, four ambulatory care clinics, two trauma centers, and twelve community health centers
- Restructured disease management and case management programs, resulting in increased usage of primary care and 30% decrease in bed days providing a $4.4 M annual savings in Baltimore, MD
- Increased DC Medicaid overpayment recoveries by 300% in one year
- In six months' time, identified a total of $22.1 M in cost-avoidance and savings for the District of Columbia Medicaid Program
- Completed a staffing realignment of 163 FTES resulting in a return of investment of 403%
- Negotiated with three of the largest unions in the District of Columbia: SEIU, AFSME, DCNA to reach re-structuring agreement
- Conducted evaluation, process redesign and implementation of healthcare business office functions, including admissions/registration, billing and collections for over 20 hospitals across the United States
- Completed cost reviews and revenue cycle assessments for over 60 hospitals across the United States
- Supervised operations of the Community Health Clinic that served over 20,000 of Baltimore's under- and uninsured residents
- Certified - Global Health Disaster and Crisis Management
- International experience with underserved health facilities:
    - o South Africa (1997 and 2001)
    - o Swaziland (1997)
    - o Jamaica (2006)
- Selected as a Senior Management Fellow for Yale-Clinton Foundation Fellowship in International Healthcare Management

1

Campbell v. DC -Fed. Ct. 043

**JA 811**

## Jennifer B. Campbell-Fitzgerald, DrPH, MHSA, FACHE
611 Pennsylvania Avenue, SE * Washington, DC * 20003 * 202-246-8893 * jbcampbell_22@yahoo.com

## PROFESSIONAL EXPERIENCE

### J. Blakely Campbell & Associates, LLC (DBA as J Blakely & Associates), Washington, DC    2012 - Present
*Principal*
J Blakely & Associates is a health care and human services consulting firm with a national and international clientele providing consultation on start-up, strategic planning, revenue cycle management, and change management / turn-around services.

- Performed strategic market assessment for home health and hospice agency resulting in a financial turn-around
- Launched start-up efforts for home health agencies once redeveloping the strategic direction to focus on post-acute service while expanding services and increasing market share
- Lead turn-around efforts for ambulatory care center resulting in a turn-around in 7 months resulting in increased profit margin by 2.3%
- Consulted with national managed care organizations to design Medicaid Managed Care Programs
- Completed 18 business plans that aided in making objective business decisions and determining hospital service lines
- Project Director on U. S. Department of Health  and Human Services contracts
    - Worked with DHHS Office on Women's Health to launch the *Health and Wellness Initiative for Women Attending Minority Institutions* impacting 40-60% of the women attending these institutions. The initiative was designed to use a multi-level approach to disease prevention and health promotion, with activities that are gender-responsive, culturally and linguistically appropriate, age-appropriate, and student-driven
    - Successfully launched "Ending Violence Against Women (EVAW): The HBCU Project", funded by the U.S. Department of Health and Human Services, Office on Women's Health (OWH) small –business contract awards
- Developed national program for the United States Department of Health and Human Services
- Raised approximately $32M for 12 organizations through grant writing and other development initiatives
- Assisted an independent home health agency to assess feasibility of starting an integrated house call program. Worked closely with client to assess feasibility, including collaborating with attorney regarding state and Federal compliance. Developed business and implementation plan and assisted to bring the house call program from concept to reality.
- Lead development of a system-level chronic illness management initiative for an integrated health system using the institute model of clinical care, research, education and philanthropy. Developed comprehensive business plan, including service/program roll-out among system members, fund raising and marketing.
- Assisted an independently owned Intermediate Care Facility (ICF) agency expand from one to three states. Worked with client to establish a Day Treatment Program for medically fragile adults.  Developed a business plan for business growth to include a facility for medically fragile children.

2

## Jennifer B. Campbell-Fitzgerald, DrPH, MHSA, FACHE
611 Pennsylvania Avenue, SE * Washington, DC * 20003 * 202-246-8893 * jbcampbell_22@yahoo.com

Government of the District of Columbia                              2008 - 2012

*Department of Health Care Finance (DHCF)*
*Chief Operating Officer*
Top advisor to the Director of the State Medicaid agency with a $2.6 Billion budget across a wide
range of issues impacting the day-to-day operations of the agency. Included managing seven (7)
departments and approximately 48 employees. The departments included:
- Human Resources
- Facilities and Transportation Management
- Information Technology (including the Health Information Exchange (HIE))
- Grants Management
- Health Reform and Innovation
- Risk Management
- Contracts and Procurement

Responsible for all DHCF administrative operations and assumes the lead role in recommending
and formulating related policies and strategies. These strategies included to:
- Ensure the timely implementation of the agency's procurement process and effective
  management of the contract monitoring activities of staff
- Implement risk management activities
- Oversee of administrative support and property management activities
- Implement agency-wide strategic planning and performance management processes and
  management of the agency's information technology programs related to the Health
  Information Technology Act
- Manage human resources and human capital

*Department of Health Care Finance (DHCF)*
*Director*
*Health Care Reform and Innovation*
The charge of this office is to plan, establish and implement each portion of the Patient Protection
and Affordable Care Act (PPACA). Lead the charge including but not limited to: grant
procurement, health insurance exchange implementation, development of legislation, and the
reconstruction of the District's health care service delivery.
- Lead the District of Columbia's efforts to plan, establish, and implement each portion of the
  Patient Protection and Affordable Care Act 2010 (PPACA)
- Drafted legislation for the development of the Health Benefit Exchange Authority

*Executive Office of the Mayor*
The Office of the Deputy Mayor for Health and Human Services (DMHHS) supports the Mayor in
coordinating a comprehensive system of benefits and services across multiple agencies to ensure
that children, youth and adults, with and without disabilities, can lead healthy, meaningful, and
productive lives.
- Developed and supported policies and program to improve the delivery of services by
  government agencies and contracted providers

3

Campbell v. DC -Fed. Ct. 045

**JA 813**

## Jennifer B. Campbell-Fitzgerald, DrPH, MHSA, FACHE

611 Pennsylvania Avenue, SE * Washington, DC * 20003 * 202-246-8893 * jbcampbell_22@yahoo.com

- Coordinated interagency activities and initiatives across 11 agencies
- Identified opportunities for reducing redundancies, leveraging resources, creating economies of scale, and improving outcomes
- Ensured compliance with federal and local mandates
- Collected and disseminated performance data for agency activities and initiatives

**Government of the District of Columbia** (cont.)          2008 - 2012

*Department of Health Care Finance (DHCF)*
*Health Care Accountability Administration*
*Associate Director, Office of Utilization Management and Third Party Liability*
*Contract Officer*

The DC Medicaid program has a budget of $2.1 Billion where the Office of Utilization Management is located within the Health Care Accountability Administration. The charge of the Office is to monitor the provision of services to Medicaid beneficiaries and to ensure that Medicaid resources were effectively and efficiently utilized to assist the beneficiary.

- Increased DC Medicaid administrative sanctions and overpayment recoveries by 300%
- In six months' time, identified a total of $22.1 M in cost-avoidance and savings for the District of Columbia Medicaid Program in the Divisions of Utilization Management and Third Party Liability
- Contributed to the development of a new District government agency (Department of Health Care Finance)
- Completed a staffing realignment of 163 FTEs resulting in a return of investment of 403%
- Developed Utilization Management oversight measures for District of Columbia Medicaid Program resulting in efficient use of Medicaid funds
- Identified over $12.1M of administrative recoveries and payment errors
- Developed the first fiscal year work plan for the DHCF Administrations
- Re-designed work flow working with unions: AFSCME and DC Nurses Association
- Drafted, implemented and enforced policies and procedures
- Developed measures of effectiveness across the Medicaid program
- Identified and resolved instances of fraud and intentional misuse of Medicaid resources
- Identified how DHCF internal processes can be strengthened to improve DHCF performance in securing high quality health care
- Identified and secured third-party resources available to pay beneficiaries' health care costs in order to conserve Medicaid resources

**Advisory Board Company,** Washington, DC          2007 - 2008

*Associate Director* – Revenue Cycle Business Intelligence

A healthcare-focused best practice research think tank that provides best-in-class consultative, educational, training, and business intelligence services.

- Provided consultation to hospitals on revenue cycle management
- Assisted clients to improve revenue cycle operations through technology and process improvement
- Developed analytics for strategic margin management
- Performed gap-analyses for organizational development and deployment

4

Campbell v. DC -Fed. Ct. 046

**JA 814**

## Jennifer B. Campbell-Fitzgerald, DrPH, MHSA, FACHE

611 Pennsylvania Avenue, SE * Washington, DC * 20003 * 202-246-8893 * jbcampbell_22@yahoo.com

- Developed continuity between front-office, HIM, and back-office functions
- Identified opportunities within charge-capture, registration, and billing

**J. Blakely & Associates, LLC**, Washington, DC                    2003 -04; 2006 - 2007
*Principal*
A health care consulting corporation with a national and international clientele providing consultation on strategic planning, revenue cycle management, grant writing/management, program evaluation, feasibility studies, process re-design, and cultural competency program development and training.

**University of Maryland Medical Center Midtown**, Baltimore, MD                    2004 - 2006

*Senior Vice President,* Planning, Business Development & Ambulatory Services
A 280-bed not-for-profit community hospital. Managed the system's strategic planning and development, product line development, external and legislative affairs, public relations, marketing, and ambulatory care services. Responsible for all real estate purchases, construction, and renovation. Directed more than 200 staff members.
- Supervised operations of the Community Health Clinic that served over 20,000 of Baltimore's under- and uninsured residents
- Created and implemented the Patient Advocacy program.
- Restructured disease management and case management programs, resulting in increased usage of primary care and 30% decrease in bed days providing a $4.4 M annual savings.
- Controlled a $22M budget for ambulatory care, real estate, marketing, business and community development.
- Increased in-patient admissions by 9.3%. This increase in admissions was due to myriad of initiatives the hospital had undertaken. These initiatives included, but are not limited to: change in service culture; improved fiscal management; improvements in processes; community image improvement; effective marketing, and thorough planning.
- Increased inpatient Primary Service Area market share from 10.22 in FY04 to 10.31 in FY05.
- Restructured the Department of Planning, Business Development and Ambulatory Care.
- Directed construction planning efforts for a healthcare campus including an ambulatory care center, hospital, and hospice.

*Vice President* of Business and Community Development                    2004 - 2005

- Managed the hospital's strategic planning and development, product line development, external and legislative affairs, public relations, marketing, and ambulatory care services.
    - Developed strategic partnerships and alliances to coordinate new service opportunities and ventures.
    - Improved patient satisfaction in ambulatory care centers by 62%.
    - Developed a marketing plan including a new branding and image campaign.
    - Grew the hospital volunteer program by 70%.
    - Reviewed and restructured processes and systems resulting in higher JCAHO and regulatory compliance rates, e.g. a pharmacy information system.

5

Campbell v. DC -Fed. Ct. 047

**JA 815**

*Jennifer B. Campbell-Fitzgerald, DrPH, MHSA, FACHE*
611 Pennsylvania Avenue, SE * Washington, DC * 20003 * 202-246-8893 * jbcampbell_22@yahoo.com

DC Healthcare Alliance, Washington, DC                                     2001–2003

(Doctors Community Healthcare Corporation and Chartered Health Plan)
*Senior Director,* Public and Community Health Services
The DC Healthcare Alliance is an $800 million integrated health service that provides comprehensive health services for the uninsured and underinsured residents of the District of Columbia. Reported directly to the CEO of the Alliance. Responsible for the oversight of administration, management, coordination and planning functions of the outreach programs and on-going public and community health programs for the Alliance. Provided effective leadership, coordination and budget controls of health promotion/disease prevention, and disease management. presented expert consultation on the community outreach to faculty, medical staff, and administration of the Alliance.

- Launched integrative health network strategic and clinical services plans to serve all of the District of Columbia's uninsured. Negotiated and collaborated with government agencies, managed care organizations, six hospitals, two skilled nursing facilities, four ambulatory care clinics, two trauma centers, and twelve community health centers.
- Marketed disease management and health promotion programs by identifying opportunities based on analyzed research and utilization data.
- Generated successful and sustaining partnerships with multiple for- and not-for-profit organizations, academic institutions and local / state/ federal governmental agencies to leverage resources and streamline processes.
- Efficient management of budgets totaling $40.2 M annually for the DC HealthCare Alliance.
- Developed all media and public relations materials for the Alliance.
- Developed a Cultural Competency Task Force resulting in a network-wide cultural competency plan (based of Federal CLAS standards) due to the largely diverse patient population leading to improved clinical and operational satisfaction (an approximate 8% increase). This effort addressed language, culture, patient rights, etc.
- Developed Clinical Utilization Review Committee that reviewed clinical authorization denials and claims denials resulting in a net $4.2 M annual savings.
- Coordinated Customer Service and Physician Satisfaction Task Force and analyzed data resulting in the ability to capture feedback and implement change.
- Designed an HIV/AIDS prevention initiative reaching over 24,000 patients.
- Implemented an influenza vaccination program for the Alliance's medically vulnerable and an immunization drive to serve 100,000 of children out of compliance.

Association of Black Cardiologists, Inc. Center for Women's Health, Atlanta, GA  2000– 2002

*Founding Director*
A not-for-profit, member-driven healthcare organization addressing issues related to cardiovascular diseases.

- Worked closely with corporate advisory board and of directors
- Developed regional program series for physician education to increase patient safety and quality of care

6

Campbell v. DC -Fed. Ct. 048

**JA 816**

## Jennifer B. Campbell-Fitzgerald, DrPH, MHSA, FACHE

611 Pennsylvania Avenue, SE * Washington, DC * 20003 * 202-246-8893 * jbcampbell_22@yahoo.com

- Launched internship/residency program with Morehouse School of Medicine utilizing graduate trainees for not-for-profit organizations to improve medical education and to provide a service to the surrounding communities
- Responsible for daily operations, strategic planning, budget development and management, and fund raising
- Established strategic partnerships with corporate, governmental, and community-based organizations
- Managed staff of 16
- Raised a total of $2.6 M in seed and continuation funding
- Worked with cardiologists in both South Africa and Swaziland on public health interventions related to heart disease in women. Elapsed time in Swaziland and South Africa across multiple Approximately that my actual physical time between Johannesburg, Cape Town, and Swaziland was three months.

## OTHER PROFESSIONAL EXPERIENCE

| | |
|---|---|
| **Chicago Department of Public Health**, Chicago, IL<br>*Senior Consultant* | 1998-2000 |
| **National Cancer Institute**<br>*Fellow* | 1998 – 2000 |
| **University of Illinois-Chicago,** School of Nursing, Chicago, IL<br>*Project Director* | 1998-2001 |
| **Ernst & Young, LLP**, Washington, DC<br>*Consultant/Intern* | 1997-1998 |

## EDUCATION

University of Illinois at Chicago, **Doctor of Public Health,** Magna Cum Laude
Concentration: Health Economics, Health Policy and Administration

George Washington University, **Master of Health Services Administration,** Magna Cum Laude
Concentration: Strategic Planning and Marketing

Howard University, **Bachelor of Science in Chemistry,** Honors
Minor: Mathematics

## PROFESSIONAL AFFILIATIONS

American College of Healthcare Executives, 1996-present
    *    Fellow
National Diabetes Education Project, Advisory Council 2001-present
National Stroke Association, Women's Health Advisory Board 2001-present
American Public Health Association 1998-present
University of Illinois at Chicago, Committee on Educational Programs 1998-present
Black Caucus of Health Workers 1998-present
National Association of Health Services Executives 1996- present
       *    Chairperson, Everett V. Fox Student Case Competition
       *    Young Healthcare Executive of the Year, 2005

7

Campbell v. DC -Fed. Ct. 049

**JA 817**

## *Jennifer B. Campbell-Fitzgerald, DrPH, MHSA, FACHE*

611 Pennsylvania Avenue, SE * Washington, DC * 20003 * 202-246-8893 * jbcampbell_22@yahoo.com

### HONORS, AWARDS, AND RECOGNITION

Young Healthcare Executive of the Year for 2005, National Association of Health Services Executives

*Baltimore Business Journal* "40 Under 40"

Department of Health and Human Services, Office on Women's Health – Award for Young Women's Health Summit

National Cancer Institute Fellowship, 2000 - 2001

Loretta Pratt Lacey Scholarship, 1999

Illinois Public Health Association, Scholarship recipient, 1999

American College of Healthcare Executives, Albert W. Dent Scholarship, 1997

### ACADEMIC APPOINTMENTS

**Adjunct Assistant Professor,** The George Washington University, 2004-present
Health Care Finance and Economics
**Adjunct Assistant Professor,** Johns Hopkins University, 2004-present
Epidemiology
**Adjunct Assistant Professor,** University of Maryland, 2003 – present
Master of Science Program, Health Economics
**Adjunct Assistant Professor of Community Health and Preventive Medicine,** Morehouse School of Medicine, 2002 – present
Master of Public Health Program
**Track Coordinator,** Morehouse School of Medicine, Master of Public Health Program, 2002 – present
Health Administration and Policy track
**Guest Lecturer,** University of Illinois at Chicago, School of Public Health, 2000-01
Health Economics
Public Health Policy
**Teaching Assistant,** The George Washington University, Health Services and Administration Program, 1997-98
Health Economics

### PUBLICATIONS

Taylor, A., Bransford, A (eds.) Campbell, J. (et al) *The African American Woman's Guide to a Healthy Heart.* Hilton Publishing: Rockford, IL; 2003

Campbell, Jennifer B. et al. "Faith-based Approaches for Cardiovascular Health in Women" *Ethnicity and Race,* (Currently in publication review)

Campbell, Jennifer B. "Cost-Effectiveness of Innovative Approaches to the Mammography Screening of African American Women" *Journal of General Internal Medicine,* Special Issue on Disparities in Health Care (Currently in publication review)

Campbell, Jennifer B. "A Literature Review: Influences of Race and Socio Economic Status on Breast Cancer" *Journal of General Internal Medicine,* Special Issue on Disparities in Health Care (Currently in publication review)

8

**JA 818**

## Jennifer B. Campbell-Fitzgerald, DrPH, MHSA, FACHE
611 Pennsylvania Avenue, SE * Washington, DC * 20003 * 202-246-8893 * jbcampbell_22@yahoo.com

Campbell, Jennifer B. "Breast Cancer- Race, Ethnicity, and Survival: A Literature Review." *Breast Cancer Research Treatment*, 74, 187:02

Campbell, Jennifer B. *Cost-effectiveness of extending mammography screening guidelines in African American women.* UMI Press: Ann Arbor, MI; 2001.

9

Campbell v. DC -Fed. Ct. 051

**JA 819**

STATEMENT OF CONFIDENTIALITY - The information contained in this electronic message and any attachments to it are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately and destroy all copies of this message and any attachments.

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever. Currently available in the iTunes App Store and in the Android Marketplace. Learn more at www.ouc.dc.gov

**From:** Cook, Nicole (DCHR)
**Sent:** Thursday, May 24, 2012 3:21 PM
**To:** Campbell, Jennifer (DHCF)
**Cc:** Frazier, Shalonda (DHCF)
**Subject:** Offer of Employment
**Importance:** High

Dear Ms. Campbell:

Congratulations! This message is to notify you of an offer of employment to the position of **Chief Operating Officer** in the **DC Department of Healthcare Finance**. Attached is a copy of the offer letter and corresponding attachments for your review and consideration.

As an appointee in the Excepted Service, you must continue to maintain District domicile for the duration of this appointment, and submit a combined total of fifteen (15) proofs. You may present the combined total of fifteen (15) proofs by the date of initial appointment. Otherwise, you must submit the required proofs within one hundred eighty (180) days of your initial appointment.

- Attached is DC Form 300D, Notification and Certification of Domicile Requirement. This form must be signed and submitted to the DCHR for processing **at the time of your acceptance**. This document certifies that you have received and understand the terms of the domicile requirement. Also, attached is DC Form 305, Certification of Submission of Proofs of District Residency or Domicile, which you will also need to complete and provide to us at the time you submit your required proofs of District domicile.

- As part of your appointment, I am required to notify you that the Mayor has directed that all Executive and Excepted Service appointees must appear for, and complete a background investigation conducted by the DC Metropolitan Police Department (MPD), Recruiting Branch. The investigation will include a criminal records check (both FBI and local), credit check, and your submission of an on-

DHCF FY13-12        - 149 -

line <u>Personal History Statement</u> via MPD's secure website. The personal history statement that you must submit requires a log-in name and password. You will receive your log-in name and password via email after you appear at MPD Recruiting.

- The MPD Recruiting Branch is located at <u>#6 D.C. Village Lane, SW, Washington, DC 20032</u>. Please report as soon as possible, but no later than **June 1, 2012**. You may report any time between 7 AM and 4 PM, Monday through Friday. If you would like to schedule a particular date and time to report, please contact the Recruiting Branch at **(202) 645-0445**. Please allow one hour for the orientation and fingerprinting process. Should the employment verification and background process disclose information that renders you unsuitable for this position, the offer of employment may be withdrawn.

### Next Steps

If this offer and terms are acceptable, please sign and date the letter on the line provided to signify your acceptance and return it to me by email (<u>Nicole.Cook@dc.gov</u>) or by fax (202.442.9646). Should you have any questions, please do not hesitate to contact me.
Sincerely,

*Nicole A. Cook*
Human Resources Specialist
Office of the Director
DC Department of Human Resources (DCHR)
441 4th Street, NW, Suite 300 South
Washington, DC 20001
202.442.9676 (Direct)
202.442.9600 (Main)
202.442.9646 (Fax)
<u>nicole.cook@dc.gov</u>
<u>www.dchr.dc.gov</u>

STATEMENT OF CONFIDENTIALITY - The information contained in this electronic message and any attachments to it are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately and destroy all copies of this message and any attachments.

 Please consider the environment before printing this email.

**From:** Cook, Nicole (DCHR) [mailto:Nicole.cook@dc.gov]
**Sent:** Thursday, May 31, 2012 12:51 PM
**To:** Frazier, Shalonda (DHCF)
**Cc:** Campbell, Jennifer (DHCF)
**Subject:** RE: J. Campbell

Thank you.

**JA 821**

     GOVERNMENT OF THE DISTRICT OF COLUMBIA     
**Department of Human Resources**

**Office of the Director**

June 4, 2012

Dr. Jennifer Campbell
Chief Operating Officer
Department of Health Care Finance

### RE: Letter Placing Dr. Jennifer Campbell, Chief Operating Officer, on Administration Leave and Notice of Contemplation of Termination

Dear Dr. Campbell:

The purpose of this letter is to inform you that effective today and until further notice, you will be placed on administrative leave. While on administrative leave, you will continue to be paid at your current rate of pay and accrue sick and annual leave.

The reason for this action is, after a preliminary investigation into inappropriate conduct which occurred at the Department of Health Care Finance (DHCF), you are being placed on administrative leave while the investigation continues. Furthermore, in accordance with section 907.4 of Chapter 9 of the D.C. Personnel Manual, this constitutes the fifteen-day (15-day) advance written notice of contemplation of termination.

It may be necessary to contact you by telephone or other means of communication during the period of administrative leave to obtain information, make inquiries, etc. Consequently, I am requiring that you make yourself available to take telephone calls, respond to electronic mail (email), etc.; from DHCF and that you provide the Director's Office with your personal contact information [telephone number(s) and email address] upon receipt of this letter.

Finally, you are to immediately return all building keys, office keys, security badge(s), pass cards(s), cell phone(s), laptop computer(s) and any government property issued to you as a District government employee. This includes all District government paper-based or computer-based documents contained on computer disks, hard drives, storage drives, and on any other type of electronic media containing such documents in your possession.

---

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

Page 2 - Letter Placing Jennifer Campbell, Chief Operating Officer, on
Administrative Leave and Notice of Contemplation of Termination

If you have questions regarding this letter, please contact Ms. Nicole Cook, Human
Resources Specialist, DC Department of Human Resources, at (202) 442-9676.

Sincerely,

Shawn Y. Stokes
Director

Cc:   Wayne Turnage, Director, DHCF

**JA 823**

Page 3 - Letter Placing Jennifer Campbell, Chief Operating Officer, on
Administrative Leave and Notice of Contemplation of Termination

ACKNOWLEDGMENT OF RECEIPT

I, _JENNIFER  B . CAMPBELL_____, acknowledge receipt of this letter:
          Name – Print

_____          _____
Employee's Signature                                      Date/Time

Witnessed By:

_____          _____
Signature                                                      Date/Time

**JA 824**

Page 4 - Letter Placing Jennifer Campbell, Chief Operating Officer, on
Administrative Leave and Notice of Contemplation of Termination

RECORD OF COLLECTED PROPERTY

☐ Government I.D. Card
☐ Building Key Card(s)  + FOB
☑ Office Key(s)
☑ Cell Phone(s)  (BB)
☐ Laptop(s) — to be dropped off (w mailed
☐ Parking Pass(s) —to be mail
☐ Other (list)

_____            _____
Employee's Signature                    Date/Time
                                        6/4/12

Collected By:

_____            _____
Signature                               Date/Time
Melvin Byrd (Rep)                       6/4/12   11:29a.

CONTACT INFORMATION
Home Address:  3723 26 TH ST NE, WASHINGTON, DC  20018

Phone Number:  202 - 246- 8893
               JBCAMPBELL_22@YAHOO.COM

**JA 825**

**From:** Turnage, Wayne (DHCF)
**Sent:** Monday, June 04, 2012 11:08 PM
**To:** Elam, Linda (DHCF); Nathan, Ganayswaran (DHCF); Byrd, Melisa (DHCF)
**Subject:** FW: STATUS OF PERSONNEL ISSUE
**Importance:** High

Download DC311 and Start Reporting Today!
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

**From:** Turnage, Wayne (DHCF)
**Sent:** Monday, June 04, 2012 10:51 PM
**To:** Murphy, Christopher (EOM); Otero, BB (EOM)
**Cc:** Stokes, Shawn (DCHR)
**Subject:** STATUS OF PERSONNEL ISSUE

All -

The following updates the actions we have taken regarding Jennifer
Campbell:

At 11:00am today, Jennifer was informed that she was being placed on
administrative leave pending the completion of an investigation of her
activities as Chief Operating Officer. My COS along with a DCHR staff
member handled the meeting.

She seemed shocked and wanted to know what the allegations were so
that she could defend herself. My COS broadly outlined the issues,
collected and disconnected Jennifer from all of DHCF's property, and
escorted her out of the building.

She later sent my COS an email asking for a meeting with me and Linda
Elam because she does not want us to believe she "let us
down." Curiously, although I am her supervisor, I have not received an,
email, text, or phone call from her since she was ordered back to DC from
a conference in Nashville Sunday night.

I met separately with two vendors -- COMPASS and CGI -- to get in-person
reports. I was told again that Jennifer directed these companies to hire or

DHCF FY13-12      - 133 -

**JA 826**

partner with certain individuals or firms and took retaliatory action if push back occurred. Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire.

After my meeting with the two firms, they took immediate action against Mr. Wiggins, terminating contact and any discussion of a partnership. COMPASS fired one of the employees that the owner was directed to hire. He reported to me that the meeting was held at 4:30pm and it was obvious the employee knew that Jennifer had been sent home -- an indication that she likely called him.

This concludes my investigation of this issue and I will inform Director Stokes that I am firing Jennifer Campbell. We plan to send her notice of this action as soon as DCHR informs me that I can.

I have also spoken with Director Staton and my staff are also reaching out to all of our contractors to inform them that we have a new point of contact at DHCF. In addition, we are checking on whether they experienced any irregularities in dealing with DHCF.

I will also report this incident to OIG as directed by the OCP.

**From:** Richard, Mike (DHS) [mailto:mike.richard@dc.gov]
**Sent:** Tuesday, June 05, 2012 11:19 AM
**To:** Hamilton, Tondalaya (DHCF)
**Cc:** Byrd, Melisa (DHCF); Shephard, Mirka (DHCF); Payton, Norma (OCFO)
**Subject:** RE: Reassignment of Jennifer Campbell's roles in PASS

The Process for reassigning Ms. Campbell's PASS roles is:

1. Record Jennifer Campbell's management level and the roles she currently holds in PASS.
2. Obtain the Agency Director's signed letter asking for delegation authority of his/her "**No Supervisor**" role and a "**Management Level of 1/\$1,000,000,000.00**" for Tondalaya Hamilton. Note--The Director's letter must include a statement of financial responsibility and be attached to the User Maintenance submitted for consideration. (**See attached example**)

Take the following actions once the above is completed:
A. Submit a User Maintenance (UM) in PASS to deactivate Jennifer Campbell's SOAR ID.
B. Submit a second User Maintenance in PASS to establish Tondalaya Hamilton with the same roles as Jennifer Campbell. (Attach the letter from the Director to the UM submission)

Once these actions are approved, submit UM forms in PASS to change the supervisor of individuals from Jennifer Campbell to Tondalaya Hamilton.

**JA 827**

**Preventing terrorism is everybody's business.**
If you SEE something, SAY something.
Call the Metropolitan Police Department at **(202) 727-9099** or email at SAR@DC.GOV to report
suspicious activity or behavior that has already occurred.
Call **911** to report in-progress threats or emergencies.

To learn more, visit **http://www.mpdc.dc.gov/operationtipp**

---

**From:** Byrd, Melisa (DHCF) [mailto:melisa.byrd@dc.gov]
**Sent:** Monday, June 11, 2012 4:25 PM
**To:** Sheryl.Johnson@dc.gov
**Subject:** FW: Another item

FYI – please see below. Jennifer still has a laptop, wireless card, and parking tag.

**From:** JC [mailto:jbcampbell_22@yahoo.com]
**Sent:** Tuesday, June 05, 2012 2:37 PM
**To:** Byrd, Melisa (DHCF)
**Subject:** Re: Another item

I am available.

Jennifer
Sent from my iPhone

On Jun 5, 2012, at 12:48 PM, "Byrd, Melisa (DHCF)" <melisa.byrd@dc.gov> wrote:

Jennifer –

We are available to meet on Thursday at 6:30pm. Please let me know if you are available.

Thanks,
Melisa

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

**From:** Jennifer Campbell [mailto:jbcampbell_22@yahoo.com]
**Sent:** Monday, June 04, 2012 12:23 PM
**To:** Byrd, Melisa (DHCF)
**Subject:** Another item

Hi Melisa -

I forgot that I also signed out a wireless card to go with the laptop. So I owe you the lap top, parking pass, and the wireless card.

I hope that I will be able to defend the five accusations outlined during our meeting today. Without details of the accusations, I do not know what to defend. I hope to be made aware of the specifics as soon as possible.

However, whatever the outcome, I want the opportunity to defend my professional reputation and more importantly my integrity. I am most interested in the truth (whether deemed defensible or not) be shared with Wayne, Linda, you and everyone else who have supported and promoted my talent and skills.

Best,
*Jennifer*

**JA 829**

# Health Care Finance COO Fired Over Contract Steering Allegations

Posted by **Alan Suderman** on Jun. 11, 2012 at 11:44 am



The chief operating officer of the Department of Health Care Finance was fired today over allegations that she tried to "steer business towards some minority firms and away from others" in the bidding on the forthcoming contract for the District's health insurance exchange, a new insurance marketplace that's the centerpiece of President **Barack Obama**'s healthcare reform efforts, emails obtained by LL show.

**Jennifer Campbell**, the COO, was placed on administrative leave early last week by her boss, DHCF Director **Wayne Turnage**. In emails Turnage sent to senior members of the Gray administration last week, he explains that one contractor, CGI, approached him with allegations that Campbell was trying to force CGI to partner with **Darryl Wiggins**, a politically connected owner of a document management company. (Wiggins was a political adviser to former Mayor **Adrian Fenty** and has been the chairman of all three of Ward 4 Councilmember **Muriel Bowser**'s campaigns. Wiggins was also part of n team with Mayor **Vince Gray**'s campaign chairwoman **Lorraine Green** and recently convicted campaign aide **Howard Brooks** that unsuccessfully tried to win the city's lottery contract.)

Turnage also writes that he'd received an allegation that Campbell was trying to steer another contractor, Compass Consulting, toward a different potential partner, **Cedrick Simon**.

Campbell could not immediately be reached for comment, and there is no hard proof in the emails to substantiate Turnage's allegations. It's not clear from the emails why Campbell would have favored those individuals. Turnage, who declined to comment, is also asking the Office of the Inspector General to investigate, according to the emails.

www.washingtoncitypaper.com/blogs/looselips/2012/06/11/health-care-finance-coo-fired-over-contract-steering-allegations/                    1/6

**JA 830**

Wiggins tells LL he's done nothing wrong and CGI is trying to discredit him and the city's procurement process because it doesn't want to team up with any local businesses. He says CGI approached him about forming a partnership and that he has only met Campbell once, and that was several months ago. Wiggins says he doesn't know what Campbell may have told CGI, but that all of his dealings have been above board.

"I don't deal in political hook ups," Wiggins says. "I don't operate this way."

Wiggins says he's working on similar insurance exchange contracts in other states and it was through one of those partnerships that he was introduced to CGI. Emails between Wiggins and CGO that Wiggins provided to Turnage, and later to LL, don't have any evidence of coercion. The emails do show Wiggins making the case that it was in CGI's best interest to form a joint partnership with local companies (including his own) in order to get the preference points awarded to Certified Business Enterprises.

"As I said to you, during our first meeting, 12% points is insurmountable. Please [remember] that when considering the business value of the [joint venture]," Wiggins wrote to CGI's vice president. (CBE's can receive up to 12 preference points, which translates to knocking 12 percent off the submitted bid.)

Wiggins tells LL he has a stellar business record in document management, and his value to any joint venture would have been much more than just bringing CBE points. The vice president at CGI, **Holli Ploog**, did not immediately return requests for comment.

In his emails, Turnage says that after meeting with CGI, they "took immediate action" against Wiggins, "terminating contact and any discussion of a partnership." Turnage also writes that Compass "fired one of the employees that the owner was directed to hire." It's not clear if that employee was Simon, who could not be reached immediately for comment.

In his emails, Turnage stresses that the District's bidding process for the insurance exchange must be "above reproach" and that he's ordered his staff to check with other contractors to see if there have been other allegations of shenanigans. Insurance exchanges are a key part of Obama's healthcare overhaul and are supposed to provide a competitive marketplace where the uninsured (and others) can find affordable insurance plans.

Health Care Finance has one of the biggest budgets in city government, at about $2.5 billion a year. Last year, it saw a much higher profile dismissal when Turnage canned former minor mayoral candidate and confirmed receiver of Gray campaign money **Sulaimon Brown**.

**Throw The Book**
June 11th, 2012
12:02 pm

Oh....Darryl Wiggins was the chairman for Bowser...wow                    #1

**gimmeabreak**
June 11th, 2012
12:09 pm

"I don't deal in political hookups", said Wiggins. One and the same who was appointed to
DC's Public Employee Relations Board, re: PR 18-0189                    #2

**Jeff**
June 11th, 2012
12:14 pm

Wayne Turnage, the next Gray crony to get arrested by the Feds. Brenda Emanuel was the
COO, what happened to her?                    #3

**KeepInItReal**
June 11th, 2012
12:44 pm

Good for Turnage, if you question it, report it. Let the IG sort out the details. It is clear that    #4
Wiggins is a part of the political machine that has caused much embarrassment to the city.
This machine, it appears, is immune to whom is in the Mayor's suite. It just goes to show you
how ingrained they are in DC.

**Peter
Rosenstein**
June 11th, 2012
1:15 pm

I think instead of decrying this I agree we should appreciate that Wayne Turnage is taking    #5
the steps he has and reported this immediately letting the IG sort it out. Turnage is right the
process on the exchanges needs to be totally above board and transparent.

**Ward 4 Voter**
June 11th, 2012
1:56 pm

It's a matter of time before Queen Muriel Bowser will be exposed in some type of corruption.    #6
To hell with lying, self serving, and corrupt politicians. Politics is so dam crooked in the 21st
century.

**RedDead**
June 11th, 2012
1:51 pm

bye-bye bowser! no mayor for you!                    #7

**RealDC**
June 11th, 2012
2:04 pm

The Old Green Team hanging around to get another bite at the apple, not surprising.    #8
Bowser's campaign chair wants the medicare contract because he copies documents? LOL.
Go away loser! Bowser and the greenies have not gotten over the fact that their boy lost.
Yes Bowser, Lopez, Wiggins, etc. your hero was a zero, get over it and go away.

This is why Bowser " loves corporate money", she is lazy and will not campaign. Miss Muffet
Bowser sitting on a tuffet, getting nothing done in ward 4 and now she wants to deliver the
same thing to the city. LOL. Don't fall for it DC, being AA and a woman was not her choice
so don't make it a criteria for voting for her. Her record in 4 is dismal. Lets see, Georgia Ave.
, Schools, Crime, Businesses, Ethics?? etc. Wake up Ward 4!!

**womanizer**
June 11th, 2012
2:19 pm

I know that's right @RealDC. I hope residents really start trying to get these hot messes out    #9

**JA 832**

#10

Roger Clegg, Ctr
for Equal
Opportunity
June 11th, 2012
3:27 pm

Why do race, ethnicity, and sex need to be considered at all in deciding who gets awarded a contract? It's good to make sure contracting programs are open to all, that bidding opportunities are widely publicized beforehand, and that no one gets discriminated against because of skin color, national origin, or sex. But that means no preferences because of skin color, etc. either--whether it's labeled a "set-aside," a "quota," or a "goal," since they all end up amounting to the same thing. Such discrimination is unfair and divisive; it breeds corruption and otherwise costs the taxpayers and businesses money to award a contract to someone other than the lowest bidder; and it's almost always illegal—indeed, unconstitutional—to boot (see 42 U.S.C. section 1981 and this model brief: http://www.pacificlegal.org/page.aspx?pid=1342 ). Those who insist on engaging in such discrimination deserve to be sued, and they will lose.

**KeepInItReal**

#11

June 11th, 2012
2:51 pm

Wait, Wiggins was CHAIRMAN of all three of Ward 4 Councilmember Muriel Bowser's campaigns? Hmmmm. Where is the political pressure coming from to award this contract to Wiggins company? Email trail? Is LL doing a FOIA? Does LL even care if it involves the darling of the Green Team? Perhaps the Examiner will care.

**rezOfward4**

#12

June 11th, 2012
3:08 pm

It will be interesting to see if that trail leads to Miss Muffett (LOL@RealDC) with her non-responsive, clenched tooth, high and mighty ass.

**N.E. John**

#13

June 11th, 2012
4:12 pm

hee hee heee. The laughs just keep on coming !

I can hear Bowser sing to the blues: "Sha na na na na na na na na na"

**RealDC**

#14

June 12th, 2012
7:38 am

For real, the system has to change in DC. Yes, we can keep locking up bamas but we have to change the system. All Wiggins is trying to do is replace Thompson. Then his girl Miss Muffet Bowser will access to his cash from the medicare contract. Miss Muffet Bowser loves "corporate money" and Wiggins will bundle money to her campaign and then we will hear how much money Miss Muffet Bowser is raising, then the Post will start writing stories about how Miss Muffet Bowser is for real..... all BS!! In so many ways Muffet Bowser is worse than the Fully Loaded and HTJ. Think about it! She is a do nothing that will standby and will not lead, read or question anything that her colleagues do. Muffet Bowser is bought and her vote is sold. Her record shows it.

**peeps4datruth**

#15

June 12th, 2012
4:29 am

I see all the comments and have yet to see anyone ask any questions about the director. These are allegations and we are are suppose to live in a country where we are innocent til proven guilty. Everyone has taken the bait of the director and changed the focus away from what we should be asking, "how can a major foreign company contact him directly during non traditional duty hours and he take action without any actual proof of wrongdoing?" Did he even discuss this issue with his recently appointed COO prior to taking action? Two weeks in the job and she has the ability to do that much? Peeps da truth is not where this is being steered. Releasing information to the media was a calculated decision to misdirect attention. Someone please ask the right questions and look in the right direction.

www.washingtoncitypaper.com/blogs/looselips/2012/06/11/health-care-finance-coo-fired-over-contract-steering-allegations/          4/6

JA 833

**hymesb**                                                                                    #16
June 13th, 2012
1:35 pm

Dwiggins...please.....Bill Lightfoot. And that isnt on Muriel....it is on Lightfoot. Funny how people keep skirting around that name. Sorry dude...lets not shoot at the little guy...go for the established ex-city councilman.

**hymesb**                                                                                    #17
June 13th, 2012
1:39 pm

Again, Darrly Wiggins is a bagman for Lightfoot. Dont sit around and try to crusify the little guys. Lightfoot pushes these buttons. Muriel does not have the tenure to pull this type of crap. Lightfoot does...and he uses these young people as his fronts. Now, you want to blow up Muriel by association with Lightfoots bagman.

Hey Feds....Lightfoot....Lightfoot.....Lightfoot....put him under the gun and you will really know what the deal is. Lindenfield is an operations guy...Lightfoot is the strategist....and one that rides both sides of the fence on every issue.

**hymesb**                                                                                    #18
June 13th, 2012
1:56 pm

And Lightfoot.....skrew you and them damn Mamie dolls that you have posted around your very nice home. You skrew people and hide like a punk. Ha ha ha!!!!! I know it is you....son!

**Brothers**                                                                                  #19
June 13th, 2012
2:48 pm

DHCF needs to be investigated! Period. Recently, they hired a MARYLAND firm, The Chappelle Group, to come in and find money. Okay. Well, I thought DC firms were given first preference.

From what I gathered the dude who runs the Chappelle Group, Jamal Chappelle, has been slapped with a personal tax lien and has an open case of second degree assault according to the public records of Maryland. Now, if he cannot handle his personal finances why in the world is he trying to find money for DHCF? From other intelligence I gathered the MARYLAND firm used the namesake of Terry Hairston, a former member of the DC School Board who was slain at the hands of two young women in a situation of "pay for play" going bad. This is all according to news reports and such.

Well, as it turns out Terry Hairston was "good friends" with Marion Barry according to Barry's on the record comment during a hearing at the end 2011 where Chappelle testified and claimed that Terry Hairston was his "brother." REALLY NOW!!!! Chappelle, your long-faced ghetto behind actually put that on the record...what an idiot...that Hairston is your brother. Is this how the Chappelle Group, a Maryland firm, easily obtained the contract at DCHF? Because Jamal Chappelle is supposedly the brother of a past good friend of Marion Barry.

C'mon Machen, Let's GO Man...Get on this!!

**Rubin**                                                                                     #20
June 13th, 2012
11:11 pm

kudos to DHCF director for saying no to old practices & established cronies and cleaning house!!!

health reform contracts should be awarded to smart dc companies and healthcare experts... not to document management companies!

**deborah**                                                                                   #21
June 13th, 2012
11:44 pm

Please people don't be fooled another second. I smell a dead RAT, Wayne Turnage use to work for Councilmember David Catania, this is clearly a smoke screen to take the heat off of

**JA 834**

10/22/13                    Health Care Finance COO Fired Over Contract Steering Allegations - Loose Lips

USCA Case #16-7077 Catania and all the alleged contacts that he gave away to his friends. Health Care 227 of 289
                 Finance is full of wrong doings by Mr. Catania, one of the reasons he wants Ghandi fired so
                 bad is because Ghandi's office knows where all the bodies are buried.

                           Subscribe to the comments on this article.

## Blogs Linking to this Article

**Linked From:**        Dept of Health Care Finance official fired over Exchange contract allegations «
                        Pulse Perspectives
June 12th, 2012
    9:20 am             [...] also said she only learned about the reasons for her dismissal after they were first
                        reported by Washington City Paper on Monday. Campbell said she suspects that she may be
                        the victim of a politically motivated attack [...]

**Linked From:**        - eHealthCare.com

November 1st, 2012      [...] Department of Health Care Finance is suing the city for wrongful termination, saying
    2:02 pm             she was fired, defamed, and humiliated for pointing out problems withArticle source: [...]

**Linked From:**        Another anti-SLAPP Motion Filed In Response to Former DC Official's
                        Defamation Suit | D.C. Anti-SLAPP Law
January 14th, 2013
    1:15 pm             [...] complaint alleges that, in a June 11, 2012 column in the City Paper, it was reported
                        that two of the defendants, who were allegedly in discussions to provide services [...]

---

SUBSCRIBE TO DISTRICT LINE DAILY      | Email Address |      | SUBSCRIBE |

---



Advertising | Work Here | Freelancer's Guide | Internships | Find a Paper | Articles and Back Issues |
Corrections | Masthead | Contact Info
© CL Washington, Inc. All Rights Reserved. | Privacy Policy

www.washingtoncitypaper.com/blogs/looselips/2012/06/11/health-care-finance-coo-fired-over-contract-steering-allegations/                    6/6

JA 835

# The Washington Post

Back to previous page

# D.C. official is fired over contract allegations

By Tim Craig, Published: June 12, 2012

A top deputy of the District agency that oversees billions of dollars of federal and local health-care spending was fired this week after she was accused of trying to steer a lucrative city contract to favored minority business vendors, according to documents reviewed by The Washington Post.

Jennifer Campbell, a four-year employee at the D.C. Department of Health Care Finance and the agency's most recent chief operating officer, was dismissed Monday after she was placed on administrative leave last week, city officials said. Agency Director Wayne Turnage confirmed Campbell's termination but declined to comment further, calling it a "personnel matter."



But documents indicate that Turnage was concerned that Campbell attempted to steer part of a pending contract to create a health-care exchange to Darryl Wiggins, a businessman who chairs the reelection campaign of D.C. Council member Muriel Bowser (D-Ward 4).

The federally funded health-care exchange, set to be put out for bid this summer, is part of the District's compliance with the federal health-care overhaul signed by President Obama in 2010.

The dismissal demonstrates the growing sensitivity within city government over allegations of improper or unethical behavior after two council members pleaded guilty and resigned over wrongdoing during the past six months. A separate federal probe of Mayor Vincent C. Gray's 2010 campaign continues.

"I have been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange network," Turnage wrote Gray administration officials. "Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in DHCF contracting office that will ensure a successful bid if they of course partner with the right persons."

Turnage has asked the D.C. inspector general to investigate the matter.

In an interview, Campbell strongly denied that she was attempting to steer a contract and said she met with Wiggins only once — at a meeting arranged by Turnage.

Campbell also said she only learned about the reasons for her dismissal after they were first reported by Washington City Paper on Monday. Campbell said she suspects that she may be the victim of a politically motivated attack after she questioned a separate exchange contract that a potential bidder was attempting to obtain.

"I think the truth will come out," Campbell said. "I am between being disturbed and being hurt. I would think when allegations are made by vendors who certainly have something to gain ... I would at least be given due process, but I was not given due process."

At issue, according to correspondence between Turnage and administration officials, is how various companies have jockeyed to potentially bid on the contract. The exchange, estimated to cost $70 million to set up, is designed to be a one-stop online portal where District residents can compare insurance options and then purchase one.

CGI, an international information technology company, had emerged as a leading contender for the contract. But under city rules, 35 percent of the contract's value must go to a certified local disadvantaged business.

On June 3, Turnage wrote to his chief of staff that a senior CGI official called him to say the company was being pressured into partnering with Document Managers, a business owned by Wiggins.

"A call came from VP of CGI that she had been contacted, unsolicited by Jennifer Campbell, our chief operating officer," Turnage wrote. "In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman named Darryl Wiggins as a minority partner."

Turnage added: "CGI's vice-president said ... this was a very difficult and awkward situation and is understandably concerned about the potential ramifications."

Campbell and Wiggins say they are baffled that such an assertion would be made.

"I can say that is not true, and that the allegation is unfounded," Campbell said. "I do not know Mr. Wiggins. I can say I have met him, did meet with him, but met with him during a meeting Director Turnage had called."

Campbell said Document Managers was one of several companies that Turnage invited to his office this spring for a meet and greet to discuss the upcoming exchange contract.

In May, Turnage held another round of meet and greets for companies that may be interested in the contract, including CGI, Campbell said. During that meeting, Campbell said Turnage appointed her as the liaison between the firms and the office.

A few days later, Campbell said she got a call from Holly Klug, a CGI vice president, inquiring about the credibility of potential local minority partners.

Campbell said she didn't recognize several companies on Klug's list but told her that Document Managers has "done business with the District and I believe have done business with DHCF."

"All I really did is answer their questions about minority business enterprises and how they can find out more about them," Campbell recalled.

Klug did not return calls seeking comment.

Wiggins is also perplexed by Campbell's firing. It puts Wiggins, an influential adviser to Bowser, in a major rift with the Gray administration just as Bowser has begun sending signals she may run for mayor in 2014.

Wiggins said he initially wanted to partner with Dell to bid on the exchange contract. But he said professional colleagues introduced him to CGI, which had recently won contracts to launch health exchanges in other states.

Wiggins, who stressed he was just part of a team of local businesses exploring a partnership with CGI, said he met with Klug, who told him that she "had a meeting coming up with Jennifer Campbell and was going to ask Jennifer Campbell about our company to see if we were reputable."

Last month, he said, he met Klug to begin forming a "teaming agreement." But Wiggins said the deal collapsed about 10 days ago after Klug told him the "D.C. government is unethical."

Campbell said she suspects CGI went to Turnage to retaliate against her because she said she did not quickly approve a separate health information technology contract it was bidding on.

"I thought there were some things on it that needed to be cleaned up" before the contract was approved, Campbell said.

Wiggins visited Turnage in his office last week, according to an e-mail Turnage sent to Gray's chief of staff, Christopher Murphy.

"He felt his reputation was under attack," Turnage wrote. "I closed the meeting by telling Mr. Wiggins that it was my job to protect the integrity of the contracting process for one of the District's most significant procurements and, because of that, we take the charges against Jennifer quite seriously."





The Motley Fool

© The Washington Post Company

 

GOVERNMENT OF THE DISTRICT OF COLUMBIA
**Department of Human Resources**

June 11, 2012

Dr. Jennifer Campbell
3722 26th Street, NE
Washington, DC 20018

Dear Dr. Campbell:

In accordance with Section 907 of Chapter 9 of the D.C. Personnel Regulations, Excepted
Services, this constitutes advance notice of at least fifteen-day (15-day) of your separation from
your Excepted Services appointment, of which you serve as the Chief Operating Officer, ES-
341-10, with the Department of Health Care Finance (DHCF). The effective date of your
separation from District service will be June 26, 2012. This action supersedes any prior
administrative action received. As you know, appointments to the Excepted Service serve at the
pleasure of the appointing personnel authority, and may be terminated at any time with or
without reason; and may not be appealed.

Please be advised that this action is being proposed for cause.

**The cause(s) for this adverse action is/are:**

**Cause(s):**

As Chief Operating Officer you acted inappropriately and violated District ethical standards cited
in Section 1810 of Chapter 18 of the District Personnel Manual by giving preferential treatment
to any person; impeding government efficiency or economy; and by affecting adversely the
confidence of the pubic in the integrity of the government.

**Specifications:**
1. On June 2, 2012 the Director of the Department of Health Care Finance (DHCF), Wayne
   Turnage received a call from a Vice-President (VP) of CGI informing him that she had
   been contacted, unsolicited, by you. You told the VP that it was in CGI's interest to take
   a look at Darryl Wiggins as a minority partner for the Level 2 grant for the District's
   Health Insurance Exchange. When asked by the VP, if Director Wayne Turnage was
   aware of this request, you told the VP that the request was coming from her and Director
   Turnage. You also told the VP that you were in charge of the process and not Mr.
   Turnage. Mr. Turnage was not aware of this request and would not have authorized such
   a request.

**JA 839**

2. On June 3, 2012, Mr. Turnage met with the owner of the minority firm, COMPASS. The owner informed Mr. Turnage that he had been approached by an employee, Cedrick Simon, who told him that he was sent by DHCF, "the client" and that he needed $250,000 as a salary to cover his expenses. The owner hired Mr. Simon but informed him that he was not going to pay the salary because it was too high. At a later meeting with DHCF, the owner of COMPASS reported that you approached him and made it very clear which employees in his organization should continue to have a job. You had the COMPASS organizational chart in your possess and pointed to persons who should stay, one of whom was Cedrick Simon. The owner of COMPASS worked to carve out a salary but Mr. Simon, but continued to resist Mr. Simon's demands to pay him $250,000. Shortly thereafter, COMPASS noted their payments from DHCF for services rendered began to be delayed. Mr. Simon later approached the owner of COMPASS and told him that he heard he was having problems with the Office of Contracts and Procurement and DHCF and indicated that he could fix the problems for him. Mr. Turnage was shown text messages sent to COMPASS from Mr. Simon requesting funds for events that Mr. Simon and others were sponsoring. One of the text messages Mr. Simon requested $20,000.

3. At the June 3rd meeting with the Mr. Turnage, COMPASS indicated that it was widely known that you have been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime contractor for the health insurance exchange. COMPASS also indicated that COMPASS and CGI were considering a partnership until CGI called and informed COMPASS they would not be partnering with CGI pursuant to instructions received from you.

In summary, employees of the District government shall at all times maintain a high level of ethical conduct in connection with the performance of official duties, and shall refrain from taking, ordering, or participating in any official action which would adversely affect the confidence of the public in the integrity of the District government. Your actions with regards to steering contractors/potential contractors to work with a specific organization; suggesting and/or requiring a contractor to hire specific individuals; and organizing a team of individuals to bid on a forthcoming request for proposal to be issued by DHCF each serve as violations of the District's ethical standards and are the basis for your separation for cause from your position.

Effective immediately, you will be placed on administrative leave with pay, and will remain in this status through the effective date of your separation. You will continue to accrue both annual and sick leave during this period.

**JA 840**

You are to immediately return all building keys, office keys, security badge(s), pass card(s), cell phone(s), and any and all government property issued to you as a District government employee to your office manager. This includes all District Government paper-based or computer-based documents contained on computer disks, hard drives, storage drives and on any other type of electronic media containing such documents, in your possession.

Pursuant to D.C. Official Code § 1-609.03 (f) (2006 Repl.), you are not entitled to receive separation pay. Payment of any unused annual or universal leave will also be disbursed as a lump sum with the standard deductions for applicable taxes and withholdings. The separation pay and annual leave checks will be issued separately. No deductions will be made from either payment for retirement or other benefits. Final payout will be withheld until all property has been received.

A copy of this letter will be forwarded to the Office of Pay and Retirement Services (OPRS) for appropriate action. Any questions regarding payment dates should be directed to Diane Gidderon, Special Pay Officer, OPRS, at (202) 741-8630. Please contact Nicole Cook, D.C. Department of Human Resources, Office of the Director, at (202) 442-9676 to schedule an exit interview.

Thank you for your service to the District of Columbia government.

Sincerely,

Shawn Y. Stokes
Director

cc: Diane Gidderon, Special Pay Officer, OPRS
    Official Personnel Folder

### ACKNOWLEDGEMENT OF RECEIPT

_____          _____
Employee Signature                              Date


_____          _____
Witness                                         Date

**JA 841**

| From: | Otero, BB (EOM) <BB.otero@dc.gov> |
| Sent: | Sunday, June 10, 2012 11:30 PM |
| To: | Turnage, Wayne (DHCF) |
| Subject: | Re: Official Heads Up |

Sorry I missed your call. Will call first thing tomorrow

**From:** Turnage, Wayne (DHCF)
**To:** Murphy, Christopher (EOM); Otero, BB (EOM); Stokes, Shawn (DCHR)
**Cc:** Byrd, Melisa (DHCF); Elam, Linda (DHCF); Nathan, Ganayswaran (DHCF)
**Sent:** Sun Jun 10 23:04:40 2012
**Subject:** Official Heads Up

All --
I received a call from Alan Suderman of the Washington City Paper tonight around 10:00pm, informing me that he had 3 of the emails that I sent on the Jennifer Campbell issue. My efforts to ascertain how these emails came into his possession were, of course, not successful. He will run with this story at 10:00am on Monday. I did not go on record with any comments but emphasized to him that these were allegations. Of course, he smartly asked the next question of why I was proceeding with a dismissal based on allegations. I told him that the work of Health Care Reform is some of the most important in the District and we could not afford even a hint of wrong doing.

He promised to call me on Monday with a broad outline of his story before he ran with it. From what I could determine, he will pursue the Darryl Wiggins angle in this story aggressively.

I have no idea how he got the emails as the distribution has been quite limited. Looking for the proverbial silver lining, this shows that when a problem was brought to our attention we acted decisively, choosing to error on the side of protecting the integrity of the contracting process for this very important project.

WT
**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever. Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

DC Campbell 004620

**JA 842**

| From: | Murphy, Christopher (EOM) <christopher.murphy@dc.gov> |
| Sent: | Thursday, June 07, 2012 2:56 PM |
| To: | Ribeiro, Pedro (EOM) |
| Subject: | Re: how we doing on |

Wowser. Let's talk.

**From:** Ribeiro, Pedro (EOM)
**To:** Murphy, Christopher (EOM)
**Sent:** Thu Jun 07 14:50:52 2012
**Subject:** FW: how we doing on

Word travels fast in this town...

**From:** Alan Suderman [mailto:asuderman@washingtoncitypaper.com]
**Sent:** Thursday, June 07, 2012 2:26 PM
**To:** Ribeiro, Pedro (EOM)
**Subject:** how we doing on

Dr. Jennifer Campbell?

--
Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

DC Campbell 004621

**JA 843**

--

Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 10, 2012 10:09 PM
**To:** Alan Suderman
**Subject:** RE: my email

Alan,

Since you have this email, I am correcting a name that was incorrectly
mentioned when it was orignially sent.  The correct name is spelled out below
in bold.

Also, you should know -- on background of course -- that I have directed my
staff to call every vendor under contract to DHCF for health care reform and
inform them that if they have been instructed to hire any individual or engage
in partnership discussions with any firm, those instructions were inappropriate
and unethical and they should feel free to terimnate those employees and end
those discussions without fear of retribution.

Finally, if you use any of this email, please emphasize my last stateement, "It
goes without saying that this process should be conducted confidentially for
the protection of both the agency and out of respect for Jennifer's potential
innocence.  I appreciate your assistance in this matter."

I am checking the other emails now.

WT

_____

The purpose of this email is to inform you of an emerging personnel issue and
request your assistance in my investigation of same.  Today I received a call
from a Vice President of CGI informing me that she had been contacted,

**JA 844**

unsolicited, by Jennifer Campbell, our Chief Operating Officer. In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman, Darryl Wiggins, as a minority partner. When CGI's VP asked if I were aware of this, Jennifer reportedly told her that the request is coming from both me and her and that she was in charge of this process, not me. CGI's Vice President said that in her entire career she has never been approached that way by a government entity involved in a procurement. She said this was a very difficult and awkward situation and is understandably concerned about the potential ramifications.

Related to this, I was shown an email by a lobbyist for CGI. The email was from Darryl Wiggins to the CGI VP and he offered a scenario where he could work with CGI on a joint venture in a bid for the District's Exchange business. In the email he admits to being unqualified but stated that his share would be 51% and CGI's 49% and that as a District resident he has seen this work before.

I have also been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange work. Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in DHCF's contracting office that will ensure a successful bid if they of course partner with the right persons.

As you might imagine, this is all very troubling and potentially very damaging to our efforts to implement a competitive RFP process for the insurance exchange that is above reproach. Before I make a final decision on Jennifer's future I need to interview CGI's Vice President and the head of Compass Consulting who was allegedly approached by a **Cedrick Simon** offering a deal. However, we must take immediate steps to protect the integrity of DHCF and our contracting process. Accordingly, I would like the following actions taken immediately:

- June 5th. Schedule a meeting in my office with Jennifer. You should be in attendance. At this meeting, I will inform her of the allegations and relieve her of all responsibilities associated with Health Care Reform, the participation on any teams formed to select vendors for any purpose, and forbid her from having contact with any vendors interested in doing business with DHCF;

**JA 845**

- June 5th. Following our meeting with Jennifer I would like you to contact Director Stokes and explain the issue, let her know that we are interviewing relevant parties, and inform her that we will be seeking her guidance once we complete our investigation of the facts;

- June 5th. Schedule a meeting with Bonnie Norton and Linda Elam in my office. At this meeting we will inform Bonnie that as Acting Director she is to begin reporting to Linda Elam immediately. By the close of business on June 5th, Bonnie should be instructed to contact all vendors on June 5th who have inquired about bidding on the exchange and inform them that effective immediately she is the point of contact for all questions and potential meetings with DHCF staff about the solicitation process for the exchange.

- Week of June 5th. I will schedule a meeting with the Vice President of CGI this week which you are to attend with me. The purpose of this meeting is to get all of the details on her conversation with Jennifer – context, tone, precise language.

- June 9th. Get on my calendar to review all the facts that we have acquired, develop a preliminary report on our findings, and schedule a meeting in the following week with Director Stokes.

- Week of June 12th. Meet with Director Stokes to discuss a final decision regarding Jennifer's role and future at DHCF.

  It goes without saying that this process should be conducted confidentially for the protection of both the agency and out of respect for Jennifer's potential innocence. I appreciate your assistance in this matter.

  Thanks
  WT

asuderman@washingtoncitypaper.com
(202) 650-6951

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 10, 2012 10:21 PM
**To:** Alan Suderman
**Subject:** RE: my email

Alan,

Since you have this email I note that these are allegations and I would prefer that you simply not make reference to the following, *"Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire"*. These are all allegations and frankly if this is mere speculation by those who told me, it could do serious damage to Jennifer and her family. Off the record, I did not necessarily believe this allegation but was duty bound to report it to my superiors. Please do not use it. If I ever get confirmation of this relationship, I promise to let you know.

WT

_____
_____

_____

The following updates the actions we have taken regarding Jennifer Campbell:

At 11:00am today, Jennifer was informed that she was being placed on administrative leave pending the completion of an investigation of her activities as Chief Operating Officer. My COS along with a DCHR staff member handled the meeting.

She seemed shocked and wanted to know what the allegations were so that she could defend herself. My COS broadly outlined the issues, collected and disconnected Jennifer from all of DHCF's property, and escorted her out of the building.

She later sent my COS an email asking for a meeting with me and Linda Elam because she does not want us to believe she "let us down." Curiously, although I am her supervisor, I have not received an,

Case 1:12-cv-01769-RC   Document 24-2   Filed 09/02/14   Page 53 of 66

**EXHIBIT F**

email, text, or phone call from her since she was ordered back to DC from a conference in Nashville Sunday night.

I met separately with two vendors -- COMPASS and CGI -- to get in-person reports. I was told again that Jennifer directed these companies to hire or partner with certain individuals or firms and took retaliatory action if push back occurred. Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire.

After my meeting with the two firms, they took immediate action against Mr. Wiggins, terminating contact and any discussion of a partnership. COMPASS fired one of the employees that the owner was directed to hire. He reported to me that the meeting was held at 4:30pm and it was obvious the employee knew that Jennifer had been sent home -- an indication that she likely called him.

This concludes my investigation of this issue and I will inform Director Stokes that I am firing Jennifer Campbell. We plan to send her notice of this action as soon as DCHR informs me that I can.

I have also spoken with Director Staton and my staff are also reaching out to all of our contractors to inform them that we have a new point of contact at DHCF. In addition, we are checking on whether they experienced any irregularities in dealing with DHCF.

I will also report this incident to OIG as directed by the OCP.

**From:** Alan Suderman [asuderman@washingtoncitypaper.com]
**Sent:** Sunday, June 10, 2012 9:54 PM
**To:** Turnage, Wayne (DHCF)
**Subject:** my email

--
Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

**JA 848**

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 10, 2012 10:09 PM
**To:** Alan Suderman
**Subject:** RE: my email

Alan,

Since you have this email, I am correcting a name that was incorrectly mentioned when it was orignially sent. The correct name is spelled out below in bold.

Also, you should know -- on background of course -- that I have directed my staff to call every vendor under contract to DHCF for health care reform and inform them that if they have been instructed to hire any individual or engage in partnership discussions with any firm, those instructions were inappropriate and unethical and they should feel free to terimnate those employees and end those discussions without fear of retribution.

Finally, if you use any of this email, please emphasize my last stateement, "It goes without saying that this process should be conducted confidentially for the protection of both the agency and out of respect for Jennifer's potential innocence. I appreciate your assistance in this matter."

I am checking the other emails now.

WT

_____

The purpose of this email is to inform you of an emerging personnel issue and request your assistance in my investigation of same. Today I received a call from a Vice President of CGI informing me that she had been contacted, unsolicited, by Jennifer Campbell, our Chief Operating Officer. In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman, Darryl Wiggins, as a minority partner. When CGI's VP asked if I were aware of this, Jennifer reportedly told her that the request is coming from both me and her and that she was in charge of this process, not me. CGI's Vice President said that in her entire career she has never been approached that way by a government entity involved in a procurement. She said this was a very difficult and awkward situation and is understandably concerned about the potential ramifications.

Related to this, I was shown an email by a lobbyist for CGI. The email was from Darryl Wiggins to the CGI VP and he offered a scenario where he could work with CGI on a joint venture in a bid for the District's Exchange business. In the email he admits to being unqualified but stated that his share would be 51% and CGI's 49% and that as a District resident he has seen this work before.

I have also been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange work. Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in DHCF's contracting office that will ensure a successful bid if they of course partner with the right persons.

As you might imagine, this is all very troubling and potentially very damaging to our efforts to implement a competitive RFP process for the insurance exchange that is above reproach. Before I make a final decision on Jennifer's future I need to interview CGI's Vice President and the head of Compass Consulting who was allegedly approached by a **Cedrick Simon** offering a deal. However, we must take immediate steps to protect the integrity of DHCF and our contracting process. Accordingly, I would like the following actions taken immediately:

- June 5th. Schedule a meeting in my office with Jennifer. You should be in attendance. At this meeting, I will inform her of the allegations and relieve her of all responsibilities associated with Health Care Reform, the participation on any teams formed to select vendors for any purpose, and forbid her from having contact with any vendors interested in doing business with DHCF;

- June 5th. Following our meeting with Jennifer I would like you to contact Director Stokes and explain the issue, let her know that we are interviewing relevant parties, and inform her that we will be seeking her guidance once we complete our investigation of the facts;

- June 5th. Schedule a meeting with Bonnie Norton and Linda Elam in my office. At this meeting we will inform Bonnie that as Acting Director she is to begin reporting to Linda Elam immediately. By the close of

business on June 5th, Bonnie should be instructed to contact all vendors on June 5th who have inquired about bidding on the exchange and inform them that effective immediately she is the point of contact for all questions and potential meetings with DHCF staff about the solicitation process for the exchange.

- Week of June 5th. I will schedule a meeting with the Vice President of CGI this week which you are to attend with me. The purpose of this meeting is to get all of the details on her conversation with Jennifer – context, tone, precise language.

- June 9th. Get on my calendar to review all the facts that we have acquired, develop a preliminary report on our findings, and schedule a meeting in the following week with Director Stokes.

- Week of June 12th. Meet with Director Stokes to discuss a final decision regarding Jennifer's role and future at DHCF.

  It goes without saying that this process should be conducted confidentially for the protection of both the agency and out of respect for Jennifer's potential innocence. I appreciate your assistance in this matter.

  Thanks
  WT

---

**From:** Turnage, Wayne (DHCF)
**Sent:** Sunday, June 03, 2012 12:49 AM
**To:** Byrd, Melisa (DHCF)
**Cc:** Otero, BB (EOM)
**Subject:** PERSONNEL ISSUE

Melisa:

The purpose of this email is to inform you of an emerging personnel issue and request your assistance in my investigation of same. Today I received a call from a Vice President of CGI informing me that she had been contacted,

**JA 851**

--

Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

--

Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 10, 2012 10:48 PM
**To:** Alan Suderman
**Subject:** RE: my email

Alan --

Aside from a few typos and syntax issues that I have tried to clean up, this email is fine but a little dated. Since you already have the email, I would clarify that the meeting with Jennifer was moved from Thursday to this Monday. Also, off the record, my recommendation for a non cause termination was rejected so this will be for cause. We will try to get in touch with Jennifer by 9:00am so that she will have this information before your story comes out. Finally, I appreciate your heads up and thank you again for not using the Cedrick Simon stuff.

WT

All -

I received an email from Darryl Wiggins requesting a meeting and in came in Tuesday evening. Mr. Wiggins was one of the individuals who, according to CGI, they were directed by Jennifer Campbell to develop a partnership to pursue the Exchange contract.

USCA Case #16-7077     Document #1674230          Filed: 05/08/2017     Page 245 of 289
Case 1:12-cv-01769-RC   Document 24-2   Filed 09/02/14   Page 48 of 66

EXHIBIT F

Mr. Wiggins opened the meeting by explaining that all of his business opportunities were drying up and he wanted to know what was going on. He was told that "Jennifer had been let go", he felt his reputation was under attack, and stated that he had done nothing wrong.

I explained to Mr. Wiggins that we had reason to believe that Jennifer had directed certain contractors to steer business towards some minority firms and away from others. I told him that I was in the process of contacting all of our contractors to let them know that if they had been directed by DHCF to partner with or hire anyone, they should ignore that direction. If they had already engaged an employee forced upon them, they should feel free to fire them without fear of retribution.

He immediately complained that CGI had contacted him but they had not been coerced. He said the tension in his relationship with CGI was due to the fact that he was asking for a joint venture with a majority share. He argued the CGI was pushing back and decided to use this tactic to get him out of the process. He said he had emails which illustrated CGI was considering engaging him to bid on the Exchange contract. I informed him that the emails only show they were talking; they do not disprove that the talks were not mandated by Jennifer Campbell.

I reiterated that I never told any of our contractors to avoid doing business with any person in particular and thus found it odd that the day after I gave assurances to CGI that we were not pushing any minority vendors, Mr. Wiggins received a call from the company terminating the relationship. I asked him why would a company go through the trouble of falsely accusing a District employee **to get out of** discussions about a possible business partnership when all they had to do was say no thanks and show him the door. He said that CGI realized that he had put together a formidable team and that would have no basis for abandoning the idea of a partnership so they needed to manufacture a reason.

About three-quarters of the way through the meeting I asked him if he knew Jennifer Campbell and when did they meet. He told me he met her for the 1st time when his company presented a demo that I attended with Nathan and Jennifer about six weeks ago.

DHCF FY14-03          - 13 -

**JA 853**

However, a little later in the meeting I asked him if he knew Cedrick Simon – the individual with whom Jennifer Campbell is alleged to have a relationship and who one contractor was ordered to hire. The question seemed to catch him off guard. He paused and said yes he knew Cedrick. I then asked him what was the nature of the relationship between Jennifer and Sedrick and he looked away and said it was a "business relationship". (Of course I wondered how he knew about the type of relationship they had if he did not know Jennifer.)

At one point in the meeting my COS put her blackberry on the table and touched the toggle button and he angrily asked her if she was recording the conversation.

I closed the meeting by telling Mr. Wiggins that it was my job to protect the integrity of the contracting process for one of the District's most significant procurements and that because of that we took the charges against Jennifer quite serious. I assured him that I would not demand that contractors not work with him as DHCF will not be making any recommendations to contractors.

### Next Steps

I will meet with Jennifer Campbell on Thursday. In the interim, we will hand deliver a letter to the OIG on Wednesday, officially referring the case to that agency. I was informed to keep the letter very general.

I have also informed Director Stokes that I would like this to be a non-cause termination. Because Jennifer Campbell is at-will, a non-cause termination is the least complicated and if effectively forecloses any legal options she would have to challenge the dismissal. As soon as I get clearance from Director Stokes we will process Jennifer's letter of termination.

**From:** Alan Suderman [asuderman@washingtoncitypaper.com]
**Sent:** Sunday, June 10, 2012 9:54 PM
**To:** Turnage, Wayne (DHCF)
**Subject:** my email

--
Alan Suderman
Loose Lips Columnist

Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 10, 2012 10:24 PM
**To:** Alan Suderman
**Subject:** RE: my email

Thanks so very much!!!! Checking one more email.......

**From:** Alan Suderman [asuderman@washingtoncitypaper.com]
**Sent:** Sunday, June 10, 2012 10:22 PM
**To:** Turnage, Wayne (DHCF)
**Subject:** Re: my email

I won't use it. Thanks.

On Sun, Jun 10, 2012 at 10:21 PM, Turnage, Wayne (DHCF) <wayne.turnage@dc.gov> wrote:
Alan,

Since you have this email I note that these are allegations and I would prefer that you simply not make reference to the following, *"Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire"*. These are all allegations and frankly if this is mere speculation by those who told me, it could do serious damage to Jennifer and her family. Off the record, I did not necessarily believe this allegation but was duty bound to report it to my superiors. Please do not use it. If I ever get confirmation of this relationship, I promise to let you know.

WT

_____
_____

_____
The following updates the actions we have taken regarding Jennifer Campbell:

At 11:00am today, Jennifer was informed that she was being placed on administrative leave pending the completion of an investigation of her activities as Chief Operating Officer. My COS along with a DCHR staff member handled the meeting.

**JA 855**

She seemed shocked and wanted to know what the allegations were so that she could defend herself. My COS broadly outlined the issues, collected and disconnected Jennifer from all of DHCF's property, and escorted her out of the building.

She later sent my COS an email asking for a meeting with me and Linda Elam because she does not want us to believe she "let us down." Curiously, although I am her supervisor, I have not received an, email, text, or phone call from her since she was ordered back to DC from a conference in Nashville Sunday night.

I met separately with two vendors -- COMPASS and CGI -- to get in-person reports. I was told again that Jennifer directed these companies to hire or partner with certain individuals or firms and took retaliatory action if push back occurred. Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire.

After my meeting with the two firms, they took immediate action against Mr. Wiggins, terminating contact and any discussion of a partnership. COMPASS fired one of the employees that the owner was directed to hire. He reported to me that the meeting was held at 4:30pm and it was obvious the employee knew that Jennifer had been sent home -- an indication that she likely called him.

This concludes my investigation of this issue and I will inform Director Stokes that I am firing Jennifer Campbell. We plan to send her notice of this action as soon as DCHR informs me that I can.

I have also spoken with Director Staton and my staff are also reaching out to all of our contractors to inform them that we have a new point of contact at DHCF. In addition, we are checking on whether they experienced any irregularities in dealing with DHCF.

I will also report this incident to OIG as directed by the OCP.

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

reform. Should you have any questions about this matter, please do not hesitate to contact me.

Thank You
Wayne Turnage

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 10, 2012 11:20 PM
**To:** Alan Suderman
**Subject:** On Background
**Importance:** High

On background, I think it is important to note that Jennifer has been at DHCF since 2009. She received a promotion to the Excepted Service position of Chief Operating Officer on May 7th and the Administration's vetting process was not yet complete.

**From:** Alan Suderman [asuderman@washingtoncitypaper.com]
**Sent:** Sunday, June 10, 2012 10:22 PM
**To:** Turnage, Wayne (DHCF)
**Subject:** Re: my email

I won't use it. Thanks.

On Sun, Jun 10, 2012 at 10:21 PM, Turnage, Wayne (DHCF) <wayne.turnage@dc.gov> wrote:
Alan,

Since you have this email I note that these are allegations and I would prefer that you simply not make reference to the following, *"Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire"*. These are all allegations and frankly if this is mere speculation by those who told me, it could do serious damage to Jennifer and her family. Off the record, I did not necessarily believe this allegation but was duty bound to report it to my superiors. Please do not use it. If I ever get confirmation of this relationship, I promise to let you know.



DHCF FY13-12        - 106 -

**JA 857**

WT

_____

_____

The following updates the actions we have taken regarding Jennifer Campbell:

At 11:00am today, Jennifer was informed that she was being placed on administrative leave pending the completion of an investigation of her activities as Chief Operating Officer. My COS along with a DCHR staff member handled the meeting.

She seemed shocked and wanted to know what the allegations were so that she could defend herself. My COS broadly outlined the issues, collected and disconnected Jennifer from all of DHCF's property, and escorted her out of the building.

She later sent my COS an email asking for a meeting with me and Linda Elam because she does not want us to believe she "let us down." Curiously, although I am her supervisor, I have not received an, email, text, or phone call from her since she was ordered back to DC from a conference in Nashville Sunday night.

I met separately with two vendors -- COMPASS and CGI -- to get in-person reports. I was told again that Jennifer directed these companies to hire or partner with certain individuals or firms and took retaliatory action if push back occurred. Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire.

After my meeting with the two firms, they took immediate action against Mr. Wiggins, terminating contact and any discussion of a partnership. COMPASS fired one of the employees that the owner was directed to hire. He reported to me that the meeting was held at 4:30pm and it was obvious the employee knew that Jennifer had been sent home -- an indication that she likely called him.

This concludes my investigation of this issue and I will inform Director Stokes that I am firing Jennifer Campbell. We plan to send her notice of this action as soon as DCHR informs me that I can.

I have also spoken with Director Staton and my staff are also reaching out to all of our contractors to inform them that we have a new point of contact at DHCF. In addition, we are checking on whether they experienced any irregularities in dealing with DHCF.

I will also report this incident to OIG as directed by the OCP.

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever. Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

**From:** Alan Suderman [asuderman@washingtoncitypaper.com]
**Sent:** Sunday, June 10, 2012 9:54 PM
**To:** Turnage, Wayne (DHCF)
**Subject:** my email

--
Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

--
Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 10, 2012 10:48 PM

**JA 859**

**To:** Alan Suderman
**Subject:** RE: my email

Alan --

Aside from a few typos and syntax issues that I have tried to clean up, this email is fine but a little dated. Since you already have the email, I would clarify that the meeting with Jennifer was moved from Thursday to this Monday. Also, off the record, my recommendation for a non cause termination was rejected so this will be for cause. We will try to get in touch with Jennifer by 9:00am so that she will have this information before your story comes out. Finally, I appreciate your heads up and thank you again for not using the Cedrick Simon stuff.

WT

_____

All -

I received an email from Darryl Wiggins requesting a meeting and in came in Tuesday evening. Mr. Wiggins was one of the individuals who, according to CGI, they were directed by Jennifer Campbell to develop a partnership to pursue the Exchange contract.

Mr. Wiggins opened the meeting by explaining that all of his business opportunities were drying up and he wanted to know what was going on. He was told that "Jennifer had been let go", he felt his reputation was under attack, and stated that he had done nothing wrong.

I explained to Mr. Wiggins that we had reason to believe that Jennifer had directed certain contractors to steer business towards some minority firms and away from others. I told him that I was in the process of contacting all of our contractors to let them know that if they had been directed by DHCF to partner with or hire anyone, they should ignore that direction. If they had already engaged an employee forced upon them, they should feel free to fire them without fear of retribution.

He immediately complained that CGI had contacted him but they had not been coerced. He said the tension in his relationship with CGI was due to the fact that

**JA 860**

he was asking for a joint venture with a majority share. He argued the CGI was pushing back and decided to use this tactic to get him out of the process. He said he had emails which illustrated CGI was considering engaging him to bid on the Exchange contract. I informed him that the emails only show they were talking; they do not disprove that the talks were not mandated by Jennifer Campbell.

I reiterated that I never told any of our contractors to avoid doing business with any person in particular and thus found it odd that the day after I gave assurances to CGI that we were not pushing any minority vendors, Mr. Wiggins received a call from the company terminating the relationship. I asked him why would a company go through the trouble of falsely accusing a District employee **to get out of** discussions about a possible business partnership when all they had to do was say no thanks and show him the door. He said that CGI realized that he had put together a formidable team and that would have no basis for abandoning the idea of a partnership so they needed to manufacture a reason.

About three-quarters of the way through the meeting I asked him if he knew Jennifer Campbell and when did they meet. He told me he met her for the 1st time when his company presented a demo that I attended with Nathan and Jennifer about six weeks ago.

However, a little later in the meeting I asked him if he knew Cedrick Simon – the individual with whom Jennifer Campbell is alleged to have a relationship and who one contractor was ordered to hire. The question seemed to catch him off guard. He paused and said yes he knew Cedrick. I then asked him what was the nature of the relationship between Jennifer and Sedrick and he looked away and said it was a "business relationship". (Of course I wondered how he knew about the type of relationship they had if he did not know Jennifer.)

At one point in the meeting my COS put her blackberry on the table and touched the toggle button and he angrily asked her if she was recording the conversation.

I closed the meeting by telling Mr. Wiggins that it was my job to protect the integrity of the contracting process for one of the District's most significant procurements and that because of that we took the charges against Jennifer quite serious. I assured him that I would not demand that contractors not work with him as DHCF will not be making any recommendations to contractors.

**Next Steps**

**JA 861**

I will meet with Jennifer Campbell on Thursday. In the interim, we will hand deliver a letter to the OIG on Wednesday, officially referring the case to that agency. I was informed to keep the letter very general.

I have also informed Director Stokes that I would like this to be a non-cause termination. Because Jennifer Campbell is at-will, a non-cause termination is the least complicated and if effectively forecloses any legal options she would have to challenge the dismissal. As soon as I get clearance from Director Stokes we will process Jennifer's letter of termination.

**From:** Alan Suderman [asuderman@washingtoncitypaper.com]
**Sent:** Sunday, June 10, 2012 9:54 PM
**To:** Turnage, Wayne (DHCF)
**Subject:** my email

--
Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 10, 2012 10:24 PM
**To:** Alan Suderman
**Subject:** RE: my email

Thanks so very much!!!! Checking one more email.......

**From:** Alan Suderman [asuderman@washingtoncitypaper.com]
**Sent:** Sunday, June 10, 2012 10:22 PM
**To:** Turnage, Wayne (DHCF)
**Subject:** Re: my email

I won't use it. Thanks.

On Sun, Jun 10, 2012 at 10:21 PM, Turnage, Wayne (DHCF) <wayne.turnage@dc.gov> wrote:
Alan,

**JA 862**

Since you have this email I note that these are allegations and I would prefer that you simply not make reference to the following, *"Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire"*. These are all allegations and frankly if this is mere speculation by those who told me, it could do serious damage to Jennifer and her family. Off the record, I did not necessarily believe this allegation but was duty bound to report it to my superiors. Please do not use it. If I ever get confirmation of this relationship, I promise to let you know.

WT

_____

_____

_____

The following updates the actions we have taken regarding Jennifer Campbell:

At 11:00am today, Jennifer was informed that she was being placed on administrative leave pending the completion of an investigation of her activities as Chief Operating Officer. My COS along with a DCHR staff member handled the meeting.

She seemed shocked and wanted to know what the allegations were so that she could defend herself. My COS broadly outlined the issues, collected and disconnected Jennifer from all of DHCF's property, and escorted her out of the building.

She later sent my COS an email asking for a meeting with me and Linda Elam because she does not want us to believe she "let us down." Curiously, although I am her supervisor, I have not received an, email, text, or phone call from her since she was ordered back to DC from a conference in Nashville Sunday night.

I met separately with two vendors -- COMPASS and CGI -- to get in-person reports. I was told again that Jennifer directed these companies to hire or partner with certain individuals or firms and took retaliatory action if push back occurred. Jennifer was alleged to be in a relationship with one of the individuals that she directed COMPASS to hire.

After my meeting with the two firms, they took immediate action against Mr. Wiggins, terminating contact and any discussion of a partnership. COMPASS fired one of the employees that the owner was directed to hire. He reported to me that the meeting was held at 4:30pm and it was obvious the employee knew that Jennifer had been sent home -- an indication that she likely called him.

This concludes my investigation of this issue and I will inform Director Stokes that I am firing Jennifer Campbell. We plan to send her notice of this action as soon as DCHR informs me that I can.

I have also spoken with Director Staton and my staff are also reaching out to all of our contractors to inform them that we have a new point of contact at DHCF. In addition, we are checking on whether they experienced any irregularities in dealing with DHCF.

I will also report this incident to OIG as directed by the OCP.

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever. Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

**From:** Alan Suderman [asuderman@washingtoncitypaper.com]
**Sent:** Sunday, June 10, 2012 9:54 PM
**To:** Turnage, Wayne (DHCF)
**Subject:** my email

--
Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

**JA 864**

Alan Suderman
Loose Lips Columnist
Washington City Paper
asuderman@washingtoncitypaper.com
(202) 650-6951

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 10, 2012 10:09 PM
**To:** Alan Suderman
**Subject:** RE: my email

Alan,

Since you have this email, I am correcting a name that was incorrectly mentioned when it was orignially sent. The correct name is spelled out below in bold.

Also, you should know -- on background of course -- that I have directed my staff to call every vendor under contract to DHCF for health care reform and inform them that if they have been instructed to hire any individual or engage in partnership discussions with any firm, those instructions were inappropriate and unethical and they should feel free to terimnate those employees and end those discussions without fear of retribution.

Finally, if you use any of this email, please emphasize my last stateement, "It goes without saying that this process should be conducted confidentially for the protection of both the agency and out of respect for Jennifer's potential innocence. I appreciate your assistance in this matter."

I am checking the other emails now.

WT

The purpose of this email is to inform you of an emerging personnel issue and request your assistance in my investigation of same. Today I received a call from a Vice President of CGI informing me that she had been contacted,

**JA 865**

unsolicited, by Jennifer Campbell, our Chief Operating Officer. In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman, Darryl Wiggins, as a minority partner. When CGI's VP asked if I were aware of this, Jennifer reportedly told her that the request is coming from both me and her and that she was in charge of this process, not me. CGI's Vice President said that in her entire career she has never been approached that way by a government entity involved in a procurement. She said this was a very difficult and awkward situation and is understandably concerned about the potential ramifications.

Related to this, I was shown an email by a lobbyist for CGI. The email was from Darryl Wiggins to the CGI VP and he offered a scenario where he could work with CGI on a joint venture in a bid for the District's Exchange business. In the email he admits to being unqualified but stated that his share would be 51% and CGI's 49% and that as a District resident he has seen this work before.

I have also been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange work. Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in DHCF's contracting office that will ensure a successful bid if they of course partner with the right persons.

As you might imagine, this is all very troubling and potentially very damaging to our efforts to implement a competitive RFP process for the insurance exchange that is above reproach. Before I make a final decision on Jennifer's future I need to interview CGI's Vice President and the head of Compass Consulting who was allegedly approached by a **Cedrick Simon** offering a deal. However, we must take immediate steps to protect the integrity of DHCF and our contracting process. Accordingly, I would like the following actions taken immediately:

- June 5th. Schedule a meeting in my office with Jennifer. You should be in attendance. At this meeting, I will inform her of the allegations and relieve her of all responsibilities associated with Health Care Reform, the participation on any teams formed to select vendors for any purpose, and forbid her from having contact with any vendors interested in doing business with DHCF;

**JA 866**

- June 5th. Following our meeting with Jennifer I would like you to contact Director Stokes and explain the issue, let her know that we are interviewing relevant parties, and inform her that we will be seeking her guidance once we complete our investigation of the facts;

- June 5th. Schedule a meeting with Bonnie Norton and Linda Elam in my office. At this meeting we will inform Bonnie that as Acting Director she is to begin reporting to Linda Elam immediately. By the close of business on June 5th, Bonnie should be instructed to contact all vendors on June 5th who have inquired about bidding on the exchange and inform them that effective immediately she is the point of contact for all questions and potential meetings with DHCF staff about the solicitation process for the exchange.

- Week of June 5th. I will schedule a meeting with the Vice President of CGI this week which you are to attend with me. The purpose of this meeting is to get all of the details on her conversation with Jennifer – context, tone, precise language.

- June 9th. Get on my calendar to review all the facts that we have acquired, develop a preliminary report on our findings, and schedule a meeting in the following week with Director Stokes.

- Week of June 12th. Meet with Director Stokes to discuss a final decision regarding Jennifer's role and future at DHCF.

    It goes without saying that this process should be conducted confidentially for the protection of both the agency and out of respect for Jennifer's potential innocence. I appreciate your assistance in this matter.

    Thanks
    WT

**JA 867**

| From: | Turnage, Wayne (DHCF) <wayne.turnage@dc.gov> |
|---|---|
| Sent: | Monday, June 11, 2012 3:27 PM |
| To: | Murphy, Christopher (EOM); Ribeiro, Pedro (EOM); Otero, BB (EOM) |
| Subject: | Corrections |

See Below

---

**From:** Turnage, Wayne (DHCF)
**Sent:** Sunday, June 03, 2012 12:49 AM
**To:** Byrd, Melisa (DHCF)
**Cc:** Otero, BB (EOM)
**Subject:** PERSONNEL ISSUE

The purpose of this email is to inform you of an emerging personnel issue and request your assistance in my investigation of same. Today I received a call from a Vice President of CGI informing me that she had been contacted, unsolicited, by Jennifer Campbell, our Chief Operating Officer. In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman, Darryl Wiggins, as a minority partner. When CGI's VP asked if I were aware of this, Jennifer reportedly told her that the request is coming from both me and her and that she was in charge of this process, not me. CGI's Vice President said that in her entire career she has never been approached that way by a government entity involved in a procurement. She said this was a very difficult and awkward situation and is understandably concerned about the potential ramifications.

Related to this, I was shown an email by a lobbyist for CGI. The email was from Darryl Wiggins to the CGI VP and he offered a scenario where he could work with CGI on a joint venture in a bid for the District's Exchange business. In the email he admits to being unqualified but stated that his share would be 51% and CGI's 49% and that as a District resident he has seen this work before.

I have also been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange work. Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in DHCF's contracting office that will ensure a successful bid if they of course partner with the right persons.

**JA 868**

DC Campbell 004614

As you might imagine, this is all very troubling and potentially very damaging to our efforts to implement a competitive RFP process for the insurance exchange that is above reproach. Before I make a final decision on Jennifer's future I need to interview CGI's Vice President and the head of Compass Consulting who was allegedly approached by a **Cedrick Simon** offering a deal. However, we must take immediate steps to protect the integrity of DHCF and our contracting process. Accordingly, I would like the following actions taken immediately:

- June 5th. Schedule a meeting in my office with Jennifer. You should be in attendance. At this meeting, I will inform her of the allegations and relieve her of all responsibilities associated with Health Care Reform, the participation on any teams formed to select vendors for any purpose, and forbid her from having contact with any vendors interested in doing business with DHCF;

- June 5th. Following our meeting with Jennifer I would like you to contact Director Stokes and explain the issue, let her know that we are interviewing relevant parties, and inform her that we will be seeking her guidance once we complete our investigation of the facts;

- June 5th. Schedule a meeting with Bonnie Norton and Linda Elam in my office. At this meeting we will inform Bonnie that as Acting Director she is to begin reporting to Linda Elam immediately. By the close of business on June 5th, Bonnie should be instructed to contact all vendors on June 5th who have inquired about bidding on the exchange and inform them that effective immediately she is the point of contact for all questions and potential meetings with DHCF staff about the solicitation process for the exchange.

- Week of June 5th. I will schedule a meeting with the Vice President of CGI this week which you are to attend with me. The purpose of this meeting is to get all of the details on her conversation with Jennifer – context, tone, precise language.

- June 9th. Get on my calendar to review all the facts that we have acquired, develop a preliminary report on our findings, and schedule a meeting in the following week with Director Stokes.

- Week of June 12th. Meet with Director Stokes to discuss a final decision regarding Jennifer's role and future at DHCF.

DC Campbell 004615

**JA 869**

It goes without saying that this process should be conducted confidentially for the protection of both the agency and out of respect for Jennifer's potential innocence. I appreciate your assistance in this matter.

Thanks
WT

DC Campbell 004616

**JA 870**

| From: | Jackson, Janene (EOM) <janene.jackson@dc.gov> |
|---|---|
| Sent: | Monday, June 11, 2012 7:59 AM |
| To: | Turnage, Wayne (DHCF) |
| Subject: | Re: Official Heads Up |

Definitely. Unfortunately, these amateurs are playing games they don't understand.


From: Turnage, Wayne (DHCF)
To: Jackson, Janene (EOM)
Sent: Mon Jun 11 07:50:30 2012
Subject: Re: Official Heads Up

All way out of my league.....


From: Jackson, Janene (EOM)
To: Turnage, Wayne (DHCF)
Sent: Mon Jun 11 07:49:08 2012
Subject: Re: Official Heads Up

That's all I needed to know. It was leaked to get at a CM who isn't Catania.


From: Turnage, Wayne (DHCF)
To: Jackson, Janene (EOM)
Sent: Mon Jun 11 07:47:30 2012
Subject: Re: Official Heads Up

Verified this morning. Said they were approached about the story.


From: Jackson, Janene (EOM)
To: Turnage, Wayne (DHCF)
Sent: Mon Jun 11 07:43:16 2012
Subject: Re: Official Heads Up

I gave it more thought and I know the source by the absence of comment.


From: Turnage, Wayne (DHCF)
To: Jackson, Janene (EOM)
Sent: Mon Jun 11 06:04:58 2012
Subject: Re: Official Heads Up

No he did not have the 3 emails. However my viscera tells me this was a Wilson Building special.


From: Jackson, Janene (EOM)
To: Turnage, Wayne (DHCF)



EXHIBIT # 1
JACKSON
6/11/14

**JA 871**

DC Campbell 004617

**Sent:** Mon Jun 11 06:03:01 2012
**Subject:** Re: Official Heads Up

Catania maybe?

**From:** Turnage, Wayne (DHCF)
**To:** Jackson, Janene (EOM)
**Sent:** Sun Jun 10 23:43:20 2012
**Subject:** Fw: Official Heads Up

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

**From:** Turnage, Wayne (DHCF)
**To:** Murphy, Christopher (EOM); Otero, BB (EOM); Stokes, Shawn (DCHR)
**Cc:** Byrd, Melisa (DHCF); Elam, Linda (DHCF); Nathan, Ganayswaran (DHCF)
**Sent:** Sun Jun 10 23:04:40 2012
**Subject:** Official Heads Up

All --
I received a call from Alan Suderman of the Washington City Paper tonight
around 10:00pm, informing me that he had 3 of the emails that I sent on the
Jennifer Campbell issue. My efforts to ascertain how these emails came into
his possession were, of course, not successful. He will run with this story at
10:00am on Monday. I did not go on record with any comments but
emphasized to him that these were allegations. Of course, he smartly asked
the next question of why I was proceeding with a dismissal based on
allegations. I told him that the work of Health Care Reform is some of the
most important in the District and we could not afford even a hint of wrong
doing.

He promised to call me on Monday with a broad outline of his story before he
ran with it. From what I could determine, he will pursue the Darryl Wiggins
angle in this story aggressively.

I have no idea how he got the emails as the distribution has been quite
limited. Looking for the proverbial silver lining, this shows that when a
problem was brought to our attention we acted decisively, choosing to error on
the side of protecting the integrity of the contracting process for this very
important project.

**JA 872**

DC Campbell 004618

WT

DC Campbell 004619

From: Byrd, Melisa (DHCF) [mailto:melisa.byrd@dc.gov]
Sent: Monday, June 04, 2012 9:26 AM
To: Massey, Herbert II (DHCF)
Cc: Turnage, Wayne (DHCF)
Subject: JCampbell Email

Herb -

Per our conversation, deactivate Jennifer Campbell's email, effective immediately.

If you have any questions, please let me know.

Thanks,
Melisa

Download DC311 and Start Reporting Today!
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

**From:** Turnage, Wayne (DHCF) [mailto:wayne.turnage@dc.gov]
**Sent:** Sunday, June 03, 2012 10:45 PM
**To:** Stokes, Shawn (DCHR)
**Cc:** Byrd, Melisa (DHCF)
**Subject:** Fw: PERSONNEL ISSUE
**Importance:** High

Director Stokes:

I have decided to put my COO on administrative leave until I complete an investigation of some pretty serious charges. The investigation will conclude this week and based on preliminary findings I will terminate her.

Can you ask Karla Kirby to come to our office and sit in on my COS' meeting with Jennifer in which she will be given a letter putting her on administrative leave. The meeting is Monday at 11:00am.

WT

**From:** Turnage, Wayne (DHCF)
**To:** Byrd, Melisa (DHCF)
**Cc:** Otero, BB (EOM)
**Sent:** Sun Jun 03 00:49:27 2012
**Subject:** PERSONNEL ISSUE

Melisa:

The purpose of this email is to inform you of an emerging personnel issue and request your assistance in my investigation of same. Today I received a call

**JA 874**

from a Vice President of CGI informing me that she had been contacted, unsolicited, by Jennifer Campbell, our Chief Operating Officer. In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman, Darryl Wiggins, as a minority partner. When CGI's VP asked if I were aware of this, Jennifer reportedly told her that the request is coming from both me and her and that she was in charge of this process, not me. CGI's Vice President said that in her entire career she has never been approached that way by a government entity involved in a procurement. She said this was a very difficult and awkward situation and is understandably concerned about the potential ramifications.

Related to this, I was shown an email by a lobbyist for CGI. The email was from Darryl Wiggins to the CGI VP and he offered a scenario where he could work with CGI on a joint venture in a bid for the District's Exchange business. In the email he admits to being unqualified but stated that his share would be 51% and CGI's 49% and that as a District resident he has seen this work before.

I have also been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange work. Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in DHCF's contracting office that will ensure a successful bid if they of course partner with the right persons.

As you might imagine, this is all very troubling and potentially very damaging to our efforts to implement a competitive RFP process for the insurance exchange that is above reproach. Before I make a final decision on Jennifer's future I need to interview CGI's Vice President and the head of Compass Consulting who was allegedly approached by a Derek Adams offering a deal. However, we must take immediate steps to protect the integrity of DHCF and our contracting process. Accordingly, I would like the following actions taken immediately:

- June 5th. Schedule a meeting in my office with Jennifer. You should be in attendance. At this meeting, I will inform her of the allegations and relieve her of all responsibilities associated with Health Care Reform, the participation on any teams formed to select vendors for any purpose, and forbid her from having contact with any vendors interested in doing business with DHCF;

- June 5th. Following our meeting with Jennifer I would like you to contact Director Stokes and explain the issue, let her know that we are interviewing relevant parties, and inform her that we will be seeking her guidance once we complete our investigation of the facts;

- June 5th. Schedule a meeting with Bonnie Norton and Linda Elam in my office. At this meeting we will inform Bonnie that as Acting Director she is to begin reporting to Linda Elam immediately. By the close of business on June 5th, Bonnie should be instructed to contact all vendors on June 5th who have inquired about bidding on the exchange and inform them that effective immediately she is the point of contact for all questions and potential meetings with DHCF staff about the solicitation process for the exchange.

- Week of June 5th. I will schedule a meeting with the Vice President of CGI this week which you are to attend with me. The purpose of this meeting is to get all of the details on her conversation with Jennifer – context, tone, precise language.

- June 9th. Get on my calendar to review all the facts that we have acquired, develop a preliminary report on our findings, and schedule a meeting in the following week with Director Stokes.

- Week of June 12th. Meet with Director Stokes to discuss a final decision regarding Jennifer's role and future at DHCF.

It goes without saying that this process should be conducted confidentially for the protection of both the agency and out of respect for Jennifer's potential innocence. I appreciate your assistance in this matter.

Thanks
WT

**JA 876**

**From:** Cedric Simon [mailto:csimon91@comcast.net]
**Sent:** Wednesday, March 14, 2012 8:45 PM
**To:** Carrie Brooks Brown; Anthony Onyewuchi
**Subject:** Fwd: Fw:


Begin forwarded message:

**From:**
**Date:** March 14, 2012 4:58:11 PM EDT
**To:** Cedric Simon <csimon91@comcast.net>, Cedric Simon <Cedric.Simon@cbbcs.com>
**Subject: Fw:**
**Reply-To:** "J. B. Campbell-Fitzgerald" <jbcampbell_22@yahoo.com>

Answers will be due by Monday morning.

Questions for Compass:

1.  Please review the required services for financial management and assistance to consumers and small businesses and resubmit your technical approach and methodology for these services. Your proposal appeared to include the provision of certain financial management and consumer assistance activities where what the District needs actually involves the creation of a financial management plan (how should the HIX Authority be managed financially – accounting tools, development of operational budget, staffing etc) and a consumer assistance assessment, call center development plan, call center report creation, and workplan for call center development.
2.  Please provide the project evaluation forms as requested in section L.2.7.2 (e).
3.  Please provide information on any subcontractors that Compass will be using to complete this work, including a description of the services that will be completed of worked on by the subcontractors.
4.  Please provide additional information on District agencies that Compass has completed work for in the past, especially any health and human services agencies.
5.  Please provide additional information on the role of each of the project managers in the project organization chart. Have any of the staff that will fill these positions been identified. How many staff does Compass plan to dedicate to the project? Speak to how accessible the project team will be, the frequency of meetings, on-site visibility, etc.

Correct mis-spelled words, re-format the table of contents, place in PDF.


**Join Mayor Gray's One City • One Hire - 10,000 Jobs Campaign**
"Putting District Residents Back to Work – One Hire at a Time"
Learn more at http://onecityonehire.org

**JA 877**

**From:** Cedric Simon [mailto:csimon91@comcast.net]
**Sent:** Wednesday, March 14, 2012 8:45 PM
**To:** Carrie Brooks Brown; Anthony Onyewuchi
**Subject:** Fwd:

Begin forwarded message:

### L.2.7.2   Technical Expertise and Capacity

The information requested in this section will be used to evaluate the Offeror's technical expertise and capacity to perform services related to planning for a health insurance exchange. The Offeror shall include at a minimum the following:

a.  The Offeror shall provide a detailed description of the Offeror's technical expertise and its prior or current experience in assisting a States with the planning and implementation of a health insurance exchange.
b.  The Offeror shall provide information on expertise in each of the following areas:
1.  Program Integration
2.  Financial Management
3.  Program Integrity
4.  Health Insurance Market Reforms
5.  Assistance to Individual and Small Business
6.  Business Operations/Exchange Functions
C.  The Offeror shall provide a draft of its Detailed Project Management Plan as described in Section C.4.1.1.
D.  The Offeror shall provide a list of three contracts or subcontracts the Offeror has performed similar in size and scope as the required services described in Section C.4 within the past five (5) years. The Offeror's list shall include the following information for each contract or subcontract:
1.  Contact Title;
2.  Contract number;
3.  Contract duration (or Period);
4.  Total contract value;
5.  Description of work performed;
6.  Contact Person name, phone, and e-mail address
e.  The Offeror shall submit a completed Past Performance Evaluation Forms provided as Attachment J.9 from the list of contracts identified in response to the item above.

Jennifer

**Health Benefit Exchange Non-IT Services**
**DHCF-2012-F-0005**
**Technical Evaluation Panel Report**
**March 27, 2012**

The Technical Evaluation Panel consists of the following members: Bonnie Norton (chair), Jennifer Campbell, Acie Slade, Rekha Ayalur, and Brendan Rose. Following the evaluation team kick-off meeting on Tuesday, March 13, 2012, the evaluation panel individually evaluated the proposals, and provided these evaluations to Jackie Alpert, Contract Specialist at DHCF, by 1pm on March 14, 2012. After meeting to discuss these individual evaluations, the panel provided to Ms. Alpert an initial report on March 15, 2012.

On Thursday, March 22, 2012, the vendors provided the Office of Contracts and Procurement with a Best and Final Offer (BAFO). The BAFO from each of the vendors included responses to questions that were posed by the technical evaluation team during the initial panel meeting. Panel members provided updated individual evaluations to Ms. Alpert on March 27, 2012, and met that same day to discuss these score and come to a consensus recommendation. The updated scores and consensus recommendation are reflected below.

The following vendors responded to the RFQ:

- Compass Solutions
- Navigant Consulting

## PROCESS OVERVIEW

**Independent Review**
In accordance with the process outlined by Office of Contracting and Procurement, each panel member began the process of independently evaluating and scoring each proposal submission. The solicitation included the following evaluation criteria:

(1) Technical Approach and Capability – 45 Points
(2) Experience and Past Performance – 40 Points

The panel's final individual review results are summarized below:

| | Approach and Methodology | | Expertise and Capacity | |
|---|---|---|---|---|
| | Compass | Navigant | Compass | Navigant |
| Panel Member 1 (AS) | 2 | 4 | 2 | 4 |
| Panel Member 2 (BN) | 3 | 4 | 3 | 3 |
| Panel Member 3 (BR) | 3 | 3 | 2 | 3 |
| Panel Member 4 (RA) | 3 | 2 | 3 | 3 |
| Panel Member 5 (JC) | 4 | 1 | 5 | 2 |

DHCF-2012-F-0005 TEP

**JA 879**

DC Campbell 006055

## Consensus Review

Following submission of the updated independent scores to the Contracting Specialist, the Evaluation Panel met to discuss their differences and to reach a consensus on the ranking of each proposal. The objective of the consensus meeting was to arrive at a balanced conclusion that reflected the different viewpoints and contributions of the panel members. At the end of the meeting, preliminary scores for each of the proposals were reached.

The panel's consensus review results are summarized below:

| | Approach and Methodology | | Expertise and Capacity | |
|---|---|---|---|---|
| | Compass | Navigant | Compass | Navigant |
| Panel Final Score | 4 (36) | 3 (27) | 3 (24) | 3 (24) |

| | Compass | Navigant |
|---|---|---|
| Approach and Methodology | 36 | 27 |
| Expertise and Capacity | 24 | 24 |
| **Total Final Score** | **60** | **51** |

## SUMMARY OF STRENTHS AND WEAKNESSES

**Vendor 1: Compass Solutions**

| Strengths | Weaknesses |
|---|---|
| **Evaluation Factor 1: Technical Approach and Methodology** | **Evaluation Factor 1: Technical Approach and Methodology** |
| Demonstrated an understanding of the majority of required services. | In some places, only high-level information was provided on how each of the tasks will be completed. |
| Provided a timeline for completing all project tasks within the required schedule. | The proposal repeated RFQ language in several places instead of using the vendor's own words and approach. |
| Provided an organizational chart that detailed multiple staff dedicated to the project. | |
| Location in the District allows for timely access to District staff, meetings, and stakeholders for completing project tasks. | |

DHCF-2012-F-0005 TEP

## JA 880

| | |
|---|---|
| **Evaluation Factor 2: Technical Expertise and Capacity** | **Evaluation Factor 2: Technical Expertise and Capacity** |
| Previous work for multiple District agencies provides a good understanding of the District landscape and policies.<br><br>Staff resumes reflect a diverse set of experience that covers almost all of the services required by the solicitation. | The vendor and subcontractors have very little experience working with states on planning or implementation of health insurance exchanges |

Vendor 2: Navigant Consulting

| Strengths | Weaknesses |
|---|---|
| **Evaluation Factor 1: Technical Approach and Methodology** | **Evaluation Factor 1: Technical Approach and Methodology** |
| Demonstrated a good understanding of all required services.<br><br>Provided information on how to approach each of the required tasks.<br><br>Provided a timeline for completing all project tasks within the required schedule.<br><br>Proposes the use of existing models and previous work that will potentially shorten the time required to complete work. | Proposed approach and methodology not necessarily specific to the District, but boilerplate language from other states.<br><br>Some questions and processes proposed already answered or completed.<br><br>Detailed approach to project staffing not provided. |
| **Evaluation Factor 2: Technical Expertise and Capacity** | **Evaluation Factor 2: Technical Expertise and Capacity** |
| Prime and subcontracting agencies and staff have extensive experience completing the types of services required in the solicitation.<br><br>Demonstrates knowledge of health insurance exchanges. | Most of the project staff would not be located in the District, which would make access very difficult. |

## EVALUATION PANEL RECOMMENDATION

The Evaluation Panel recommends that an award be made to Compass Solutions.

DHCF-2012-F-0005 TEP

## JA 881

DC Campbell 006057

**Exchange Non-IT Services**
**DHCF-2012-F-0005**
**Technical Evaluation Panel Report**
**March 27, 2012**

Below you will find the signatures of the evaluation panel which signify their agreement to the information contained in the report

_____
Bonnie Norton, Chairperson
Project Manager, DHCF

3/27/12
Date

_____
Jennifer Campbell
HCRIA Director, DHCF

3/27/12
Date

_____
Brendan Rose
Health Care Policy Analyst, DISB

3/27/12
Date

_____
Acie Slade
IT Project Manager, DHCF

3/27/12
Date

_____
Rekha Ayalur
Project Manager, DHCF

3/27/12
Date

DHCF-2012-F-0005 TEP

**JA 882**

DC Campbell 006058

**From:** Turnage, Wayne (DHCF) <wayne.turnage@dc.gov>
**Sent:** Saturday, June 02, 2012 11:57 AM
**To:** Byrd, Melisa (DHCF)
**Subject:** CGI Call

**Categories:** Red Category

CGI just called me. Very disturbing charge against a staff member.  We will need to investigate and act accordingly.

Download DC311 and Start Reporting Today!
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

JA 883

DC Campbell 004675

| | |
|---|---|
| **From:** | Murphy, Christopher (EOM) <christopher.murphy@dc.gov> |
| **Sent:** | Sunday, June 03, 2012 2:14 PM |
| **To:** | Otero, BB (EOM) |
| **Subject:** | Re: PERSONNEL ISSUE |

Thank you. Indeed troubling. Sounds like Wayne is handling this perfectly. Please keep me posted.


**From**: Otero, BB (EOM)
**To**: Murphy, Christopher (EOM)
**Sent**: Sun Jun 03 13:35:49 2012
**Subject**: Fw: PERSONNEL ISSUE

Very serious and troubling. Call me so I can fill you in


**From**: Turnage, Wayne (DHCF)
**To**: Byrd, Melisa (DHCF)
**Cc**: Otero, BB (EOM)
**Sent**: Sun Jun 03 00:49:27 2012
**Subject**: PERSONNEL ISSUE

Melisa:

The purpose of this email is to inform you of an emerging personnel issue and request your assistance in my investigation of same. Today I received a call from a Vice President of CGI informing me that she had been contacted, unsolicited, by Jennifer Campbell, our Chief Operating Officer. In this telephone conversation, Jennifer reportedly explained to her that it was in CGI's interest to take a look at a gentleman, Darryl Wiggins, as a minority partner. When CGI's VP asked if I were aware of this, Jennifer reportedly told her that the request is coming from both me and her and that she was in charge of this process, not me. CGI's Vice President said that in her entire career she has never been approached that way by a government entity involved in a procurement. She said this was a very difficult and awkward situation and is understandably concerned about the potential ramifications.

Related to this, I was shown an email by a lobbyist for CGI. The email was from Darryl Wiggins to the CGI VP and he offered a scenario where he could work with CGI on a joint venture in a bid for the District's Exchange business. In the email he admits to being unqualified but stated that his share would be 51% and CGI's 49% and that as a District resident he has seen this work before.

**JA 884**

DC Campbell 004650

I have also been told that it is widely known that Jennifer Campbell has been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange work. Moreover, there are allegedly persons shopping themselves to minority business owners stating that they have contacts in DHCF's contracting office that will ensure a successful bid if they of course partner with the right persons.

As you might imagine, this is all very troubling and potentially very damaging to our efforts to implement a competitive RFP process for the insurance exchange that is above reproach. Before I make a final decision on Jennifer's future I need to interview CGI's Vice President and the head of Compass Consulting who was allegedly approached by a Derek Adams offering a deal. However, we must take immediate steps to protect the integrity of DHCF and our contracting process. Accordingly, I would like the following actions taken immediately:

- June 5th. Schedule a meeting in my office with Jennifer. You should be in attendance. At this meeting, I will inform her of the allegations and relieve her of all responsibilities associated with Health Care Reform, the participation on any teams formed to select vendors for any purpose, and forbid her from having contact with any vendors interested in doing business with DHCF;

- June 5th. Following our meeting with Jennifer I would like you to contact Director Stokes and explain the issue, let her know that we are interviewing relevant parties, and inform her that we will be seeking her guidance once we complete our investigation of the facts;

- June 5th. Schedule a meeting with Bonnie Norton and Linda Elam in my office. At this meeting we will inform Bonnie that as Acting Director she is to begin reporting to Linda Elam immediately. By the close of business on June 5th, Bonnie should be instructed to contact all vendors on June 5th who have inquired about bidding on the exchange and inform them that effective immediately she is the point of contact for all questions and potential meetings with DHCF staff about the solicitation process for the exchange.

- Week of June 5th. I will schedule a meeting with the Vice President of CGI this week which you are to attend with me. The purpose of this meeting is to get all of the details on her conversation with Jennifer – context, tone, precise language.

**JA 885**

DC Campbell 004651

- June 9th. Get on my calendar to review all the facts that we have acquired, develop a preliminary report on our findings, and schedule a meeting in the following week with Director Stokes.

- Week of June 12th. Meet with Director Stokes to discuss a final decision regarding Jennifer's role and future at DHCF.

It goes without saying that this process should be conducted confidentially for the protection of both the agency and out of respect for Jennifer's potential innocence. I appreciate your assistance in this matter.

Thanks
WT

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

**JA 886**

DC Campbell 004652

| | |
|---|---|
| **From:** | Murphy, Christopher (EOM) <christopher.murphy@dc.gov> |
| **Sent:** | Wednesday, June 06, 2012 9:51 AM |
| **To:** | Turnage, Wayne (DHCF); Otero, BB (EOM); Stokes, Shawn (DCHR) |
| **Subject:** | RE: STATUS OF PERSONNEL ISSUE |

Also, when will Ms. Campbell receive her termination notice and will it be effective immediately?

**From:** Turnage, Wayne (DHCF)
**Sent:** Wednesday, June 06, 2012 1:22 AM
**To:** Murphy, Christopher (EOM); Otero, BB (EOM); Stokes, Shawn (DCHR)
**Subject:** STATUS OF PERSONNEL ISSUE

All -

I received an email from Darryl Wiggins requesting a meeting and in came in Tuesday evening. Mr. Wiggins was one of the individuals who, according to CGI, they were directed by Jennifer Campbell to develop a partnership to pursue the Exchange contract.

Mr. Wiggins opened the meeting by explaining that all of his business opportunities were drying up and he wanted to know what was going on. He was told that "Jennifer had been let go", he felt his reputation was under attack, and stated that he had done nothing wrong.

I explained to Mr. Wiggins that we had reason to believe that Jennifer had directed certain contractors to steer business towards some minority firms and away from others. I told him that I was in the process of contacting all of our contractors to let them know that if they had been directed by DHCF to partner with or hire anyone, they should ignore that direction. If they had already engaged an employee forced upon them, they should feel free to fire them without fear of retribution.

He immediately complained that CGI had contacted him but they had not been coerced. He said the tension in his relationship with CGI was due to the fact that he was asking for a joint venture with a majority share. He argued the CGI was pushing back and decided to use this tactic to get him out of the process. He said he had emails which illustrated CGI was considering engaging him to bid on the Exchange contract. I informed him that the emails only show they were talking; they do not disprove that the talks were not mandated by Jennifer Campbell.

I reiterated that I never told any of our contractors to avoid doing business with any person in particular and thus found it odd that the day after I gave assurances to CGI that we were not pushing any minority vendors, Mr. Wiggins received a call

DC Campbell 004625

from the company terminating the relationship. I asked him why would a company go through the trouble of falsely accusing a District employee simply exit discussions about a possible business partnership when all they had to do was say no thanks and show him the door. He said that CGI realized that he had put together a formidable team and that would have no basis for abandoning the idea of a partnership so they needed to manufacture a reason.

About three-quarters of the way through the meeting I asked him if he knew Jennifer Campbell and when did they meet. He told me he met her for the 1st time when his company presented a demo that I attended with Nathan and Jennifer for about six weeks ago.

However, a little later in the meeting I asked him if he knew Sedrick Simon – the individual with whom Jennifer Campbell is alleged to have a relationship and who one contractor was ordered to hire. The question seemed to catch him off guard. He paused and said yes he knew Sedrick. I then asked him what was the nature of the relationship between Jennifer and Sedrick and he looked away and said it was a "business relationship". (Of course I wondered how he knew about the type of relationship they had if he did not know Jennifer.)

At one point in the meeting my COS put her blackberry on the table and touched the toggle button and he angrily asked her if she was recording the conversation.

I closed the meeting by telling Mr. Wiggins that it was my job to protect the integrity of the contracting process for one of the District's most significant procurements and that because of that we took the charges against Jennifer quite serious. I assured him that I would not demand that contractors not work with him as DHCF will not be making any recommendations to contractors.

**Next Steps**

I will meet with Jennifer Campbell on Thursday. In the interim, we will hand deliver a letter to the OIG on Wednesday, officially referring the case to that agency. I was informed to keep the letter very general.

I have also informed Director Stokes that I would like this to be a non-cause termination. Because Jennifer Campbell is at-will, a non-cause termination is the least complicated and if effectively forecloses any legal options she would have to challenge the dismissal. As soon as I get clearance from Director Stokes we will process Jennifer's letter of termination.

**JA 888**

DC Campbell 004626

**Download DC311 and Start Reporting Today!**
With the new DC311 free smartphone app, reporting an issue to 311 is now easier than ever.
Currently available in the iTunes App Store and in the Android Marketplace.
Learn more at www.ouc.dc.gov

DC Campbell 004627

**Chronology of Events Related To Compass Solutions and Allegations Against Jennifer Campbell**

Jan. 28th      Carrie Brooks-Brown (Carrie) of CBBCS first approached Anthony Onyewuchi (Anthony) of COMPASS Solutions asking to use the company's GSA schedule in her pursuit of a "Federal Opportunity with CMS" that required all respondents to be on the Schedule. [Compass and Carrie's company, CBBCS, partnered 4-5 years ago on a project in the District].

      Anthony informed Carrie that it did not consider "pass through" opportunities but sent an email to GSA directly inquiring about the propriety of COMPASS allowing CBBCS to use its Schedule to serve as a prime contractor on a solicitation

Jan 31st      GSA responded saying that Compass had to be the prime contractor in order for the responding team to satisfy the GSA schedule requirement – Compass could not be a sub-contractor.

      Carrie told Compass that Cedric Simon (Simon) was responsible for "mining the opportunity" but did not disclose more specific information about the source or scope of the opportunity. Anthony knew that Simon and Carrie had a previous working relationship where, on at least one occasion, they successfully pursued federal work. Carrie had indicated to Anthony that Simon was an independent contractor who works for CBBCS, complete with company email and contact information.

      On that basis, Anthony provided CBBCS its GSA schedule to ensure that Compass qualified to receive the solicitation on behalf of the yet undetermined team.

Feb 7th      Carrie sent Anthony a ***draft copy*** of solicitation for the Level I portion of the Health Insurance Exchange implementation from the Department of Health Care Finance (DHCF). COMPASS decided not to act on the draft information and let Carrie know that since the client was DHCF as opposed the Federal Government as she had indicated, there were several reasons why Compass could not participate.

      Anthony explained that his reading of the legislative guidelines for the establishment of state and regional insurance exchanges prohibits contractors that worked in the planning phase of HIX (Level I) from participating in the implementation phase of HIX (Level II). Anthony also informed Carrie that he was working with another team to pursue Level II. Carrie incorrectly inferred that COMPASS was going to be partnering with Navigant. COMPASS allowed that assumption to hold.

**JA 890**

DC Campbell 006835

Feb 7-22        Carrie continued to try to persuade COMPASS to agree to work on the
                opportunity. Anthony indicated that he wanted to wait for the RFP to come out to
                ensure there were no conflicts before he made a decision to participate.

Feb 22nd        Carrie inquired if COMPASS was "in or out", expressing concern that the RFP
                would be officially released soon.

                Simon followed with an email to Compass (see below):

On Feb 22, 2012, at 7:00 PM, Cedric Simon <csimon91@verizon.net> wrote:

                This [the draft RFP] was released this way in error and the contact has assured
                me of that. We have additional information that makes me confident in our
                ability to win this regardless of who submits. I've discussed Compass' agreement
                with Navigant and the impact on this project with my source and they can find
                no reason to move away from what we have agreed to as the larger release has
                no connection with this effort. Compass would be prime here and sub on that
                one. I hope Compass is still in the deal as it is easier for us CBBCS and myself.
                However, if they aren't going to stay in it with us, I need to know ASAP to inform
                those who need to know and align properly quickly. Contact has begun to send
                me resumes for the project, I will forward the first ones shortly
                >
                > Cedric

                *[Note: At this time, Jennifer Campbell was the Administrator for Health Care
                Reform at DHCF, was responsible for developing the RFP for the project, and
                assembling the team to evaluate bids for the Level I proposals].*

Feb 23rd        Carrie assured COMPASS that it could pursue Level I and would not be
                conflicted.

                Carrie notified COMPASS that the RFP has been released

Feb 24th        The team came to the offices of COMPASS

March 8th        COMPASS submitted response to RFP

March 12th        Carrie responded and requested a meeting with Anthony at the offices of
                COMPASS to discuss the structure of the team and distribution of work for
                Monday March 12th

March 13th        Carrie informed COMPASS that DHCF was going to award the Level I contract
                on Friday, "as long as we have a financial agreement in place".

**JA 891**

DC Campbell 006836

April 3rd   Carrie and Simon made another request to change the teaming arrangement and request more money for "business development". COMPASS rejected this request. Acrimony develops between COMPASS, Carrie and Simon as they try to force Compass to agree to pay more. Simon responds by threatening escalation to the "client".

April 10th   Anthony attends kick-off meeting at DHCF and Jennifer Campbell is acting both aggressive and combative **[Note: DHCF staff confirm this]**. Told vendors she wanted to be notified in advance of any staffing changes. After the meeting, Anthony alleged that Jennifer approached COMPASS with the company's organizational chart and tells him who she wants to see in what jobs and specifically points out Simon on the chart. "I do not want any changes on this page"

April 19th   Carrie informs Anthony that DHCF wants Simon to be a project manager. Anthony rejects this idea stating that "Simon cannot manage himself out of a wet paper bag". They eventually settle on the originally discussed title of "project liaison".

    COMPASS suspecting improper behavior on the part of Simon and possibly Carrie, insists on non-collusion and non-kick-back clauses in the contracts. Fresh round of acrimony ensues but Compass holds firm. Carrie and Simon want the language removed. COMPASS refuses. More stalemate and additional talk of escalation to the "client". Carrie and Simon eventually back down and agree to the clause.

April 26th   Simon wants to be paid $125/hr for 2000 ($250,000) even though the project scope is less than 700 hours. Compass refuses. "All hell breaks loose". Simon threatens to holdup delivery/acceptance of work product. Anthony believes he can do it.

April 26th   Anthony's suspicion grows on "outside kick-back". Anthony confronts Carrie and accuses her of "improper back-deal". Carrie is furious, denies it and threatens legal action. – See email below:

**From:** Carrie Brooks-Brown [mailto:carrie.brooks.brown@cbbcs.com]
**Sent:** Thursday, April 26, 2012 10:55 PM
**To:** 'Cedric Simon'; Anthony Onyewuchi
**Cc:** 'Nancy Nowak Utech'
**Subject:** RE: cost listing

**Let me state for the record one more time there has been absolutely no I repeat no outside agreements.** I do not do business in that manner. I have spoken to my attorney regarding these false allegations and I will not hesitate to take further legal actions if any more accusations of this nature are brought to my attention. I have done business with Compass before and there is no basis for these comments. In the 10 years CBBCS has been doing business I have always been ethical in each and every one of my business dealings. My attorney awaits a call to discuss the attach with your

**JA 892**

DC Campbell 006837

attorney. I think it imperative that we focus on completing this project and moving forward with both our companies reputations intact.

Carrie Brooks-Brown
Managing Partner, CBBCS
877-592-2227 ext. 101

May 25 (est)   Carrie contacts Anthony to let him know that a previous unrelated contract awarded to Orion and Compass has been "stalled". Carrie suggests that Anthony talk to Simon. Anthony suspects a shakedown and seeks outside counsel.

May 31   Anthony talks with Simon who offers to help but indicates compensation is required. Anthony explains that the contract has already been awarded on its merit and is almost at cost therefore no compensation for help was forthcoming.

Simon asks for and receives a copy of the Orion/Compass task order proposal and indicates that "he will see what he can do".

June 1ˢᵗ   Jennifer Campbell sends the following email to a DHCF employee (see last paragraph):

---

**From:** Campbell, Jennifer (DHCF)
**Sent:** Saturday, June 02, 2012 8:00 PM
**To:** Woodson, Cleveland (DHCF)
**Subject:** Re: Marketing Plan for HIE: Follow UP

Hi Cleveland

As I think through our needs I've sorted the following as the delineation of tasks:

DHCF
- create web site similar to healthreform.dc.gov that advertises DIRECT; on that website should be a link to sign up for DIRECT; the link will be to a website created by Compass for enrollment (see Daren and OCTO)
-create tiered payment system (free for first 50, $15 for next 100, $20 for 101+)
- determine method of collection (see budget and accounting)


COMPASS
- create sign up website to collect data
- create marketing plan (mostly cold-calling front offices) for the following groups:
  - physicians
  - pharmacies
  - hospitals
  - labs
- verify identify of non-Medicaid providers via notarized statement
- enroll at least 300 providers by July 31st

Orion should use a portion of their current contract to pay Compass, however, if additional funding is required we can go up to an additional $210K.

En is our call?

**JA 893**

DC Campbell 006838

Jennifer

------------------
Dr. Jennifer B. Campbell
Chief Operating Officer
Department of Health Care Finance

Late May or June    Anthony is fed up and calls the former COO of DHCF, Brenda Emanuel to
try and get a sense of what was going on.  After hearing his complaints,
Brenda urged him to reach out to the Director of DHCF because she was
sure that the Director would not condone this behavior.

June 2nd    Anthony reaches out to the Director through a mutually known contact and
requests a meeting

June 3rd    First meeting held with the Director of DHCF.  Anthony informed Director
Turnage of the aforementioned details regarding his experiences with Carrie and
Simon.  Also, Anthony stated that it was widely known that Jennifer Campbell
had been meeting with minority vendors in an effort to put together a team that
would submit a bid as a prime for the insurance exchange work.  He also stated
that COMPASS and CGI were considering a partnership until CGI called and
informed him that they would not be partnering with CGI per Jennifer's
instructions because Compass was conflicted out of Level II.

Director concluded the meeting by telling the owner that if he had hired any
employees at the suggestion of DHCF he should feel free to fire them without fear
of retribution.  The next day Simon is fired.

June 6th    Director Turnage conducted more interviews with DHCF contracting staff
regarding Jennifer Campbell activities as COO.  One staff person provided me
with a copy of an email that Jennifer sent to him last Saturday (June 2nd),
essentially requesting that the contract for COMPASS be increased by $217,000
to cover services that had been stripped out of the contract.  This email request
completely circumvented the process for requesting contract payment increases –
all such requests are supposed to come from program staff with a written
justification which must be approved by the COO and then submitted to the
agency's financial officer.

Director Turnage spoke with another staff person by phone who informed me that
some of Jennifer's staff raised questions about the vendor selection process for the
Level I grant that was awarded to COMPASS.  According to this staff person,
Navigant had a comparable proposal at a significant lower cost but the panel felt
pushed by Jennifer to award the grant to COMPASS.

June 7th.    Director Turnage spoke with one of the members of the selection team, Bonnie
Norton, regarding the evaluation referenced above.  She confirmed that most
members of the panel initially believed that Navigant's proposal was superior but

**JA 894**

DC Campbell 006839

were persuaded by Jennifer to select COMPASS based in part on her assertions that COMPASS would be able to provide a better product since they were a local company and would be dedicating the appropriate level of resources.

**Chronology of Events Related to CGI's Allegations Against Jennifer Campbell**

June 2nd.     Director received a call from a Vice President of CGI informing him that she had been contacted, unsolicited, by Jennifer Campbell who reportedly explained to her that it was in CGI's interest to take a look Darryl Wiggins as a minority partner for the Level II grant for the insurance exchange. When CGI's VP asked if I were aware of this, Jennifer reportedly told her that the request is coming from both me and her but that she was in charge of this process, not me. CGI's Vice President said that in her entire career she has never been approached that way by a government entity involved in procurement. She said this was a very difficult and awkward situation and is understandably concerned about the potential ramifications. Related to this, Director Turnage was shown an email by the person who connected him to CGI. The email was from Darryl Wiggins to the CGI VP and he offered a scenario where he could work with CGI on a joint venture in a bid for the District's Exchange business. In the email he admits to being unqualified for the particular project but stated that his share would be 51% and CGI's 49% and that as a District resident he has seen this work before.

June 4th.     Director Turnage and his COS met in-person with the Vice President CGI and asked her to recount the nature of her phone call with Jennifer Campbell. She walked through the call – when it occurred and what was said. She repeated her earlier charge – that Jennifer asked her who CGI was considering as a minority partner. When she told them COMPASS, Jennifer allegedly told her that COMPASS had too much business in the District, was conflicted out of future work on the exchange and, as a result, she needed to look at Darryl Wiggins' company. The Director concluded the meeting by informing the Vice President that if they had engaged in any partnership discussions at the suggestion of DHCF they were free to terminate those discussions without fear of retribution. He also apologized to CGI for having to endure this behavior from a DHCF staff member and he thanked them for bringing this matter to the agency's attention.

June 5th.     After the meeting with CGI, they took immediate action against Mr. Wiggins, terminating any discussion of a partnership and closing off future contact.

June 7th     Mr. Wiggins requested and received a meeting with Director Turnage. The Director's COS was in attendance. In this meeting Mr. Wiggins defended himself and indicated he barely knew Jennifer. He acknowledged knowing Simon and when asked whether Simon knew Jennifer Campbell, he said yes and described their association as a "business relationship".

June 8th     Simon called Director Turnage. The Director placed the call on speaker phone and his COS sat in to listen to the call. Wanted to know what was going on and

**JA 895**

DC Campbell 006840

defended himself against any and all allegations of wrong doing.  Simon informed the Director to expect a letter from his attorney.

**JA 896**

DC Campbell 006841

## CERTIFICATE OF SERVICE

I certify that on May 8, 2017, electronic copies of the Joint Appendix were

served through the Court's ECF system, to:

Alan Lescht, Esq.
1050 17th Street, NW, Suite 400
Washington, D.C. 20036

/s/ Holly M. Johnson
HOLLY M. JOHNSON